JINA L. CHOI (NY Bar No. 2699718)
ERIN E. SCHNEIDER (Cal. Bar No. 216114)
SHEILA E. O'CALLAGHAN (Cal. Bar No. 131032)
  ocallaghans@sec.gov
WADE M. RHYNE (Cal. Bar No. 216799)
  rhynew@sec.gov
BERNARD B. SMYTH (Cal. Bar No. 217741)
  smythb@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, California  94104
Telephone:  (415) 705-2500
Facsimile:  (415) 705-2501

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. _____ |
| Plaintiff, | |
| vs. | COMPLAINT |
| AEQUITAS MANAGEMENT, LLC; AEQUITAS HOLDINGS, LLC; AEQUITAS COMMERCIAL FINANCE, LLC; AEQUITAS CAPITAL MANAGEMENT, INC.; AEQUITAS INVESTMENT MANAGEMENT, LLC; ROBERT J. JESENIK; BRIAN A. OLIVER; and N. SCOTT GILLIS, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("Commission") alleges:

## SUMMARY OF THE ACTION

1.       This litigation arises from a scheme to defraud and misuse client assets in connection with investments offered through the Aequitas group of companies, founded by Robert J. Jesenik and based in Lake Oswego, Oregon.  Jesenik controls the entire Aequitas enterprise, the ultimate parent of which is Aequitas Management, LLC ("Aequitas Management").  Since 2014, Jesenik, together with his longtime chief fundraiser, Brian A. Oliver, has defrauded investors into thinking that they were investing in a portfolio of trade receivables in the healthcare, education, transportation, or consumer credit sectors.  In reality, Jesenik, Oliver, and—after he joined Aequitas in early 2015, former Chief Financial Officer and Chief Operating Officer, N. Scott Gillis—used the vast majority of investor funds to repay prior investors and to pay the operating expenses of the Aequitas enterprise, which far exceeded the fees Aequitas's affiliated entities told investors they would charge for managing the investments.

2.       Jesenik and Oliver raised funds primarily by issuing promissory notes through Aequitas Commercial Finance, LLC ("ACF"), an entity wholly owned by Aequitas Holdings, LLC ("Aequitas Holdings"), and through promissory notes and other interests issued by a series of Aequitas-affiliated investment funds (the "Aequitas Funds").  The manager of ACF is Aequitas Capital Management, Inc. ("ACM") and the manager of the Aequitas Funds is Aequitas Investment Management, LLC ("AIM").  Aequitas Management, Aequitas Holdings, ACF, ACM, and AIM are referred to collectively as the "Entity Defendants."

3.       The ACF notes were typically offered on one to four year terms with interest rates generally between 5 and 15 percent.  According to its financial records, ACF appears to have been profitable from 2011 to 2013.  However, in May 2014, Corinthian Colleges ("Corinthian"), a for-profit education provider, whose receivables made up 75% of the receivables owned by ACF, defaulted on its obligations to ACF, exacerbating the significant cash flow shortages of ACF and its parent, Aequitas Holdings.  By at least July 2014, Jesenik and Oliver knew that redemptions and interest payments to prior investors were being paid primarily from new

investor money in a Ponzi-like fashion, and that very little investor money was being used to purchase trade receivables. The cash flow shortages at ACF and Aequitas Holdings continued with increased severity through 2015.

4.      Rather than change the business to reduce expenses or increase operating income, Jesenik and Oliver decided to cover the cash shortfall – and continue paying the growing expenses of the enterprise, including their own lucrative salaries, a private jet and pilots, and dinners and golf outings for prospective investors – by raising funds from new investors and convincing prior investors to reinvest. Between January 2014 and January 2016, they raised approximately $350 million through ACF and the Aequitas Funds.

5.      However, they never disclosed to investors that: (1) ACF and Aequitas Holdings were effectively insolvent; (2) the vast majority of investor funds was not used to purchase trade receivables but instead to pay redemptions and interest to prior investors and to pay for operating expenses; and (3) only a fraction of the notes issued by ACF and the Aequitas Funds were backed by trade receivables. ACF and the Aequitas Funds also sent out quarterly updates to investors, approved by Jesenik and Oliver and with financial information approved by Gillis, falsely stating in 2015 that ACF was using investor money primarily to purchase receivables. By the end of 2015, ACF owed investors $312 million and had virtually no operating income to repay them.

6.      ACF made itself look financially viable by keeping an intercompany loan to its parent company, Aequitas Holdings, on its books that it counted as its largest asset even though Jesenik, Oliver and Gillis knew that Aequitas Holdings did not have the assets to pay ACF back. By the beginning of 2016, the balance on the loan exceeded $180 million and the Aequitas enterprise began to collapse. ACF announced it could no longer meet its obligations to investors, and the Aequitas companies announced layoffs of approximately 80 of their 120 employees. In early February 2016, they hired a consulting firm to conduct an orderly wind-down of the business.

7.      Defendants violated the antifraud provisions of the Securities Act of 1933 ("Securities Act"), the Securities Exchange Act of 1934 ("Exchange Act"), and the Investment Advisers Act of 1940 ("Advisers Act") in connection with the offer and sale of securities issued by ACF and the Aequitas Funds.  ACM and AIM, the Defendants responsible for managing ACF and the Aequitas Funds, also breached their fiduciary duties by misusing millions of dollars in client assets.

### JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

8.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b),77t(d) and 77v(a)]; Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa]; and Sections 209(c), 209(d) and 209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(c), 80b-9(d) and 80b-9(e)].

9.      Defendants, directly or indirectly, have made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices and courses of business alleged in this Complaint.

10.      Venue in this District is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14] because acts and transactions constituting violations alleged in this Complaint, including the offer and sale of securities, occurred within the District of Oregon.

11.      Assignment to the Portland Division of this Court is proper because a substantial part of the events or omissions that give rise to claims alleged in this Complaint occurred in Lake Oswego, Oregon in Clackamas County.

### DEFENDANTS

12.      Robert J. Jesenik, age 56, resides in West Linn, Oregon, and founded the Aequitas group of companies in 1993.  Jesenik is 35% owner of Defendant Aequitas Management, which owns 84% of Defendant Aequitas Holdings, the sole owner and member of Defendant ACF and

the sole shareholder of Defendant ACM.  Jesenik is the Chief Executive Officer and President of the Entity Defendants.  Jesenik is also the Chief Investment Officer of ACM and AIM.

13.      Brian A. Oliver, age 51, resides in Aurora, Oregon.  Oliver is the 25% owner of Aequitas Management and an Executive Vice President of the Entity Defendants.  Oliver was the primary fundraiser for ACF and the Aequitas Funds and a member of the management committees responsible for selecting or approving the investments made with investor money.

14.      N. Scott Gillis, age 62, resides in Lake Oswego, Oregon.  Gillis is 10% owner of Aequitas Management and, from approximately January 2015 to January 2016, was Chief Operating Officer of ACF, ACM, and AIM.  Gillis was Chief Financial Officer of those entities from April 2015 to January 2016.  From approximately January 2015 to January 2016, Gillis was also an Executive Vice President of the Entity Defendants.

15.      Aequitas Management, LLC ("Aequitas Management") is an Oregon limited liability company formed in 2007 with a principal place of business in Lake Oswego, Oregon. Aequitas Management owns 84% and exercises exclusive control over Aequitas Holdings, the sole owner and member of ACF and the sole shareholder of ACM.

16.      Aequitas Holdings, LLC ("Aequitas Holdings") is an Oregon limited liability company formed in 2007 with a principal place of business in Lake Oswego, Oregon.  Aequitas Holdings is the sole owner and member of ACF and the sole shareholder of ACM.

17.      Aequitas Commercial Finance, LLC ("ACF") is an Oregon limited liability company formed in 2003 with a principal place of business in Lake Oswego, Oregon.  ACF is the sole owner and member of at least seven subsidiaries that engage in the business of acquiring or investing in portfolios of trade receivables in the healthcare, education, transportation, and consumer credit sectors.  ACF also holds ownership stakes in the Aequitas Funds and a number of other Aequitas-affiliated companies.

18.      Aequitas Capital Management, Inc. ("ACM") is an Oregon corporation formed in 1993 with a principal place of business in Lake Oswego, Oregon.  ACM is the manager of ACF and the sole owner and member of AIM.  As the manager of ACF, ACM is responsible for the

overall operations of ACF, including the management of ACF's loan and investment portfolio, for which it received a management fee of 2% of ACF's assets and 20% of ACF's annual net income.

19.     Aequitas Investment Management, LLC ("AIM") is an Oregon limited liability company formed in 2006 with a principal place of business in Lake Oswego, Oregon.  AIM is registered as an investment adviser with the Commission and is the manager of the Aequitas Funds.  As the manager of the Aequitas Funds, AIM is responsible for the overall operations of the Aequitas Funds, including the management of their loan and investment portfolios, for which it received a management fee of 2% of the assets of each Aequitas Fund.

## RELATED ENTITIES

20.     The Aequitas Funds are a number of Aequitas-affiliated entities, managed by AIM, that raise money from investors through the issuance of notes.  Investor money is pooled within each Aequitas Fund and then used to invest directly or indirectly in trade receivables.  In 2015, the majority of money raised through the Aequitas Funds was raised by Income Opportunity Fund II, LLC ("IOF II").

## FACTUAL ALLEGATIONS

### A.  Aequitas's Organizational Structure

21.     The Aequitas group of companies was founded by Jesenik in 1993.  Over the years, the Aequitas enterprise has established a complicated organizational structure that currently involves approximately 75 active entities.  The entity at the top of that structure is Aequitas Management, which is majority owned by Jesenik, Oliver, and Gillis.  Aequitas Management has sole control over, and an 84% ownership interest in, Aequitas Holdings, which is the sole owner and member of ACF and sole shareholder of ACM.  ACM is the manager of ACF and the sole owner and member of AIM, the manager of and registered investment adviser to the Aequitas Funds.

22.     ACF and the Aequitas Funds, which hold themselves out as engaged primarily in the business of investing in securities related to the purchase and financing of trade receivables,

are the primary vehicles through which Jesenik and Oliver raise investor funds. ACM is the primary operating entity of the Aequitas group of companies and, together with another wholly-owned subsidiary of Aequitas Holdings, pays the majority of the overhead, payroll, and other operating expenses of the enterprise. ACM is funded through management fees charged to ACF and to the Aequitas Funds, through AIM, and is also funded—increasingly during 2014 and 2015—by investor money from ACF and the Aequitas Funds cycled through Aequitas Holdings.

## B. ACF and the Private Note Program

23.     Since its inception in 2003, ACF has raised hundreds of millions of dollars from thousands of investors through the issuance of promissory notes, referred to at ACF as the "Private Note Program." As of December 31, 2015, approximately $312 million in ACF notes were outstanding to more than 1,500 investors. ACF offers and sells notes both directly to investors and through registered investments advisers ("RIAs"), many of which are owned in part by Aequitas Holdings.

24.     The notes issued by ACF typically had terms of one to four years with annual interest rates ranging between 5% and 15%, with a weighted average interest rate of approximately 10%. Interest was generally either paid monthly or quarterly, or automatically reinvested in ACF notes, depending on the agreement with the particular investor.

25.     During 2014 and 2015, ACF investors were generally provided a private placement memorandum ("PPM") dated November 2013. Jesenik had ultimate approval authority over the disclosures contained in the PPM and the distribution of the PPM to investors.

26.     The ACF PPM states that funds raised through the Private Note Program will be used to "engage in various specialty financing transactions, to provide senior and junior debt and equity funding for the benefit of its affiliates and its related investment programs and to repay previously issued [Private] Notes." The PPM identifies five specific uses of Private Note Program proceeds: (1) funding or financing the purchase of student loan receivables; (2) funding or financing the purchase of healthcare receivables; (3) funding or financing the purchase of other receivables and loan portfolios; (4) engaging in other debt transactions and equity

investments in third party private credit strategies; and (5) providing working capital and operating lines of credit to ACF affiliates.  Investors were told that the ACF notes were secured by all personal property of ACF.

27.    The PPM further states:

> ACF generally pays the principal and interest of [the Private Notes] from the proceeds from repayments of loans, leases, subordinated debt investments and similar assets of [ACF] and sales of [ACF] assets.  From time to time, the Company may use proceeds of the sale of [Private Notes] to repay the principal and interest of previously issued [Private Notes] due principally to the illiquid nature of many of [ACF's] investments and to [ACF's] ongoing efforts to reduce its weighted average cost of capital by, in part, replacing [Private Notes] bearing higher interest rates with [Private Notes] bearing lower interest rates.

28.    In addition to the PPMs provided to investors at the time of their initial investment, quarterly updates were sent to investors and potential investors or their RIAs describing the financial performance, assets, and uses of investor funds for ACF and the Aequitas Funds.  Jesenik and Oliver approved the content and distribution of the quarterly updates in 2014 and 2015, and Gillis approved the financial information included in the updates in 2015.  Gillis also approved the financial statements of the Aequitas enterprise in 2015, including audited financials for 2014, and was aware that ACF's financials were provided to potential investors or their RIAs.

29.    In 2014 and 2015, Oliver met with prospective investors and RIAs who recommended the Private Note investment to their clients, oversaw the distribution of PPMs to prospective investors by investor relations staff, and sometimes personally sent PPMs and other offering materials to prospective investors.

## C.  **The Aequitas Funds and Income Opportunity Fund II**

30.    In addition to raising funds through ACF, the Aequitas group of companies offers and sells notes issued by the Aequitas Funds, which are managed by AIM.  The largest Fund by notes outstanding as of December 2015 was IOF II with $101.5 million.

31.    The PPMs for the Aequitas Funds state that investment proceeds will be used for the direct or indirect purchase of trade receivables.  The PPM for IOF II, for example, states that

proceeds will be used to invest, directly or indirectly, in a portfolio of receivables in various sectors, including healthcare, education, transportation, and consumer credit. The IOF II PPM also states that proceeds may be used to make loans to ACF, to be secured by the assets of ACF, for the purpose of investing in receivables. Jesenik had ultimate approval authority over the disclosures contained in the Aequitas Funds PPMs, including the IOF II PPM, and the distribution of the PPMs to investors.

32.    As with the Private Note Program, in 2014 and 2015, Oliver met with prospective investors and RIAs who recommended investment in the Aequitas Funds to their clients and oversaw the distribution of PPMs to potential investors by Aequitas investor relations staff.

33.    In addition to the PPMs provided to investors at the time of their initial investment, quarterly updates were sent to investors and potential investors or their RIAs describing the financial performance, assets, and uses of investor funds for the Aequitas Funds. Jesenik and Oliver approved the final content of quarterly updates for the Aequitas Funds in 2014 and 2015 and authorized them for distribution. In 2015, Gillis approved the financial information stated in the quarterly updates for the Aequitas Funds, including the total assets held by the particular Fund for which the update was prepared and a breakdown by category of the assets held within the Fund.

**D.  ACF's Operations and Performance Prior to 2014**

34.    According to ACF's consolidated audited financial statements, ACF was profitable from 2011 through 2013. The largest category of assets on ACF's balance sheet at the end of 2013 was $215.1 million in trade receivables. At the end of 2013, ACF's receivables business was heavily concentrated in education loan receivables that one of ACF's subsidiaries, Campus Student Funding, LLC ("CSF"), purchased from Corinthian.

35.    Pursuant to agreements with Corinthian, CSF purchased pools of student loan receivables at a discounted value. The receivables purchased from Corinthian were subject to recourse agreements that required Corinthian to buy back from CSF the full value of any student loans that became delinquent by 90 days. Of the $215.1 million in receivables on ACF's balance

sheet at the end of 2013, $153.5 million were loans purchased from Corinthian that were subject to recourse agreements.

**E.  ACF's Deteriorating Financial Condition in 2014 and 2015**

36.    Through CSF, ACF received recourse payments and other fees from Corinthian on a monthly basis.  In 2014, however, Corinthian was suffering serious financial difficulties.  While ACF received between $4.7 million and $7.1 million a month from Corinthian for the first five months of 2014, in June 2014 Corinthian failed to make a $4.8 million payment due in default of its agreement with CSF.  Corinthian has made no recourse payments to CSF since its default in June 2014, and on May 4, 2015, Corinthian filed for Chapter 11 bankruptcy protection.  Without Corinthian's recourse payments, CSF has been forced to engage in collection efforts directly from borrowers.

37.    Prior to Corinthian's default, ACF already relied heavily on raising investor funds to meet its weekly cash obligations.  The loss of income from Corinthian heightened ACF's cash crunch and made it even more dependent on investor funds to meet obligations, including redemptions and interest payments to prior investors.

38.    Aequitas executives, including Jesenik and Oliver through 2014 and 2015 and Gillis in 2015, received internal cash models and projections on a daily basis that showed the severity of ACF's cash issues.  Jesenik frequently discussed the cash models and projections with the Aequitas Treasury Manager who prepared the models and projections.

39.    According to the cash models and projections prepared at the end of April 2014 (before Corinthian's default), ACF projected sufficient cash to meet obligations for two weeks.  Included in those projections was $6.4 million of monthly cash inflows from Corinthian.  By the end of June 2014 (after Corinthian's default), projected cash inflows from Corinthian were removed and Treasury projected a cash shortfall of $3.1 million for the next week.  According to internal projections prepared on July 18, 2014, ACF estimated that it was more than $200,000 short of cash to meet its current obligations and had a cash shortfall of $19.1 million for the coming two weeks.

40.     Although the then CFO had warned Jesenik face-to-face on several occasions in 2014 of the need to reduce operating expenses in light of ACF's cash issues, Jesenik and Oliver satisfied projected cash shortfalls, including for redemptions requested by prior Private Note investors, not by reducing operating expenses, but primarily by raising investor funds, contrary to their material representations in the PPM.

41.     Jesenik and Oliver began to issue short-term ACF notes at high interest rates to attract new investors.  Between July 18, 2014 and November 28, 2014, ACF raised $23.7 million from the issuance and sale of 67 notes with 6-month terms and interest rates of primarily 11-12%.  In late 2014, ACF began offering 1-year notes at 15% interest, and Jesenik and Oliver also began to raise money through the offer and sale of notes issued by IOF II.

42.     By 2015, the financial situation for the Aequitas companies was dire.  The 67 6-month notes issued by ACF between July and November 2014 came due between January and May 2015, further exacerbating ACF's cash crunch.  Indeed, by at least April 2015, Oliver confirmed to certain investors that ACF could not meet their redemption requests on a timely basis.  ACF's cash shortage was well known to Jesenik, Oliver, and Gillis, all of whom received cash models and projections sent by Treasury to them on a daily basis during 2015.

43.     ACF and Aequitas Holdings both had significant operating losses in 2014 and 2015.  According to the companies' financial records, in 2014, Aequitas Holdings lost approximately $22.2 million, including a $15.3 million loss for ACF.  In 2015, Aequitas Holdings lost approximately $46.7 million, including a $19.5 million loss for ACF.

**F.  ACF and the Aequitas Funds Have Raised Investor Money Through Fraud Since 2014**

44.     Despite ACF's deteriorating financial condition, Jesenik and Oliver, with Gillis's knowledge in 2015, continued to raise funds from new investors and convincing prior investors to reinvest.  Defendants knowingly or recklessly engaged in a scheme to defraud investors in ACF and the Aequitas Funds.  Further, ACF and Jesenik knowingly or recklessly made false and misleading statements, and material omissions of fact to investors.

45.     Between January 2014 and January 2016, approximately $350 million was raised from investors through ACF and the Aequitas Funds.  The representations made to investors in ACF and the Aequitas Funds were materially false and misleading for several reasons.

1.   **The Insolvency of ACF and the Aequitas Enterprise Was Concealed from Investors**

46.     Jesenik, Oliver and Gillis, through the Entity Defendants, did not disclose the increasing insolvency of ACF and Aequitas Holdings. Instead they acted to conceal the insolvency of the companies through an intercompany loan from ACF to its parent, Aequitas Holdings (the "Holdings Note").  ACF counted the Holdings Note on its books as one of its most valuable assets.  As such, Jesenik, Oliver and Gillis knew that its collectability was essential for the solvency of ACF and the entire Aequitas enterprise.

47.     At the beginning of 2014, the Holdings Note had an outstanding balance of $78.8 million.  That increased to $120.9 million by the end of 2014.  By the end of 2015, the Holdings Note had a balance of $180.3 million and was the largest single asset on ACF's books.

48.     The Holdings Note was used primarily as a means of moving cash from ACF to Aequitas Management, ACM, and another wholly-owned Aequitas subsidiary, to cover the operating expenses of the Aequitas enterprise.  Those expenses, which far exceeded the amount of ACM's and AIM's management fees, included a private jet, dinners and golf outings with potential investors and RIAs, the opening of a new office location in New York City, the renovation of Aequitas's headquarters in Lake Oswego, and large compensation obligations to Aequitas employees—the largest of which were Jesenik, Oliver and Gillis's own.  Jesenik received a salary of $685,000 with a bonus target of 100% of his salary; Oliver received a salary of $350,000 with a bonus target of 100% of his salary; and Gillis received a salary of $400,000 with a bonus target of 100% of his salary.

49.     ACF's ability to pay its investors depended on Aequitas Holdings' ability to pay ACF.  Yet, Aequitas Holdings lost $22.2 million in 2014 and did not have sufficient assets to act

as collateral for its debt to ACF.  Aequitas's Controller frequently prepared collateral analyses that set forth the value of the assets held by Aequitas Holdings as compared to the balance of the Holdings Note.  Those collateral analyses were prepared and presented to Aequitas executives, including Jesenik and Oliver throughout 2014 and 2015, and Gillis throughout 2015.

50.    According to the collateral analysis for March 2014, Aequitas Holdings was short about $20 million in assets compare to what it owed to ACF.  The gap between what Aequitas Holdings owed ACF and the assets it had to meet its obligations grew significantly through 2015. As a result, Aequitas Holdings, and therefore ACF, was becoming more and more insolvent.

51.    According to the collateral analysis for the end of February 2015, Aequitas Holdings had $67.0 million in assets available as collateral for the $127.6 million outstanding on the Holdings Note.  The collateral analysis for the end of June 2015 showed that assets available as collateral decreased to $65.3 million and the outstanding balance on the Holdings Note increased to $147.4 million.  At the end of October 2015, $69.8 million in assets was available as collateral and the Holdings Note balance had soared to $169 million, a nearly $100 million shortfall.

52.    Jesenik, Oliver and Gillis knew, or were reckless in not knowing, that Aequitas Holdings did not have sufficient assets to pay back the Holdings Note.  The collateral analyses showing the growing shortfall were presented and discussed at regularly-held Asset-Liability meetings and meetings of the Office of the Chief Investment Officer, both of which were led by Jesenik and attended by Oliver and Gillis.  In addition, Jesenik and Gillis held specific meetings to discuss the collateral reports with Finance staff throughout 2015.

### 2.    Investors Were Not Told That Their Investments Were Used Primarily to Repay Prior Investors or Cover Aequitas's Operating Losses

53.    Jesenik and Oliver, with Gillis's knowledge in 2015, also raised funds from investors in ACF and the Aequitas Funds without disclosing that funds raised were primarily

used to either repay prior investors or to fund growing operating losses of the Aequitas companies.

54.     The PPMs for the Aequitas Funds stated that the funds raised would be used for the direct or indirect purchase of trade receivables.  The ACF PPM also disclosed that one of the primary uses of investor funds was to finance the purchase of trade receivables.  However, in 2014 only approximately $44 million (or about 25%) of the money invested in ACF and the Aequitas Funds was used to purchase trade receivables or other income-generating assets.  In 2015, only about $15 million (or 8%) of the money invested in ACF and the Aequitas Funds was used to purchase trade receivables or other income-generating assets.

55.     Indeed, by at least July 2014, instead of using investors' money to invest in the portfolio of trade receivables as described in the offering materials, Jesenik and Oliver were using the vast majority of investor money to cover redemptions and interest payments to prior investors and to pay the operating expenses of the entire Aequitas enterprise.

56.     Such uses of investor money were contrary to the disclosures provided to investors in the Aequitas Funds.  Although ACF's PPM included a disclosure that the proceeds from the issuance of new notes "may" be used to repay the principal and interest due to prior investors, Jesenik and Oliver, with Gillis's knowledge in 2015, deceived investors into believing that such payments were only made "from time to time" as disclosed in ACF's PPM.  In reality, at least by July 2014, ACF was generally paying the principal and interest due on prior ACF notes from the proceeds of investments, in a Ponzi-like fashion.

57.     In addition to the PPMs, the quarterly updates provided to investors and prospective investors in ACF and the Aequitas Funds from 2014 through the second quarter of 2015 failed to disclose that the primary use of investor funds was to repay prior investors or to cover the operating expenses of the Aequitas enterprise.  However, in a quarterly update prepared for the third quarter of 2015, ACF acknowledged that "ACF uses proceeds from Private Note primarily to repay prior investors."  Yet that quarterly update was not even prepared until late December 2015.

58.     Jesenik, Oliver and Gillis knew or were reckless in not knowing that the information provided to investors failed to disclose that the primary use of investor funds was to repay prior investors or to cover the operating expenses of the Aequitas enterprise.

**3.  Defendants Misrepresented the Underlying Trade Receivables Available as Collateral for the Notes Issued by ACF and the Aequitas Funds**

59.     Jesenik and Oliver since 2014, with Gillis's knowledge since 2015, further defrauded investors by misrepresenting the underlying trade receivables available as collateral for the notes issued by ACF and the Aequitas Funds.

60.     The ACF quarterly updates for the first and second quarters of 2015 listed ACF's trade receivable assets with a book value in excess of $200 million, without disclosing that only a fraction of that value was supported by actual receivables as collateral.  In fact, as Jesenik, Oliver and Gillis knew, the vast majority of those trade receivable assets were already pledged as security for lines of credit with financial institutions or other senior debt issued by various Aequitas entities.

61.     Indeed, in the quarterly update prepared for the third quarter of 2015, ACF acknowledged that only 13% of its assets (about $42 million) were collateralized by trade receivables.  Yet, as described above, that quarterly update was not even prepared until late December 2015.

62.     In addition to the misrepresentations made to ACF investors, Jesenik, Oliver and Gillis also misrepresented the underlying trade receivables available as collateral for the notes issued by the Aequitas Funds.  During 2015, the primary Aequitas Fund through which Jesenik and Oliver raised new investor money was IOF II, which raised a total of $70 million during 2015 alone.

63.     Rather than using the IOF II investor proceeds for the direct or indirect purchase of trade receivables, as represented in the IOF II PPM, Jesenik, Oliver and Gillis, through AIM as the manager of IOF II, transferred the proceeds directly to ACF and then used the money

either to pay redemptions and interest to prior investors or to continue paying the operating expenses of the entire enterprise with no documented note or loan agreement between ACF and IOF II.  Jesenik and Oliver continued this practice during the summer and fall of 2015, with Gillis's knowledge, over the objections of an IOF II portfolio manager who told Jesenik and Oliver that these uses of money were not allowed by the IOF II PPM.

64.    The transfer of funds raised through IOF II to ACF resulted in a balance due from ACF to IOF II.  At the end of each month, Aequitas executives, including Jesenik, Oliver and Gillis, met to account for the balance due through the issuance of notes by ACF subsidiaries to IOF II.

65.    According to the IOF II PPM, the notes issued by the ACF subsidiaries were to be collateralized by unpledged trade receivables owned by the subsidiaries.  To that end, the executives, including Jesenik, Oliver and Gillis, reviewed a report prepared by Treasury called the "Product Menu," which showed the value of the receivables then owned by ACF's various subsidiaries and what portion, if any, of those receivables had already been pledged as collateral on other obligations.  Beginning in early 2015, notes were issued by ACF subsidiaries to IOF II despite the fact that the Product Menu showed that the subsidiaries no longer held sufficient trade receivables with which to collateralize the notes.

66.    Between August and December 2015, according to the Product Menu, the collateral shortfall for notes issued by the subsidiaries, including notes issued to IOF II, ballooned from $2 million to $54 million.  Yet Jesenik and Oliver continued to raise funds from IOF II investors through the middle of January 2016, telling investors the funds were being used to acquire trade receivables.

67.    On at least two occasions during 2015, Oliver also raised additional funds for ACF by selling notes issued by an ACF subsidiary to high net worth investors backed by trade receivables that had already been used to secure a note to IOF II, further contributing to the collateral shortfalls on the notes to IOF II.  A portfolio manager of IOF II objected to Jesenik and

Oliver about this improper use of the collateral belonging to IOF II, but Jesenik and Oliver disregarded his objection.

68.     Jesenik, Oliver and Gillis knew, or were reckless in not knowing, that investors were not told that there were insufficient underlying trade receivables available to secure the notes issued by ACF and the Aequitas Funds.

**G.  ACF's Efforts to Avoid Registration As An Investment Company Demonstrate Its Insolvency**

69.     In late 2014, Aequitas negotiated with a major financial institution for a line of credit for one of ACF's subsidiaries.  As part of the agreement to provide the line of credit, the financial institution required ACF to provide a legal opinion in July 2015 that ACF was not required to register with the Commission as an investment company under the Investment Company Act of 1940 (the "Investment Company Act").

70.     Jesenik and Oliver, and Gillis in 2015, knew, or were reckless in not knowing, that registration as an investment company would have significant additional consequences for Aequitas's business.  In November 2014, Aequitas's former CFO gave a presentation to Jesenik, Oliver, and others stating that registration as an investment company would restrict ACF's ability to make intercompany loans (such as the Holdings Note) and eliminate Aequitas's practice of investing in RIAs that recommend Aequitas investments.

71.     In obtaining a legal opinion, ACF relied upon an exemption from registration as an investment company that required 55% of ACF's overall business to consist of a type that qualifies under the exemption.  The Holdings Note was the largest asset on ACF's balance sheet that did not qualify for the purposes of that exemption.  The value of the Holdings Note as reflected on ACF's balance sheet began to cause Jesenik and Aequitas's prior CFO significant concern in 2014 that ACF would fall below the 55% threshold in qualifying assets.

72.     As part of ACF's efforts to show that it was exempt from registration under the Investment Company Act, Gillis instructed an ACF Finance employee to prepare an internal report in July 2015 that totaled ACF's qualifying versus non-qualifying assets.  The Holdings

Note was valued at approximately $147 million on ACF's balance sheet as of the end of June 2015 and resulted in a 49% ratio of qualifying assets.

73.    Gillis instructed the employee to use the "fair value" of the Holdings Note rather than the balance of the debt owed as reflected on ACF's balance sheet.  To determine the "fair value" of the debt owed, Gillis told the employee to use the collateral reports, prepared by Aequitas' Controller, which identified the amount of collateral held by Aequitas Holdings that could be used to satisfy its debt to ACF.  The collateral report for June 30, 2015 reflected a total of $65 million in available collateral at Aequitas Holdings—$82 million less than the balance owed by Aequitas Holdings as valued on ACF's balance sheet.  At Gillis's instruction, the Finance employee valued the Holdings Note at $65 million (rather than $147 million as set forth on ACF's balance sheet) in his internal report, which raised the ratio of qualifying assets from 49% to 56%.

74.    In July 2015, Gillis signed a certification for the purpose of obtaining a legal opinion regarding ACF's qualification for an exemption from investment company registration.  The certification stated that ACF held at least 55% in qualifying assets, but failed to disclose that the value of the Holdings Note had been reduced by $82 million from the amount listed on ACF's balance sheet.

75.    Based on Gillis' certification, ACF's legal counsel provided an opinion letter to the financial institution that ACF did not need to register as an investment company.  At the time, Gillis, as well as Jesenik (who regularly met with Gillis to discuss ACF's qualification for an exemption), knew that ACF's books reflected a substantially higher value for the Holdings Note than what was presented to ACF's legal counsel to meet the 55% threshold.

76.    The Finance employee discussed with Gillis the fact that the Holdings Note was listed as an asset on ACF's books at a value $82 million more than the value that had been used for the certification to obtain the legal opinion.  Gillis said that the value used for the legal opinion could not be reflected on ACF's books because recognition of an impairment of that magnitude would have a massive impact on the solvency of the entire Aequitas enterprise.  Gillis

COMPLAINT                                        17

received daily cash models showing that ACF and the Aequitas Funds continued to raise millions of dollars from investors after he acknowledged that disclosing the "fair value" of the Holdings Note would have a massive impact on Aequitas's solvency.

## H. Aequitas' Ongoing Collapse in 2016

77.     By mid-January 2016, it became clear that the desperate efforts of Jesenik, Oliver, and Gillis to conceal ACF's true financial condition through the inflated value of the Holdings Note and to continue raising investor money had failed.  In late January 2016, they announced layoffs of approximately 80 of the enterprise's 120 employees.

78.     On February 2, 2016, ACF sent a letter to investors informing them that ACF had been unable to keep pace with redemption requests since November 2015 and that ACF was meeting with advisors to develop a plan to allow for the liquidation of ACF's assets "in an orderly fashion over time, with an objective of continued quarterly distributions to investors." ACF informed investors that no redemptions would be paid until a formal plan was in place.

79.     In mid-February 2016, Aequitas engaged a consulting firm to oversee the liquidation and wind-down of ACF and certain other Aequitas companies.

## FIRST CLAIM FOR RELIEF

### (Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act by All Defendants)

80.     The Commission realleges and incorporates by reference paragraphs 1 through 79.

81.     By engaging in the acts and conduct alleged above, Defendants Aequitas Management, Aequitas Holdings, ACM, ACF, AIM, Jesenik, Gillis and Oliver directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails: with scienter employed devices, schemes, or artifices to defraud; and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

82.     By reason of the foregoing, Defendants Aequitas Management, Aequitas Holdings, ACM, ACF, AIM, Jesenik, Gillis and Oliver have violated and, unless restrained and

enjoined, will continue to violate Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)].

## SECOND CLAIM FOR RELIEF

### (Aiding and Abetting Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act by Defendants Jesenik, Gillis and Oliver)

83.    The Commission realleges and incorporates by reference paragraphs 1 through 79.

84.    By engaging in the acts and conduct alleged above, Defendants Aequitas Management, Aequitas Holdings, ACM, ACF and AIM directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails: with scienter employed devices, schemes, or artifices to defraud; and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

85.    Defendants Jesenik, Gillis and Oliver knowingly provided substantial assistance to Aequitas Management's, Aequitas Holdings', ACM's, ACF's and AIM's violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)].

86.    By reason of the foregoing, Defendants Jesenik, Gillis and Oliver have aided and abetted, and unless enjoined, will continue to aid and abet, violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)].

## THIRD CLAIM FOR RELIEF

### (Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) Thereunder by All Defendants)

87.    The Commission realleges and incorporates by reference Paragraphs 1 through 79.

88.    By engaging in the acts and conduct alleged above, Defendants Aequitas Management, Aequitas Holdings, ACM, ACF, AIM, Jesenik, Gillis and Oliver, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or

instrumentalities of interstate commerce, or of the mails, or of a facility of a national security

exchange, with scienter:  employed devices, schemes, or artifices to defraud; and engaged in

acts, practices, or courses of business which operated or would operate as a fraud or deceit upon

other persons, including purchasers and sellers of securities.

89.     By reason of the foregoing, Defendants Aequitas Management, Aequitas

Holdings, ACM, ACF, AIM, Jesenik, Gillis and Oliver have violated and, unless restrained and

enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and

Rules 10b-5(a) and 10b-5(c) [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)] thereunder.

## <u>FOURTH CLAIM FOR RELIEF</u>

**(Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a)**

**and 10b-5(c) Thereunder by Defendants Jesenik, Gillis and Oliver)**

90.     The Commission realleges and incorporates by reference Paragraphs 1 through

79.

91.     By engaging in the acts and conduct alleged above, Defendants Aequitas

Management, Aequitas Holdings, ACM, ACF and AIM, directly or indirectly, in connection with

the purchase or sale of securities, by the use of means or instrumentalities of interstate

commerce, or of the mails, or of a facility of a national security exchange, with scienter:

employed devices, schemes, or artifices to defraud; and engaged in acts, practices, or courses of

business which operated or would operate as a fraud or deceit upon other persons, including

purchasers and sellers of securities.

92.     Defendants Jesenik, Gillis and Oliver knowingly provided substantial assistance

to Aequitas Management's, Aequitas Holdings', ACM's, ACF's and AIM's violations of Section

10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) [17 C.F.R.

§§ 240.10b-5(a) and 240.10b-5(c)] thereunder.

93.     By reason of the foregoing, Defendants Jesenik, Gillis and Oliver have aided and

abetted, and unless enjoined, will continue to aid and abet, violations of Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)] thereunder.

## FIFTH CLAIM FOR RELIEF

### (Violations of Section 17(a)(2) of the Securities Act by Defendants ACF and Jesenik)

94.     The Commission realleges and incorporates by reference paragraphs 1 through 79.

95.     By engaging in the acts and conduct alleged above, Defendants ACF and Jesenik directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading.

96.     By reason of the foregoing, Defendants ACF and Jesenik have violated and, unless restrained and enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. §§ 77q(a)(2)].

## SIXTH CLAIM FOR RELIEF

### (Aiding and Abetting Violations of Section 17(a)(2) of the Securities Act by Defendants Jesenik, Gillis and Oliver)

97.     The Commission realleges and incorporates by reference paragraphs 1 through 79.

98.     By engaging in the acts and conduct alleged above, Defendant ACF directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading.

99.    Defendants Jesenik, Gillis and Oliver knowingly provided substantial assistance to ACF's violations of Section 17(a)(2) of the Securities Act [15 U.S.C. §§ 77q(a)(2)].

100.    By reason of the foregoing, Jesenik, Gillis and Oliver have aided and abetted, and unless enjoined, will continue to aid and abet, violations of Sections 17(a)(2) of the Securities Act [15 U.S.C. §§ 77q(a)(2)].

<u>**SEVENTH CLAIM FOR RELIEF**</u>

**(Violations of Section 10(b) of the Exchange Act and Rules 10b-5(b) Thereunder by Defendants ACF and Jesenik)**

101.    The Commission realleges and incorporates by reference Paragraphs 1 through 79.

102.    By engaging in the acts and conduct alleged above, Defendants ACF and Jesenik directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national security exchange, with scienter, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

103.    By reason of the foregoing, Defendants ACF and Jesenik have violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

<u>**EIGHTH CLAIM FOR RELIEF**</u>

**(Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder by Defendants Jesenik, Gillis and Oliver)**

104.    The Commission realleges and incorporates by reference Paragraphs 1 through 79.

105.    By engaging in the acts and conduct alleged above, Defendant ACF directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national security

exchange, with scienter, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

106.    Defendants Jesenik, Gillis and Oliver knowingly provided substantial assistance to ACF's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

107.    By reason of the foregoing, Defendants Jesenik, Gillis and Oliver have aided and abetted, and unless enjoined, will continue to aid and abet, violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(b) [17 C.F.R.§§ 240.10b-5(b)] thereunder.

## NINTH CLAIM FOR RELIEF

### (Violations of Sections 206(1) and 206(2) of the Advisers Act by Defendants ACM and AIM)

108.    The Commission realleges and incorporates by reference paragraphs 1 through 79.

109.    At all relevant times, ACM acted as an investment adviser, as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80(b)-2(a)(11)], to ACF.

110.    At all relevant times, AIM acted as an investment adviser, as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80(b)-2(a)(11)], to the Aequitas Funds.

111.    ACM and AIM, by engaging in the acts and conduct alleged above, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce or of the mails, and while engaged in the business of advising others for compensation as to the advisability of investing in, purchasing, or selling securities:  (a) with scienter, employed devices, schemes, and artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients.

112.    By reason of the foregoing, Defendants ACM and AIM violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)] and unless enjoined will continue to violate Sections 206(1) and 206(2) of the Advisers Act.

## TENTH CLAIM FOR RELIEF

### (Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Advisers Act by Defendants Jesenik, Gillis and Oliver)

113.    The Commission realleges and incorporates by reference paragraphs 1 through 79.

114.    ACM and AIM, by engaging in the acts and conduct alleged above, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce or of the mails, and while engaged in the business of advising others for compensation as to the advisability of investing in, purchasing, or selling securities:  (a) with scienter, employed devices, schemes, and artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients.

115.    Defendants Jesenik, Gillis and Oliver knowingly provided substantial assistance to ACM's and AIM's violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-(1) and 80b-6(2)].

116.    By reason of the foregoing, Defendants Jesenik, Gillis and Oliver have aided and abetted, and unless enjoined, will continue to aid and abet, violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-(1) and 80b-6(2)].

## ELEVENTH CLAIM FOR RELIEF

### (Violations of Sections 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder by Defendants ACM and AIM)

117.    The Commission realleges and incorporates by reference paragraphs 1 through 79.

118.    At least from 2014 to the present, ACM acted as an investment adviser, as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80(b)-2(a)(11)], to ACF.

119.    ACF operated as a pooled investment vehicle, as defined by Rule 206(4)-8(b) promulgated under the Advisers Act [17 C.F.R. § 275.206(4)-8(b)].

120.    At least from 2014 to the present, AIM acted as an investment adviser, as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80(b)-2(a)(11)], to the Aequitas Funds.

121.    The Aequitas Funds operated as pooled investment vehicles, as defined by Rule 206(4)-8(b) promulgated under the Advisers Act [17 C.F.R. § 275.206(4)-8(b)].

122.    ACM, by engaging in the acts and conduct alleged above, while acting as an investment adviser to a pooled investment vehicle, by the use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly, has engaged in transactions, practices, and courses of business which operate as a fraud or deceit upon investors in ACF. ACM made untrue statements of a material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in ACF, and otherwise engaged in acts, practices or courses of business that were fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in ACF.

123.    AIM, by engaging in the acts and conduct alleged above, while acting as an investment adviser to a pooled investment vehicle, by the use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly, has engaged in transactions, practices, and courses of business which operate as a fraud or deceit upon investors in the Aequitas Funds.  AIM made untrue statements of a material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the Aequitas Funds, and otherwise engaged in acts, practices or courses of business that were fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the Aequitas Funds.

124.    By reason of the foregoing, Defendants ACM and AIM violated Section 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8] and unless enjoined will continue to violate Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

## TWELFTH CLAIM FOR RELIEF

### (Aiding and Abetting Violations of Sections 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder by Defendants Jesenik, Gillis and Oliver)

125.    The Commission realleges and incorporates by reference paragraphs 1 through 79.

126.    ACM, by engaging in the acts and conduct alleged above, while acting as an investment adviser to a pooled investment vehicle, by the use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly, has engaged in transactions, practices, and courses of business which operate as a fraud or deceit upon investors in ACF. ACM made untrue statements of a material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in ACF, and otherwise engaged in acts, practices or courses of business that were fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in ACF.

127.    AIM, by engaging in the acts and conduct alleged above, while acting as an investment adviser to a pooled investment vehicle, by the use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly, has engaged in transactions, practices, and courses of business which operate as a fraud or deceit upon investors in the Aequitas Funds.  AIM made untrue statements of a material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the Aequitas Funds, and otherwise engaged in acts, practices or courses of business that were fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the Aequitas Funds.

128.    Defendants Jesenik, Gillis and Oliver knowingly provided substantial assistance to ACM's and AIM's violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

129.    By reason of the foregoing, Defendants Jesenik, Gillis and Oliver have aided and abetted, and unless enjoined, will continue to aid and abet, violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Enjoin Defendants Aequitas Management, Aequitas Holdings, ACM, ACF and AIM, preliminarily and permanently from directly or indirectly violating Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) [17 C.F.R. §§ 240.10b-5(a) and 10b-5(c)] thereunder.

### II.

Enjoin Defendants Jesenik, Gillis and Oliver, permanently from directly or indirectly violating Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) [17 C.F.R. §§ 240.10b-5(a) and 10b-5(c)] thereunder.

### III.

Enjoin Defendant ACF, preliminarily and permanently from directly or indirectly violating Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)], Section 10(b) of the Exchange Act [15U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

### IV.

Enjoin Defendants Jesenik, Gillis and Oliver permanently from directly or indirectly violating Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)], Section 10(b) of the Exchange Act [15U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

V.

Enjoin Defendants ACM and AIM, preliminarily and permanently from directly or indirectly violating Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

VI.

Enjoin Defendants Jesenik, Gillis and Oliver, permanently from directly or indirectly violating Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

VII.

Enjoin Defendants Aequitas Management, Aequitas Holdings, ACM, ACF and AIM, preliminarily and permanently from directly or indirectly participating in the issuance, offer, or sale of any security of any entity controlled by, or under joint control with, any of them.

VIII.

Enjoin Defendants Jesenik, Gillis and Oliver, permanently from directly or indirectly participating in the issuance, offer, or sale of any security of any entity controlled by, or under joint control with, any of them.

IX.

Enjoin Defendants Aequitas Management, Aequitas Holdings, ACM, ACF and AIM, preliminarily and permanently from directly or indirectly soliciting any person or entity to purchase or sell any security.

X.

Enjoin Defendants Jesenik, Gillis and Oliver, permanently from directly or indirectly soliciting any person or entity to purchase or sell any security.

XI.

Order Defendants Aequitas Management, Aequitas Holdings, ACM, ACF, AIM, Jesenik, Gillis and Oliver to disgorge their ill-gotten gains according to proof, plus prejudgment interest thereon.

XII.

Order Defendants Aequitas Management, Aequitas Holdings, ACM, ACF, AIM, Jesenik, Gillis and Oliver to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

XIII.

Enter a Final Judgment imposing an officer and director bar against Defendants Jesenik, Gillis and Oliver pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

XIV.

Enter an order appointing a receiver over Defendants Aequitas Management, Aequitas Holdings, ACM, ACF and AIM and the affiliates of such defendants as identified in the concurrently filed stipulated order to appoint a receiver.

XV.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

XVI.

Grant such other and further relief as this Court may deem just, equitable, and necessary.


Dated:  March 10, 2016                    Respectfully submitted:



                                          By:  /s/ Bernard B. Smyth
                                                    Bernard B. Smyth

                                          Attorneys for Plaintiff
                                          SECURITIES AND EXCHANGE COMMISSION


COMPLAINT                    29