*Execution Version*

AMENDED AND RESTATED
AGREEMENT OF PURCHASE AND SALE

    This Amended and Restated Agreement of Purchase and Sale, dated as of December 7, 2016 (this "Purchase Agreement"), is by and among Cedar Springs Special Opportunities IV, LP, a Delaware limited partnership (the "LP Buyer"), CSC Spec Opps IV GP, LLC, a Delaware limited liability company ("GP Buyer", and together with the LP Buyer, each a "Buyer" and collectively "Buyers"), Aequitas Commercial Finance, LLC, an regon limited liability company, Aequitas Private Client Fund, LLC, a Delaware limited liability company and Aequitas Holdings, LLC, an Oregon limited liability company (each, an "LP Seller" and together, the "LP Sellers"), and CCM Capital Opportunities GP, LLC, a Delaware limited liability company ("GP Seller"), and Aequitas Corporate Lending, LLC, an Oregon limited liability company ("Lender" and, together with the GP Seller and LP Sellers, each a "Seller" and collectively "Sellers") acting by and through Ronald Greenspan (the "Receiver"), as receiver of Sellers.

**RECITALS:**

    A.    On March 10, 2016, the Securities and Exchange Commission filed an action captioned *SEC v. Aequitas Management, LLC et al.* (Case No. 3:16-cv-00438-PK) alleging defendants violated the federal securities laws (the "Action").

    B.    On April 14, 2016, the United States District Court for the District of Oregon (the "Oregon Court") entered a Final Order Appointing Receiver (the "Final Receiver Order"), appointing the Receiver as receiver of the entity defendants named in the Action, their subsidiaries, and/or majority-owned affiliates, attached hereto as Exhibit 3. Each of Sellers is subject to the powers of the Receiver, as set forth in the Final Receiver Order, together with the other entities identified in the Final Receiver Order as a Receivership Entity (the "Receivership Entities").

    C.    Sellers own the Property (as hereinafter defined) as set forth on Schedule I hereto.

    D.    Buyers desire to purchase from Sellers, and Sellers desire to sell to Buyers, the Property, upon the terms and subject to the conditions set forth in this Purchase Agreement.

    E.    The Buyers are committing to the CCM Liquidity-Offer and CCM Follow-on Financing (each as hereinafter defined). If 100% of the non-Receivership Entity limited partners elect to liquidate their Partnership interests, Buyers' financial obligation may increase by up to $21,700,000.00 as of the Closing Date to effect the CCM Liquidity-Offer.

    F.    On September 21, 2016, the Oregon Court entered an Order Granting Receiver's Motions (1) For Approval of Letter of Intent, (2) For Approval of Bid Procedures, Break-up Fee, and Stalking Horse Bidder, and (3) To Schedule Final Sale Hearing (the "Initial Order"), attached hereto as Exhibit 4. The Initial Order did not include as an exhibit thereto a definitive purchase agreement.

    G.    The Sellers have received an order from the Oregon Court in the Action approving, among other things, the sale of the Property (other than CarePayment) free and clear of all liens to the approved buyers (the "Stub Portfolio Final Sale Order"). Prior to Closing, the Sellers will receive an order from the Oregon Court in the Action approving, among other things, the sale of the Property (including CarePayment and the Notes) free and clear of all liens to the approved buyers (the "CCM Portfolio Final Sale Order"). This Purchase Agreement will be filed with the Oregon Court on or about December 14, 2016.

1

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 1 of 151

*Execution Version*

NOW THEREFORE, in consideration of the mutual agreements, covenants, representations, warranties and indemnities contained in this Purchase Agreement, Buyers and Sellers agree as follows:

**1.      Definitions.**

For purposes of this Purchase Agreement, the following terms shall have the meanings set forth below:

(a)      "Act" shall mean the Securities Act of 1933, as amended.

(b)      "Additional Buyer's Documents" shall mean, with respect to each Buyer, the documents and instruments executed and delivered by such Buyer pursuant to this Purchase Agreement and listed on the Closing Schedule 1(b), which schedule will include the Assignment Agreement.

(c)      "Additional Seller's Documents" shall mean, with respect to each Seller, the documents and instruments executed and delivered by such Seller pursuant to this Purchase Agreement and listed on the Closing Schedule 1(c), which schedule will include the Assignment Agreement.

(d)      "AIV" shall mean, with respect to each Seller, an "Alternative Vehicle" or "Parallel Vehicle" as defined in the Partnership Limited Partnership Agreement.

(e)      "Assignment Agreement" shall mean, with respect to (i) each Interest, the assignment and assumption agreement or other agreements or instruments necessary to effect the transfer of such Interest, in a form reasonably acceptable to the applicable Seller and Buyer and (ii) the Notes, the assignment and assumption agreement or other agreements or instruments necessary to effect the transfer of such Notes, in a form reasonably acceptable to the applicable Seller and Buyer.

(f)      "Buyers" shall have the meaning set forth in the preamble.

(g)      "Capital Account Balance" shall mean, with respect to the Partnership and each Interest, the applicable Seller's capital account balance in the Partnership with respect to such Interest as reported on the financial statements of the Partnership as of December 31, 2015 and the K-1s as of December 31, 2015, as set forth in Schedule III.

(h)      "Capital Commitment" shall mean, with respect to the Partnership and each Interest, the aggregate amount that the owner of such Interest has committed to contribute to the Partnership with respect to the Interest.

(i)      "CarePayment" shall mean CarePayment Technologies, Inc.

(j)      "Closing" shall mean the event at which Buyers shall acquire the Property and pay the Purchase Price to Sellers for the Property scheduled to take place on the Closing Date.

(k)      "Closing Date" shall mean any date as may be mutually agreed to by Sellers and Buyers after satisfaction or waiver of all conditions set forth in Paragraph 8 and Paragraph 9.

(l)      "Closing Deadline" shall mean the earlier of (i) January 18, 2017 or (ii) 7 business days following the entry of the CCM Portfolio Final Sale Order, except if the CCM Portfolio Final Sale Order is issued prior to January 18, 2017 and there is an appeal or request for reconsideration, the Closing Deadline will be on the earlier of (x) three (3) business days following the date that the CCM Portfolio Final Sale Order becomes a non-appealable order or (y) February 1, 2017.

2

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 2 of 151

*Execution Version*

    (m)    "Code" shall mean the Internal Revenue Code of 1986, as amended.

    (n)    "CCM Debt" means all debt (including principal and accrued interest) related to that certain Business Loan Agreement dated effective May 21, 2015, as amended, between the Partnership, as lender, and CarePayment, as borrower with an outstanding principal balance of $19,000,000.00.

    (o)    "CCM Follow-on Financing" shall mean the follow-on financing commitment of $20,000,000 made by the Buyers to the Partnership, the proceeds of which will be used to make a follow-on investment in CarePayment, as described more fully in the Limited Partner Consent and Election and as referenced in Paragraph 7(n) and Paragraph 8(p).

    (p)    "CCM Liquidity-Offer" shall mean the offer from Buyers to the non-Receivership Entity limited partners of the Partnership to liquidate their interests in the Partnership as described more fully in the Limited Partner Consent and Election and as referenced in Paragraph 8(o).

    (q)    "Contractual Right" shall mean, with respect to each Seller, any contractual right of such Seller under any of the Property Agreements (or otherwise) relating to an Interest, to the extent such Seller has such rights and such rights are transferable, including, without limitation, (i) rights to be represented on committees of the Partnership, if any; (ii) rights of first refusal on issuances of additional limited partner interests of the Partnership; (iii) rights of first refusal, first offer and co-sale among partners of the Partnership; and (iv) rights to receive financial and other information from the Partnership.

    (r)    "Data Room" shall mean the electronic documentation site established on behalf of Sellers containing the documents set forth in the index included in Disclosure Schedule 1(r).

    (s)    "Disclosure Schedules" shall mean the Disclosure Schedules delivered by Sellers and Buyers concurrently with the execution and delivery of this Purchase Agreement. Disclosure Schedules shall not include the Closing Schedules, Schedule I, Schedule II or Schedule III.

    (t)    "EdPlus" shall mean EdPlus Holdings, LLC.

    (u)    "Excluded Assets" shall mean: (i) (x) all of the Securities owned by, or other rights held by, the Partnership in or related to SCA and EdPlus; (y) any contract or other rights relating to such entities, including any loans to or from such entities and any carried interest due under the Partnership Limited Partnership Agreement relating to such entities; and (z) all communication, including, attorney client privileged and confidential information and data owned, held or used by the Partnership relating to such entities and relating to the Excluded Assets; (ii) all insurance policies where a Receivership Entity is a named insured, any rights or claims from such policies for the benefit of the Partnership or its affiliates and any insurance proceeds therefrom (excluding any insurance policies of any Portfolio Company); (iii) the bank account of the Partnership held at MUFG Union Bank and any cash in such account; (iv) any communications among the Receivership Entities during the Receivership, and any communication between the Receiver and his agents on behalf of the Partnership or any Receivership Entities and any third parties regarding the sale of the Partnership, the interests of the Partnership or any portfolio companies of the Partnership; and (v) other items identified on Disclosure Schedule 1(u). The parties confirm that Aequitas Commercial Finance, LLC's interest in Aequitas ETC Founder Fund, LLC which fund holds interests in ETC Global Group, LLC is also an Excluded Assets.

    (v)    "Excluded Obligations" shall mean: (i) any Losses arising as a result of the breach by such Seller of any Additional Seller's Documents or this Purchase Agreement; (ii) any Losses relating to any of the Property or arising under the Property Agreements which arise out of events occurring on or

prior to the Closing Date; (iii) any LP Clawback Obligation; (iv) any obligations or liabilities of such Seller relating to Taxes or other governmental fees attributable to the ownership by such Seller of the applicable Interests prior to the Closing; (v) any obligation or liabilities of the Partnership relating to its interest in MotoLease, LLC prior to the Closing; (vi) any obligation of an LP Seller or GP Seller to pay (or bear) any accrued but unpaid management fees; (vii) any Losses, liabilities or obligations arising from or related to the GP Seller's management of the Partnership prior to the Closing; (viii) any Losses related in anyway whatsoever to the Excluded Assets; (ix) any Losses arising out of claims for violation of securities laws or regulations or breach of the Partnership Limited Partnership Agreement against any Seller or, with respect to claims arising through and including the Closing, the Partnership and (x) other items identified on Disclosure Schedule 1(v).

(w)    "Governmental Entity" shall mean any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any court of competent jurisdiction.

(x)    "GP Interest" shall mean the general partnership interest in the Partnership owned by the GP Seller.

(y)    "Indemnified Person" shall have the meaning set forth in Paragraph 11(e)(i).

(z)    "Indemnifying Party" shall have the meaning set forth in Paragraph 11(e)(i).

(aa)    "Interests" shall mean the Partnership Interests that are being sold pursuant to this Purchase Agreement, as set forth on Schedule I, which for the avoidance of doubt shall include each Seller's corresponding interest in each AIV or similar entity through which such Seller participated in any underlying investment of the Partnership (other than the Excluded Assets).

(bb)    "Investment Company Act" shall mean the Investment Company Act of 1940, as amended.

(cc)    "Investment Lien" shall mean any Lien pertaining to the sale, assignment, disposition or transfer of the Interests (including any consents or approvals of transfers, options, rights of first refusal, co-sale and similar rights) arising out of or based on any Property Agreement.

(dd)    "Knowledge" or any other similar knowledge qualification (i) with respect to each Seller shall mean the actual knowledge of those persons listed on the Disclosure Schedule 1(dd) and (ii) with respect to each Buyer shall mean the actual knowledge of Colin McGrady or Neset Pirkul.

(ee)    "Lien" shall mean any lien, pledge, mortgage, deed of trust, security interest, charge, easement, encroachment or other similar encumbrances.

(ff)    "Losses" shall mean all losses, damages, costs or expenses, including, but not limited to, reasonable attorneys' fees; subject to Paragraph 11(i).

(gg)    "LP Clawback Obligation" shall mean, with respect to each Interest, any liabilities relating to such Interest arising by operation of any "limited partner clawback," "all partner clawback," capital contribution or similar obligation to return or repay distributions or otherwise contribute capital (whether such return, repayment or contribution obligation shall be effected by repayment, drawdown, deduction from any capital account, set-off against any subsequent distribution or otherwise) pursuant to such Interest or as required by applicable law and relating to all or part of a distribution made to the applicable Seller.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 4 of 151

*Execution Version*

(hh)    "LP Consent and Election" shall mean that certain Limited Partner Consent and Election sent by the Receiver to the Partnership's limited partners relating to the transactions described in this Purchase Agreement, the CCM Follow-On Financing, the CCM Liquidity-Offer and the other matters set forth therein.

(ii)    "LP Interests" shall mean the limited partnership interests in the Partnership owned by each LP Seller.

(jj)    "MOGL" shall mean Empyr Incorporated fka MOGL Loyalty Services, Inc.

(kk)    "MotoLease" shall mean MotoLease, LLC.

(ll)    "MotoLease Letters" shall have the meaning set forth in Paragraph 11(a).

(mm)    "New Program Agreements" shall have the meaning set forth in Paragraph 8(q).

(nn)    "Notes" shall mean that certain Promissory Note that is being sold pursuant to this Purchase Agreement, as set forth on Schedule I, issued pursuant to that Business Loan Agreement dated as of September 29, 2011, by and between CarePayment and Lender, as amended (the "Loan Agreement"), and all rights, claims and interests arising thereunder or the Loan Agreement and any agreement, instrument and document to which Lender is a party with respect to the Loan Agreement.

(oo)    "Order" shall mean an order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with a Governmental Entity.

(pp)    "Partnership" shall mean CCM Capital Opportunities Fund, LP fka Aequitas Capital Opportunities Fund, LP, a Delaware limited partnership, the issuer of the Interests as set forth on Schedule I.

(qq)    "Partnership Interests" shall mean all general partner and limited partner ownership (beneficial and of record) interests in the Partnership.

(rr)    "Partnership Limited Partnership Agreement" shall mean the Amended and Restated Limited Partnership Agreement of Aequitas Capital Opportunities Fund, LP (now known as CCM Capital Opportunities Fund, LP) as of February 24, 2014.

(ss)    "Person" shall mean any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or Governmental Entity.

(tt)    "Portfolio Companies" shall mean the following entities, of which the shares and units identified on Disclosure Schedule 1(tt) are owned by the Partnership: (i) ETC Global Group, LLC; (ii) MotoLease, LLC; (iii) QuarterSpot, Inc; (iv) Independence Bancshares, Inc., (v) Mogl Loyalty Services, Inc. and (vi) CarePayment Technologies, Inc.  Due to the limited information available to the Sellers and the Receiver as to the potential existence of any options, calls, warrants, commitments or any other rights of any Person to acquire an interest in any of the Portfolio Companies, Sellers have informed Buyers that they will only provide the Partnership's current ownership interest in each of the Portfolio Companies and not its "fully diluted" ownership interest.

(uu)    "Pre-Closing Tax Period" shall mean any taxable period that ends on or before the Closing Date.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 5 of 151

*Execution Version*

(vv)  "Property" shall mean all of the Interests, Notes and Property Agreements, including all of the Contractual Rights.

(ww)  "Property Agreement" shall mean any agreement, instrument and document to which a Seller is a party that governs or regulates the terms of such Seller's ownership in the Interests, including subscription agreements, partnership agreements, side letters and other similar agreements, and any schedules or exhibits thereto, in each case, as amended, modified or supplemented and in effect, and including such agreements, instruments or documents relating to any AIV or other similar vehicle of the Partnership.  For the avoidance of doubt, Property Agreement does not include any agreement between the Partnership or any Seller on the one hand, and the Portfolio Companies, on the other hand.

(xx)  "Property Purchase Price" shall have the meaning set forth in Paragraph 4(a).

(yy)  "Purchase Price" shall have the meaning set forth in Paragraph 4(a).

(zz)  "Required Approvals" shall mean the "Required Approvals" listed on Schedule II hereto and identified on that Schedule by Sellers and Buyers as the Required Approvals for purposes of Closing from the list of all notices, legal opinions, consents, amendments, waivers and modifications required pursuant to the terms of any of the Property Agreements or such other documents in order to permit consummation of the transactions contemplated by this Purchase Agreement, including, without limitation, (i) with respect to the transfer of the LP Interests by each LP Seller to the LP Buyer, waivers of all prohibitions on transfer, waivers of all rights of first refusal, co-sale rights or similar rights, as applicable, and consents by the general partner of the Partnership to the transfer of such LP Interests to the LP Buyer and the admission of each LP Buyer as a limited partner of the Partnership, (ii) with respect to the transfer of the GP Interest by the GP Seller to the GP Buyer, the required consent of the Partnership limited partners and (iii) any approvals required in connection with the transfer of the Excluded Assets from the Partnership to the Side Pocket SPV.

(aaa)  "SCA" shall mean SCA Holdings, LLC and its affiliates.

(bbb)  "Schedule Supplement" shall have the meaning set forth in Paragraph 7(i).

(ccc)  "SEC" shall mean the U.S. Securities and Exchange Commission.

(ddd)  "Securities" shall have the meaning ascribed to that term in the Act.

(eee)  "Seller" shall have the meaning set forth in the preamble.

(fff)  "Side Pocket SPV" shall have the meaning set forth in Paragraph 8(k).

(ggg)  "Tax" (and, with correlative meaning, "Taxes," and "Taxable") shall mean any net or gross income, net or gross receipts, net or gross proceeds, capital gains, capital stock, sales, use, user, leasing, lease, transfer, natural resources, premium, ad valorem, value added, franchise, profits, gaming, license, capital, withholding, payroll or other employment, estimated, goods and services, severance, excise, stamp, fuel, interest equalization, registration, recording, occupation, premium, turnover, personal property (tangible and intangible), real property, unclaimed or abandoned property, alternative or add-on, windfall or excess profits, environmental (including Code Section 59A), social security, disability, unemployment or other tax or customs duties or amount imposed by (or otherwise payable to) any Governmental Entity, or any interest, any penalties, additions to tax or additional amounts assessed, imposed, or otherwise due or payable under applicable laws with respect to taxes, in each case, whether disputed or not.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 6 of 151

*Execution Version*

(hhh)  "Tax Return" shall mean any return, declaration, report, claim for refund, or information return or statement required to be filed with respect to Taxes, including any schedule or attachment thereto, and any amendments, submitted to (or required under applicable laws to be submitted to) a Governmental Entity.

(iii)  "Third Party Claim" shall have the meaning set forth in Paragraph 11(e)(i).

(jjj)  "Transfer Taxes" shall mean all sales (including bulk sales), use, transfer (including real property transfers or gains), filing, recording, ad valorem, privilege, documentary, gains, gross receipts, registration, conveyance, excise, license, stamp, duties or similar Taxes or fees (other than any fees and expenses of the Partnership), together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties incurred in connection with any transaction contemplated by this Purchase Agreement, but not including any income Taxes (or withholding Taxes with respect thereto).

## 2.    Sale and Purchase of the Property.

Subject to the terms and conditions of this Purchase Agreement, and in reliance on the representations, warranties and agreements set forth in this Purchase Agreement, at the Closing, Sellers shall sell, assign, transfer and deliver to Buyers, and Buyers shall purchase and acquire from Sellers, all right, title and interest of Sellers in and to the Property. For the avoidance of doubt, the Excluded Obligations shall remain the responsibility of the applicable Seller before and after the Closing. Schedule I hereto sets forth the percentage allocation of the Notes and each Interest to be purchased by each Buyer at the Closing. Except for the Excluded Obligations, Buyers shall assume after the Closing Date, and shall after the Closing Date perform and discharge in accordance with their respective terms, all of Sellers' or Seller's affiliates' duties, obligations and liabilities under the applicable Property Agreements relating to the applicable Property purchased pursuant to this Purchase Agreement. Buyers shall not assume the Excluded Obligations and neither the Buyers nor the Partnership shall be entitled to the Excluded Assets.

## 3.    Closing.

(a)  The transactions contemplated by this Purchase Agreement shall take place at one Closing. The Closing will take place on the Closing Date by exchange of executed documents via facsimile or email, or at such place as Buyers and Sellers may agree. If any condition in Paragraph 8 or Paragraph 9 is not satisfied in any respect (or is not duly waived) at the Closing, the party whose obligations are subject to such condition may extend the Closing Date (during which extension the other party shall use commercially reasonable efforts to cause all such conditions to be satisfied in all respects). If all conditions are determined to be satisfied (or are duly waived) at the Closing (whether or not delayed), the Closing shall be consummated.

(b)  At the Closing, each Buyer shall deliver to each Seller: (i) that portion of the Property Purchase Price relating to each Interest and the Notes being transferred or assigned by such Seller at the Closing, (ii) all applicable executed Assignment Agreements and other applicable Additional Buyer's Documents, (iii) the certificates and other documents referred to in Paragraph 8 to be delivered by a Buyer as a condition to the consummation of the transactions contemplated under this Purchase Agreement, and (iv) if not theretofore delivered, all other instruments and documents commercially reasonably required by Sellers and the Partnership to be delivered by Buyers as a condition to the consummation of the transactions contemplated under this Purchase Agreement.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 7 of 151

*Execution Version*

(c)     At the Closing, each Seller shall deliver or cause to be delivered to Buyers: (i) all applicable executed Assignment Agreements and other applicable Additional Seller's Documents, (ii) all of the Property Agreements and other documents that constitute a part of the Interests and Notes to be transferred or assigned at the Closing by such Seller and have not previously been delivered to Buyers, (iii) the certificates and other documents referred to in Paragraph 9 to be delivered by such Seller as a condition to the consummation of the transactions contemplated under this Purchase Agreement, (iv) the Required Approvals, and (v) if not theretofore delivered, all other instruments and documents commercially reasonably required by Buyers to be delivered by Sellers as a condition to the consummation of the transactions contemplated under this Purchase Agreement.

**4.      Purchase Price and Financial Obligations of Buyers.**

(a)     The aggregate purchase price for each Interest and the Notes (the "Property Purchase Price") shall be the amount set forth opposite the name of the relevant Seller and Buyer relating to such Property on Schedule I under the heading "Purchase Price Allocation." The aggregate purchase price for all of the Interests and Notes making up the Property shall be $52,000,000.00 (the "Purchase Price"). The Purchase Price will be allocated first to the Notes in respect of all outstanding and unpaid principal and accrued interest owed under the Notes, and the remainder of the Purchase Price will be allocated to the Interests.

(b)     To the extent that any debt is owed by CarePayment or the Partnership to a Receivership Entity other than the Notes and CCM Debt, the Purchase Price shall be reduced by the amount of such debt (including all principal and accrued interest), and at the Closing, the Buyers shall repay on behalf of such company, or cause such company to repay, the amount of such debt in full.

(c)     At the Closing, each Buyer shall pay that portion of each Property Purchase Price as set forth on Schedule I by wire transfer of immediately available funds pursuant to wire instructions to be provided prior to Closing.

**5.      Representations and Warranties of Sellers.**

The Disclosure Schedules shall be arranged in paragraphs and subparagraphs contained in this Paragraph 5 and the disclosure in any paragraph or subparagraph shall qualify the corresponding paragraphs and subparagraphs in this Paragraph 5.

(a)     Representations as to the Sellers. Each Seller hereby represents and warrants to Buyers, as of the date of this Purchase Agreement and as of the Closing Date, as follows:

(i)     Authorization. Such Seller is an entity duly formed/organized and validly existing in good standing under the laws of its jurisdiction of formation/organization (to the extent good standing is recognized in such jurisdiction). Subject to the Initial Order and the CCM Portfolio Final Sale Order (if issued) and subject to obtaining all Required Approvals, (A) the Receiver has full power and authority on behalf of each Seller to enter into, execute and deliver this Purchase Agreement and each of the Additional Seller's Documents to which such Seller is a party and to perform all of the obligations to be performed by it hereunder and thereunder; and (B) this Purchase Agreement has been, and each of the Additional Seller's Documents to which such Seller is party will have been at the Closing, duly authorized, executed and delivered by it, and this Purchase Agreement constitutes at the Closing, its valid and binding obligation, enforceable against it in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of

8

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 8 of 151

*Execution Version*

creditors' rights generally. Each of the Initial Order and the Stub Portfolio Final Sale Order is in full force and effect as of this date, and if issued, the CCM Portfolio Final Sale Order will be in full force and effect and will not be stayed, vacated or reversed on the Closing Date.

    (ii)    <u>Conflicts and Consents</u>.

    (A)    Subject to obtaining the Required Approvals, and assuming the accuracy of each Buyer's representations and warranties in <u>Paragraph 6</u>, none of the execution and delivery by such Seller of this Purchase Agreement or the Additional Seller Documents to which it is a party, the consummation of the transactions contemplated hereby or thereby, or compliance by such Seller with any of the provisions hereof or thereof, will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under, any provision of (i) the certificate of organization or formation (or the equivalent organizational or constituent documents) of such Seller, (ii) any Property Agreement, (iii) any Order to which such Seller or to Sellers' Knowledge, by which any of the properties or assets of such Seller is bound or (iv) any applicable law.

    (B)    No Required Approval, Order, consent, waiver, permit or authorization of, or filing with, or notification to, any Governmental Entity or third party is required on the part of such Seller in connection with the execution and delivery of this Purchase Agreement or such Additional Seller Documents to which it is a party or the compliance by such Seller with any of the provisions hereof or thereof, or the consummation of the transactions contemplated hereby or thereby. All Required Approvals will have been duly obtained or waived by Buyers and Sellers on or before the Closing Date.

    (iii)    <u>Brokers</u>. Except as disclosed on <u>Disclosure Schedule 5(a)(iii)</u>, since October 1, 2015 and to Sellers' Knowledge, such Seller has not, directly, or indirectly, dealt with anyone acting in the capacity of a finder or broker, nor has such Seller incurred any obligations for any finder's or broker's fee or commission, in connection with the transactions contemplated by this Purchase Agreement.

    (iv)    <u>Employee Benefit Plan</u>. Such Seller is not, and is not acting on behalf of, an employee benefit plan or "benefit plan investor" within the purview of the Employment Retirement Income Security Act (ERISA).

    (v)    <u>Acknowledgements</u>. Such Seller is a sophisticated and experienced investor and has evaluated the merits and risks of selling the Interests on the terms set forth in this Purchase Agreement on its own and without reliance upon Buyers or any information provided by Buyers or their representatives (other than with respect to Buyers' representations, warranties and covenants set forth herein), and has such knowledge and experience in financial and business matters and in making investments of this type that it is capable of evaluating the merits and risks of such purchase, is aware of and has considered the financial risks and financial hazards of selling the Interests on the terms set forth in this Purchase Agreement and is able to bear the economic risks of selling the Interests. Sellers acknowledge that Buyers have not given Sellers any investment advice and that the Purchase Price may be more or less than the fair market value of the Interests. Sellers have had access to such information regarding the business and finances of the Partnership and such other matters with respect to each Interest as a reasonable person would consider in evaluating the transactions contemplated by this Purchase Agreement.

9

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 9 of 151

(b)    Representations as to the Interests.  Except as disclosed on Disclosure Schedule 5(b) and subject to obtaining the Required Approvals, each Seller hereby represents and warrants to Buyers, as of the date of this Purchase Agreement and as of the Closing Date, as follows:

(i)    Ownership.

(A)    Such Seller owns all right, title and interests (legal and beneficial) in and to the Property, free and clear of all Liens other than Investment Liens and restrictions under federal and state securities laws.  Upon delivery of the Interests to Buyers and payment to Sellers of the Purchase Price for such Interests, Buyers will acquire good title to such Interests free and clear of all Liens other than (i) Investment Liens pertaining to Buyers and restrictions under federal and state securities laws and (ii) any Liens created by Buyers.  Except for the Property, including the Interests, no Seller nor any other Receivership Entity owns any other interests in the Property or any other interests in the Partnership.

(B)    Schedule I sets forth the record and beneficial owners of the Interests in accordance with the books and records of the Sellers and the Partnership.  To Sellers' Knowledge, (i) all of the Interests are duly authorized, validly issued, fully paid and non-assessable (to the extent such concepts are applicable); (ii) none of the Interests are subject to any right of first refusal, co-sale right or any other pre-emptive right in connection with the transactions contemplated in this Purchase Agreement; and (iii) no other Person, except as set forth in the Property Agreements, has any options, calls, warrants, commitments or rights of any character whatsoever to acquire an interest in the Partnership that would reduce such Seller's percentage ownership in the Partnership.

(ii)    Agreements and Commitments.

(A)    Such Seller has furnished to Buyers copies of all Property Agreements relating to the Interests.  To Sellers' Knowledge, all of the Property Agreements are listed on Disclosure Schedule 5(b)(ii)(A).  Such Seller will use commercially reasonable efforts to assist Buyers in obtaining any additional documents relating to the Interests.  Other than this Purchase Agreement, the Property Agreements and any liens on the Interests (to be removed pursuant to the CCM Portfolio Final Sale Order), to each Seller's Knowledge, such Seller is not a party to any contract, agreement or commitment with respect to the Interests.

(B)    To each Seller's Knowledge, such Seller has contributed to the capital of the Partnership all amounts or assets which it was required to contribute pursuant to the terms of the relevant Property Agreements, and, except for the remaining capital commitments set forth on Disclosure Schedule 5(b)(ii)(B), such Seller has no obligation to make any further capital contributions or other payments, including capital contributions for management fees or obligations to loan money, to the Partnership.  To each LP Seller's Knowledge, such LP Seller does not have discretion with respect to any particular investment by the Partnership and such LP Seller has not opted out of or been excluded, voluntarily or involuntarily, from any investments of the Partnership pursuant to the terms of the Property Agreements or otherwise.  No Seller has been requested by the Partnership to pay capital to pay management fees due and payable on or prior to the Closing Date pursuant to the terms of the relevant Property Agreements.  To

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 10 of 151

such Seller's Knowledge, such Seller has not made any voluntary capital contributions or written commitments to the Partnership nor have any been made on behalf of it.

(C)   To each Seller's Knowledge, such Seller (i) has not received any written request to return any distributions or portions of distributions previously received by it from the Partnership; (ii) subject to obtaining the Required Approvals, is not in material default or breach, nor is there any basis for any valid claim of material default or breach, under any Property Agreement; and (iii) has not elected to be treated as a "blocker partner" for U.S. federal tax purposes or participated in any underlying investment of the Partnership through an intermediary entity treated as a corporation for U.S. federal income tax purposes.  Except as set forth on Disclosure Schedule 5(b)(ii)(C), to each Seller's Knowledge, such Seller has not participated in any underlying investment of the Partnership through an AIV.

(iii)   Litigation.  Except as set forth on Disclosure Schedule 5(b)(iii), there is (a) no Legal Proceeding pending or, to such Seller's Knowledge, threatened against such Seller or the Partnership, at law or in equity, before or by any Governmental Entity, which, if adversely determined, would question the validity of, or prevent or delay the consummation of, the transactions contemplated by this Purchase Agreement or such Seller's ability to perform its obligations hereunder or materially and adversely affects such Seller's ability to transfer the Interests being transferred by Seller pursuant to this Purchase Agreement; (b) no action or suit by such Seller pending or threatened against any other Person involving the Interests or the Partnership (other than any actions or suits related solely to Excluded Assets); and (c) no Order has been issued which may materially adversely affect such Seller's ability to consummate the transactions contemplated by this Purchase Agreement.

(iv)   Lists of Commitments, etc.  To the Sellers' Knowledge, Schedule III contains true and accurate lists of (A) such Seller's aggregate Capital Commitment and remaining capital commitment to the Partnership with respect to each Interest; and (B) the amount of the Capital Account Balances of such Seller in the Partnership with respect to each Interest.

(v)   Certain Conduct.  Except as set forth on Disclosure Schedule 5(b)(v), since October 1, 2015, to Sellers' Knowledge, such Seller has not (A) sold, assigned, transferred, delivered or otherwise disposed of any of the Property; (B) converted, exchanged or redeemed any of the Interests; (C) forgiven, released or compromised any indebtedness owed to it by the Partnership other than upon full payment thereof or demanded payment of any indebtedness owed to it by the Partnership; (D) amended, canceled or terminated any Property Agreement or entered into any new Property Agreement; (E) waived, amended, canceled or terminated any material Contractual Right; (F) created or permitted to exist any Lien on any portion of the Property, other than Investment Liens; nor (G) agreed to do any of the foregoing.

(vi)   Limited Liability.  To such Seller's Knowledge, such Seller has not received any written notice that the limited liability of the partners of the Partnership has not been recognized in any jurisdiction applicable to the Partnership.

(c)   Representations as to the Partnership.  Subject to obtaining the Required Approvals, the GP Seller hereby represents and warrants to Buyers, as of the date of this Purchase Agreement and as of the Closing Date, as follows:

11

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 11 of 151

(i)    Organization.  The Partnership is an entity duly formed and validly existing in good standing under the laws of its jurisdiction of formation.  The Partnership has the requisite limited partnership power and authority to carry on its business as now conducted pursuant to the Final Receiver Order.

(ii)    Capitalization.  To GP Seller's Knowledge: (A) all of the Partnership Interests in the Partnership (including, but not limited to, each of the Interests being transferred by a Seller hereunder) have been duly authorized and are validly issued, fully paid and non-assessable; (B) Disclosure Schedule 5(c)(ii)(B) sets out a true, complete and accurate "schedule of partners" of the Partnership as of the date hereof, including the name and capital commitment of each partner of record of the Partnership as of the date hereof; (C) the listed Partnership Interests constitute all of the total outstanding ownership interests in the Partnership; (D) none of the Partnership Interests have been issued in violation of any preemptive or similar rights; (E) except for the Partnership Interests set forth on Disclosure Schedule 5(c)(ii)(B), there are no outstanding (i) equity interests in the Partnership, (ii) securities convertible into, or exercisable or exchangeable for, equity interests in the Partnership, or (iii) options, other rights, arrangements, or agreements (other than this Purchase Agreement) to acquire from the Partnership, or cause the Partnership to issue, any equity interests in, or any securities convertible into, or exercisable or exchangeable for, equity interests in, the Partnership; and (F) the capitalization tables listed on Disclosure Schedule 5(c)(ii)(F) with respect to each of the Portfolio Companies that Sellers have provided to Buyers are true and correct as of the respective dates referenced on such capitalization tables.

(iii)    Portfolio Companies.  The Partnership currently owns the shares and units in each of the Portfolio Companies as reflected in the definition thereof in Paragraph 1.

(iv)    Indebtedness.  Disclosure Schedule 5(c)(iv) sets forth a list of all contracts under which indebtedness for borrowed money is currently outstanding by the Partnership.

(v)    Financial Statements.  Sellers have delivered to Buyers copies of the financial statements of the Partnership listed on Disclosure Schedule 5(c)(v).

(vi)    Approvals.  Except for the Required Approvals, no material third party consents are required in connection with the execution or performance of this Purchase Agreement.

(vii)    Affiliate Transactions.  Except for the Assignment Agreements, to the GP Seller's Knowledge, there are no written agreements, arrangements, understandings, transfers or other commitments or transactions, whether or not in the ordinary course of business, between the Partnership, on the one hand, and a Seller or any of its affiliates, on the other hand, that will continue following the Closing.

(viii)    AML.  GP Seller will provide any OFAC certifications or information in its possession regarding the Partnership or any general partner or limited partner of the Partnership to Buyers.  To GP Seller's Knowledge, other than the former directors, officers, and principals of the Receivership Entities, none of the Partnership nor any general partner or limited partner of the Partners (A) has been convicted of or charged with a felony relating to money laundering or other similar or related illegal activity or (B) is under investigation by any Governmental Entity for money laundering or any other similar or related illegal activity.  In addition, none of the transactions contemplated by this Purchase Agreement is being undertaken for any illegal purpose, including, but not limited to, money laundering activities.

*Execution Version*

(ix)　Taxes.

(A)　To the Sellers' Knowledge, (i) all U.S. federal income Tax Returns and all other material Tax Returns required to be filed by the Partnership have been duly and timely filed, (ii) all Taxes required to be paid by the Partnership have been duly and timely paid, and (iii) all Taxes required to be withheld by the Partnership have been duly and timely withheld, and such withheld Taxes have been either duly and timely paid to the proper Governmental Entity or, to the extent not yet payable, properly set aside in accounts for such purpose.

(B)　The Partnership is classified as a partnership (and to the Knowledge of Sellers has never been classified as an association taxable as a corporation) for U.S. tax purposes and is not (and to the Knowledge of Sellers never has been) a "publicly traded partnership" as defined in Treasury Regulations Section 1.7704-1.

(C)　To the Knowledge of Sellers, (i) no audits or other Legal Proceedings are in progress with regard to any Taxes or Tax Returns of or with respect to the Partnership and (ii) neither the Partnership nor any Seller as a result of its ownership of the Partnership has received in the years of the Partnership's existence a notice from any tax authority that the Partnership or such Seller as a result of its ownership of the Partnership is required to pay Taxes or file Tax Returns in a jurisdiction in which the Partnership or such Seller as a result of its ownership of the Partnership does not file Tax Returns or pay Taxes.

(D)　The Sellers have provided to the Buyers true, correct and complete copies of all material Tax Returns filed by the Partnership for the last three (3) taxable years.

(E)　The Partnership does not have an election in effect to be treated as an "electing investment partnership" under Section 743(e)(6) of the Code.

(F)　Except for certain representations related to Taxes in this Paragraph 5(c)(ix), the representations and warranties set forth in this Paragraph 5(c)(ix) are the Sellers' sole and exclusive representations and warranties regarding Tax matters.

(d)　Representations as to the Notes. Lender hereby represents and warrants to Buyers, as of the date of this Purchase Agreement and as of the Closing Date, as follows:

(i)　Ownership. Except as set forth on Disclosure Schedule 5(d)(i), Lender owns all right, title and interests (legal and beneficial) in and to the Notes, free and clear of all Liens. Upon delivery of the Notes to Buyers and payment to Lender of the Purchase Price for such Notes, Buyers will acquire good title to such Notes free and clear of all Liens.

(ii)　Principal Amount. The aggregate principal amount outstanding with respect to the Notes is $3,483,723 with accrued and unpaid interest of $348,242 as of November 30, 2016.

(iii)　Agreements and Commitments. Lender has furnished to Buyers copies of the Notes, the Loan Agreement and all other agreements, instruments relating to the Notes, all of which are listed on Disclosure Schedule 5(d)(iii).

(e)　Representations as to CarePayment. The GP Seller hereby represents and warrants to Buyers, as of the date of this Purchase Agreement and as of the Closing Date, as follows:

*Execution Version*

(i)    <u>Capitalization</u>.  Except as set forth on <u>Disclosure Schedule 5(e)(i)</u>, the number of shares of capital stock that CarePayment has authority to issue is (A) 75,000,000 shares of common stock, of which 65,000,000 shares are designated Class A Common Stock and 10,000,000 shares are designated Class B Common Stock and (B) 10,000,000 shares of Preferred Stock, of which 17,857,242 shares of Class A Common Stock, 8,010,092 shares of Class B Common Stock and no shares of Preferred Stock (collectively, the "<u>Shares</u>") are issued and outstanding.  The Shares are duly authorized, validly issued, fully paid and nonassessable, and were not issued in violation of any preemptive rights or any federal or state securities Law. Except as set forth on <u>Disclosure Schedule 5(e)(i)</u>, there are (1) no authorized or outstanding options, warrants, calls, securities, rights (preemptive or other), subscriptions, commitments or other contracts that give any person the right to purchase, subscribe for or otherwise receive or be issued any shares of capital stock of CarePayment or any security convertible into or exchangeable or exercisable for any shares of capital stock of CarePayment, (2) no outstanding debt or equity securities of CarePayment which upon the conversion, exchange, or exercise thereof would require the issuance, sale, or transfer by CarePayment of any new or additional equity interests in CarePayment (or any other securities of CarePayment which, whether after notice, lapse of time, or payment of monies, are or would be convertible into or exchangeable or exercisable for equity interests in CarePayment), (3) no agreements or commitments obligating CarePayment to repurchase, redeem or otherwise acquire any shares of capital stock of CarePayment and (4) no outstanding or authorized stock appreciation rights, phantom stock or stock rights in respect of CarePayment.  CarePayment has not issued any voting indebtedness. There is no proxy, stockholder agreement, voting trust or other agreement or understanding to which CarePayment or any Seller is a party or by which it is bound relating to the voting of any shares of capital stock of CarePayment and there are no rights to participate in the equity, income or election of directors or officers of CarePayment.

(ii)    <u>Financial Statements</u>.  Sellers have delivered to Buyers true and correct copies of the audited financial statements of CarePayment listed on <u>Disclosure Schedule 5(e)(ii)</u>.    Sellers have delivered to Buyers copies of the internally prepared and unaudited financial statements of CarePayment listed on <u>Disclosure Schedule 5(e)(ii)</u>.

(iii)    <u>No Undisclosed Liabilities</u>.  To the GP Seller's Knowledge, and except as listed on <u>Disclosure Schedule 5(e)(iii)</u>, CarePayment has no indebtedness, obligations or Liabilities of any kind other than those (i) fully reflected in, reserved against or otherwise described in the financial statements or the notes thereto delivered to Buyers prior to the date hereof or (ii) arising in the ordinary course of business consistent with past practice, or (iii) indebtedness, obligations and Liabilities, individually and collectively, are not material in amount.  The term "Liabilities" includes any indebtedness, loss, damage, adverse claim, liability or obligation (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability or otherwise).

(iv)    <u>Compliance with Laws</u>.  To the GP Seller's Knowledge, and except as listed on <u>Disclosure Schedule 5(e)(iv)</u>, CarePayment is in compliance in all material respects with all laws and Orders applicable to it and its assets and properties.  To the GP Seller's Knowledge, and except as listed on <u>Disclosure Schedule 5(e)(iv)</u>, CarePayment has not received any notice of or been charged with the violation of any law or Order within the last 12 months that has not been cured.    To the GP Seller's Knowledge, and except as listed on <u>Disclosure Schedule 5(e)(iv)</u>,CarePayment is not under investigation in respect of the violation of any law or Order and there are no facts or circumstances that could form the basis for any such violation.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 14 of 151

*Execution Version*

(f)     Except for the representations and warranties contained in this Paragraph 5 (including the related portions of the Disclosure Schedules), none of Sellers, the Partnership, the Receiver or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Sellers or the Partnership, including any representation or warranty as to the accuracy or completeness of any information regarding the Partnership or the Property furnished or made available to Buyers (including any information, documents or material made available to Buyers in the Data Room, presentations or in any other form in expectation of the transactions contemplated by this Purchase Agreement) or as to the future revenue, profitability or success of the Partnership or the Property, or any representation or warranty arising from statute or otherwise in law.

**6.      Representations and Warranties of Buyers.**

The Disclosure Schedules shall be arranged in paragraphs and subparagraphs contained in this Paragraph 6 and the disclosure in any paragraph or subparagraph shall qualify the corresponding paragraphs and subparagraphs in this Paragraph 6.

Each Buyer hereby represents and warrants to each Seller, as of the date of this Purchase Agreement and as of the Closing Date, as follows:

(a)     Authorization.  Such Buyer is an entity duly organized and validly existing in good standing under the laws of its jurisdiction of organization.  Subject to obtaining the Required Approvals, such Buyer has the requisite power and authority to enter into, execute and deliver this Purchase Agreement and each of the Additional Buyer's Documents to which it is party and to perform all of the obligations to be performed by it hereunder and thereunder.  This Purchase Agreement has been, and each of the Additional Buyer's Documents to which it is party will have been at the Closing, duly authorized, executed and delivered by it, and this Purchase Agreement constitutes, and each of the Additional Buyer's Documents to which it is party will constitute at the Closing, its valid and binding obligation, enforceable against it in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally.

(b)     No Conflicts.  Subject to obtaining the Required Approvals and except as set forth on Disclosure Schedule 6(b), assuming the accuracy of each Seller's representations and warranties in Paragraph 5, neither the execution and delivery of this Purchase Agreement or the Additional Buyer's Documents to which it is party nor the performance or consummation of the transactions contemplated by this Purchase Agreement by such Buyer will conflict with, result in the breach of, constitute a default under or accelerate the performance required by the terms of: (i) any law, rule or regulation of any Governmental Entity or regulatory agency; (ii) any Order, permit or license of any Governmental Entity or regulatory agency to which such Buyer may be subject; (iii) any contract, agreement, commitment or instrument to which such Buyer is a party or by which it or any of its assets is bound; or (iv) such Buyer's constituent documents or other governing instruments (or constitute an event which, with the passage of time or action by a third party, would result in any of the foregoing).  The execution and delivery of this Purchase Agreement by such Buyer and, assuming the accuracy of each Seller's representations and warranties in Paragraph 5, the performance and consummation of the transactions contemplated by this Purchase Agreement do not require any registration, filing, qualification, consent or approval under any such law, rule, regulation, Order, permit or license to which such Buyer may be subject.

(c)     Acknowledgments.  Such Buyer is acquiring the Interests for such Buyer's own account, for investment and not with a view to the distribution or resale thereof, except in compliance with the Act and applicable state securities laws.  Such Buyer is a sophisticated and experienced investor and has

*Execution Version*

evaluated the merits and risks of purchasing the Interests on the terms set forth in this Purchase Agreement on its own and without reliance upon Sellers or any information provided by Sellers or their representatives (other than with respect to Sellers' representations, warranties and covenants set forth herein), and has such knowledge and experience in financial and business matters and in making investments of this type that it is capable of evaluating the merits and risks of such purchase, is aware of and has considered the financial risks and financial hazards of purchasing the Interests on the terms set forth in this Purchase Agreement and is able to bear the economic risks of purchasing the Interests. Such Buyer acknowledges that Sellers have not given such Buyer any investment advice and that the Purchase Price may be more or less than the fair market value of the Interests. Such Buyer has had access to such information regarding the business and finances of the Partnership and such other matters with respect to each Interest as a reasonable person would consider in evaluating the transactions contemplated by this Purchase Agreement, including, in particular, all information necessary to determine the fair market value of the Interests. Such Buyer is an "accredited investor," as that term is defined in Rule 501(a) of Regulation D under the Act and a "qualified purchaser" as that term is defined in Section 2(a)(51) of the Investment Company Act.

(d)     <u>Brokers</u>.  Such Buyer has not, directly or indirectly, dealt with anyone acting in the capacity of a finder or broker and has not incurred any obligations for any finder's or broker's fee or commission in connection with the transactions contemplated by this Purchase Agreement.

(e)     <u>Litigation</u>.  Except as disclosed on <u>Disclosure Schedule 6(e)</u>, there is no Legal Proceeding pending or, to such Buyer's knowledge, threatened against such Buyer, at law or in equity, before or by any Governmental Entity, which, if adversely determined, would question the validity of, or prevent or delay the consummation of, the transactions contemplated by this Purchase Agreement or such Buyer's ability to perform its obligations hereunder or materially and adversely affects such Buyer's ability to purchase the Interests being sold to such Buyer pursuant to this Purchase Agreement.

(f)     **Sufficiency of Funds.**  Buyers have sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Purchase Agreement.

7.     **Covenants.**

(a)     <u>Cooperation</u>.  Prior to the Closing, each of the parties to this Purchase Agreement will cooperate and use commercially reasonable efforts to execute and deliver such additional documents, certificates and instruments to perform such additional acts and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper, advisable or appropriate hereunder and under applicable law to consummate the transfer of the Interests and otherwise consummate the transactions contemplated by this Purchase Agreement, including, without limitation, (i) taking such actions commercially reasonably necessary to procure all Required Approvals as of the Closing, (ii) satisfying the conditions set forth in <u>Paragraph 8</u> and <u>Paragraph 9</u> (the "<u>Closing Conditions</u>"), provided that, such obligation to use commercially reasonable efforts to satisfy the Closing Conditions shall not obligate any party to waive any Closing Condition or pay any consent fee to any other Person, and (iii) furnishing any non-confidential information or performing any action commercially reasonably requested by another party, in each case, that does not adversely affect such party.

(b)     <u>Access and Information</u>.  From the date hereof until the Closing or the earlier termination of this Purchase Agreement, the Sellers shall give Buyers and their respective affiliates and their respective accountants, counsel and other representatives reasonable access (and shall use commercially reasonable efforts to cause relevant service providers, if any, to provide such access) during normal business hours to employees of the Sellers and its affiliates whose roles or duties previously related to

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 16 of 151

*Execution Version*

the management of the Partnership to the extent reasonably requested by Buyers and shall furnish Buyers with such documents, financial data, records and information with respect to the Partnership as Buyers shall from time to time reasonably request.

(c)     <u>Conduct of Sellers Pending Closing</u>.  Each Seller agrees that from the date of this Purchase Agreement until the Closing Date:

(i)     Such Seller shall provide Buyers with prompt notice of any distributions received or expected by such Seller on or prior to the Closing Date with respect to any Interest to be transferred by such Seller pursuant to this Purchase Agreement.

(ii)     Except as consented to by the applicable Buyer(s) in writing, which consent will not be unreasonably withheld, delayed or conditioned, or in accordance with any Required Approvals, no Seller will: (A) dispose, liquidate, mortgage, sell, assign, or transfer any Interest; (B) consent to, amend, modify, cancel or terminate any of the Property Agreements or the Contractual Rights, in each case with respect to any of the Interests being sold by such Seller, or enter into any agreement relating thereto or to the Interests being sold by such Seller hereunder; (C) fail to materially perform, or take any action or omit to take any action that would constitute a further material breach of, its obligations under any of the Property Agreements or the Contractual Rights; (D) create or permit to exist any Lien on the Interests other than the Investment Liens, restrictions under federal and state securities laws or as disclosed on the <u>Disclosure Schedule 7(c)(ii)(D)</u>; (E) take any action the effect of which would be to incur a material penalty or other specified material adverse consequence under any of the Property Agreements or the Contractual Rights, including the conversion of all or a portion of the Interests to a fixed obligation; (F) take any action which would result in a reduction in such Seller's percentage of ownership in the Partnership; (G) waive any material right with respect to any Interest; or (H) agree to do any of the foregoing.

(d)     <u>Conduct of the Partnership Pending Closing</u>.  The GP Seller agrees that from the date of this Purchase Agreement until the Closing, except (1) as expressly permitted by this Purchase Agreement, (2) to the extent required by applicable law or (3) as otherwise consented to by the applicable Buyer in writing, which consent will not be unreasonably delayed, withheld or conditioned, the GP Seller shall use commercially reasonable efforts to cause the Partnership to carry on its business in the same course as the Receiver has been conducting the business under the Final Receiver Order and related or subsequent orders. Without limiting the generality of the foregoing, unless consented to by GP Buyer in writing, or as otherwise contemplated by this Purchase Agreement, the Partnership shall not dispose of any of its interests in the Portfolio Companies, incur any additional indebtedness that will not be satisfied on or prior to the Closing Date, or any take any other action that would reasonably be expected to impair the value of the Interests.

(e)     <u>Change of Condition</u>.  After the date of this Purchase Agreement and on or prior to the Closing Date, Sellers shall give prompt notice to Buyers if Sellers obtain actual Knowledge, or have a reasonable belief, of (A) any other default or event which, with notice or lapse of time or both, would become a material default, under any of the Property Agreements or the Contractual Rights, (B) any written material notice or other written material communication from or on behalf of any of the Portfolio Companies relating to an adverse consequence to the Portfolio Companies, (C) any written notice or other written communication relating to any contemplated or pending Legal Proceeding by any Governmental Entity involving or relating to the Partnership or any Interest (other than the SEC and other governmental action relating to the former officers, directors and principals of the Receivership Entities), and (D) any matter which would cause a breach of any representations made by any Seller in this Purchase Agreement. With respect to any notice or other communication received by a Seller that

pertains to any matter described in (A)-(D) of the preceding sentence, Sellers shall promptly furnish Buyers with a copy thereof (including any related materials).

 (f) <u>Tax Matters</u>.

  (i) Sellers, Buyers and the Partnership shall treat the transactions contemplated by this Purchase Agreement as a termination of the Partnership for federal income tax purposes pursuant to Section 708 of the Code, with the result that the current taxable year of the Partnership shall terminate on the Closing Date.

  (ii) The Sellers, at their sole cost and expense, shall (A) prepare and timely file (or cause the Partnership to prepare and timely file) all Tax Returns of the Partnership due (after taking into account all appropriate extensions) on or prior to the Closing Date (the "<u>Pre-Closing Tax Returns</u>"); (B) prepare (or cause the Partnership to prepare) the IRS Form 1065 (and any comparable state and local Tax Returns) of the Partnership that are due after the Closing Date with respect to any Pre-Closing Tax Period, including the Pre-Closing Tax Period that ends on the Closing Date (the "<u>Partnership Returns</u>" and collectively with Pre-Closing Tax Returns, the "<u>Seller Prepared Returns</u>"); and (C) timely pay (or cause the Partnership to timely pay) all Taxes that are shown as payable with respect to any Seller Prepared Returns. Each Seller Prepared Return shall be prepared in accordance with existing procedures and practices and accounting methods of the Partnership provided the Partnership Return for the Pre-Closing Tax Period beginning on January 1, 2016 and ending on the Closing Date shall include a Code Section 754 election on the IRS Form 1065 (and any comparable state and local Tax Returns). Each Partnership Return due after the Closing Date that needs to be filed by the Partnership shall be submitted to the Buyers for the Buyers' review at least thirty (30) days prior to the due date of the Tax Return, including any applicable extensions.

  (iii) The Buyers, at their sole cost and expense, shall cause the Partnership to prepare and timely file all Tax Returns (other than Partnership Returns) of the Partnership due after the Closing Date (the "<u>Buyer Prepared Returns</u>"). To the extent that a Buyer Prepared Return relates solely to or straddles a Pre-Closing Tax Period, such Tax Return shall be prepared on a basis consistent with existing procedures and practices and accounting methods of the Partnership unless otherwise required by law, and such Tax Return that needs to be filed by the Partnership shall be submitted to the Sellers for the Sellers' review at least thirty (30) days prior to the due date of the Tax Return, including any applicable extensions.

  (iv) From the Closing Date through the date on which the Receiver files his Final Accounting in the Action, Sellers shall (A) make available any information, records, or other documents relating to any Taxes or Tax Returns of the Partnership; (B) make available any information necessary or reasonably requested to allow the Buyers or the Partnership to comply with any information reporting or withholding requirements contained in the Code or other applicable laws or to compute the amount of payroll or other employment Taxes due with respect to any payment made in connection with this Purchase Agreement; and (C) provide certificates or forms, and timely execute any Tax Return, that are necessary or appropriate to establish an exemption for (or reduction in) any Transfer Tax. Buyers and the Partnership shall pay the reasonable expenses of the Sellers associated with this cooperation. For a period of three (3) years from the Closing Date, the Buyers (and the Partnership on or after the Closing Date) shall (A) assist in the preparation and timely filing of any Tax Return of the Partnership relating to a Pre-Closing Tax Period; (B) assist in any audit or other Legal Proceeding with respect to Taxes or Tax Returns of the Partnership relating to a Pre-Closing Tax Period; and (C) make available any information, records, or other documents reasonably requested by Sellers relating to any Taxes or

*Execution Version*

Tax Returns of the Partnership with respect to a Pre-Closing Tax Period.  Sellers shall pay the reasonable expenses of the Buyers and the Partnership associated with this cooperation.

(v)    No later than sixty (60) days after the Closing Date, the Buyers shall prepare a balance sheet based on the tax basis of the Partnership's assets (the "Tax Basis Balance Sheet") and a balance sheet based on the fair market value of the Partnership's assets (the "FMV Balance Sheet").  The Buyers shall provide the Sellers with copies of and a reasonable opportunity to consult with the Buyers with respect to the Tax Basis Balance Sheet and FMV Balance Sheet, provided that any final determinations with respect to the preparation of the Tax Basis Balance Sheet and the FMV Balance Sheet shall be made by the Buyers.  The Tax Basis Balance Sheet and the FMV Balance Sheet will be prepared in accordance with the Purchase Price Allocation set forth in Schedule I and shall be utilized by the Buyers and the Partnership to compute allocations under Sections 704(c), 743(b) and 755 of the Code.  The parties hereto agree for all Tax reporting purposes to report the transactions in accordance with the agreements herein and the Purchase Price Allocation, the Tax Basis Balance Sheet, and the FMV Balance Sheet and to not take any position during the course of any audit or other proceeding inconsistent with the foregoing unless required by a final determination of the applicable Governmental Entity.

(g)    AIVs.  If, on or prior to the Closing Date, Seller is treated as owning an AIV with respect to an Interest (other than the Side Pocket SPV assets), that AIV shall be treated as part of and transferred with the corresponding Interest; subject to further negotiations on Purchase Price to the extent the AIV does not relate to a Portfolio Company; and once so agreed upon, any such AIV partnership or other operating agreements shall be deemed to be within the definition of Property Agreement.

(h)    Rights to Track Record.  Except with respect to the Excluded Assets and Excluded Obligations, each of the Sellers acknowledges and agrees that, from and after the Closing, it shall have no right to use, and shall not take any action to prevent any Buyer or any of their respective affiliates from using, the investment performance track record relating to the Partnership's investments.

(i)    Supplement to Disclosure Schedules.  No later than the date of entry of the CCM Portfolio Final Sale Order, Sellers and Buyers shall have the right (but not the obligation) to supplement or amend the Disclosure Schedules with respect to matters set forth in Paragraph 5 and Paragraph 6 to reflect matters arising or of which it becomes aware after the date of this Purchase Agreement (each a "Schedule Supplement"), except for Disclosure Schedules 1(tt), 5(b)(ii)(B) and 5(c)(ii)(B) which shall not be subject to a Schedule Supplement.  Any disclosure in any such Schedule Supplement shall not be deemed to have cured any inaccuracy in or breach of any representation or warranty contained in this Purchase Agreement, including for purposes of the termination rights contained in this Purchase Agreement or of determining whether or not the conditions set forth in Paragraph 9 have been satisfied; provided, however, that following (i) any such Schedule Supplement by Sellers, Buyers may terminate this Purchase Agreement in accordance with Paragraph 13.1(b)(ii) within three (3) days after receiving such Schedule Supplement from Sellers and (ii) any such Schedule Supplement by Buyers, Sellers may terminate this Purchase Agreement in accordance with Paragraph 13.1(b)(iii) within three (3) days after receiving such Schedule Supplement from Buyers.  If a party has a right to, but does not elect to, terminate this Purchase Agreement under this Paragraph, such party shall be deemed to have irrevocably waived any right to terminate this Purchase Agreement with respect to such matter (solely pursuant to this Paragraph), and further, shall have irrevocably waived its right to indemnification under this Purchase Agreement with respect to the matter set forth on the Schedule Supplement.

(j)    Pre-Closing MotoLease Tax Liability, If Any.  The parties acknowledge there may be currently undetermined tax liability in respect of taxable income attributable to the Partnership's ownership of MotoLease with respect to the period beginning on January 1, 2016 and ending on the

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 19 of 151

Closing Date (the "MotoLease Pre-Closing Tax Liability"). The parties shall negotiate in good faith among themselves and shall use commercially reasonable efforts to agree upon the respective amounts of such MotoLease Pre-Closing Tax Liability, if any to be allocated to Sellers, on the one hand, and Buyers, on the other hand, and the mechanic to reflect such allocation (whether by reimbursement, purchase price adjustment or otherwise), or an alternative solution to this issue that is acceptable to Buyers and Sellers.

(k)    MotoLease Claims. The GP Buyer agrees that, at the Closing, it shall assign to the Receiver any claims that the Partnership may have against MotoLease and/or its principals that are referenced in the MotoLease Letter attached to this Purchase Agreement as Exhibit 2 (collectively, the "Covered Claims"), solely for the purpose of making or threatening a defense or counterclaim to any complaint or claim by MotoLease and/or its principals against the Receiver, any of the Receivership Entities or the Buyers; provided, that the Partnership and the Buyers also have the right to assert such Covered Claims in an independent action. The assignment agreement effecting this assignment shall (a) address the manner in which each of the Receiver and/or Side Pocket SPV, on the one hand, and the Partnership and/or the Buyers, on the other hand, shall cooperate with one another and take into account each other's interests in determining how to proceed with respect to any Covered Claim, (b) provide that if the Receiver and/or any Receivership Entities or their respective affiliates recover any net proceeds based on the Covered Claims, the Partnership shall be entitled to receive 23% of the "net proceeds recovered" (as further defined in the assignment agreement); and (c) specify that the Receiver and/or Side Pocket SPV is a real party in interest for purposes of the assignment agreement and maintaining jurisdiction in the Court. The assignment shall be effected through an assignment agreement (the "MotoLease Claim Assignment Agreement") in a form reasonably acceptable to the GP Buyer and the Receiver.

(l)    Stalking Horse; Expense Reimbursement and Breakage Fee. The Receiver will use his commercially reasonable best efforts to submit this Purchase Agreement to the Oregon Court on December 14, 2016, after having complied with the certification requirements in Local Rule 7-1(a) of the Oregon Court, for an order approving the terms of this Purchase Agreement relating to the stalking horse procedures and breakup fee provisions contained herein and in Exhibit 6 and scheduling a hearing for approval of the sale to Buyers or a Qualified Alternative Overbidder (as defined in Exhibit 6), if any. Buyers will be designated as the "Stalking Horse" bidder for a period not to exceed fourteen (14) days (the "Notice Period"). If (x) the Receiver accepts a Qualified Alternative Overbid (as defined in Exhibit 6) and the Qualified Alternative Overbidder transaction closes; or (y) the Buyers terminate this Purchase Agreement in accordance with Paragraph 13(b)(i)(x), then Buyers will be entitled to a break-fee payment equal to $2,000,000. Payment of such break-fee amount will be due within 5 days following the closing of the sale of the Interests and Notes to a third party. Buyers will not be entitled to the break-fee amount if the Purchase Agreement is terminated in accordance with Paragraph 13(b)(i)(y) or Paragraph 13(b)(ii).

(m)    CCM Liquidity-Offer. The Buyers are committing to make, and shall make, the CCM Liquidity-Offer.

(n)    CCM Follow-on Financing. The Buyers are committing to, and shall close, the CCM Follow-on Financing (including the follow-on investment in CarePayment as further described in the term sheet attached as Exhibit 8) within one day of the Closing Date.

**8.    Conditions to Obligations of Sellers.**

The obligations of Sellers to consummate the transactions contemplated by this Purchase Agreement at the Closing are, at the option of Sellers, subject to each of the following conditions, and Buyers shall use commercially reasonable efforts to cause each such condition to be timely satisfied:

(a)     <u>Representations and Warranties</u>.  The representations and warranties of each Buyer contained in this Purchase Agreement and in the Additional Buyer's Documents shall be true and accurate in all material respects (disregarding any qualification as to materiality contained in such representation or warranty) as of the date when made and at and as of the Closing Date as though such representations and warranties were made at and as of the Closing Date.

(b)     <u>Performance</u>.  Each Buyer shall have performed in all material respects all agreements and obligations and complied with all conditions required by this Purchase Agreement to be performed or complied with by such Buyer at or prior to the Closing.

(c)     <u>No Injunction</u>.  No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any Order which restrains, prohibits or otherwise makes illegal the consummation of the transactions contemplated by this Purchase Agreement.

(d)     <u>Certificate</u>.  Each Buyer shall have furnished Sellers with a certificate, dated as of the Closing Date signed by an authorized signatory of such Buyer to the effect that such Buyer has performed and complied with the conditions set forth in Subparagraphs (a) and (b) above.

(e)     <u>Required Approvals</u>.  All Required Approvals required to permit the transfer and assignment to Buyers of the Property shall have been obtained and any other consents and approvals required to be obtained by Buyers from any Governmental Entity, creditor or any other Person for the execution, delivery and performance of this Purchase Agreement and the Additional Buyer's Documents on the part of Buyers shall have been obtained.  The limited partners of the Partnership shall have consented to the transactions contemplated by this Purchase Agreement including those transactions pursuant to the conditions set forth in Subparagraphs (o) and (p) below.

(f)     <u>Delivery of Purchase Price</u>.  Buyers shall have delivered the Purchase Price to Sellers in the manner described in <u>Paragraph 4</u>.

(g)     <u>Delivery of Assignment Agreements</u>.  The Assignment Agreements with respect to the Interests being purchased by each Buyer at the Closing, executed by such Buyer, the applicable Seller and the Partnership, shall have been delivered by such Buyer to Sellers.

(h)     <u>Sale of Aggregate Interests held by Sellers</u>.  With respect to each Interest, the transactions contemplated by this Purchase Agreement between Sellers and Buyers shall be consummated simultaneously.

(i)     <u>No Rescinding of Authorization</u>.  Buyers shall not have rescinded any authorizing action taken in connection with the transactions contemplated by this Purchase Agreement, nor shall any Buyer have taken any other action materially inconsistent with this Purchase Agreement or the Additional Buyer's Documents to which it is a party.

(j)     <u>Approval of the Oregon Court</u>.  The Oregon Court shall have entered the CCM Portfolio Final Sale Order, and as of the Closing Date, the CCM Portfolio Final Sale Order shall be in full force and effect and shall not have been stayed, vacated or reversed.

(k)     <u>Excluded Assets</u>.  The Sellers shall have received the requisite approval from the limited partners of the Partnership to transfer the Excluded Assets to (i) a special purpose vehicle to be formed by the GP Seller or its affiliates or (ii) any other Receivership Entity (in each case, a "Side Pocket SPV").

*Execution Version*

(l)    <u>Agreement on MotoLease Pre-Closing Tax Liability, If Any</u>.  Buyers and Sellers shall have come to an agreement on a solution regarding the MotoLease Pre-Closing Tax Liability, if any, pursuant to <u>Paragraph 7(j)</u>.

(m)    <u>MotoLease Claim Assignment Agreement</u>.    The MotoLease Claim Assignment Agreement, in a form reasonably acceptable to GP Buyer and the Receiver, shall have been executed and delivered by GP Buyer to the Receiver.

(n)    <u>CCM Portfolio Final Sale Order</u>.  The CCM Portfolio Final Sale Order shall provide that the Property (including the GP Interests, the LP Interests and the Notes) are sold to Buyers free and clear of all claims and Liens, including, but not limited to, (i) those claims and Liens set forth in the Disclosure Schedules and (ii) claims of any creditors of the Partnership and/or the Sellers, claims for violations of securities laws and regulations, claims for breach of the Partnership Limited Partnership Agreement, and any other claims and causes of action which are not expressly assumed by or allocated to Buyers pursuant to this Purchase Agreement.

(o)    <u>CCM Liquidity-Offer</u>.  The Buyers shall have made the CCM Liquidity-Offer to the non-Receivership Entity limited partners in the Partnership to liquidate their interests in the Partnership on the same terms as the LP Sellers or retain their limited partnership ownership in the Partnership.

(p)    <u>CCM Follow-on Financing</u>.  The Buyers shall have made a commitment to the CCM Follow-on Financing (including the follow-on investment in CarePayment as further described in the term sheet attached as <u>Exhibit 8</u>).  Buyers agree that the Partnership will provide all non-Receivership Entity limited partners choosing to retain their Partnership interests (pursuant to the CCM Liquidity-Offer) the right to participate in the CCM Follow-on Financing in an amount based on their pro rata Partnership interests (thereby reducing Buyers' portion) or be diluted

(q)    <u>New Program Agreements</u>.  CarePayment and certain applicable Receivership Entities shall have entered into one or more agreements, mutually satisfactory to Buyer, Sellers and CarePayment, with respect to (i) the existing receivables portfolios owned by Receivership Entities outside of the Partnership and (ii) subsequent receivables to be originated by Receivership Entities outside of the Partnership (the "<u>New Program Agreements</u>").  The New Program Agreements will address all charges, costs, fees and other business terms related to the sale, servicing and origination of the receivables and will be consistent with the terms attached as Exhibit 7.

**9.    Conditions to Obligations of Buyers.**

The obligations of Buyers to consummate the transactions contemplated by this Purchase Agreement at the Closing are, at the option of Buyers, subject to each of the following conditions, and Sellers shall use commercially reasonable efforts to cause each such condition to be timely satisfied:

(a)    <u>Representations and Warranties</u>.  The representations and warranties of each Seller contained in this Purchase Agreement and in the Additional Seller's Documents shall be true and accurate in all material respects (disregarding any qualification as to materiality contained in such representation or warranty) as of the date when made and at and as of the Closing Date as though such representations and warranties were made at and as of the Closing Date.

(b)    <u>Performance</u>.  Each Seller shall have performed in all material respects all agreements and obligations and complied with all conditions required by this Purchase Agreement to be performed or complied with by such Seller at or prior to the Closing.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 22 of 151

*Execution Version*

(c)    <u>No Injunction</u>.    No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any Order which restrains, prohibits or otherwise makes illegal the consummation of the transactions contemplated by this Purchase Agreement.

(d)    <u>Certificates</u>.

(i)    Sellers shall have furnished Buyers with a certificate, dated as of the Closing Date signed by an authorized signatory of each Seller to the effect that each Seller has performed and complied with the conditions set forth in Subparagraphs (a) and (b) above and that all of the Required Approvals have been obtained.

(ii)    Each Seller shall have furnished Buyers with a FIRPTA certificate in a form attached as <u>Exhibit 5</u> hereto, dated as of the Closing Date and signed by an authorized signatory.

(e)    <u>Required Approvals</u>.    All Required Approvals shall have been obtained.  Buyers shall have received a memorandum from the Sellers' SEC counsel, Pepper Hamilton LLP, confirming certain correspondence with the SEC pertaining to interpretative guidance with respect to Investment Company Act matters.  The transactions contemplated hereby shall be in compliance with all applicable law and regulation, including, but not limited to, the Investment Company Act or an applicable exemption therefrom.

(f)    <u>Delivery of Assignment Agreements</u>.    The Assignment Agreements with respect to the Interests being sold by each Seller at the Closing, executed by such Seller, the applicable Buyer and the Partnership, shall have been delivered by such Seller to Buyers.

(g)    <u>Sale of Aggregate Interests held by Sellers</u>.  With respect to each Interest, the transactions contemplated by this Purchase Agreement between Sellers and Buyers shall be consummated simultaneously.

(h)    <u>Transfer of Excluded Assets</u>.    The Excluded Assets shall have been transferred by the Partnership to the Side Pocket SPV, and evidence of the same in a form reasonably satisfactory to the Buyers shall have been delivered to the Buyers.

(i)    <u>Termination of IAA</u>.    The Investment Advisory Agreement shall have been terminated pursuant to a termination agreement, the form of which shall be mutually agreed to by Sellers and Buyers.

(j)    <u>New IAA</u>.    The GP Buyer and the Partnership shall have entered into a new investment advisory agreement with a replacement investment advisor to the Partnership.

(k)    <u>Ownership of MOGL</u>.    The Partnership shall have closed a follow-on investment in MOGL in the amount of $180,000.

(l)    <u>CCM Portfolio Final Sale Order</u>.    The CCM Portfolio Final Sale Order shall provide that the Property (including the GP Interests, the LP Interests and the Notes) are sold to Buyers free and clear of all claims and Liens, including, but not limited to, (i) those claims and Liens set forth in the Disclosure Schedules and (ii) claims of any creditors of the Partnership and/or the Sellers, claims for violations of securities laws and regulations, claims for breach of the Partnership Limited Partnership Agreement, and any other claims and causes of action which are not expressly assumed by or allocated to Buyers pursuant to this Purchase Agreement.

23

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 23 of 151

(m)    <u>Receipt of Portfolio Companies Financials</u>.   Buyers shall have received copies of financial statements with respect to each of the Portfolio Companies for the quarter-ended June 30, 2016.

(n)    <u>Receipt of Portfolio Company Capitalization Tables</u>.   Buyers shall have received true and accurate copies of the current capitalization tables with respect to each of the Portfolio Companies.

(o)    <u>Receipt of Partnership 2015 Audit</u>.   Buyers shall have received a copy of the Partnership's auditor's report for the fiscal year-ended 2015.

(p)    <u>Receipt of Account Statement</u>.   Buyers shall have received a copy of the most recent statements with respect to the bank account of the Partnership held at MUFG Union Bank and confirmed that the account balance is less than $1,000.

(q)    <u>Agreement on MotoLease Pre-Closing Tax Liability, If Any</u>.   Buyers and Sellers shall have come to an agreement on a solution regarding the MotoLease Pre-Closing Tax Liability, if any, pursuant to <u>Paragraph 7(j)</u>.

(r)    <u>MotoLease Claim Assignment Agreement</u>.   The MotoLease Claim Assignment Agreement, in a form reasonably acceptable to GP Buyer and the Receiver, shall have been executed and delivered by the Receiver to GP Buyer.

(s)    <u>No Material Adverse Change</u>.   No material adverse change shall have occurred with respect to the Partnership, the GP Seller or any of the Portfolio Companies since the date of this Purchase Agreement that causes the overall valuation of the Property to be materially adversely affected.

(t)    <u>No Rescinding of Authorization</u>.   No Seller shall have rescinded any authorizing action taken in connection with the transactions contemplated by this Purchase Agreement, nor shall any such Seller have taken any other action materially inconsistent with this Purchase Agreement and the Additional Seller's Documents to which it is a party.

(u)    <u>Termination of Affiliate Agreements</u>.   Except for those agreements contemplated by clause (v) of this <u>Paragraph 9</u>, all agreements between CarePayment and its subsidiaries, on the one hand, and any Seller or affiliated Receivership Entity, on the other hand, shall have been amended, terminated or allowed to continue to exist on terms reasonably satisfactory to Buyers and Sellers.

(v)    <u>New Program Agreements</u>.   CarePayment and certain applicable Receivership Entities shall have entered into the New Program Agreements.

**10.    Survival of Representations and Warranties.**

Each and every representation and warranty in this Purchase Agreement, the Schedules, the Schedules and Disclosure Schedules to it, the Additional Seller's Documents and the Additional Buyer's Documents shall survive the Closing and shall be fully effective and enforceable for a period of eighteen (18) months from the Closing. Subject to the last sentence of the first paragraph in <u>Paragraph 11(a)</u>, any investigation or other examination that may be made at any time by or on behalf of a party to which representations and warranties are made shall not limit, diminish or in any way affect the specific representations and warranties in this Purchase Agreement, and the parties may rely on the specific representations and warranties in this Purchase Agreement, irrespective of any information obtained by them by any investigation, examination or otherwise. All rights to indemnification with respect of any representation and warranty hereunder shall survive only as long as the applicable representation and warranty survives; *provided, however,* that with respect to any claim for indemnification asserted prior to

the termination of the representation or warranty, the parties' indemnification obligations shall survive until the claim is resolved.

## 11.   Indemnification.

(a)    Indemnification by Sellers.  Each Seller agrees to defend, indemnify and hold harmless each Buyer, its affiliates and their respective officers, directors, partners, members, managers, employees, agents, trustees, successors and assigns, from and against any and all Losses which may be imposed, sustained, incurred or suffered or asserted as a result of, relating to or arising out of (i) any inaccuracy in or breach of any representation or warranty of such Seller contained in this Purchase Agreement or the Additional Seller's Documents to which it is a party, (ii) any failure by such Seller to perform any covenant, agreement or obligation of such Seller contained in this Purchase Agreement or the Additional Seller's Documents to which it is a party (unless waived in writing by such Buyer at or prior to the Closing Date), (iii) such Seller's ownership of the applicable Interests with respect to any Pre-Closing Tax Period, including liabilities for Taxes, charges and fees and including any withholding Taxes under Section 1445 of the Code or otherwise (together with any interest, penalties or additions to Tax), (iv) any claim by any Person with whom or which such Seller has, directly or indirectly, dealt for any finder's or broker's fee or commission in connection with the transactions contemplated by this Purchase Agreement, (v) any Excluded Obligation of such Seller, (vi) any claims (or threats of claims) by MotoLease, LLC and/or its principals against the Partnership, Sellers, and/or Buyers relating to the Partnership's ownership of its interest in MotoLease prior to the Closing and/or the transactions contemplated by this Purchase Agreement; and (vii) any and all actions, suits, litigations, arbitrations, proceedings, investigations, claims or liabilities of whatever nature arising out of any of the foregoing.

(b)    Indemnification by Lender.  Lender agrees to defend, indemnify and hold harmless each Buyer, its affiliates and their respective officers, directors, partners, members, managers, employees, agents, trustees, successors and assigns, from and against any and all Losses which may be imposed, sustained, incurred or suffered or asserted as a result of, relating to or arising out of (i) any inaccuracy in or breach of any representation or warranty of Lender contained in this Purchase Agreement, (ii) any failure by Lender to perform any covenant, agreement or obligation of Lender contained in this Purchase Agreement (unless waived in writing by such Buyer at or prior to the Closing Date), (iii) Lender's ownership of the Notes with respect to any Pre-Closing Tax Period, including liabilities for Taxes, charges and fees and including any withholding Taxes under Section 1445 of the Code or otherwise (together with any interest, penalties or additions to Tax), (iv) any claim by any Person with whom or which Lender has, directly or indirectly, dealt for any finder's or broker's fee or commission in connection with the transactions contemplated by this Purchase Agreement, (v) any Excluded Obligation of Lender, and (vi) any and all actions, suits, litigations, arbitrations, proceedings, investigations, claims or liabilities of whatever nature arising out of any of the foregoing.

(c)    Limitations of Sellers and Lender Indemnification.  With respect to Losses under Paragraphs 11(a)(i) and 11(b)(i) above (including Paragraph 11(a)(vii) to the extent applicable to Paragraph 11(a)(i) and including Paragraph 11(b)(vi) to the extent applicable to Paragraph 11(b)(i)): (x) no Loss can be asserted against the Sellers and Lender until the aggregate amount of all Losses in respect of indemnification under those clauses exceed $250,000 (the "Threshold") in which event the applicable Indemnifying Party shall be required to pay or be liable for the total amount of all Losses from the first dollar without regard to the Threshold and (y) the aggregate amount of all Losses for which the Indemnifying Parties shall be liable under those Clauses shall not exceed an amount equal to (i) with respect to Losses based upon or arising out of any inaccuracy in or breach of any of the representations or warranties of Sellers contained in Paragraph 5(e)(i) or Paragraph 5(e)(iii), 100% of the Purchase Price allocated to the Interests under Paragraph 4(a) and actually received by Sellers, (ii) with respect to Losses based upon or arising out of any inaccuracy in or breach of any of the representations or

*Execution Version*

warranties of Lender contained in Paragraph 5(d), 100% of the Purchase Price allocated to the Notes under Paragraph 4(a) and actually received by Sellers, and (iii) with respect to Losses based upon or arising out of any other inaccuracy in or breach of any of the other representations or warranties of Sellers, 50% of the Purchase Price allocated to the Interests under Paragraph 4(a) and actually received by Sellers. No Seller or Lender shall be liable under clause (a)(i) or clause (b)(i) of this Paragraph 11 for any Losses based upon or arising out of any inaccuracy in or breach of any of the representations or warranties of Sellers or Lender contained in this Purchase Agreement if Buyers had Knowledge of such inaccuracy or breach prior to the Closing.

For the avoidance of doubt, Sellers agree and acknowledge that any Losses which may be imposed, sustained, incurred or suffered or asserted by each Buyer, its affiliates and their respective officers, directors, partners, members, managers, employees, agents, trustees, successors and assigns relating to or arising out of any of the facts and circumstances set forth in the MotoLease Letters shall be subject to the indemnification obligations of Sellers set forth in clause (vi) above of Paragraph 11(a). The "MotoLease Letters" are the following letters attached as Exhibit 1 and Exhibit 2: (X) a letter from Bryan Cave LLP, legal counsel to Motolease and its principals, dated September 22, 2016; and (Y) from Schwabe Williamson & Wyatt, legal counsel to Receiver, dated September 30, 2016.

(d)     Indemnification by Buyers. Each Buyer agrees to defend, indemnify and hold harmless each Seller, its affiliates and their respective officers, directors, partners, members, managers, employees, agents, trustees, successors and assigns from and against any and all Losses which may be imposed, sustained, incurred or suffered or asserted as a result of, relating to or arising out of (i) any inaccuracy in or breach of any representation or warranty of such Buyer contained in this Purchase Agreement or the Additional Buyer's Documents to which it is a party, (ii) any failure by such Buyer to perform any covenant, agreement or obligation of such Buyer contained in this Purchase Agreement or in the Additional Buyer's Documents to which it is a party (unless specifically waived in writing by such Seller at or prior to the Closing Date), (iii) any and all liabilities specifically assumed by such Buyer pursuant to Paragraph 3(d) of this Purchase Agreement, (iv) such Buyer's ownership of the Interests after the Closing, including liabilities for Taxes, charges and fees and including any withholding Taxes under Section 1445 of the Code or otherwise (together with any interest, penalties or additions to Tax), (v) any claim by any Person with whom or which such Buyer has, directly or indirectly, dealt for any finder's or broker's fee or commission in connection with the transactions contemplated by this Purchase Agreement, and (vi) any and all actions, suits, litigations, arbitrations, proceedings, investigations, claims or liabilities of whatever nature arising out of any of the foregoing.  With respect to Losses under (i) above (including (vii) to the extent applicable to (i)): (x) no Loss can be asserted against the Buyers until the aggregate amount of all Losses in respect of indemnification under those Clauses exceed the Threshold in which event the Indemnifying Party shall be required to pay or be liable for the total amount of all Losses from the first dollar without regard to the Threshold and (y) the aggregate amount of all Losses for which an Indemnifying Party shall be liable under those Clauses shall not exceed the Purchase Price.

(e)     Procedure for Third Party Claims.

(i)     If a Person entitled to assert a claim for indemnification under this Purchase Agreement shall receive written notice of the assertion by any Person not a party to this Purchase Agreement of any claim or of the commencement of any action or proceeding (a "Third Party Claim") with respect to which Sellers or the Buyers is obligated to provide indemnification, the indemnified Person (the "Indemnified Person") shall give the indemnifying party (the "Indemnifying Party") prompt written notice after becoming aware of such Third Party Claim. The failure of the Indemnified Person to give notice as provided in this Paragraph shall not relieve the Indemnifying Party of its obligations for indemnification under this Purchase

26

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 26 of 151

*Execution Version*

Agreement, except to the extent that the failure has materially and adversely affected the rights of the Indemnifying Party. The notice from the Indemnified Person shall describe the Third Party Claim in reasonable detail.

(ii)    An Indemnifying Party may elect to compromise or defend, at the Indemnifying Party's own expense and by the Indemnifying Party's own counsel, any Third Party Claim. If an Indemnifying Party elects to compromise or defend a Third Party Claim, it shall, within thirty (30) days (or sooner, if the nature of the Third Party Claim so requires), notify the Indemnified Person in writing of its intent to do so, and the Indemnified Person shall cooperate in the compromise of, or defense against, the Third Party Claim. The Indemnifying Party shall pay the Indemnified Person's actual out-of-pocket expenses incurred in connection with its cooperation. After notice from an Indemnifying Party to an Indemnified Person of its election to assume the defense of a Third Party Claim, the Indemnifying Party shall not be liable to the Indemnified Person under this Purchase Agreement for any legal or other expenses subsequently incurred by the Indemnified Person in connection with defense of the Third Party Claim; provided that Indemnified Person shall have the right to employ one counsel in each applicable jurisdiction (if more than one jurisdiction is involved) to represent Indemnified Person if, in the Indemnified Person's reasonable judgment (based on advice of counsel), a conflict of interest between the Indemnified Person and the Indemnifying Party exists in respect of such Third Party Claim, and in that event the reasonable fees and expenses of such separate counsel shall be paid by the Indemnifying Party. If an Indemnifying Party elects not to defend against a Third Party Claim, or fails to notify an Indemnified Person of its election as provided in this Paragraph, the Indemnified Person may pay, compromise or defend such Third Party Claim on behalf of, and for the account and risk of, the Indemnifying Party. No Indemnifying Party shall consent to entry of any judgment or enter into any settlement, except with the written consent of each affected Indemnified Person (which consent shall not be unreasonably withheld, delayed or conditioned), if such judgment or settlement provides for anything other than money damages or other money payments for which the Indemnified Person is entitled to indemnification under this Purchase Agreement or which does not contain as an unconditional term thereof the giving by the claimant or plaintiff to the Indemnified Person of a release from all liability in respect of the Third Party Claim.

(iii)    If there is a reasonable likelihood that a Third Party Claim may materially and adversely affect an Indemnified Person, other than as a result of money damages or other money payments for which the Indemnified Person is entitled to indemnification hereunder, the Indemnified Person will have the right, after consultation with the Indemnifying Party, to assume the defense of the Third Party Claim with counsel reasonably acceptable to the Indemnifying Party. In the event that an Indemnified Person assumes the defense, under this Subparagraph (iii), of a Third Party Claim, Buyers agree that it shall in good faith provide Sellers with a meaningful opportunity to consult and collaborate with Buyers as to the strategy and substance of such defense or other response including, but not limited to, with respect to any potential counterclaims. Notwithstanding the foregoing, Sellers agree that in the event Sellers and Buyers do not agree on any matter relating to the defense or other response to any such claims against the Partnership, the final decision in respect of such matter shall be made by Buyers.

(f)    Procedure for Non-Third Party Claims. With respect to any claim for indemnification hereunder which does not result from a Third Party Claim, the Indemnifying Party shall have a period of thirty (30) days after receipt of written notice from the Indemnified Person within which to respond to the Indemnified Person. If the Indemnifying Party does not respond within the thirty (30) day period, the Indemnifying Party shall be deemed to have accepted responsibility to make payment and shall have no further right to contest the validity of such claim. If the Indemnifying Party does respond within the

thirty (30) day period and rejects the claim in whole or in part, the Indemnified Person shall be free to pursue such remedies as may be available to the Indemnified Person under applicable law.

(g)    Reduction of Claim or Loss. If the amount of any Loss shall, at any time subsequent to payment pursuant to this Paragraph 11, be reduced by recovery, settlement or otherwise, the amount of such reduction, less any expenses incurred in connection therewith, shall promptly be repaid by the Indemnified Person to the related Indemnifying Party.

(h)    Exclusive Remedies. Subject to Paragraph 15(k), the parties acknowledge and agree that their sole and exclusive remedy with respect to any and all Losses for any breach of any representation, warranty, covenant, agreement or obligation set forth in this Purchase Agreement or otherwise relating to the subject matter of this Purchase Agreement, shall be pursuant to the indemnification provisions set forth in this Paragraph 11. In furtherance of the foregoing, each party hereby waives, to the fullest extent permitted under law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth in this Purchase Agreement or otherwise relating to the subject matter of this Purchase Agreement it may have against the other parties to this Purchase Agreement and their affiliates arising under or based upon any law, except pursuant to the indemnification provisions set forth in this Paragraph 11. Notwithstanding the foregoing, nothing in this Subparagraph shall limit (i) any Person's right to seek and obtain any equitable relief to which any Person shall be entitled pursuant to Paragraph 15(k) or (ii) any remedy at law or equity to which a party may be entitled as a result of fraud or intentional misrepresentation or deliberate and willful breach by any of the other parties of any of their respective representations and warranties under this Purchase Agreement or the Disclosure Schedules.

(i)    Limited Damages. In no event shall any Indemnifying Party be liable to any Indemnified Person for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Purchase Agreement, or diminution of value or any damages based on any type of multiple or other valuation measurement.

(j)    Sellers shall not be liable for any indemnification obligations of Lender under this Purchase Agreement, and Lender shall not be liable for any indemnification obligations of Sellers under this Purchase Agreement.

**12.    [Intentionally omitted].**

**13.    Termination.**

(a)    By Mutual Consent. This Purchase Agreement may be terminated and the transactions contemplated by it abandoned at any time prior to the Closing for any reason pursuant to the mutual written consent of Buyers and Sellers and Buyers shall have no further obligation to buy, and Sellers shall have no further obligations to sell, the Interests.

(b)    By Buyers or Sellers.

(i)    This Purchase Agreement may be terminated and the transactions contemplated by it abandoned, by written notice from Buyers to Sellers, or from Sellers to Buyers, (x) in the event of a material breach by any Seller or Buyer, respectively, of any representation, warranty, covenant or agreement contained in this Purchase Agreement which cannot be or is not cured within ten (10) days after written notice of the breach is given to the party committing the breach and that would give rise to the failure of any condition specified in Paragraphs 8 and 9 (as

28

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 28 of 151

applicable); or (y) if the Closing does not occur on or before the Closing Deadline (or such later date as may be agreed upon in writing by Buyers and Sellers); provided, however, that the right to terminate this Purchase Agreement under this <u>Paragraph 13(b)(i)</u> shall not be available to a party if such party's breach of this Purchase Agreement has been the cause of or resulted in the failure of the Closing to occur on or before the Closing Deadline, it being understood and agreed that neither a failure to satisfy any of the conditions set forth in <u>Paragraphs 8(c), 8(n), 9(c)</u> and <u>9(l)</u> nor the failure of the Oregon Court to enter the CCM Portfolio Final Sale Order shall be deemed a breach or failure to fulfill any obligation by any party.

        (ii)     By Buyers pursuant to <u>Paragraph 7(i)</u>.

        (iii)    By Sellers pursuant to <u>Paragraph 7(i)</u>.

    (c)    <u>Survival</u>.  If this Purchase Agreement is terminated, no party to this Purchase Agreement will have any liability or further obligation to the other party pursuant to this Purchase Agreement; *provided, however*, that the agreements of Sellers and Buyers contained in <u>Paragraphs 7(l) and 15(a)</u> shall survive such termination; and *provided, further*, that if termination results from the bad faith of a party, such party will remain liable for any and all costs, expenses, damages incurred or suffered by the other party as a direct result of such failure or breach.

## 14.    Post-Closing Covenants.

    (a)    <u>Post-Closing Cooperation</u>.  The parties to this Purchase Agreement shall use commercially reasonable efforts to cooperate with each other, and shall cause their respective representatives to use commercially reasonable efforts to cooperate with each other, following the Closing to facilitate the orderly transition of the ownership of the Interests to the Buyers and the ownership of the Excluded Assets to the Side Pocket SPV and to minimize disruption to the management of the Partnership or the Side Pocket SPV that might result from the transactions contemplated by this Purchase Agreement, including access during normal business hours to employees of the Sellers, Buyers and their affiliates whose roles or duties previously related to the management of the Partnership to answer questions relating to the books and records of the Partnership as Buyers or Sellers shall from time to time reasonably request.

    (b)    <u>Books and Records</u>.  For a period of five (5) years following the Closing Date, no party to this Purchase Agreement shall destroy or give up possession of any original or final copy of any of the books and records relating to the Interests or the Partnership and that may be reasonably required in the preparation of tax, regulatory and other governmental compliance matters, without first offering the other parties the opportunity to obtain such original or final copy or a copy thereof and such parties paying the cost of the copying.

## 15.    General Provisions.

    (a)    <u>Expenses</u>.  Except as provided in <u>Paragraph 7(l)</u>, all fees and expenses incurred in connection with this Purchase Agreement (and the transactions contemplated hereunder), including all fees of counsel, brokers or finders and accountants, shall be borne by the party incurring the same. For the avoidance of doubt, the fees and expenses incurred in connection with the transfer by the Partnership of the Excluded Assets to the Side Pocket SPV shall be borne solely by Sellers.  All Transfer Taxes incurred in connection with the consummation of the transactions contemplated by this Purchase Agreement shall be borne equally by Buyers and Sellers. Subject to applicable law, any Tax Returns that must be filed with respect to Transfer Taxes shall be prepared and filed when due by the applicable party, with the reasonable cooperation of the other party if necessary.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 29 of 151

*Execution Version*

    (b)   <u>Notices</u>. All notices, requests, demands and other communications required or permitted under this Purchase Agreement shall be in writing and shall be deemed to have been duly given and received when delivered by hand or courier, when received by electronic mail or fax, or three (3) business days after the date when posted by air mail, with postage prepaid, addressed as follows:

        (i)    If to Sellers, to:

            c/o Aequitas Commercial Finance, LLC
            5300 Meadows Road, Suite 300
            Lake Oswego, OR 97035
            Attention:  Receiver
            Email: ron.greenspan@fticonsulting.com
            Fax: (503) 419-3530

            With a copy to:

            Schwabe Williamson & Wyatt
            1211 SW Fifth Avenue, Suite 1900
            Portland, OR 97204
            Attention:  Trevor Livingston &  Lawrence R. Ream
            Fax:  (503) 796-2900

or to such other Person or address as Sellers shall furnish to Buyers in writing.

        (ii)    If to Buyers, to:

            Cedar Springs Capital, LLC
            Commonwealth Hall at Old Parkland
            3899 Maple Ave. Ste. 150, Dallas, TX 75219
            Attn:    Colin McGrady
                    Neset Pirkul
            Email:  cmcgrady@cedarspringscapital.com
                   npirkul@cedarspringscapital.com

            and a copy to:

            Miller, Egan, Molter & Nelson LLP
            2911 Turtle Creek Blvd., Suite 1100
            Dallas, TX  75219
            Attn:  Michael S. Colvin
            E-mail: michael.colvin@milleregan.com

or to such other Person or address as Buyers shall furnish to Sellers in writing.

    (c)   <u>Assignment</u>. This Purchase Agreement and all of its provisions shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.  This Purchase Agreement may not be assigned without the prior written consent of each of the parties to this Purchase Agreement; provided, however, that the Buyers may assign the rights to purchase the Property hereunder

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 30 of 151

to one or more affiliates of the Buyer, provided that the Buyers may not delegate its obligations hereunder without the consent of the other parties hereto.

(d)     Governing Law.  This Purchase Agreement and the legal relations among the parties shall be governed by and construed in accordance with the laws of the State of Oregon without reference to the conflicts of laws principles thereof that would cause the application of the laws of another jurisdiction.

(e)     Counterparts.  This Purchase Agreement may be executed in two or more identical counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Facsimile or other electronic signatures shall be deemed acceptable and binding.

(f)     Interpretation.   The headings of the Paragraphs, Subparagraphs and Clauses of this Purchase Agreement are inserted for convenience only and shall not constitute a part of or affect in any way the meaning or interpretation of this Purchase Agreement.  The words "include," "includes" and "including" when used in this Purchase Agreement shall be deemed in each case to be followed by the words "without limitation."  Defined terms used in this Purchase Agreement shall have the same meaning whether defined or used herein in the singular or the plural, as the case may be.

(g)     Entire Agreement.  This Purchase Agreement, including the Schedules, Disclosure Schedules, and Exhibits to this Purchase Agreement, and the Additional Buyer's Documents and Additional Seller's Documents set forth the entire agreement and understanding of the parties with respect to the subject matter of this Purchase Agreement and supersede all prior agreements, promises, covenants, arrangements, communications, representations or warranties, whether oral or written, by any officer, employee or representative of any party, including, without limitation, any confidentiality agreement entered into by any Seller or Buyer or their respective agents or affiliates in respect of the transactions contemplated herein.

(h)     Amendment; Waiver.  This Purchase Agreement may be amended only by a written instrument executed by Sellers and Buyers.  Any failure of Buyers to comply with any obligation, agreement or condition under this Purchase Agreement may only be waived in writing by Sellers, and any such failure by Sellers may only be waived in writing by Buyers, but any such waiver shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.  No failure by a party to take any action against any breach of this Purchase Agreement or default by the other party shall constitute a waiver of such party's right to enforce any provision of this Purchase Agreement or to take any such action.

(i)     Third Parties.  Except as specifically set forth or referred to in this Purchase Agreement, nothing in this Purchase Agreement, expressed or implied, is intended, or shall be construed, to confer upon or give to any Person other than the parties and their successors or assigns, any rights or remedies under or by reason of this Purchase Agreement.

(j)     Additional Documents and Acts.  Each of the parties agrees to execute and deliver such additional documents, certificates and instruments, and to perform such additional acts, as may be commercially reasonably requested and as may be necessary or appropriate to carry out the provisions of this Purchase Agreement and to consummate the transactions contemplated by this Purchase Agreement.

(k)     Specific Performance.  Each Seller hereby acknowledges that Buyers will have no adequate remedy at law if such Seller fails to perform any of its material obligations under this Purchase Agreement.  In such event, such Seller agrees that Buyers shall have the right, in addition to any other

rights Buyers may have (whether at law or in equity), to specific performance of this Purchase Agreement, without the necessity of posting any bond and without the necessity of establishing that monetary relief would not provide an adequate remedy.

(l)    <u>Resolution of Conflicts</u>.  In the event of any inconsistency or conflict between the terms and provisions of this Purchase Agreement and the terms and provisions of any document executed by a Buyer and/or a Seller in connection with obtaining the Required Approvals (including any Assignment Agreement), the terms and provisions of this Purchase Agreement shall control.

(m)    <u>No Presumption Regarding Drafting</u>.  Each party to this Purchase Agreement acknowledges that it has reviewed this Purchase Agreement prior to its execution and that changes were made to this Purchase Agreement based upon its comments. If any disputes arise with respect to the interpretation of any provision of this Purchase Agreement, the provision shall be deemed to have been drafted by both of the parties and shall not be construed against any party on the basis that the party was responsible for drafting that provision.

(n)    <u>Severability</u>.  If any term, provision, agreement, covenant or restriction of this Purchase Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, or unenforceable, the remainder of the terms, provisions, agreements, covenants and restrictions of this Purchase Agreement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated so long as the economic or legal substance of the transactions contemplated by this Purchase Agreement is not affected in any manner materially adverse to any party to this Purchase Agreement. Upon such a determination, the parties shall negotiate in good faith to modify this Purchase Agreement so as to effect the original intent of the parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated by this Purchase Agreement may be consummated as originally contemplated to the fullest extent possible.

(o)    <u>Waiver of Jury Trial</u>.  EACH OF THE PARTIES TO THIS PURCHASE AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS PURCHASE AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS PURCHASE AGREEMENT.

(p)    <u>Venue; Service of Process</u>.  THE PARTIES HEREBY IRREVOCABLY CONSENT TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON (the "<u>Court</u>"), and agree and consent that service of process may be made upon it in any legal proceeding relating to this Purchase Agreement or any other relationship between Buyers and Sellers by any means allowed under state or federal law.  Any legal proceeding arising out of or in any way related to this Purchase Agreement or any other relationship between Buyers and Sellers may be brought and litigated in the Court.  Buyers and Sellers waive and agree not to assert, by way of motion, as a defense or otherwise, that any such proceeding is brought in an inconvenient forum or that the venue thereof is improper.  Any judicial proceeding involving (directly or indirectly) any matter in any way arising out of, related to, or in connection with this Purchase Agreement shall be brought only in the Court.

(q)    <u>Attorney's Fees</u>.  If any arbitration or litigation is instituted to interpret, enforce, or rescind this Purchase Agreement, including but not limited to any proceeding brought under the United States Bankruptcy Code, the prevailing party on a claim will be entitled to recover with respect to the claim, in addition to any other relief awarded, the prevailing party's reasonable attorney's fees and other fees, costs, and expenses of every kind, including but not limited to the costs and disbursements incurred in connection with the litigation, any appeal or petition for review, the collection of any award, or the enforcement of any Order, as determined by the Court.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 32 of 151

*Execution Version*

      (r)    <u>Remedies</u>.  Subject to the terms and conditions of this Purchase Agreement and the exclusive jurisdiction of the Court, the parties will have all remedies available to them at law or in equity.  All available remedies are cumulative and may be exercised singularly or concurrently.

      (s)    <u>Time of Essence.</u>  Time is of the essence with respect to all dates and time periods in this Purchase Agreement.

Exhibit 1 to Declaration of Ronald F. Greenspan

*Execution Version*

IN WITNESS WHEREOF, the parties have executed this Amended and Restated Agreement of Purchase and Sale, acting by their duly authorized agents, as of the date first above written.

SELLERS:

**Aequitas Commercial Finance, LLC**

By:_____
Name:
Title:

**Aequitas Private Client Fund, LLC**

By:_____
Name:
Title:

**Aequitas Holdings, LLC**

By:_____
Name:
Title:

**Aequitas Capital Opportunities GP, LLC**

By:_____
Name:
Title:

**Aequitas Corporate Lending, LLC**

By:_____
Name:
Title:

THE RECEIVER: *(solely for purposes of Paragraphs 7(k) and 7(l))*

_____
Ronald Greenspan

BUYERS:

**Cedar Springs Special Opportunities IV, LP**

By: *[signature]*
Name: Neset Pirkul
Title: Principal

**CSC Spec Opps IV GP, LLC**

By: *[signature]*
Name: Neset Pirkul
Title: Principal

34

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 34 of 151

*Execution Version*

IN WITNESS WHEREOF, the parties have executed this Amended and Restated Agreement of Purchase and Sale, acting by their duly authorized agents, as of the date first above written.

SELLERS:                                          BUYERS:

**Aequitas Commercial Finance, LLC**             **Cedar Springs Special Opportunities IV, LP**

By: _Ronald Greenspan_                            By: _____
Name: Ronald Greenspan                            Name:
Title: Receiver                                   Title:

**Aequitas Private Client Fund, LLC**            **CSC Spec Opps IV GP, LLC**

By: _Reed Gyr_                                    By: _____
Name: Ronald Greenspan                            Name:
Title: Receiver                                   Title:

**Aequitas Holdings, LLC**

By: _Ronald Greenspan_
Name: Ronald Greenspan
Title: Receiver

**Aequitas Capital Opportunities GP, LLC**

By: _Reed Gyr_
Name: Ronald Greenspan
Title: Receiver

**Aequitas Corporate Lending, LLC**

By: _Reed Green_
Name: Ronald Greenspan
Title: Receiver

THE RECEIVER: *(solely for purposes of Paragraphs 7(k) and 7(l))*

_Ronald Greenspan_
Ronald Greenspan

34

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 35 of 151

*Execution Version*

**Exhibit 1**

**MotoLease Letter (9/22/16)**



1164323.2



Bryan Cave LLP



Exhibit 1 to Declaration of Ronald F. Greenspan
Page 39 of 151

**EXHIBIT 1**
**Page 3 of 3**

*Execution Version*

**Exhibit 2**

**MotoLease Letter (9/30/16)**



**EXHIBIT 2**
**Page 1 of 9**

U.S. Bank Centre  |  1420 5th Avenue  |  Suite 3400  |  Seattle, WA  |  98101-4010  |  M 206.622.1711  |  F 206.292.0460  |  schwabe.com

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 41 of 151



**EXHIBIT 2**
**Page 2 of 9**



**EXHIBIT 2**
**Page 3 of 9**

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 43 of 151



**EXHIBIT 2**
**Page 4 of 9**



**EXHIBIT 2**
**Page 5 of 9**



**EXHIBIT 2**
**Page 6 of 9**





EXHIBIT 2
Page 9 of 9

d F. Greenspan

*Execution Version*

**Exhibit 3**

**Final Receiver Order**

1

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 50 of 151

JINA CHOI (NY Bar No. 2699718)
ERIN E. SCHNEIDER (Cal. Bar No. 216114)
SHEILA E. O'CALLAGHAN (Cal. Bar No. 131032)
  ocallaghans@sec.gov
WADE M. RHYNE (Cal. Bar No. 216799)
  rhynew@sec.gov
BERNARD B. SMYTH (Cal. Bar No. 217741)
  smythb@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, California 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 3:16-cv-00438-PK |
| Plaintiff, | |
| vs. | [PROPOSED] ORDER APPOINTING RECEIVER |
| AEQUITAS MANAGEMENT, LLC; AEQUITAS HOLDINGS, LLC; AEQUITAS COMMERCIAL FINANCE, LLC; AEQUITAS CAPITAL MANAGEMENT, INC.; AEQUITAS INVESTMENT MANAGEMENT, LLC; ROBERT J. JESENIK; BRIAN A. OLIVER; and N. SCOTT GILLIS, | |
| Defendants. | |

[PROPOSED] ORDER
APPT. RECEIVER

Pursuant to the stipulation entered into by Plaintiff Securities and Exchange Commission ("Commission") and defendants Aequitas Management, LLC, Aequitas Holdings, LLC, Aequitas Commercial Finance, LLC, Aequitas Capital Management, Inc. and Aequitas Investment Management, LLC, directly or through their attorneys of record, the Court finds that the appointment of a receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all assets of defendants Aequitas Management, LLC, Aequitas Holdings, LLC, Aequitas Commercial Finance, LLC, Aequitas Capital Management, Inc. and Aequitas Investment Management, LLC (collectively "Receivership Defendants"), and hereby orders as follows:

## I. Appointment of Receiver

1.      IT IS HEREBY ORDERED that Ronald Greenspan, is appointed to serve without bond as receiver of the Receivership Defendants, and their subsidiaries and/or majority-owned affiliates as set forth on the attached Exhibit A (collectively "Receivership Entity"). The entities listed on the attached Exhibit B (collectively "Extended Entities") shall cooperate fully with the Receiver in the execution of his duties, but shall not be included in the Receivership Entity, unless the Receiver in his discretion seeks approval from this Court to include such entities as part of the Receivership Entity. Mr. Greenspan (the "Receiver") is authorized to retain FTI Consulting, Inc. ("FTI"), and the law firms of Pepper Hamilton LLP ("Pepper Hamilton"), Pachulski Stang Ziehl & Jones LLP ("Pachulski") and Schwabe, Williamson & Wyatt ("Schwabe") in connection with this appointment. With the Court's approval, the Receiver, Pepper Hamilton, Pachulski and Schwabe shall be compensated from the Receivership Estates (as defined in paragraph 6 below) for all reasonable fees and costs. The professionals mentioned above are permitted to retain any remaining balances from pre-receivership retainers to apply to invoices approved in the future.

The agreed upon fee schedules for these professional firms are as follows:

1

[PROPOSED] ORDER
APPT. RECEIVER.

FTI Consulting

Senior Managing Director $825

Managing Director $660

Senior Director $605

Director $570

Senior Consultant $460

Consultant $345

Project Assistant $250

Rates above reflect a discount from ordinary rates. FTI may add or substitute other professionals with comparable experience at comparable rates.

Pepper Hamilton LLP

Joseph V. Del Raso (Partner) $845

Ivan B. Knauer (Partner) $725

John P. Falco (Partner) $445

Brian M. Nichilo (Associate) $330

Rates above reflect a discount from ordinary rates. Pepper Hamilton may add or substitute other professionals with comparable experience at comparable rates. Rates, after application of discount to ordinary rates, range from $445 to $845 for partners, from $275-$490 for associates and from $100 to $250 for paralegals and other non-attorney staff.

Pachulski Stang Ziehl & Jones LLP

Ira D. Kharasch (Partner) $846

John W. Lucas (Partner) $574

Rates above reflect a discount from ordinary rates. Pachulski may add or substitute other professionals with comparable experience at comparable rates.

Schwabe, Williamson & Wyatt

Senior Shareholder $510

2

[~~PROPOSED~~] ORDER
APPT. RECEIVER.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 53 of 151

EXHIBIT 3
Page 3 of 19

Senior Litigation Shareholder $490

Junior Transactional Shareholder $465

Junior Litigation Shareholder $445

Senior Associate $330

Junior Associate $295

Paralegal $230

Rates above reflect a discount from ordinary rates. Schwabe may add or substitute other professionals with comparable experience at comparable rates.

The Receiver is also authorized to retain a noticing agent.

## II. Asset Freeze

2.      Except as otherwise specified herein with respect to the powers of the Receiver, all property of the Receivership Entity is frozen until further order of this Court. Accordingly, all persons and entities with direct or indirect control over any property of the Receivership Entity, other than the Receiver, are hereby restrained and enjoined from directly or indirectly transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating or otherwise disposing of or withdrawing such assets.

## III. General Powers and Duties of Receiver

3.      The Receiver shall have all powers, authorities, rights and privileges heretofore possessed by the officers, directors, members, managers and general and limited partners of the Receivership Entity under applicable state and federal law, by the governing charters, by-laws, articles and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 and 1692, and Fed.R.Civ.P. 66.

4.      The trustees, directors, officers, members, and managers of the Receivership Entity are hereby dismissed and the powers of any general partners, directors, members and/or managers are hereby suspended. Such persons and entities shall have no authority with respect

3

[PROPOSED] ORDER
APPT. RECEIVER.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 54 of 151

EXHIBIT 3
Page 4 of 19

to the Receivership Entity's operations or assets, except to the extent as may hereafter be expressly granted by the Receiver. The Receiver shall have the authority to dismiss any employees, investment advisors, accountants, attorneys and other agents of the Receivership Entity as needed to effectively execute his duties and responsibilities. The Receiver shall assume and control the operation of the Receivership Entity and preserve all of their claims. The Receiver is expressly permitted to provide any notices required under this Order or otherwise by electronic means.

     5.    No person, other than the Receiver, holding or claiming any position of any sort with any of the Receivership Entity shall possess any authority to act by or on behalf of any of the Receivership Entity.

     6.    Subject to the specific provisions in Sections IV through XV, below, the Receiver shall have the following general powers and duties:

     A.    To use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Entity, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Entity own, possess, have a beneficial interest in, or control directly or indirectly ("Receivership Property" or, collectively, the "Receivership Estates");

     B.    To take custody, control and possession of all Receivership Property and records relevant thereto from the Receivership Entity; to sue for and collect, recover, receive and take into possession from third parties all Receivership Property and records relevant thereto;

     C.    To manage, control, operate and maintain the Receivership Estates and hold in his possession, custody and control all Receivership Property, subject to powers provided below and pending further Order of this Court;

     D.    To use Receivership Property for the benefit of the Receivership Entity, which, from the date of this Order, shall be treated as a consolidated enterprise for the purpose of making payments and disbursements, including payments to professionals, and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver; however, this provision shall have no force or effect with respect to whether the Receivership Entity shall be treated as a consolidated enterprise for the distribution (claims payment) phase of this

4

[PROPOSED] ORDER
APPT. RECEIVER.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 55 of 151

EXHIBIT 3
Page 5 of 19

matter nor after a motion and court order prospectively making this paragraph of no further force or effect;

E.    To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers, trustees and agents of the Receivership Entity;

F.    To engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders or auctioneers;

G.    To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property;

H.    To issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure, concerning any subject matter within the powers and duties granted by this Order;

I.    To bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver;

J.    To pursue, resist and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Receivership Estates; and,

K.    To take such other action as may be approved by this Court.

## IV. Access to Information

7.    The Receivership Entity and the past and/or present officers, directors, agents, managers, general and limited partners, trustees, attorneys, accountants and employees of the entity Receivership Entity, as well as those acting in their place, are hereby ordered and directed to preserve and turn over immediately upon the Receiver's request to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Entity and/or all Receivership Property; such information shall include but not be limited to books, records, documents, accounts and all other instruments and papers.

## V. Access to Books, Records and Accounts

8.    The Receiver is authorized to take immediate possession of all assets, bank

5

~~[PROPOSED]~~ ORDER
APPT. RECEIVER.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 56 of 151

EXHIBIT 3
Page 6 of 19

accounts or other financial accounts, books and records and all other documents or instruments relating to the Receivership Entity. All persons and entities having control, custody or possession of any Receivership Property are hereby directed to turn such property over to the Receiver.

9.      The Receivership Entity, as well as their agents, servants, employees, attorneys, any persons acting for or on behalf of the Receivership Entity, and any persons receiving notice of this Order by personal service, facsimile transmission or otherwise, having possession of the property, business, books, records, accounts or assets of the Receivership Entity are hereby directed to deliver the same to the Receiver, his agents and/or employees.

10.      All banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody or control of any assets or funds held by, in the name of, or for the benefit of, directly or indirectly, the Receivership Entity that receive actual notice of this Order by personal service, email, facsimile transmission or otherwise shall:

A.      Not liquidate, transfer, sell, convey or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Receivership Entity except upon instructions from the Receiver;

B.      Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;

C.      Within five (5) business days of receipt of that notice, file with the Court (in redacted form if required by F.R.Civ.Pro 5.2) and serve on the Receiver and counsel for the Commission a sworn statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the; and,

D.      Cooperate expeditiously in providing information and transferring funds, assets and accounts to the Receiver or at the direction of the Receiver.

### VI.  Access to Personal Property

11.      The Receiver is authorized to take immediate possession of all personal property of the Receivership Entity, wherever located, including but not limited to electronically stored information, computers, laptops, hard drives, external storage drives, and any other such

[PROPOSED] ORDER
APPT. RECEIVER.

memory, media or electronic storage devices, books, papers, data processing records, evidence of indebtedness, bank records and accounts, savings records and accounts, brokerage records and accounts, certificates of deposit, stocks, bonds, debentures, and other securities and investments, contracts, mortgages, furniture, office supplies and equipment.

     12.    The Receiver is authorized to open all mail directed to or received by or at the offices or post office boxes of the Receivership Entity, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order.

### VII. Notice to Third Parties

     13.    The Receiver shall promptly give notice, which may be electronic, of his appointment to all known officers, directors, agents, employees, shareholders, creditors, debtors, managers and general and limited partners of the Receivership Entity, as the Receiver deems necessary or advisable to effectuate the operation of the receivership

     14.    All persons and entities owing any obligation, debt, or distribution with respect to an ownership interest to any Receivership Entity shall, until further ordered by this Court, pay all such obligations in accordance with the terms thereof to the Receiver and its receipt for such payments shall have the same force and effect as if the Receivership Entity had received such payment.

     15.    In furtherance of his responsibilities in this matter, the Receiver is authorized to communicate with, and/or serve this Order upon, any person, entity or government office that he deems appropriate to inform them of the status of this matter and/or the financial condition of the Receivership Entity. All government offices which maintain public files of security interests in real and personal property shall, consistent with such office's applicable procedures, record this Order upon the request of the Receiver or the Commission.

     16.    The Receiver is authorized to instruct the United States Postmaster to hold and/or reroute mail which is related, directly or indirectly, to the business, operations or activities of any

[PROPOSED] ORDER
APPT. RECEIVER.

of the Receivership Entity (the "Receiver's Mail"), including all mail addressed to, or for the benefit of, the Receivership Entity.  The Postmaster shall not comply with, and shall immediately report to the Receiver, any change of address or other instruction given by anyone other than the Receiver concerning the Receiver's Mail.  The Receivership Entity shall not open any of the Receiver's Mail and shall immediately turn over such mail, regardless of when received, to the Receiver.

## VIII.  Injunction Against Interference with Receiver

17.     The Receivership Entity and all persons receiving notice of this Order by personal service, email, facsimile or otherwise, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would:

A.     Interfere with the Receiver's efforts to take control, possession, or management of any Receivership Property; such prohibited actions include but are not limited to, using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Property;

B.     Hinder, obstruct or otherwise interfere with the Receiver in the performance of his duties; such prohibited actions include but are not limited to, concealing, destroying or altering records or information;

C.     Dissipate or otherwise diminish the value of any Receivership Property; such prohibited actions include but are not limited to, releasing claims or disposing, transferring, exchanging, assigning or in any way conveying any Receivership Property, enforcing judgments, assessments or claims against any Receivership Property or any Receivership Entity, attempting to modify, cancel, terminate, call, extinguish, revoke, foreclose upon, enforce default provisions or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement or other agreement executed by any Receivership Entity or which otherwise affects any Receivership Property; or,

D.     Interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estates.

18.     The Receivership Entity and Extended Entities shall cooperate with and assist the Receiver in the performance of his duties.

8

~~[PROPOSED]~~ ORDER
APPT. RECEIVER.

19.    The Receiver shall promptly notify the Court and Commission counsel of any failure or apparent failure of any person or entity to comply in any way with the terms of this Order.

### IX. Stay of Litigation

20.    As set forth in detail below, the following proceedings, excluding the instant proceeding and any action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power and actions of the Commission related to the above-captioned enforcement action, are stayed until further Order of this Court:

> All civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving: (a) the Receiver, in his capacity as Receiver; (b) any Receivership Property, wherever located; (c) any of the Receivership Entity; or (d) any of the Receivership Entity's past or present officers, directors, managers, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

21.    The parties to any and all Ancillary Proceedings are enjoined from commencing or continuing any such legal proceeding, or from taking any action, in connection with any such proceeding, including, but not limited to, the issuance or employment of process.

22.    All Ancillary Proceedings are stayed in their entirety, and all Courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court. Any statute of limitation or ultimate repose applicable to a cause of action that is enjoined pursuant to this Order is tolled, effective March 14, 2016 and during the term of the injunction, unless otherwise subsequently ordered by this Court. Further, as to a cause of action accrued or accruing in favor of one or more of the Receivership Entity against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action.

23.    Notwithstanding the foregoing, Ancillary Proceedings shall not include civil legal proceedings upon claims that have accrued or are accruing exclusively to parties other than the

9

[~~PROPOSED~~] ORDER
APPT. RECEIVER.

Receiver on behalf of the Receivership Estates and brought against third party professionals, registered investment advisers, and others in which the Receivership Entity has no direct or indirect ownership interest. Proceedings against such third parties are not subject to the stay of litigation. The stay of litigation does, however, enjoin any claims brought in such proceedings (including, but not limited to, cross-claims or third party claims) against (a) the Receiver, in his capacity as Receiver; (b) any Receivership Property, wherever located; (c) any of the Receivership Entity; or (d) any of the Receivership Entity's past or present officers, directors, managers, or general or limited partners.

24.     The Receiver shall investigate the impact, if any, on the Receivership Estates of Ancillary Proceedings brought against registered investment advisers in which the Receivership Entity has an ownership interest. The Receiver shall include in the report and petition it must file with the Court pursuant to Paragraph 39 below, a recommendation to the Court as to whether Ancillary Proceedings brought against registered investment advisers in which the Receivership Entity has an ownership interest should remain subject to the stay of litigation. The Receiver shall also investigate the probable impact of discovery directed to the Receiver and the Receivership Entity in Ancillary Proceedings and those actions authorized in Paragraph 23. The Receiver shall include in the report and petition it must file pursuant to Paragraph 39 below, a recommendation to the Court as to a plan to govern all discovery directed to the Receiver and the Receivership Entity in Ancillary Proceedings and those actions authorized in Paragraph 23. Until such time as the Court enters an order governing discovery following submission of the Receiver's report, all discovery directed to the Receiver and the Receivership Entity is enjoined.

## X.  Managing Assets

25.     For each of the Receivership Entity, where appropriate and necessary in the judgment of the Receiver, the Receiver shall establish one or more custodial accounts at a federally insured bank to receive and hold all cash equivalent Receivership Property.

26.     The Receiver may, without further Order of this Court, transfer, compromise,

10

[PROPOSED] ORDER
APPT. RECEIVER.

abandon or otherwise dispose of any Receivership Property, other than real estate, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Entity and with due regard to the realization of the true and proper value of such Receivership Property.  The Receiver may sell real estate or assets outside of the ordinary course of business, or abandon material assets, only with Court approval after reasonable notice under the circumstances and an opportunity for interested parties to be heard.  The assets of the Receivership Entity, with Court approval,  may be sold, transferred or disposed, free and clear of any liens, claims or encumbrances, with such liens, claims or encumbrances attaching to the proceeds.

27.    The Receiver is authorized to take all actions to manage, maintain, and/or wind-down business operations of the Receivership Entity, including making legally required payments to creditors, employees, and agents of the Receivership Entity and communicating with vendors, investors, governmental and regulatory authorities, and others, as appropriate.

### XI.  Investigating and Prosecuting Claims

28.    Subject to the requirement, in Section IX above, that leave of this Court is required to resume or commence certain litigation, the Receiver is authorized and empowered to investigate, prosecute, defend, intervene in or otherwise participate in, compromise, and/or adjust actions in any state, federal or foreign court or proceeding of any kind as may in his discretion, and in consultation with Commission counsel, be advisable or proper to recover and/or conserve Receivership Property.

29.    Subject to his obligation to expend receivership funds in a reasonable and cost-effective manner, the Receiver is authorized and empowered to investigate the manner in which the financial and business affairs of the Receivership Entity were conducted and (after obtaining leave of this Court) to institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Entity, as the Receiver deems necessary and appropriate.  The Receiver may seek, among other legal and equitable relief, the imposition of constructive trusts, disgorgement

11

[PROPOSED] ORDER
APPT. RECEIVER.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 62 of 151

EXHIBIT 3
Page 12 of 19

of profits, asset turnover, avoidance of fraudulent transfers, rescission and restitution, collection of debts, and such other relief from this Court as may be necessary to enforce this Order. The Receiver should provide prior notice to Counsel for the Commission before commencing investigations and/or actions.

30.    The Receiver hereby holds, and is therefore empowered to waive, all privileges, including the attorney-client privilege, held by the Receivership Entity.

31.    The receiver has a continuing duty to ensure that there are no conflicts of interest between the Receiver, his Retained Personnel (as that term is defined below), and the Receivership Entity.

## XII. Bankruptcy Filing

32.    The Receiver may seek authorization of this Court to file voluntary petitions for relief under Title 11 of the United States Code (the "Bankruptcy Code") for the Receivership Entity. If a Receivership Entity is placed in bankruptcy proceedings, the Receiver may become, and may be empowered to operate each of the Receivership Estates as, a debtor in possession. In such a situation, the Receiver shall have all of the powers and duties as provided a debtor in possession under the Bankruptcy Code to the exclusion of any other person or entity. Pursuant to Paragraph 4 above, the Receiver is vested with management authority for all entity Receivership Entity and may therefore file and manage a Chapter 11 petition.

33.    The provisions of Section IX above bar any person or entity, other than the Receiver, from placing any of the Receivership Entity in bankruptcy proceedings.

## XIII. Liability of Receiver

34.    Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with his fiduciary obligations in this matter.

35.    The Receiver and his agents, acting within scope of such agency ("Retained Personnel") are entitled to rely on all outstanding rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment,

12

[PROPOSED] ORDER
APPT. RECEIVER.

or decree. In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel, nor shall the Receiver or Retained Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of their duties.

36.    This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

37.    In the event the Receiver decides to resign, the Receiver shall first give written notice to the Commission's counsel of record and the Court of its intention, and the resignation shall not be effective until the Court appoints a successor. The Receiver shall then follow such instructions as the Court may provide.

### XIV. Recommendations and Reports

38.    The Receiver is authorized, empowered and directed to develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Property (the "Liquidation Plan").

39.    Within thirty (30) days after the end of the first full calendar quarter occurring after entry of this order, the Receiver shall serve and file with the Court a verified report and petition for instructions. The report and petition must contain a summary of the operations of the Receiver, an inventory of the assets and an estimated range of their appraised value, a schedule of all receipts and disbursements, and a list of all creditors, their addresses and the amounts of their claims according to the books and records of the Receivership Entity. Such report shall not establish any presumption(s) regarding distribution of the Receivership Property. The petition must contain the Receiver's recommendation as to the continuance of the Receivership and reason therefor.

40.    Within thirty (30) days after the end of the first full calendar quarter occurring after entry of this order and each calendar quarter thereafter, the Receiver shall file and serve a

13

[~~PROPOSED~~] ORDER
APPT. RECEIVER.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 64 of 151

EXHIBIT 3
Page 14 of 19

full report and accounting of each Receivership Entity (the "Quarterly Status Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the existence, value, and location of all Receivership Property, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Entity.

41.    The Quarterly Status Report shall contain the following:

A.    A summary of the operations of the Receiver;

B.    The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C.    A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

D.    A description of all known Receivership Property, including anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E.    A description of liquidated and unliquidated claims held by the Receivership Entity, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F.    A list of all known creditors with their addresses and the amounts of their claims according to the books and records of the Receivership Entity;

G.    The status of litigation brought by the Receivership Estate after such proceedings have been commenced; and,

H.    The Receiver's recommendations for a continuation or discontinuation of the Receivership and the reasons for the recommendations.

42.    On the request of the Commission, the Receiver shall provide the Commission with any documentation that the Commission deems necessary to meet its reporting requirements, that is mandated by statute or Congress, or that is otherwise necessary to further the Commission's mission.

## XV. Fees, Expenses and Accountings

14

[PROPOSED] ORDER
APPT. RECEIVER.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 65 of 151

EXHIBIT 3
Page 15 of 19

43.    Subject to Paragraphs 44 – 50 immediately below, the Receiver need not obtain Court approval prior to the disbursement of Receivership funds for expenses in the ordinary course of the administration and operation of the Receivership. Further, prior Court approval is not required for payments of applicable federal, state or local taxes.

44.    Subject to Paragraph 45 immediately below, the Receiver is authorized to solicit professional persons and entities ("Retained Personnel") to assist him in carrying out the duties and responsibilities described in this Order. The Receiver shall not engage any Retained Personnel, other than those appointed pursuant to Paragraph 1 above, without first obtaining an Order of the Court authorizing such engagement, which authorization can be granted *nunc pro tunc* at the discretion of the court.

45.    The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estates as described in the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the "Billing Instructions") agreed to by the Receiver. Such compensation shall require the prior approval of the Court.

46.    Within sixty (60) days after the end of the first full calendar quarter occurring after the entry of this order, the Receiver and Retained Personnel shall apply to the Court for compensation and expense reimbursement from the Receivership Entity (the "Quarterly Fee Applications"). At least thirty (30) days prior to filing each Quarterly Fee Application with the Court, the Receiver will serve upon counsel for the Commission a complete copy of the proposed Application, together with all exhibits and relevant billing information in a format to be provided by the Commission staff.

47.    All Quarterly Fee Applications will be interim and will be subject to final reviews at the close of the Receivership. At the close of the Receivership, the Receiver will file a final fee application.

48.    Quarterly Fee Applications may be subject to a holdback in the amount of 20% of

15

[~~PROPOSED~~] ORDER
APPT. RECEIVER.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 66 of 151

EXHIBIT 3
Page 16 of 19

the amount of fees, for each application filed with the Court. Such holdback amounts shall not include out-of-pocket expenses of the Receiver and Retained Personnel. The total amounts held back during the course of the Receivership will be paid out at the discretion of the Court as part of the final fee application submitted at the close of the Receivership.

49.    Each Quarterly Fee Application shall:

    A.    Comply with the terms of the Billing Instructions agreed to by the Receiver; and,

    B.    Contain representations (in addition to the Certification required by the Billing Instructions) that: (i) the fees and expenses included therein were incurred in the best interests of the Receivership Estate; and, (ii) with the exception of the Billing Instructions, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof, except that the Receiver's fees shall be paid to FTI.

50.    At the close of the Receivership, the Receiver shall submit a Final Accounting, in a format to be provided by the Commission staff, as well as the Receiver's final application for compensation and expense reimbursement.

IT IS SO ORDERED.

DATED this 14th day of April, 2016

United States Magistrate Judge

16

[PROPOSED] ORDER
APPT. RECEIVER.

## EXHIBIT A

| | | | |
|---|---|---|---|
| 1 | Aequitas Enterprise Services, LLC | 27 | Aequitas Capital Opportunities Fund, LP |
| 2 | Aequitas Hybrid Fund, LLC | 28 | Aequitas Capital Opportunities GP, LLC |
| 3 | Aequitas Income Opportunity Fund II, LLC | 29 | ACC Holdings 5, LLC |
| 4 | Aequitas Private Client Fund, LLC | 30 | ACC Funding Series Trust 2015-5 |
| 5 | Aequitas Income Opportunity Fund, LLC | 31 | Aequitas Corporate Lending, LLC |
| 6 | Aequitas ETC Founders Fund, LLC | 32 | Aequitas Wealth Management, LLC |
| 7 | Aequitas Enhanced Income Fund, LLC | 33 | Aequitas Wealth Management Partner Fund, LLC |
| 8 | Aequitas WRFF I, LLC | 34 | Hickory Growth Partners, LLC |
| 9 | Aequitas Income Protection Fund, LLC | 35 | Aspen Grove Equity Solutions, LLC |
| 10 | Aequitas EIF Debt Fund, LLC | 36 | Aequitas International Holdings, LLC |
| 11 | ACC C Plus Holdings, LLC | 37 | Aequitas Asset Management Oregon, LLC |
| 12 | ACC Holdings 2, LLC | 38 | AAM Fund Investment, LLC |
| 13 | ACC Funding Trust 2014-2 | 39 | Aequitas Senior Housing Operations, LLC |
| 14 | Aequitas Peer-To-Peer Funding, LLC | 40 | Executive Citation, LLC |
| 15 | CarePayment Holdings, LLC | 41 | Executive Falcon, LLC |
| 16 | CarePayment, LLC | 42 | APF Holdings, LLC |
| 17 | CP Funding I Holdings, LLC | 43 | Aequitas Partner Fund, LLC |
| 18 | Campus Student Funding, LLC | | |
| 19 | ACC F Plus Holdings, LLC | | |
| 20 | ACC Holdings 1, LLC | | |
| 21 | ACC Funding Trust 2014-1 | | |
| 22 | ML Financial Holdings, LLC | | |
| 23 | Motolease Financial, LLC | | |
| 24 | Unigo Student Funding, LLC | | |
| 25 | The Hill Land, LLC | | |
| 26 | Aequitas Senior Housing, LLC | | |

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 68 of 151

EXHIBIT 3
Page 18 of 19

EXHIBIT B

| | |
|---|---|
| 1 | CarePayment Technologies, Inc |
| 2 | EDPlus Holdings, LLC |
| 3 | Marketing Services Platform, Inc. |
| 4 | Ivey Performance Marketing, LLC |
| 5 | Gridbox Media, LLC |
| 6 | Skagit Gardens, Inc. |
| 7 | Syncronex, LLC |
| 8 | Aequitas International Opportunities, LP |
| 9 | CP Funding I Trust |

*Execution Version*

**Exhibit 4**

**Initial Order**

Troy D. Greenfield, OSB #892534
Email: tgreenfield@schwabe.com
Joel A. Parker, OSB #001633
Email: jparker@schwabe.com
Jeffrey S. Eden, OSB #851903
Email: jeden@schwabe.com
Schwabe, Williamson & Wyatt, P.C.
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Facsimile: 503.796.2900

Ivan B. Knauer (Admitted *Pro Hac Vice*)
Email: knaueri@pepperlaw.com
Brian M. Nichilo (Admitted *Pro Hac Vice*)
Email: nichilob@pepperlaw.com
Pepper Hamilton, LLP
600 14th Street, NW, Suite 500
Washington, DC 20005
Telephone: 202. 220.1219
Facsimile: 202. 220.1665

Attorneys for the Receiver for Defendants
AEQUITAS MANAGEMENT, LLC; AEQUITAS HOLDINGS,
LLC; AEQUITAS COMMERCIAL FINANCE, LLC; AEQUITAS
CAPITAL MANAGEMENT, INC.; AEQUITAS INVESTMENT
MANAGEMENT, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>AEQUITAS MANAGEMENT, LLC; AEQUITAS HOLDINGS, LLC; | No. 3:16-cv-00438-PK<br><br>[~~PROPOSED~~] ORDER GRANTING RECEIVER'S MOTIONS (1) FOR APPROVAL OF LETTER OF INTENT, (2) FOR APPROVAL OF BID PROCEDURES, BREAK-UP FEE, AND STALKING HORSE BIDDER and (3) TO SCHEDULE FINAL SALE HEARING |

Page 1 -    [~~PROPOSED~~] ORDER GRANTING RECEIVER'S MOTIONS (1)
FOR APPROVAL OF LETTER OF INTENT, (2) FOR APPROVAL OF
BID PROCEDURES, BREAK-UP FEE, AND STALKING HORSE
BIDDER, and (3) TO SCHEDULE FINAL SALE HEARING
PDX\129912\215141\AP\19061202.3

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax 503.796.2900

AEQUITAS COMMERCIAL FINANCE,
LLC; AEQUITAS CAPITAL
MANAGEMENT, INC.; AEQUITAS
INVESTMENT MANAGEMENT, LLC;
ROBERT J. JESENIK, BRIAN A. OLIVER;
and N. SCOTT GILLIS,

                    Defendants.

This matter having come before the Honorable Paul Papak on Receiver's Motions for Orders: (1) Scheduling Hearing to Approve Purchase and Sale Agreement; (2) Approving Stalking Horse Bidder; (3) Approving Break-Up Fee; (4) Approving Bidding Procedures; and (5) Approving the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests (CCM Capital Opportunities Fund, LP) (the "Motion") [Dkt. 247], on the terms set forth in the Letter of Intent, which will be supplemented with the definitive Purchase and Sale Agreement, and the Court, having given all counsel an opportunity to oppose the Motion and being fully advised in the premises, now, therefore,

THE COURT FINDS as follows:

A.      On March 10, 2016, the Securities and Exchange Commission ("SEC") filed a complaint in this Court against the five entity defendants and three individual defendants, Robert J. Jesenik, Brian A. Oliver, and N. Scott Gillis.

B.      On March 16, 2016, pursuant to the Stipulated Interim Order Appointing Receiver, the Receiver was appointed as receiver for the Receivership Entity[1] on an interim basis. On April 14, 2016, pursuant to the Order Appointing Receiver, the Receiver was appointed as receiver of the Receivership Entity on a final basis.

---

[1] Capitalized terms not otherwise defined in this Order shall have the meanings ascribed to them in the Motion.

Page 2 - [PROPOSED] ORDER GRANTING RECEIVER'S MOTIONS (1) FOR APPROVAL OF LETTER OF INTENT, (2) FOR APPROVAL OF BID PROCEDURES, BREAK-UP FEE, AND STALKING HORSE BIDDER, and (3) TO SCHEDULE FINAL SALE HEARING
PDX\129912\215141\AP\19061202.3

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax 503.796.2900

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 72 of 151

EXHIBIT 4
Page 2 of 10

C.     Due, timely, and adequate notice of the Motion was given, and such notice was good, sufficient, and appropriate under the circumstances. No other or further notice of the Motion is or shall be required.

F.     Approval of the Break-Up Fee, the Bidding Procedures, and the Letter of Intent dated September 7, 2016 (the "Letter of Intent") [Dkt. 248-1] that was submitted with the Motion, and the transactions described therein, is in the best interests of the Receivership Entity and its estate.

G.     The Letter of Intent, Break-Up Fee and Bidding Procedures were negotiated in a fair and reasonable manner under the circumstances.  There is no evidence that the Receivership Entity, Receiver, or Origami Capital Partners, LLC ("Origami"), engaged in any conduct (including but not limited to collusion or fraud of any kind) that would cause or permit the Letter of Intent to be avoided.

H.     The Court having reviewed the Motion, and having considered the presentations of counsel, and having considered any objections filed to the Motion, and it appearing that the Sale is in the best interest of the Receivership Entity and its estate, and for good cause shown,

IT IS HEREBY ORDERED AND DECREED as follows.

1.     Except as modified hereby, the Letter of Intent is approved in its entirety.

2.     Origami is approved as the "stalking-horse-bidder."

3.     The Bidding Procedures are approved in their entirety.  The Bidding Procedures are attached and incorporated at Exhibit 1.

4.     The Break-Up Fee is approved.  Notwithstanding anything to the contrary in the Motion, Letter of Intent, or the Bidding Procedures, Origami will only be entitled to receive the Break-Up Fee if, following the approval of the Purchase and Sale Agreement by this Court and satisfaction of the Conditions to Closing described in the Letter of Intent [Dkt. 248-1, at p. 6], either (a) the Receiver fails to transact with Origami for any reason following the expiration of

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax 503.796.2900

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 73 of 151

EXHIBIT 4
Page 3 of 10

the Notice Period other than because of a breach by Origami, or (b) there is a Qualified Overbid that closes following approval by this Court.

5.      The Receiver shall file the definitive Purchase and Sale Agreement by not later than the date that is seven (7) calendar days prior to the Final Sale Hearing.

6.      The Final Hearing to approve the Sale, including a sale to a Successful Bidder, is hereby scheduled for October 12, 2016, at 10:00 a.m. (Pacific time).

7.      All objections to the relief granted in this Motion that have not been withdrawn, waived, settled, or expressly reserved pursuant to the terms of this Order are hereby overruled.

8.      This Court shall retain jurisdiction over any issues relating to the Motion and to enforce this Order.

9.      This Order shall be binding in all respects on Origami, all creditors and interest holders of the Receivership Entity, and their successors and assigns.

Dated this 21st day of September, 2016.

_____
United States Magistrate Judge Paul Papak

///

///

///

Page 4 -   [PROPOSED] ORDER GRANTING RECEIVER'S MOTIONS (1) FOR APPROVAL OF LETTER OF INTENT, (2) FOR APPROVAL OF BID PROCEDURES, BREAK-UP FEE, AND STALKING HORSE BIDDER, and (3) TO SCHEDULE FINAL SALE HEARING
PDX\129912\215141\AP\19061202.3

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax 503.796.2900

SUBMITTED BY:

SCHWABE, WILLIAMSON & WYATT, P.C.


By:    s/ Alex I. Poust, OSB #925155
     Troy D. Greenfield, OSB #892534
     tgreenfield@schwabe.com
     Joel A. Parker, OSB #001633
     jparker@schwabe.com
     Jeffrey S. Eden, OSB #851903
     jeden@schwabe.com
     Telephone: 503.222.9981
     Facsimile: 503.796.2900

     Ivan B. Knauer (Admitted *Pro Hac Vice*)
     knaueri@pepperlaw.com
     Brian M. Nichilo (Admitted *Pro Hac Vice*)
     nichilob@pepperlaw.com
     PEPPER HAMILTON LLP
     600 Fourteenth Street, N.W.
     Washington, DC 2005
     Tel: (202) 220-1665

     Attorneys for the Receiver for Defendants
     Aequitas Management, LLC, Aequitas
     Holdings, LLC, Aequitas Commercial Finance,
     LLC, Aequitas Capital Management, Inc., and
     Aequitas Investment Management, LLC

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax 503.796.2900

## EXHIBIT 1

### BIDDING PROCEDURES

1.      Following entry of the Bid Procedures Order,[1] the Receiver shall be entitled to solicit additional offers for the CCM Interests from prospective bidders (each, an "Alternative Bid") and, subject to the receipt from the prospective bidders of appropriate confidentiality agreements, provide necessary and requested due diligence to such prospective bidders. The Receiver proposes the following terms and procedures to govern the submission of Alternative Bids for the CCM Interests, including the proposed dates set forth below:

(i)    Alternative Bid Deadline. Each Alternative Bid must be provided to the Receiver not later than 5:00 p.m. Pacific Time on or before the expiration of the Notice Period (the "Bid Deadline").

(ii)   Qualified Alternative Bid. The Receiver will consider an Alternative Bid only if the Alternative Bid is a "Qualified Overbid" as that term is defined in the Letter of Intent (a "Qualified Alternative Bid"). Without limiting or altering the terms of the Letter of Intent (and the Purchase and Sale Agreement), to be a Qualified Alternative Bid, an Alternative bid must:

a.     identify the proponent of the Alternative Bid and an officer or representative who is duly authorized in all respects to appear, act on behalf of, and legally bind such proponent (an "Authorized Representative");

b.     provide for the purchase of all of the CCM Interests, and shall otherwise be on substantially the same or better terms as those set forth in the Letter of Intent, in the Receiver's sole discretion; provided, however, that an Alternative Bid shall not provide for the payment of a break-up fee or overbid protections because no bidders other than the Stalking Horse Bidder will be entitled to receive a break-up fee and/or any reimbursement of expenses or transaction costs;

c.     be accompanied by an executed purchase and sale agreement in the form substantially the same as the Purchase and Sale Agreement,

---

[1] Capitalized terms not otherwise defined in these Bidding Procedures shall have the meanings ascribed to them in the Receiver's Motions for Orders: (1) Scheduling Hearing to Approve Purchase and Sale Agreement; (2) Approving Stalking Horse Bidder; (3) Approving Break-Up Fee; (4) Approving Bidding Procedures; and (5) Approving The Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests. [Dkt. 247].

1 – BIDDING PROCEDURES
PDX\129912\215141\AP\19061566.2

EXHIBIT 1
Page 1 of 5

EXHIBIT 4
Page 6 of 10

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 76 of 151

except that the structure may be changed so long as the value delivered to the Seller is at least $13,175,000 (inclusive of the Break-Up Fee);

d.    set forth the purchase price, payable in cash, which purchase price and value to the Seller, when combined with the value of any assets to be excluded from the purchase that are currently included in the Letter of Intent, shall be higher and better than the Purchase Price such that the value to the Seller exceeds the Purchase Price by at least $1,000,000, including the Break-Up fee;

e.    be a firm offer and not contain any contingencies other than those contained in the Purchase and Sale Agreement, to the validity, effectiveness or binding nature of the offer, including without limitation, contingencies for financing, due diligence or inspection;

g.    be accompanied by financial information for the prospective bidder, including but not limited to financial statements including the prospective bidder's balance sheet sufficient to enable the Receiver to determine such bidder's creditworthiness and ability to pay the purchase price and close a sale; provided, however, determination that the bidder has met this qualification shall be in the sole discretion of the Receiver;

h.    be open and irrevocable through the conclusion of the Final Hearing unless extended by agreement of the parties.

2.    If the Receiver receives one or more Qualified Alternative Bids, the Receiver shall conduct an auction (the "Auction") at the offices of Schwabe, Williamson & Wyatt, 1211 SW Fifth Avenue, Suite 1900, Portland, OR 97204 at 10:00 a.m. (Pacific time) on the second business day following the expiration of the Notice Period, or such later time and date and/or such other place as the Receiver shall notify all bidders who have submitted Qualified Alternative Bids (together, "Qualified Alternative Bidders") and the Stalking Horse Bidder. The following procedures will apply to the Auction:

(i)    Only the following parties and their counsel shall be permitted to attend the Auction: the Stalking Horse Bidder, Qualified Alternative Bidders, and the Receiver. Only the Stalking Horse Bidder and Qualified Alternative Bidders, including through their counsel, shall be permitted to make any additional bids ("Subsequent Bids") at the Auction.

2 – BIDDING PROCEDURES
PDX\129912\215141\AP\19061566.2

EXHIBIT 1
Page 2 of 5

EXHIBIT 4
Page 7 of 10

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 77 of 151

(ii) All Qualified Alternative Bidders that desire to participate in the Auction shall have their Authorized Representatives physically present for all bidding each with the understanding that the true identity of each Qualified Alternative Bidder shall be fully disclosed to all other Qualified Alternative Bidders and that all material terms including but not limited to the amount, of each bid will be fully disclosed to all other bidders throughout the entire Auction.

(iii) The Receiver will give the Stalking Horse Bidder, all other Qualified Alternative Bidders, and their counsel a copy of the highest and best Qualified Alternative Bid received and copies of all other Qualified Alternative Bids on or before the Business Day prior to the Auction. In addition, the Receiver will inform the Stalking Horse Bidder and each Qualified Alternative Bidder who has expressed its intent to participate in the Auction of the identity of all Qualified Alternative Bidders that may participate in the Auction.

(iv) Prior to the start of the Auction the Authorized Representative of each Qualified Alternative bidder shall certify, in writing, as follows:

(a) Each bid it makes at the Auction shall, if accepted by the Receiver, constitute a binding and legally enforceable contract of the Qualifying Bidder to timely close a purchase of the CCM Interests according to the terms of the bid in the event an order of the Court is entered approving a sale based upon such bid.

(b) No bids made by the Qualifying Bidder, whether before or during the Auction, shall be subject to any conditions or contingencies related to due diligence, financing, or any other further approval other than the Authorized Representative present at the Auction.

(c) The Authorized Representative present for the Qualified Alternative Bidder at the Auction has the full power and authority to act on behalf of and to legally bind such Qualified Alternative Bidder for any bids made, and any agreements entered into at or in connection with the Auction.

(d) Other than the Stalking Horse Bidder, each Qualified Alternative Bidder that participates in the Auction shall authorize the Receiver to conditionally accept such Qualified Alternative Bidders second-highest bid at the Auction as a back—up to the high bid, which shall become binding upon and enforceable against such Qualified Alternative Bidder other than the Stalking Horse Bidder, in the event the highest bid is approved by the Court, but such Qualified Alternative Bidder fails or otherwise refuses to close its purchase

EXHIBIT 1
Page 3 of 5

EXHIBIT 4
Page 8 of 10

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 78 of 151

of the CCM Interests for any reason other than a material failure of performance by the Seller.

(e)     That such Qualified Alternative Bidder has at all times proceeded in good faith in submitting its bids, and has not engaged in any collusion with any other person or bidder with respect to the Auction and related proceedings.

3.     The Receiver shall have reasonable discretion with respect to the conduct of the Auction. Among other things, the Receiver may announce at the Auction additional procedural rules that he determines to be reasonable under the circumstances (e.g. the amount of time allotted to make subsequent alternative bids) for conducting the Auction so long as such additional rules are not inconsistent with these Bidding Procedures and the terms, deadlines, and intent of the Purchase and Sale Agreement.

(i)     At the Auction, bidding shall begin with the highest and best Qualified Alternative Bid (the "Initial Overbidder"). The Receiver will identify the Initial Overbidder at the beginning of the Auction. Any subsequent bids must be at least $250,000 more than the immediately preceding Qualifying Bid and each such increment (including the initial increment over the Purchase Price) must be payable in cash ("Minimum Subsequent Overbid Amount"). In any of its subsequent bids, the Stalking Horse Bidder shall be entitled to credit bid up the sum of the Break-Up Fee, provided that the Stalking Horse Bidder shall recover the sum of the Break-Up Fee directly from the cash paid by the Successful Bidder in the event that the Court enters a sale order authorizing a sale of the CCM Interests to a buyer other than the Stalking Horse Bidder.

(ii)     The Auction, at the discretion of the Receiver, shall be recorded by stenographer or other reliable means of preserving the record of the Auction proceedings, and shall continue in one or more rounds of "open cry," or publically announced bidding and shall conclude after each participating bidder has had the opportunity, within any time period specified by the Receiver, to submit an additional Subsequent Bid with full knowledge of the then-existing highest bid.

(iii)     For the purpose of evaluating the value of the consideration provided by each Subsequent Bid (including any Subsequent Bid by the Stalking Horse Bidder), the value shall be the net cash consideration payable to the Seller after giving effect to the Break-Up Fee that may be payable to the Stalking Horse Bidder under the Purchase and Sale Agreement and the Bid Procedures Order, as well as any assets to be excluded, as compared to all of the CCM Interests.

(iv)     At the conclusion of the bidding, the Receiver shall announce his determination (pursuant to the following paragraph) as to the Qualified

4 – BIDDING PROCEDURES
PDX\129912\215141\AP\19061566.2

EXHIBIT 1
Page 4 of 5

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 79 of 151

**EXHIBIT 4**
**Page 9 of 10**

Alternative Bidder submitting the successful highest and best bid ("Successful Bid"), which shall be submitted to the Court for approval at the Final Hearing. The Stalking Horse Bidder shall be deemed a party-in-interest with standing to appear and be heard in connection with any motions, objections, hearings, or other proceedings related to this Motion, the Purchase and Sale Agreement, the Auction, and any Alternative Bid, Subsequent Bid, or the Successful Bid.

(v)   In determining the Successful Bid to submit to the Court for approval, the Receiver, in his sole discretion and in consultation with his professionals, shall determine whether an Alternative Bid constitutes a higher and better offer than the Purchase and Sale Agreement. In making that determination, the Receiver may consider any and all factors associated with all Qualified Alternative Bids and Qualified Alternative Bidders, including but not limited to factors such as the likelihood and ability of the proposed buyer(s) to immediately consummate and close the proposed transactions, other timing issues, employment issues, overall value of the Qualified Alternative Bids, and any other material factors. The highest and/or best offer as reasonably determined by the Receiver shall be submitted to the Court for approval at the Final Hearing, subject to the rights of parties in interest, including the Stalking Horse Bidder, to object to or challenge such determination.

(vi)  If the Receiver does not timely receive any Qualified Alternative Bids, the Receiver shall forthwith cancel the Auction and promptly present the Final Sale Order for entry by the Court at the Final Hearing.

(vii) If, following the entry of the Final Sale Order approving a sale to the Successful Bidder, such Successful Bidder fails or otherwise refuses to consummate such sale, then the next highest or best Qualified Alternative Bid other than the Stalking Horse Bidder as to which the bidder has agreed will stand as a back-up bid (the "Back-Up Bid" and, such bidder, the "Back-Up Bidder") will be deemed to be the Successful Bid and the Seller will be obligated to effectuate a sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without further order of the Court. If the Stalking Horse Bidder is determined to be the Back-Up Bidder, its obligation to consummate a purchase of the CCM Interests shall for all purposes be governed by the terms of the Purchase and Sale Agreement, as modified, if at all, by any Subsequent Bid made by the Stalking Horse Bidder. All other Back-Up Bids shall remain open until twenty (20) calendar days following entry of the Final Sale Order (the "Back-Up Bid Expiration Date"). All Qualified Alternative Bids (other than the Successful Bid and the Back-Up Bid) shall be deemed rejected by the Receiver on and as of the date of entry of the Final Sale Order by the Court.

5 – BIDDING PROCEDURES
PDX\129912\215141\AP\19061566.2

EXHIBIT 1
Page 5 of 5

EXHIBIT 4
Page 10 of 10

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 80 of 151

*Execution Version*

**Exhibit 5**

**Certification of Non-Foreign Status**

Section 1445 of the Internal Revenue Code of 1986, as amended (the "Code"), provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person.  To inform Buyer that withholding of tax is not required upon the disposition of a U.S. real property interest by Seller, Seller certifies the following:

1)      Seller is not a foreign person within the meaning of Treas. Reg. section 1.1445-2(b)(2)(i);

2)      Seller is not a disregarded entity within the meaning of Treas. Reg. Section 1.1445-2(b)(2)(iii);

3)      Seller's U.S. taxpayer identification number is _____; and

4)      Seller's address is:

                [_____]
                [_____]

Seller understands that this certification may be disclosed to the U.S. Internal Revenue Service by Buyer, and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury, the undersigned has examined this certification and to the best of his/her knowledge and belief it is correct and complete, and the undersigned further declares that he/she has authority to sign this certification on behalf of Seller.

[SELLER]

By:_____
Name:
Title:

Dated _____

1

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 81 of 151

**Exhibit 6**

**Bidding Procedures**

BIDDING PROCEDURES

1.      The Receiver[1] shall be entitled to solicit additional offers for the Property from prospective bidders (each, an "Alternative Bid") for fourteen (14) calendar days following the date of entry of the Bid Procedures Order (the "Notice Period") and, subject to the receipt from the prospective bidders of appropriate confidentiality agreements, provide necessary and requested due diligence to such prospective bidders.  The following terms and procedures shall govern the submission of Alternative Bids for the Property:

(i)      Alternative Bid Deadline.  Each Alternative Bid must be provided to the Receiver not later than 12:00 Noon Pacific Time on the date that the Notice Period expires (the "Bid Deadline").

(ii)     Qualified Alternative Bid.  The Receiver will consider an Alternative Bid only if the Alternative Bid is a "Qualified Alternative Bid."  Without limiting or altering the terms of the Purchase and Sale Agreement, to be a Qualified Alternative Bid, an Alternative Bid must:

a.      identify the proponent of the Alternative Bid and an officer or representative who is duly authorized in all respects to appear, act on behalf of, and legally bind such proponent (an "Authorized Representative");

b.      provide for the purchase of all of the Property, and shall otherwise be on substantially the same or better terms as those set forth in the Purchase and Sale Agreement, in the Receiver's sole discretion; provided, however, that an Alternative Bid shall not provide for the payment of a break-up fee or overbid protections because no bidders other than the Stalking Horse Bidder will be entitled to receive a break-up fee and/or any reimbursement of expenses or transaction costs;

c.      be accompanied by an executed purchase and sale agreement in the form substantially the same as the Purchase and Sale Agreement, except that the structure may be changed so long as the value delivered to the Seller is at least $55,000,000.00, payable in cash at closing, inclusive of the Break-Up Fee;

---

[1] Capitalized terms not otherwise defined in these Bidding Procedures shall have the meanings ascribed to them in the Receiver's Motion for Orders: (1) Scheduling Hearing to Approve Sale of Assets; (2) Approving Stalking Horse Bidder; (3) Approving Break-Up Fee; (4) Approving Bidding Procedures; and (5) Approving The Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests.  [Dkt. ___].

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 83 of 151

    d.      be a firm offer and not contain any contingencies other than those contained in the Purchase and Sale Agreement, to the validity, effectiveness or binding nature of the offer, including without limitation, contingencies for financing, due diligence or inspection;

    e.      be accompanied by financial information for the prospective bidder, including but not limited to financial statements including the prospective bidder's balance sheet or such other information sufficient to enable the Receiver to determine such bidder's creditworthiness and ability to pay the purchase price and close a sale; provided, however, determination that the bidder has met this qualification shall be in the sole discretion of the Receiver;

    f.      be open and irrevocable through the conclusion of the Final Hearing unless (1) extended by agreement of the parties or the terms of these Bidding Procedures, or (ii) the Qualified Alternative Bid is designated a Back-Up Bid, which shall then remain open until twenty (20) calendar days following the date that the Final Sale Order becomes a non-appealable order.

2.      If the Receiver receives one or more Qualified Alternative Bids, the Receiver shall conduct an auction (the "Auction") at the offices of Schwabe, Williamson & Wyatt, 1211 SW Fifth Avenue, Suite 1900, Portland, OR 97204 at 10:00 a.m. (Pacific time) on the first (1st) business day following the expiration of the Notice Period, or such later time and date and/or such other place as the Receiver shall notify all bidders who have submitted Qualified Alternative Bids (together, "Qualified Alternative Bidders") and the Stalking Horse Bidder. The following procedures will apply to the Auction:

    (i)      Only the following parties and their counsel shall be permitted to attend the Auction: the Stalking Horse Bidder, Qualified Alternative Bidders, and the Receiver. Only the Stalking Horse Bidder and Qualified Alternative Bidders, including through their counsel, shall be permitted to make any additional bids ("Subsequent Bids") at the Auction.

(ii)   All Qualified Alternative Bidders that desire to participate in the Auction shall have their Authorized Representatives physically present for all bidding each with the understanding that the true identity of each Qualified Alternative Bidder shall be fully disclosed to all other Qualified Alternative Bidders and that all material terms, including but not limited to the amount, of each bid will be fully disclosed to all other bidders throughout the entire Auction.

(iii)  The Receiver will give the Stalking Horse Bidder, all other Qualified Alternative Bidders, and their counsel a copy of the highest and best Qualified Alternative Bid received and copies of all other Qualified Alternative Bids prior to the start of the Auction.  In addition, the Receiver will inform the Stalking Horse Bidder and each Qualified Alternative Bidder who has expressed its intent to participate in the Auction of the identity of all Qualified Alternative Bidders that may participate in the Auction.

(iv)   Prior to the start of the Auction the Authorized Representative of the Stalking Horse Bidder and each Qualified Alternative Bidder shall certify, in writing or on the record, as follows:

(a)   Each bid it makes at the Auction shall, if accepted by the Receiver, constitute a binding and legally enforceable contract of the bidder to timely close a purchase of the Property according to the terms of the bid in the event an order of the Court is entered approving a sale based upon such bid.

(b)   No bids made by the Stalking Horse Bidder or a Qualified Alternative Bidder, whether before or during the Auction, shall be subject to any conditions or contingencies related to due diligence, financing, or any other further approval other than the Authorized Representative present at the Auction.

(c)   The Authorized Representative present for the Stalking Horse Bidder or a Qualified Alternative Bidder at the Auction has the full power and authority to act on behalf of and to legally bind the Stalking Horse Bidder or such Qualified Alternative Bidder for any bids made, and any agreements entered into at or in connection with the Auction.

(d)   The Stalking Horse Bidder and each Qualified Alternative Bidder that participates in the Auction shall authorize the Receiver to conditionally accept such bidder's second-highest bid at the Auction as a back—up to the Successful Bid, which shall become binding upon and enforceable against such bidder in the event that the Successful Bid is approved by the Court, but such Successful

Bidder fails or otherwise refuses to close its purchase of the Property for any reason other than a material failure of performance by the Seller.

(e)     That the Stalking Horse Bidder and each Qualified Alternative Bidder has at all times proceeded in good faith in submitting its bids, and has not engaged in any collusion with any other person or bidder with respect to the Auction and related proceedings.

3.      The Receiver shall have reasonable discretion with respect to the conduct of the Auction. Among other things, the Receiver may announce at the Auction additional procedural rules that he determines to be reasonable under the circumstances (e.g. the amount of time allotted to make subsequent alternative bids) for conducting the Auction so long as such additional rules are not materially inconsistent with these Bidding Procedures and the terms, deadlines, and intent of the Purchase and Sale Agreement.

(i)     At the Auction, bidding shall begin with the highest and best Qualified Alternative Bid (the "Initial Overbidder"). The Receiver will identify the Initial Overbidder at the beginning of the Auction. Any subsequent bids must be at least $250,000 more than the immediately preceding bid and each such increment (including the initial increment over the Purchase Price) must be payable in cash ("Minimum Subsequent Overbid Amount"). In any of its subsequent bids, the Stalking Horse Bidder shall be entitled to credit bid up to the sum of the Break-Up Fee, provided that the Stalking Horse Bidder shall recover the sum of the Break-Up Fee directly from, and only from, the cash paid by the Successful Bidder in the event that the Court enters a sale order authorizing a sale of the Property to a buyer other than the Stalking Horse Bidder.

(ii)    The Auction, at the discretion of the Receiver, shall be recorded by stenographer or other reliable means of preserving the record of the Auction proceedings, and shall continue in one or more rounds of "open cry," or publically announced bidding and shall conclude after each participating bidder has had the opportunity, within any time period specified by the Receiver, to submit an additional Subsequent Bid with full knowledge of the then-existing highest bid.

(iii)   For the purpose of evaluating the value of the consideration provided by each Subsequent Bid (including any Subsequent Bid by the Stalking Horse Bidder), the value shall be the net cash consideration payable to the Seller after giving effect to the Break-Up Fee that may be payable to the Stalking

Horse Bidder under the Purchase and Sale Agreement and the Bid Procedures Order.

(iv) At the conclusion of the bidding, the Receiver shall announce his determination (pursuant to the following paragraph) as to the bidder (the "Successful Bidder") submitting the highest and best bid (the "Successful Bid"), which shall be submitted to the Court for approval at the Final Hearing. The Stalking Horse Bidder shall be deemed a party-in-interest with standing to appear and be heard in connection with any motions, objections, hearings, or other proceedings related to the Motion, the Purchase and Sale Agreement, the Auction, and any Qualified Alternative Bid, Subsequent Bid, or the Successful Bid.

(v) In determining the Successful Bid to submit to the Court for approval, the Receiver, in his sole discretion and in consultation with his professionals, shall determine whether a Qualified Alternative Bid constitutes a higher and better offer than the bid of the Stalking Horse Bidder. In making that determination, the Receiver may consider any and all factors associated with all Qualified Alternative Bids and Qualified Alternative Bidders, including but not limited to factors such as the likelihood and ability of the proposed buyer(s) to immediately consummate and close the proposed transactions, other timing issues, employment issues, overall value of the Qualified Alternative Bids, and any other material factors.

(vi) The Court has set a deadline in the Bid Procedures Order for filing objections to the Motion or entry of the Final Sale Order (the "Objection Deadline"). Any objections to the Motion or entry of the Final Sale Order that are not filed with the Court by the Objection Deadline shall be deemed irrevocably waived and withdrawn.

(vii) If the Receiver does not timely receive any Qualified Alternative Bids, the Receiver shall forthwith cancel the Auction and promptly present the Final Sale Order for entry by the Court at the Final Hearing.

(viii) If, following the entry of the Final Sale Order approving a sale to the Successful Bidder, such Successful Bidder fails or otherwise refuses to consummate such sale, then the next highest or best bid shall be deemed as the back-up bid (the "Back-Up Bid" and, such bidder, the "Back-Up Bidder") and the Seller will be obligated to effectuate a sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without further order of the Court. The Back-Up Bid shall remain open until twenty (20) calendar days following the date that the Final Sale Order becomes a non-appealable order. All Qualified Alternative Bids (other than the Successful Bid and the Back-Up Bid) shall be deemed rejected by the Receiver on and as of the date of entry of the Final Sale Order by the Court.

## BIDDING PROCEDURES

1.      The Receiver[1] shall be entitled to solicit additional offers for the Property from prospective bidders (each, an "Alternative Bid") for fourteen (14) calendar days following the date of entry of the Bid Procedures Order (the "Notice Period") and, subject to the receipt from the prospective bidders of appropriate confidentiality agreements, provide necessary and requested due diligence to such prospective bidders. The following terms and procedures shall govern the submission of Alternative Bids for the Property:

(i)     Alternative Bid Deadline. Each Alternative Bid must be provided to the Receiver not later than 12:00 Noon Pacific Time on the date that the Notice Period expires (the "Bid Deadline").

(ii)    Qualified Alternative Bid. The Receiver will consider an Alternative Bid only if the Alternative Bid is a "Qualified Alternative Bid." Without limiting or altering the terms of the Purchase and Sale Agreement, to be a Qualified Alternative Bid, an Alternative Bid must:

a.      identify the proponent of the Alternative Bid and an officer or representative who is duly authorized in all respects to appear, act on behalf of, and legally bind such proponent (an "Authorized Representative");

b.      provide for the purchase of all of the Property, and shall otherwise be on substantially the same or better terms as those set forth in the Purchase and Sale Agreement, in the Receiver's sole discretion; provided, however, that an Alternative Bid shall not provide for the payment of a break-up fee or overbid protections because no bidders other than the Stalking Horse Bidder will be entitled to receive a break-up fee and/or any reimbursement of expenses or transaction costs;

c.      be accompanied by an executed purchase and sale agreement in the form substantially the same as the Purchase and Sale Agreement, except that the structure may be changed so long as the value delivered to the Seller is at least $55,000,000.00, payable in cash at closing, inclusive of the Break-Up Fee;

---

[1] Capitalized terms not otherwise defined in these Bidding Procedures shall have the meanings ascribed to them in the Receiver's Motion for Orders: (1) Scheduling Hearing to Approve Sale of Assets; (2) Approving Stalking Horse Bidder; (3) Approving Break-Up Fee; (4) Approving Bidding Procedures; and (5) Approving The Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests. [Dkt. ___].

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 88 of 151

d.      be a firm offer and not contain any contingencies other than those contained in the Purchase and Sale Agreement, to the validity, effectiveness or binding nature of the offer, including without limitation, contingencies for financing, due diligence or inspection;

e.      be accompanied by financial information for the prospective bidder, including but not limited to financial statements including the prospective bidder's balance sheet or such other information sufficient to enable the Receiver to determine such bidder's creditworthiness and ability to pay the purchase price and close a sale; provided, however, determination that the bidder has met this qualification shall be in the sole discretion of the Receiver;

f.      be open and irrevocable through the conclusion of the Final Hearing unless (1) extended by agreement of the parties or the terms of these Bidding Procedures, or (ii) the Qualified Alternative Bid is designated a Back-Up Bid, which shall then remain open until twenty (20) calendar days following the date that the Final Sale Order becomes a non-appealable order.

2.      If the Receiver receives one or more Qualified Alternative Bids, the Receiver shall conduct an auction (the "Auction") at the offices of Schwabe, Williamson & Wyatt, 1211 SW Fifth Avenue, Suite 1900, Portland, OR 97204 at 10:00 a.m. (Pacific time) on the first (1st) business day following the expiration of the Notice Period, or such later time and date and/or such other place as the Receiver shall notify all bidders who have submitted Qualified Alternative Bids (together, "Qualified Alternative Bidders") and the Stalking Horse Bidder.  The following procedures will apply to the Auction:

(i)      Only the following parties and their counsel shall be permitted to attend the Auction: the Stalking Horse Bidder, Qualified Alternative Bidders, and the Receiver.  Only the Stalking Horse Bidder and Qualified Alternative Bidders, including through their counsel, shall be permitted to make any additional bids ("Subsequent Bids") at the Auction.

(ii)  All Qualified Alternative Bidders that desire to participate in the Auction shall have their Authorized Representatives physically present for all bidding each with the understanding that the true identity of each Qualified Alternative Bidder shall be fully disclosed to all other Qualified Alternative Bidders and that all material terms, including but not limited to the amount, of each bid will be fully disclosed to all other bidders throughout the entire Auction.

(iii)  The Receiver will give the Stalking Horse Bidder, all other Qualified Alternative Bidders, and their counsel a copy of the highest and best Qualified Alternative Bid received and copies of all other Qualified Alternative Bids prior to the start of the Auction.  In addition, the Receiver will inform the Stalking Horse Bidder and each Qualified Alternative Bidder who has expressed its intent to participate in the Auction of the identity of all Qualified Alternative Bidders that may participate in the Auction.

(iv)  Prior to the start of the Auction the Authorized Representative of the Stalking Horse Bidder and each Qualified Alternative Bidder shall certify, in writing or on the record, as follows:

    (a)  Each bid it makes at the Auction shall, if accepted by the Receiver, constitute a binding and legally enforceable contract of the bidder to timely close a purchase of the Property according to the terms of the bid in the event an order of the Court is entered approving a sale based upon such bid.

    (b)  No bids made by the Stalking Horse Bidder or a Qualified Alternative Bidder, whether before or during the Auction, shall be subject to any conditions or contingencies related to due diligence, financing, or any other further approval other than the Authorized Representative present at the Auction.

    (c)  The Authorized Representative present for the Stalking Horse Bidder or a Qualified Alternative Bidder at the Auction has the full power and authority to act on behalf of and to legally bind the Stalking Horse Bidder or such Qualified Alternative Bidder for any bids made, and any agreements entered into at or in connection with the Auction.

    (d)  The Stalking Horse Bidder and each Qualified Alternative Bidder that participates in the Auction shall authorize the Receiver to conditionally accept such bidder's second-highest bid at the Auction as a back—up to the Successful Bid, which shall become binding upon and enforceable against such bidder in the event that the Successful Bid is approved by the Court, but such Successful

Bidder fails or otherwise refuses to close its purchase of the Property for any reason other than a material failure of performance by the Seller.

(e)     That the Stalking Horse Bidder and each Qualified Alternative Bidder has at all times proceeded in good faith in submitting its bids, and has not engaged in any collusion with any other person or bidder with respect to the Auction and related proceedings.

3.      The Receiver shall have reasonable discretion with respect to the conduct of the Auction. Among other things, the Receiver may announce at the Auction additional procedural rules that he determines to be reasonable under the circumstances (e.g. the amount of time allotted to make subsequent alternative bids) for conducting the Auction so long as such additional rules are not materially inconsistent with these Bidding Procedures and the terms, deadlines, and intent of the Purchase and Sale Agreement.

(i)     At the Auction, bidding shall begin with the highest and best Qualified Alternative Bid (the "Initial Overbidder"). The Receiver will identify the Initial Overbidder at the beginning of the Auction. Any subsequent bids must be at least $250,000 more than the immediately preceding bid and each such increment (including the initial increment over the Purchase Price) must be payable in cash ("Minimum Subsequent Overbid Amount"). In any of its subsequent bids, the Stalking Horse Bidder shall be entitled to credit bid up to the sum of the Break-Up Fee, provided that the Stalking Horse Bidder shall recover the sum of the Break-Up Fee directly from, and only from, the cash paid by the Successful Bidder in the event that the Court enters a sale order authorizing a sale of the Property to a buyer other than the Stalking Horse Bidder.

(ii)    The Auction, at the discretion of the Receiver, shall be recorded by stenographer or other reliable means of preserving the record of the Auction proceedings, and shall continue in one or more rounds of "open cry," or publically announced bidding and shall conclude after each participating bidder has had the opportunity, within any time period specified by the Receiver, to submit an additional Subsequent Bid with full knowledge of the then-existing highest bid.

(iii)   For the purpose of evaluating the value of the consideration provided by each Subsequent Bid (including any Subsequent Bid by the Stalking Horse Bidder), the value shall be the net cash consideration payable to the Seller after giving effect to the Break-Up Fee that may be payable to the Stalking

4 – BIDDING PROCEDURES

Horse Bidder under the Purchase and Sale Agreement and the Bid Procedures Order.

(iv)    At the conclusion of the bidding, the Receiver shall announce his determination (pursuant to the following paragraph) as to the bidder (the "Successful Bidder") submitting the highest and best bid (the "Successful Bid"), which shall be submitted to the Court for approval at the Final Hearing. The Stalking Horse Bidder shall be deemed a party-in-interest with standing to appear and be heard in connection with any motions, objections, hearings, or other proceedings related to the Motion, the Purchase and Sale Agreement, the Auction, and any Qualified Alternative Bid, Subsequent Bid, or the Successful Bid.

(v)     In determining the Successful Bid to submit to the Court for approval, the Receiver, in his sole discretion and in consultation with his professionals, shall determine whether a Qualified Alternative Bid constitutes a higher and better offer than the bid of the Stalking Horse Bidder. In making that determination, the Receiver may consider any and all factors associated with all Qualified Alternative Bids and Qualified Alternative Bidders, including but not limited to factors such as the likelihood and ability of the proposed buyer(s) to immediately consummate and close the proposed transactions, other timing issues, employment issues, overall value of the Qualified Alternative Bids, and any other material factors.

(vi)    The Court has set a deadline in the Bid Procedures Order for filing objections to the Motion or entry of the Final Sale Order (the "Objection Deadline"). Any objections to the Motion or entry of the Final Sale Order that are not filed with the Court by the Objection Deadline shall be deemed irrevocably waived and withdrawn.

(vii)   If the Receiver does not timely receive any Qualified Alternative Bids, the Receiver shall forthwith cancel the Auction and promptly present the Final Sale Order for entry by the Court at the Final Hearing.

(viii)  If, following the entry of the Final Sale Order approving a sale to the Successful Bidder, such Successful Bidder fails or otherwise refuses to consummate such sale, then the next highest or best bid shall be deemed as the back-up bid (the "Back-Up Bid" and, such bidder, the "Back-Up Bidder") and the Seller will be obligated to effectuate a sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without further order of the Court. The Back-Up Bid shall remain open until twenty (20) calendar days following the date that the Final Sale Order becomes a non-appealable order. All Qualified Alternative Bids (other than the Successful Bid and the Back-Up Bid) shall be deemed rejected by the Receiver on and as of the date of entry of the Final Sale Order by the Court.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 92 of 151

**Exhibit 7**

1

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 94 of 151



2
Exhibit 1 to Declaration of Ronald F. Greenspan
Page 95 of 151



3

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 96 of 151





5

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 98 of 151



6

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 99 of 151



Exhibit 1 to Declaration of Ronald F. Greenspan
Page 100 of 151

**Exhibit 8**





2

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 103 of 151



3

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 104 of 151



4

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 105 of 151



5

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 106 of 151



6

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 107 of 151



7

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 108 of 151



8

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 109 of 151

*Execution Version*

## Schedule I

SCHEDULE I



*Execution Version*

Schedule II

1

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 112 of 151

Schedule II



Exhibit 1 to Declaration of Ronald F. Greenspan
Page 113 of 151



Exhibit 1 to Declaration of Ronald F. Greenspan
Page 114 of 151

Schedule III

Capital Commitment, Remaining Capital Commitment; Capital Account Balance

PDX\129912\215141\TAL\19564883.6
Exhibit 1 to Declaration of Ronald F. Greenspan
Page 115 of 151

## SCHEDULE III

### Remaining Capital Commitments and December 31, 2015 Capital Account Balances

| Seller | Capital Commitment | Capital Commitment Percentage | Capital Contributions | Remaining Capital Commitment | 12/31/2015 Capital Account Balance* |
|---|---|---|---|---|---|
| CCM Capital Opportunities GP, LLC | $1,020,707.00 | 1.00% | $987,683.31 | $33,023.69 | $22,257,124.81 |
| Aequitas Private Client Fund, LLC | $12,813,455.00 | 12.55% | $12,790,543.86 | $22,911.14 | $22,981,619.49 |
| Aequitas Commercial Finance, LLC | $52,922,070.00 | 51.85% | $52,827,442.50 | $94,627.50 | $94,918,573.92 |
| Aequitas Holdings, LLC | $3,714,475.00 | 3.64% | $3,707,833.32 | $6,641.68 | $6,662,110.34 |

*These amounts are based on the unaudited financial statements of the Partnership and incorporate valuation adjustments based on asset valuations determined by the pre-receivership management of the Partnership. As such, the capital account balances remain subject to modification based on recommendations of auditors. These values are not indicative of the capital account balances of the Sellers as of the date of this Purchase Agreement.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 116 of 151

# DISCLOSURE SCHEDULES

### Index

Disclosure Schedule 1(r)                 Data Room
Disclosure Schedule 1(u)                 Excluded Assets
Disclosure Schedule 1(v)                 Excluded Obligations
Disclosure Schedule 1(dd)                Knowledge – Sellers
Disclosure Schedule 1(tt)                Portfolio Companies
Disclosure Schedule 5(a)(iii)            Brokers
Disclosure Schedule 5(b)                 Representations as to the Interests
Disclosure Schedule 5(b)(ii)(A)          Property Agreement
Disclosure Schedule 5(b)(ii)(B)          Remaining Capital Commitments
Disclosure Schedule 5(b)(ii)(C)          Participation in Partnership Investments Through AIV
Disclosure Schedule 5(b)(iii)            Litigation
Disclosure Schedule 5(b)(v)              Certain Conduct
Disclosure Schedule 5(c)(ii)(B)          Schedule of Partners/Partnership Interests
Disclosure Schedule 5(c)(ii)(F)          Capitalization of Portfolio Companies
Disclosure Schedule 5(c)(iv)             Indebtedness
Disclosure Schedule 5(c)(v)              Financial Statements
Disclosure Schedule 5(d)(i)              Representations as to the Notes; Ownership
Disclosure Schedule 5(d)(iii)            Representations as to the Notes; Agreements and Commitments
Disclosure Schedule 5(e)(i)              Representations as to CarePayment; Capitalization
Disclosure Schedule 5(e)(ii)             Representations as to CarePayment; Financial Statements
Disclosure Schedule 5(e)(iii)            Representations as to CarePayment; Other Liabilities
Disclosure Schedule 5(e)(iv)             Representations as to CarePayment; Compliance with Laws
Disclosure Schedule 6(b)                 No Conflicts
Disclosure Schedule 6(e)                 Litigation
Disclosure Schedule 7(c)(ii)(D)          Liens on Interests

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 117 of 151

## DISCLOSURE SCHEDULES

These Disclosure Schedules (the "Disclosure Schedules") are made and delivered pursuant to the Agreement of Purchase and Sale (the "Agreement") dated as of December 7, 2016, by and among CEDAR SPRINGS SPECIAL OPPORTUNITIES IV, LP, a Delaware limited partnership (the "LP Buyer"), CSC SPEC OPPS IV GP, LLC, a Delaware limited liability company ("GP Buyer," and together with the LP Buyer, each a "Buyer" and collectively "Buyers"), AEQUITAS COMMERCIAL FINANCE, LLC, an Oregon limited liability company, AEQUITAS PRIVATE CLIENT FUND, LLC, a Delaware limited liability company, and AEQUITAS HOLDINGS, LLC, an Oregon limited liability company (each, an "LP Seller" and together, the "LP Sellers"), CCM CAPITAL OPPORTUNITIES GP, LLC, a Delaware limited liability company ("GP Seller"), and AEQUITAS CORPORATE LENDING, LLC, an Oregon limited liability company ("Lender," and together with the LP Sellers, each a "Seller" and collectively "Sellers") acting through RONALD GREENSPAN (the "Receiver"), as receiver of Sellers. Capitalized terms used but not defined in these Disclosure Schedules shall have the same meanings given to them in the Agreement.

In accordance with the Agreement, these Disclosure Schedules shall be construed with, and form an integral part of, the Agreement as if fully set forth therein. These Disclosure Schedules and the information, descriptions and disclosures included in these Disclosure Schedules are intended to qualify those representations, warranties and covenants contained in the Agreement that are subject to qualification and shall not be deemed to expand in any way the scope or effect of any of such representations, warranties or covenants.

Certain information in these Disclosure Schedules may not be required to be disclosed pursuant to the Agreement. Any such information is included solely for informational purposes, will not be construed to mean that such item is necessarily required to be included in these Disclosure Schedules, and does not imply that other matters of a similar nature are included. The disclosure of any item in the Disclosure Schedules does not establish or imply a standard of materiality, a standard for what may be in the ordinary course of business, or any other standard for purposes of the Agreement. Nothing in these Disclosure Schedules shall be deemed an admission or representation of fault, liability, value or materiality.

The information, descriptions, and disclosures included in each paragraph, subparagraph and clause of these Disclosure Schedules shall be deemed to be disclosed, included and incorporated in: (a) such specific paragraph, subparagraph and/or clause; and (b) any other paragraph and subparagraphs referencing by cross-reference the materials disclosed in such paragraph or subparagraph.

The headings, if any, of the individual paragraphs of these Disclosure Schedules are inserted for convenience only, and are not intended to limit the effect of the disclosures included in these Disclosure Schedules or to expand the scope of the information required to be disclosed in these Disclosure Schedules.

The contents of all agreements and other documents referred to in these Disclosure Schedules (other than the documents and agreements referred to Disclosure Schedule 1(r)) form an integral part of the Disclosure Schedules and are incorporated by reference for purposes of the specific disclosure as if set forth fully in these Disclosure Schedules. Where documents or provisions in documents have been summarized, reference must be made to the actual documents for complete information.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 118 of 151

**DISCLOSURE SCHEDULE 1(r)**



3

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 119 of 151











8

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 124 of 151



## DISCLOSURE SCHEDULE 1(u)

<u>Excluded Assets</u>

- Warrants to purchase 15,000 Common Units of ETC Global Group, LLC owned by Aequitas Commercial Finance, LLC.

- All rights and interests in the Partnership's deposit of $250,000 with Kirkland & Ellis (the "Deposit") made on behalf of itself and the other Receivership Entities as described in the letter agreement dated July 11, 2016 among FTV IV, L.P., the Partnership and CarePayment, including the right to a return of the Deposit (the "FTV Rights").  The FTV Rights will also include all claims related to the Deposit that the Partnership or other Receivership Entities may have against Kirkland & Ellis, FTV IV, L.P. or any of their affiliates.

- Aequitas Commercial Finance, LLC's ownership interest in Aequitas ETC Founders Fund, LLC, which owns 1,760,000 Series A Preferred Units of ETC Global Group, LLC.

**DISCLOSURE SCHEDULE 1(v)**

<u>Excluded Obligations</u>

- Any broker fees or other liabilities or obligations to brokers, including any claims for compensation from the potential brokers listed on <u>Disclosure Schedule 5(a)(iii)</u>.

- <u>Pre-Receivership Aequitas Commercial Finance Loan</u>:  On June 30, 2014, the Partnership entered into a Business Loan Agreement with Aequitas Commercial Finance, LLC ("ACF") whereby ACF agreed to provide the Partnership with a revolving line of credit in the maximum principal amount of $2,000,000.  This line of credit was substantially paid down and has had a balance of $102.83 since October 2014.  This loan will be paid off at the Closing in accordance with <u>Paragraph 4(b)</u> of the Purchase Agreement.

- <u>Post-Receivership Aequitas Commercial Finance Loan</u>:  On July 15, 2016, ACF loaned the Partnership $185,000 and the Partnership executed a Secured Promissory Note in favor of ACF in the same amount.  As of the date of this Purchase Agreement, this loan has an outstanding balance of $185,000.  This loan will be paid off at the Closing in accordance with <u>Paragraph 4(b)</u> of the Purchase Agreement.

- <u>ACC Funding Trust 2014-2 Loans</u>:  In 2016, an aggregate of $252,720.71 was loaned to the Partnership by ACC Funding Trust 2014-2, a receivership entity, for (i) payment of the EMPYR Incorporated Series B-2 Preferred Stock follow-on investment, (ii) payment of payroll obligations to Craig Froude, (iii) payment of tax obligations, and (iv) other obligations of the Partnership. These loans will be paid off at the Closing in accordance with <u>Paragraph 4(b)</u> of the Purchase Agreement.

- <u>Aequitas Capital Management, Inc.</u>: An aggregate of $42,727.52 is owed by the Partnership to Aequitas Capital Management, Inc., a receivership entity, for its payment of remaining payroll obligations to Craig Froude on behalf of the Partnership in 2016. This liability will be paid off at the Closing in accordance with <u>Paragraph 4(b)</u> of the Purchase Agreement.

- <u>Carried Interest</u>:  William Ruh's November 2013 employment agreement with Aequitas Capital Management, Inc. ("ACM") claims that ACM will arrange for Mr. Ruh to receive 16.5% of the carried interest the GP Seller is entitled to from the Partnership.  Mr. Ruh resigned from his position with ACM and forfeited any rights to the carried interest from the Partnership.  Pre-receivership executives of ACM may have communicated to Craig Froude, and Mr. Froude may so assert, that he is entitled to receive 16.5% of the carried interest the GP Seller is entitled to from the Partnership. Such an asserted arrangement was never formally documented.  Per the CCM Portfolio Final Sale Order, all claims and Liens as of the date of Closing will be released as against the GP Interest to allow the GP Interest to be sold to Buyers free and clear of all Liens, including these claims.

Disclosure Schedules 12/7/16

## DISCLOSURE SCHEDULE 1(dd)

<u>Knowledge</u>

- Ronald Greenspan

- Blake Bowman

- Brad Foster

**DISCLOSURE SCHEDULE 1(tt)**

<u>Portfolio Companies</u>

- <u>ETC Global Group, LLC</u>: 1,478,502 Common Units[1]

- <u>QuarterSpot, Inc.</u>: 739,092 shares of Common Stock; Warrants to purchase 122,466 shares of Common Stock (Sellers disclaim and provide no representation or warranty as to whether the warrants are valid or exercisable; QuarterSpot contends that the right to 19,840 shares covered by the warrant is void)

- <u>EMPYR Incorporated (f/k/a MOGL Loyalty Services, Inc.)</u>: 7,805,226 shares of Series B-2 Preferred Stock

- <u>Independence Bancshares, Inc.</u>: 2,450 shares of Series A Preferred Stock

- <u>MotoLease, LLC</u>: 100 Common Units plus 13% ownership interest based on option exercise

- <u>CarePayment Technologies, Inc.</u>: 15,900,927 shares of Class A Common Stock; 7,910,092 shares of Class B Common Stock

---

[1] Warrant held by Aequitas Commercial Finance, LLC to purchase 15,000 common units of ETC Global Group, LLC is an Excluded Asset.

13

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 129 of 151

**DISCLOSURE SCHEDULE 5(a)(iii)**



14

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 130 of 151

**DISCLOSURE SCHEDULE 5(b)**



## DISCLOSURE SCHEDULE 5(b)(ii)(A)

### Property Agreements

- Limited Liability Company Certificate of Formation of Aequitas Merchant Bank Fund, LLC, a Delaware limited liability company filed with the State of Delaware Secretary of State on 12:31 PM June 14, 2013

- Certificate of Conversion from a Limited Liability Company to a Limited Partnership of Aequitas Capital Opportunities Fund, LP filed with the State of Delaware Secretary of State on 02:02 PM December. 13, 2013

- Certificate of Limited Partnership of Aequitas Capital Opportunities Fund, LP filed with the State of Delaware Secretary of State on 02:02 PM December 13, 2013

- Amendment to the Certificate of Limited Partnership filed with the State of Delaware Secretary of State on July 6, 2016

- Amended and Restated Limited Partnership Agreement of Aequitas Capital Opportunities Fund, LP dated as of February 24, 2014

- Confidential Private Placement Memorandum of Aequitas Capital Opportunities Fund, LP dated February 2014

- Investment Advisory Agreement dated as of February 24, 2014

- Contribution Agreement dated effective July 12, 2013 between Aequitas Commercial Finance, LLC and Aequitas Merchant Bank Fund, LLC

- Contribution Agreement dated effective June 30, 2013 between Aequitas Holdings, LLC and Aequitas Merchant Bank Fund, LLC

- Contribution Agreement dated effective September 1, 2013 between Aequitas Holdings, LLC and Aequitas Merchant Bank Fund, LLC

- Acquisition, Assignment and Assumption of Limited Partnership Interest dated effective July 31, 2015 between Aequitas Commercial Finance, LLC and Aequitas Private Client Fund, LLC

**DISCLOSURE SCHEDULE 5(b)(ii)(B)**

<u>Remaining Capital Commitments</u>

| Seller | Remaining Capital Commitment |
|---|---|
| CCM Capital Opportunities GP, LLC | $33,023.69 |
| Aequitas Private Client Fund | $22,911.14 |
| Aequitas Commercial Finance, LLC | $94,627.50 |
| Aequitas Holdings, LLC | $6,641.68 |

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 133 of 151

**DISCLOSURE SCHEDULE 5(b)(ii)(C)**

<u>Participation in Partnership Investments Through AIV</u>

- <u>Aequitas ETC Founders Fund</u>:  Aequitas Commercial Finance, LLC ("ACF") owns a minority interest in Aequitas ETC Founder Fund, LLC ("ETC Founders Fund").  ETC Founders Fund owns 1,760,000 Series A Preferred Units of ETC Global Group, LLC.  The Partnership owns 1,478,502 Common Units of ETC Global Group, LLC.  Sellers do not believe that ETC Founders Fund is an AIV, but if ETC Founders Fund is considered an AIV, Buyers and Sellers expressly agree that ACF's ownership in ETC Founders Fund will specifically be considered an Excluded Asset and will not be sold to the Buyers pursuant to this Purchase Agreement.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 134 of 151

## DISCLOSURE SCHEDULE 5(b)(iii)

<u>Litigation</u>

- <u>MotoLease</u>:  The Legal Proceedings described in the MotoLease Letters attached as <u>Exhibits 1</u> and <u>2</u>

- Final Receiver Order

- Initial Order

- CCM Portfolio Final Sale Order

- The other matters before the Court in connection with the Action which do not relate to the substance of this transaction or specifically mention the Property

Disclosure Schedules 12/7/16

**DISCLOSURE SCHEDULE 5(b)(v)**

<u>Certain Conduct</u>

- <u>Liens</u>: See Disclosure <u>Schedule 7(c)(ii)(D)</u>. Per the CCM Portfolio Final Sale Order, all Liens (including, all liens, claims, encumbrances and interests) as of the date of Closing will be released as against the Property (including the Interests and the Notes) to allow the Property to be sold to Buyers free and clear of all Liens, and such Liens, if any, shall attach to the proceeds of the sale to the same extent, validity, and priority as they were attached to the Property as of the date of the Receivership.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 136 of 151

**DISCLOSURE SCHEDULE 5(c)(ii)(B)**



Exhibit 1 to Declaration of Ronald F. Greenspan





**DISCLOSURE SCHEDULE 5(c)(ii)(F)**



Exhibit 1 to Declaration of Ronald F. Greenspan
Page 140 of 151

## DISCLOSURE SCHEDULE 5(c)(iv)

### Indebtedness

- Pre-Receivership Aequitas Commercial Finance Loan:  On June 30, 2014, the Partnership entered into a Business Loan Agreement with Aequitas Commercial Finance, LLC ("ACF") whereby ACF agreed to provide the Partnership with a revolving line of credit in the maximum principal amount of $2,000,000.  This line of credit was substantially paid down and has had a balance of $102.83 since October 2014.  This loan will be paid off at the Closing in accordance with Paragraph 4(b) of the Purchase Agreement.

- Post-Receivership Aequitas Commercial Finance Loan:  On July 15, 2016, ACF loaned the Partnership $185,000 and the Partnership executed a Secured Promissory Note in favor of ACF in the same amount.  As of the date of this Purchase Agreement, this loan has an outstanding balance of $185,000.  This loan will be paid off at the Closing in accordance with Paragraph 4(b) of the Purchase Agreement.

- ACC Funding Trust 2014-2 Loans:  In 2016, an aggregate of $252,720.71 was loaned to the Partnership by ACC Funding Trust 2014-2, a receivership entity, for (i) payment of the EMPYR Incorporated Series B-2 Preferred Stock follow-on investment, (ii) payment of payroll obligations to Craig Froude, (iii) payment of tax obligations, and (iv) other obligations of the Partnership. These loans will be paid off at the Closing in accordance with Paragraph 4(b) of the Purchase Agreement.

- Aequitas Capital Management, Inc.: An aggregate of $42,727.52 is owed by the Partnership to Aequitas Capital Management, Inc., a receivership entity, for its payment of remaining payroll obligations to Craig Froude on behalf of the Partnership in 2016. This liability will be paid off at the Closing in accordance with Paragraph 4(b) of the Purchase Agreement.

- Although not an obligation for borrowed money, pursuant to an Unlimited Unconditional Guaranty Agreement dated February 19, 2016 (the "RIPA Guaranty"), the Partnership has guaranteed CarePayment's performance of its obligations under (i) a Business Loan Agreement dated February 19, 2016 (the "RIPA Loan Agreement") between CarePayment and RIPA LLC ("RIPA") wherein RIPA agreed to loan up to $10,000,000 to CarePayment; and (ii) a Promissory Note dated February 19, 2016 (the "RIPA Note") executed by CarePayment in favor of RIPA in the original principal amount of up to $10,000,000. RIPA's interest in the RIPA Loan Agreement, RIPA Note and RIPA Guaranty were ultimately assigned and transferred to Direct Lending Income Fund, LP.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 141 of 151

## DISCLOSURE SCHEDULE 5(c)(v)

<u>Financial Statements</u>

- Partnership 2014 Audited Financial Statements

**DISCLOSURE SCHEDULE 5(d)(i)**



Exhibit 1 to Declaration of Ronald F. Greenspan
Page 143 of 151

## DISCLOSURE SCHEDULE 5(d)(iii)

<u>Representations as to the Notes; Agreements and Commitments</u>

- Business Loan Agreement dated September 29, 2011 between Aequitas Commercial Finance, LLC and CarePayment Technologies, Inc.

- Promissory Note dated September 29, 2011 between Aequitas Commercial Finance, LLC and CarePayment Technologies, Inc.

- Commercial Security Agreement dated September 29, 2011 between Aequitas Commercial Finance, LLC and CarePayment Technologies, Inc.

- Amendment No. 1 to Promissory Note and Business Loan Agreement dated December 29, 2011 between Aequitas Commercial Finance, LLC and CarePayment Technologies, Inc.

- Amendment No. 2 to Promissory Note and Business Loan Agreement dated March 5, 2012 between Aequitas Commercial Finance, LLC and CarePayment Technologies, Inc.

- Amendment No. 3 to Promissory Note and Business Loan Agreement dated April 12, 2012 between Aequitas Commercial Finance, LLC and CarePayment Technologies, Inc.

- Amendment No. 4 to Promissory Note and Business Loan Agreement dated December 20, 2012 between Aequitas Commercial Finance, LLC and CarePayment Technologies, Inc.

- Amendment No. 5 to Promissory Note and Business Loan Agreement dated May 2, 2013 between Aequitas Commercial Finance, LLC and CarePayment Technologies, Inc.

- Amendment No. 6 to Promissory Note and Business Loan Agreement dated July 15, 2013 between Aequitas Commercial Finance, LLC and CarePayment Technologies, Inc.

- Amendment No. 7 to Promissory Note and Business Loan Agreement dated December 31, 2013 between Aequitas Commercial Finance, LLC and CarePayment Technologies, Inc.

- Amendment No. 8 to Promissory Note and Business Loan Agreement dated June 17, 2014 between Aequitas Commercial Finance, LLC and CarePayment Technologies, Inc.

- Amendment No. 9 to Promissory Note and Business Loan Agreement dated January 1, 2015 between Aequitas Commercial Finance, LLC and CarePayment Technologies, Inc.

- Amendment No. 10 to Promissory Note and Business Loan Agreement dated May 16, 2016 between Aequitas Corporate Lending, LLC and CarePayment Technologies, Inc.

- Contribution Agreement dated May 1, 2015 between Aequitas Commercial Finance, LLC and Aequitas Corporate Lending, LLC

- The drawdown requests related to the loan documents referenced above.

**DISCLOSURE SCHEDULE 5(e)(i)**



**DISCLOSURE SCHEDULE 5(e)(ii)**

<u>Representations as to CarePayment; Financial Statements</u>

- CarePayment 2014 Audited Financial Statements

- CarePayment 2015 Unaudited Financial Statements

- CarePayment 2016 Year-to-Date (through September 30, 2016) Unaudited Financial Statements

## DISCLOSURE SCHEDULE 5(e)(iii)



**DISCLOSURE SCHEDULE 5(e)(iv)**



Disclosure Schedules 12/7/16

**DISCLOSURE SCHEDULE 6(b)**

<u>No Conflicts</u>

None

33

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 149 of 151

**DISCLOSURE SCHEDULE 6(e)**

<u>Litigation</u>

- Matters set forth in the MotoLease Letters

**DISCLOSURE SCHEDULE 7(c)(ii)(D)**

<u>Liens on Interests</u>

- <u>Liens</u>:  Per the CCM Portfolio Final Sale Order, all Liens (including, all liens, claims, encumbrances and interests) as of the date of Closing will be released as against the Property (including the Interests and the Notes) to allow the Property to be sold to Buyers free and clear of all Liens, and such Liens, if any, shall attach to the proceeds of the sale to the same extent, validity, and priority as they were attached to the Property as of the date of the Receivership. Accordingly, and without limitation, the following Liens will be released:

    o  Lien of LeaseDimensions, Inc., as Collateral Agent for Aequitas Commercial Finance Private Note Investors, on all personal property assets of Aequitas Commercial Finance, LLC.

    o  Lien of LeaseDimensions, Inc., as Collateral Agent for Aequitas Private Client Fund Investors, on all personal property assets of Aequitas Private Client Fund, LLC.

    o  Lien of Aequitas Commercial Finance, LLC on all personal property assets of Aequitas Holdings, LLC.

Exhibit 1 to Declaration of Ronald F. Greenspan
Page 151 of 151