**Troy D. Greenfield,** OSB #892534
Email: tgreenfield@schwabe.com
**Alex I. Poust,** OSB #925155
Email: apoust@schwabe.com
**Lawrence R. Ream** (Admitted *Pro Hac Vice)*
Email: lream@schwabe.com
Schwabe, Williamson & Wyatt, P.C.
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Facsimile: 503.796.2900

**Ivan B. Knauer** (Admitted *Pro Hac Vice*)
Email: iknauer@swlaw.com
Snell & Wilmer LLP
1101 Pennsylvania Ave., N.W., Suite 300
Washington, DC 20004
Telephone: 202.802.9770
Facsimile: 202.688.2201

Attorneys for the Receiver for Defendants
AEQUITAS MANAGEMENT, LLC; AEQUITAS HOLDINGS,
LLC; AEQUITAS COMMERCIAL FINANCE, LLC; AEQUITAS
CAPITAL MANAGEMENT, INC.; AEQUITAS INVESTMENT
MANAGEMENT, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>AEQUITAS MANAGEMENT, LLC;<br>AEQUITAS HOLDINGS, LLC; | No. 3:16-cv-00438-JR<br><br>NOTICE OF FILING RECEIVER'S REPORT REGARDING THE INVESTIGATION OF THE RECEIVERSHIP ENTITY'S BUSINESS CONDUCT |

Page 1 -    NOTICE OF FILING RECEIVER'S REPORT
REGARDING THE INVESTIGATION OF THE
RECEIVERSHIP ENTITY'S BUSINESS CONDUCT

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

AEQUITAS COMMERCIAL FINANCE,
LLC; AEQUITAS CAPITAL
MANAGEMENT, INC.; AEQUITAS
INVESTMENT MANAGEMENT, LLC;
ROBERT J. JESENIK, BRIAN A. OLIVER;
and N. SCOTT GILLIS,

            Defendants.

Ronald F. Greenspan, the duly appointed Receiver of the entity defendants and 43 related

entities, hereby files the attached Report Regarding the Investigation of the Receivership Entity's

Business Conduct, dated November 1, 2018.

     Dated this 21st day of November, 2018.

                      Respectfully submitted,

                      SCHWABE, WILLIAMSON & WYATT, P.C.

By:    *s/ Alex I. Poust,* OSB #925155
        Troy D. Greenfield, OSB #892534
        tgreenfield@schwabe.com
        Alex I. Poust, OSB #925155
        apoust@schwabe.com
        Lawrence R. Ream (Admitted *Pro Hac Vice*)
        lream@schwabe.com
        Telephone: 503.222.9981
        Facsimile: 503.796.2900

        Ivan B. Knauer (Admitted *Pro Hac Vice*)
        iknauer@swlaw.com
        SNELL & WILMER LLP
        Telephone: 202.802.9770
        Facsimile: 202.688.2201

        Attorneys for the Receiver for Defendants
        Aequitas Management, LLC, Aequitas
        Holdings, LLC, Aequitas Commercial
        Finance, LLC, Aequitas Capital
        Management, Inc., and Aequitas Investment
        Management, LLC

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

**RONALD F. GREENSPAN**
**COURT-APPOINTED RECEIVER FOR**
**AEQUITAS MANAGEMENT, LLC, AEQUITAS HOLDINGS, LLC, AEQUITAS**
**COMMERCIAL FINANCE, LLC, AEQUITAS CAPITAL MANAGEMENT, INC., AEQUITAS**
**INVESTMENT MANAGEMENT, LLC AND CERTAIN RELATED ENTITIES**
**(the "Receivership Entity")**

---

**In re AEQUITAS MANAGEMENT, LLC, et al.**

Case No. 3:16-cv-00438-PK

United States District Court

District of Oregon

Portland Division

Report Regarding the Investigation of the Receivership Entity's Business Conduct

by

Ronald F. Greenspan, Receiver

November 1, 2018

## Table of Contents

A.    BACKGROUND ...................................................................................................... 5

B.    THE ENGAGEMENT ............................................................................................... 6

B.1.   SCOPE OF SERVICES .............................................................................................. 6

B.2.   LIMITATIONS OF REPORT ....................................................................................... 6

B.3.   FORENSIC INVESTIGATION ..................................................................................... 6

C.    EXECUTIVE SUMMARY .......................................................................................... 7

C.1.   DURING THE RELEVANT TIME PERIOD, AEQUITAS RAISED APPROXIMATELY $403.2 MILLION FROM OVER 1,077 UNIQUE INVESTOR ACCOUNTS.  IN ADDITION, THE BOOKS AND RECORDS INDICATE THAT AT THE BEGINNING OF THE RELEVANT TIME PERIOD AGGREGATE INVESTOR ACCOUNTS TOTALED $369.0 MILLION. ............................. 8

C.2.   DURING THE RELEVANT TIME PERIOD, AEQUITAS PAID APPROXIMATELY $165.1 MILLION OF PRINCIPAL TO INVESTORS AND $84.5 MILLION IN RETURNS TO INVESTORS, FOR A TOTAL OF $249.6 MILLION. ................................ 8

C.2.1.  INCLUDES $17.8 MILLION OF PRINCIPAL AND INTEREST TO INSIDERS. ................................................. 8

C.3.   AS OF MARCH 10, 2016, THE AMOUNT REMAINING DUE TO INVESTORS IS APPROXIMATELY $617.6 MILLION (INCLUDES INVESTMENTS PRIOR TO AND DURING THE RELEVANT TIME PERIOD). ............................................... 8

C.4.   AS OF MARCH 10, 2016, THERE WERE AT LEAST 623 UNIQUE INVESTOR ACCOUNTS THAT INVESTED APPROXIMATELY $91.3 MILLION THROUGH INDIVIDUAL RETIREMENT ACCOUNT CUSTODIANS. ............................... 8

C.5.   DURING THE RELEVANT TIME PERIOD, INVESTOR FUNDS WERE FREQUENTLY TRANSFERRED BETWEEN AEQUITAS' BANK ACCOUNTS AT THE DIRECTION AND DISCRETION OF AEQUITAS MANAGEMENT RATHER THAN INVESTORS' INSTRUCTIONS.  AT LEAST $1.3 BILLION IN INTERCOMPANY CASH TRANSFERS WERE COMPLETED DURING THIS PERIOD ............................................................................................................. 8

C.5.1.  ADDITIONALLY, FUNDS FROM THE VAST MAJORITY OF INVESTORS IN IOFII WERE AGGREGATED AT LEAST TWICE – AT THE IBAT LEVEL (WHICH ACTED AS A CONSOLIDATOR FOR AEQUITAS INVESTMENTS) AND AGAIN AT THE AEQUITAS LEVEL. ................................................................................................................ 8

C.6.   THE AEQUITAS ENTITY DURING THE RELEVANT TIME PERIOD: ..................................................... 8

C.6.1.  WAS DEPENDENT ON CONTINUED INFUSION OF NEW INVESTOR MONEY TO PAY OPERATING EXPENSES AND RETURNS TO INVESTORS; ................................................................................................ 8

C.6.2.  DID NOT USE INVESTOR MONEY FOR THE STATED PURPOSES; ................................................. 8

C.6.3.  USED A SIGNIFICANT PORTION OF NEW INVESTOR MONEY TO PAY RETURNS AND PRINCIPAL TO EARLIER INVESTORS; ............................................................................................................ 8

C.6.4.  DID NOT GENERATE SUFFICIENT (ANY) PROFITS TO PAY THE PROMISED RETURNS TO INVESTORS; ................. 8

C.6.5.  CREATED NUMEROUS, SELF-DESCRIBED "MANUFACTURED NOTES" WHICH CREATED LIABILITIES AMONG THE ENTITIES AND WHICH FREQUENTLY DID NOT REFLECT THE ACTUAL RECEIPT OF FUNDS BY THE ENTITIES ISSUING SUCH NOTES; ............................................................................................................ 8

C.6.6.  CONVERTED LIABILITIES BETWEEN ENTITIES TO FAVOR SPECIFIC INVESTORS EVEN WHEN THE NEW OBLIGORS DID NOT RECEIVE ANY MATERIAL BENEFIT FROM ASSUMING SUCH LIABILITY; ........................................... 8

C.6.7.  IN THE WANING DESPERATE MONTHS OF THE SCHEME, AFTER SEPTEMBER 1, 2015, WHEN THE RECENTLY HIRED GENERAL COUNSEL BEGAN INQUIRING ABOUT ISSUES REGARDING RAISING FURTHER INVESTOR FUNDS AND LATER ADVISED AEQUITAS COULD NO LONGER RAISE FUNDS IN "ORDINARY COURSE," AEQUITAS REDEEMED $35.8 MILLION OF EXISTING INVESTMENTS, INCLUDING $3.5 MILLION OWING TO MANAGEMENT AND MEMBERS OF THE AEQUITAS ADVISORY BOARD ("AB"). .................................................................................. 8

C.6.8.  WAS INSOLVENT FROM AT LEAST JULY 3, 2014 ONWARD. ................................................. 8

C.7.   THE AEQUITAS ACCOUNTING RECORDS (I) DO NOT REFLECT APPROPRIATE RESERVES FOR UNCOLLECTABLE ASSETS AND (II) INCLUDE INFLATED "MARK-UPS" TO ASSET VALUATIONS, BOTH OF WHICH RESULT IN A MISREPRESENTATION OF AEQUITAS' INCOME GENERATED AND ASSETS AVAILABLE (AND NET WORTH). ................... 8

C.8.   THE AEQUITAS ENTITY, DURING THE RELEVANT TIME PERIOD, MADE PAYMENTS OF $5.7 MILLION TO OR FOR THE BENEFIT OF JESENIK (AND HIS RELATIVES), OLIVER, GILLIS, AND RELATED ENTITIES. ............................ 8

C.9.  Since 2014, Aequitas paid $14.5 million out of Investor funds in commissions and consulting fees in furtherance of the scheme, often to unlicensed salespeople. ...................................9

C.10.  Aequitas paid $11.7 million out of Investor funds to establish a network of registered investment advisors and service providers in furtherance of the scheme. ................................9

C.11.  Between 2014 and March 2016 Aequitas spent at least $51.3 million of Investor funds on overhead and compensation in excess of the 2% of asset management fee and Administrative Services Agreement ("ASA") fees permitted by the offering documents. ...................................9

D.  Introduction ...................................................................................................................10

D.1.  Ponzi scheme defined ...................................................................................................10

D.2.  General factors to establish a Ponzi scheme ................................................................11

E.  Deeper dive and additional factors .............................................................................11

E.1.  Investor monies were commingled ...............................................................................11

E.1.1.  Funds transferred based on cash needs rather than investment criteria ....................12

E.1.2.  Weider/Forman conversion .........................................................................................12

E.1.3.  Aequitas Corporate Lending, LLC ..............................................................................18

E.1.4.  William (Bill) Ruh note with ACL ...............................................................................20

E.1.5.  Terrell Group Management note with ACL ..................................................................25

E.1.6.  Direction of investments and Manufactured Notes ....................................................30

E.2.  No legitimate business operations to which alleged investment program is connected .........38

E.2.1.  Flawed business models which could not reasonably fund operations ......................................39

E.2.1.1 ............Balance sheet solvency driven by intercompany loans and capitalization of operating expenses ...................................................................................................................39

E.2.1.2.  Poorly performing operating companies with no corresponding investment write-down 40

E.2.1.3.  Poorly performing portfolios due to financial structure ...........................................54

E.2.1.4.  Investments with no economic support .....................................................................60

E.2.1.5.  ACF compliance issues July 2015 .............................................................................64

E.3.  Loans to insiders ...........................................................................................................64

E.3.1.  Newman loan .................................................................................................................64

E.3.2.  NorthBranch ................................................................................................................66

E.4.  Unrealistic promises of returns ....................................................................................71

E.4.1.  Note returns vs. other investment vehicles ..................................................................71

E.4.1.1.  Weider/Forman higher return than junior lenders ..................................................71

E.4.2.  Lack of available cash from any other source .............................................................72

E.4.3.  Agents recruited to sell Aequitas products and commissions paid to perpetuate the scheme 76

E.4.3.1.  Use of "consultants" and AB members as finders .....................................................76

E.4.3.2.  Aequitas Wealth Management ...................................................................................79

E.5.  Failed to invest all of the Investor funds in promised investments .............................81

E.5.1.  Whistleblower complaints .............................................................................................81

E.5.2.  Used Investor funds for non-investment purposes .....................................................81

E.5.2.1.  Conversion of assets to APF ......................................................................................81

E.5.2.2.  Conversion of assets to PCF ......................................................................................85

E.5.2.3.  Corporate spending in excess of management fees ...................................................88

E.6.  Mischaracterization of the nature of investment and associated risk ........................90

E.7.  Overstated investment returns and understated risks and losses ...............................92

E.8.  False statements provided to customers .......................................................................92

F.  History of Aequitas Funds ............................................................................................93

F.1.  Direct Note summary ...................................................................................................93

F.2.  Direct Note details in order of origination ..................................................................96

F.3.  Income Opportunity Fund ............................................................................................107

F.4.    INCOME OPPORTUNITY FUND II..................................................................................113
G.    FOCUSED INVESTMENT FUNDS ....................................................................................122
G.1.    LUXEMBOURG BONDS ..................................................................................................122
G.2.    WINDOW ROCK FEEDER FUND (A/K/A WRFF) ............................................................123
G.3.    ETC FOUNDERS FUND (ETCFF)...................................................................................124
G.4.    CCM OPPORTUNITY FUND (FKA CAPITAL OPPORTUNITY FUND) ...............................124
H.    SOLVENCY....................................................................................................................127
H.1.    AEQUITAS WAS INSOLVENT ON OR BEFORE JULY 3, 2014 AND CONTINUED TO BE SO DURING THE REMAINDER
OF THE RELEVANT TIME PERIOD, AS ITS ASSETS AT FAIR VALUE DID NOT EXCEED ITS LIABILITIES [THE "BALANCE
SHEET TEST"]..........................................................................................................................127
H.2.    AEQUITAS INTENDED TO INCUR, OR HAD REASON TO BELIEVE THAT IT WOULD INCUR, DEBTS BEYOND ITS
ABILITY TO PAY AS THEY BECAME DUE [THE "TIMELY PAYMENT TEST"] .........................................128
H.3.    AEQUITAS POSSESSED INSUFFICIENT ASSETS TO CONDUCT ITS INTENDED BUSINESS ["UNREASONABLY
SMALL ASSETS TEST"]..............................................................................................................128
I.    PAYMENTS TO INSIDERS ..............................................................................................130
I.1.    PAYMENTS TO INDIVIDUAL DEFENDANTS ....................................................................130
I.2.    OLAF JANKE SEPARATION PAYMENT ...........................................................................130
J.    INFORMATION GATHERING ..........................................................................................133
J.1.    COLLECTION AND PRESERVATION OF HARD COPY DATA AND ELECTRONICALLY STORED INFORMATION ....133
J.1.1.    HOSTED DATA SERVICES ..............................................................................................134
J.1.1.1.  MICROSOFT EXCHANGE EMAIL COMMUNICATIONS .......................................................134
J.1.1.2.  EMAIL DATA ARCHIVING SERVICE ...............................................................................134
J.1.1.3.  SECURE ONLINE FILE SHARING SERVICE ......................................................................134
J.1.1.4.  ONLINE VIRTUAL DATA ROOM SERVICE ......................................................................134
J.1.1.5.  SALESFORCE CRM DATA (DEPRECATED 2017)..............................................................134
J.1.1.6.  CONCUR EMPLOYEE EXPENSE DATA (DEPRECATED 2017) .............................................134
J.1.2.    ON-PREMISE DATA SERVICES .......................................................................................134
J.1.2.1.  MICROSOFT ACTIVE DIRECTORY SERVICES ..................................................................134
J.1.2.2.  MICROSOFT WINDOWS NETWORK FILE SHARING SERVICES ...........................................134
J.1.2.3.  AEQUITAS DATA WAREHOUSE SERVICES ......................................................................134
J.1.2.4.  VIRTUAL SERVER INFRASTRUCTURE SERVICES ..............................................................134
J.1.2.5.  ENTERPRISE DATA BACKUP SERVICES ..........................................................................135
J.2.    ACCOUNTING DATA .....................................................................................................135
J.3.    BANK DATA .................................................................................................................135
J.4.    PAYROLL DATA ...........................................................................................................135
J.5.    TAX RETURNS ..............................................................................................................136
J.5.1.    TAX RETURN PREPARERS .............................................................................................136
J.5.2.    ELECTRONIC TAX RECORDS .........................................................................................136
J.5.3.    OTHER TAX RECORDS ..................................................................................................136
J.6.    MANAGEMENT OF DATA/RECORDS ..............................................................................136
J.7.    INFORMATION FROM AEQUITAS ENTITY PERSONNEL....................................................137

## A. Background

During the course of an investigation into the business practices of Aequitas Management, LLC ("AM"); Aequitas Holdings, LLC ("AH"); Aequitas Commercial Finance, LLC ("ACF"); Aequitas Capital Management, Inc. ("ACM"); and Aequitas Investment Management, LLC ("AIM") (collectively "Entity Defendants"), as well as 43 subsidiaries and/or majority-owned affiliates (collectively "Aequitas," "Aequitas Entity," "Receivership" or "Receivership Entity")[1], the Securities and Exchange Commission ("Commission" or "SEC") concluded that the appointment of a receiver was necessary and appropriate for the purposes of marshaling and preserving all assets of the Receivership Entity (the "Receivership Property").

The Commission filed its complaint ("Complaint")[2] on March 10, 2016 ("Complaint Date") against the Entity Defendants, as well as Robert (Bob) J. Jesenik[3], Brian A. Oliver[4] and N. Scott Gillis[5] (collectively the "Individual Defendants"), for alleged violation of federal securities laws in what the Commission describes as a "Ponzi-like" scheme [Dkt. 1. ¶ 3].[6]  The Commission alleges that the Individual Defendants, all principals of one or more of the Entity Defendants, defrauded Investors[7], who were led to believe that they were purchasing indirect interests in trade receivables, and instead misused Investor funds to pay operating expenses and to repay earlier Investors [Dkt.1 ¶¶ 1-7].  The Commission further alleges that "[b]y the end of 2015, [Aequitas] owed Investors $312.0 million and had virtually no operating income to repay them." [Dkt. 1 ¶ 5].

Also, on March 10, 2016, the Commission and the Entity Defendants filed a Proposed Stipulated Order Appointing Receiver (the "Proposed Receivership Order") [Dkt. 2-2].  On March 16, 2016, pursuant to the Stipulated Interim Order Appointing Receiver (the "Interim Receivership Order"), Ronald Greenspan was appointed as Receiver for the Entity Defendants and 43 related entities on an interim basis [Dkt.30].  On April 14, 2016, pursuant to the Order Appointing Receiver, Mr. Greenspan was appointed as Receiver for the Receivership Entity on a final basis (the "Final Receivership Order") [Dkt. 156].

The Receiver, under the Final Receivership Order, is authorized and empowered to investigate the manner in which the financial and business affairs of the Receivership Entity were conducted (the "Investigation").  Based on the information provided in the Complaint and the books and records of the Receivership, the Receiver determined January 1, 2014 through March 10, 2016 to be the most relevant time period (the "Relevant Time Period") for his Investigation.  In furtherance of his responsibilities in the Investigation, the Receiver files the following Report Regarding the Investigation of the Receivership Entity's' Business Conduct (the "Report").

---

[1] Capitalize terms/acronyms are defined herein or otherwise have the meaning ascribed to them in the attached glossary.

[2] *Securities and Exchange Commission, Plaintiff, Vs. Aequitas Management, LLC; Aequitas Holdings, LLC; Aequitas Commercial Finance, LLC; Aequitas Capital Management, Inc.; Aequitas Investment Management, LLC; Robert J. Jesenik; Brian A. Oliver; and N. Scott Gillis, Defendants;* Case 3:16-cv-00438-PK; District of Oregon, Portland Division.  An organizational chart of relevant entities is attached as exhibit A.2, and all entities comprising the Receivership Entity and Extended Entities are located in Exhibits A and B of the Final Receivership Order [Dkt. 156]. "Extended Entities" are Aequitas affiliated entities that are not a part of the Receivership Entity, but must cooperate fully with the Receiver.

[3] Chief Executive Officer.

[4] Executive Vice President Product & Business Development.

[5] Executive Vice President, Chief Operating Officer & Chief Financial Officer.

[6] All docket references are available at the Receivership's website, http://www.kccllc.net/aequitasreceivership.

[7] The defrauded Investors generally fall into three buckets, collectively referred to as "Investors" for purposes of this Report: (1) Investors in debt instruments of ACF referred to as "Private Note" Investors; (2) Investors in Aequitas equity or debt funds (e.g., Aequitas Enhanced Income Fund, LLC ("EIF"); Aequitas Income Opportunity Fund, LLC ("IOF"); Aequitas Income Opportunity Fund II, LLC ("IOFII"); Aequitas Capital Opportunities Fund, LP ("COF"); Aequitas ETC Founders Fund, LLC ("ETCFF"); Aequitas Hybrid Fund, LLC ("AHF"); Aequitas Income Protection Fund, LLC ("IPF"); Aequitas Partner Fund, LLC ("APF"); Aequitas Private Client Fund, LLC ("PCF"); Aequitas WRFF I, LLC ("WRFF") and Aequitas International Opportunities LP ("AIO")); and (3) Investors in debt instruments of ACF/AH affiliates (e.g. ACC C Plus Holdings, LLC ("ACCCPH"); ACC F Plus Holdings, LLC ("ACCFPH"); Aequitas Corporate Lending, LLC ("ACL"); Aequitas Peer-To-Peer Funding, LLC ("AP2PF"); CarePayment Holdings, LLC ("CPH"); MotoLease Financial, LLC ("MLF") and ML Financial Holdings, LLC ("MLFH")) referred to as "Direct Note" Investors.

## B.  The Engagement

### B.1. Scope of Services

As litigation service engagements performed by Certified Public Accountants ("CPA") are deemed to be consulting services as defined by the American Institute of Certified Public Accountants ("AICPA"), work performed by CPAs on the Investigation was carried out in accordance with the applicable standards as set forth in the Standards for Consulting Services established by the AICPA.  Further, as a result of having staff possessing other relevant professional certifications engaged on the Assignment, staff adhered to the applicable standards of those governing organizations in the performance of the work in this matter.

Fact discovery in this case has not concluded as of the filing of this Report, and we believe related investigations are concurrently being conducted by various law enforcement agencies to determine the existence of possible criminal and/or civil violation acts of some of the individuals/entities described herein and others.  Accordingly, this Report is based upon the information available to me and reviewed to date, and I hereby reserve the right to supplement or amend this Report in the event additional information becomes available for review.

### B.2. Limitations of Report

The information contained herein has been prepared based upon financial and other data obtained from the Receivership Entity's books and records and provided to the Receiver and FTI Consulting, Inc. ("FTI Consulting") from the staff employed by the Receivership Entity as well as its contract staff and advisers, or from public sources.

The Receiver has not subjected the information contained herein to an audit in accordance with generally accepted auditing or attestation standards or the Statement on Standards for Prospective Financial Information issued by the AICPA.  Further, the work involved so far did not include a detailed review of all transactions, and cannot be expected to identify all errors, irregularities or illegal acts, including fraud or defalcations that may exist.  Accordingly, the Receiver cannot express an opinion or any other form of assurance on, and assumes no responsibility for, the accuracy or correctness of the historical information or the completeness and achievability of the projected financial data, valuations, information and assessments upon which the following Report is rendered.

### B.3. Forensic Investigation

A forensic investigation requires professional judgment regarding, among other matters, the nature, timing and extent of procedures to be performed; the weight, quality and reliability of evidential matter; and the cost versus benefit of acquiring and testing evidence.

The information supporting our analysis was obtained during the performance of our procedures and through discussions with Investors, management, employees and other parties.  Unless otherwise noted herein, we have not performed any procedures to corroborate the completeness or accuracy of the information or the explanations provided to us.

Certain information requested for our procedures was not produced to us for a variety of reasons, including certain documents in the possession of governmental or regulatory bodies.  Additionally, in our experience, certain types of older records are unavailable.  Generally, more recently prepared information was readily available and stored in electronic form as compared to older materials that were mostly hard

copy.  The form, availability and completeness of information were taken into consideration during the course of performing the procedures, and significant limitations are reported herein.

## C.  Executive Summary

The Commission alleges in the Complaint that "…redemptions and interest payments to prior investors were being paid primarily from new investor money in a **Ponzi-like** [emphasis added] fashion…."[8] While the Investigation uncovered frequent instances where redemptions and interest payments were financed by fundraising efforts or the movement of funds among entities to satisfy such obligations, that, in and of itself, does not qualify as a Ponzi scheme.  This Report examines the Ponzi scheme construct and applies multiple factors by which a finder of fact could determine if the Aequitas scheme qualifies as such.

Even though Aequitas does not present as a classically defined Ponzi scheme where there was no material business being conducted, there is still sufficient evidence of actual fraud and badges of fraud[9] apparent that establish the Ponzi-like nature and fraudulent activity.  The Investigation uncovered instances of self-dealing and misstatement of financial statements and activities intended to perpetuate an investor fraud.  Based on the findings of the Investigation, it is the Receiver's intention to seek the designation of a Ponzi scheme as it relates to the Receivership Entity.

My preliminary findings are as follows:

---

[8] Complaint, para. 4.  Also see para. 56 [Dkt.1].
[9] The Uniform Fraudulent Transfer Act ("UFTA") §4(b) provides that "in determining actual intent under subsection (a)(1), consideration may be given, among other factors, to whether:" 1. the transfer or obligation was to an insider; 2. the debtor retained possession or control of the property transferred after the transfer; 3. the transfer or obligation was disclosed or concealed; 4. before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; 5. the transfer was of substantially all the debtor's assets; 6. the debtor absconded; 7. the debtor removed or concealed assets; 8. the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; 9. the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; 10. the transfer occurred shortly before or shortly after a substantial debt was incurred; and 11. the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

**C.1. During the Relevant Time Period, Aequitas raised approximately $403.2 million from over 1,077 unique Investor accounts. In addition, the books and records indicate that at the beginning of the Relevant Time Period aggregate Investor accounts totaled $369.0 million.**

**C.2. During the Relevant Time Period, Aequitas paid approximately $165.1 million of principal to Investors and $84.5 million in returns to Investors, for a total of $249.6 million.**[10]

    **C.2.1.  Includes $17.8 million of principal and interest to insiders.**

**C.3. As of March 10, 2016, the amount remaining due to Investors is approximately $617.6 million (includes investments prior to and during the Relevant Time Period).**

**C.4. As of March 10, 2016, there were at least 623 unique Investor accounts that invested**[11] **approximately $91.3 million through Individual Retirement Account custodians.**

**C.5. During the Relevant Time Period, Investor funds were frequently transferred**[12] **between Aequitas' bank accounts at the direction and discretion of Aequitas management rather than Investors' instructions. At least $1.3 billion in intercompany cash transfers were completed during this period.**[13]

    **C.5.1.  Additionally, funds from the vast majority of Investors in IOFII were aggregated at least twice – at the IBAT**[14] **level (which acted as a consolidator for Aequitas investments) and again at the Aequitas level.**

**C.6. The Aequitas Entity during the Relevant Time Period:**

    **C.6.1.  Was dependent on continued infusion of new Investor money to pay operating expenses and returns to Investors;**

    **C.6.2.  Did not use Investor money for the stated purposes;**

    **C.6.3.  Used a significant portion of new Investor money to pay returns and principal to earlier Investors;**

    **C.6.4.  Did not generate sufficient (any) profits to pay the promised returns to Investors;**

    **C.6.5.  Created numerous, self-described "Manufactured Notes"**[15] **which created liabilities among the entities and which frequently did not reflect the actual receipt of funds by the entities issuing such notes;**

    **C.6.6.  Converted**[16] **liabilities between entities to favor specific Investors even when the new obligors did not receive any material benefit from assuming such liability;**

    **C.6.7.  In the waning desperate months of the scheme, after September 1, 2015, when the recently hired General Counsel**[17] **began inquiring about issues regarding raising further Investor funds and later advised Aequitas could no longer raise funds in "ordinary course," Aequitas redeemed $35.8 million of existing investments, including $3.5 million owing to management and members of the Aequitas Advisory Board ("AB").**

    **C.6.8.  Was insolvent from at least July 3, 2014 onward.**

**C.7. The Aequitas accounting records (i) do not reflect appropriate reserves for uncollectable assets and (ii) include inflated "mark-ups" to asset valuations, both of which result in a misrepresentation of Aequitas' income generated and assets available (and net worth).**

**C.8. The Aequitas Entity, during the Relevant Time Period, made payments of $5.7 million to or for the benefit of Jesenik (and his relatives), Oliver, Gillis, and related entities.**[18]

**C.9.** Since 2014, Aequitas paid $14.5 million out of Investor funds in commissions and consulting fees in furtherance of the scheme, often to unlicensed salespeople.

**C.10.** Aequitas paid $11.7 million out of Investor funds to establish a network of registered investment advisors and service providers in furtherance of the scheme.[19]

**C.11.** Between 2014 and March 2016 Aequitas spent at least $51.3 million of Investor funds on overhead and compensation in excess of the 2% of asset management fee and Administrative Services Agreement ("ASA") fees permitted by the offering documents.

As detailed further in this Report, Aequitas suffered periodic liquidity crunches (dating back as far as 2011) and uncertain asset valuations of poorly performing subsidiaries, investments and portfolios (many of which were non-viable). Moreover, with no material invested equity, Aequitas was only solvent to the extent profits exceeded losses (or assets were legitimately "marked up"), and it had a constant need for additional investor funds.

Compounding its other vulnerabilities, Aequitas' largest external investment was Corinthian Colleges' student receivables, which investment grew substantially over time. One could argue about the reasonableness of the carrying value and likelihood of repayment of these receivables prior to July 2014; however, as of July 3, 2014, when (i) the United States Department of Education and Corinthian Colleges, Inc. ("CoCo") announced an operating plan requiring CoCo to either close or sell all campuses over the next six months, (ii) CoCo ceased to honor its obligation to repurchase the many defaulted student loans, and (iii) there was a well-publicized ongoing Consumer Financial Protection Bureau ("CFPB") investigation of abusive lending practices in connection with CoCo student loans, one could no longer reasonably make that argument.[20] From that point forward, with Aequitas' business model dependent upon the performance of $241.0 million of increasingly delinquent CoCo student debt, there appears little argument that Aequitas was not hopelessly insolvent.

While Aequitas was likely insolvent substantially prior to July 3, 2014, the Receiver has not considered it a beneficial use of Receivership resources to undertake the extensive analysis necessary to support or refute a hypothesis of insolvency prior to July 2014 (however, if such need becomes apparent, this analysis can be performed). With respect to the exact date of insolvency at or near the time of the CoCo

---

[10] The Report uses the word "principal", "interest" and "returns" but the Receiver does not concede those characterizations from the Aequitas records. Any such determination will be governed by the Court approved distribution plan.

[11] The term invested, invest and investment is used interchangeably throughout the Report to mean money loaned as debt or investment in equity vehicles.

[12] Throughout the Report, use of the term "transfer", "transferred" or like indicates a cash intercompany payment from one Aequitas entity bank account to another, for the transfer of an asset or liability.

[13] Calculated based on net cash transfers out for the period of January 1, 2014 through December 31, 2015 coded to intercompany payment ($608 million), distribution paid – intercompany ($463.5 million), investor redemption – intercompany ($1.3 million), investor redemption - direct transfers ($29.8 million), notes receivable – intercompany ($81.2 million) and borrowed funds – intercompany ($89.8 million).

[14] Affiliate of Integrity Bank and Trust.

[15] "Manufactured Notes" was a self-described program, for which Aequitas management would assign assets to Aequitas Funds in the form of a note payable from a Special Purpose Entity ("SPE"). The SPE would incur the liability to repay the note, often times without receiving any direct cash consideration. This is further described in section E.1.6.

[16] Throughout the Report, use of the term "convert", "conversion" or like indicates a non-cash journal entry, intended to transfer an asset or liability from one Aequitas entity to another without cash consideration. This is consistent with terminology often employed by Aequitas management to describe these transactions.

[17] Robert (Bob) Holmen, hired on June 1, 2015.

[18] Includes payroll, bonus, expense reimbursement and distributions during the Relevant Time Period, plus the remaining principal balances of the Newman Loan (further described in section E.3.1) and the Northbranch Member Loans (described in section E.3.2).

[19] Includes $11.7 million for Aequitas Wealth Management, LLC ("AWM") entities and $4.4 million for Marketing Services Platform, Inc. ("MSP") / Ivey Performance Marketing, LLC.

[20] See Corinthian College timeline attached as an exhibit to this Report. Based on what was known (or should have been known) by Aequitas management, one could reasonably conclude that the financial stability of CoCo, and its ability and/or willingness to honor its guaranty, should have been questioned significantly before July 3, 2014.

default, there are comprehensive financial statements as of June 30, 2014, and therefore the Receiver has used those balances in connection with his analysis and finding of insolvency as of July 3, 2014.

## D.  Introduction

### D.1. Ponzi scheme defined

Courts around the country have recognized that no single definition of a Ponzi scheme exists.[21]  In general, courts have stated that Ponzi schemes exist when "returns to investors are not obtained by any business venture but are taken from monies received from new investors."[22]  Other courts have concluded that the existence of some legitimate business operations does not preclude a determination of the existence of a Ponzi scheme when it deviated thereafter.[23]  Some courts have stated that Ponzi schemes, by their very nature, are insolvent from inception of the scheme and become increasingly more insolvent as the scheme progresses.[24]

The Commission defines a Ponzi scheme as follows:

> *A Ponzi scheme is an investment fraud that involves the payment of purported returns to existing investors from funds contributed by new investors. Ponzi scheme organizers often solicit new investors by promising to invest funds in opportunities claimed to generate high returns with little or no risk. In many Ponzi schemes, the fraudsters focus on attracting new money to make promised payments to earlier-stage investors to create the false appearance that investors are profiting from a legitimate business.[25]*

The Forensic & Valuation Services Practice Forensic Accounting – Fraud Investigations, published by the AICPA, defines a Ponzi scheme as follows:

> *A Ponzi or pyramid scheme is usually a venture wherein earlier investors are repaid principal plus interest with funds provided by later investors. There may or may not be a legitimate business purpose for the venture, but the need for capital creates and continues the scheme. Often, unusually high investment returns or other inducements are offered by the promoters to attract investors.[26]*

The Ninth Circuit Court of Appeals has described a Ponzi scheme as:

> *...an arrangement whereby an enterprise makes payments to investors from the proceeds of a later investment rather than from profits of the underlying business venture, as the investors expected.  The fraud consists of transferring proceeds received from the new investors to previous investors, thereby*

---

[21] *Gold v. First Tenn. Bank (In re Taneja)*, 2012 WL 3073175 *4-6 (Bankr. E.D. VaA. July 30, 2012) (quoting various Ponzi scheme definitions and case citations). *See also, Smith v. Suarez (In re IFS Fin. Corp.)*, 417 B. R. 419 n. 15 (Bankr. S.D. Tex. 2009), subsequently aff'd, 669 F.3d 255 (5th Cir. 2012)("The Fifth Circuit's reasoning applies whether the organization neatly fits within a judicially constructed definition of Ponzi scheme or was a fraudulent scheme that has some, but perhaps not all, attributes of the traditional Ponzi scheme.  When an organization perpetuating a fraud makes a transfer necessary for continuation of the fraud, the transfer is made with actual intent to defraud.").

[22] *In re Taubman*, 160 B.R. 964, 978 (Bankr. S.D. Ohio 1993) (citing *Danning v. Bozek (In re Bullion Reserve of N. Am.)*, 836 F.2d 1214, 1219 n.8 (9th Cir. 1988), *cert. denied*, 486 U.S. 1056 (1988)); *See also, Auza v. United Dev., Inc. (In re United Dev., Inc.)*, 2007 Bankr. LEXIS 4857, at *14 (9th Cir. BAP 2007).

[23] See, e.g., Auza v. United Dev., Inc. (In re United Dev., Inc.), 2007 Bankr. LEXIS 4857, at *16 (9th Cir. BAP 2007); In re Bonham, 251 B.R. 113, 136–137 (Bankr. D. Alaska 2000); In re Taubman, 160 B.R. 964, 973 (Bankr. S.D. Ohio 1993); Gillman v. Geis (In re Twin Peaks Fin. Servs.) 516 B.R. 651, 655 (Bankr. D. Utah 2014) ("The fact that an investment scheme may have some legitimate business operations is not determinative.  If the debtor's legitimate business operations cannot fund the promised returns to investors, and the payments to investors are funded by newly attracted investors, then the debtor is operating a Ponzi scheme."); and Wing v. Dockstader, 2010 WL 5020959 at *4 (D. Utah 2010).

[24] *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, 458 B.R. 87, 110 n.15 (Bankr. S.D.N.Y. 2011) (additional citations omitted); and *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006).

[25] *What is a Ponzi scheme?*, U.S. Sec. & Exch. Comm'n, https://www.sec.gov/fast-answers/answersponzihtm.html (last visited Apr. 11, 2018).

[26] Forensic & Valuation Services Practice Aid Forensic Accounting – Fraud Investigations, published by the American Institute of Certified Public Accountants 2014, page 58 – Ponzi.

*giving other investors the impression that a legitimate profit-making business opportunity exists, where in fact no such opportunity exists.*[27]

### D.2. General factors to establish a Ponzi scheme

Courts have found that to establish a Ponzi scheme, a plaintiff must establish that:

> *(1) deposits were made by investors; (2) the Debtor conducted little or no legitimate business operations as represented to investors; (3) the purported business operations of the Debtor produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors.*[28]

It is incontrovertible that with respect to Aequitas, (i) deposits were made by Investors, (ii) Aequitas acquired significant portfolios of consumer accounts receivable, (iii) Aequitas acquired significant and sometimes controlling interests in numerous businesses both related to and independent of the consumer accounts receivable, and (iv) that due to the exceptionally high leverage, high cost of capital, high operating, overhead and marketing costs, and generally poor performance of these various investments, a substantial portion of the principal and interest repaid to Investors during the past five years was possible only because of new funds from Investors. Moreover, as discussed in this Report, I believe that, at least since July 2014, Aequitas was insolvent, and the actual financial condition of Aequitas and activities undertaken were not accurately disclosed to Investors.

Ponzi schemes are doomed because their funding requirements increase geometrically over time (a $100 thousand investor earning 15% will be paid in a year by a $115 thousand investor earning 15% will be paid in a year by a $132 thousand investor, etc.). Consequently, there are not many exit strategies for the person running a Ponzi scheme. Ultimately the perpetrator will have to find an extraordinary investment that pays off handsomely in order to make sufficient money to cover the fraud — or fail. In the case of Aequitas, the collapse of funding contributed substantially to its inevitable failure — as there no longer were funds to pay Investor redemptions and returns nor to subsidize the many operating businesses that had negative cash flow — and to the resulting cross-defaults on significant financial institution debt.

What adds complexity to the Ponzi evaluation in the instant case is that the Aequitas scheme included numerous actual business operations — albeit those operations generally produced no profits or, more often, produced significant losses, especially on an after debt-service basis (outside of COF, ETCFF, and WRFF) where equity investments were specifically solicited, all entities were capitalized almost entirely with debt. However, the existence of some legitimate business activities does not preclude the determination of a Ponzi scheme; there are other factors and concepts that would tilt the scale to one side or the other. We explore each of these concepts further in this Report as well as other additional factors that have been found to be determinative in establishing a Ponzi case.

### E.  Deeper dive and additional factors

### E.1. Investor monies were commingled

*Commingling of funds frequently occurs in fraud cases and is notably common in Ponzi scheme cases. It occurs when funds belonging to one party are deposited into the same bank account as funds that belong to a different party and, even if there is a legitimate business, the investor's funds cannot be traced to a*

---

[27] *Auza v. United Dev., Inc. (In re United Dev. Inc.),* 2007 Bankr. LEXIS 4857 at *14; *Hayes v. Palm Seedlings Partners (In re Agric Research)* 916 F.2d 528, 531 (9th Cir. 1990)(Citing, Cunningham v. Brown, 265 U.S. 1, 7–8, 44 S.Ct. 424, 425, 68 L. Ed. 873 (1924); *see also Wyle v. C. H. Rider & Family (In re United Energy Corp.),* 944 F.2d 589, 590 n. 1 (9th Cir. 1991).
[28] *Rieser v. Hayslip (In re Canyon Sys. Corp.),* 343 B.R. 615, 630 (Bankr. S.D. Ohio 2006); *see also Wiand v. Waxenberg,* 611 F. Supp. 2d 1299, 1312 (M.D. Fla. 2009); *Forman v. Salzano (In re Norvergence, Inc.),* 405 B.R. 709, 730 (Bankr. D. N.J. 2009).

*specific investment. Because money is fungible, it is not possible to trace which dollars belong to which party if they reside in the same bank account. In the instant matter, each entity had its own bank accounts and the books and records contain sufficient detail to trace cash movements among the entities. However, the courts have also found that the transfer of money between accounts of different entities to meet these corporations' liabilities also qualifies under the definition of commingling.*[29]

*The Aequitas organizational structure and movements of cash were extremely complex. However, as previously discussed, the books and records — after significant research and investigation — provide sufficient detail to effectively trace and identify cash movements of all transactions involving the Investors and amongst the Aequitas Entity. With very few exceptions (which usually related to the timing of the opening of an entity's bank account), each entity had its own bank accounts and financials.*

*Simple (single step) transactions were generally accurately reflected on the books and records of the various entities. Oftentimes more complex, multi-entity transactions were recorded, and cash moved, based on the "ultimate outcome," and intermediate steps (involving offsetting debits and credits) were not always recorded and cash did not move through the intermediaries' bank accounts.*

### E.1.1.    Funds transferred based on cash needs rather than investment criteria

*As continued in E.1.6, the Manufactured Note process was established in order to retroactively justify the transfer of Investor cash from Aequitas Funds*[30] *throughout Aequitas for the specific needs of Aequitas at the time. By allowing fluid and instantaneous transfers of cash throughout Aequitas, and then completing corresponding journal entries to increase or decrease relative "due-to/due-from" accounts or equity in subsidiaries, the cash would frequently not flow to the SPE that incurred the liability.*

*Management's ability to strip out equity and value in certain entities in favor of other entities' needs can also be seen in Direct Note*[31] *"conversions". In times of low cash liquidity, management would negotiate with outside Investors to retain their investment in Aequitas (rather than receive redemptions) in exchange for better note terms (such as increased interest rates) or an apparently more desirable SPE as replacement obligor. If the SPE which received the original cash investment was illiquid at the time of the conversion (either due to illiquid investments, adverse investment results, or the SPE had already distributed its liquidations to ACF or affiliates), and therefore could not convey funds to the "transferee" SPE, then the transfer would be completed through non-cash journal entries, "converting" the liability to an obligation of the SPE and thereby stripping out its ostensible equity value (or ability to pay other creditors).*

### E.1.2.    Weider/Forman conversion

*For example, on October 3, 2014, Weider Health and Fitness ("Weider" and together with Weider's CFO Bruce Forman "Weider/Forman") purported to have converted $6.0 million of debt owed by CSF Leverage I, LLC ("CSFLI") into $6.0 million of alleged debt owed by CPH. A careful reading of the documents purporting to effect such "conversion" and a detailed review of the accounts of CPH reveal that CPH did not receive any consideration for the alleged $6.0 million obligation it purportedly incurred.*

---

[29] *Wing v. Dockstader,* 2010 WL 5020959 at *5 (D. Utah 2010).

[30] "Aequitas Funds" is a general term to describe any outside Investor fund (EIF, IOF, IOFII, IPF, PCF and Private Note) with exception of equity funds (such as COF, WRFF, ETCFF, AHF, AIF, etc.), AIO and Direct Notes.

[31] Direct Notes differ from Manufactured Notes, as they were marketed to outside Investors, who would generally send investments directly to an SPE, rather than investing in an Aequitas Fund (which fund would receive the Manufactured Note). Direct Notes are issued directly by pre-determined SPE silos, unlike Manufactured Notes which are issued based on asset availability in the Product Menu. Exceptions to this rule are Investor conversions from another Aequitas Fund (Ruh and Terrell), and Weider's Direct Note conversion, as described in applicable sections. Further information on Direct Notes can be found in section F.1.

*According to the business loan agreement which purports to establish the transaction, the loan would be created when "Lender shall disburse to Borrower [CPH] one Advance in the aggregate principal amount of $6.0 million ...." Advance is defined in the business loan agreement to mean "the disbursement of Loan funds made (or deemed made) to borrower pursuant to the terms of this agreement."  A review of the books and records shows that Weider never advanced the $6.0 million to CPH, nor were such funds transferred to CPH by any Aequitas entity on Weider's behalf[32].  In other words, CPH was purportedly burdened to repay, to the detriment of its other Investors and creditors, $6.0 million it never received from Weider simply because Weider/Forman, together with the alleged perpetrators of the Ponzi-like scheme, "deemed" it so.*

| ID | Date | Transaction | Note Holder | Cash/ Journal Entry (JE) | CPF | AFSGLI / CSFLI | CPH | Private Note | Total Investment | Entity who ultimately received benefit of incoming funds | Entity who funded payout |
|----|------|-------------|-------------|--------------------------|-----|----------------|-----|--------------|------------------|----------------------------------------------------------|--------------------------|
| 1 | 05/03/11 | Debt at ACF | Weider | Cash | | | | 2.0M | 2.0M | IOF | - |
| 2 | 07/19/11 | Debt at ACF | Forman | Cash* | | | | 125K | 2.1M | ACF/CSF | - |
| 3 | 05/25/12 | Debt at CPF | Weider | Cash | 2.0M | | | | 4.1M | CPLLC | - |
| 4 | 06/27/12 | Debt at CPF | Forman | Cash | 100K | | | | 4.2M | CPF | - |
| 5 | 01/29/13 | Debt at AFSGLI | Weider | Cash | | 5.0M | | | 9.2M | ACF/IOF/IPF/CPF & Skagit | - |
| 6 | 05/17/13 | Additional debt at AFSGLI | Weider | Cash | | 3.0M | | | 12.2M | CSF | - |
| 6b | 05/17/13 | Additional debt at AFSGLI | Forman | Cash | | 500K | | | 12.7M | CSF | - |
| 6c | 05/17/13 | ACF Transfer to AFSGLI | Forman | Cash - Interco | | 125K | | - 125K | 12.7M | CSF | ACF |
| 7 | 09/10/13 | CPF Pays Forman | Forman | Cash | - 100K | | | | 12.6M | - | ACF |
| 8a | 11/15/13 | CPF Debt transferred to AFSGLI | Weider | Cash - Interco | -2.0M | 2.0M | | | 12.6M | ACF/CPF/CSF | CSF |
| 8b | 11/15/13 | ACF Debt transferred to AFSGLI | Weider | Cash - Interco | | 2.0M | | -2M | 12.6M | ACF/CPF/CSF | CSF |
| 9 | 10/03/14 | CSFLI debt transferred to CPH | Weider | JE - Interco | | -6.0M | 6.0M | | 12.6M | - | - |
| 9b | 10/03/14 | CSFLI Pays Weider | Weider | Cash | | -2.0M | | | 10.6M | - | CPLLC/ACF |
| 9c | 10/03/14 | CSFLI Pays Forman | Forman | Cash | | - 625K | | | 10.0M | - | CPLLC/ACF |
| 10 | 11/06/14 | CSFLI Pays Weider | Weider | Cash | | -1.5M | | | 8.5M | - | ACF |
| 11 | 11/13/14 | CSFLI Pays Weider | Weider | Cash | | -1.0M | | | 7.5M | - | ACF |
| 12 | 12/01/14 | CSFLI Pays Weider | Weider | Cash | | -1.5M | | | 6.0M | - | CPLLC/ACF |
| 13a | 06/29/15 | Subsequent debt at CPH | Weider | Cash | | | 4.0M | | 10.0M | - | Corporate Wide |
| 13b | 06/30/15 | Subsequent debt at CPH | Forman | Cash | | | 500K | | 10.5M | - | Corporate Wide |
| | | | | | - | - | 10.5M | - | | | |
| | | *Non Cash Adustments* | | | | *6.0M* | *-6.0M* | | | | |
| | | | | | **6.0M** | **4.5M** | | | | | |

*\*Note- bank statement and wire activity missing for 7/19/11 investment*

Summary of Weider/Forman investments:

On May 3, 2011, Weider invested $2.0 million into Private Note at a 12% interest rate.[33]  Funds were deposited into the Private Note bank account ("ACF-PN"),[34] then were transferred to IOF and used to send interest and redemptions to roughly 21 IOF Investors.[35]  Upon renewal in April 2013, a special terms approval request was submitted, as Weider was still receiving 12% interest and monthly payments, versus the 9% and quarterly interest for other Private Note holders.[36]  This special treatment was approved by Oliver and Andrew (Andy) MacRitchie.[37]

On July 19, 2011, Forman invested $125 thousand into Private Note at a 12% interest rate.[38]  Funds went into ACF-PN,[39] then were used by ACF-PN to help pay a redemption to Terrell Group Management

[32] Over the course of time, funds were sent to CPH by other entities, but none of those funds were directly related to the conversion of the $6.0 million of Weider debt.
[33] June 17, 2011 "Note (PN) Weider Health $2MM 12% 2yrs 5-3-11.pdf"; May 6, 2011 "Subscription Agrmt (PN) Weider Health $2MM May 2011".
[34] January 20, 2017, "Dkt 356_Forman's Supplemental Declaration in Support of Limited Objection to COF Sale.pdf" page 4; Great Plains Journal Entry 54889
[35] Great Plains Journal Entries: 54542, 54835-54836, 54842, 54848-54865, 54889, 55099.
[36] May 16, 2013, "Special Terms Approval Request - Forman May 2013.pdf".
[37] Executive Vice President Corporate Development & Governmental Affairs.
[38] August 15, 2011, "Note (PN) Forman $125K 12% 2 years 7-19-11 pay monthly.pdf"; July 29, 2011, "Subscription Agrmt (PN) Bruce Forman $125K July 2011.pdf".
[39] Great Plains Journal Entry 62559.

("TGM")[40], various legal bills, and the remaining funds were transferred to the operating bank account of affiliate ASFG, LLC (the entity "ASFG",[41] and the bank account "ASFG-Op").[42]  Along with the Weider Private Note above, Forman also received special terms approval in April 2013 for higher-than-average interest terms.

On May 25, 2012, Weider invested $2.0 million into the Aequitas CarePayment Fund, LLC ("CPF") at an 11% interest rate.  The offering was proffered by Aequitas for $3.0 million at 11%; however, Forman struck the second installment requirement from the subscription agreement.  Once deposited into CPF,[43] the funds were contributed down to CarePayment, LLC ("CPLLC", which was owned by CPF) along with an additional $100 thousand from other sources.[44]

On June 27, 2012, Forman invested $100 thousand into CPF at an 11% interest rate.[45]  Funds were deposited into CPF, then appear to be combined with other funds to be transferred to CP Funding I, LLC the following day, reportedly to be used for additional asset acquisition.[46]

On January 29, 2013, Weider invested $5.0 million into ASFG Leverage I, LLC ("ASFGLI", later known as CSFLI) at a 12% interest rate.[47]  After the deposit into ASFGLI, ASFGLI transferred the funds to ASFG-Op, and $1.2 million was used to pay down the CapitalSource Bank ("CapitalSource") facility.[48]  Another $1.3 million was transferred to ACF, which subsequently transferred the funds to IOF, CPF, and IPF to make interest payments to prior Investors.  On February 1, 2013, another $3.5 million was transferred from ASFG-Op to ACF, which subsequently made a $2.9 million advance to Skagit Gardens, Inc. ("Skagit"), paid $400 thousand in consultant fees, and used the rest for various other accounts payable.[49]

On May 17, 2013, Weider invested $3.0 million[50] and Forman invested an additional $500 thousand into ASFGLI at a 15% interest rate — substantially higher than other Investors were earning.  The funds were transferred from ASFGLI to ASFG-Op,[51] then to the ASFG Blocked account.[52]  From there, the funds were used to pay down the CapitalSource facility.[53]  Forman's total note equaled $625 thousand, which included a $125 thousand investment transfer from Private Note, summarized below.

On May 17, 2013, Forman transferred his July 19, 2011 $125 thousand Private Note to ASFGLI.  Forman was issued a note for $625 thousand, combining the value of the new cash noted above and the Private Note transfer.[54]  The ACF Operating bank account ("ACF-Op") sent the cash to ACF-PN, then ACF-PN transferred the cash to ASFGLI as an investment transfer.[55]  From there, ASFGLI transferred the funds to ASFG-Op, and ASFG-Op transferred the funds back to ACF-Op via a distribution.[56]  Thus, ASFGLI

---

[40] A company controlled by Patrick (Pat) Terrell, Aequitas Advisory Board Member.
[41] ASFG was later known as Campus Student Funding, LLC ("CSF"), the holder of the CoCo student loan receivables.
[42] July 22, 2011, Account Number 02001-00-000-10007 credit transactions.
[43] January 20, 2017, "Dkt 356_Forman's Supplemental Declaration in Support of Limited Objection to COF Sale.pdf" page 5; Great Plains Journal Entry 92864.
[44] July 24, 2012, "2012.05 CPF PCB x398".
[45] July 10, 2012, "Subscription Agrmnt (CPF) Forman 401K $100K June 2012.pdf"
[46] July 24, 2012, "2012.06 CPF PCB x398.pdf".
[47] March 21, 2013, "Promissory Note (ASFG-Weider) 01-28-13 v1_0.pdf" as amended on November 1, 2013.
[48] January 20, 2017, "Dkt 356_Forman's Supplemental Declaration in Support of Limited Objection to COF Sale.pdf" page 5; Great Plains Journal Entry 92864; April 15, 2013, "01 Jan 2013 Key Statement 8463.pdf".  In 2012, ASFG and CapitalSource Bank entered into a $40 million secured term loan facility, as amended and restated in 2013, for the purchase of student loan receivables.  CapitalSource received full repayment, as confirmed on August 8, 2014.
[49] April 15, 2013, "02 Feb 2013 Key Statement".
[50] May 4, 2016, "Promissory Note $3MM (ASFG Leverage I-Weider Health) 05-17-13 v1_0.pdf" as amended on November 1, 2013.
[51] January 8, 2014, "2013.05 ASFG Lev KeyB x8463.pdf"
[52] January 8, 2014, "2013.05 ASFG KeyB x9470.pdf"
[53] January 8, 2014, "2013.05 ASFG PCB x1140.pdf".
[54] "Promissory Note $625K (ASFG Leverage I-Bruce Forman) 05-17-13 v1_0.pdf" as amended on November 1, 2013.
[55] July 19, 2013, "2013.05 ACF PN  x0007.pdf".
[56] January 8, 2014, "2013.05 ASFG KeyB x9470.pdf".

undertook the liability to Forman, yet the cash made a roundtrip, starting in ACF-Op and ending back in ACF-Op.

On August 28, 2013 William ("Bill") Malloy[57] coordinated with Forman and informed the Aequitas Fund Operations team that Forman would like to redeem his $100 thousand June 2012 investment in CPF.[58] Originally, Forman has indicated this was to be a part of a new investment transfer into ASFGLI along with Weider's May 2011 and May 2012 CPF and Private Note investments.  However, Forman removed his personal investment from the transfer.[59]  As CPF did not have adequate funds for the redemption, ACF-Op wired CPF the remaining amount needed, and funds were wired to Forman on September 10, 2013.[60]

On November 15, 2013, Weider transferred the obligation to pay from ACF to ASFGLI its May 3, 2011 $2.0 million Private Note[61] and its May 25, 2012 $2.0 million CPF note[62].  To do this, there were a series of intercompany cash transfers and loans, as described below.  Ultimately, ASFG (and IPF) provided funds to Private Note/CPF to complete the investment transfers:

1. First, ASFG-Op account transferred $3.0 million to ACF-PN.  ACF-PN also received $1.0 million from IPF as a loan advance.[63]

2. Two transactions were completed from the $4.0 million received at ACF-PN.  In both transactions, ASFGLI received $2.0 million, albeit sourced from money contributed by other Aequitas Investors and not Weider.

   a. ACF-PN transferred $2.0 million to ASFGLI to complete the transfer of Weider's May 3, 2011 note liability to ASFGLI.[64]

   b. ACF-PN then transferred the remaining $2.0 million it had received from ASFG-Op/IPF to CPF as a loan paydown for other non-Weider related funds ACF had previously borrowed.  CPF in turn sent the money to ASFGLI to complete the Weider transfer of the obligation to pay its $2.0 million May 25, 2012 note from CPF to ASFGLI.[65]

3. Upon receipt of the funds, ASFGLI distributed $4.0 million to ASFG-Op.  ASFG-Op then sent $1.0 million to ACF-Op, which was transferred to CPF for another (non-Weider) CPF redemption.  ASFG-Op also sent $700 thousand to ACF-PN to make Private Note Investor payments.[66]

On October 3, 2014, after CoCo had defaulted on its obligation to backstop the defaulted student debt, Forman began negotiations with senior management for Aequitas to redeem the $12.0 million that Weider/Forman had then invested in ASFGLI (which had been renamed CSFLI).  Management informed Weider/Forman of Aequitas' cash flow issues; understanding the stress being experienced based on Aequitas' "stated lack of funding viability in 4Q14," [67] Forman agreed to repayment of only one-half of

57 Senior Vice President, Business Development and Investor Sales.
58 Email from Malloy to Hauck and Crow, "RE: Weider & Forman from CPF & PN to SMA acct".
59 Email from Malloy to Wilcox, August 12, 2013, "RE: Weider PN and CP Fund Transfer".
60 January 8, 2014, "2013.09 CPF KeyB x2400.pdf".
61 Great Plains Journal Entry 149478.
62 Great Plains Journal Entry 149942.
63 June 20, 2014, "2013.11 ACF PN  x0007.pdf".
64 June 16, 2015, "2013.11 ASFG Lev KeyB x8463.pdf"
65 June 20, 2014, "2013.11 CPF KeyB x2400.pdf".
66 June 16, 2015, "2013.11 ASFG KeyB x9470.pdf".
67 Email from Forman to Janke, September 26, 2014, "Re: CSF Leverage I".

Weider's investment paid out of CSFLI and to convert the remaining amount into a $6.0 million promissory note from CPH at 7% interest.[68]  No cash was moved for the "investment transfer" by which CPH became liable for a $6.0 million note.  To complete the double-entry bookkeeping, the offsetting entry was booked as a reduction in ACF's equity investment in CPH, which provided CPH no benefit whatsoever.[69]

With respect to the $6.0 million Weider note and $625 thousand Forman note which were to be redeemed, rather than converted, Forman agreed to a schedule of staged redemptions between October 3, 2014 and December 1, 2014:

1.  On October 3, 2014, $2.0 million of Weider's and $625 thousand of Forman's staged CSFLI redemptions were paid,[70] with $4.0 million still listed as outstanding.  CSFLI did not have adequate cash to make the redemption.  Therefore, on September 30, 2014, CPLLC distributed $1.7 million to ACF-Op as an equity distribution; ACF-Op then combined it with additional, mostly Investor-provided funds from a variety of sources (including CP Leverage I, LLC, ACM, ACF-PN, IOF, and AP2PF) to send the needed $2.6 million to CSFLI.[71]  Wires were then sent to Weider and Forman on October 3, 2014.[72]

2.  On November 6, 2014, another $1.5 million of Weider's staged CSFLI redemptions was to be paid.[73]  To fund these payments, ACF-Op and ACF-PN sent the funds to the operating bank account of CSF ("CSF-Op"),[74] which sent them to CSFLI to make the redemption.[75]  ACF-Op and ACF-PN primarily received the funds from Investors making new investments into Private Notes.

3.  On November 13, 2014, $1.0 million of Weider's staged CSFLI redemptions was to be paid.[76]  To fund, ACF-PN sent CSF-Op the funds,[77] which sent them to CSFLI to make the redemption.[78]  ACF-PN received the funds from several large Private Note Investors who invested their funds that day.

4.  On December 1, 2014, the final $1.5 million of Weider's staged CSFLI redemptions were to be paid.[79]  To fund, CPLLC transferred $1.2 million directly to ACF-PN (bypassing the intermediary ownership entities), which then combined the funds with others on hand and sent $1.5 million to CSF-Op.[80]  CSF-Op then sent the funds to CSFLI to make the redemption.[81]

Seven months later, on June 5, 2015, Oliver began discussions with Forman, in order to extend Weider's outstanding $6.0 million investment.[82]  Forman originally came to Oliver, requesting a segregated pool of CarePayment receivables (with special restrictions on institutional debt) at a 12% interest rate.  On June 9, Oliver responded noting that a segregated pool might not be possible and stated that he believed a 12%

---

[68] October 3, 2014, "Note $6MM (CarePayment Holdings-Weider Health) 10-03-14 v1_0.pdf".
[69] Great Plains Journal Entry 192414.
[70] Great Plains Journal Entry 190068.
[71] Aequitas Commercial Finance LLC September 2014 Full Analysis Checking.
[72] CSF Leverage I LLC October 2014 Full Analysis Checking.
[73] Great Plains Journal Entry 194180.
[74] Campus Student Funding LLC November 2014 Full Analysis Checking.
[75] CSF Leverage I LLC November 2014 Full Analysis Checking.
[76] Email from Janke to Forman, November 12, 2014, "Re: Aequitas repayment"; Great Plains Journal Entry 194182.
[77] Campus Student Funding LLC November 2014 Full Analysis Checking.
[78] CSF Leverage I LLC November 2014 Full Analysis Checking.
[79] Email from Ades to Abushaaban and Pyne, December 1, 2014, "12.1.14 Weider Payout"; Great Plains Journal Entry 197030.
[80] Campus Student Funding LLC December 2014 Full Analysis Checking.
[81] CSF Leverage I LLC December 2014 Full Analysis Checking.
[82] Email from Oliver to Forman and Malloy, June 5, 2015, "Re: Weider Health & Fitness".

cost of capital would make the overall financing prohibitive. On June 23, Forman stated that without the bank debt leverage, he had new terms, which included an interest rate increase to 17%.[83] On June 23, Oliver responded:

> *In regards to the proposed 17% interest rate, not sure I can sell that internally. We would be much more motivated to consider it if the new funds could in fact be advanced by Monday June 29th, which would allow us to take advantage of some other attractive quarter end asset purchases available to us that we would otherwise have to forego.[84] Before I advance the consideration of this proposal internally, would you let me know if funding the additional $4,000,000 by Monday would be a possibility?*

Forman then agreed to increase the note by $4.0 million. Oliver responded that it would be in a senior position, with a guarantee from ACF, and that the highest cost of capital enterprise-wide was less than 15%. Forman continued to assert that he would accept no less, and through later discussions Forman agreed, on June 24, to convert Weider's existing $6.0 million into a CPH note at 14% (plus 1pt extension fee), or to provide $10.0 million at 17% (later extended to include Forman's $500 thousand personal investment).[85]

On June 29, 2015, Weider wired the additional $4.0 million into CPH.[86] On that date, the parties amended and restated the original October 3, 2014 promissory note to increase the amount to $10.0 million and to increase the interest rate of the entire CPH liability from 7% to 17% (10 percentage point increase).[87] The $4.0 million went into CPH,[88] then in a series of intercompany transfers, the funds were transferred out to other entities as described below (combined with Forman's $500 thousand):[89]

1. $2.5 million was transferred up to ACF, and ultimately over to ACC Funding Trust 2014-2 ("ACCFT-2") to fund its acquisition of consumer loans from Freedom Financial Network and their affiliates ("FFN").

2. $1.9 million was transferred up to ACF, which combined with other funds was sent in a series of transfers to pay RP Capital commission payments and many other transfers which in turn ultimately funded the following entities for various cash needs: AH, MLF, ACCFT-2, AP2PF, ACL, IOF, ACC Funding Trust 2014-1 ("ACCFT-1"), CSF, ACF-PN, WRFF and others.

On June 29, 2015, Forman invested $500 thousand into CPH at 17% interest.[90] Cash went into CPH, then combined with Weider's $4.0 million to complete the series of intercompany transfers listed above.

Thus, every penny of the $4.5 million of Weider/Forman money CPH received in cash was transferred out of CPH for other Aequitas purposes within a day of deposit.

The following chart summarizes the transactions that converted and partially redeemed Weider and Forman's $12.6 million investment in ASFGLI/CSFLI, as well as the follow-on cash investments in CPH:

---

[83] Email from Forman to Oliver, June 23, 2015, "follow-up proposal".
[84] As noted below, $2.5 million of the investment went towards FFN asset purchases, whereas the remaining amount was transferred to ACF to be used corporate-wide for commission payments, interest payments, redemptions, etc.
[85] Email from Forman to Oliver, June 23, 2015, "follow-up proposal".
[86] Great Plains Journal Entry 229204.
[87] June 29, 2015, "A&R Promissory Note - $10M (CarePayment Holdings-Weider Health) 06-29-15"; "A&R Business Loan Agreement - $10M (CarePayment Holdings-Weider Health) 06-29-15.pdf".
[88] August 20, 2015, "2015.06 CPH BA x6607.pdf".
[89] August 18, 2015, "06 - Jun2015 ACF Op x7815.pdf".
[90] June 30, 2015, "Promissory Note $500K (CarePayment Holdings-Forman) 06-29-15.pdf"; "Business Loan Agmt (CarePayment Holdings-Forman) 06-29-15.pdf".



### E.1.3.   Aequitas Corporate Lending, LLC

On April 1, 2015, CSF Leverage II, LLC was reorganized and renamed ACL, a limited liability company. ACF was the sole member of ACL.  ACL originated and funded loans to business entities for working capital and other purposes.

On April 1, 2015, following the name change to ACL, ACL and ACF entered into a contribution agreement wherein ACF contributed its interest in various loan agreements and promissory notes

receivable with outstanding principal balances totaling $25.3 million.  The consideration for this contribution was an increase in ACF's capital account balance with ACL.  The contributed notes were as follows (all values as of the April 1, 2015, transaction date and include accrued and unpaid interest):

1. ACF's interest in the business loan agreement dated December 31, 2013, and associated promissory note with EDPlus Holdings, LLC ("EdPlus"), totaling $16.1 million.  EdPlus was an Extended Entity of the Receivership and was a majority-owned subsidiary of COF at the time of the sale of the Receivership's interest in the fund.

2. ACF's interest in the business loan agreement dated May 13, 2009 and associated promissory note with Syncronex, LLC ("Syncronex"), totaling $2.7 million.  Syncronex is an Extended Entity of the Receivership and is a wholly-owned subsidiary of APF.

3. ACF's interest in the business loan agreement dated January 14, 2014 and associated promissory note with Syncronex totaling $1.0 million.

4. ACF's interest in the business loan agreement dated January 31, 2014 and associated promissory note with Aspen Grove Equity Solutions, LLC ("AGES"), totaling $1.7 million.

5. ACF's interest in the business loan agreement dated July 1, 2014 and other related documents with SCA Holdings, LLC ("SCAH"), totaling $1.6 million.  SCAH was a partially-owned subsidiary of COF at the time of the sale of the Receivership's interest in the fund.

6. ACF's interest in the business loan agreement dated April 15, 2014 and related documents with Fieldstone Financial Management Group, LLC ("Fieldstone") totaling $1.6 million.  Fieldstone is not a related party to the Receivership Entity or Extended Entities.

7. ACF's interest in the convertible promissory note dated August 15, 2014 with Gladstone Technology Partners, LLC ("Gladstone Technology"), totaling $563 thousand.  Gladstone Technology is not a related party to the Receivership Entity or the Extended Entities.

In conjunction with these contributions of assets, ACL assumed the ACF liabilities related to a subordinated note payable to IOFII totaling $1.8 million.  The notes receivable were carried at par value, with no allowance or reserve for doubtful repayments.  Thus, the ACF capital account balance following the April 1, 2015 reorganization of ACL was $23.5 million.

On May 1, 2015, ACF and ACL entered into a second contribution agreement wherein ACF contributed its interest in various loan receivables from CarePayment Technologies, Inc., (the entity, "CPYT", and the loan receivables, the "ACF-CPYT Note") with an aggregate outstanding indebtedness of $18.1 million (now "ACL-CPYT Note").  CPYT was an Extended Entity of the Receivership and was a majority-owned subsidiary of COF at the time of the sale of the Receivership's interest in the fund.  The consideration for this contribution was an increase in ACF's capital account balance with ACL.  Following this contribution, the ACF capital account balance was $41.6 million.

On May 1, 2015, following the contribution of the ACF-CPYT Note, ACF sold its interest in ACL to AH. The consideration for the transaction was an increase in the intercompany receivable from AH to ACF ("ACF-AH Note") of $41.8 million (capital account balance plus net income).

Between May 21, 2015 and May 29, 2015, CPYT made four payments on the ACL-CPYT Note totaling $17.9 million: a payment on May 21 totaling $6.2 million, a second payment on May 21 totaling $6.0

million, a payment on May 22 totaling $1.5 million, and a payment on May 29 totaling $4.2 million. As of May 31, 2015, the balance on the ACL-CPYT Note was $228 thousand.

For each of the four payments, CPYT paid cash directly to the AH bank account; ACL did not have its own bank account at the time. AH decreased its investment in ACL, and ACL decreased the outstanding balance of the ACL-CPYT Note. AH then immediately sent the cash received from CPYT to ACF-Op.

### E.1.4.   William (Bill) Ruh note with ACL[91]

Short-term Private Note bridge loan summary:

In November 2014, management informed several insiders that there was a delay in incoming funds from IOFII, COF and Private Note that caused a liquidity need at Aequitas. To finance several commitments, management needed to raise at least $15.0 million in 12 days.

To accomplish this, Oliver reached out to several insiders, including Ruh[92], offering "a 'friends and family' Aequitas Special Terms Private Note Bridge Loan Offering."[93]   At that time, standard terms for Private Note required at least a 6-month investment, at a rate of 5%. However, Oliver offered these insiders a 90-day term, at 15% interest.[94]   There were six insiders who invested $1.7 million, plus $2.5 million from Robert Zamarripa and $2.0 million from Michael Zuffinetti. Per internal records, Oliver pre-approved these terms; however, the special terms were not sent for formal Credit Risk Committee approval until February 18, 2015.[95]

On November 14, 2014, Ruh wired ACF-PN $500 thousand and received a Private Note bearing 15% interest, although the funds were received two days after Oliver's offering was set to close.[96]   The note was scheduled to be redeemed in 90 days, on February 16, 2015.[97]

However, in February 2015 there was over $26.2 million of Private Notes due to be redeemed to Investors. Oliver, Jesenik, Brian Rice[98] and Olaf Janke[99] worked the list of maturities to attempt to extend or have reinvested as many of these funds as possible.[100]   Ruh agreed to several extensions, with the note always carrying the 15% interest rate.[101]

nD Bancgroup investment:

In February 2015, Ruh presented to the Aequitas Investment Committee ("IC") a proposal to invest $2.6 million equity into nD Bancgroup ("nD") for the COF portfolio. nD is a bank holding company, which sold real-time transaction and payment services through its payment processing system. The IC approved the investment, subject to some additional due diligence and negotiation items.[102]

Cash shortage:

---

[91] Includes Summary of all investments that became a part of the Ruh ACL investment, but excludes other non-ACL related investments such as his June 2013 and July 2014 Private Notes.
[92] Managing Principal, Capital Opportunities Fund, Executive Vice President.
[93] Email and attachments from Oliver to Jesenik, MacRitchie, Janke, Szabo, Froude, et. al, November 4, 2014, [No Subject].
[94] November 4, 2014, "Secured Subordinated Promissory Note" sample.
[95] January 22, 2015, "Special Terms Approval Request".
[96] November 14, 2014, "Ruh Aequitas Private Note Secured Subordinated Debt Offering Subscription Booklet"; "Secured Subordinated Promissory Note"; "Accounting Details"; email and letter from Aequitas Investor Services to Ruh.
[97] Ruh's bridge loan note is individually highlighted as a lead in to the nD Bancgroup investment that is discussed in the following section.
[98] Executive Vice President of Wealth Management.
[99] Executive Vice President, Finance and Chief Financial Officer. Separated April 30, 2015.
[100] Email from Oliver to Rice, February 7, 2015, "Private Note Redemptions".
[101] March 27, 2015, "1st Note Amendment Ruh Trust 2-16-15.doc"; letters from Aequitas Investor Services to Ruh.
[102] February 2, 2015, nD Bancgroup documentation including: "Investment Committee Minutes," "nD Bancgroup Underwriting Report".

At the beginning of the day on May 8, 2015, there was a combined total of $3.2 million of funds in Aequitas' 32 accounts. However, there was also $4.2 million in outstanding checks cut from 14 of the 32 entities. Given the lack of funds, Aequitas held ~$3.7 million of these checks (including redemptions to Private Note Investors, payments to lawyers, etc.). Aequitas then chose to segregate $1.8 million in COF, to be used for the nD investment. Aequitas entities then received an additional $1.9 million from new IOFII and Private Note Investors (both swept to ACF-Op), but after other payments, Aequitas ended the day with only $1.5 million available cash.[103] In addition to the ~$3.7 million of held checks, management projected a two-week net deficit of $2.3-40.6 million, which range primarily depended upon a potential $35.0 million investment into EIF from Trust Capital Holdings.

Investment negotiations:

When Ruh was notified the Aequitas nD investment may not occur due to this cash shortage, Ruh reached out to Oliver and Craig Froude.[104] As summarized in an email between Oliver, Jesenik, MacRitchie, Rice and Gillis:[105]

> Bill [Ruh] feels a personal obligation/commitment to get the nD Bancgroup investment funded by mid-week next week, as not completing the investment will cause nD Bancgroup challenges and hardship and Bill of course feels strongly that it would be bad form and create reputational risk for Aequitas if we in fact do not fund as committed.

Oliver informed Ruh that there was only $1.6-1.7 million available in the COF account at that time. Ruh then agreed to loan Aequitas the additional $750 thousand needed for the investment, if Aequitas would exclusively use the funds to complete the investment mid next-week.

Ruh then entered negotiations with Oliver, stating that he would like to roll his November 14, 2014 Private Note bridge loan into his new investment, therefore creating a single note. Ruh initially requested a senior secured position in COF or MLF assets; however, Jesenik stated he would approve the transaction if Ruh invested in the corporate debt entity instead (to be named ACL). Ruh reluctantly agreed to this arrangement, under the following terms:

1. First lien position in all assets of ACL

2. Redemption on August 1, 2015

3. 15% interest through August 1, 2015

   a. Increase to 20% should it be redeemed after August 1, 2015

4. To repaid at the earlier of:

   a. Maturity date

   b. Such time as third-party financing > $5.0 million is obtained by borrower entity

   c. Such time as any other ACF or affiliate financing is obtained of $10.0 million or greater

Objections to investment:

---

[103] Email from Abushaaban to Jesenik, Gillis, Rice & Oliver, May 8, 2015, "Cash Report | 5/8", "Cash Dash 5|8" and responses.
[104] Executive Vice President, Managing Principal Capital Opportunities Fund.
[105] Email from Oliver to Jesenik, Froude, Rice, Gillis and MacRitchie, May 9, 2015, "nD Bancgroup / Bill Ruh".

MacRitchie objection:

When Oliver notified the parties of the investment, MacRitchie responded they should not continue with any discretionary investments, given the status of ACF's debt backlog.[106]  MacRitchie's email stated:

> *Brian. Based on what you were briefing me on I just can't see any situation where we should be making discretionary investments at this time. If COF is sitting with $1.7m then we should be having it pay down some of ACFs debt or at a minimum fund the credit lines to the COF portfolio companies. Why does COF only have $1.7m if it has a $2.6m commitment - why should ACF be expected to fund the difference - that's not how other PE funds work. Lastly, I appreciate Bill's desire to support but we cannot provide partners with better terms than PN holders. This is a huge conflict and if we decide to proceed will require CRC sign off. I'd rather we upset ND than fail to cover payroll. (By the way I really like the ND deal but that isn't the issue).*

No apparent written response was made to MacRitchie in related emails.  However, MacRitchie later sent his approval via email, approving the transaction on ACM's behalf.[107]

In-house legal counsel:

A member of the in-house legal team responded to Oliver and stated that Ruh must be informed of the SEC investigation prior to making his investment.[108]  Oliver responded that it should not be a problem to disclose.

Covenant breach and collateral transfer:

One week after receiving Ruh's funds, ACL was to accept additional funds from TGM into ACL. However, there was not enough collateral in the ACL entity to comply with Ruh's limit of 30% senior indebtedness (requirement of $30.0 million in loans receivable, whereas ACL only had $24.7 million available at the time).[109]

To comply and keep Ruh and TGM's investment, Oliver proposed that ACF contribute its 2011 CPYT note receivable to ACL (IOF held a participation interest in this note, which needed to be eliminated through a re-purchase by ACF).  Through a series of non-cash entries, Aequitas back-dated ACF's repurchase of IOF's participation in the ACF-CPYT Note to May 1 and contributed the loan to ACL[110] (for further details, please see F.3).

nD investment approval by Aequitas management:

On the day of the transfer, Aequitas' Treasury department was given 30 minutes to compile all approvals and release the $2.6 million wire to nD.[111]  Per the exchanges, there was an outstanding need for IC to approve the completion of due diligence on the investment, as well as officers of ACM to approve the transaction.[112]  Oliver[113] and MacRitchie[114] approved the investment on behalf of ACM.  Additionally, it

---

[106] Email from MacRitchie to Oliver, May 9, 2015, "nD Bancgroup / Bill Ruh".
[107] Email from MacRitchie to Abushaaban, May 13, 2015, "RE: APPROVAL REQUIRED: nD Bancorp Wire".
[108] Email from Myers to Oliver, May 12, 2015, "nD Bancgroup / Bill Ruh".
[109] Email from Oliver to Terrell, May 19, 2015, "Terrell Group Loan to Aequitas Corporate Lending, LLC".
[110] May 20, 2015, "Transfer of CPYT Note"; Investment Committee Memo.
[111] May 13, 2015, "Outgoing Payments Report".
[112] Email from Abushaaban to Oliver, Ruh, Jesenik, Gillis, et. al, May 13, 2015, "APPROVAL REQUIRED: nD Bancorp Wire".
[113] Email from Oliver to Ruh, Jesenik, Gillis, Abushaaban, et. al, May 13, 2015, "RE: APPROVAL REQUIRED: nD Bancorp Wire".
[114] Email from MacRitchie to Abushaaban, May 13, 2015, "RE: APPROVAL REQUIRED: nD Bancorp Wire".

was noted that AIM needed to approve the investment as its Investment Advisor. Jesenik[115] and Ruh[116] waived/approved on behalf of AIM.[117]

Cash investment and use of funds:

While Ruh's note was an obligation of ACL, the intention of Ruh's investment was to have the funds be available for COF. Through a series of non-cash entries, Ruh's investment was completed as follows:

1. Cash deposits

   a. November 14, 2014 - initial cash deposit of $500 thousand in ACF-PN

   b. May 13, 2015 – cash deposit of $750 thousand in COF[118]

2. Non-cash journal entries[119]

   a. Private Note to ACL conversion:[120]

      i. Compounding of accrued Private Note interest ($37 thousand) into investment

      ii. Non-cash decrease in ACF-AH Note of $537 thousand

      iii. Non-cash reduction of AH equity in ACL of $537 thousand

      iv. ACL to assume $537 thousand liability to Ruh by issuing note ACLLLC00002

   b. COF to ACL conversion:[121]

      i. Non-cash decrease in ACF line of credit to COF by $750 thousand

      ii. Non-cash decrease in ACF-AH Note of $750 thousand

      iii. Non-cash reduction of AH equity in ACL of $750 thousand

      iv. ACL incurred an additional $750 thousand liability to Ruh under note ACLLLC00002

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

---

[115] Email from Jesenik to Abushaaban, May 13, 2015, "RE: APPROVAL REQUIRED: nD Bancorp Wire".
[116] Email from Ruh to Abushaaban, May 13, 2015, "RE: APPROVAL REQUIRED: nD Bancorp Wire".
[117] nD Bancgroup subscription booklet and subscription agreement.
[118] Email from CashPro Notifications to CF Incoming Funds, May 13, 2015, "CashPro Notification Incoming Wire Confirmation".
[119] Email from Abushaaban to Walker, Steigerwald, House and Kuzeer, May 13, 2015, "FW: APPROVAL REQUIRED: nD Bancorp Wire".
[120] Email from Abushaaban to Pyne, Gillis, House, et. al, May 13, 2015, "Bill Ruh | Investment in ACL & PN transfer."; June 09, 2015, "Adjusting Journal Form – JE# 225044.pdf".
[121] June 09, 2015, "Adjusting Journal Form – JE# IAJ000017582".



As such, ACL never received any of the $1.2 million.  The initial $500 thousand was received by ACF-PN and the later $750 thousand was received by COF.  Instead of receiving and booking a cash receipt, ACL booked the liability to Ruh through booking a decrease in the ACF-AH Note and a reduction in AH's equity in ACL.

Ruh redemption:

Ruh was redeemed on August 4, 2015, three days after his scheduled redemption date.  As Ruh had been receiving monthly interest payments, his payoff included July interest at 15% ($17 thousand) plus 20% for August ($2 thousand), for a total payout of $1.3 million.

As ACL had no cash to redeem Ruh at the time, ACL received the needed $1.3 million from other internal sources.  Cash was transferred to ACL from ACF, which received the funds from EIF and

CPLLC. EIF had just received new Investor funds from ACA Master Select Fund ($619 thousand), and CPLLC had receivable collections of $1.2 million. These entities transferred their combined $1.8 million to ACF, which then sent $1.3 million to ACL (with the offsetting accounting being an increase in the ACF-AH Note) and $500 thousand to ACCFT-1 for a FFN loan funding. An illustration of the ACL funding and Ruh redemption is below:



**August 4, 2015**

**Ruh Redemption & Source of Funds**

### E.1.5.    Terrell Group Management note with ACL

As of the SEC Complaint Date, TGM held a senior secured promissory note from ACL with principal of $7.7 million. This liability originated from earlier secured demand notes executed in favor of TGM by DC Equipment Finance, LLC ("DCEF") – a former Aequitas entity that is not included in the Receivership Entity.

Initial investment in DCEF:

TGM sent cash to Aequitas in three different ways. For each investment tranche in 2009, and one additional tranche on December 7, 2012, totaling $9.0 million, TGM sent cash directly to DCEF and received as consideration a secured demand note.

After January 1, 2010, additional cash investments from TGM relating to the DCEF secured demand notes were recorded differently; the two exceptions to this are the $1.4 million transaction on December

7, 2012 (as described above) and the $2.1 million transaction on August 31, 2011 (as described in more detail in the paragraph below). Through this second method, TGM sent cash directly to ACF. ACF recorded a debit to its cash account and a credit to its intercompany payable account with DCEF. DCEF recorded a debit to the intercompany receivable account from ACF, and a credit to the TGM account. Between April 2010 and November 2014, TGM invested an additional $14.9 million.

On August 31, 2011, TGM contributed an additional $2.1 million towards its DCEF secured demand notes via a payment to ACF. ACF recorded a debit to its cash account and a credit to its investment account with DCEF. DCEF recorded a debit to the intercompany payable account with ACF, and a credit to the TGM account. The cash did not go to DCEF.

During the period from April 2009 to March 2015, TGM received payments from ACF on the DCEF notes, totaling $24.7 million, which were recorded in the books and records as $20.2 million in principal redemptions and $4.5 million in interest payments. As of May 20, 2015, the book balance of the TGM DCEF notes was $5.9 million.[122]

Conversion from DCEF to ACL:

On May 20, 2015, TGM and DCEF, along with other Aequitas entities, entered into an assignment and assumption agreement with ACL wherein ACL assumed liability for the $5.9 million of secured demand notes payable by DCEF.[123] At the time of the transaction, DCEF did not contribute any cash to other Aequitas entities, as the DCEF bank account had less than a $1 balance. Additionally, per the 2015 monthly balance sheet, the only other asset held by DCEF at the time of the transaction was a $1.7 million intercompany payable due from ACF. Rather, for compensation, ACF (as parent of DCEF) accepted a $5.9 million increase in an intercompany "due to" account from DCEF to ACF (a clearly worthless receivable as there was no assets at DCEF other than a smaller note receivable from ACF). In turn, ACF decreased its ACF-AH Note by the same amount, purportedly converting the TGM liability from DCEF as obligor to AH as obligor. AH then, as ACL's parent entity, converted the $5.9 million liability of AH as obligor to ACL in exchange for reducing AH's equity investment in ACL by the same amount. This is described on the right side of the below chart.

TGM also contributed $1.9 million cash, bringing the initial principal amount of the senior secured promissory note ("TGM-ACL Note") to $7.8 million.[124] This cash was contributed to an ACF bank account in two tranches: on May 20, 2015, TGM wired $1.9 million to ACF-PN, which was then transferred to ACF-Op the following day, and on May 22, 2015, a TGM check for $5 thousand was deposited into ACF-Op. While ACL did not receive the cash benefit of either of these tranches, ACL assumed the liability for the additional investment under the same increases and reductions of intercompany payable and intercompany equity accounts described on the left side of the following chart.

The $1.9 million in new cash was comingled in ACF-Op with cash from six other internal entities. From there, ACF sent the cash to seven other internal entities for various corporate uses. In the days covering the bottom portion of the following chart, a total of $21.6 million of SPE/Aequitas Funds' cash was transferred to ACF, with $20.8 million being sent out by ACF to various other SPE/Aequitas Funds via 25 intercompany bank transfers, as described below.

---

[122] During this time period, TGM held only notes payable by DCEF yet received payments from ACF accounts. ACF was a guarantor on the DCEF to TGM notes.
[123] September 9, 2015, "Assignment and Assumption Agreement - Terrell Group Note (DCEF-ACF-AH-ACL) 05-20-15.pdf".
[124] June 17, 2015, "ACL - Senior Secured Note $7,773,000 (Terrell Group) 05-20-15.pdf".



Additional TGM to ACL investments:

The TGM-ACL Note was amended a total of three times in May and June 2015, corresponding with the contribution of additional capital to Aequitas or conversion of investments in other Aequitas products.

The first amendment to the TGM-ACL Note occurred on May 27, 2015.[125] TGM contributed an additional $100 thousand. TGM sent cash to the AH bank account; an ACL bank account was not established until June 24, 2015. The liability for the cash was converted to ACL in exchange for a reduction in AH's equity investment in ACL. AH sent the cash to ACC Holdings 2, LLC ("ACCH2") to fund a FFN loan purchase.

The second amendment to the TGM-ACL Note occurred on June 11, 2015.[126] TGM sent an additional $422 thousand in cash to the AH bank account. The transaction was booked to the general ledger in the same fashion as the first amendment to the TGM-ACL Note. On June 12, 2015, $423 thousand (inclusive of the TGM investment, as corroborated by the AH bank statements) was sent from AH to ACF-Op, reducing the ACF-AH Note.

The third amendment to the TGM-ACL Note occurred in two parts, on June 23 and 24, 2015.[127] On June 23, TGM sent $550 thousand cash to the AH bank account on behalf of a family member/friend Doug Antone. Terrell had encouraged Antone to invest this amount under the TGM-ACL Note, as Terrell claimed additional senior secured position and guarantees.[128] The transaction was also booked to the general ledger in the same fashion as the first amendment to the TGM-ACL Note. That same day, AH sent $2.3 million (inclusive of the TGM investment, as corroborated by the AH bank statements) to ACF-Op. The Receiver believes ACL was insolvent during this period.

On June 24, Terrell instructed Antone's $500 thousand senior secured promissory note from IOF (which was due for redemption) to be transferred into the TGM-ACL Note.[129] As IOF only had $12 thousand available in its cash account, ACF-Op transferred $500 thousand to IOF, and this was booked as a decrease in the intercompany payable due to IOF. IOF then transferred the $500 thousand cash to ACL as cash consideration for the note increase.[130] ACL immediately transferred $250 thousand of this amount to CPYT as an advance on ACL's business loan agreement with CPYT. The remaining $250 thousand was transferred to the AH bank account and booked as an equity reduction, and then transferred back to ACF-Op and booked as a reduction in the ACF-AH Note.

As of June 2015, the TGM-ACL Note balance totaled $9.3 million.

ACL interest payments and partial redemptions:

Per the terms of the TGM-ACL Note, TGM received monthly "interest" payments at 13% per annum. From June 2015 through February 2016, TGM received $879 thousand in interest. The June 2015 interest payment was paid from the AH bank account, as an ACL account had not yet been established; all other interest payments were paid from the ACL bank account.

On June 19, 2015, AH received an $86 thousand cash transfer from ACF-Op. AH used this cash to pay the June 2015 TGM interest payment.

---

[125] June 17, 2015, "ACL - Senior Secured Note - 1st Amendment (Terrell Group) 05-27-15.pdf".
[126] June 17, 2015, "ACL - Senior Secured Note - 2nd Amendment (Terrell Group) 06-11-15.pdf".
[127] July 7, 2015, "ACL - Senior Secured Note - 3rd Amendment (Terrell Group) 06-23-15.pdf".
[128] Email from Terrell to Oliver, June 19, 2015, "Doug Antone" and Email from Antone to Donnelly, June 18, 2015, "Re: Aequitas Documents".
[129] Email from Terrell to Oliver, June 19, 2015, "Doug Antone".
[130] Aequitas Income Opprtunty (sic) Fund, LLC June 2015 Full Analysis Checking.

On July 17, 2015, ACF-Op advanced $95 thousand to AH and increased its ACF-AH Note. AH then advanced that $95 thousand to ACL as an equity contribution to ACL. ACL then used that $95 thousand to cover the majority of TGM's $100 thousand interest payment.

On August 19, 2015, ACF-Op advanced $380 thousand to AH and increased its ACF-AH Note. AH then advanced $223 thousand of that amount to ACL as an equity contribution (remaining cash was sent to another Aequitas entity). ACL then used $105 thousand of that amount to pay the TGM monthly interest payment ($110 thousand of the remaining cash was used to fund the ACL-CPYT Note).

On September 18, 2015, ACF-Op advanced $105 thousand to AH and increased its ACF-AH Note. AH then advanced that $105 thousand to ACL as an equity contribution. ACL then used $105 thousand of that amount to pay the TGM monthly interest payment.

On October 19, 2015, ACF-Op advanced $98 thousand to AH and increased its ACF-AH Note. AH then used that amount plus additional money in its own bank account to advance $102 thousand to ACL as an equity contribution to ACL. ACL then used $101 thousand of that amount to pay the TGM monthly interest payment.

On November 19, 2015, CSF transferred $255 thousand to ACF-Op, as an equity distribution. ACF-Op then advanced the $255 thousand to AH and increased its ACF-AH Note. AH then advanced that $255 thousand cash to ACL as an equity contribution to ACL. ACL then used $255 thousand of that amount to pay the TGM monthly interest payment of $105 thousand and a $150 thousand partial principal repayment of the TGM-ACL Note. This is described on the left-hand side of the "TGM Partial Redemptions & Source of Funds" chart below.

On December 17, 2015 ACF-Op advanced $97 thousand to AH and increased its ACF-AH Note. AH then used that amount plus additional money in its own bank account to advance $100 thousand to ACL as an equity contribution. ACL then used that $100 thousand to cover the majority of the $100 thousand TGM monthly interest payment.

On December 30, 2015, ACM sent $650 thousand to AH as an equity distribution. AH then transferred the funds to ACL, as an equity contribution. In turn, ACL sent the funds to EdPlus, as an advance on the ACL to EdPlus business loan agreement. EdPlus then used part of that advance from ACL in order to make its mandatory November and December interest payment back to ACL on the loan, returning $207 thousand and $221 thousand to ACL. To get the additional funds needed, on December 31, 2015, ACL issued a subordinated promissory note to IOFII in exchange for $1.4 million in cash consideration.[131] ACL then used $1.5 million for a partial principal repayment of the TGM-ACL Note. This is described on the right-hand side of the "TGM Partial Redemptions & Source of Funds" chart below.

On January 19, 2016, ACL issued a subordinated promissory note to IOFII in exchange for $1.3 million in cash consideration. ACL then used $92 thousand of this cash to pay the TGM monthly interest payment. $1.2 million of this cash was used as an equity distribution to AH.

On February 5, 2016, ACL received a payment of $125 thousand on account of a note receivable from AGES. On February 23, $86 thousand of these funds was used to pay the TGM monthly interest payment.

---

[131] Email from Rodriguez to Gillis, Jesenik, et. al, December 31, 2015, "Approval Request – Manufactured Notes".



TGM Partial Redemptions & Sources of Funds

### TGM Investment Activity by Year

| | DC Equipment Finance, LLC | | | Aequitas Corporate Lending, LLC | | | | |
| Year | Cash Investments | Cash Redemptions | Non-Cash Conversions Out | Non-Cash Conversions In | Cash Investments | Cash Redemptions | Year End Balance | Interest Paid |
|---|---|---|---|---|---|---|---|---|
| 2009 | $ 7.6 M | -$ 3.4 M | $ – | $ – | $ – | $ – | $ 4.2 M | -$ 1.0 M |
| 2010 | 2.2 M | -1.3 M | – | – | – | – | 5.1 M | -0.8 M |
| 2011 | 2.1 M | -2.9 M | – | – | – | – | 4.3 M | -0.6 M |
| 2012 | 6.1 M | -4.0 M | – | – | – | – | 6.3 M | -0.6 M |
| 2013 | 0.4 M | -4.4 M | – | – | – | – | 2.3 M | -0.6 M |
| 2014 | 7.6 M | -2.0 M | – | – | – | – | 8.0 M | -0.5 M |
| 2015 | – | -2.1 M | -5.9 M | 5.9 M | 3.4 M | -1.7 M | 7.7 M | -1.1 M |
| 2016 | – | – | – | – | – | – | 7.7 M | -0.2 M |
| **Total** | **$26.1 M** | **-$20.2 M** | **-$5.9 M** | **$5.9 M** | **$3.4 M** | **-$1.7 M** | | **-$5.4 M** |

#### E.1.6.   Direction of investments and Manufactured Notes

*Beginning in 2014, Aequitas internally engaged in what it termed the Manufactured Note program. This program involved the creation of debt instruments by, or the conversion of debt obligations to liabilities of, Aequitas entities that commonly would receive no cash consideration. As new Investor funds were deposited or transferred into the individual Aequitas Funds (for example, IOFII) the money would generally be swept regularly (daily or weekly) out of the Aequitas Fund into ACF-Op for various ACF or subsidiary (each such subsidiary, an Aequitas SPE) needs. These needs would include redemptions,*

*interest payments, equity infusions into the SPEs, etc.  In exchange for the cash transfer from the Aequitas Fund to ACF, the Aequitas Fund would receive a "due from ACF" intercompany receivable.*

*Weeks after the cash was swept from the Aequitas Funds to ACF, a monthly Capital Pending Deployment ("CPD") spreadsheet would be prepared, which reflected the total capital raised that month (less redemptions), and roughly 3-8 weeks after month-end, management would examine a "Product Menu," which would indicate SPEs (ACCCPH, CPH, MLFH, etc.) which had "available collateral" (ostensible asset values, generally consumer notes receivable, in excess of outstanding borrowings by such entity). Based on the Product Menu, notes payable would be created (either senior or subordinate) and backdated to the first of the month following deposit, and book entries would be created to reflect the instruments so created: the Aequitas Fund which was the source of the cash, such as IOFII, would reduce its "due from ACF" receivable, and ACF would reduce its equity or reduce its loan to AH.  In many cases, the subsidiaries which incurred the note payable would never receive the cash consideration — as the cash primarily went to ACF for use as needed, and the liability was booked at whichever entity had "available collateral."*

*Unlike when an entity gives an "in-the-money" note in exchange for the receipt of cash, which has no effect on the borrower's net worth or, in theory, the position of pari passu creditors, incurring an obligation without receipt of comparable consideration decreases net worth (and thus the investment value of those investors whose funds had been invested as equity) and the cushion for existing investor creditors.  And if the new indebtedness is contractually senior to prior or future creditors, the creditors are even more disadvantaged by the entity incurring this gratuitous senior liability.  Effectively, management was stripping out equity and value from certain entities in an effort to fund needs at other entities.  Moreover, often the ostensible net asset value which was supposed to back the Manufactured Notes did not in fact exist, thereby creating a deficit capital situation and harming all existing and subsequent Investors and creditors (and certainly the reported collateral value would not be expected to exist in the event of an orderly liquidation as has been conducted by the Receiver and was inevitable given the insolvency of the overall entity).*

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK



132

*The interest rates to be paid by, and the capital structure of, the underlying entities appear to be wholly determined by the "needs" of the Aequitas Funds or Direct Note Investors which would receive the notes payable — that is, what was perceived by the Aequitas marketers as needed to sell the notes to investors. In the case of IOFII (the Aequitas Fund most impacted by this strategy), most Investors received a note which bore an interest rate of 10%. Based on the need to "cover" that debt burden plus fund the 2% annual management fee, the 0.5% allocated for operating costs and the 1% cushion for deployment timing, management determined that each credit strategy would bear the same blended 14% cost of capital when issuing notes to IOFII — irrespective of the underlying rate of return (often lower) and/or risk of that strategy. That note yields were driven by investor marketing rather than the creditworthiness or market justification of the underlying businesses/assets indicates a Ponzi scheme.*

*Further, the interest rates and high percentage of subordinated debt[133] made it unlikely/impossible for the underlying portfolio entities to turn a profit at 100% leverage. For example, the ACCFPH notes' weighted average cost of capital is 18.1% and the receivables didn't bear an average interest rate anywhere close to this.*

Note Manufacturing process with IOFII:

In the immediate month after receipt of Investor funds, Accounting, Fund Operations, Treasury and other Aequitas groups would calculate the total amount of funds that were either deposited into IOFII (primarily through IBAT, which held 93% of the IOFII notes as of December 31, 2015) or transferred to IOFII from other Aequitas Funds (these transfers could be effected either through journal entry conversions or via cash moved from the redeeming entity to IOFII). Accounting would then subtract the amount of IOFII Investor funds or SPE notes that were redeemed or transferred/converted out to establish

---

[132] May 1, 2015, "Aequitas_Note Manufacturing Process_2015_05_01.pdf".
[133] November 5, 2014, "Aequitas Managed Fund Portfolio Asset Allocation Policy_FINAL_2014_11_05", Table III.

the net amount of new liabilities taken on in the prior month.  This final amount became the CPD for the month.

Simultaneously, the Director of Funds Management would prepare a Product Menu, a chart that was created to list all available assets and/or investment instruments, and their respective terms and conditions.  Specifically, it would state the "collateral available for deployment" by each SPE— which was actually a list of the purported value of assets owned less existing liabilities for each SPE.  The report would be used to determine which SPEs would issue a note in the required CPD amount.  It would also identify SPEs which were "undercollateralized" (meaning they had outstanding liabilities in excess of their then-current asset valuations), which should trigger redemptions (reductions) of outstanding liabilities, as otherwise the SPE's assets would be exceeded by its debt.

The files were then compiled and emailed to management and related employees, to be presented monthly in the Aequitas Office of the Chief Investment Officer ("OCIO") meetings.  Once management reviewed the relevant files, it would determine which SPE(s) would assume the liability of the Manufactured Note.  In addition to choosing which SPE(s) would become liable for the note, management would determine the terms for such note (i.e., interest rate and redemption date).  This was called the Asset Allocation Methodology or "Asset Allocation Policy", initially established in November 2014, and updated in June 2015.[134]  Per the methodology, the manager of the Aequitas Fund (in IOFII's case, AIM) must issue notes based on:

> A.   each Aequitas Managed Fund Total Portfolio Return Requirement (referred to as the "Benchmark"),
>
> B.   each Aequitas Managed Fund Portfolio Concentration Limitation set forth for each Credit Strategy Receivables program (referred to as the "Base Policy Mix"), and
>
> C.   the expected rate of return for each Credit Strategy Receivables program (referred to as the "Required Return").

Once the maker of the note and its terms were determined, the note would be backdated to the 1st day of the preceding month, and interest would be accrued as of that date.  In the majority of cases, the liability would be established through non-cash journal entries, as described below.

Example:

1.  In April 2015, IOFII received $5.7 million in new cash investments.  In addition to the new funds, an Investor transferred $788 thousand from IPF to IOFII.  Cash was moved from the IPF bank account to IOFII, to satisfy the transfer.  With this, the fund manager noted that there was $6.5 million of CPD to be issued for April:[135]

---

[134] November 5, 2014, "Aequitas Managed Fund Portfolio Asset Allocation Policy_FINAL_2014_11_05... (1)"; July 9, 2015, "Aequitas Managed Fund Portfolio Asset Allocation Policy - approved - 20150625 - clean.pdf".

[135] Email from Abushaaban to Accounting, Gillis and Mazer, May 27, 2015 "Action Required: IOF II | Promissory Note Issuances & Maturities | 2015-04-30" Section I.

| FUND MANAGEMENT | 30-Apr-15 |
|---|---|
| **IOFII** | |
| Aggregate Capital Raised | $49,228,554 |
| **Less: Redemptions** | – |
| **Net Capital Raised** | **$49,228,554** |
| **Less: Deployments** | |
| Notes Issued - Sr. | (20,527,342) |
| Notes Issued - 2nd Lien | (32,592,725) |
| **Total Deployments** | **$(53,120,067)** |
| **Add: Maturities** | |
| Notes Matured - Sr. | 5,076,887 |
| Notes Matured - 2nd Lien | 5,317,090 |
| **Total Maturities** | **$10,393,977** |
| **Net Capital Pending Deployment:** | **$6,502,464** |

2. On May 20, the fund manager released the Product Menu, which stated the SPEs with available collateral to issue notes, and the amount of "Net Available Assets" per SPE:[136]



---

[136] May 20, 2015, "Aequitas_Product_Menu_External_2015_05_20.pdf".

## Product Menu: All Aequitas Credit Strategies

As of: 20-May-15

| Program | Yield* | Gross Assets | Issuing Entity | Structure | Current Net Assets Available** | Current Notes Outstanding | 30-Day Net Assets Available** | 30-Day Notes Matured (Issued) | 60-Day Net Assets Available** | 60-Day Notes Matured (Issued) | 90-Day Net Assets Available** | 90-Day Notes Matured (Issued) | 1 yr. | 2 yr. | 3 yr. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CarePayment | 29% | $41MM | CPH | Sr. 85% | $0.3MM | $0.0MM | $0.2MM | $0.0MM | $0.2MM | $0.0MM | $0.2MM | $0.0MM | 2.500% | 3.500% | |
| | | | CPH | Sub. 15% | $0.0MM | ($6.0MM) | $1.9MM | $0.0MM | $3.9MM | $0.0MM | $5.7MM | $0.0MM | 6.000% | 7.000% | 8.500% |
| Unigo | 10% | $31MM | CSF | Sr. 25% | ($0.1MM) | ($7.9MM) | ($0.5MM) | $0.0MM | ($0.5MM) | $0.0MM | ($0.5MM) | $0.0MM | 0.000% | 0.000% | |
| | | | CSF | Sub. 75% | ($0.8MM) | ($24.1MM) | ($2.0MM) | $0.0MM | ($1.9MM) | $0.0MM | ($1.8MM) | $0.0MM | 11.000% | 12.000% | 14.000% |
| MotoLease | 23% | $22MM | MLFH | Sr. 75% | $9.5MM | ($7.2MM) | $9.0MM | $0.0MM | $9.6MM | $0.0MM | $10.2MM | $0.0MM | 8.000% | 8.500% | 9.250% |
| | | | MLFH | Sub. 25% | $0.0MM | ($5.6MM) | ($0.2MM) | $0.0MM | $0.0MM | $0.0MM | $1.0MM | $0.0MM | 14.000% | 16.500% | 18.000% |
| OnDeck | 22% | $4MM | AP2PF | Sr. 50% | $1.3MM | ($0.8MM) | $1.2MM | $0.0MM | $1.1MM | $0.0MM | $1.0MM | $0.0MM | 2.750% | 3.250% | 4.000% |
| | | | AP2PF | Sub. 50% | $0.0MM | ($2.1MM) | ($0.1MM) | $0.0MM | ($0.1MM) | $0.0MM | ($0.1MM) | $0.0MM | 12.000% | 15.500% | 17.500% |
| QuarterSpot | 28% | $2MM | ACF | Sr. 70% | $1.3MM | $0.0MM | $1.2MM | $0.0MM | $1.1MM | $0.0MM | $1.1MM | $0.0MM | 5.250% | 6.000% | 7.500% |
| | | | ACF | Sub. 30% | $0.6MM | $0.0MM | $0.5MM | $0.0MM | $0.5MM | $0.0MM | $0.5MM | $0.0MM | 12.500% | 14.000% | 16.500% |
| Freedom F+ | 18% | $28MM | ACCFH | Sr. 70% | $1.3MM | ($0.0MM) | $6.7MM | $0.0MM | $11.2MM | $0.0MM | $16.4MM | $0.0MM | 2.750% | 3.250% | 4.000% |
| | | | ACCFH | Sub. 30% | $8.5MM | $0.0MM | $10.0MM | $0.0MM | $11.5MM | $0.0MM | $13.3MM | $0.0MM | 12.000% | 13.000% | 14.000% |
| Freedom C+ | 20% | $31MM | ACCCFH | Sr. 90% | $1.8MM | $0.0MM | $5.3MM | $0.0MM | $8.5MM | $0.0MM | $11.6MM | $0.0MM | 2.750% | 3.250% | 4.000% |
| | | | ACCCFH | Sub. 10% | $0.6MM | ($2.5MM) | $0.0MM | ($0.8MM) | $0.4MM | $0.0MM | $0.8MM | $0.0MM | 11.000% | 11.750% | 12.500% |
| Corporate Loans | 10% | $44MM | ACL | Sr. 70% | $20.8MM | ($9.1MM) | $20.8MM | $0.0MM | $20.8MM | $0.0MM | $20.8MM | $0.0MM | 6.250% | 7.000% | 8.000% |
| | | | ACL | Sub. 30% | $11.0MM | ($1.8MM) | $11.0MM | $0.0MM | $11.0MM | $0.0MM | $11.0MM | $0.0MM | 12.500% | 13.500% | 15.000% |
| Real Estate (CBFL) | 46% | $0MM | ACF | Sr. 70% | $0.0MM | | $0.0MM | | $0.0MM | | $0.0MM | | 3.750% | 4.250% | 5.000% |
| | | | ACF | Sub. 30% | $0.0MM | | $0.0MM | | $0.0MM | | $0.0MM | | 10.000% | 11.000% | 12.500% |
| Real Estate (WR) | 38% | $5MM | WRFF | Sr. 0% | $0.0MM | | $0.0MM | | $0.0MM | | $0.0MM | | | | |
| | | | WRFF | Sub. 100% | $4.5MM | | $4.5MM | | $4.5MM | | $4.5MM | | 11.500% | 13.000% | 15.000% |
| TOTAL | | $228MM | | | $61MM | | $70MM | | $82MM | | $74MM | | | | |
| MANAGED FUND RESERVE (STAGES 3, 4, & 5) | | | | | ($9MM) | | ($9MM) | | ($9MM) | | ($9MM) | | | | |
| MANAGED FUND RESERVE (FORWARD FLOW BUDGET) | | | | | | | ($3MM) | | ($7MM) | | ($10MM) | | | | |
| NET AVAILABLE ASSETS (CASH CUSHION) | | | | | $52MM | | $87MM | | $46MM | | $74MM | | | | |

*Net of loan loss provisions & asset management fee | **Net of Sr. Secured & Subordinated Promissory Notes Outstanding | ***Per anum

---

## Product Menu by Entity Detail

As of: 20-May-15

| Program | Gross Assets | Entity | Funding Source | Loans & Notes Outstanding | Current Net Assets Available** | 30-Day Net Assets Available** | 30-Day Notes Matured (Issued) | 60-Day Net Assets Available** | 60-Day Notes Matured (Issued) | 90-Day Net Assets Available** | 90-Day Notes Matured (Issued) | Action Items, Assumptions, & Remarks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CarePayment | $41MM | CP LLC | B of A | ($18.2MM) | | | | | | | | Fully Funded |
| | | CP Funding I Trust | Wells Fargo | ($17.7MM) | | | | | | | | |
| | | CP Holdings | AE Funds | ($6.0MM) | $0.3MM | $2.1MM | $1.0MM | $4.1MM | $0.0MM | $5.8MM | $0.0MM | |
| Unigo | $31MM | CSF LLC | Scottrade | ($5.1MM) | | | | | | | | Fully Funded |
| | | CSF LLC | AE Funds | ($47.6MM) | ($0.9MM) | ($2.5MM) | $0.0MM | ($2.4MM) | $0.0MM | ($2.3MM) | $0.0MM | |
| Freedom C+ | $31MM | ACC Funding Trust 2 | Comvest | ($25.8MM) | | | | | | | | Notes Available for Sale |
| | | ACC C Plus Holdings | AE Funds | ($2.5MM) | $2.4MM | $5.3MM | ($0.8MM) | $8.9MM | $0.0MM | $12.3MM | $0.0MM | |
| Freedom F+ | $31MM | ACC Funding Trust 1 | Comvest | ($17.7MM) | | | | | | | | Notes Available for Sale |
| | | ACC F Plus Holdings | AE Funds | $0.0MM | $10.4MM | $16.7MM | $0.0MM | $22.6MM | $0.0MM | $29.7MM | $0.0MM | |
| MotoLease | $20MM | MLFH LLC | AE Funds | ($12.7MM) | $9.5MM | $8.9MM | $0.0MM | $10.0MM | $0.0MM | $11.2MM | $0.0MM | Assumes no Senior Leverage, Notes Available for Sale |
| OnDeck | $4MM | AP2PF LLC | AE Funds | ($3.0MM) | $1.4MM | $1.1MM | $0.0MM | $1.0MM | $0.0MM | $1.0MM | $0.0MM | Assumes no Senior Leverage, Notes Available for Sale |
| Corp. Loans | $44MM | ACL | Run & TGM | ($9.1MM) | | | | | | | | Notes Available for Sale |
| | | ACL | AE Funds | | $31.8MM | $31.8MM | $0.0MM | $31.8MM | $0.0MM | $31.8MM | $0.0MM | |
| WR | $5MM | WRFF | FN | $0.0MM | $4.5MM | $4.5MM | $0.0MM | $4.5MM | $0.0MM | $4.5MM | $0.0MM | |
| QuarterSpot | | ACF | FN | $0.0MM | $1.8MM | $1.7MM | $0.0MM | $1.6MM | $0.0MM | $1.5MM | $0.0MM | |
| TOTAL | $228MM | | | ($167MM) | $61MM | $70MM | | $82MM | | $96MM | | |
| MANAGED FUND RESERVE (STAGES 3, 4, & 5) | | | | | ($9MM) | ($9MM) | | ($9MM) | | ($9MM) | | |
| MANAGED FUND RESERVE (FORWARD FLOW BUDGET) | | | | | | ($3MM) | | ($7MM) | | ($10MM) | | |
| NET AVAILABLE ASSETS (CASH CUSHION) | | | | | $52MM | $57MM | | $66MM | | $76MM | | |

*Net of loan loss provisions & asset management fee | **Net of Sr. Secured & Subordinated Promissory Notes Outstanding

3. On May 27, the fund manager requested the following notes to be issued and back-dated to May 1, 2015 (the 1st day of the month).[137]  The $6.5 million was split in half: IOFII received a $3.3 million subordinate note from ACCFPH and a $3.3 million ACCCPH subordinate note.[138]

AEQUITAS INCOME OPPORTUNITY FUND II, LLC
Notes Issued

| Capital Raised: | $6,502,463.67 |
|---|---|
| Note Maturities: | $0.00 |
| Total Notes Issued: | $6,502,463.67 |
| Hurdle Rate*: | 14.000% |
| Issue Date: | 1-May-15 |

| Issuing SPV | Base | Policy | Mix | Note Structure | | Registry No. | Notes Issued | Term (yr.) | Interest Rate** | Return** |
|---|---|---|---|---|---|---|---|---|---|---|
| ACC F Plus Holdings, LLC | | 50.0% | | Sr. Secured | 0% | | 0.00 | 1 | 7.500% | $0.000MM |
| | | | | Subordinated | 100% | ACCFPHLLC00001 | 3,251,231.84 | 1 | 22.500% | $0.732MM |
| ACC C Plus Holdings, LLC | | 50.0% | | Sr. Secured | 0% | | 0.00 | 1 | 7.500% | $0.000MM |
| | | | | Subordinated | 100% | ACCCPHLLC00001 | 3,251,231.84 | 1 | 22.500% | $0.732MM |
| Aequitas Peer-to-Peer Funding, LLC | | | | Sr. Secured | 100% | | 0.00 | 1 | 2.750% | $0.000MM |
| | | | | Subordinated | 0% | | 0.00 | 1 | 22.500% | $0.000MM |
| Grand Total: | | 100.0% | | | | | 6,502,463.67 | | | $1.463MM |

*Inclusive of: 2.00% Management Fee, 0.50% Operating Expenses, & 1.00% for capital deployment lead time.

**Per annum

| Credit Strategy Receivables | Note Structure | Current Status of Inventory | Current Balance | Notes Issued to IOF II | Notes Issued to EIF | Pro-Forma Balance |
|---|---|---|---|---|---|---|
| CarePayment | Sr. | | $0.269MM | $0.000MM | $0.000MM | $0.269MM |
| | 2nd Lien Sr. | | $0.018MM | $0.000MM | $0.000MM | $0.018MM |
| CSF | Sr. | Unavailable | ($6.113MM) | $0.000MM | $0.000MM | ($6.113MM) |
| | 2nd Lien Sr. | Unavailable | ($0.833MM) | $0.000MM | $0.000MM | ($0.833MM) |
| MotoLease | Sr. | | $9.514MM | $0.000MM | $0.000MM | $9.514MM |
| | 2nd Lien Sr. | | $0.007MM | $0.000MM | $0.000MM | $0.007MM |
| Freedom (F+) | Sr. | | $2.765MM | $0.000MM | $0.000MM | $2.765MM |
| | 2nd Lien Sr. | | $8.824MM | ($3.251MM) | $0.000MM | $5.573MM |
| Freedom (C+) | Sr. | | $3.585MM | $0.000MM | $0.000MM | $3.585MM |
| | 2nd Lien Sr. | Unavailable | $0.792MM | ($3.251MM) | $0.000MM | ($2.459MM) |
| OnDeck | Sr. | | $1.339MM | $0.000MM | $0.000MM | $1.339MM |
| | 2nd Lien Sr. | | $0.043MM | $0.000MM | $0.000MM | $0.043MM |
| ACL | Sr. | | $20.689MM | $0.000MM | $0.000MM | $20.689MM |
| | 2nd Lien Sr. | | $10.983MM | $0.000MM | $0.000MM | $10.983MM |
| Grand Total: | | | $57.881MM | ($6.502MM) | $0.000MM | $51.379MM |

4. A year-to-date IOFII inventory was then presented, showing the collateral issued to IOFII at that time.[139]  Note that the cash balance listed in the bottom row ($7.4 million) is not cash held by IOFII:  it is simply the cash that had been invested into IOFII in May and was to be a part of the next month's CPD.  By the end of May, that new cash investment balance would increase to $9.6 million, but all the cash, plus the account beginning balance, would have already been swept to ACF-Op or ACF-PN ($6.6 million and $3.2 million, respectfully) in a series of weekly transfers.

---

[137] Email from Abushaaban to Accounting, Gillis and Mazer, May 27, 2015 "Action Required: IOF II | Promissory Note Issuances & Maturities | 2015-04-30" Section III.

[138] Of special note, the pro forma allocation of underlying assets showed the notes would create an under-collateralization of $2.5 million in ACCCPH at that time, but there was excess collateral in other SPEs.  However, the note was still approved.  Email from Abushaaban to Accounting, Gillis and Mazer, May 27, 2015 "Action Required: IOF II | Promissory Note Issuances & Maturities | 2015-04-30" Section IV.

[139] Email from Abushaaban to Accounting, Gillis and Mazer, May 27, 2015 "Action Required: IOF II | Promissory Note Issuances & Maturities | 2015-04-30" Section V.



5. On June 4, 2015, Gillis and Oliver returned the signed promissory notes, backdated to May 1, 2015. [140]

6. Accounting would then complete a series of journal entries, to convert the liability from ACF to ACCCPH[141] and ACCFPH,[142] as described in the following chart. Neither ACCCPH nor ACCFPH received any cash as part of this transaction. Also, it should be noted, that often the transfer between Aequitas Funds, such as the IPF to IOFII transfer which was part of this transaction, was also not a cash transfer (as it was here).

---

[140] Email from Butler to How and Bowman, June 4, 2015, "RE: Action Required: IOF II | Promissory Note Issuances & Maturities | 2015-04-30"; June 4, 2015, "ACCCPHLLC00001.pdf" and "ACCFPHLLC00001.pdf".

[141] June 25, 2015, "JE 225042 - 05.pdf".

[142] June 25, 2015, "JE 225041 - 05.pdf".



IOFII April 2015 Note Manufacturing

**E.2. No legitimate business operations to which alleged investment program is connected**

*Courts have found that regardless of the seemingly legitimate nature of the operations, businesses associated with alleged Ponzi schemes are illegitimate due to the use of defrauded investors' funds.*[143] *Many, if not all, of the Aequitas operating companies and portfolios lost money (after accounting for bad debt and the cost of Investor capital). As predominantly consumer financing portfolios and companies, their profitability is substantially determined by the "spread" between their cost of funds and the rate they earn on their receivables (net of bad debt losses, overhead and assessed management fees). The high cost of Aequitas' Investor funds and management fee charges, coupled with no equity other than on account of the same high-cost Investor liabilities, meant that the enterprise was structurally unable to turn a profit.*

*Also, with respect to one of the largest investments in CarePayment health care receivables, there was an intercompany contract designed to transfer the net interest margin to CPYT; however, an erroneous formula in the contract caused the financing entities to transfer more than the net interest margin to CPYT, thereby guaranteeing the Aequitas entities ongoing losses. (Aequitas and CPYT named the net interest margin transfer "Business Service Revenue" or "BSR").*

---

[143] *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995) ("It is no answer that some or for that matter all of [the investor's] profit may have come from 'legitimate' trades made by the corporations [owned by the debtor]. They are not legitimate. The money used for the trades came from investors gulled by fraudulent representations."); *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 590 n.1 (9th Cir. 1991) (describing the Ponzi scheme's purported "profit-making business opportunity" as "an illusion"); *Santa Barbara Capital Mgmt. v. Neilson (In re Slatkin)*, 525 F.3d 805, 816 (9th Cir. 2008) ("Further, that Slatkin may have invested a small percentage of the funds he received from investors, and may have received a profit from such investments, does not create a genuine issue of material fact as to the actual existence of the Ponzi scheme.").

*ACF was shown as solvent (positive book value) and capable of producing a profit only because of partial consolidation (which did not eliminate the related party ACF-AH Note) and the frequent "write-up" of the value of its equity ownership interests. In addition, the $180.3 million ACF-AH Note (as of December 31, 2015) was carried without meaningful reserve for doubtful payment, although there was significant evidence (including internal spreadsheets) showing repayment in full was very unlikely. We investigated the various business operations and valuations thereof within Aequitas and report our findings below.*

### E.2.1.   Flawed business models which could not reasonably fund operations

#### E.2.1.1.   Balance sheet solvency driven by intercompany loans and capitalization of operating expenses

*The largest asset of ACF was the ACF-AH Note receivable; the largest asset of AH was its equity interest in ACF. Financial statements were prepared on a consolidated basis at ACF, which, because AH was its parent, did not consolidate (and thus eliminate) the AH note receivable nor notes receivable from entities owned by AH (as was ACF).*

SEC Complaint — ACF (the issuer of a majority of the Investor notes) made itself look financially viable by keeping an intercompany loan to its parent company, AH, on its books even though Jesenik, Oliver and Gillis knew that AH did not have the assets to pay back ACF.

Jesenik described ACF as the "corporate balance sheet" and, indeed, it was the vehicle through which the majority of the Aequitas scheme was funded. Aequitas raised money from Investors primarily through senior and subordinated promissory notes issued by ACF, other Aequitas Funds, and SPEs. Aequitas' investments in consumer receivables and portfolio companies were held by other entities which predominately were funded by intercompany loans and / or equity infusion from ACF and the other Aequitas Funds. Further, ACF, the Aequitas Funds and each SPE paid an asset management fee (generally 2% of managed assets) to either AIM, ACM, ACF, or Aequitas Enterprise Services, LLC ("AES"). Since all equity in the SPEs was owned by Aequitas, all profits (to the extent they existed) from ACF, the Aequitas Funds, and the operating companies would flow up to AH and be available to retire the ACF-AH Note (again, to the extent such profits existed).

ACF portrayed a positive annual profit because (1) ACF elected to account for a portion of its student loans acquired with recourse, its consumer receivables, a portion of its healthcare receivables with recourse and its investment in COF using the fair value option in which <u>unrealized</u> gains flow through to the profit and loss statement (despite a less than rigorous evaluation of the likelihood of ultimately realizing such gains) and (2) the overhead expense recognized for purposes of the profit and loss statement reflects only the 2% management fee, with all costs in excess thereof "borrowed" from ACF and capitalized, thereby increasing ACF's assets and net worth (regardless of the borrower's inability to repay such additional obligation).[144]

The table below was compiled from audited (where available) financial statements for the years 2011-2015. It demonstrates how the annual profitability was driven by "net unrealized gain on fair value option election assets" (which exceeded the reported net income each year — and by an increasing amount each

---

[144] Aequitas accomplished this feat by consolidating expenses in ACM, AIM and AES, and then ACF loaning to AH the funds necessary to pay all the corporate expenses. AH and the affiliates (ACM, AIM and AES) had no way of repaying the loan other than through future 2% management fees or profits generated by ACF, the funds or the operating companies. However, ACF, the Aequitas Funds and the operating companies had no history of earning profits — they stayed profitable on paper only through fair value adjustments and mischaracterization of costs.

year).  And, as a result, the net cash used in operating activities was a negative $59 million in 2013-15 despite reporting over $42 million of net income.

*Cash Flows From Operating Activities for Aequitas Commercial Finance, LLC (2011 - 2015)*
*($ in 000's)*

| Aequitas Commercial Finance, LLC | Unaudited 2015 | Audited 2014 | Audited 2013 | Audited 2012 | As Restated 2011 |
|---|---|---|---|---|---|
| Net income | $        8,929 | $    12,026 | $    21,219 | $      8,316 | $       5,288 |
| **Adjustments to reconcile net income to net cash used in operating activities:** | | | | | |
| Amortization of unearned income | (16,812) | (13,426) | (10,062) | - | - |
| Amortization of deferred charges | 527 | 373 | 1,107 | 7,390 | 4,705 |
| Net realized gain (loss) on investments | (274) | 871 | (594) | - | (3,659) |
| **Net unrealized gain on fair value option election assets** | **(42,116)** | **(39,481)** | **(37,828)** | **(15,559)** | **(7,022)** |
| Provision for credit losses | 7,105 | 6,230 | 8,441 | 6,324 | 734 |
| Changes in assets and liabilities: | | | | | |
| Deposits in escrow | 1,013 | 1,730 | 2,879 | - | - |
| Accounts receivable | (2,288) | 3,603 | (2,188) | (5,599) | (7,535) |
| Receivable from affiliates | (1,098) | (670) | (844) | - | - |
| Other assets | 2,471 | (1,364) | (3,695) | 3,489 | 1,072 |
| Accounts payable and accrued expenses | (63) | (6,914) | 7,276 | 4,387 | 5,986 |
| Payable to affiliates | 7,072 | 2,645 | 4,895 | - | - |
| Accrued interest payable | 9,557 | 7,112 | 3,398 | 1,439 | 1,251 |
| Subtotal of adjustments to net income | (34,906) | (39,288) | (27,216) | 1,871 | (4,468) |
| **Net cash used in operating activities** | **$    (25,977)** | **$    (27,262)** | **$     (5,996)** | **$    10,187** | **$        821** |

Aequitas' records indicate the ACF-AH Note receivable was backed by minimal tangible assets owned by AH.  Instead, the repayment of the obligation was wholly dependent on the performance of the AH subsidiaries — ACF, the consumer debt portfolios and the operating companies.  However, the more AH borrowed and consumed from ACF, the fewer assets ACF had available to invest and generate returns required for AH to be able to repay the AH debt (let alone generate enough cash to pay interest and repay principal to Private Note Investors).[145]

A review of the AH balance sheet reveals that the bulk of its assets was its investments in affiliates.[146]  As detailed in this Report, the book value of the investments was overstated due to erroneous valuations.  Aequitas would periodically review the assets purported to back the ACF-AH Note.  The assets listed by Aequitas— even at questionable, inflated book values, failed to cover the liability.  Moreover, these assets included intercompany receivables from entities that funded operating expenses (AES and ACM) and receivables from entities with no prospect of repayment (MSP and ACL).  The collectability of the ACF-AH Note should have been reviewed with extreme scrutiny, as it was the fulcrum asset upon which the solvency of ACF rested.

### E.2.1.2.    Poorly performing operating companies with no corresponding investment write-down

*Aequitas reported substantially all of its assets and liabilities at fair value, with changes in fair value reported in current earnings, pursuant to investment company accounting principles.[147]  Fair value is an*

---

[145] *Hayes v. Palm Seedlings Partners-A* (*In re Agric. Research & Tech. Grp., Inc.*), 916 F.2d 528, 532 (9th Cir. 1990) (Ponzi-scheme business which guaranteed substantial return greatly in excess of costs and with no apparent connection with the marketability or market value of the purported assets); *see also In re United Dev., Inc.*, 2007 Bankr. LEXIS 4857, at *2-3 (9th Cir. BAP 2007) (debtor's legitimate real estate business became a Ponzi scheme when it borrowed funds to continue its operations and also used those funds to pay earlier investors).

[146] The largest investments were ACM - $24.8 million; AM - $20.7 million; MSP - $15.0 million; ACCCPH - $10.5 million and Private Advisory Group - $10.0 million (measured by book value as of December 31, 2015).  Aequitas listed as additional collateral for the loan a $69 million "enterprise value" for AH itself.

[147] In June 2013, the Financial Accounting Standards Board issued Accounting Standards Update No. 2013-08, Financial Services-Investment Companies (Topic 946): Amendments to the Scope, Measurement and Disclosure Requirements (the "ASU").  The amendments in this ASU seek to clarify former inconsistencies as to what is considered an investment company and to provide extensive guidance in determining whether an entity is an investment company under United States generally

*estimate of the exit price, representing the amount that would be received upon the sale of an asset or paid to transfer a liability in an orderly transaction between market participants (i.e., the exit price at the measurement date).  Fair value is one of the more complicated and controversial areas of accounting.  Many of the rules involving fair value require the application of a great deal of judgment and interject a high risk of fraud.*[148]  *Fair value measurement contains a hierarchy to measure fair value, with Level 1 being the most objective, Level 2 being less objective and Level 3 being the most subjective.*[149]  *Level 3 utilizes a set of principles for determining the "market" value of assets in which there is no trading and hence no market.  The methodology relies instead on the company's internal assumptions to estimate what prices would have been if there had been a market.  Level 3 was also the methodology used by Aequitas exclusively to determine the fair value of its investments in non-marketable common stock and membership units.*

*During the Relevant Time Period, unrealized valuation gains were the sole source of "profitability" and masked negative cash flow from operations.  Given the prominence in the reported financial performance (and viability) of Aequitas and the almost exclusive use of Level 3 measurement, this is an area that is very susceptible to manipulation and fraud.*[150]

As previously discussed, Aequitas elected to account for its activities as an investment company, which allowed for the recognition of unrealized gains on its financial statements.  During the Relevant Time Period, unrealized valuation gains were the sole source of "profitability" and masked repeated annual negative cash flows from operations.  The fair value write-up of CPYT was the largest of such unrealized valuation gains.  Initially, the unrealized valuation gains resulted in the ability for Aequitas to "transfer" or "sell" its portfolios to other Aequitas entities for an inflated value, which transfers or sales were financed by the Investors.  Additionally, the increases in asset values made the entity appear more attractive for outside investors and lenders, and drove higher management fees to Aequitas.  During the Relevant Time Period, the increases in carrying value of CPYT directly impacted the value of COF.  As the unrealized valuation gain was pushed out to the members of COF, it impacted the financial statements of four other Aequitas entities (ACF, AH, PCF and Aequitas Capital Opportunities GP, LLC ("COFGP")) through direct value write-ups and of two others (AH again and AES) with additional value write-ups

accepted account principles ("U.S. GAAP").  Investment companies follow specialized accounting and reporting requirements that are unique and different than operating companies. In particular, they measure investments at fair value. The new guidance also requires an investment company to measure non-controlling ownership interests in other investment companies at fair value rather than the equity method.  Finally, the amendments in this ASU require additional disclosures in regards to an entity's status as an investment company, changes to that status and information about financial support provided or contractually required to be provided by an investment company to an investee.

[148] See, In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig., 763 F. Supp. 2d 423, 475 (S.D.N.Y. 2011).  The Southern District of New York determined that the plaintiff stated claims against Bearn Stearns where, for example, the company "allegedly knew that the models it used to value its Level 3 mortgage-backed assets were badly out of date and did not reflect crucial data about housing prices and default rates and that its risk managers had little power to provide any independent review of these figures"  The court reasoned that, "[t]o the extent Bear Stearns knowingly used flawed models that would produce unreliable and skewed results, or recklessly disregarded such flaws, the results produced by those models and reported to investors are actionable misstatements."  Id. at 491-92.  Similarly, the Southern District of New York found that plaintiffs stated claims against Citigroup in relation to misstatements and omissions stemming from reliance on Level 3 valuations of consolidated debt obligation (CDO) holdings. See, In re Citigroup Inc. Sec. Litig., 753 F. Supp. 2d 206, 223 and 236 (S.D.N.Y. 2010) ("Plaintiffs claim that Citigroup's [sic] falsely calculated the fair value of Citigroup's CDO holdings because Citigroup valued those holdings by means of Level 3 inputs …. rather than readily available Level 2 inputs."). In re Miller Energy Resources Sec. Litig., Case No. 3:11-CV-386-TAC-CCS, 2014 WL 415730 (E.D. Tenn. Feb. 4, 2014).  This case also involves fraud charges based on violations of the U.S. Securities Act of 1933.

[149] Level 1 - Unadjusted quoted prices in active markets for identical assets or liabilities.  Level 2 - Inputs other than quoted market prices that are observable, either directly or indirectly, and reasonably available.  Observable inputs reflect the assumptions market participants would use in pricing the asset or liability and are developed based on market data obtained from sources independent of the company.  Level 3 - Unobservable inputs reflect the assumptions that the company develops based on available information about what market participants would use in valuing the asset or liability.  Fair value measurements, Statement of Fin. Accounting Standards No. 157 (Fin. Accounting Standards Bd. 2006).

[150] In re Bear Stearns Co., Inc. Securities, Derivative, & ERISA Litig., 763 F. Supp. 2d 423, 511~22 (S.D.N.Y. 2011) (holding shareholders' complaint adequately stated a claim against Deloitte for securities fraud, when sufficient audit risks or "red flags" imposed a duty upon Deloitte to investigate Bear Stearns' processes for establishing fair market value of level 3 assets); Official Comm. of Unsecured Creditors of TOUSA, Inc. v. Citicorp N. Am., Inc. (In re TOUSA, Inc.), Case No. 08-10928-JKO, Adv. Pro. No. 08-1435-JKO, at *97~103 (Bankr. S.D. Fla. Oct. 13, 2009) (finding valuation firm's opinions regarding debtor's solvency lacked credibility in fraudulent transfer analysis because the valuation firm blindly relied upon the debtor's own assumptions and financial projections without verifying or testing those assumptions).

related to the increases at COFGP.

COF Equity Interests
($ in thousands)

| | COF Equity Interests | G/L Balance at 12/31/2012 | Purchases | 2013 Pre-Transfer Change in unrealized gain | COF Initial Investment | 2013 Post-Transfer Change in unrealized gain | Audited Balance at 12/31/2013 | Purchases | Change in unrealized gain | Audited Balance at 12/31/2014 | (Sales) Purchases /Collections | Change in unrealized gain | G/L Pre-Audit Balance at 12/31/2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Aequitas Activity | | | | | | | |
| [1] | ETC Global Holdings, Inc. | $ 8,000 | $ 1,855 | $ (1,641) | $ 8,214 | $ 359 | $ 8,573 | $ - | $ 527 | $ 9,100 | $ - | $ - | $ 9,100 |
| [1][2] | Motolease, LLC | 800 | - | - | 800 | - | 800 | 1,040 | 6,470 | 8,310 | - | 190 | 8,500 |
| | QuarterSpot, Inc. | - | - | - | - | - | - | - | - | - | - | - | 0 |
| | Common Shares | - | - | - | - | - | - | 3,695 | 1,404 | 5,100 | - | 4,340 | 9,440 |
| | Warrants | - | - | - | - | - | - | 0 | (0) | - | - | 1,210 | 1,210 |
| | nD Bank | - | - | - | - | - | - | - | - | - | 2,450 | - | 2,450 |
| | MOGL Loyalty Services | - | - | - | - | - | - | - | - | - | 2,000 | - | 2,000 |
| | **Subtotal** | $ 8,800 | $ 1,855 | $ (1,641) | $ 9,014 | $ 359 | $ 9,373 | $ 4,736 | $ 8,401 | $ 22,510 | $ 4,450 | $ 5,740 | $ 32,700 |
| [3] | Carepayment Technologies, Inc | 21,398 | 5,972 | 11,477 | 38,846 | 5,154 | 44,000 | - | 48,000 | 92,000 | - | 48,000 | 140,000 |
| [3] | EdPlus Holdings, Inc. | - | 1,733 | 5,357 | 7,090 | 17,910 | 25,000 | - | (13,300) | 11,700 | - | (4,700) | 7,000 |
| [4] | Strategic Capital Alternatives, LLC | - | 800 | - | 800 | - | 800 | 533 | 2,667 | 4,000 | (32) | 675 | 4,644 |
| | **Total** | $ 30,198 | $ 10,359 | $ 15,193 | $ 55,750 | $ 23,422 | $ 79,173 | $ 5,269 | $ 45,768 | $ 130,210 | $ 4,419 | $ 49,715 | 184,344 |

[1] Transferred to COF from ACF
[2] Includes membership units and warrants
[3] Transferred to COF from AH and ACF
[4] Transferred to COF from AH; Includes Class A and B Common Stock

A critical review of the valuations and the underlying procedures that fueled the ever-increasing valuation gains reveal the impact on the reported overall enterprise profitability and paper equity. Additionally, FTI Consulting has prepared an independent estimate of the fair value of certain of the Aequitas equity holdings as of various valuation dates. FTI Consulting reviewed the valuation of the investments that were the major source of unrealized valuation gains, and the findings follow.

### E.2.1.2.1.    CPYT – highly cash dependent; unable to secure financing; unreasonable valuations

In November 2006, ACM invested $1.5 million in microHelix, Inc. (NasdaqSM: MHLXU), the manufacturer of custom assemblies for medical and commercial original equipment manufacturers and predecessor to CPYT. MHLXU failed a year later. Aequitas renamed MHLXU and, in December 2009, the newly minted CPYT acquired certain assets and rights which had previously been held by Aequitas and its affiliate, CPLLC, enabling it to begin creating its business as a healthcare receivables servicer (and to a limited extent, an investor in such receivables). The acquired assets and rights included the exclusive right to administer, service, and collect patient accounts receivable generated by healthcare providers and purchased by CPLLC or its affiliates, and a proprietary software product that was used to manage the servicing.

Typically, CPLLC or an affiliate would purchase accounts receivable from health care providers, and CPYT would service and collect the outstanding accounts receivable for a fee. More specifically, CPYT received for Funded accounts[151] (1) a 6% origination fee on the funding amount and (2) a 5% servicing fee (annual rate) payable based on the outstanding monthly balance of accounts receivable. For Billing accounts[152] CPYT received a 2% billing fee (annual rate) on the outstanding unpaid balance of the receivable. CPYT would also receive a 1% servicing fee on Service Only[153] accounts. Excluding the

---

[151] "Funded accounts" are those that are originated under the program and that CPLLC or its affiliate acquires and provides the funding for (i.e., purchases of patient accounts receivable from the healthcare provider).

[152] "Billing accounts" are those that are originated under the program and CPYT services, but that were not acquired by CPLLC or its affiliates at the point of origination. These accounts were typically converted to Funded after certain number of payments were received from the patients.

[153] "Service Only accounts" are those that the health care providers retain ownership of, but which they request CPYT to service. In addition to the servicing fee, CPYT retains a certain percentage of collections, ranging from 8-16%, depending on the client hospital contract.

Billing and Service Only account fees, the fees were paid by, and reduced the return of, another Aequitas entity.

CPYT entered into a Program Management Agreement ("PMA") with ACF on July 1, 2013 in which CPYT would provide administrative services and strategic advice regarding operations, planning, and financing, among other services.  As compensation for CPYT's services, ACF agreed to pay to CPYT a fee intended to be the net interest margin ("NIM" aka "BSR" or "Program Management Fee") on the health care receivables.  FTI Consulting notes that the PMA allows for a reduction in the BSR for certain expenses incurred in connection with the operation of the CarePayment program.  Per FTI Consulting's understanding, the payment, and thus CPYT's revenues, from July 2013 to December 2015 was inflated due to a flaw in the interpretation of the program fee expense structure of the BSR, wherein the payment of the servicing fee to CPYT was not deducted as an expense from the BSR.  This led to an estimated overstatement of the BSR amounts by $1.0 million, $2.2 million, and $2.8 million in 2013, 2014 and 2015, respectively.  This issue was corrected on a prospective basis via the second amendment to the PMA, effective January 1, 2016.  FTI Consulting notes that these unsupported inflated revenues existed during the time that Duff & Phelps performed its valuation analyses and appears not to have been detected during the audits performed on CPYT's fiscal year 2013 and 2014 financial statements, presented on a consolidated basis.

As of March 30, 2013, Aequitas and its affiliates owned 95.9% of CPYT's Class A Common stock and 99.4% of CPYT's Class B Common stock.[154]  The ownership structure changed during mid-2013 when Aequitas created COF and contributed Aequitas' interests in CPYT to COF, in exchange for a partnership interest.  The transaction was effected as a result of the following series of events:[155]

1. Aequitas Merchant Bank, LLC was formed on June 14, 2013.  On December 13, 2013, the company was converted from a Delaware limited liability company to a Delaware limited partnership and changed its name to Aequitas Capital Opportunities Fund, LP (or COF).

2. ACF and AH, both affiliates of COF, contributed their respective interests in the following entities:

    a. Pursuant to the contribution agreement between ACF and COF effective June 28, 2013, ACF contributed 14.4 million shares of Class A Common stock of CPYT at the fair market value of $23.5 million.

    b. Pursuant to the contribution agreement between AH and COF effective June 30, 2013, AH contributed 1.2 million shares of Class A Common stock of CPYT at an Aequitas-determined "fair market value" of $2.0 million and 7.9 million shares of Class B Common stock of CPYT similarly determined by Aequitas to have a fair market value of $12.9 million.

---

[154] CPYT 2012 10-K.
[155] Aequitas Capital Opportunities Fund, LP Financial Statements as of December 31, 2013 (audited by Deloitte).

As a result, as of December 31, 2013, COF owned 94% of Class A and 99% of Class B stock in CPYT.[156] [157]  As of December 31, 2014, due to management stock grant dilution and following conversion of other stock classes to Class A, COF owned 90% of Class A and 99% of Class B stock in CPYT.[158] [159]

As demonstrated in the chart[160] that follows, the valuation methodology employed by both Duff & Phelps (as well as Aequitas) propelled CPYT's valuations to higher and higher levels based only on overly optimistic and unachievable projections of revenue and earnings before interest, taxes, depreciation and amortization.



Projections prepared by Aequitas (or CPYT) would suffer from potential financial projection bias,[161] especially when they are not based on historical financial performance or any other objective standard.  A thorough review of the historical financial statements and understanding of the underlying business model would provide a better understanding of the future prospects or at least a yardstick against which they can be compared.  There is nothing in the historical financial statements that would support such a dramatic increase in performance and hence value over such a short period of time.

Further to the point on the unreliability of the CPYT financial projections, in July 2015 Aequitas management admitted that the valuations (and the financial projections upon which they were based) were susceptible to overstatement.  Per the July 28, 2015 memo signed and approved by Gillis and Jesenik:[162]

---

[156] CarePayment Technologies, Inc. Financial Statements as of December 31, 2013 (audited by Deloitte).
[157] Based on Aequitas Capital Opportunities Fund, LP Financial Statements as of December 31, 2013 (audited by Deloitte), COF's Class A shares had a cost of $26.0 million and a fair value of $29.4 million, while its Class B shares had a cost of $12.9 million and a fair value calculated by Aequitas of $14.6 million.
[158] CarePayment Technologies, Inc. Financial Statements as of December 31, 2014 (audited by Deloitte).
[159] Based on Aequitas Capital Opportunities Fund, LP Financial Statements as of December 31, 2014 (audited by Deloitte), COF's Class A shares had a cost of $26.0 million and a fair value calculated by Aequitas of $61.4 million, while its Class B shares had a cost of $12.9 million and a fair value calculated by Aequitas of $30.6 million.
[160] Chart is based on one included in the Q3 2015 valuation memo for CPYT compiled by Aequitas, and represents Aequitas' calculation of equity value.  October 15, 2015, "CPYT Q3 2015 Valuation 10 15 15.pdf".
[161] Management forecasts can typically suffer from five types of bias: (1) Overconfidence bias in the estimate of what can be achieved; (2) Confirmation bias when management seeks out information that confirms their initial hypothesis; (3) Planning bias causing an underestimate of the time, money, and other resources needed to achieve the projections; (4) Commitment bias in which management justifies a previously made decision despite new evidence; and (5) Incentive bias occurring when management has a financial incentive to boost the expected performance.
[162] July 28, 2015, "July 28 2015 memo reducing CPYT value on ACF books.pdf".  Author not evident.

*ACOF has provided guidance that, based on growth projections for the remainder of 2015 and the first half of 2016, ACOF's estimated value at the end of Q2 2015 is $ 155.4mm, which is up 19.4% over the Q4 2014 estimated value of $130.2mm. The biggest driver in this increase in valuation is ACOF's investment in CarePayment Technologies, Inc. (CPYT). ACOF has provided guidance on CPYT's valuation, recommending increases from $92mm at the end of Q4 2014, to $ 110mm at the end of Q l 2015, and then to $ 116mm at the end of Q2 2015 (cumulatively, a 26. l % increase in six months). The increase is driven primarily on estimates of forward revenue growth. While ACF is encouraged by the increased revenue projections provided by ACOF, we recommend that ACF should hold the CPYT valuation at the Q1 2015 ACOF estimated value pending achievement of the projected CPYT revenue growth or completion of financings led by new third-party investors to establish a negotiated value for CPYT equty* [sic].

As a result, Aequitas reduced the Q2 2015 valuation for CPYT on the books and records of ACF by $6.0 million — while leaving the valuation at the COF subsidiary for the same asset at the full proposed valuation. Curiously (and without an explanation), management determined as part of its Q3 2015 valuation review to reverse the $6.0 million reserve and restate the carrying value at $140 million.

FTI Consulting undertook a detailed review of the Duff and Phelps' valuations of CPYT and found significant errors and deficiencies in the methodology, comparable companies used and reliance on overly optimistic management financial projections. This led to an overstatement of the COF and ACF financial statements related to the fair value of investments. Such erroneous values were communicated to Investors and the SEC and used by management as a justification to take on additional investor debt. A summary of the various projections follows:

**Valuation Ranges for CarePayment Technologies**
($ in millions)

| Valuation Date Range | November 30, 2013 Low | High | Fair Value¹ | December 31, 2013 Low | High | Fair Value¹ | June 30, 2014 Low | High | Fair Value¹ | December 31, 2014 Low | High | Fair Value¹ | June 30, 2015 Low | High | Fair Value¹ | September 30, 2015 Low | High | Fair Value¹ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Duff & Phelps | $ 25.0 | $ 35.0 | | | | | $ 58.0 | $ 75.0 | | $ 90.0 | $ 110.0 | | | | | | | |
| Aequitas | | | | | | $ 44.0 | | | $ 62.0 | | | $ 92.0 | | | $ 116.0 | | | $ 140.0 |
| FTI Consulting | $ 9.2 | $ 12.0 | | | | | $ 15.1 | $ 19.7 | | $ 28.0 | $ 35.5 | | | | | | | |

[1] Fair values represented by Aequitas to investors in investment update reports.
    The Duff & Phelps November 30, 2013 valuation range represents the more conservative "Existing Product Only" case, which excludes revenue associated with new products slated to launch in 2015 and thereafter.
    The Duff & Phelps valuation also included a Management Case with a range of $35.0M to $45.0M.

Of note, as part of the Receiver's mandate to monetize assets, the Receivership's interest in COF (which would include the Receivership's interest in CPYT) was sold in December 2016 for $52.0 million.[163] Based on a previously obtained binding bid for all of the other COF assets (with the exception of CPYT) of $14.7 million, this would indicate a value for the Receivership's 69.0% interest in COF's CPYT equity of $18.7 million or $32.8 million for the entirety of CPYT's equity value.[164]

### E.2.1.2.2.    EdPlus – Flawed business model, valuations based on prospective income stream from CoCo student loan origination and servicing which never occurred

EdPlus owned and operated an online platform that offered information to students about colleges. The business plan was for EdPlus to originate private student loans along with information regarding scholarships, internships, majors, and careers. EdPlus generated revenue through fees collected on interest and servicing of loans that it owned, as well as from services offered through its website. EdPlus

---

[163] Purchase price of $52.0 million included the Receivership's interest in COF and a loan made by ACL to CPYT for $3.9 million.
[164] The Receivership owned 69.04% of COF which in turn owned 82.85% of CPYT.

also offered enrollment and market research services to colleges and universities. EdPlus was incorporated in 2013 and was headquartered in Lake Oswego, Oregon.[165] The following is a list of key milestones for EdPlus from 2013 to 2015.[166]



Aequitas deployed significant Investor funds in creating EdPlus. During 2013-2015, Aequitas advanced in excess of $30.0 million in the form of debt and equity to fund the many acquisitions and operational losses.

As demonstrated in the chart[167] that follows, the valuation methodology employed by Duff & Phelps (as well as Aequitas) decreased EdPlus' cost-based value over time as a result of the financial underperformance and degradation of the business projections tied to origination and servicing of student loan portfolios. Yet, even these valuations overstated EdPlus' value due to overly optimistic and unachievable projections of revenue and earnings before depreciation, taxes and amortization.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

---

[165] Capital IQ.
[166] Per Aequitas presentation dated February 21, 2016. December 3, 2015, "timelineSlide-White.pdf".
[167] Chart is based on one included in the Q3 2015 valuation memo for EdPlus compiled by Aequitas, and represents Aequitas' calculation of equity value. October 2, 2014, "Unigo Q3 2015 Valuation 10.2.15.pdf".



Similar to CPYT and further to the point on the unreliability of the EdPlus financial projections, in July 2015 Aequitas management admitted that the valuations (and the financial projections upon which they were based) were susceptible to overstatement.  Per the July 28, 2015 memo signed and approved by Gillis and Jesenik:[168]

> *In addition, ACOF has provided valuation guidance with respect to EdPlus Holdings, Inc. (Unigo), recommending a reduction in value from the year-end 2014 value of $11.7mm to $7.6mm as of the end of Q2 2015. Note that this value is net of $18mm in debt owed by Unigo, providing a gross enterprise value of over $25mm. This valuation is based on estimated forward revenue growth; however, given (a) failure to meet projections for the Unigo technology and Saas platforms and (b) the substantial disruption to Unigo's student loan business caused by the bankruptcy filing by Corinthian Colleges and the significant regulatory scrutiny around private school loans, ACF should consider that Unigo may have no equity value above the debt owed by Unigo. Accordingly, we recommend that ACF reduce Unigo's valuation on the balance sheet to $0 for the end of Q2 2015 pending achievement of the projected Unigo revenue growth or completion of financings led by new third-party investors to establish a negotiated value for Unigo's equity.*

As a result, Aequitas reduced the Q2 2015 valuation for EdPlus to zero on the books and records of ACF by recording a $7.6 million reserve.  Curiously (and without an explanation), management determined as part of its Q3 2015 valuation review to reverse the $7.6 million reserve and restate the carrying value at $7.6 million.

Additionally, EdPlus owed ACL approximately $24.6 million.  If Aequitas management believed the equity value of EdPlus was $0, then it was highly likely that the EdPlus debt was also impaired (since every dollar of operating loss was borne by the debt) and a reserve should have been established on such debt.

---

[168] July 28, 2015, "July 28 2015 memo reducing CPYT value on ACF books.pdf".

FTI Consulting undertook a detailed review of the Duff and Phelps' valuations of EdPlus and found significant errors and deficiencies in the methodology, comparable companies used and reliance on overly optimistic management financial projections. This led to an overstatement of the COF and ACF financial statements related to the fair value of investments and an overstatement of the ACL financial statements for the lack of impairment of the debt. Such erroneous values were communicated to Investors and the SEC and used by management as a justification to take on additional investor debt. A summary of the various valuations follows:

| Valuation Ranges for EdPlus ($ in millions) | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Valuation Date Range | November 30, 2013 | | | December 31, 2013 | | | June 30, 2014 | | | December 31, 2014 | | | June 30, 2015 | | | September 30, 2015 | | |
| | Low | High | Fair Value[1] | Low | High | Fair Value[1] | Low | High | Fair Value[1] | Low | High | Fair Value[1] | Low | High | Fair Value[1] | Low | High | Fair Value[1] |
| Duff & Phelps | $ 13.0 | $ 31.0 | | | | | $ 29.5 | $ 35.0 | | $ 30.0 | $ 35.0 | | | | | | | |
| Aequitas | | | | | | $ 25.0 | | | $ 20.7 | | | $ 11.7 | | | $ 7.6 | | | $ 7.0 |
| FTI Consulting | $ - | $ 0.9 | | | | | $ - | $ - | | $ - | $ - | | | | | | | |

[1] Fair values represented by Aequitas to investors in investment update reports.

Of note, as part of the Receiver's mandate to monetize assets, the Receivership's interest in EdPlus was sold in June 2016 for $500 thousand plus contingent consideration dependent upon performance of EdPlus in the year following sale. Not unexpectedly, there was nothing received on account of the contingent consideration. The $500 thousand of sale proceeds were used to partially repay debt incurred by EdPlus following the Receivership in order to support its continuing business and allow consummation of a going-concern sale (EdPlus operated at a loss). There was no payment made on $24.6 million in debt owed to ACL and no value in the equity owned by COF.

### E.2.1.2.3.    MSP/Ivey – Underperforming business, cashflow negative, valuations based on overly optimistic projections

MSP was originally a holding company formed to acquire companies in the marketing, printing, and graphic arts industries. Over time the holding company acquired the assets of three traditional printing companies (Printing Today), a packaging company, and Ivey Performance Marketing (a branding, marketing, and digital technology company herein referred to as "Ivey"). Ivey's services included brand and marketing strategy, market analysis, project management, event activation, graphic design, and other marketing-driven services. Ivey was founded in 1975 and was based in Portland, Oregon.[169] At the time of the Receivership, only the Ivey business was active, with the other operations either being shut down, sold off, or rolled into Ivey.

MSP:

On April 24, 2008, AHF entered into a business loan agreement with MSP and advanced funds under the agreement for operating expenses. On June 30, 2009, MSP underwent an initial recapitalization wherein Aequitas Catalyst Fund, LLC ("Catalyst Fund") converted a loan of $3.2 million into 10.9 million shares of Series D Preferred stock of MSP. On May 6, 2013, ACF purchased certain outstanding secured and unsecured loans and equity securities from James McDaniel, under which loans MSP was the borrower and in default. For consideration, McDaniel received $500 thousand cash and a $2.0 million Private

---

[169] Capital IQ.

Note.[170]  By the end of 2014, the outstanding balance on the Aequitas loans had grown to $22.0 million.[171]

Ivey Performance Marketing:

On July 22, 2008, ACF purchased outstanding Bank of America senior notes under which Ivey Imaging, LLC was the borrower and in default.  The notes had a face value of $3.9 million.  On September 5, 2008 Ivey Imaging, LLC surrendered its assets to ACF in lieu of a foreclosure and on the same day ACF sold the assets to a newly formed company, Ivey, as a subsidiary of MSP.  Following that transaction, ACF periodically funded additional subordinated debt to cover operating losses.

On February 23, 2015, the IC discussed issues related to closing out of the Ivey audits for 2013 and 2014 due to an overstatement of income as company expenses were being accrued on the balance sheet as an asset, instead of being expensed in an equity account.  The total amount in the account at the end of 2013 was $784 thousand.  The practice continued through the end of 2014, and the account built up to $1.5 million.[172]

Printing Today:

Initially, Catalyst Fund invested $500 thousand in Printing Today, Inc. ("PTI") on May 24, 2009 in the form of subordinated debt to provide working capital to the entity.  In addition, Aequitas facilitated the transfer of the bankrupt Paramount Graphics' sales force and customers to PTI in exchange for 100% common equity ownership in PTI.  Following that transaction, ACF periodically funded additional subordinated debt to cover operating losses.  In early 2013, PTI was placed under the control of Ivey.  In February 2014, Aequitas undertook a valuation of its interests in PTI and determined that more than 50% of the ACF loan was impaired and recognized a $2.5 million reserve against the $5.4 million debt owed by PTI.[173]  Note that this valuation was predicated on an unsolicited proposal to purchase the equipment assets of PTI from Wright Business Graphics – which proposal was never negotiated, binding nor consummated.

In June 2014, Aequitas performed an update on the MSP valuation (which held the PTI and Ivey interests) wherein the enterprise value for PTI was indicated at a negative $2.7 million (or effectively no value) with outstanding Aequitas debt of $5.7 million – which would imply an additional debt reserve of $3.2 million (over and above the $2.5 million already recognized) which reserve was requested, but not booked.[174]  The proposed PTI valuation improved slightly in the Q3 2014 valuation to an enterprise value of positive $1.0 million – which would still imply an additional debt reserve of on the Aequitas debt of $2.2 million (over and above the $2.5 million already recognized) which reserve was not requested nor booked.[175]  Lastly, Aequitas suspended its past practice of evaluating equity valuations for MSP / Ivey and determined to only calculate debt impairment tests going forward.  Still, with no determination of equity value, the analysis indicated a range of proposed PTI enterprise values of $1.0 to $3.1 million which would still imply an additional debt reserve on 100% of the Aequitas debt of up to $2.2 million

[170] McDaniel's Private Note is still outstanding.
[171] AHF loan and interest payable - $9.1 million; ACF loan and interest payable - $6.8 million; DCEF loan and interest payable - $4.3 million and IOF loan and interest payable $2.1 million.  MSP was paying current interest on only DCEF loan and was deferring interest on all others (accrued, but unpaid interest was added to the outstanding note balance).
[172] Minutes for Investment Committee Meeting held February 23, 2015.
[173] February 14, 2014, "PTI Q4 2013 Valuation Memo.pdf".
[174] July 3, 2014, "MSP Q2 2014 Valuation.pdf"
[175] October 3, 2014, "MSP Q3 2014 Valuation – IC Approved.pdf".  Note that the summary contains a calculation error indicating a negative equity value of (5.1) million instead of the correct number of $(4.7) million in negative equity.

(including a reserve on $1.2 million of interest accrued, but unpaid) which reserve was not requested nor booked.

MSP recapitalization:

In early 2015, Aequitas management concluded that the debt levels on the balance sheet of MSP were unsustainable and exceeded those of its peers. A debt-to-equity conversion was proposed for a significant portion of MSP's debt held by various Aequitas entities.[176] At the February 23, 2015 meeting, the IC approved a plan to recapitalize MSP by converting $14.6 million of subordinated debt to new Series E Preferred equity and agreeing to provide an additional $11.0 million in funding under a revolving loan. The newly created Series E Preferred equity had a senior equity position over current shareholders with a liquidation preference. This had the effect of ensuring the debt being converted maintained the same senior position it currently had to existing shareholders. As part of the recapitalization, Aequitas reversed the bad debt reserve – recognizing a gain in the current period and increasing the book basis of the equity converted.

FTI Consulting undertook a detailed review of the 2015 Q1 internal valuation and found significant errors and deficiencies in the methodology, comparable companies used and reliance on overly optimistic management financial projections. This led to an overstatement of the equity held by APF and the debt held by IOF and AHF due to the lack of impairment of the debt. Further, MSP and Ivey were not capable of servicing the debt – even after multiple debt to equity conversions. Finally, Aequitas' suspension of its past practice of evaluating equity valuations for MSP / Ivey perpetuated the over-valuation of the equity by continuing to carry the equity at the inflated book values created by the debt to equity conversions. Such erroneous values were communicated to Investors and the SEC and used by management as a justification to take on additional investor debt. A summary of the various balances follows:

| | APF - Investment MSP | Catalyst - Investment MSP | ACF - Investment MSP (from Catalyst) | AH - Investment MSP | Valuation Adjustment | AH - Series E Preferred Stock | Total Equity Investment |
|---|---|---|---|---|---|---|---|
| Balance 12/31/2008 | $ - | $2,880,237 | $ - | $ - | $ - | $ - | $ 2,880,237 |
| June 30, 2009- Debt to Equity Conversion | | 3,593,855 | | | | | 3,593,855 |
| Market Value Adjustment | | (1,604,092) | | | | | (1,604,092) |
| Balance 12/31/2009 | $ - | $4,870,000 | $ - | $ - | $ - | $ - | $ 4,870,000 |
| Balance 12/31/2010 | $ - | $4,870,000 | $ - | $ - | $ - | $ - | $ 4,870,000 |
| Adjustment Market Value | | (600,000) | | | | | (600,000) |
| Balance 12/31/2011 | $ - | $4,270,000 | $ - | $ - | $ - | $ - | $ 4,270,000 |
| Sale from Catalyst to ACF thru AH 12/31/2012 | | (2,000,000) | 2,000,000 | | | | - |
| Adjustment Market Value | | (737,007) | | | | | (737,007) |
| Balance 12/31/2012 | $ - | $1,532,993 | $ 2,000,000 | $ - | $ - | $ - | $ 3,533,493 |
| Purchase of MSP Stock & Loans from Jim McDaniel 5/3/2013 | | | 1,581,381 | | | | 1,581,381 |
| Adjust MSP Stock Valuation 12/31/2013 | | | (771,999) | | | | (771,999) |
| Transfer from Catalyst to APF 12/31/2013 | 1,532,933 | (1,532,993) | | | | | (60) |
| Balances 12/31/2013 | $1,532,933 | $ - | $ 2,809,382 | $ - | $ - | | $ 4,342,815 |
| 2014 Valuation Adjustment | | | 100,618 | | | | 100,618 |
| 2014 ACF to AH | - | | (2,910,000) | 2,910,000 | | | - |
| 2014 AH Contribution to APF | 2,910,000 | | | (2,910,000) | | | - |
| 9/30/2014 Valuation Adjustment | | | | | 727,067 | | 727,067 |
| Balance 12/31/2014 | $4,442,933 | $ - | $ - | $ - | $ 727,067 | $ - | $ 5,170,500 |
| March 1 Debt Conversion to Preferred Stock | | | | | | 14,998,764 | 14,998,764 |
| Balance 12/31/2015 | $4,442,933 | $ - | $ - | $ - | $ 727,067 | $14,998,764 | $20,169,264 |
| Balance 12/31/2016 | $4,442,933 | $ - | $ - | $ - | $ 727,067 | $14,998,764 | $20,169,264 |

---

[176] December 12, 2015, "MSP Recap 12-15-14.pdf".

| | DCEF Note & Interest Receivable | Catalyst MSP Note & Interest Receivable | Catalyst Printing Today Note & Interest Receivable | AIOF Note & Interest Receivable | Hybrid Note & Interest Receivable | ACF Notes & Interest Receivable[1] | ACF - Loan Loss Reserve | Total Notes & Int Receivable[1] |
|---|---|---|---|---|---|---|---|---|
| Balance 9/30/2008 | $ - | $ - | $ - | $ - | $ 4,592,681 | $ 913,009 | $ - | $ 5,505,690 |
| 2008 Debt Assignment from ACF to Hybrid[2] | | | | | 913,009 | (913,009) | | - |
| 2008 Hybrid Increases[2] | | | | | 5,440,432 | | | 5,440,432 |
| 2008 Hybrid Decreases[2] | | | | | (5,274,879) | | | (5,274,879) |
| Balance 12/31/2008 | $ - | $ - | $ - | $ - | $ 5,671,243 | $ - | $ - | $ 5,671,243 |
| Note Funding | | 3,414,214 | 900,000 | | | 250,000 | | 4,564,214 |
| 2009 Interest Accrued | 179,641 | 72,353 | | 81,460 | 1,290,393 | 16,027 | | 1,639,874 |
| Possible Interest Payments | | (44,288) | | | (395,279) | | | (439,567) |
| Move from Hybrid to AIOF | | | | 1,100,000 | (1,100,000) | | | - |
| June 30, 2009- Debt to Equity Conversion | (3,593,855) | | | | | | | (3,593,855) |
| Balance 12/31/2009 | $ - | $ - | $ 928,065 | $1,181,460 | $ 5,466,357 | $ 266,027 | $ - | $ 7,841,909 |
| Loan Funding | | 1,000,000 | | | | 1,250,000 | | 2,250,000 |
| Interest Accrued | 214,289 | | 276,884 | | 594,508 | 129,289 | | 1,214,970 |
| Possible Interest Paid thru Accts Rec | (157,139) | | (223,875) | 182,639 | | | | (198,375) |
| Transfer from ACF to DCEF 6/30/2010 | 1,645,316 | | | | | (1,645,316) | | - |
| Balance 12/31/2010 | $1,702,466 | $ - | $ 1,981,074 | $1,364,099 | $ 6,060,865 | $ - | $ - | $ 11,108,504 |
| Loan Funding | 1,417,500 | | 350,000 | | | 305,500 | | 2,073,000 |
| Payments | | | | | | (139,863) | | (139,863) |
| Interest Accrued | 147,758 | | 261,766 | 164,945 | 310,437 | | | 884,906 |
| Possible Interest Paid thru Accts Rec | (39,025) | | (132,547) | (53,817) | | | | (225,389) |
| Balance 12/31/2011 | $3,228,699 | $ - | $ 2,460,293 | $1,475,227 | $ 6,371,302 | $ 165,637 | $ - | $ 13,701,158 |
| ACF In and Loan MSG 1/20/2012 | | | | | | 300,000 | | 300,000 |
| Loan Funding | 637,917 | | 1,134,196 | | | | | 1,772,113 |
| Interest Accrued | 121,126 | | 52,177 | 182,389 | 810,542 | | | 1,166,234 |
| Payments | (80,077) | | (92,538) | | | (65,432) | | (238,047) |
| Transfer Note from ACF to DCEF | 296,086 | | | | | (296,086) | | - |
| Transfer Note from Catalyst to ACF thru AH | | | (3,384,197) | | | 3,384,197 | | - |
| Record Loan Loss Reserve | | | | | | | (344,000) | - |
| Balance 12/31/2012 | $4,203,751 | $ - | $ 169,931 | $1,657,616 | $ 7,181,844 | $ 3,488,316 | $ (344,000) | $ 16,701,458 |
| Loan Funding | | | | | | 1,137,555 | | 1,137,555 |
| Interest Accrued | 574,846 | | | 189,963 | 910,621 | 873,246 | | 2,548,676 |
| Payments | (477,651) | | | | | (88,578) | | (566,229) |
| Purchase of MSP Stock & Loans from Jim McDaniel 5/3/2013 | | | | | | 2,697,807 | | 2,697,807 |
| Move Deferred Interest to From Catalyst to ACF | | | (169,931) | | | 169,931 | | - |
| Adjust Loan Loss Reserve | | | | | (26,228) | | (2,116,000) | (26,228) |
| Balances 12/31/2013 | $4,300,946 | $ - | $ - | $1,821,351 | $ 8,092,465 | $ 8,278,277 | $ (2,460,000) | $ 20,033,039 |
| 2014 Interest Accrued | 525,968 | | | 230,992 | 1,026,326 | 977,370 | | 2,760,656 |
| 2014 Interest Paid | (530,645) | | | | | | | (530,645) |
| Principal Payments | | | | | | (15,541) | | (15,541) |
| Balance 12/31/2014 | $4,296,268 | $ - | $ - | $2,052,343 | $ 9,118,791 | $ 9,240,106 | $ (2,460,000) | $- 22,247,509 |
| 2015 Interest Accrued | 85,032 | | | 13,773 | 1,156,520 | 161,406 | | 1,416,731 |
| 2015 Interest Paid | (172,946) | | | | | | | (172,946) |
| Principal Payments | | | | | | (28,786) | | (28,786) |
| Reverse Bad Debt Reserve | | | | | | | 2,460,000 | 2,460,000 |
| March 1 Debt Conversion to Preferred Stock | (4,208,354) | | | (2,092,344) | | (8,698,066) | | (14,998,764) |
| Transfer from ACF to AIOF | | | | 674,660 | | (674,660) | | - |
| Balance 12/31/2015 | $ - | $ - | $ - | $ 648,432 | $10,275,311 | $ - | $ - | $ 10,923,744 |
| 2015 Interest Accrued | | | | 12,128 | 1,306,933 | - | | 1,319,061 |
| 2015 Interest Paid | | | | (2,975) | | - | | (2,975) |
| Principal Payments | | | | (543,892) | | | | (543,892) |
| Balance 12/31/2016 | $ - | $ - | $ - | $ 113,693 | $11,582,244 | $ - | $ - | $ 11,695,938 |

1. Includes a $2.46M Bad Debt Reserve.
2. No documentation of transaction found.

Of note, as part of the Receiver's mandate to monetize assets, the Receivership attempted to sell its interest in MSP. The Receiver, MSP and Ivey retained the services of a prominent Portland-based investment banker. The marketing efforts were not successful in sourcing any offers that returned value to the Receivership, and alternative plans were evaluated and offers sought for the separate business lines. This approach also failed to produce satisfactory offers.

Ivey was not able to sustain operations without additional loans or equity investment. Given the inadequate offers generated by the marketing efforts of the investment banker and the likely inability to recover any new funds advanced, the Receiver declined to provide additional funds. On September 15, 2017, Ivey sold two of its four lines of business (branded environment and content) in a "distressed sale" for $850 thousand, with the bulk of the proceeds (together with existing cash balances) used to pay

secured debt in exchange for lien releases ($486 thousand), personnel-related costs ($307 thousand) and investment banker costs ($105 thousand). On October 27, 2017, Ivey sold the remaining assets associated with bag insert and partnership marketing services in partial satisfaction of related trade vendor liabilities. This last transaction effectively completed the liquidation of Ivey's assets. There was no recovery on the ~$12.5 million of debt held by AHF and, consequently, no positive equity value in MSP.

### E.2.1.2.4.    ETC – Persistent losses and plagued by various administrative, regulatory, and legal difficulties

ETC Global Group, LLC (together with its affiliates, "ETC") is the parent company for ETC USA, a registered U.S. brokerage and clearing firm, and ETC Canada, a Canadian brokerage holding company. ETC was touted to Aequitas Investors as "an SEC-registered broker-dealer that was formed for the purpose of specializing in and offering efficient and cost-effective clearing solutions to high-frequency proprietary securities trading firms in US equity securities. These solutions include sponsored access to various securities markets and exchanges as well as clearing, settlement, custodial and back-office services. ETC is a prime facilitator in the high frequency trading sector."[177]

Aequitas' initial investment in ETC was via the 2008 acquisition by Catalyst Fund of 1.2 million shares of common stock for $1.0 million in conjunction with ETC's initial capitalization. By June 2009, Aequitas had marked up the value of these shares by $6.5 million — from $1.0 million to a total fair value of $7.5 million. The shares were subsequently assigned to ACF and, together with an additional 278 thousand shares acquired in Q3 2013, were ultimately contributed to COF at a value determined by Aequitas of $8.2 million (a majority of which flowed through to ACF's balance sheet). As of the end of 2015, COF owned 1.5 million Series B Common shares valued by Aequitas at $9.1 million[178] — which had an original cost basis of $1.7 million.[179]

Aequitas also converted a $3.8 million revolving note into 760 thousand shares of Series A Preferred stock in September 2011. The conversion agreement for the note granted Aequitas the option to purchase an additional 2.7 million shares of Series A Preferred stock at a strike price of $5/share. In September 2011, Aequitas contributed its shares into the newly formed ETCFF and, together with funds raised from individual Investors, purchased another 1.0 million shares — representing 100% of the preferred shares issued by ETC. In the December 2012 audited financials, ETCFF booked an unrealized gain of $11.7 million on its $8.8 million investment, with a subsequent write-down in 2013 of $1.1 million and an additional write-up in 2014 of $352 thousand. As of the end of 2015, Aequitas had valued the Series A Preferred stock held by ETCFF at $21.0 million which had an original cost basis of $8.8 million.[180]

ETC operates in a highly competitive, regulated environment. Due to its limited operating history, Aequitas needed to apply significant scrutiny when analyzing the company's ability to meet its financial projections. Furthermore, the clearing and custodial industry is a capital-intensive business. Given its limited operating history and lack of strong performance, ETC found it difficult to obtain the necessary capital. ETC's inability to meet its projections prevented the company from obtaining financing to fund its operations, which represents a significant risk to sustainability of operations and survival of the

---

[177] February 27, 2014, "Private Placement Memorandum_Aequitas Capital Opportunities Fund LP (Feb 2014).pdf".
[178] October 23, 2015, "IC Minutes 10 05 15 (FINAL DRAFT).pdf".
[179] Aequitas reduced the fair value of the common stock interest by $550 thousand in Q2 2013.
[180] October 23, 2015, "ETC Q3 2015 Valuation_v2.pdf".

business itself.  During 2012-2016, ETC incurred persistent, deepening losses and demonstrated no ability to achieve consistent growth and profitability in the future.

Moreover, between March 31, 2011and September 15, 2017, ETC received 19 regulatory sanctions from FINRA (and related exchanges) due to unethical and illegal practices and incurred fines of approximately $1.7 million.[181]  The accusations which led to the19 sanctions varied from failing to implement proper internal controls to prevent money laundering to failing to report suspicious transactions to the proper authorities.  ETC was also sanctioned for failing to adequately document all relevant procedures in its internal control processes, failing to transmit order documentation in a timely manner, and for improper supervision of transactions over numerous years.  The sanctions and fines levied across this approximately six-year period demonstrate that in addition to the risk factors inherent to companies operating in the industry, there are also significant risk factors due to the lack of reliable management.  Despite ETC's failure to achieve profitability and its ongoing regulatory issues, Aequitas continued to book and maintain positive valuation adjustments.[182]

### *ETC Equity Valuation and Debt Summary*



In June 2017, ETC's financial struggles came to a head.  ETC's continuing significant operating losses caused the liabilities reflected on its balance sheet to exceed its assets.  ETC's management team consistently represented to the Receiver that ETC's business would fail without a significant and immediate capital contribution.  They also communicated that ETC's regulators had expressed concerns about the viability of its business and were demanding that ETC raise additional capital to support its operations.  Based on the information provided by ETC, the Receiver and his staff believed ETC's

---

[181] FINRA case numbers 2011027293801, 2011029711701, 2011026157603, 2014039947501, 2010025475601, 2012035298101, 2013036531901 and 2013037709301.  Chicago Board Options Exchange case numbers 15-0040 / 20150448985, 11-0009 and 16-0013/ 20150460041.  NASDAQ Stock Market case numbers 2011026157602 and 2010025475602.  EDGA Exchange, Inc. case numbers 2011026157601 and 2011028033001.  New York Stock Exchange case number 2016-11-00072.  NYSE ARCA, Inc. case number 2010025475603.  Bats Z-exchange, Inc. case number 2010025475604.  National Stock Exchange September 8, 2014 settlement.

[182] Chart is based on one included in the Q3 2015 valuation memo for ETC compiled by Aequitas, and represents Aequitas' calculation of equity value.  October 2, 2014, "ETC Q3 2015 Valuation 10.2.15.pdf".

portrayal of its dire financial condition was accurate and that there was a significant risk that Aequitas' investments in ETC would be lost completely without an immediate and significant capital infusion.

ETC advised the Receiver that it had been seeking additional financing over the preceding months and years. Recent losses had been financed with a series of loans from Quantlab Investments, LLC ("Quantlab"). ETC informed the Receiver about a proposed financing transaction involving Quantlab and Cerberus Capital Management L.P. ("Cerberus"). ETC contended that it had no alternative financing opportunities, and the Receiver was not aware of any other viable options to address ETC's immediate need for additional capital. As such, ETC consummated the financing transaction as follows: (1) Cerberus committed to loan up to $60 million to ETC at a rate of 10% per annum. ETC granted warrants entitling Cerberus to acquire Class A-1 Units representing more than 53% of the total equity of ETC (fully diluted); (2) Quantlab, which had previously loaned ETC approximately $23.5 million, committed to make an additional $4.0 million loan as well as provide a $4.0 million guarantee. ETC granted warrants entitling Quantlab to acquire Class A-1 Units representing more than 38% of the total equity of ETC (fully diluted). If Cerberus and Quantlab exercise their warrants, Aequitas' equity position in ETC would be diluted to less than 6%. Further, ETC may issue additional equity interests after this transaction that could further dilute the Fund's equity position in ETC.

FTI Consulting undertook a detailed review of Aequitas' valuations and found significant errors and deficiencies in the methodology and comparable companies used, and reliance on overly optimistic management financial projections. This led to an overstatement of the ACF, COF and ETCFF financial statements related to the fair value of investments. Such erroneous values were communicated to Investors and the SEC and used by management as a justification to take on additional investor debt. A summary of the various projections follows:

| Valuation Ranges for ETC | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ($ in millions) | | | | | | | | | | | | | | | | | | |
| Valuation Date Range | November 30, 2013 | | | December 31, 2013 | | | June 30, 2014 | | | December 31, 2014 | | | June 30, 2015 | | | September 30, 2015 | | |
| | Low | High | Fair Value[1] | Low | High | Fair Value[1] | Low | High | Fair Value[1] | Low | High | Fair Value[1] | Low | High | Fair Value[1] | Low | High | Fair Value[1] |
| Duff & Phelps | $ 34.5 | $ 47.5 | | $ 37.9 | $ 48.4 | | $ 32.0 | $ 44.1 | | $ 44.3 | $ 59.5 | | | | | | | |
| Aequitas | | | | | | $ 45.5 | | | $ 44.0 | | | $ 47.8 | | | $ 47.8 | | | $ 47.8 |
| FTI Consulting | $ 5.7 | $ 7.3 | | | | | $ 11.6 | $ 14.9 | | $ 14.4 | $ 18.6 | | | | | | | |

[1] Fair values represented by Aequitas to investors in investment update reports.

### E.2.1.3.    Poorly performing portfolios due to financial structure
#### E.2.1.3.1.        ACF and CPH – BSR calculation changes; servicing fee not previously deducted; interest rate deduction capped

Medical accounts receivable due from patients were purchased at a discount from participating healthcare facilities subject to a recourse arrangement whereby the healthcare facilities agreed to repurchase delinquent accounts. In partnership with an unrelated bank, an open-ended revolving line of credit with an initial outstanding balance equal to the account receivable purchased from the healthcare facility was offered to eligible patients. Patients could use the line of credit to purchase additional healthcare products and services from the healthcare facility. Balances due on the lines of credit were generally payable over a term between 6 to 60 months (predominantly 25 months) with no interest to the patient. Collection, administration and servicing obligations were subcontracted to CPYT, an affiliated company.

Aequitas elected to record the medical accounts receivable with recourse (held by CPFIT and CPLLC)[183] as measured at fair value using a discounted cash flow methodology that considers the timing and amounts of expected future cash flows discounted to arrive at a present value — this methodology and assumptions employed resulted in a booked value which exceeded the acquisition cost. The write-up in value (as recourse was deemed to guarantee payment at the face amount of the receivable) failed to recognize the economic structure wherein the net interest margin (fair value less the cost) was transferred to CPYT under the PMA as a BSR payment. Although the medical account receivables were held by CPLLC and CPFIT, the BSR payment was an obligation of ACF, parent to CPH into which CPLLC and CPFIT rolled up.[184] As discussed earlier in this Report, the PMA allowed for a reduction in the BSR for certain expenses (certain interest and program related costs). Per our understanding, costs during 2013 to 2015 were understated by a flaw in the structure of the PMA wherein the 5% servicing fee paid by CPLLC and CPFIT to CPYT was not included as an expense, thereby inflating the BSR paid by ACF to CPYT. This issue was later corrected prospectively only via the second amendment to the PMA in January 2016. However, CPH was still guaranteed to operate at a loss — as the second amendment to the PMA capped the amount of interest allowed to be deducted from the BSR at less than the actual interest expense incurred by CPH. In February 2016, in response to the technical default of ACF, the third amendment was executed to transfer the payment obligation from ACF to CPH.

### E.2.1.3.2.    CSF – Risk profile changes with CoCo bankruptcy, regulatory investigations, climbing defaults and the impact on portfolio value

Initially, in June of 2011, a pool of $30.9 million of private education loans was acquired at a discount from CoCo on a non-recourse basis, wherein Aequitas assumed the risk of student default.[185] Subsequent purchases of student loan pools in 2011 through 2014 were backed by a recourse agreement from CoCo, requiring CoCo to repurchase delinquent loans 90 days after default.[186] The borrowers were typically paying interest only while in school and afterwards pay interest and principal. On average, the loans had a maturity of approximately six to seven years. Collection, administration and servicing were mainly outsourced by Aequitas to third-party providers. With respect to the recourse loans, contracts between Aequitas and CoCo allowed Aequitas to return past-due student loans after they have been delinquent for 90 days and recoup the entire cost of the investment. In addition, CoCo was contractually obligated to pay Aequitas certain fees and reimburse Aequitas for any third-party servicing expenses. Further, Aequitas was required to pay a commission and share any profits over a specified return threshold with the architect of the student loan business – American Student Financial Group, Inc.[187] This back-end split share percentage varies based on the type of loan (recourse or nonrecourse) and the total gross receipts compared to the purchase cost.

Recourse loans and fair value:

---

[183] And such predecessors of CPLLC and CP Funding I Trust ("CPFIT"), such as CP Leverage 1 and CP Funding 1.

[184] ACF accounted for the BSR payment (which, to the extent it exceeded any net equity distribution from CPH to ACF, could have only been made using supplemental funds from PN Investors) as a direct expense on its books and records. Such treatment benefited the Direct Note Investors in the underlying SPEs, which received the net interest margin but did not pay the contractual BSR to CPYT. During the Relevant Time Period, ACF made $18.5 million in BSR payments to CPYT, which would be reduced by the net equity distribution of CPH and affiliates of $6.0 million according to the books and records as of March 31, 2016.

[185] This initial purchase of non-recourse loans was booked to the financial statements as $30.9 million of student loans and the $5.9 million discount as a reserve for doubtful accounts.

[186] Subsequent purchases of recourse student loans were recorded at face value with a contra account for the discounted amount (the sum of which would net to the purchase price). The contract allowed for the discounted amount of the student loans to be remitted back to CoCo after Aequitas had recovered its purchase price (along with reimbursements for fees and costs and any student loan interest payments).

[187] American Student Financial Group, Inc. ("ASFG, Inc."), a Delaware corporation, is a separate and distinct entity from ASFG, LLC (a former Aequitas entity). ASFG, Inc. is not part of the Receivership Entity or otherwise affiliated with the Receivership.

Recourse loans were valued at fair value based upon a discounted cash flow using management's assumptions purportedly based on known information and developed assumptions. Factors utilized for the calculations were:

1. Weighted average interest rate of the individual loans in the specific loan pool.

2. Weighted average loan term of the individual loans in the specific loan pool.

3. Student loan payment schedules as per the underlying loan agreements. Typical cash flow assumption would be interest-only payments for the first 12 months and amortizing payments of interest and principal thereafter.

4. SSR Rate or adjustments to principal – Risk of a student dropping out of a program early with the loan not being fully funded or the loan amount otherwise reduced.

5. Forbearance rate – Student loan terms include a possible loan payment suspension for a period in the case of financial hardship.

6. Recourse rate – The risk of student default and the repurchase of the remaining loan by CoCo.

7. Credit risk – The risk of CoCo not repurchasing the defaulted loans.

8. Liquidity risk – Risk of illiquidity/non-transferability and the risk Aequitas will be unable to fulfill its obligations.

9. Model risk – Risk the model does not reflect ultimate actual cash flow and assumptions.

Assumptions for the fair value calculations were revised by Aequitas management each year. Loans were grouped for purposes of analysis, and each group was evaluated separately. Observable inputs for the fair value calculations are summarized as follows:

| Observable Inputs | 2011 (A) | 2012 (B) | 2013 (C) | 2014 (D) | 2015 (E) |
|---|---|---|---|---|---|
| Weighted Average Interest Rate | 13.5% - 14.9% | 6.8% - 14.1% | 5.9% - 14.9% | 5.9% - 14.9% | |
| Weighted Average Term | 57 - 85 months | 34 - 160 months | 40 - 60 months | 48 - 164 months | |
| SSR Rate | 1.1% - 14% | 0 - 15.9% | 1.1% - 17.0% | 0.0% - 18.6% | |
| Recourse Rate | 45% - 55% | 49% - 61% | 35% - 63% | 39% - 69% | |
| Forbearance Rate | 20% - 25% | 20% - 25% | 0% - 44.9% | 0% - 40.9% | |
| Credit Risk | 3.70% | 2.90% | 0% - 0.8% | 0% | |
| Liquidity risk | 2.00% | 2.00% | 1.8% | 1.8% | |
| Model Risk | 1.30% | 1.3% - 2.0% | 0.9% - 1.3% | 0.7% - 1.3% | |

(**A**) Compiled from Discounted Cash flow models generated in 2012 by Aequitas staff.

(**B**) Source - Aequitas Commercial Finance, LLC audited financial statements. Auditor EisnerAmper LLP of San Francisco, California. Audit Opinion dated April 30, 2013.

(**C**) Source - Aequitas Commercial Finance, LLC audited financial statements. Auditor Deloitte & Touche LLP of Portland, Oregon. Audit Opinion dated May 23, 2014.

(**D**) Source - Aequitas Commercial Finance, LLC audited financial statements. Auditor Deloitte & Touche LLP of Portland, Oregon. Audit Opinion dated May 29, 2015.

(**E**) Data not compiled for 2015 due to lack of financial audit and commencement of Receivership.

Based on the observable inputs above, Aequitas calculated a fair value of the recourse portfolio and recognized $28.6 million in unrealized gains on the recourse student loan portfolio as the portfolio was building through 2013. The unrealized gains (or, as actually occurred, losses) are then realized during 2014 and 2015 as the loan payments are received and the portfolio shrinks. Summarized activity for the recourse student loan portfolio is as follows:

| | Fiscal Year | | | | |
|---|---|---|---|---|---|
| Recourse Student Loans | 2011 (A) | 2012 (A) (D) | 2013 (B) (D) | 2014 (C) | 2015 (F) |
| Balance Beginning of Year | | $ 40,225,693 | $ 120,504,083 | $ 153,508,936 | $ 109,701,134 |
| Fair Value Prior Period Adjustment made in 2013 (D) | | | $ 4,111,555 | | |
| Student Loan Pool Purchases | $ 34,197,901 | $ 140,428,272 | $ 108,245,582 | $ 8,246,751 | |
| Sales/Paydowns | $ (2,335,342) | $ (71,696,579) | $ (88,359,074) | $ (41,890,816) | $ (16,861,446) |
| Transfer to Amortized Cost (E) | | | | $ (34,870,575) | |
| Transfer from Fair Value (E) | | | | $ 34,870,575 | |
| Amortization of Unearned Income | | | $ 348,023 | $ 492,466 | |
| Unrealized Gain (Loss) | $ 8,363,134 | $ 11,546,697 | $ 8,658,767 | $ (10,656,203) | $ (7,306,366) |
| Balance End of Year | $ 40,225,693 | $ 120,504,083 | $ 153,508,936 | $ 109,701,134 | $ 85,533,322 |

(A) Source - Aequitas Commercial Finance, LLC audited financial statements. Auditor EisnerAmper LLP of San Francisco, California. Audit Opinion dated April 30, 2013.

(B) Source - Aequitas Commercial Finance, LLC audited financial statements. Auditor Deloitte & Touche LLP of Portland, Oregon. Audit Opinion dated May 23, 2014.

(C) Source - Aequitas Commercial Finance, LLC audited financial statements. Auditor Deloitte & Touche LLP of Portland, Oregon. Audit Opinion dated May 29, 2015.

(D) Subsequent to the issuance of the 2013 financial statements, Aequitas determined that it had incorrectly calculated the fair value of its student loan receivables as of December 31, 2013. Fair value was increased by $4,111,555 retroactively as of January 1, 2013.

(E) Recourse loans for which CoCo had not submitted payment were transferred to an amortized cost basis accounting. No impairment was recorded, as future cash flows were considered adequate to recover cost.

(F) 2015 Balances calculated from Great Plains general ledger balance sheet changes from 2014 to 2015.

In November 2013, the CFPB reported that it was investigating CoCo for abusive lending practices in connection to CoCo student loans. On or about June 10, 2014, CoCo defaulted on its contract with Aequitas to reimburse for past due accounts, fees, and servicing expenses. Less than a month later, on July 3, 2014 the United States Department of Education and CoCo announced their plan to require CoCo to close or sell all campuses over the next six months. On April 26, 2015, CoCo announced that it would cease operations at all remaining U.S. locations effective April 27, 2015. Finally, on May 4, 2015, CoCo filed for bankruptcy pursuant to Chapter 11 of the U.S. Bankruptcy Code, seeking to liquidate all its assets. Per the contract between CoCo and Aequitas, if payment of past due accounts and fees is not remitted by CoCo, Aequitas had the right to retain all cash collections owed CoCo until its receivables are fully paid off.

As of December 31, 2014, the outstanding amounts of past due accounts and fees for which CoCo had not remitted payment were $31.8 million and $2.8 million, respectively. Rather than recognizing a loss reserve as of December 31, 2014, Aequitas reclassified the defaulted recourse loans from assets measured at fair value to assets valued at net amortized cost. This caused a negative fair value adjustment as the

previously recognized but unrealized gain due to the write-up of the defaulted recourse loans was reversed. However, the cost basis of these defaulted recourse loans remained on the financial statements as an asset. By December 31, 2015, the outstanding amounts of past due accounts and fees for which CoCo had not remitted payment had grown to $51.8 million and $9.5 million, respectively. No adjustment was made to the financial statements or fair value calculation for the additional $20 million in defaulted loans. With respect to the reimbursement of servicing fees, Aequitas in conjunction with the 2014 ACF audit had determined there were insufficient estimated future cash collections to cover all the outstanding and future servicing fee reimbursements. As of December 31, 2014, the outstanding amount of servicing fees reimbursement for which CoCo had not remitted payment was $2.4 million, of which Aequitas deemed $1.2 million to be uncollectible. Aequitas fully reserved against all future servicing fee reimbursements but failed to make any reserve for past due accounts on the unsupported assumption that any monies owed to CoCo would be offset against the past-due accounts owed to Aequitas by CoCo, thus making Aequitas whole.[188]

Aequitas elected to record student loans with recourse as measured at fair value using a discounted cash flow methodology that considers the timing and amounts of expected future cash flows discounted to arrive at an estimate of present value. The fair value methodology was flawed in that it did not consider all costs related to the CoCo program and thus overstated the receivables' fair value. Further, due to CoCo's default in mid-2014, the fair value inputs as determined by management, which assumed continued payments by CoCo, differed significantly from any reasonable assumptions in the absence of effective recourse — which again overstated the fair value. Finally, failure to recognize a significant loss on the student loan portfolio as well as the materially different risk profile of the investment misstated the financial condition of ACF. Subsequently, Aequitas' failure to take an additional reserve for proposed settlement with CFPB, whose investigation was known prior to the finalization of 2014 financial statements, misstated the financial condition of ACF.

### E.2.1.3.3.    FFN – High cost of capital and no loan balancing based on consumer defaults/borrowing base

Beginning in 2014, Aequitas purchased unsecured subprime consumer loans that had been originated by the FFN program.[189] As of March 31, 2016, the receivable's principal balance totaled $70.8 million, net of charge-offs. FFN assets included two portfolios of unsecured consumer loans (the "Consumer Loan Portfolios") held by the Receivership Entity, as follows:[190]

- ACCFT-1 held a portfolio of unsecured consumer loans denominated as FreedomPlus or "F+" loans (the "F+ Loans"). As of March 31, 2016, there were approximately 1,847 loans in the F+ Loans portfolio, with a cumulative principal balance receivable of approximately $22.5 million.

- ACCFT-2 held a portfolio of unsecured consumer loans denominated as ConsolidationPlus or "C+" loans (the "C+ Loans"). As of March 31, 2016, there were approximately 2,929 loans in the C+ Loans portfolio, with a cumulative principal balance receivable of approximately $48.2 million.

---

[188] Aequitas purchased the majority of the receivables at 60% of face value and was contractually obligated to remit any monies collected from the receivables in excess of 60% to CoCo. After CoCo's default, Aequitas assumed that it had the right to offset any monies owed by CoCo against the excess monies collected. Deloitte signed off on the audit under these assumptions.
[189] Technically, Aequitas acquired the loans from Cross River Bank, for whom FFN had performed certain origination services and, subsequently, serviced and administered the loans.
[190] Another portfolio of F+ and C+ consumer loans were held by ACC Funding Series Trust 2015-5 ("ACCFST-5"), which is described further in section G.1.

The Consumer Loan Portfolios were collateral for two secured notes (the "Comvest Notes") from third parties:  Comvest Capital, III, L.P. ("Comvest") and Atalaya Asset Income Fund II LP and certain of its affiliates ("Atalaya" and, collectively with Comvest, "Comvest Lenders").  The Comvest Notes provided acquisition financing to ACCFT-1 and ACCFT-2 with respect to the Consumer Loan Portfolios.  As of March 31, 2016, the approximate principal balance owing to the Comvest Lenders was $59.0 million, plus accrued and unpaid interest of $1.5 million.

The acquisition of the Consumer Loan Portfolios was financed at a specified advance rate via draws on a senior secured note bearing interest at 12.5% and, if in default, 15.5%.  The Comvest Note also contained a prepayment penalty starting at 6% and sliding to 0% over a three-year period.

On February 2, 2016, Comvest provided notice of multiple alleged events of default under the credit agreement.  In addition to reserving its default rights, remedies, and powers under the credit agreement, Comvest's notice purported to impose the "Default Rate Interest for all outstanding Obligations retroactive to April 14, 2015" — effectively increasing the interest rate from an already high 12.5% to 15.5% retroactively and effective just two weeks after the closing of the initial loan.  In addition, the difference between the purchase price of the receivables and the advance rate on the Comvest Note was provided by junior debt from Aequitas Funds bearing a blended interest rate of 16.6% — pushing the current net yield of the portfolios further negative.

A summary of the economics on the portfolios follows:[191]

| | F+ | | C+ | |
|---|---|---|---|---|
| **Portfolio Yield** | **17.6%** | | **22.1%** | |
| Portfolio Face Value | $19.8 M | | $44.1 M | |
| Comvest Debt | $14.8 M | | $39.3 M | |
| Subordinated Debt | $9.3 M | | $7.8 M | |
| | *Nominal* | *Weighted* | *Nominal* | *Weighted* |
| Premium Paid | 0.00% | 0.00% | 3.50% | 3.50% |
| ComVest Senior Debt | 12.50% | 9.35% | 12.50% | 11.14% |
| ComVest Default Rate | 3.00% | 2.24% | 3.00% | 2.67% |
| Aequitas Subordinated Debt | 16.20% | 7.66% | 17.00% | 3.02% |
| Freedom - Servicing Fee / year | 0.75% | 0.75% | 0.83% | 0.83% |
| Freedom - Asset Management Fee / year | 1.00% | 1.00% | 0.00% | 0.00% |
| Aequitas - Asset Management Fee / year | 2.00% | 2.00% | 2.00% | 2.00% |
| Freedom - Participation Fee | 10.00% | 1.70% | 0.00% | 0.00% |
| Cumulative Charge-offs | 7.00% | 1.80% | 7.00% | 1.75% |
| **Total** | | **26.51%** | | **24.92%** |
| *Spread to Portfolio Yield* | | *-8.96%* | | *-2.81%* |

In addition, not only was the financial structure of the portfolios flawed, the portfolio economics continued to deteriorate over time.  As the receivables defaulted and the face value of the portfolios

---

[191] Values as of June 2016 and excludes the portfolio of F+ and C+ consumer loans were held by ACCFST-5.

decreased, they reached a point at which they were insufficient to retire the underlying debt and repay Investors. A summary comparison of the face value of the portfolios' outstanding debt follows:

| | Q4 2014 | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | 2016 (as of 6/17/16 sale) |
|---|---|---|---|---|---|---|
| **Consumer Debt Portfolios at Face Value** | | | | | | |
| C+ Face Value - Investments | 14,785,866 | 25,659,852 | 34,577,351 | 42,043,094 | 49,363,020 | 43,479,721 |
| F+ Face Value - Investments | 7,388,958 | 20,586,872 | 27,220,278 | 26,925,819 | 23,665,963 | 19,492,195 |
| **Total Consumer Debt Portfolios at Face Value** | **22,174,825** | **46,246,723** | **61,797,628** | **68,968,913** | **73,028,983** | **62,971,916** |
| **Outstanding Debt** | | | | | | |
| C+ Total Debt | 8,461,997 | 24,806,642 | 35,487,121 | 41,752,392 | 50,991,803 | 45,938,618 |
| F+ Total Debt | 585,413 | 13,021,816 | 26,282,190 | 28,938,388 | 25,412,903 | 23,694,315 |
| **Total Outstanding Debt** | **9,047,411** | **37,828,458** | **61,769,311** | **70,690,780** | **76,404,706** | **69,632,933** |
| | | | | | | |
| **Net Consumer Debt Porfolios Less Debt** | **13,127,414** | **8,418,265** | **28,317** | **(1,721,868)** | **(3,375,723)** | **(6,661,017)** |
| | | | | | | |
| **AH and ACF Cash Investment** | **24,210,825** | **12,088,820** | **17,555,232** | **19,253,040** | **17,936,440** | **19,657,340** |

### E.2.1.4.    Investments with no economic support
#### E.2.1.4.1.    The Hill Land, LLC

*The Hill Land transaction had no legitimate business purpose. The purchase by Aequitas and lease (with option to purchase) of property used by a church school previously attended by Jesenik's children appears to use Investor money for the sole benefit of Jesenik and/or Jesenik's family. A donation (the source of which was Investor funds) in the amount of monthly rent was made to the school such that it essentially enjoyed occupancy of the property rent free. A below-market sale option period was extended without apparent consideration. The property was sold immediately before the Receivership at a loss.*

The Hill Land, LLC ("Hill Land") is an entity 100% owned by ACF. Hill Land was formed for the sole purpose of owning approximately 7.44 acres of land at 8200 SW Pfaffle, Tigard, OR and leasing it to Westside Christian High School, Inc. ("WCHS"). The land was purchased by Hill Land on February 12, 2013 for $1.5 million, and WCHS simultaneously executed an interim 30-year net lease. At underwriting, one of the potential future exits for Hill Land was envisioned as a "cash-neutral" donation of the land, which could be realized as a tax write-off of ~40% of the land's fair value. At the same time as Hill Land purchased the land, WCHS acquired the existing improvements located on this land parcel.

Hill Land used the following sources of funds for the land acquisition:

- $1.4 million short-term loan from WCHS to Hill Land;

- $140 thousand term loan from ACF; and

- $10 thousand equity contribution from ACF.

Throughout 2013, ACF made multiple advances to Hill Land, and Hill Land used those proceeds to pay off its loan from WCHS. Based on the amended and restated promissory note between Hill Land and ACF dated April 24, 2013, ACF has agreed to loan Hill Land up to $1.5 million.

Effective April 26, 2013, the interim lease agreement was replaced with a new lease agreement ("Ground Lease with an Option to Purchase") that, among other provisions, included revised rent amounts and granted WCHS an option to purchase Hill Land for $1.5 million if the closing occurred on or before December 31, 2015; otherwise, the option would have to be exercised at the greater of $1.5 million or fair market value. Under the Ground Lease with an Option to Purchase, Hill Land also had a "put" option to

require WCHS to purchase membership interests in Hill Land at fair market value upon the terms and conditions set forth in the lease. Monthly rent amounts were set at:

- April 17, 2013 to June 30, 2014: $8 thousand;

- July 1, 2014 to June 30, 2015: $13 thousand;

- July 1, 2015 to June 30, 2016: $17 thousand;

- July 1, 2016 forward – CPI-based adjustments.

Around the same time, WCHS also obtained a construction loan from Capital Pacific Bank to finance the remodeling of existing improvements and construction of additional improvements on the subject site. Hill Land agreed to defer the ground rent in the event that WCHS is out of compliance with certain financial covenants under its loan agreement with Capital Pacific Bank. Hill Land also agreed to execute and deliver a Trust Deed for the land as additional security for the Capital Pacific Bank construction loan.

In connection with the contemplated construction loan, Capital Pacific Bank commissioned an appraisal of the property and improvements in process.[192] The appraisal noted the rent paid by WCHS (and subsidized by Aequitas Investors) to be below market (and that the "owners", presumably Jesenik, is an alum of the school and that is the incentive to extend a favorable, below market lease agreement to WCHS). The appraiser's analysis of the leasehold interest concluded a positive leasehold to the tenant (i.e. the under-market leasehold payments represent an additional net benefit to WCHS).

Throughout the term of the lease from 2013 until January 2016, Aequitas subsidized WCHS rent payments through monthly donations to WCHS. We have been advised that Jesenik's children had previously attended this school; by the time of the land acquisition and subsequent donations, it is believed that they had graduated. The total amount of the donations made to WCHS is estimated to be at least $251 thousand.

Effective December 1, 2015, Hill Land and WCHS amended the Ground Lease with an Option to Purchase, to extend the time period allowing WCHS to purchase the land for $1.5 million until March 31, 2016. We are not aware of any consideration received by Hill Land for the extension of the option.

The property owned by Hill Land was sold to WCHS on February 23, 2016 for $1.4 million when Aequitas experienced a severe liquidity crisis. Based on the information provided by Washington County staff in June of 2016, WCHS was the owner of record.

By funding the contractual lease payments, extending the duration of the under-market value option (with no consideration given for such an extension) and including the additional $100 thousand discount to the option price provided to WCHS, Aequitas lost at least $351 thousand, with WCHS obtaining the financial benefit.[193]

### E.2.1.4.2.    Prairie Financial Inc.

*The Prairie Financial Inc. ("Prairie") transaction is an example of management putting Investor funds at risk without commensurate investment returns. It appears from the outset to have been structured as a loss (based on return versus cost of funds) whose only purpose was to engender a relationship with*

---

[192] Appraisal dated May 12, 2014 performed by Jackson Group NW Inc.

[193] As part of this Investigation, the Receiver did not attempt to independently determine the fair market value of the parcel sold. In addition to the 2014 appraisal, the Receiver does note that the "7/1/15 to 6/30/16 Real Property Tax Statement" received from Washington County, Oregon listed the market value for the land at $4.4 million with no value stated for improvements.

*Scottrade Bank ("Scottrade") which it was hoped would open the door to additional fundraising in furtherance of the scheme.  Ultimately, Prairie repaid the loan with interest per the agreement.*

Background:

In Q3 2014, Jesenik, Oliver and Janke were approached by Scottrade regarding the purchase of a company, Prairie, also known as OA Finance, LLC.  Prairie's primary operation was to originate and service loans for the Outdoor Amusement ("OA") industry.  The OA industry includes carnivals, fairs, waterparks, etc.  Scottrade had received Prairie and its portfolio when Scottrade acquired Boulevard Bank (which had purchased Prairie in 2011).  Post-acquisition, Scottrade's regulators determined that Prairie did not fall under their core business strategy, and Scottrade looked to sell the origination company and its portfolio of outstanding loans.

In September of 2014 Scottrade extended an offer to potentially establish a $75.0 million senior lending facility for ACF, as an incentive for it to buy the OA loans.  These funds would be used to provide senior leverage for the purchase of the existing Scottrade Prairie portfolio, totaling $28.7 million of principal outstanding as of July 2014.  The remainder of the $46.3 million could be used to fund additional ACF assets as deemed fit.  However, on October 12, 2014, Scottrade reported that it was unlikely ACF would get the $75.0 million from Scottrade, and instead it could potentially get a facility up to the value of the OA loans and refinance the CSF loan portfolio, with perhaps 10-20% additional for other ACF assets.[194]

In the meantime, however, Prairie had a pipeline of loan offers extended to its clients, which Scottrade was no longer willing to fund.  Scottrade requested ACF facilitate the funding of this pipeline during discussions of the lending relationship.[195]  The IC was approached on October 16, 2014, to provide bridge funding for the Prairie portfolio.[196]  Aequitas was asked to advance up to $2.4 million for bridge funding throughout the remainder of 2014.  Per the report presented to IC, the cost of funds for Private Notes was higher than the returns on the portfolio, and therefore the deal's only purpose was to facilitate establishing a senior credit facility for Aequitas.[197]  In the corresponding discussion, the deal was approved to gain favor with Scottrade and help strengthen Scottrade's resolve to provide the facility to Aequitas.

Ultimately, Aequitas' objective was frustrated.  On November 8 Joseph Pope, President and CEO of Scottrade, wrote Jesenik and officially stated that the bank had no further appetite for funding a new, or increasing any current, credit facility with Aequitas.[198]

Relationship with Garea:

At the time of the transaction, Scottrade's representative, Joseph Garea, was the Managing Director of Manchester Partners "Manchester" (later to be known as Hancock Investment Advisors).  Manchester was the primary shareholder of Boulevard Bank before the Scottrade buyout, and Garea had a personal relationship with the owners of Prairie, Paul and Wade Muller.  Garea and Manchester were also invested in the Prairie portfolio and were arranging for the ultimate purchase of the company.

Additionally, Garea consulted with Jesenik, Oliver and Janke on several occasions, to connect them with various potential banking partners.  Garea and his business partners also invested their Hancock RIA[199]

---

[194] Email from Garea to Olaf, Jesenik, Oliver, Ruh, October 12, 2014, "Re: Scottrade/Aequitas credit facility thoughts".
[195] Email from Garea to Oliver and Jesenik, October 1, 2014, "Outdoor Amusement business".
[196] August 18, 2015, "IC Minutes 10 16 14 (APPROVED).pdf".
[197] Exhibit B from "IC Minutes 10 16 14 (APPROVED).pdf".
[198] Email from Pope to Jesenik, November 8, 2014, "RE: LOI - Acquisition of Prairie Financial 10-31-14.docx".
[199] Registered Investment Advisers ("RIA"s)

clients in Aequitas Private Notes on several occasions.  Garea (and his partners) were also active members in Aequitas Financial Services Network ("AFSN"),[200] Garea personally holds roughly $200 thousand in Private Notes, and participated in several other Aequitas strategies and deals.

Investment in Prairie:

Despite the removal of the senior credit facility incentive, Aequitas continued its arrangement with Manchester to fund the pipeline of Prairie. [201]  Aequitas was to fund 90% of the loan and Manchester would fund the remaining 10%.[202]  The original term for the pipeline funding program was December 17, 2014; however, when Manchester was unable to arrange new funding by December, the IC voted to extend the term until March 15, 2015. [203]  A total of $800 thousand was loaned by ACF at a 10% interest rate, which was less than the Private Note average cost of capital of roughly 11-12% (plus ACF's 2% annual asset management fee).  There were several times Aequitas failed to fulfill its funding commitment due to lack of funds.  Often Manchester funded the entirety of the loans, and Aequitas was to reimburse Manchester as funds came available.

In March of 2015, Jesenik and Oliver considered having Aequitas fund a sub-debt and membership interest purchase with Garea as a "friend and family" investment of $500 thousand.  Per an email between Oliver and Jesenik, Oliver reiterated that the deal was a relationship investment, as a favor to Garea and Hancock Investment.[204]  Below are some experts from that March 15, 2015 email:

> At the end of the day, we would never do this deal on the stand-alone merits of the investment as a little 5% owner in small, niche specialty finance portfolio that is projected to be nominally profitable.
>
> Not very compelling, but again this is really a "relationship" investment with the rationale not being an anticipated great return but being based on:
>
> A relationship going back with Hancock Investment Advisors for 3+ years.  During that time period the relationship has been strategic and beneficial in that:
>
> - Mutual investment in Spouting Rock Financial.[205]
>
> - They introduced us to Scottrade Bank, who provided us $25MM in financing for our Campus Student Funding private loan portfolio.
>
> - They have invested $1.5MM through their RIA clients into the Aequitas Private Note
>
> - They have consulted with us on our overall pursuit of a bank investment strategy
>
> - They have referred us and consulted with us on numerous private credit investment strategies

---

[200] AFSN is discussed in further detail in E.4.3.2.
[201] November 5, 2014, "(1) Loan Purchase Agreement (ACF-Prairie Financial) - 10-27-14 - EXECUTION VERSION-signed.pdf" and "(2) Loan Servicing Agreement (ACF-Prairie Financial) - 10-27-14 - EXECUTION VERSION-signed.pdf".
[202] November 5, 2014, "(3) Participation Agreement (ACF-Manchester) - 10-27-14 - EXECUTION VERSION-signed.pdf".
[203] January 8, 2015, "Loan Purchase Agreement - First Amendment 01-08-2015.pdf".
[204] Email from Oliver to Jesenik, March 15, 2015, "OA Finance (Prairie Financial)".
[205] ACM invested $400k for 30,582 shares of Class A units of Spouting Rock Financial Partners, LLC on August 15, 2013.  All units were sold to Hopedene Ventures, LLC on February 12, 2016 for $100k.

- *They have been an active Member in the Aequitas Financial Services Network since inception and are in discussions with CliftonLarsonAllen, Integrity Bank & Trust, and others as a result.*

*This is a Hancock "friends and family" investment.  We are really just trying to help them out as part of their "friends and family".*

*They anticipate leveraging this platform to be a broader origination/funding/servicing platform for other small, niche credit strategies.  This could be strategic for Aequitas in regards to potentially utilizing them as a 3rd party servicer, but also as a platform to refer smaller opportunities to* [sic] *that aren't a fit for Aequitas to work with directly.*

Ultimately, Oliver and Jesenik decided to pass on the sub-debt and membership interest investment and communicated such to Garea in March of 2015.  On April 1, 2015, Prairie obtained new outside financing and returned the principal borrowed plus $27 thousand in interest to ACF. [206]

### E.2.1.5.    ACF compliance issues July 2015

*In early 2015 and in conjunction with the due diligence related to the Wells Fargo financing for CPFIT, ACF was required to obtain an opinion letter that it was compliant with the 1940 Investment Companies Act (aka "40 Act") or exempt (Aequitas asserted it could be exempt under Section 3(c)(5)).  To avoid registration requirements (which would have had detrimental impacts on Aequitas' investment strategies — including loans/transfers to affiliates), ACF had to prove via calculation that it contained an appropriate level of "Good Assets" versus "Bad Assets."[207]  As part of the analysis, ACF determined it held several Bad Assets that needed to be conveyed outside of ACF (potentially to AH, IOF and/or other investment vehicles).  Moreover, ACF needed to acquire interests in additional Good Assets and identified suitable candidates owned by other AH subsidiaries and the Aequitas Funds.*

*Good Assets include interests in consumer receivables such as student loans, motorcycle loans and other consumer debt.  Management identified $31.8 million of student and motorcycle loans owned by IOF which could be contributed back to ACF in exchange for notes receivable, which constituted Bad Assets. In mid-July 2015, management approved a plan to remove IOF from under ACF, and to replace all the $31.8 million of IOF note receivable from ACF (backed by equity in MLF) and the IOF note receivable from ACF (backed by equity in CSF) with Bad Assets, when management then back-dated the agreements to have them effective on June 30, 2015.  The subsequent investment shuffle to bring ACF into compliance is further detailed in sections E.5.2.1 and F.3.*

### E.3. Loans to insiders

### E.3.1.   Newman loan

*As discussed further in this Report, Aequitas made loans to RIAs in connection to the AWM Network to promote fundraising and in furtherance of the scheme.  The loan to Jesenik's brother-in-law is the only cash loan made with Investor funds to a non-RIA.  This appears to be an instance of self-dealing with Jesenik (and Jesenik's family), the only beneficiary of the loan.*

---

[206] April 6, 2015, "Letter re Loan Repurchase and Termination (ACF-Prairie-Manchester) 04-1-2015.pdf".
[207] Although Aequitas presentations regarding the shuffling of investments to achieve compliance with the 40 Act discuss Good Assets and Bad Assets, that is unfortunate nomenclature which refers to the suitability of the assets.  Good Assets are simply assets that allow Aequitas to maintain compliance though an exemption, provided the company held only consumer and corporate debt.  Bad Assets, in the Aequitas case, consisted of equities and securities that would have triggered registration under the 40 Act.  However, it should be pointed out that the Bad Assets are the major source of investment losses for the Receivership.

Background:

Michael J. Newman, brother-in-law to Jesenik, and his wife, Susan L. Newman, requested a loan from ACF on December 17, 2010 for $325 thousand, which was subsequently approved by the IC ("Newman Loan").  At the point of origination, the Newman Loan carried an interest rate of 20%, and would mature on December 17, 2013.[208]  Per the agreement, Newman was to make a mandatory pay-down of $100 thousand within the first 18 months.  In 2011 Newman made the payment, decreasing the face value to $225 thousand.

Michael and Susan Newman are the borrowers and liable parties under the Newman Loan; however, the loan was taken out to complete the final purchase of their business, Dayspring Hardware and Molding, Inc.[209]  Newman and his partner (Bill Smith) purchased the business in 2006 for $2.1 million.  Newman was to purchase 30% of the equity, with Smith purchasing 20%.  Final payment for the business ($1.2 million combined) was owed on December 31, 2010, for which Newman was $325 thousand short.

Per the email from an internal analyst to IC, at the time of origination Newman's personal net worth was approximately $385 thousand, which included his 401(k), residential home, and life insurance policy. Newman's equity portion in Dayspring Hardware was also estimated to be $550 thousand.  The loan was collateralized by "all cash, accounts receivable, notes receivable, contract rights, deposits, securities, investments, chattel paper, documents, instruments, general intangibles, inventory, raw materials, work in progress, finished goods, furnishings, fixtures, trade fixtures, equipment, machinery, motor vehicles and all other personal property, assets or rights of whatever nature now owned or hereafter acquired by Borrower."

Amendments to the agreement:

On December 1, 2012, the first amendment was executed, reducing the interest rate on the loan from 20% to 11%.[210]  At the time of the amendment, the remaining balance on the loan was $225 thousand plus $5 thousand of accrued interest.

On December 31, 2013, a memo requesting an extension of the Newman Loan due date was presented to IC.[211]  The remaining balance on the loan at that time was $224 thousand plus $862 of accrued interest. Newman requested a three-year extension, setting the new due date of December 31, 2016.  Newman was to make mandatory payments each year, reducing the balance to $200 thousand by the end of 2014 and under $175 thousand by the end of 2015.[212]  This was approved by IC, with no additional changes to the loan terms, and was executed as the second amendment.[213]

Post-amendment activity:

On September 28, 2014, Jesenik emailed Newman, responding to a July 2014 email from Newman, alluding to trading Dayspring's stock for relief from the promissory note.[214]  Jesenik stated:

---

[208] April 18, 2011, "Ltr (Newman) re ACF Loan Txn Docs 04-18-11 v1_0.pdf".
[209] Email from Ezra to Investment Committee, November 17, 2010, "Dayspring Newman Investment Opportunity".
[210] December 4, 2014, "Prom Note-Loan Agmt-Amendment No 1 (Newman-ACF) 12-01-12 v1_0.pdf".
[211] January 2, 2014, "IC Txn Approval Minutes - Newman Note Extension 12-31-13 v1_0.pdf".
[212] Email from Steffner to Newman, December 31, 2013, "RE: Aequitas Commercial Finance loan extension".
[213] February 3, 2014, "Prom Note-Loan Agmt-Amendment No2 (Newman-ACF) 12-17-13.pdf".
[214] Email from Jesenik to Newman, September 28, 2014, "RE: Thank You".

*Working on distribution of note to me personally. Will then be able to gift you $40k-50k/ year end and then Jan 1 as well. At that point you can stop making payments, and in a couple years we will be done. Hang in there.BJ*

On November 12, 2014, an internal analyst followed up with Newman, to request status on the mandatory $23 thousand payment.  This payment was necessary to comply with the second amendment, bringing the loan under $200 thousand by year end.  Newman responded, stating "Bob Jesenik and I are working on this."[215]  When the analyst approached Jesenik on January 26, 2015, inquiring if there should be changes to the loan documentation, Jesenik responded "No thanks- it will come out of ACF in the partner fund distribution and I will handle from there. Thanks for asking.BJ."[216]

In April of 2015, management concluded long term discussions regarding the conversion of assets from ACF to APF.  Backdated to October 1, 2014, the Newman Loan was assigned from ACF to its parent entity, AH, as a part of a wider $4.3 million non-cash investment conversion to APF.[217]  For consideration of the assignment, the outstanding balance of the ACF-AH Note was increased by the amount due on the Newman Loan, $223 thousand. [218]

The last payment made by Newman on the loan occurred in March 2015, for roughly $186.  On July 22, 2015 Jesenik confirmed to inside counsel that his intention was to buy out the Newman Loan from AH as of August 1, 2015.[219]  Outstanding principal as of that date was $222 thousand, with accrued and unpaid interest of $16 thousand.[220]  Counsel drafted an assignment of loan form for Jesenik, which was never executed.[221]

On July 24, 2015, Jesenik asked counsel for clarification on the assignment form, asking if the Newman Loan was still with AH and had not been assigned down to APF.[222]  A corresponding comment suggested that Jesenik intended to replace the Newman Loan with a note to APF from himself.  Per researchable records, the Newman Loan had not been resolved after that date; however, it was regularly on the agenda for the OCIO Integrated Tax Meetings through January 2016, for which Jesenik was an attendee.  The note remains unpaid, and Receiver is pursuing collection.

### E.3.2.    NorthBranch

*Aequitas used Investor funds to make a series of loans to insiders and enterprises owned by insiders in order to prop up those investments.  The loans to the insiders were nonrecourse (except to their interest in the failing enterprise) and made on non-commercial terms.  This self-dealing passed all the risk to the Aequitas Investors, with all upside, other than interest payments on the debt, going to the insiders.  In the case of Northbranch, LLC ("NorthBranch"), between 2007 and 2013 Aequitas invested at least $7 million into a failing restaurant enterprise, which was foreclosed on and refinanced using additional Aequitas funds at least three times during that span.  Aequitas did not receive any principal payments from the various restaurant entities, and received only a few of the interest payments that Aequitas was due.[223]*

---

[215] Email from Steffner to Newman, November 11, 2014, "RE: Aequitas Commercial Finance loan extension".

[216] Email from Jesenik to Steffner, January 27, 2015, "RE: Loan to Mike Newman".

[217] February 2, 2015, "Partner Fund Restructure - Document and Issue Summary.docx".

[218] April 23, 2015, "(3a) Assignment Agreement (ACF to AH) 10-01-14.pdf".

[219] Email from Jesenik to Holmen, July 22, 2015, "RE: Buyout of Newman Note".

[220] Email from Rivera to Bowman, August 4, 2015, "RE: Newman Loan".

[221] July 23, 2015, "Assignment of Loan (AH to BJesenik) 08-01-15.docx".

[222] Email from Jesenik to Holmen, July 24, 2015, "RE: Assignment of Newman Loan".

[223] Aequitas did accept small principal reductions for transfer of assets, such as a July 2010 equipment purchase, which reduced AEF' note receivable by $35 thousand.

Background:

Aequitas' history with NorthBranch can be traced back to 2007, when the company was operating under another name (The Fargo Rose, LLC or "Fargo Rose").  Over the years, Aequitas entered into numerous loan and investment agreements under several DBA names, including Fargo Rose, RDA, LLC ("RDA" dba Rose's Bakery), Rose's, NorthBranch and Riffle NW, LLC ("Riffle").  Moreover, numerous Aequitas entities were involved in the various transactions, including AH, ACF, ACM, Aequitas Equipment Finance ("AEF"), AHF and APF.

Early records of the agreements and investments are not always available.  During 2007-2008, various records show at least $4.3 million was lent from AHF to Fargo Rose.[224]  An additional note from AEF was also outstanding, for $350 thousand (plus accrued interest of $18 thousand).[225]  On October 30, 2009, MacRitchie, Gerald Frank[226] and other then-members of management met with the CEO of Fargo Rose and announced that Fargo Rose could no longer pay its obligations, and, as such, AHF would take possession of its assets.[227]

On November 1, 2009, Aequitas entered into a Foreclosure Bill of Sale with RDA for the deemed fair market value of the assets, $555 thousand.[228]  RDA was a single-member LLC, of which ACM held all membership interests.  Aequitas financed its own buyout and ACF issued RDA a note for the amount (effectively "paying off" AHF),[229] along with a business loan agreement[230] and line of credit agreement up to $250 thousand,[231] later amended to $355 thousand.[232]  The remainder of the AHF notes was then written off; however, the AEF note remained outstanding.  As such, by December 15, 2009, Aequitas had $1.1 million of loans still outstanding.  On December 31, 2009, Accounting wrote off $255 thousand, listing the remaining outstanding amount as $819 thousand.[233]

In 2010, there were additional amendments to and advances on account of the two ACF/AEF notes, totaling roughly $826 thousand.  The original note for the sale of the company was increased to $655 thousand while the initial $250 thousand ACF note was increased to $878 thousand.[234]  Combined with the remaining AEF debt, total Aequitas investment debt was $1.9 million.

RDA failed to make any of the scheduled payments in 2010 and was deemed non-performing.  The IC proposed that the RDA obligations be moved to ACM, as owner.[235]  As such, effective December 31, 2010, ACF dividend up the notes to AH, which then contributed the RDA notes to ACM.  AEF also agreed to allow ACM to sell the assets of RDA in exchange for an ACM guarantee for AEF's remaining loan value (as AEF held the first lien on the assets).[236]  On March 12, 2011, Accounting recognized a loss of $1.1 million, back dated to December 1, 2010, effectively reducing the value of the RDA investment at $600 thousand.[237]

---

[224] November 13, 2013, "Rose NorthBranch.xlsx".
[225] December 17, 2008, "3. Promissory Note (Roses-AEF) 12.05.08.pdf".
[226] Aequitas Advisory Board Member.
[227] November 8, 2009, "mgmt com notes10_30.doc".
[228] November 9, 2009, "Foreclosure BOS (RDA-ACF) 11.01.09.pdf"; October 26, 2009, "11.09.09 Notice Pursuant to LL Waiver.pdf"; November 11, 2009, "11.09.09 Notice Pursuant to LL Waiver.pdf"; October 28, 2009, "Notice Pursuant to Intrcrdt (Hybrid) 10.28.09.pdf".
[229] November 9, 2009, "Prom Note (RDA-ACF) 11.01.09.pdf".
[230] November 9, 2009, "BLA (RDA-ACF) 11.04.09.pdf".
[231] November 9, 2009, "Prom Note (RDA-ACF) 11.04.09.pdf".
[232] March 2, 2010, "1st Amdmt to BLA Note (ACF-RDA) 2.24.10.pdf".
[233] January 8, 2011, "Journal Entries Holdings2009.xls".
[234] May 27, 2011, "2010 Notes Rec & Loan Loss Reserve-CSH.xls".
[235] Email from Brown to Jesenik, MacRitchie, Craig, February 26, 2011, "FW: Partner memo RDA".
[236] February 26, 2011, "RDA 12-31-10_ ACF debt distribute to AH then to ACM.doc".
[237] March 15, 2011, "JE 49269.pdf"; August 27, 2012, "RDA schedule 2011.xls".

In March 2011, ACM made two additional advances on the original $878 thousand ACF note, increasing the balance to $957 thousand in preparation for the sale.[238]  At the same time, AH began issuing "employee advances" totaling $70 thousand, which were labeled as advances for the benefit of RDA/Northbranch.  These were the initial advances into what would become the managing member loans.  Four advances were made in the two-month period between March 7 and May 5, 2011.[239]

Member participated loans:

On May 15, 2011, Aequitas again financed its own buyout of the company,[240] when AH entered into an official agreement with the managing members of the newly formed NorthBranch (the "NorthBranch Members"), a group that closely mirrored the Aequitas management.  Per the agreements, AH was to loan the determined sum to the NorthBranch Members ("NorthBranch Member Loans"), who then would contribute the loan proceeds to NorthBranch in the form of either equity or a working capital loan.[241]  The NorthBranch Member Loans were issued on a limited recourse basis, with the only remedy upon default to the NorthBranch Member's equity in NorthBranch — thus endowing the NorthBranch Members with all the upside of the investment with no downside risk (which was borne by the Aequitas Investors whose funds were lent to the NorthBranch Members).  Initially, these loans were recorded under the same Employee Advance GL account as the initial $70 thousand loaned between March 7 and May 5, 2011.

The fair value of the remaining assets of RDA was deemed to be $600 thousand.  As such, the NorthBranch Members (using AH funds) agreed to "purchase" RDA from ACM for $600 thousand, plus provide $300 thousand for working capital.  An additional Aequitas employee (Jim Quist) put in $50 thousand outside of the AH agreement, increasing total funding to Northbranch to $950 thousand.[242]  The Partners brought on additional management and consultants, hired and paid for by Aequitas, in order to manage this restaurant venture.  While bank records for this period are missing, other records indicate that on May 16, 2011, ACF wired $900 thousand to a trust account for NorthBranch, controlled by the NorthBranch Members.[243]  The following day, the trust account returned between $600-660 thousand back to ACF, depending on the record source.[244]  The remaining $300 thousand was to remain in the trust account, which allegedly was available to NorthBranch to make periodic funding requests and withdrawals.  However, after a reasonable search, the bank records could not be found in Aequitas' records.

Per Accounting records and an IC email, ACF then used $600 thousand of the returned "sale" proceeds to repay the original AEF loan and accrued interest ($406 thousand), and used the remaining $193 thousand to repay a small portion of the other notes then residing in ACM, increasing the 2011 write off of RDA loans to more than $1.4 million.[245]  Moreover, on June 30, 2011, the $70 thousand of employee advances made between March and May 5 were written off from Accounting's books as "NB advance not recovered" and "provision for bad debt."[246]  The rest of the advances were transferred off of the employee advances account, to a newly established "partner notes NB capitalization" account.[247]  NorthBranch's

[238] April 23, 2012, "2011.03 ACF PCB OP x482.pdf"; Great Plains Journal Entries: 48865 and 49756.
[239] Great Plains Journal Entries: 49801, 49802, 53306 and 55334.
[240] June 1, 2011, "20110524133001108.pdf" and "20110524133019622.pdf".
[241] February 26, 2011, "Memo - Capitalize NewCo_List Partners.pdf".
[242] March 29, 2011, "Projected NorthBranch Capitalization.pdf".
[243] Email from Jesenik to Ezra, May 16, 2011, "Re: NorthBranch Notes -- Funding Approval" and "NorthBranch Funds Flow -$900k.xls".
[244] Email from Olsen to Brown, "Day end snapshot 5/17/11".
[245] Email from Ezra to Investment Committee, May 11, 2011, "Investment Committee Request -- Sale of RDA Assets to NorthBranch".
[246] November 15, 2011, "JE 62541.pdf"; June 27, 2012, "12 2011 Aequitas Holdings Account Reconciliation Package".
[247] July 27, 2011, "JE 62532.pdf".

additional $50 thousand from Quist, which was unrelated to the AH loan, allotted him 7% of the NorthBranch equity.  NorthBranch Member allocation of the $900 thousand as of funding is as follows: [248]

| Member | Ownership Percentage | Equity Breakdown | Debt Breakdown | Combined Partner Equity and Debt |
|---|---|---|---|---|
| Bob Jesenik | 23.1% | $  150,028 | $  75,014 | $  225,042 |
| Brian Oliver | 14.0% | 91,099 | 45,549 | 136,648 |
| Andy MacRitchie | 7.6% | 49,060 | 24,530 | 73,590 |
| Brown | 1.4% | 8,778 | 4,389 | 13,166 |
| Tom Sidley | 9.9% | 64,386 | 32,193 | 96,578 |
| Bob Noack | 2.5% | 15,895 | 7,947 | 23,842 |
| Tom Szabo | 7.6% | 49,345 | 24,673 | 74,017 |
| Stan Smith | 1.5% | 9,964 | 4,982 | 14,945 |
| Steve Wright | 4.0% | 25,811 | 12,906 | 38,716 |
| Megan Terrell | 2.4% | 15,536 | 7,768 | 23,304 |
| Kimberly Terrell | 2.4% | 15,536 | 7,768 | 23,304 |
| Patrick Terrell | 5.0% | 32,367 | 16,184 | 48,550 |
| Rick Terrell | 11.1% | 72,194 | 36,097 | 108,291 |
| *Jim Quist*[249] | *7.7%* | *50,000* | - | - |
| **Total** | | **$  650,000.00** | **$  300,000.00** | **$  900,000.00** |

Additional cash need:

On December 14, 2011, MacRitchie emailed Jesenik and Oliver, stating that they should "pull the plug on NorthBranch now, save $250K per year (and $30K/month cash burn)."[250]  However, in 2012 NorthBranch was once again in need of additional capital, and Aequitas continued to provide it.  ACF began issuing loans on the old 2010 lines (of which the previous balance had been written off) in the intermediate term and began contemplating the restructure of the note in AH.  All in, an estimated $175 thousand of new funds went out to NorthBranch in February of 2012.  Additionally, on February 16, 2012, Accounting reversed the 2011 write off of the $70 thousand in AH employee advances, backdated to December 31, 2011.[251]

In March 2012, AH and NorthBranch Members issued the 1st amendment to their promissory notes, and increased the allowed loan amount by $540 thousand, consequently also increasing AH's commitment to the NorthBranch Members.  They also included and converted the $175 thousand February loan as a secondary advance on the loan and added in accrued and unpaid interest equal to $21 thousand to the principal balance.

Over the next two months, AH would distribute $255 thousand to NorthBranch through the NorthBranch Member Loans.  In November of 2012, Aequitas appears to have rebooked the 2011 $70 thousand AH

---

[248] April 4, 3013, "NorthBranch Purchase and Member Loans since 2011.pdf".
[249] Quist purchased his equity ownership directly by wiring funds to NorthBranch, rather than through the NorthBranch Member Loans. As such, he is added to the charts for supplemental purposes, but is not included in the total partner equity and debt.
[250] Email from MacRitchie to Oliver and Jesenik on December 14, 2011, "RE: Update".
[251] June 29, 2012, "JE 94315.pdf".

employee advance loan write-off reversal as an additional advance on the amendment, rather than an employee advance.[252]  The remaining $19 thousand left on the loan was used to pay associated legal bills for the NorthBranch transactions.

| Member | Lender | Original Amt 5/16/11 | Increased Amt 3/1/12 |
|---|---|---|---|
| Bob Jesenik | Aequitas Holdings, LLC | $ 225,042.21 | $ 348,862.41 |
| Brian Oliver | Aequitas Holdings, LLC | 136,648.02 | 212,351.03 |
| Andy MacRitchie | Aequitas Holdings, LLC | 73,590.65 | 115,276.27 |
| Pat Brown | Aequitas Holdings, LLC | 13,166.61 | 21,235.10 |
| Tom Sidley | Aequitas Holdings, LLC | 96,578.83 | 150,162.51 |
| Bob Noack | Aequitas Holdings, LLC | 23,842.23 | 37,919.83 |
| Tom Szabo | Aequitas Holdings, LLC | 74,017.68 | 115,276.27 |
| Stan Smith | Aequitas Holdings, LLC | 14,945.88 | 22,751.90 |
| Steve Wright | Aequitas Holdings, LLC | 38,716.94 | 60,671.72 |
| Megan Terrell | Aequitas Holdings, LLC | 23,304.38 | 36,403.03 |
| Kimberly Terrell | Aequitas Holdings, LLC | 23,304.38 | 36,403.03 |
| Patrick Terrell | Aequitas Holdings, LLC | 48,550.80 | 75,839.65 |
| Rick Terrell | Aequitas Holdings, LLC | 108,291.39 | 166,847.24 |
| **Total** | | **$ 900,000.00** | **$ 1,400,000.00** |

Discrepancies can be found between the recorded amounts above (which match the accounting records),[253] and with the legal amendments and other files.[254]  However, due to missing documents and files, the cause of the discrepancy is uncertain.  Per certain amendments with the NorthBranch Members, the loan amounts are larger than the $1.4 million shown above.[255]

Riffle transaction:

In November 2012, AH entered into a direct lending agreement with NorthBranch, this time with Riffle, a seafood restaurant opened by NorthBranch in Portland.[256]  Over a year-long period, AH made five advances to Riffle, totaling $170 thousand.[257]  Unlike the NorthBranch Member Loans, Riffle owed these funds directly to AH.  The loan was eventually assumed by NorthBranch, Riffle's parent, in March of 2013.[258]

Effective October 1, 2014, the combined NorthBranch Member Loans and Riffle loan (or "NorthBranch Notes") were then assigned from AH to APF as a part of the larger APF conversion.[259]  At the end of the day, APF was owed $1.6 million from the NorthBranch Notes, plus accrued interest, with the

---

[252] February 13, 2013, "JE 109975.pdf".
[253] Great Plains Account Number 00101-80-802-14402.
[254] As an example, the note between NorthBranch and Steve Wright is $13 thousand for his allocation of the $300 thousand working capital loan.  However, his loan withholdings, which should include his portion of the $600 thousand equity, is incorrectly still listed as $13 thousand.  A signed version of his first amendment has not been located after reasonable search attempts.
[255] As an example, the first amendment to the Jesenik-Holdings note states the increased balance is $359 thousand, a delta of $11 thousand.
[256] January 15, 2013, "1a. Promissory Note $30K (Riffle NW-AH) 11 07 12 v1_0.pdf".
[257] January 15, 2013, "1b. Note - 1st Amendment $20K (AH-Riffle) 01-15-13 v1_0.pdf"; May 16, 2013, "1c. Note - 2nd Amendment (AH-Riffle) 03-15-13 v1_0.pdf"; May 16, 2013, "1d. Note - 3rd Amendment (AH-Riffle) 04-10-13 v1_0.pdf"; December 23, 2013, "1e. Note - 4th Amendment (AH-NorthBranch) 10-29-13 v1_0.pdf".
[258] December 23, 2013, "1f. Assignment and Assumption of Note (Riffle-NorthBranch) 05-23-13 v1_0.pdf".
[259] Further described in E.5.2.1; March 20, 2015, "JE 203746 – 10.pdf".

NorthBranch Members retaining all the upside in the investment in NorthBranch, but none of the downside.

As of the date of the Receivership, only one restaurant remained — the Rose's Bakery in Sherwood, Oregon, which had been operating for twelve years.  Other Rose's locations have been either closed or sold.  Riffle was sold after nine months to Jennifer Quist, a member of the original management team that opened the restaurant.  It was sold after attempts to make it a viable concern failed.  The sale was made mainly as a way to get out of the lease commitment and other closing responsibilities.  Riffle subsequently closed in August of 2013.  Rose's Bakery closed in December 2017 after struggling financially and without the financial support of the ownership group or rescue financing from the Receivership.

In turn, Aequitas continued to finance, as well as incur additional Aequitas resource costs, on a failing company at the risk and cost to the Investors.  Despite continued failed ventures, management would refinance a prior bad loan using additional Investor funds, in order to create and maintain "new", yet money-losing, investments.  In total, there were six entities and at over 60 loans, loan transfers, write-offs, write-off reversals and other booked transactions.

### E.4. Unrealistic promises of returns

*As detailed in this Report, the operating companies in which Aequitas invested had a demonstrated history of unprofitability, which losses continued under Aequitas ownership.  Aequitas repeatedly poured additional Investor funds into these failing entities in the hopes of either rescuing its investment or deferring the day of reckoning.  Additionally, the consumer debt portfolios were afflicted with material structural defects to the extent that there were little to no net proceeds available to pay Investor returns at the operating/holding company level or at ACF.  Given the lack of profitability at the subsidiary and portfolio levels, the only remaining source for most repayments was from new Investors.  It is an unrealistic proposition that investor returns (at a rate determined by Aequitas, not based on the risk/creditworthiness of the investment) would be funded in such a non-sustainable way.  This untenable arrangement is a hallmark of a Ponzi scheme, and an ever-increasing flow of money from new investors is its lifeblood.*

#### E.4.1.   Note returns vs. other investment vehicles

##### E.4.1.1.    Weider/Forman higher return than junior lenders

Weider/Forman purports to hold a promissory note[260] from CPH that is (1) senior to other creditors in CPH and (2) secured by (at least) the collateral described in the commercial security agreement (primarily the equity interests in certain CPH affiliates) and disputably the assets owned by the subsidiaries of CPH.  Debt securities that take precedence over unsecured notes are generally referred to as senior notes.  Senior notes must be paid first if assets are available in the event of a company's liquidation.  A senior note, especially if secured, generally pays a lower rate of interest compared to junior or unsecured notes, since the senior debt has a lesser risk of default and lower expected loss in the event of default.

However, on or about June 29, 2015, Aequitas agreed to pay 17% interest (an increase from the initial proposal of 12% rate and 7% on the original note executed nine months earlier) on all outstanding Weider

---

[260] The amended and restated promissory note dated June 29, 2015 is the debt instrument related to an amended and restated business loan agreement dated the same date.  The original promissory note, business loan agreement and commercial security agreement are all dated as of October 4, 2014.

debt, for an additional advance of $4.5 million.[261]  This raised the effective interest rate on the additional $4.5 million advance to more than 30% per annum.[262]  Comparably, Aequitas paid 9.7% blended yield on the more than $15 million in debt that Weider asserts is junior to its position.  Such a deviation from the general custom and practice by providing a higher reward to the lower-risk investor is anathema to the basic principles of structured finance and suggests a non-market, potentially fraudulent situation.[263]

**AEQUITAS INVESTMENT MANAGEMENT, LLC | FORM OF REGISTRY**

PROMISSORY NOTES ISSUED BY:

CarePayment Holdings, LLC

| Total Notes Issued: | | | | | | | $25.575MM | |
|---|---|---|---|---|---|---|---|---|

| Issued to | Registry No. | Note Structure | Notes Issued | Term (Yr.) | Interest Rate* | Issue Date | Maturity Date | Retired |
|---|---|---|---|---|---|---|---|---|
| Weider Health & Fitness | CPHLLC00001 | Sr. Secured | 10,000,000.00 | 1 | 17.000% | 29-Jun-15 | 31-Dec-16 | |
| Bruce Forman | CPHLLC00002 | Sr. Secured | 500,000.00 | 1 | 17.000% | 29-Jun-15 | 31-Dec-16 | |
| Perennial Specialty Income Fund, LP | CPHLLC00003 | Subordinated | 1,000,000.00 | 3 | 12.000% | 18-Sep-15 | 18-Mar-18 | |
| Thomas Vredevelt Jr | CPHLLC00004 | Subordinated | 500,000.00 | 3 | 12.000% | 18-Sep-15 | 18-Mar-18 | |
| Etheridge Group, LLC | CPHLLC00005 | Subordinated | 500,000.00 | 3 | 12.000% | 18-Sep-15 | 18-Mar-18 | |
| Integrity Capital Income Fund, Inc | CPHLLC00006 | Subordinated | 1,000,000.00 | 3 | 12.000% | 18-Sep-15 | 18-Sep-18 | |
| Stephenson Ventures | CPHLLC00007 | Subordinated | 1,000,000.00 | 3 | 8.500% | 15-Oct-15 | 15-Oct-18 | |
| Royal Fund, LP | CPHLLC00008 | Subordinated | 1,000,000.00 | 3 | 8.500% | 15-Oct-15 | 15-Oct-18 | |
| Stephenson Ventures | CPHLLC00009 | Subordinated | 1,500,000.00 | 1 | 7.500% | 30-Nov-15 | 30-Nov-16 | |
| Aequitas Income Opportunity Fund II, LLC | CPHLLC00010 | Subordinated | 2,000,000.00 | 0 | 8.500% | 25-Nov-15 | 30-Jun-16 | |
| Aequitas Income Opportunity Fund II, LLC | CPHLLC00011 | Subordinated | 2,000,000.00 | 1 | 8.500% | 14-Dec-15 | 14-Dec-16 | |
| Aequitas Income Opportunity Fund II, LLC | CPHLLC00012 | Subordinated | 825,000.00 | 1 | 11.000% | 17-Dec-15 | 17-Dec-16 | |
| Aequitas Income Opportunity Fund II, LLC | CPHLLC00013 | Subordinated | 1,500,000.00 | 1 | 11.000% | 30-Dec-15 | 30-Dec-16 | |
| Aequitas Income Opportunity Fund II, LLC | CPHLLC00014 | Subordinated | 300,000.00 | 1 | 11.000% | 31-Dec-15 | 31-Dec-16 | |
| Aequitas Enhanced Income Fund, LLC | CPHLLC00015 | Subordinated | 750,000.00 | 1 | 11.000% | 31-Dec-15 | 31-Dec-16 | |
| Aequitas Income Opportunity Fund II, LLC | CPHLLC00016 | Subordinated | 800,000.00 | 1 | 8.500% | 1-Feb-16 | 1-Feb-17 | |
| Aequitas Income Opportunity Fund II, LLC | CPHLLC00017 | Subordinated | 400,000.00 | 1 | 8.500% | 8-Feb-16 | 8-Feb-17 | |
| **Grand Total:** | | | **25,575,000.00** | | | | | |

*Per annum

### E.4.2.   Lack of available cash from any other source

*Stoll Complaint - Oliver and Jesenik "discussed the fact that Aequitas was unable to fund its commitments or otherwise use investor funds for their stated purpose because of a liquidity crunch that was not disclosed to investors."*[264]

Cash liquidity:

While the severity of the cash problems increased after June 30, 2014, Aequitas had a history of cash flow issues which would regularly occur, typically aligned with large redemptions or quarterly interest payments.  When this would occur, management would assert that the issue was a direct correlation with

---

[261] See E.1.2 for further information on the Weider/Forman notes.
[262] $6.0 million at 7% interest compared to $10.5 million in 17% interest yields $1.4 million additional annual interest related to the $4.5 million additional advance.
[263] CPH also received a series of four advances in February and March 2016, totaling $1.5 million, through a business loan agreement with CPYT (an Extended Entity of the Receivership).  This loan is excluded from above, but carried a 10% interest rate.
[264] Second Amended Class Action Complaint, filed with the United States District Court on August 8, 2017 by Stoll Stoll Berne Lokting & Shlachter P.C. Case 3:16-cv-00580-AC, document 257.

lulls or inadequate levels of fundraising, as demonstrated in many emails and meetings between management and relevant teams.

While the frequency and severity of the cash flow problems increased significantly in 2014, examples of such cases can be found as far back as 2011.  In one such email sent from Oliver to Jesenik in 2011, MacRitchie and 10 other upper-level employees, Oliver sent out the following warning:[265]

> *Next week we have over $4MM of quarterly interest payments to make, and in case you're not reading it in detail Val's weekly update all of a sudden we have had $4MM - $5MM of redemption requests jump up. On top of normal flow with Corinthian, Capio is finally experiencing some success and expects $4MM of fundings over the next 2 – 3 weeks.*

> *So, as you can see we now have $22MM of projected cash going out the door in October with no significant investor inflow forecasted in imminent cash other than the normal weekly SCG flow of $1.0MM - $1.5MM. We will blow through our excess liquidity by the end of the month if nothing changes.*

Throughout the end of the year, emails continued to circulate, urging additional fundraising needs of over $10 million by year end.

Additional examples can be found in August of 2013, when there was a large amount of upcoming CPF (predecessor entity to CPH) redemptions and Cash Liquidity Sensitivity reports for the following two weeks showed a deficit between $1.9 to 8.2 million.[266]  At that time, Jesenik responded:

> *Its* [sic] *unfortunate we are all taking time to do emails around these redemptions, stress about cash, etc. when we basically created this problem ourselves. They weren't looking for redemptions, but since we didn't get enough dough in the door thru our past approaches and the various means we committed to, we are taking time to scramble, call folks, create ill will and so forth. Of course all this time then takes away from productive things like getting the dough to begin with. Being fresh from vacation, I really don't want to perpetuate this process anymore, I truly don't.*

The CPF redemptions ended up being pushed to a later date, allowing more incoming funds to offset the needed redemption payments.

Again, on Friday, October 25, 2013, $11.5 million of CPF redemptions and interest were scheduled to be paid out.  As such, the Cash Liquidity Sensitivity reports for the following two weeks showed a deficit of $10.0-12.6 million.[267]  Aequitas management circled up to extend the expected redemption, which reduced the cash deficit to $2.0-4.0 million over the next two weeks.  Jesenik reached out to Oliver to see what other form of incoming funds "upside" could be expected, of which there was nominal.  Jesenik responded to discuss other forms of "Hail Mary's" they can find the following day.[268]

By the following Monday, October 28, the deficit increased to $14.5-17.7 million.[269]  Janke, Jesenik and Oliver reviewed the updated reports, and by Tuesday pushed out all payments but $2.0 million of the CPF redemptions, still leaving an estimated negative cash flow of $2.7-8.2 million for the two weeks.  The

---

[265] Email from Oliver to Jesenik, MacRitchie, et. al, October 1, 2011, "Fund Raising Urgency".
[266] Email from Abushaaban to Jesenik, Oliver and Janke, August 26, 2013, "RE: Cash Report | 8/26".
[267] Email from Abushaaban to Jesenik, Oliver and Janke, October 25, 2013, "Cash Report | WE Update | 10/25".
[268] Email from Jesenik to Oliver and Janke, October 28, 2013, "RE: Cash Report | WE Update | 10/25".
[269] Email from Abushaaban to Jesenik, Janke, Oliver, October 28, 2013, "RE: Cash Report | 10/28".

Director of Treasury emailed the model and forecasts to the three managers above and stated that there was a cash shortage of $2.9 million the following day — cash required to make payroll, IPF and IOF returns, and standard asset funding.[270]  Ultimately, Aequitas transferred $3.0 million out of CPLLC (supposedly, an SPE to acquire health care receivables) in order to make the needed ACM, IOF and IPF payments.

The cash liquidity crisis continued and accelerated throughout 2014 and 2015.  In July 2014, Janke emailed Jesenik to discuss the possibility of partially or fully withholding the planned principal payment to TGM.  Per Janke's email, he recommended not processing the payment, as there was already a negative liquidity balance of $1.0 million for the following week.  Furthermore, he stated that they would need additional liquidity for IPF and IOF return payments.  Therefore, he suggested not paying out redemptions, unless they had received word they could expect $5.5 million of new investor funds to be available for further interest/redemption payments:[271]

> Hence, in case you received any feedback from Keith Gregg which realistically let us expect to receive at least $5.5MM of additional funds by month end, we could go ahead with the $1MM Pat redemption, otherwise, we need to consider him telling no funds

On July 14, Janke reached out to Terrell to inform him that they would be unable to make a requested $2.0 million redemption on July 14, due to liquidity shortages and "slippage on the fund raising side."  Terrell agreed to assist Aequitas by pushing out the TGM redemption until July 21 and reducing the amount to $1.4 million.[272]  On July 30, Jesenik reached out again due to cash shortage, to request TGM's redemption be pushed further,[273] after Treasury reported a forecast cash shortage of $2.6-6.5 million over the following 13 business days, and a 12-week projection of negative $55.8-59.6 million.[274]

Numerous other examples can be found throughout 2014 and 2015, with management consistently blaming fundraising slippages as the cause for the cash shortage.  Typically, scheduled cash payments would be pushed out until adequate new investor funds or facility advances could take place.

In October of 2015, management and the Chief Compliance Officer brought up the issues surrounding the cash management within ACF and its compliance with regulations.  Due to the transfers/conversions that had occurred, ACF had a negative equity balance as of October.  Per the Office of the Chief Compliance Officer meeting ("OCCO meeting") minutes, Gillis was to investigate potential assets to contribute from AH in order to restore a positive equity balance.[275]  Around the same time, on October 12, cash projections supplied by Treasury noted an immediate cash need of $4.5 million in order make required payroll and asset funding through the following four business days.[276]

By November 18, 2015, Aequitas management began investigating different "ACF wind down" scenarios, under the assumption that ACF would no longer remain operable.  Jesenik, Gillis, Oliver, Rice, Froude and MacRitchie were presented with a proposal which listed several scenarios in which ACF would cease to function, and their relative impacts on assets and Private Note holders.[277]  In the scenarios, management could toggle with the data to either cease new fundraising or "kick the can down the road,"

[270] Email from Abushaaban to Jesenik, Janke, Oliver, October 28, 2013, "RE: Cash Report | 10/29".
[271] Email from Janke to Jesenik, July 11, 2014, "RE: Principal Reduction".
[272] Email from Janke to Terrell, Jesenik and Miller, July 14, 2014, "RE: Principal Reduction".
[273] Email from Jesenik to Terrell and Olaf, July 30, 2014, "RE: tomorrow's wire transfer $1.4 mm".
[274] Email from Abushaaban to Jesenik, Janke, Oliver, July 30, 2014, "Cash Report | 7/30".
[275] October 13, 2015, "OCCO Minutes 10-06-15 (FINAL DRAFT).pdf".
[276] Email from Abushaaban to Jesenik, Gillis, Oliver, Rice & Mazer, October 12, 2015, "Cash Dash | 10/12".
[277] Email from Holmen to Jesenik, Gillis, Oliver, Rice, Froude & MacRitchie, November 18, 2015, "ACF Runoff Scenarios"; November 18, 2015, "ACF Runoff.xlsx".

and continue to raise funds within ACF/Private Note while AH sells off assets to repay ACF (such as COF and CPYT).  It is noted that:

> *kicking that can down the road requires that we raise new private note (or roll over) $138M in investors over the next three years.*

Ultimately, the model was discussed in a closed-door meeting, without easily identifiable written responses.

On December 9, 2015, the General Counsel responded to the above group, following up on the ACF restructuring.[278]  He suggested an immediate cessation of further borrowing from ACF to support payroll and expenses; however, he noted that they were likely not operationally on track to cease borrowing until the new year.  The General Counsel spelled out the following:

> *I'd like to understand the gap between revenue and expense, and how far along we are in solving that.*
>
> *Based on cash out the door, here's what I understand:*
>
> *Monthly ACM payroll = $400k*
>
> *Monthly AES payroll = $1.4M*
>
> *Monthly AP (net of CPYT & Unigo AP) = $3.0M*
>
> *So total is = $4.8M.*
>
> *That does include extraordinary expenses such as Duoos, CFPB and SEC legal fees. Netting that out leaves us around $4M/mo in payroll and expenses.*
>
> *From the work on management fees, it looks like we can count on about $1.2M/month from the 2%s.*

Jesenik responded stating "I'm sure this will be an agenda item next Tuesday in AMLLC."[279]  As of the same date, Treasury reported to management that, should Aequitas pay all due redemptions, Aequitas would be $4.3-5.6 million short in cash by the following day, with a projected deficit of $9.1-10.6 million in the following three weeks.[280]  Oliver and Jesenik responded with twelve fundraising or investment conversion opportunities they were actively seeking.[281]

Related ACF reduction discussions continue in AM meeting agenda items throughout 2015 and 2016.

---

[278] Email from Holmen to Jesenik, MacRitchie, Oliver, Rice, Gillis & Froude, December 9, 2015, "Cessation of Borrowing from ACF".
[279] Email from Jesenik to Holmen, MacRitchie, Oliver, Rice, Gillis & Froude, December 9, 2015, "RE: Cessation of Borrowing from ACF".
[280] Email from Hulquist to Jesenik, Gillis, Oliver, Rice, December 8, 2015, "Cash Dash | 12/8".
[281] Email from Jesenik to Hulquist, Gillis, Rice and Oliver, December 9, 2015, "RE: Running list............".

### E.4.3.   Agents recruited to sell Aequitas products and commissions paid to perpetuate the scheme[282]

*In light of the SEC's allegations of a Ponzi-like scheme, at the very least, these sales agents are potential claw-back defendants.[283]*

*Moreover, in a Ponzi scheme, commissions paid to brokers or sales agents are not in exchange for reasonably equivalent value as a matter of law regardless of whether the sales agent is a net winner.*

### E.4.3.1.   Use of "consultants" and AB members as finders

*Aequitas acquired companies, made loans, and paid consulting fees (all with Investor funds) in an effort to further the scheme and broaden the fundraising efforts.  Such amounts are set forth on the following:*

| Payments during the Relevant Time Period | | | | | |
|---|---|---|---|---|---|
| Names | Commissions | Loans | Consulting Fees | Other | Total |
| RP Capital, LLC | $   8,087,824 | | | $    5,750 | $   8,093,574 |
| Fieldstone Financial | | 1,408,994 | | | 1,408,994 |
| Kristofor Behn | | | | 25,000 | 25,000 |
| Circle Squared Alternative Investments, LLC | | 500,000 | 500,000 | | 1,000,000 |
| Sica Wealth Management, LLC | | | 1,020,000 | | 1,020,000 |
| Atherton Capital Holdings, LLC | | | 672,000 | 19,429 | 691,429 |
| Tom Szabo | | | | 13,424 | 13,424 |
| Fortress Investment Management, LLC | | | 326,833 | 69,455 | 396,288 |
| Accelerate-IT, LLC | | | | 41,860 | 41,860 |
| MBO Partners (James Alexander) | 155,000 | | 160,000 | 66,887 | 381,887 |
| Jerome Anglade | | | | 210,000 | 210,000 |
| PPG Partners | | | 225,000 | | 225,000 |
| Nicholas Mavroleon | | | 205,000 | 18,258 | 223,258 |
| Keith Gregg | | | 115,323 | 30,617 | 145,939 |
| James Reinmuth | | | 125,000 | 1,257 | 126,257 |
| Rachel Minard (Minard Capital) | | | 90,000 | 8,341 | 98,341 |
| Matrix Capital | 71,086 | | | | 71,086 |
| William (Bill) Corbett | | | 69,000 | | 69,000 |
| George King | | | 65,000 | | 65,000 |
| Capital Alliance Partners | | | 50,786 | 257 | 51,043 |
| Allen & Associates (Marcia Allen) | | | 35,000 | | 35,000 |
| Integrity Bank & Trust | | | | 22,224 | 22,224 |
| Hancock Securities | 19,509 | | | | 19,509 |
| Ocean Avenue Wealth Mgmt | 19,500 | | | | 19,500 |
| Elite Wealth Management Inc | | | | 4,512 | 4,512 |
| **Total** | **$   8,352,919** | **$ 1,908,994** | **$ 3,658,942** | **$ 537,271** | **$ 14,458,125** |

*In addition to the above, Aequitas also used unregistered broker-dealer staff who were primarily involved in fundraising/sales.  Reportedly, all had other ongoing functions in addition to the sale of new*

---

[282] Some courts have determined that commissions paid to brokers or sales agents in a Ponzi scheme are not in exchange for reasonably equivalent value as a matter of law. *Warfield v. Byron*, 436 F.3d 551, (5th Cir. 2006) (holding that payments for broker services in a Ponzi scheme are not in exchange for reasonably equivalent value observing that "[i]t takes cheek to contend that in exchange for payments [the broker] received, the . . . Ponzi scheme benefitted from his efforts to extend the fraud by securing new investments." Id. at 560; see also, *In re Ramirez Rodriquez*, 209 B.R. 424, 434 (Bankr. S.D. Tex 1997) (holding that participant in Ponzi scheme provided no reasonably equivalent value to support commissions based on getting others to invest in the Ponzi scheme).  But see, *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 657-58 (Bankr. M.D. Fla. 2002) (held that commissions were reasonably equivalent value as the brokers performed a valuable service to the Ponzi entity by providing exactly what it wanted, which was more sales to keep the Ponzi scheme from collapsing earlier).

[283] *See, e.g., Donnell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) ("Where causes of action are brought under UFTA against Ponzi scheme investors, the general rule is that to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers.").

*investments, such as investor relations with existing Investors. It appears that Aequitas was careful not to pay these staff members transaction-based compensation, only salary plus discretionary bonus. In late 2013, Aequitas terminated all "finder's fee" agreements with what it determined were unregistered broker-dealers and entered into consulting agreements with compensation in the form of monthly retainers. Essential to these consulting agreements was the schedule setting forth the services the consultant was to perform, which read in part:*

- *Consultant will provide Aequitas and its affiliates with general input and advisory services as it relates to marketing for investment and fund raising strategies in the identified channels and regions.*

- *Consultant will endeavor to make introductions-only to (a) prospective investment opportunities for Aequitas, (b) prospective investors for Aequitas, and (c) prospective qualified customers or acquisition candidates for Aequitas service companies; provided, however, both parties agree and acknowledge that with respect to each of (a), (b) and (c), Consultant will not be involved in any of the negotiations involved with any investment transactions.*

*There was no bonus criteria or formula published, as that could be argued as being transaction based and, at this time, while the situation looks suspicious, we do not have sufficient detail of funds raised to determine whether the substantial bonuses were in fact disguised commissions calculated on account of sales activity.*

| | Advisory Board Members | | | | | | | | |
| | Accrued 2014 -Q1 2016[1] Fees | | | | | | | | |
| Names | Advisory Fees | Commissions | Transaction Fees | Other | Total | Cash Payments | Expense Offsets[2] | Accrued and Unpaid[3] |
|---|---|---|---|---|---|---|---|---|
| Terrell Mgt. Group (Pat Terrell) | $    93,000 | $    171,591 | $ 262,188 | $  109,781 | $    636,560 | $    (309,781) | $ (393,114) | $    113,953 |
| William (Bill) McCormick | 360,000 | - | - | - | 360,000 | (270,000) | (26,000) | 182,875 |
| William (Will) Glasgow | 135,000 | - | - | 7,027 | 142,027 | (132,027) | - | 10,000 |
| Gerry Frank | 135,000 | - | - | - | 135,000 | (125,000) | - | 10,000 |
| Martin Brantley | 135,000 | - | - | - | 135,000 | (125,000) | - | 10,000 |
| Donna Miles | 105,354 | - | - | 4,785 | 110,139 | (103,099) | - | 12,000 |
| Robert (Bob) Zukis | 31,000 | - | - | 4,771 | 35,771 | (25,271) | - | 10,500 |
| Gillis Mgt. Solutions, Inc. (Scott Gillis) | 30,000 | - | - | 4,675 | 34,675 | (34,675) | - | - |
| Edmund Jensen | - | - | - | - | - | - | - | - |
| Keith Barnes | - | - | - | - | - | - | - | - |
| Total | $  1,024,354 | $    171,591 | $262,188 | $131,038 | $ 1,589,172 | $    (1,124,853) | $ (419,114) | $    349,328 |

1. Q1 2016 amount is estimated based off available actual data, and estimates for standard expenses
2. Offsets include Aequitas payment of Advisory Board members office rent, healthcare, direct employees salary and healthcare, etc.
3. Includes carry over accrued and unpaid balances from 2013

Aequitas had an AB made up of experienced business men and women[284] and, for purposes of this Report, they are considered insiders of Aequitas. The AB served as advisors to AM and Aequitas' executives and appears not to have exerted direct authority over the management of the company. In his resignation email from the AB, Barnes refers to participation on the AB as a "non-binding and non-fiduciary activity."[285]  However, the Private Note PPM[286] touted the AB as providing the Aequitas executive team "…with insight and guidance on market opportunities and product developments."[287] Further, in an August 2015 email chain wherein Barnes is seeking access to one of the Aequitas jets,

---

[284] As of January 28, 2016, the Aequitas Advisory Board consisted of William McCormick, Edmund Jensen, Patrick Terrell, Martin Brantley, William Glasgow J.D., Keith Barnes, Donna Miles, Robert (Bob) Zukis and Gerald Frank.  Aequitas records show many of the advisors resigned around January 29, 2016.
[285] Email from Barnes to Holmen, January 29, 2016, "Resignation".
[286] Private Placement Memorandum or "PPM" is a document provided to prospective investors in specific Aequitas Funds or SPEs, otherwise also known as an offering document.
[287] Aequitas Private Note Confidential Private Placement Memorandum; IV.  Management of The Company - Advisors section.

Oliver and MacRitchie take a different view of the importance of the AB and information the AB knew (or should have known) as to Aequitas' dire outlook.[288]

> Oliver – *Don't kid me – you* [MacRitchie] *know exactly what he* [Jesenik] *is doing: Putting a positive spin/exaggeration on Keith's email to show us the AB has a positive view on our direction and most importantly Scott Gillis.*
>
> *Bob was masterful about focusing the AB on Scott working magic on 40 Act and how the **future** CarePayment valuation gains are going to pull us out and be a "game changer".*
>
> *Amazing to me how we could waltz through an AB update on a six month period that basically reflects:*
>
> - *A $29MM interim loss ($40MM before Investment Gains, so $6MM/month of cash losses).*
>
> - *The Note Receivable from Aequitas Holdings to Aequitas Commercial Finance having grown by the same $29MM to $147MM to fund the cash losses.*
>
> - *We are now at **negative** $93.5MM controlling equity at the Holdings level. This is the balance sheet that backs the $147MM loan from Aequitas Commercial Finance, which now represents 24% of the total Aequitas Commercial Finance balance sheet and the single biggest asset that Private Note holders are reliant upon once you deduct all of the senior debt.*
>
> - *We pulled a rabbit out of the hat to meet 40 Act compliance at 6/30/15 by doing the Private Client Fund $45MM purchase of Capital Opportunities Fund interests; but, we have no idea what that will do to the ACF financial performance the 2nd half of the year with the future gains moving to Private Client Fund.*
>
> - *Negative cash as of the end of the period. We talked about "making process"(sic) toward our $20MM liquidity buffer because we are projected to have $10MM as of the end of August; but, we have $25MM of cash payments in October ($18MM redemptions, $7MM quarterly interest) that we don't have projected availability to meet, and November doesn't get any better.*
>
> - *We have ongoing matters with the CFPB and SEC that are not insignificant.*
>
> - *We have significant morale and overall employee concerns, with several key employees "on the edge".*
>
> *The only one that even questioned things was Will Glasgow.*
>
> *Yet what you see back from Keith Barnes is a request to use the airplane and two new investor referrals?*
>
> *Maybe I am the only one that sees a different scenario than what was presented, and feel like we are believe (sic) our own BS at a very critical time.*

---

[288] Email chain dated August 17, 2015 between Oliver and MacRitchie in response to an August 16, 2015 email from Barnes forwarded by Jesenik to Oliver and MacRitchie with the subject line "Jet Access".

> MacRitchie – ...I really thought Will [Glasgow] was going to drill in but he backed off – really disappointing since I think only the AB can challenge the strategy now. I am worried about ACF's ability to continue to be viable for selling PN – the results are ugly. We desperately need to stop the bleeding.

### E.4.3.2.    Aequitas Wealth Management

*Aequitas expended significant Investor funds on the creation of AWM in furtherance of the scheme. AWM was intended as a complete wealth-management platform that would provide intellectual, financial and human capital to fuel growth-oriented RIAs with a focus on alternative investments (with an incentive to sell Aequitas product). The formulation of AWM consisted of not only the acquisition of or investment in RIAs such as Private Advisory Group, LLC ("PAG"), Strategic Capital Group, LLC ("SCG"),[289] Redrock Investment Advisors, Mariner Investment Advisors, Hickory Grove Partners and Spouting Rock Financial Advisors[290] but also in companies that provide services to RIAs such as Alternative Capital Advisors, Strategic Capital Alternatives, LLC ("SCA")[291] and MSP/Ivey.*

Aequitas further leveraged this investment in RIAs and firms that provided services to RIAs via what was labeled as Aequitas Capital Partners ("ACP"). ACP purported to provide to RIAs "a balance of products and services, operational support, and resources to grow your business and better serve your clients."[292] Membership in ACP was free to those that sold Aequitas product, an additional premium tier (the "Quarter Club") for those that sold greater than $25.0 million in product[293] and a separate paid membership marketed as AFSN. A comparison of the two ACP tiers follows:



For a $10 thousand annual membership fee, AFSN purported to provide additional benefits to RIAs who promoted Aequitas product in the form of access to Investor-funded support services and referral fees and

---

[289] Two months after Aequitas/PAG acquired SCG client accounts, the SEC fined SCG and Gary Price for purchasing bonds through his personal broker-dealer before selling them to SCG Clients at a mark-up. http://www.sec.gov/News/PressRelease/Detail/PressRelease/1370542983435.
[290] Spouting Rock Financial Partners, LLC20 is both an investment banking firm and an alternative investment consulting firm, and was developing a new mutual fund when Aequitas made its investment of $400 thousand in August 2013.
[291] SCA, a Washington limited liability company, and SCAH, a Washington limited liability company, are each entities providing back-office infrastructure to RIAs. Although SCA and SCAH are neither part of the Receivership Entity nor Extended Entities, they had financial relationships with the Receivership Entity.
[292] September 30, 2014, "FallMeeting_AFSNKGregg.pptx".
[293] The ACP October 2014 meeting acknowledged the following Quarter Club members: Private Advisory Group (Doug Maurer, Chris Bean, Doug Bean), Integrity Bank & Trust (Randy Rush, Eric Davis) and Sica Wealth Management (Jeff Sica).

revenue sharing.  AFSN also offered participating RIAs access to "growth and acquisition capital through Aequitas Capital to expand and accelerate their business."





As of December 31, 2015, the following firms were paying members of AFSN:  Manchester Holdings, Concert Advisor Services, Clifton Larson Allen, SCA, Integrity Bank & Trust, Atlas Banc, Gavion, Ivey Performance Marketing and Gladstone Associates.  Additionally, loans were made to the following RIAs: Fieldstone ($1.6 million), Gladstone Technology ($530 thousand), Circle Squared ($500 thousand), and Trust Capital/Euro Investment Partners ($500 thousand).  The Receiver has commenced collection activities against the subject borrowers.  In the collection action against Fieldstone, Fieldstone alleges that the sole purpose of the AFSN financing was "to make loans to RIAs so that Aequitas could access more investors to sell more notes and close more business."

### E.5. Failed to invest all of the Investor funds in promised investments[294]

#### E.5.1.    Whistleblower complaints

The Receiver is aware of at least two instances in which Aequitas employees exposed activity that they deemed illegal, unethical, or not correct.  In February 2010, Aequitas' corporate controller triggered a code of conduct investigation (discussed further in F.3) alleging that Aequitas (1) was not in compliance with procedures involving the use of cash received from investors and (2) failed to make timely redemptions.[295]  The claims were investigated by MacRitchie and dismissed, as ACF was not specifically prohibited from loaning "idle cash" from Aequitas Funds to itself, and redemption issues in January and February of 2010 were related to a liquidity issue that was temporary in nature.  In actuality, this process can be seen carried into, and formalized in, 2014 through the Manufactured Notes process, as described in E.1.6, whereby incoming Investor funds would first go to ACF or affiliates and only afterwards would the Aequitas Fund receive a note and sometimes purported collateral.  Updated PPMs included such uses of cash as "permissible investments"; however, they appeared to be reflected as a minority use of funds.  Thus, almost all new Investor funds in 2014 and 2015 flowed through ACF or similar affiliate, before ultimately being recorded as a note and collateral through non-cash journal entries.

More recently, in October 2015, a Senior Managing Director in the Capital Markets & Treasury group voiced concerns over (1) misuse of Investor funds, (2) misrepresentation in the sale of securities to Investors, (3) failure to provide adequate disclosure information to Investors and (4) violations of securities laws, and SEC rules and regulations.

#### E.5.2.    Used Investor funds for non-investment purposes[296]

##### E.5.2.1.    Conversion of assets to APF

*As part of a financial restructuring in an effort to cure violations of the 40 Act, AM "purchased" a number of investments owned by ACF, with the consideration being an increase in the ACF-AM Note, and then the obligation was converted to an asset of AM, with the consideration being an increase in a similar note due from AM to AH ("AH-AM Note").  AM then contributed the investments into a subsidiary of AM known as APF.  Those investments represented various non-core and "pet" project investments made by Aequitas with Investor money.  It appears that AM had no way to repay the AH-AM Note other than through potential future gains that would flow to AM from APF, and all interest on the AH-AM Note was accrued but not paid (as there was no source of cash to pay the interest).  Investor money was still at risk since the promissory notes from the "partners" were recourse only to their interest in APF.  Had the assets remained in ACF, the Private Note Investors would have been able to share in any upside in these investments, rather than continuing to bear all the risk of decline without upside opportunity.*

APF's major assets:

As of the Complaint Date, APF was a majority-held subsidiary of AM and held the following assets:

1.  A 100% equity stake in Syncronex, LLC.

2.  A 95.4% equity stake in Skagit Gardens, Inc.

3.  An 80.3% equity stake in MSP; an additional 8.1% of MSP equity is held by AH.  MSP is the 100% equity owner of both Ivey and Gridbox Media, LLC.

---

[294] *Emerson v. Maples (In re Mark Benskin & Co.)*, 161 B.R. 644, 650 (Bankr. W.D. Tenn. 1993).
[295] April 21, 2010, "Code of Conduct Investigation Report (IOF-ACF) 04-21-10 v1_0.pdf".
[296] *Emerson v. Maples (In re Mark Benskin & Co.)*, 161 B.R. 644, 650 (Bankr. W.D. Tenn. 1993); World Vision, 275 B.R. at 657.

4.  A 5.9% equity stake in Cana's Feast Winery, LLC ("Cana's Feast").

5.  A roughly 3% equity stake in Cloudward, Inc. (f/k/a Etelos, Inc.)

6.  A roughly 3% equity stake in Certified Security Solutions, Inc. ("CSS")

7.  A note receivable with Rock and Roll Restaurants LLC, an unrelated third party, with a book balance of $500 thousand as of the Complaint Date (the "Rock and Roll Restaurants Note").

8.  A series of notes receivable relating to NorthBranch (collectively, the NorthBranch Notes)

    a.  A promissory note with NorthBranch as the assignee from Riffle, with an amended principal balance of $170 thousand.

    b.  NorthBranch Member Loans with amended principal balances totaling $1.4 million.

9.  A guarantee from ACM relating to a $631 thousand judgment in a litigated dispute against CashReady, LLC and Brandon Becker ("CashReady Judgment").[297]

Equity ownership history of APF:

Between October and December 2007, Aequitas insiders (Jesenik, MacRitchie, William (Bill) McCormick,[298] Robert Noack,[299] Oliver, Stanley Smith,[300] Richard Terrell, and PatRick Investments, LLC ("Patrick Investments")[301] assigned $3.4 million of their interests in various Aequitas Funds and notes to AH for a consideration of Class A Special Units of AH ("Special Units"). The majority of the assignment ($2.0 million) came from AHF equity interests; $1.1 million came from Catalyst Fund equity interests; $220 thousand came from Private Notes. During 2008, McCormick, Noack, and MacRitchie contributed an additional $250 thousand of their interests in AHF ($240 thousand) and Private Note ($15 thousand) to their Special Units.

Per a December 6, 2007 letter from Jesenik to Elgie McGrath, then an investor in ACM, the Special Units were used to track specific investments in vehicles such as APF.[302] The Schedule K-1 tax form issued by APF to AH for 2007 further corroborates this, stating that AH contributed $3.4 million during the year and matching the amounts that the Aequitas insiders contributed to AH for the Special Units;[303] the Schedule K-1 for the 2008 tax year shows an additional capital contribution of $255 thousand from AH, matching the additional contributions to Special Units from the Aequitas insiders.[304]

On December 31, 2009 AH assigned 10 thousand shares of common stock in Skagit to APF, constituting 100% of the outstanding Skagit capital stock, for an increase of AH's capital account in APF by $4.5 million.[305] AH immediately converted $3.3 million of its APF interests to an asset of ACF for a reduction in the ACF-AH Note.[306] On March 31, 2010, ACF assigned its interests in APF — then totaling $3.3

---

[297] On November 10, 2011, a judge for the Circuit Court of Oregon ruled that Brandon Becker and CashReady, LLC were in default and materially breached a September 15, 2009 promissory note and commercial guaranty, and were liable for damages thereunder. ACM was awarded judgments in its favor totaling $471 thousand plus accrued interest; IOF was awarded a judgment in its favor totaling $548 thousand plus accrued interest; and CR Funding I, LLC (a former subsidiary of ACF, dissolved in 2014) was awarded a judgment in its favor totaling $75 thousand plus accrued interest. On December 31, 2013, ACM guaranteed the outstanding amount of the IOF judgment, then totaling $630 thousand.
[298] Aequitas Advisory Board Member.
[299] Managing Director, resigned March 14, 2014.
[300] Senior Vice President, Financial Products, resigned April 30, 2013.
[301] A company managed by Patrick (Pat) Terrell, Aequitas Advisory Board Member.
[302] Letter from Jesenik to McGrath, December 6, 2007, "Re: Aequitas Holdings, LLC Formation".
[303] June 10, 2014, "2007 Aequitas Partner Fund LLC SY Intital Return.pdf", Page55.
[304] February 25, 2014, "2008 Aequitas Partner Fund, LLC - Fed & State.pdf", Page 19.
[305] July 6, 2015, 2018, "Assignment of Stock-Skagit 10K Shares (AH-Partner Fund) 12-31-09.pdf".
[306] December 31, 2009, "Assignment of Membership Interest in Aequitas Partner Fund, LLC".

million — to DCEF.[307]  The assignment of membership interest in APF agreement between ACF and DCEF does not state specific consideration for this conversion; however, the General Ledger shows a credit increase of $3.3 million to the intercompany DCEF due to ACF account corresponding to the conversion.

On March 31, 2011, McCormick assigned all of his AH Special Units to ACF, for a reduction in the principal balance of a promissory note owed by McCormick to ACF.[308] [309]  McCormick assigned the Special Units at 61% of the value of his initial capital contribution.

On May 31, 2013, Stanley Smith redeemed all of his Special Units.[310]  AH purchased the Special Units at 59% value of his initial capital contribution.  The cash consideration for this transaction was paid out of ACF-Op on June 3, 2013; based on a review of the banking activity, it appears cash for this transaction came from the ASFG bank account.

On March 31, 2014, Noack redeemed all of his AH Special Units.[311]  AH purchased the Special Units at 54% value of his initial capital contribution.  The cash consideration for this transaction was paid out of ACF-Op on April 4, 2014; the majority of the cash for this transaction came from the CSF bank account.

On May 30, 2014, the positions of the remaining AH Special Unit holders (Jesenik, Oliver, MacRitchie, R. Terrell, and PatRick Investments) were redeemed.  AH purchased the Special Units at 54% of the value of their initial capital contribution.  The cash consideration for this transaction was paid out of the ACM Operating bank account.

APF asset acquisitions prior to October 2014:

Cloudward, Inc. (f/k/a Etelos, Inc.):

On September 30, 2009, Etelos, Inc. ("Etelos") executed a $250 thousand convertible debenture with APF.[312]  On November 9, 2009, payment was released from the ACF-Op account, on behalf of APF.  ACF booked the transaction as a "due from" APF receivable.  Additionally, APF received stock warrants for up to 375 thousand shares of Etelos stock.[313]  On December 17, 2009, Etelos executed an additional $125 thousand convertible denture with APF.[314]  On the same day, the cash corresponding to this debenture was released from ACF-Op, and booked the same as the September 2009 transaction, as an APF "due to" ACF.

Syncronex, LLC:

On September 30, 2013, IOF assigned to ACF its interests in a certain business loan agreement executed May 13, 2009 with Syncronex as borrower.[315]  The original principal amount of the loan was $1.6 million; as of September 30, 2013, the total amount owed on the loan was $2.3 million.  The consideration for the transaction was a corresponding increase in the intercompany amounts owed to IOF from ACF.  At the time of the transaction, per a September 30, 2013 internal memo to the Aequitas

---

[307] March 31, 2010, "Assignment of Membership Interest in Aequitas Partner Fund, LLC".
[308] November 5, 2014, "AH-3 Assgt of Membership Interest - McCormick (McCormick-ACF) 05 31 11.pdf".
[309] November 13, 2013, "CANCELLED - Note - 1st Amdmt & Satisfaction (McCormick-ACF) 05 31 11.pdf".
[310] November 5, 2013, "AH-1 Consent-Action of Manager (AH) 04-01-13 re Repurchase of Smith Class A Special Units v1_0.pdf".
[311] March 20, 2015, "72  Assignment Class A Special Units-AH (Bob Noack-AH) 03-31-14 partial-needs to by signed by Millennium v1_0.pdf".
[312] November 15, 2010, "2b. Debenture (APF) 09.30.09.pdf".
[313] December 21, 2009, "3a. Warrant (APF) 09.30.09.pdf".
[314] September 19, 2013, "2b. Debenture (APF) 12-17-09.pdf".
[315] July 30, 2014, "Assignment of Loan (Syncronex) (IOF-ACF) 09-30-13.pdf".

Conflicts Review Committee ("CRC"), Syncronex "has no ability to pay the obligation and is in payment default."[316]  This Syncronex loan was ultimately assigned to ACL in April 2015.

Additionally, on October 4, 2013, ACF purchased 100% of Syncronex equity held by AHF for cash consideration of $207 thousand.[317]  The AHF cost basis for the equity interest, per the September 30, 2013 internal memo to the CRC, was $145 thousand.  The cash for this transaction came from the ACF-PN account on October 11, 2013 and was at least partially funded from the new Private Note investments that were sent to Aequitas on October 10 and 11, 2013.

On December 31, 2013, ACF assigned the Syncronex equity interests to APF.[318]  The consideration for this transaction was a reduction of $207 thousand of the balances due on a secured subordinated promissory note from ACF (similar form to a Private Note) held by APF.

Cana's Feast Winery, LLC:

On December 20, 2013, APF was admitted as a member of Cana's Feast.[319]  APF contributed $100 thousand for 57 thousand membership units (then, 5.27% ownership of Cana's Feast).  The cash for this contribution came from ACF-Op.  As consideration for this cash outlay from ACF, APF again reduced the balance due from ACF on its above promissory note by $100 thousand.

October 2014 sale to AM:

On October 1, 2014, Aequitas restructured APF to contribute assets held by other Aequitas entities and to move ownership of APF from AH to ACM.  This transaction occurred in five parts (all values per the transaction date):

First, DCEF sold its membership interest of APF to ACF.[320]  At the time of the transaction, the DCEF capital account balance was $1.7 million, corresponding to roughly a 31% interest in APF.  The consideration for the transaction was an increase in the intercompany payable from ACF to DCEF in the same amount as the capital account balance.

Second, IOF assigned the CashReady Judgment to ACF.[321]  The consideration for this assignment was an increase in the outstanding principal balances of an intercompany secured subordinated promissory note by $631 thousand, the amount of the guarantee.

Third, ACF sold a portfolio of assets to AH: APF equity, the ACM guarantee of the CashReady Judgment, MSP equity, CSS equity, the Rock and Roll Restaurants Note, and the Newman Loan with a principal amount of $325 thousand.[322] [323]  The consideration for the transaction was an increase of $6.1 million in the outstanding principal balances of an intercompany promissory note.

Fourth, AH contributed a portfolio of assets to APF, increasing the AH capital account balance with APF by $5.8 million: the ACM guarantee of the CashReady Judgment, MSP equity, CSS equity, the Rock and Roll Restaurants Note, and the NorthBranch Notes;[324] the Newman Loan was not contributed to APF.

[316] September 30, 2013, Memo to CRC, "Re: Update to the Sale of Syncronex, LLC Membership Units from Hybrid to ACF".
[317] July 30, 2014, "Assignment of Membership Interest-Syncronex (Hybrid-ACF) 10-04-13.pdf".
[318] July 30, 2014, "Assignment of Membership Interest-Syncronex (ACF-Partner Fund) 12-31-13.pdf".
[319] December 27, 2013, "Admission Agmt (Partner Fund-Cana's Feast Winery) 12-20-13.pdf".
[320] April 23, 2015, "(1) Sale of APF Membership Interest (DECF to ACF) 10-01-14.pdf".
[321] April 23, 2015, "(2) Assignment of Guaranty (IOF to ACF) 10-01-14.pdf".
[322] April 23, 2015, "(3a) Assignment Agreement (ACF to AH) 10-01-14.pdf".
[323] April 23, 2015, "(3b) Sale of APF Membership Interest (ACF to AH) 10-01-14.pdf".
[324] April 23, 2015, "(4a) Contribution Agreement (AH to APF) 10-01-14.pdf".

APF then distributed the following assets to AH, decreasing the AH capital account balance: a limited partner interest in Portland Seed Fund II, LLC with a capital account balance of $88 thousand, and its AHF equity interest with a capital account balance of $1.2 million, corresponding to roughly a 14% interest in AHF.[325]

Finally, AH sold 100% of the APF equity to AM and three Investors: an 83.6% equity interest to AM with a capital account balance of $8.5 million;[326] a 0.6% equity interest to McCormick with a capital account balance of $62 thousand;[327] a 7.9% equity interest to R. Terrell with a capital account balance of $798 thousand;[328] a 7.9% equity interest to PatRick Investments (together with McCormick and R. Terrell, the "External APF Investors"), with a capital account balance of $798 thousand.[329]

As consideration for this sale, AM issued a promissory note to AH in the amount of its capital account balance, secured by the AM interests in APF.[330] The External APF Investors each individually issued non-recourse promissory notes to AH in the amount of their capital account balances, secured by, and limited in recourse only to, the External APF Investors' interests in APF.[331]

### E.5.2.2.    Conversion of assets to PCF

*In 2015, Aequitas management formed a private fund for select individuals, predominantly made up of upper Aequitas management and close insiders or Investors. Aequitas then began parsing out ACF and AH assets, previously purchased with Investor funds, into this vehicle, which limited the investment upside to only select individuals. As such, the select Investors within the fund limited their risk to the value of the contributed assets, however they gained all of the upside potential of the assets previously bought using other Investor funds.*

PCF was formed on July 21, 2015. It is 100% owned by AH and is managed by AIM. Per the PCF LLC agreement, PCF owed management fees monthly to AIM, calculated as two percent per annum of the unpaid principal amount of the series notes outstanding to the PCF Investors.

PCF had three core assets as of the Complaint Date:

1. A 19.49% limited partner interest in COF; the limited partner interest had an estimated value of $20.6 million on the date of acquisition.

2. A promissory note with Skagit; on the date of acquisition of the promissory note, it had an outstanding principal balance of $10.3 million, but a book carrying value of $8.1 million.

3. Approximately 4.2 million shares of preferred stock in Pipeline Health Holdings, LLC ("Pipeline Health"), an entity not included in the Receivership Entity or Extended Entities; on the date of acquisition of the shares, they had an estimated value of $7.5 million on the Aequitas books and records.

Investors converted from Private Note to PCF in three groupings. The first grouping was effective on July 31, 2015. Eight Investors (Brantley,[332] Froude, MacRitchie, McCormick, Tracy Oliver, Thomas and

---

[325] April 23, 2015, "(5) Action of Manager and Member - Dist of Portland Seed Fund and Hybrid  (APF) 10-01-14.pdf".
[326] May 27, 2015, "(6a1) Sale of APF Membership Interest (AH to AMLLC) 10-01-14.pdf".
[327] June 2, 2015, "(6b1) Sale of APF Membership Interest (AH to BMcCormick) 10-01-14.pdf".
[328] July 20, 2015, "(6d1) Sale of APF Membership Interest (AH to RTerrell) 10-01-14.pdf".
[329] May 27, 2015, "(6c1) Sale of APF Membership Interest (AH to PatRick Investments) 10-01-14.pdf".
[330] May 27, 2015, "(6a2) Promissory Note (AMLLC-AH) 10-01-14.pdf".
[331] June 2, 2015, "(6b2) Non-Recourse Secured Note (BMcCormick-AH) 10-01-14.pdf"; May 27, 2015, "(6c2) Non-Recourse Secured Note (PatRick Investment-AH) 10-01-14.pdf"; July 20, 2015, "(6d2) Non-Recourse Secured Note (RTerrell-AH) 10-01-14.pdf".
[332] Aequitas Advisory Board Member.

Julia Szabo, Walter Wurster, and Zamarripa) converted twenty-six Private Notes and accrued interest balances totaling $29.7 million to PCF via a non-cash intercompany adjustment; however, effective the same day, ACF also assigned to PCF both a limited partner interest in COF[333] and a promissory note with Skagit,[334] reducing its intercompany payable to PCF by $28.7 million.  Additionally, Froude converted two of his personal IOF notes to PCF for $203 thousand on July 31, 2015 via a non-cash intercompany adjustment; however, cash was ultimately transferred from IOF to PCF on December 28, 2015.

The second grouping occurred on September 29, 2015.  Jesenik invested $300 thousand cash in PCF and received a secured promissory note.

The final group of investments came into PCF during December 2015.  Four Investors (Keith Barnes, Sharon Barnes, Barbara Etheridge, and Sharp) converted twelve Private Notes and accrued interest balances, totaling $7.2 million, all completed on a non-cash basis through due-to or due-from related entities.  On December 31, 2015, ACF assigned its Pipeline Health stock to PCF, reducing the intercompany payable by $7.5 million.

PCF made two rounds of quarterly interest payments to its Investors.  First, PCF paid the Q3 interest payment on October 29 and 30, 2015, totaling $487 thousand; $300 thousand of this cash came from the Jesenik investment in September 2015, and the remaining cash was transferred from ACF-Op.

Second, PCF paid the Q4 interest payment on January 28, 2016, but only for two Investors (Wurster and Zamarripa).  The interest payment totaled $534 thousand.  Cash for this payment came from a $700 thousand cash transfer from ACF-Op on November 20, 2015; the remaining $150 thousand was predominately used to pay the AIM monthly management fee.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

---

[333] October 28, 2015, "Assignment and Assumption of LP Interest - COF (ACF to PCF) 07-31-15.pdf".
[334] October 28, 2015, "Assignment of Loan - Skagit Gardens (ACF to PCF) 07-31-15.pdf".

| Master Name | Effective Date | Prior Investment | | | | | | PCF |
|---|---|---|---|---|---|---|---|---|
| | | Transfer Amount | Transfer Entity | Investment Date | Orig. Maturity | Rate @ Transfer | Special PN Terms? [1] | Increase (Decrease) |
| **Andrew MacRitchie** | 7/31/2015 | $75.0 K | ACF-PN | 7/21/2014 | 7/21/2019 | 8%[2] | Below investment minimum. Standard rate 7% | 4% |
| | | $124.5 K | ACF-PN | 4/24/2008 | 4/24/2015 | 13% | Below investment minimum, initial rate 13%, reduced in 2011 to 12%. Standard rate 9% | 0% |
| | | $10.0 K | ACF-PN | 7/13/2010 | 4/24/2015 | 12% | Below investment minimum, initial rate 13%, reduced in 2011 to 12%. Standard rate 9% | 0% |
| | | $205.2 K | Accrued PN Interest | | | - | | - |
| **Brian and Tracy Oliver** | 7/31/2015 | $250.0 K | ACF-PN | 12/16/2013 | 12/31/2017 | 10% | Initial rate 13%, standard is 10%. Allowed early redemption of $100k in 2013, for reduction to 10% | 2% |
| **Craig Froude** | 7/31/2015 | $1.0 M | ACF-PN | 5/1/2015 | 5/1/2019 | 11% | Standard rate ~10% | 1% |
| | | $102.5 K | IOF | 5/31/2010 | 6/30/2015 | 10% | Initial PN Investment, transferred to IOF | 2% |
| | | $100.0 K | IOF | 8/2/2010 | 6/30/2015 | 10% | | 2% |
| **L. Martin Brantley** | 7/31/2015 | $500.0 K | ACF-PN | 9/20/2010 | 9/20/2017 | 11% | Standard rate 10% | 1% |
| **Robert Zamarripa** | 7/31/2015 | $3.0 M | ACF-PN | 4/2/2013 | 4/1/2015 | 12% | Standard rate 11% | 0% |
| | | $3.0 M | ACF-PN | 4/2/2013 | 4/1/2016 | 12% | | 0% |
| | | $1.8 M | ACF-PN | 4/2/2013 | 4/1/2017 | 11% | Initial 1 year $3M investment @ 12%, partial extension @ 11%. Standard rate 10% | 1% |
| **Thomas and Julia Szabo** | 7/31/2015 | $500.0 K | ACF-PN | 8/7/2013 | 8/7/2015 | 11% | Standard rate 9% | 1% |
| **Walter Wurster** | 7/31/2015 | $100.0 K | ACF-PN | 2/18/2011 | 2/18/2016 | 13% | Below investment minimum. Standard rate 9-10% | -1% |
| | | $100.0 K | ACF-PN | 12/21/2012 | 12/21/2015 | 13% | Below investment minimum. Standard rate 9-10% | -1% |
| | | $150.0 K | ACF-PN | 2/15/2013 | 2/15/2016 | 13% | Below investment minimum. Standard rate 9-10% | -1% |
| | | $330.8 K | ACF-PN | 12/16/2014 | 12/16/2019 | 12% | Below investment minimum. Standard rate 9-10% | 0% |
| | | $500.0 K | ACF-PN | 5/16/2014 | 5/16/2019 | 12% | Below investment minimum. Standard rate 9-10%. Special interest payment schedule | 0% |
| | | $1.3 M | ACF-PN | 6/1/2013 | 6/1/2016 | 12% | Standard rate 11% | 0% |
| | | $1.5 M | ACF-PN | 9/1/2012 | 6/1/2016 | 12% | Original note 11%, increased to 12%. Standard rate 11%. Special liquidity provision & interest payment schedule | 0% |
| | | $899.0 K | ACF-PN | 3/9/2009 | 6/1/2016 | 12% | Original note 13.5%, decreased to 12%. Standard rate 10-12% | 0% |
| | | $12.4 M | ACF-PN | 6/1/2013 | 6/1/2018 | 12% | Below investment minimum. Standard rate 9-10% | 0% |
| | | $201.3 K | Accrued PN Interest | | | - | | - |
| **William McCormick** | 7/31/2015 | $255.2 K | ACF-PN | 4/2/2009 | 4/2/2019 | 12% | Standard rate 9% | 0% |
| | | $300.0 K | ACF-PN | 5/14/2009 | 5/14/2019 | 12% | Standard rate 9% | 0% |
| | | $302.2 K | ACF-PN | 8/1/2014 | 8/1/2018 | 10% | Standard rate 9% | 2% |
| | | $200.0 K | ACF-PN | 11/13/2014 | 2/16/2019 | 12% | Initial Special Terms Bridge Loan @ 15%, standard rate 5%. Extended 4 years @ 12%, standard rate 9% | 0% |
| | | $200.0 K | ACF-PN | 1/29/2015 | 1/29/2019 | 12% | Standard rate 9% | 0% |
| | | $126.8 K | ACF-PN | 8/1/2014 | 8/1/2018 | 10% | Special terms allowing transfer of IPF investment to PN. Standard rate 9% | 2% |
| | | $100.0 K | ACF-PN | 11/5/2009 | 11/5/2018 | 10% | Initial rate 18%, reduced to 15% then 13% then 10% with maturity extensions. Standard rate 9% | 2% |
| | | $402.0 K | Accrued PN Interest | | | - | | - |
| **Robert Jesenik** | 9/28/2015 | $300.0 K | New Funds | | | - | | - |
| **Steve and Patricia Sharp** | 12/14/2015 | $500.0 K | ACF-PN | 8/21/2015 | 8/21/2019 | 12% | Standard rate 10% | 0% |
| | | $250.0 K | ACF-PN | 4/1/2015 | 4/1/2016 | 9% | Standard rate 7% | 3% |
| | | $250.0 K | ACF-PN | 4/1/2015 | 4/1/2017 | 10% | Standard rate 8-10% | 2% |
| | | $250.0 K | ACF-PN | 11/19/2014 | 11/19/2015 | 9% | Standard rate 7% | 3% |
| | | $250.0 K | ACF-PN | 11/19/2014 | 11/19/2016 | 10% | Standard rate 8-10% | 2% |
| | | $250.0 K | ACF-PN | 11/19/2014 | 11/19/2017 | 11% | Standard rate 9% | 1% |
| | | $250.0 K | ACF-PN | 11/19/2014 | 11/19/2018 | 12% | Standard rate 9% | 0% |
| | | $34.2 K | Accrued PN Interest | | | - | | - |
| **Keith and Sharon Barnes** | 12/31/2015 | $500.0 K | ACF-PN | 1/24/2013 | 8/1/2018 | 13% | Initial rate 15% for 7 months, standard rate 5%. Reduced to 13% and extended one year, standard rate 9%. Later extended to 2018. Preferential liquidity & redemption priority. | -1% |
| | | $1.2 M | ACF-PN | 4/25/2014 | 10/24/2019 | 13% | Standard rate 10-12%. Preferential liquidity & redemption priority | -1% |
| | | $500.0 K | ACF-PN | 4/10/2015 | 4/10/2016 | 13% | Standard rate 8%. Preferential liquidity & redemption priority | -1% |
| **Ted and Barbara Etheridge** | 12/31/2015[3] | $2.0 M | ACF-PN | 2/27/2015 | 2/27/2018 | 11% | Standard rate 9%, monthly interest payments | 1% |
| | | $1.0 M | ACF-PN | 7/1/2014 | 7/1/2017 | 10% | | 2% |
| **Total:** | | $37.5 M | | | | | | |

1. Standard terms are what were offered to public, based on closest standard investment value and length. As many above investments are non-standard terms or amounts, exact matches are not always available.
2. Interest rate increased to 11% for last 7 days of PN investment
3. Signed docs and transfer occurred on January 11, 2016, however was backdated to December 31, 2015

### E.5.2.3.        Corporate spending in excess of management fees

*The only "recurring" (and disclosed) source of funds for Aequitas' corporate expenses and payroll was the 2% annual asset management fee which it was entitled to collect on invested funds.  Because the corporate spend exceeded the amount of this fee, it became incumbent upon Aequitas to raise as much money as possible (and also keep asset valuations high)*, *to generate the largest fees possible to cover its spending.*

During the Relevant Time Period, the main sources of revenue for AES, ACF, ACM and AIM (together, the "Operating Entities") were internal management fees from related entities (such as ACL, AWM, CPH & subsidiaries, MLFH & subsidiaries, COF, etc.), as well as ASA fees.  Management fees, frequently referred to as the "2%'s", were paid (subject to cash availability) on a monthly basis, predominantly as a calculation of 0.167% of the gross value of the assets, or unpaid principal value of the entities' receivables.  The majority of ASA fees were paid by CPYT and EdPlus for support services provided by the Operating Entities.  Reimbursement payments (or rebills) for payroll and certain expenses paid by Aequitas on behalf of CPYT and EdPlus were paid as well.  In 2015 AES also received ASA payments from AH.

During the Relevant Time Period, Aequitas accrued a total of approximately $22.7 million in management fees from related entities (excluding management fees paid from one Operating Entity to another).  Total ASA accrual for the same period was approximately $15.8 million.  As such, total revenue available to cover expenses is estimated at $38.5 million.  Rebill payments received from CPYT and EdPlus totaled $27.6 million, as a reimbursement of direct expenses paid by Aequitas on CPYT and EdPlus' behalf.

During the same period, the Operating Entities spent at least $117.4 million on employee compensation, professional expenses, office expenses, travel & entertainment and more.  While ASA and management fee income remained relatively close to the 2014 income totals ($17.3 million and $17.6 million respectively), 2015 net expenses increased by at least 124%.  Overall, the Operating Entities spent over double the combined management fees and ASA.  Such difference was made up by new Investor funds, particularly through ACF and its subsidiaries.  These funds were then lent to AH, with a corresponding increase in the ACF-AH Note, and were then contributed to the respective Operating Entity subsidiaries of AH.  This can be seen from the 2014 to 2015 ACF-AH Note balance increase from $120.9 million to $180.3 million.  In other words, the excess expenses were being capitalized and represented as assets on the ACF balance sheet rather than being expensed through the income statement (which would have led to losses).

Aequitas management justified this treatment (and the collectability of the AH note payable) by asserting that additional income would come from the net interest margin earned by SPEs owned by AH.  In a response to the General Counsel asserting that the 2% management fee should be the only guaranteed revenue, Oliver stated:[335]

> *I do not disagree philosophically, but this view assumes that the debate over Aequitas Commercial Finance being a "Fund" vs. a "Finance Company" is over. … I have always explained us as a specialty finance company paying a fixed return to our investors and then working off of the spread, with a much higher than 2% overhead/fixed cost infrastructure to*

---

[335] Email from Jesenik to MacRitchie, Oliver, Holmen, Gillis, Rice, Froude, January 3, 2016, "RE: January 1, 2016: Starting a New Fee and Expense Paradigm at Aequitas".

> *manage complex credit portfolios and therefore the need to keep more of the margin/NIM. ...*
> *Again, I don't disagree with the philosophy and target of working towards the 2% covering the*
> *expenses, but just some additional food for thought on how we have historically viewed and*
> *positioned the company vs. where we are trying to get to and why we have not historically viewed*
> *NIM the same as the 20% carry (meaning we have previously been structured and presented*
> *ourselves to investors for NIM to be used to cover overhead).*

However, as management continued to dissipate all equity in the SPEs, either through Direct Notes to Investors or Manufactured Notes to Aequitas Funds (all carrying high interest rates), repayment of the AH note was impossible. In an email from the General Counsel to Jesenik, Oliver, Gillis, MacRitchie, Rice and Froude, he warned against this practice due to the status of the portfolios:[336]

> *It is fair to supplement that with NIM based on reasonable projections. I don't think we can count*
> *on any NIM from Motolease or CSF since those strategies are in run-off, are fully leveraged and*
> *(in the case of CSF) are subject to further erosion at the hands of the CFPB. Since CarePayment*
> *NIM is fully allocated to the BSR, that leaves Freedom NIM plus any NIM coming from ACL and*
> *other note assets (to the extent that NIM is not needed to pay interest on ACF subordinated*
> *notes).*[337]

Aequitas management also continually referenced the "20% carry" Aequitas would receive on investments such as COF. Again, in the above email from the General Counsel, he specifically suggested they remove these amounts from the budget, for the following reasons:

> *We can also use the 20% carry, but I see three issues in developing a budget based on spending*
> *the carry coming off the funds: (a) there is uncertainty as to the amount of carry any given*
> *quarter/year, (b) the carry is illiquid and (c) the carry already is "owed" back to the noteholders*
> *as security for the intercompany loans to ACM and AES, thus the priority on amounts realized*
> *from carry likely should be pay down of the AH line.*

Ultimately, as discussed in E.4.2, the General Counsel was warning the management team to cease borrowing from ACF to pay payroll and Operating Entities' expenses. In October 2015, management was presented with a "3 Year Plan Update," which listed the projected losses and upsides that were forecasted. The plan was prepared by Fund Operations, with several reviews and edits completed by Gillis. This was then presented to the AM committee later that month and again in December.[338]

These projections, including fair value adjustments, forecast an $18.0 million consolidated loss in 2015. However, in an email from Oliver to Jesenik on October 22, 2015, Oliver noted that those forecasts do not even take into consideration a $15-25 million reserve for CoCo portfolios, a $5.5-6.5 million overestimate of CPYT revenue, and projections of $34 million in "new strategies" which will not happen "given we are at end of October already and don't have projected excess liquidity." With this, Oliver estimated the consolidated loss would likely be closer to $50.0 million. Oliver goes on to say:[339]

> *Unfortunately we have a history of building what we think are "conservative" plans, making*
> *business/spending/investing decisions based on those plans, not achieving those plans, and as a*
> *result creating a wider and wider gap between cash revenue and cash expenses. Of course this*

---

[336] Email from Holmen to Jesenik, MacRitchie, Oliver, Rice, Gillis & Froude, December 9, 2015, "Cessation of Borrowing from ACF".
[337] Note the prior discussion in this Report demonstrating that both FFN portfolios necessarily had negative NIM.
[338] October 9, 2015, "3 Year Plan - Final 2015.10.09.pdf".
[339] Email from Oliver to Jesenik, October 22, 2015, "RE: 3 Year Plan Update – Final".

*ultimately shows up in the growth of the AH note year over year. Since converting to an asset management firm, we've virtually never been profitable, and have now accumulated nearly $100MM of aggregate losses over our history.*

### E.6. Mischaracterization of the nature of investment and associated risk

*SEC Complaint - [The defendants] never disclosed to investors that: (1) ACF and AH were effectively insolvent; (2) the vast majority of investor funds was not used to purchase trade receivables but instead to pay redemptions and interest to prior investors and to pay for operating expenses; and (3) only a fraction of the notes issued by ACF and the Aequitas Funds were backed by trade receivables.*

It is the opinion of the Receiver that Aequitas was effectively insolvent from at least July 3, 2014. A review of Aequitas' communications with Investors and the audited year-end 2014 financial statements (issued May 29, 2015) expressly represent to the contrary. It is the Receiver's understanding that the Individual Defendants assert that Aequitas was not insolvent, as it was able to pay its liabilities when they came due. As the only source of capital was new investor funds — which were raised under misleading circumstances and the use of which was to pay the redemptions and return of earlier Investors is a classic signal of a Ponzi scheme — the purported ability to pay its current obligations does not belie the insolvency determination.

An additional signal of the deepening insolvency was Aequitas' increasing reliance on short term debt to bridge the looming maturity gap. In 2011, just 35% of senior and subordinated debt (for entities residing under ACF) matured within one year. By 2015, that rate had ballooned to 58%. This shift to shorter term money was in response to Aequitas' inability to raise sufficient long-term funds and was required to use the shorter maturities as an impetus to "fill the pipe." The combination of having too much debt, not having the right kind of debt at the right time, and lacking collateral or business income to repay that debt all foreshadowed the impending collapse of Aequitas when the fundraising ceased.[340]

| ACF Consolidated Notes Balance (A) As of December 31, | | | | | |
|---|---|---|---|---|---|
| | 2011 (B) | 2012 (B) | 2013 (B) | 2014 (B) | 2015 (A&C) |
| Senior Secured Notes | $ 29,527,893 | $ 36,269,756 | $ 49,186,185 | $ 75,165,294 | $ 146,157,012 |
| Subordinated Secured Notes | 164,756,585 | 182,616,185 | 249,825,093 | 354,270,566 | 323,663,780 |
| **Total ACF Consolidated Notes** | **$ 194,284,478** | **$ 218,885,941** | **$ 299,011,278** | **$ 429,435,860** | **$ 469,820,792** |

| Future maturities of senior and subordinated debt: | | | | | |
|---|---|---|---|---|---|
| 1 year | $ 67,874,339 | $ 90,451,377 | $ 103,664,311 | $ 220,614,727 | $ 272,812,177 |
| 2 years | 57,576,040 | 40,661,566 | 69,688,052 | 88,873,805 | 95,456,507 |
| 3 years | 14,578,031 | 51,099,560 | 61,234,483 | 73,639,210 | 40,832,696 |
| 4 years | 39,657,632 | 34,273,438 | 52,053,090 | 36,543,317 | 54,809,482 |
| 5 years | 10,281,035 | 2,400,000 | 12,371,342 | 9,764,801 | 5,909,930 |
| Thereafter | 4,317,400 | - | - | - | - |
| **Total** | **$ 194,284,477** | **$ 218,885,941** | **$ 299,011,278** | **$ 429,435,860** | **$ 469,820,792** |

Note A: In 2015 Aequitas restructured entity ownership and moved certain assets and liabilities to other entities under AH. 2015 balances include 2014 debt which still existed at 12/31/2015 but was no longer under the ACF consolidation.

Note B: Source for 2011 through 2014 data - Aequitas Commercial Finance, LLC audited consolidated financial statements.

Note C: Source for 2015 data - Great Plains General Ledger Balance Sheets. Maturity data calculated from accounting records.

---

[340] The ACF consolidated notes balance chart includes notes that were held/originated in entities that consolidated under ACF (Private Note, CPH, DCEF, IOF, IOFII, CSF, MLFH, MLF, AP2PF & ACCFPH). Related to the 40 Act restructuring in 2015, $26.9 million of liabilities that were held under ACF were assigned (or converted) to other entities under AH (DCEF, IOF & AP2PF). To provide an appropriate comparison, these notes were added back into the 2015 balances shown above.

It is clear that the vast majority of Investor funds were not used to purchase consumer receivables. The following table summarizes the amount of debt related to consumer loan portfolio entities (both institutional debt and Investor debt) as compared to the consumer loan portfolio fair value. After satisfaction of the institutional debt, the remaining book value of the consumer loan portfolio only covers a fraction of the outstanding Investor debt[341] — starting at coverage of 37% of the Investor debt in the 4th quarter of 2013 and declining steadily to 24% in the 1st quarter of 2016.

| Summary of Aequitas Portfolio Assets to Debt (in millions) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Q4 2013 | Q1 2014 | Q2 2014 | Q3 2014 | Q4 2014 | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | Q1 2016 |
| Consumer Portfolios at Fair Value | $191.9 | $177.3 | $166.2 | $171.9 | $186.5 | $206.3 | $227.0 | $240.1 | $243.3 | $230.6 |
| Institutional Debt | -65.4 | -58.5 | -51.1 | -39.6 | -38.4 | -75.2 | -90.0 | -103.6 | -107.0 | -111.8 |
| Value After Retiring Institutional Debt | 126.5 | 118.7 | 115.0 | 132.2 | 148.1 | 131.1 | 137.0 | 136.5 | 136.3 | 118.8 |
| | | | | | | | | | | |
| **Investor Debt** | **$345.5** | **$363.3** | **$381.4** | **$410.9** | **$445.7** | **$464.6** | **$474.2** | **$469.4** | **$488.3** | **$494.6** |
| | | | | | | | | | | |
| Portfolio Coverage for Institutional Debt | 293% | 303% | 325% | 434% | 486% | 274% | 252% | 232% | 227% | 206% |
| Portfolio Coverage for Investor Debt | 37% | 33% | 30% | 32% | 33% | 28% | 29% | 29% | 28% | 24% |

The table also indicates that as of the end of the 4th quarter of 2013 there existed $126.5 million in book value of consumer receivables in excess of the institutional debt. Also note that as of the end of the 1st quarter of 2016 that excess had diminished to $118.8 million. Over that same period (Q1 2014 through Q1 2016), Aequitas raised a net $171 million in new Investor funds.[342] Given the decrease in equity in the consumer receivables portfolio, the funds raised were not used to purchase new receivables.

Finally, almost half of the new money raised during the Relevant Time Period was related to Private Notes ($81 million of the $171 million in new investments). Private Notes are direct debt obligations of ACF and purported to be collateralized by "all the assets of ACF"[343] (including the equity in ACF subsidiaries that own consumer receivables) rather than "backed" by the receivables themselves. A review of the Aequitas tear sheets[344] provided to Investors indicates a disclosure to Investors that:[345]

*ACF uses proceeds from Private Note primarily to fund or finance the purchase of student loan receivables from educational providers, patient-pay receivables from healthcare providers, other private credit strategy receivables and loan portfolios, or direct collateralized loan and lease obligations, equities, and secured liquidity lines to affiliates for general corporate purposes.*

That disclosure language was unchanged during the Relevant Time Period until the Q3 2015 tear sheet, which changed the order of cash uses such that:

*Proceeds from the sale of Notes to prior investors were used to fund or finance the purchase of private equity, loans to affiliates for operating capital, student loan receivables from educational providers, patient-pay receivables from healthcare providers, and other private credit strategy receivables and loan portfolios.*

---

[341] Investor debt in chart includes debt at Private Note, IOF, IOFII, IPF, EIF, A2PF, MLF, CSF, ACCFPH, ACCCPH and CPH.

[342] During the Relevant Time Period, Aequitas raised $322.9 million in new investments and redeemed $151.9 million in investments equaling a $171 million net increase in Investor funds. Additionally, Aequitas also paid out $80.9 million in interest and equity returns.

[343] During the Relevant Time Period, the tear sheets provided to Private Note Investors describe the collateral as a "Lien on all assets of ACF" until the Q3 2015 tear sheet, when the language is changed to a "Subordinated lien on all assets of ACF".

[344] Used throughout the Report, a "tear sheet" refers to a fact sheet and marketing material compiled by Aequitas for Aequitas Funds or SPEs, intended to summarize the holdings and financial performance of the Aequitas Fund or SPE, and provided to current and prospective investors.

[345] See Exhibit E.8 for a summary of the Private Note and IOF II tear sheet disclosures.

### E.7. Overstated investment returns and understated risks and losses[346]

The SEC identifies several Ponzi scheme "red flags" which include (1) high investment returns with little or no risk and (2) overly consistent returns.[347] In the instant case, Aequitas promoted the various debt instruments as

> *High-yielding, secured, subordinated debt instrument issued by Aequitas Commercial Finance, LLC ("ACF"). The Private Notes are issued as direct obligations of ACF and are supported by the balance sheet of ACF. The Notes are structured to provide a fixed quarterly return and principal return upon maturity.*[348]

Further, Aequitas offered this summary of weighted average interest rates compared to key market returns:[349]

**Offering Summary: Weighted Average Interest Rate (2008-2015)**

| Year | Q1 | Q2 | Q3 | Q4 | Annual Return | Barclays US Aggregate Bond Index | Barclays US Corporate High Yield Index |
|------|-----|-----|-----|-----|---------------|-------------------|--------------------|
| 2008 | 3.6% | 3.6% | 3.4% | 3.4% | 14.0% | 5.2% | -26.2% |
| 2009 | 3.2% | 3.1% | 3.3% | 3.3% | 13.0% | 5.9% | 58.2% |
| 2010 | 3.2% | 3.0% | 3.1% | 3.0% | 12.4% | 6.5% | 15.1% |
| 2011 | 3.0% | 2.9% | 2.9% | 2.9% | 11.7% | 7.8% | 5.0% |
| 2012 | 2.9% | 2.9% | 2.9% | 2.9% | 11.6% | 4.2% | 15.8% |
| 2013 | 2.8% | 2.8% | 2.7% | 2.6% | 10.9% | -2.0% | 7.4% |
| 2014 | 2.6% | 2.6% | 2.5% | 2.5% | 10.2% | 6.0% | 2.5% |
| 2015 | 2.5% | 2.6% | 2.5% | - | 10.1% | 1.1% | -2.5% |

Aequitas clearly marketed these investments as yielding higher returns than otherwise comparable available investments and was only able to pay these "overly consistent returns" not based on the earnings of the underlying investments made by Aequitas, but rather the continued funding from new Investors. As demonstrated earlier in this Report, each of the operating companies were hemorrhaging cash and the structure of the debt portfolios were flawed to the extent that they could not support the debt service of the combined enterprise. Further, Aequitas understated its losses through inflated asset valuations, debt conversion into equity, and failure to recognize losses as they were incurred.

### E.8. False statements provided to customers

*SEC Complaint - ACF and the Aequitas Funds also sent out quarterly updates to Investors, approved by Jesenik and Oliver and with financial information approved by Gillis, falsely stating in 2015 that ACF was using Investor money primarily to purchase receivables.*

The Receiver reviewed quarterly updates provided to Investors in Private Note (Q1 2014 through Q3 2015) and IOFII (Q4 2014 through Q3 2015). A summary of the pertinent language from each of the quarterly updates is attached to this Report and changes from period to period are highlighted. It is our understanding that significant revisions to the disclosures were in process for the Q4 2015 updates – which changes were never finalized, and updates never provided. The disclosures on the periodic updates

---

[346] *Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 630 (Bankr. S.D. Ohio 2006); In re Taubman 160 B.R. 964, 978 (Bankr. S.D. Ohio 1993); Kapila v. Phillips Buick-Pontiac-GMC Truck, Inc. (*In re ATM Fin. Servs., LLC*), 2011 Bankr. LEXIS 2394, at *15 (Bankr. M.D. Fla. 2011) and *Wing v. Dockstader*, 2010 WL 5020959 at *4 (D. Utah 2010).

[347] https://www.sec.gov/fast-answers/answersponzihtm.html.

[348] May 21, 2014, "Aequitas Private Note Tear Sheet Investment Advisor Q1 2014.pdf ". Aequitas Commercial Finance, Quarterly Update, Performance Summary Q1 2014.

[349] December 18.2015, "AequitasCapital_PN_TearSheet-Q32015_RIA.pdf". Aequitas Commercial Finance, Quarterly Update, Performance Summary Q3 2015.

clearly indicate a focus on the acquisition of consumer debt receivables with the stated purpose of providing "secured liquidity lines to affiliates for general corporate purposes" listed last – if at all.

## F.   History of Aequitas Funds

### F.1. Direct Note summary

Since establishment of the Direct Note program, 33 notes, totaling $44.9 million in principal, were issued to Investors.  As of the beginning of the Receivership, $40.1 million in principal remains outstanding.

These notes were issued by the following seven SPE entities:

- ACC C Plus Holdings, LLC
    - Previously ACC Holdings 2, LLC
- ACC F Plus Holdings, LLC
- Aequitas Corporate Lending, LLC
- Aequitas Peer-to-Peer Funding, LLC
- CarePayment Holdings, LLC[350]
- MotoLease Financial Holdings, LLC
- MotoLease Financial, LLC

Of the $44.8 million direct investment notes issued, only 61% ($27.2 million) were a result of direct cash consideration being sent to the SPE entity, either through newly invested funds or through cash intercompany transfers.  The remaining 39% ($17.6 million) were issued by entities which "assumed" the liability through a series of accounting journal entries, without receiving cash consideration.  For these non-cash notes, the money could either be deposited into a non-SPE related Aequitas entity (such as AH) or a note could be "redeemed" from another Aequitas Fund (such as IOF, DCEF or CSF), and its liability would be converted into an SPE entity above.

The principal amount of the Direct Notes can be broken down into the sub-categories as follows:

1. Receipt of cash consideration by an SPE: 61%
    a. Cash received & was ultimately utilized by the issuing SPE: 23%
    b. Cash received & was ultimately disbursed to ACF and affiliates for corporate use: 38%
2. No cash consideration to an SPE: 39%
    a. New incoming funds (to a different entity): 9%
    b. Converted Aequitas Fund investments: 30%

While most of the Direct Notes would have the entire amount of their principal included in either category 1 or 2, there are some notes which are a combination of cash and non-cash transfers/conversions, namely note ACLLLC00003 and CPHLLC00001 to TGM and Weider, respectively.  Additional summary can be found in the corresponding chart, by date of origination.

---

[350] CPH also received a series of four advances in February and March 2016, totaling $1.5 million, through a business loan agreement with CPYT (an Extended Entity of the Receivership).  This is excluded from the analysis in this section, as is outside the definition of a Direct Note.

| # | Issued to | Registry No. | Note Struct | Remaining Amt | Retired? | Redem. Date | Cash Consid. | Cash Use / Transfer Details |
|---|-----------|--------------|-------------|---------------|----------|-------------|--------------|------------------------------|
| 1 | Integrity Capital Income Fund, Inc. | A2PPFLLC00003 | Sub | 51,500.00 | | | Yes | Funds trsf to ACF-PN |
| a | | | | 500,000.00 | | | Yes | Funds trsf to ACF-Ops |
| b | | | | | (448,560.00) Partial | 2-Feb-16 N/A | Yes | Funds received from AH equity infusion |
| 2 | Integrity Capital Income Fund, Inc. | MLFILLC00007 | Sub | 500,000.00 | | | No | Used in ACF to redeem 2 Hybrid investors |
| 3 | IBAT, LLP | A2PPFLLC00004 | Sub | 0.00 | | | | |
| a | | | | 200,000.00 | (200,000.00) Retired | 2-Feb-16 N/A | Yes | Funds sent to OnDeck for asset purchase |
| 4 | IBAT, LLP | MLFILLC00008 | Sub | 200,000.00 | | | Yes | Funds received from AH equity infusion |
| 5 | Finance 500 401K Plan FBO Robert L. Hicks | ACCH2LLC00009 | Sub | 500,000.00 | | | Yes | Funds trsf to ACF-Ops |
| 6 | Perennial Specialty Income Fund, LP | ACCH2LLC00010 | Sub | 1,000,000.00 | | | Yes | Funds trsf to ACF-PN |
| 7 | Perennial Specialty Income Fund, LP | ACCH2LLC00011 | Sub | 1,000,000.00 | | | Yes | Funds trsf to ACF-Ops |
| 8 | Integrity Capital Income Fund, Inc. | A2PPFLLC00009 | Sub | 75,000.00 | | | Yes | Funds received from AH equity infusion |
| 9 | IBAT, LLP | A2PPFLLC00010 | Sub | 98,500.00 | | | Yes | Funds trsf to ACF-Ops |
| a | | | | 250,000.00 | | | Yes | Funds received from new EIF Investor and CPLLC distribution |
| b | | | | | (151,500.00) Partial | 2-Feb-16 N/A | No | Used for COFS nID BancGroup investment |
| 10 | William Ruh | AC1LLC00002 | Sr. Sec. | 0.00 | Retired | 4-Aug-15 | No | Prior Investment in ACF-PN |
| a | | | | 536,986.28 | | | No | Prior Investment in DCEF |
| b | | | | 750,000.00 | | | No | Commgled corporate-wide transfer from ACF |
| c | | | | | (1,286,986.28) Retired | | No | Commgled corporate-wide transfer from ACF |
| 11 | Terrell Group Management | AC1LLC00003 | Sr. Sec. | 7,668,000.00 | | | No | Funds trsf to ACCH2 |
| a | | | | 5,918,000.00 | | | No | Funds trsf to ACF-Ops |
| b | | | | 1,850,000.00 | | | No | Funds trsf to ACF-Ops |
| c | | | | 5,000.00 | | | Yes | Prior Investment in IOF |
| d | | | | 100,000.00 | | | No | Funded from distribution from CSF |
| e | | | | 422,100.00 | | | No | Funded from new IOFH investors & ACM disbursement/EIF+ interest pmt |
| f | | | | 550,000.00 | | | No | Prior Investment in CSFLI |
| g | | | | 500,000.00 | | | No | Funds trsf to ACF-Ops |
| h | | | | 500,000.00 | (150,000.00) Partial | 19-Nov-15 N/A | No | Funds trsf to ACF-Ops |
| i | | | | | (1,527,100.00) Partial | 31-Dec-15 N/A | No | Funds trsf to ACF-Ops |
| 12 | Weider Health & Fitness | CPHLLC00001 | Sr. Sec. | 10,000,000.00 | | | | |
| a | | | | 6,000,000.00 | | | No | Prior Investment in CSFLI |
| b | | | | 4,000,000.00 | | | Yes | Funds trsf to ACF-Ops |
| 13 | Bruce Forman | CPHLLC00002 | Sr. Sec. | 500,000.00 | | | No | Prior Investment in CSFLI |
| 14 | Perennial Specialty Income Fund, LP | CPHLLC00004 | Sub | 500,000.00 | | | Yes | Injected into CPLLC |
| 15 | Thomas Vredevelt Jr | CPHLLC00005 | Sub | 500,000.00 | | | Yes | Injected into CPLLC |
| 16 | Etheridge Group, LLC | CPHLLC00005 | Sub | 500,000.00 | | | Yes | Injected into CPLLC |
| 17 | Integrity Capital Income Fund, Inc | CPHLLC00006 | Sub | 1,000,000.00 | | | Yes | Injected into CPLLC |
| 18 | Cinffield Revocable Trust | MLFILLC00002 | Sr. Sec. | 1,000,000.00 | | | Yes | Funds trsf to ACF-Ops |

| # | Name | Code | Type | Amount | Date | Funded | Notes |
|---|------|------|------|--------|------|--------|-------|
| 19 | The Zanderic Trust | MLFLLC00001 | Sr. Sec. | 2,000,000.00 | | Yes | Funds trsf to MLFH and used to redeem IOFII Note and tsf to ACF |
| 20 | BriLight Investments, LLC | MLFLLC00003 | Sr. Sec. | 0.00 | | Yes | Funds trsf to MLFH and used to redeem IOFII Note and tsf to ACF |
| a | | | | 1,000,000.00 | 2-Dec-15 N/A | No | Funded from later MLFH investment |
| b | | | | (1,000,000.00) Retired | | | Prior Investment in ACF-PN |
| 21 | RF MacDonald Co. | MLFLLC00004 | Sr. Sec. | 1,000,000.00 | | Yes | Funds trsf to ACF-Ops |
| 22 | MacDonald Family Trust DTD 12/5/2000 | MLFLLC00005 | Sr. Sec. | 500,000.00 | | Yes | Funds trsf to ACF-Ops |
| 23 | MacDonald Family Trust DTD 2/20/2009 | MLFLLC00006 | Sr. Sec. | 500,000.00 | | Yes | Funds trsf to MLFH and used to redeem IOFII Note and tsf to ACF |
| 24 | Stephenson Ventures | ACCFPHLLC00005 | Sub | 1,000,000.00 | | Yes | Funds used to redeem IOFII Note, ultimately ending at ACF |
| 25 | Royal Fund, LP | ACCFPHLLC00006 | Sub | 1,000,000.00 | | Yes | Funds used to redeem IOFII Note, ultimately ending at ACF |
| 26 | Stephenson Ventures | CPHLLC00007 | Sub | 1,000,000.00 | | Yes | Injected into CPLLC |
| 27 | Royal Fund, LP | CPHLLC00008 | Sub | 1,000,000.00 | | Yes | Injected into CPLLC |
| 28 | Stephenson Ventures | MLFHLLC00016 | Sub | 1,000,000.00 | | Yes | Funds trsf to MLFH and used to redeem BriLight |
| 29 | Royal Fund, LP | MLFLLC00017 | Sub | 1,000,000.00 | | Yes | Funds used to redeem IOFII Note and tsf to ACF |
| 30 | Stephenson Ventures | MLFLLC00007 | Sub | 1,000,000.00 | | Yes | Funds trsf to MLFH and used to redeem IOFII Note and tsf to ACF |
| 31 | Royal Fund, LP | MLFLLC00008 | Sr. Sec. | 1,000,000.00 | | Yes | Funds used to redeem IOFII Note, ultimately ending at ACF |
| 32 | Stephenson Ventures | CPHLLC00009 | Sub | 1,500,000.00 | | Yes | Injected into CPLLC |
| 33 | Perennial Specialty Income Fund, LP | MLFLLC00009 | Sr. Sec. | 1,000,000.00 | | Yes | Funds used to redeem IOFII Note, ultimately funding new ACL or CPH note |

### F.2. Direct Note details in order of origination

AP2PFLLC00003 - Integrity Capital Income, Inc.:[351]

Funds were deposited on November 17, 2014 into AP2PF, but were swept out of the account, ultimately transferred to the ACF-PN account.[352]  Integrity Capital received a partial early redemption (3 months prior to scheduled redemption) of $449 thousand on February 2, 2016.[353]  Per former Aequitas staff recollections, this was due to AP2PF being under-collateralized, and therefore AH injected enough cash in order complete an $800 thousand redemption to outside entities and a $1.5 million redemption to IOF.  The Aequitas Fund Operations department coordinated with Integrity Capital and IBAT to allocate the $800 thousand among three of its four notes.

Additional details:

- $500 thousand initial amount on November 17, 2014

- Subordinated, 18 months @ 14.5%

- Received partial redemption of $449 thousand at 15 months on February 2, 2016

    - $51 thousand remaining

MLFHLLC00007 - Integrity Capital Income Fund, Inc.:[354]

As a bank account for MLFH was not operational until December 2014, funds were deposited into the ACF-Op account on November 19, 2014.[355]  The cash was immediately used to redeem two former AHF Investors (Langer Family Trust and R4Sons).  Accounting then labeled the investment as an ACF due-to MLF, and it remained as such on the books for some time.[356]

Additional details:

- $500 thousand initial amount on November 19, 2014

- Subordinated, 18 months @ 14.5%

AP2PFLLC00004 – IBAT, LLP:[357]

Funds were deposited into AP2PF on December 5, 2014 and were sent to OnDeck to complete an asset purchase.[358]  IBAT received a full early redemption (3 months prior to scheduled redemption) on February 2, 2016.[359]  Per former Aequitas staff recollections, this was due to AP2PF being under-collateralized, and therefore AH injected enough cash in order complete an $800 thousand redemption to outside entities and a $1.5 million redemption to IOF.  Aequitas Fund Operations department coordinated with Integrity Capital and IBAT to allocate the $800 thousand between three of their four notes.

Additional details:

---

[351] November 17, 2014, "AP2P - Subordinated Promissory Note $500K (Integrity Capital Income Fund) 11-17-14.pdf".
[352] Aequitas Peer-to-Peer Funding LLC November 2014 Full Analysis Checking.
[353] Email from Schuler to Hulquist, February 1, 2016, "FW: ICIF bank details".
[354] November 19, 2014, "MLFH Subordinated Note - $500K (Integrity Capital) 11-19-14.pdf".
[355] Aequitas Commercial Finance LLC December 2014 Full Analysis Checking.
[356] November 30, 2014, "Standard Journal Form – JE# 195749".
[357] December 5, 2014, "AP2P - Subordinated Promissory Note $200K (IBAT) 12-05-14.pdf".
[358] Aequitas Peer-to-Peer Funding LLC December 2014 Full Analysis Checking.
[359] Email from Schuler to Hulquist, February 1, 2016, "FW: ICIF bank details".

- $200 thousand initial amount on December 5, 2014

- Subordinated, 18 months @ 14.5%

- Received full redemption at 15 months on February 2, 2016

MLFHLLC00008 – IBAT, LLP:[360]

Funds were deposited into MLFH's bank account on December 5, 2014.[361]  From there, the cash was transferred to ACF-Op for corporate use three days later.

Additional details:

- $200 thousand initial amount on December 5, 2014

- Subordinated, 18 months @ 14.5%

ACCH2LLC00009 - Finance 500 401K Plan FBO Robert L. Hicks:[362]

Funds were deposited into ACCFT-2's bank account on March 2, 2015, with the note being issued the following day (March 3, 2015).[363]  From there, the funds were transferred into ACCH2, the obligor on the note.  After reaching ACCH2, funds were transferred to ACF-Op, as an equity disbursement, for corporate use.  The note was amended on May 1, 2015 to assign it newly formed Aequitas entity ACCCPH through a non-cash equity investment in ACCH2 by ACCCPH of $505 thousand.[364]

Additional details:

- $500 thousand initial amount on March 3, 2015

- Subordinated, 36 months @ 12.5%

ACCH2LLC00010 - Perennial Specialty Income Fund, LP:[365]

Funds were deposited into ACCH2 on March 9, 2015; however, the note was issued as of March 6 (funds received 3 days after issuance).[366]  The following day, the funds were distributed up to ACF-Op for corporate use.  The note was amended on May 1, 2015 to assign it to newly formed Aequitas entity ACCCPH through a non-cash equity investment in ACCH2 by ACCCPH of $1.0 million.[367]

Additional details:

- $1.0 million initial amount on March 6, 2015

- Subordinated, 36 months @ 12.5%

ACCH2LLC00011 - Perennial Specialty Income Fund, LP:[368]

Funds were deposited into ACCH2 on March 17, 2015; however, the note was issued as of March 13 (funds received 4 days after issuance).[369]  Funds were transferred to ACF-PN, part of which went to a

---

[360] December 5, 2014, "MLFH Subordinated Note - $200K (IBAT) 12-05-14.pdf".

[361] ML Financial Holdings, LLC December 2014 Full Analysis Checking.

[362] March 10, 2015, "ACCH2 - Subordinated Note $5000,000.00 (Finance 500) 03-03-15.pdf".

[363] ACC Funding Trust 2014-2 March 2015 Full Analysis Checking.

[364] May 15, 2015, "Assignment and Assumption Agreement - F500 $500K Note-Robert Hicks (ACCH2 to ACCC+) 05-01-15.pdf".

[365] March 10, 2015, "ACCH2 - Subordinated Note $1,000,000.00 (Perennial Specialty Income Fund) 03-06-15.pdf".

[366] ACC Holdings 2, LLC March 2015 Full Analysis Checking.

[367] May 20, 2015, "Assignment and Assumption Agreement - Perennial 3-6-15 $1M Note (ACCH2 to ACC C+) 05-01-15.pdf".

[368] March 17, 2015, "ACCH2 - Subordinated Note $1,000,000.00 (Perennial Specialty Income Fund) 03-13-15.pdf".

[369] ACC Holdings 2, LLC March 2015 Full Analysis Checking.

Private Note Millennium Trust redemption. The note was amended on May 1, 2015 to assign it to newly formed ACCCPH through a non-cash equity investment in ACCH2 by ACCCPH of $1.0 million.[370]

Additional details:

- $1.0 million initial amount on March 13, 2015

- Subordinated, 36 months @ 12.5%

AP2PFLLC00009 - Integrity Capital Income Fund, Inc.:[371]

Funds were deposited into AP2PF on April 16, 2015.[372] Cash was later combined with incoming funds from IBAT (AP2PFLLC00010) and transferred to ACF-Op on April 20 for corporate use. This note was the only outside AP2PF note that did not receive at least a partial redemption, per the February 2, 2016 allocation by IBAT and Integrity Capital.

Additional details:

- $75 thousand initial amount on April 16, 2015

- Subordinated, 18 months @ 14.5%

AP2PFLLC00010 – IBAT, LLP:[373]

Funds were deposited into AP2PF on April 16, 2015.[374] Cash was later combined with incoming funds from Integrity Capital (AP2PFLLC00009) and transferred to ACF-Op on April 20 for corporate use. IBAT received a partial early redemption (3 months prior to scheduled redemption) of $152 thousand on February 2, 2016.[375] Per recollections, this was due to AP2PF being under-collateralized; therefore, AH injected enough cash in order to complete a $800 thousand redemption to outside entities and a $1.5 million redemption to IOF. Fund Operations department coordinated with Integrity Capital and IBAT to allocate the $800 thousand between three of their four notes.

Additional details:

- $250 thousand initial amount on April 16, 2014

- Subordinated, 18 months @ 14.5%

- Received partial redemption of $152 thousand at 15 months on February 2, 2016

    - $98 thousand remaining

ACLLLC00002 - William (Bill) Ruh:[376]

For full details, see E.1.4. Initial $500 thousand investment was made into an insider-only Private Note "friends and family" short-term investment with a 15% interest rate (10% higher than offered to outside Investors). On May 13, 2015, Ruh's investment and accrued interest of $37 thousand was converted to ACL through a series of non-cash journal entries. Another $750 thousand investment was made via wire

---

[370] March 20, 2015, "Assignment and Assumption Agreement - Perennial 3-13-15 $1M Note (ACCH2 to ACC C+) 05-01-15.pdf".
[371] July 22, 2016, "AP2P - Subordinated Promissory Note $75K (Integrity Capital Income Fund) 04-16-15.pdf".
[372] Aequitas Peer-to-Peer Funding LLC April 2015 Full Analysis Checking.
[373] July 22, 2016, "AP2P - Subordinated Promissory Note $250K (IBAT) 04-16-15.pdf".
[374] Aequitas Peer-to-Peer Funding LLC April 2015 Full Analysis Checking.
[375] Email from Schuler to Hulquist, February 1, 2016, "FW: ICIF bank details".
[376] May 19, 2015, "ACL - Senior Secured Note $1,286,986.28 (Ruh) 05-13-15.pdf".

to COF on May 13, 2015 and was combined with other COF funds to complete a $2.6 million investment in nD Bancgroup (see "Ruh ACL Note Issuance" chart in E.1.4). Liability to repay this debt was then converted to ACL through a series of non-cash journal entries.

Ruh received a full repayment on August 4, 2015, three days after his scheduled redemption date.[377] The payment included his final monthly interest payment plus 4 days of additional 5% interest.[378] As ACL did not have the funds for the redemption, ACL received funds through a series of intercompany transfers originating from EIF and CPLLC (see "Ruh Redemption and Source of Funds" chart in E.1.4).

Additional details:

- $1.3 million note total

    - $537 thousand initial investment in Private Note

    - $750 thousand additional amount to COF

- Senior secured, 3 months @ 15% + a 5% rate increase for late payment

- Received full redemption at 3 months on August 4, 2015

ACLLLC00003 - Terrell Group Management:[379] [380]

For full details, see summary in E.1.5. Through a series of two Aequitas Fund and SPE investment conversions ($5.9 million and $500 thousand from DCEF and IOF, respectively) and five new investments ($2.9 million), the TGM note totaled $9.3 million by June 24, 2015. Out of the $9.3 million, only $500 thousand would be deposited into ACL's bank account, with the remainder sent to other Aequitas entities, and the liability for the note converted to ACL as reductions in its parent's (AH) equity.

TGM received two partial redemptions on November 19, 2015 and December 31, 2015, totaling $1.7 million, plus monthly interest.

Additional details:

- $9.3 million note total

    - $5.9 million initial investment in DCEF[381]

    - $500 thousand initial investment in IOF[382]

    - $1.1 million additional amount to AH[383]

    - $1.9 million additional amount to ACF[384]

- Senior secured, 13 months @ 13%

---

[377] Aequitas Corporate Lending, LLC August 2015 Full Analysis Checking.
[378] Email from Ruh to Abushaaban and Oliver, August 4, 2015, "Wiring Info".
[379] June 17, 2015, "ACL - Senior Secured Note $7,773,000 (Terrell Group) 05-20-15.pdf" as amended on May 27, 2015, June 11, 2015 and June 23, 2015.
[380] December 2, 2015, "(1) Business Loan Agreement (Terrell Group-ACL) 11-20-15.pdf"; December 8, 2015, "Terrell Group $9M Loan Facility - Contract Summary.docx".
[381] September 9, 2015, "Assignment and Assumption Agreement - Terrell Group Note (DCEF-ACF-AH-ACL) 05-20-15 v1_0.pdf"; June 25, 2015, "JE 224918 - 05.pdf".
[382] Email from Terrell to Oliver, June 19, 2015, "Doug Antone" and Aequitas Income Opprtunty (sic) Fund, LLC June 2015 Full Analysis Checking.
[383] Great Plains Journal Entries: 225456, 229391 and 226948.
[384] June 10, 2015, "Bank Transaction Posting Journal IAJ000017625" and "Bank Transaction Posting Journal IAJ000017626".

- Received two partial redemptions on November 16, 2015[385] ($150 thousand)[386] and December 31, 2015[387] ($1.5 million)

    - $7.7 million remaining

CPHLLC00001 - Weider Health & Fitness:[388]

For full details, see summary in E.1.2.  Through a series of four Aequitas Fund and SPE investment conversion ($6.0 million involving ACF, CPF and ASFGLI) and a new investment into CPH ($4.0 million), the Weider note totaled $10.0 million as of June 29, 2015.

Additional details:

- $10.0 million note total

    - $2.0 million initial investment in ACF

    - $2.0 million initial investment in CPF

    - $2.0 million initial investment in ASFGLI (also known as CSFLI)

    - $4.0 million additional amount to CPH

- Senior secured, 18 months @ 17%

CPHLLC00002 - Bruce Forman:[389]

For full details, see summary in E.1.2.  Funds were deposited into CPH on June 29, 2015 under the Weider note.

Additional details:

- $500 thousand initial amount on June 29, 2015

- Senior secured, 18 months @ 17%

CPHLLC00003 - Perennial Specialty Income Fund, LP:[390]

Funds were deposited into CPH on September 25, 2015; however, the note was issued as of September 18 (funds received 7 days after issuance).[391]  The standard note was revised to include a special ACF guarantee.[392]  The funds were then transferred to CPLLC for further originations.

Additional details:

- $1.0 million initial amount on September 25, 2015

- Subordinated, 30 months @ 12%

---

[385] Aequitas Corporate Lending, LLC November 2015 Full Analysis Checking.
[386] Email from How to Miller, November 18, 2015, "November Payment".
[387] Aequitas Corporate Lending, LLC December 2015 Full Analysis Checking.
[388] November 7, 2014, "Business Loan Agmt (CarePayment Holdings-Weider Health) 10-03-14.pdf" as amended on May 15, 2015; June 29, 2015, "A&R Business Loan Agreement - $10M (CarePayment Holdings-Weider Health) 06-29-15.pdf"; March 4, 2015, "Note $6MM (CarePayment Holdings-Weider Health) 10-03-14.pdf"; June 29, 2015, "A&R Promissory Note - $10M (CarePayment Holdings-Weider Health) 06-29-15.pdf".
[389] June 30, 2015, "A&R Promissory Note - $10M (CarePayment Holdings-Weider Health) 06-29-15.pdf"; June 30, 2015, "Promissory Note $500K (CarePayment Holdings-Forman) 06-29-15.pdf".
[390] September 28, 2015, "CPH Subordinated Note - ACF Guaranty $1,000,000 (Perennial Specialty Income Fund) 09-18-15.pdf".
[391] CarePayment, LLC September 2015 Full Analysis Checking.
[392] ACF guarantees were not included in prior notes issued to other individuals, but were added during the note negotiations that commenced in September 2015.

CPHLLC00004 - Thomas Vredevelt Jr.:[393]

Funds were deposited into CPH on September 18, 2015.[394]  Lender also received a special guarantee by ACF.  The funds were then combined with incoming funds from CPHLLC00005 & CPHLLC00006 and transferred to CPLLC for further originations.

Additional details:

- $500 thousand initial amount on September 18, 2015

- Subordinated, 30 months @ 12%

CPHLLC00005 - Etheridge Group, LLC:[395]

Funds were deposited into CPH on September 18, 2015.[396]  Lender also received a special guarantee by ACF.  The funds were then combined with incoming funds from CPHLLC00004 & CPHLLC00006 and injected into CPLLC for further originations.

Additional details:

- $500 thousand initial amount on September 18, 2015

- Subordinated, 30 months @ 12%

CPHLLC00006 - Integrity Capital Income Fund, Inc.:[397]

Funds were deposited into CPH on September 18, 2015.[398]  Lender also received a special guarantee by ACF.  The funds were then combined with incoming funds from CPHLLC00004 & CPHLLC00005 and injected into CPLLC for further originations.

Additional details:

- $1.0 million initial amount on September 18, 2015

- Subordinated, 30 months @ 12%

MLFLLC00002 - Ciuffitelli Revocable Trust:[399]

Funds were deposited into MLF on September 24, 2015.[400]  The following day, the funds were transferred to ACF-Op through a series of intercompany transfers.

On September 22, Oliver reached out to Aaron Douglas ("Doug") Maurer,[401] informing him that there were "timing challenges and opportunities at the upcoming 9/30/15 quarter end" and that Aequitas was seeking short-term bridge financing.  He offered 13% interest on a 40-70-day note, with 1st lien position.[402]

[393] October 6, 2015, "CPH Subordinated Note - ACF Guaranty $500,000 (Thomas Vredevelt Trust) 09-18-15.pdf".
[394] CarePayment, LLC September 2015 Full Analysis Checking.
[395] September 28, 2015, "CPH Subordinated Note - ACF Guaranty $500,000 (Etheridge Group) 09-18-15.pdf".
[396] CarePayment, LLC September 2015 Full Analysis Checking.
[397] September 28, 2015, "CPH Subordinated Note - ACF Guaranty $1,000,000 (Integrity Capital Income Fund) 09-18-15.pdf".
[398] CarePayment, LLC September 2015 Full Analysis Checking.
[399] October 7, 2015, "MLF Senior Secured Note - ACF Guaranty $1,000,000 (Ciuffitelli Trust) 09-24-15.pdf" as amended on December 2, 2015.
[400] MotoLease Financial, LLC September 2015 Full Analysis Checking.
[401] Maurer owned membership interest in PAG, an RIA under the AWM platform.  Maurer also held a consulting agreement with PAG.
[402] Email from Oliver to Maurer, September 23, 2015, "Opportunity Summary".

This was a new entity issuance, as all prior notes under the MotoLease structure had been originated out of MLFH, parent of MLF. Structurally, all newly issued MLF notes became senior to previously issued MLFH notes. Additionally, the lender received a special guarantee by ACF.

The note was marketed to be short term, with a maturity date of December 2, 2015 (69-day term). On November 9, Maurer emailed Oliver that, following their discussion, Lawrence Ciuffitelli had agreed to extend his note to June 30, 2016.[403]

Additional details:

- $1.0 million initial amount on September 24, 2015

- Senior secured, 69-day note, amended to 9 months @ 13%

MLFLLC00001 – The Zanderic Trust:[404]

Under the same Maurer special offer issuance as MLFLLC00002, Zanderic deposited $2.0 million to MLF on September 30, 2015.[405] On October 2, the funds were combined with MLFLLC00006 and distributed to MLFH and then sent to IOFII to redeem a Manufactured Note, MLFHLLC00014.[406] Funds were then transferred from IOFII to ACF-Op for corporate use. The redemption by IOFII of the internal note was highly contested by the fund manager at the time.

The note was marketed to be short term, with a maturity date of December 2, 2015 (63-day term). On November 9, Maurer emailed Oliver that, following their discussion, they had agreed to extend their note until March 31, 2016.[407]

Additional details:

- $2.0 million initial amount on September 30, 2015

- Senior secured, 63-day note, amended to 6 months @ 13%

MLFLLC00003 - BriLight Investments, LLC:[408]

Under the same Maurer special offer issuance, BriLight agreed to convert its Private Note into MLF rather than redeem, as a part of Oliver's request to Maurer, to keep additional funds available in the September 30, 2015 quarter end. On October 1, 2015, Accounting completed a series of non-cash journal entries to convert the liability to MLF.[409]

On December 2, 2015 the BriLight note came due. Oliver worked unsuccessfully with Maurer to attempt to get another investor to replace BriLight (Sims); however, ultimately the note became due for redemption. Funds from later note MLFHLLC00016, contributed by Stephenson Ventures, were contributed down to MLF to redeem BriLight.[410]

Additional details:

403 Email from Maurer to Oliver, November 9, 2015, "RE: Checking in".
404 September 30, 2015, "MLF Senior Secured Note - ACF Guaranty $2,000,000 (Zanderic Trust) 09-30-15.pdf" as amended on December 30, 2015.
405 MotoLease Financial, LLC September 2015 Full Analysis Checking.
406 Email from Abushaaban to Gillis, October 2, 2015, "Please Approve Intercompany Money Transfer".
407 Email from Maurer to Oliver, November 9, 2015, "RE: Checking in".
408 November 24, 2015, "MLF Senior Secured Note - ACF Guaranty $1,000,000 (BriLight Investments) 09-30-15.pdf".
409 Great Plains Journal Entries: 256864 and 255778.
410 MotoLease Financial, LLC December 2015 Full Analysis Checking.

- $1.0 million initial investment in Private Note

- Senior secured, 62-day note @ 13%

- Received full redemption on December 2, 2015

MLFLLC00004 - RF MacDonald Co.:[411]

Under the same Maurer special offer issuance as MLFLLC00002, RF MacDonald deposited $1.0 million into MLF on September 29, 2015, although the note was issued as of September 30, 2015.[412]  Through a series of transfers the funds were combined with MLFLLC00005 and ultimately distributed up to ACF-Op for corporate use.

The note was marketed to be short term, with a maturity date of December 2, 2015 (64-day term).  On November 13, Maurer emailed Oliver that, following their discussion, the MacDonald Family had agreed to extend their note until June 30, 2016.[413]

Additional details:

- $1.0 million initial amount on September 29, 2015

- Senior secured, 64-day note, amended to 9 months @ 13%

MLFLLC00005 - MacDonald Family Trust DTD 12/5/2000:[414]

Under the same Maurer special offer issuance as MLFLLC00002, MacDonald Family deposited an additional $500 thousand into MLF on September 29, 2015, although the note was issued as of September 30, 2015.[415]  Through a series of transfers, the funds were combined with MLFLLC00004 and ultimately distributed up to ACF-Op, for corporate use.

The note was marketed to be short term, with an expiration date of December 2, 2015 (64-day term).  On November 13, Maurer emailed Oliver that, following their discussion, the MacDonald Family had agreed to extend their note until June 30, 2016.[416]

Additional details:

- $500 thousand initial amount on September 29, 2015

- Senior secured, 64-day note, amended to 9 months @ 13%

MLFLLC00006 — MacDonald Family Trust DTD 2/20/2009:[417]

Under the same Maurer special offer issuance as MLFLLC00002, MacDonald Family deposited an additional $500 thousand into MLF on October 2, 2015.[418]  That same day, the funds were combined with MLFLLC00001 and distributed to MLFH, to be sent to IOFII to redeem internal note

---

[411] September 28, 2015, "MLF Senior Secured Note - ACF Guaranty $1,000,000 (R.F. MacDonald Co.) 09-30-15.pdf" as amended on December 2, 2015.
[412] MotoLease Financial, LLC September 2015 Full Analysis Checking.
[413] Email from Maurer to Oliver, November 13, 2015, "RE: Checking in".
[414] September 28, 2015, "MLF Senior Secured Note - ACF Guaranty $500,000 (James MacDonald Trust) 09-30-15.pdf" as amended on December 2, 2015.
[415] MotoLease Financial, LLC September 2015 Full Analysis Checking.
[416] Email from Maurer to Oliver, November 13, 2015, "RE: Checking in".
[417] October 5, 2015, "MLF Senior Secured Note - ACF Guaranty $500,000 (Mike MacDonald Trust) 10-02-15.pdf" as amended on December 2, 2015.
[418] MotoLease Financial, LLC October 2015 Full Analysis Checking.

MLFHLLC00014.[419]  Funds were then transferred from IOFII to ACF-Op for corporate use.  The IOFII redemption was highly contested by the fund manager at the time.

The note was marketed to be short term, with an expiration date of December 2, 2015 (61-day term).  On November 13, Maurer emailed to notify Oliver that, following their discussion, the MacDonald Family had agreed to extend their note until June 30, 2016.[420]

Additional details:

- $500 thousand initial amount on September 29, 2015

- Senior secured, 61-day note, amended to 9 months @ 13%

ACCFPHLLC00005 - Stephenson Ventures:[421]

A single check was deposited into ACCFPH on October 16, 2015 for both ACCFPHLLC00005 and ACCFPHLLC00006, although the note was issued as of October 15.[422]  Due to growing concerns over appropriate use of funds, the funds remained in the account until November 9, when Gillis approved a series of pay downs to IOFII.  Stephenson funds were combined with funds from ACCFPHLLC00006 and sent to IOFII.  From there, IOFII combined it with funds from MLFLLC00007 & MLFLLC00008 and transferred $4.0 million to CSF in exchange for a new CSF note (CSFLLC00014).  CSF then distributed the funds to ACF-Op for corporate use.[423]

Additional details:

- $1.0 million initial amount on October 15, 2015

- Subordinated, 12 months @ 12%

ACCFPHLLC00006 – Royal Fund, LP:[424]

A single check was deposited into ACCFPH on October 16, 2015 for both ACCFPHLLC00005 and ACCFPHLLC00006, although the note was issued as of October 15.[425]  Due to growing concerns over appropriate use of funds, the funds remained in the account until November 9, when Gillis approved a series of pay-downs to IOFII.  Royal funds were combined with funds from ACCFPHLLC00005 and sent to IOFII.  From there, IOFII then combined it with funds from MLFLLC00007 & MLFLLC00008 and transferred $4.0 million to CSF in exchange for a new CSF note (CSFLLC00014).  CSF then distributed the funds to ACF-Op for corporate use.[426]

Additional details:

- $1.0 million initial amount on October 15, 2015

- Subordinated, 12 months @ 12%

---

[419] Email from Abushaaban to Gillis, October 2, 2015, "Please Approve Intercompany Money Transfer".
[420] Email from Maurer to Oliver, November 13, 2015, "RE: Checking in".
[421] November 10, 2015, "ACCFPH Subordinated Promissory Note - $1,000,000 (Stephenson Ventures) 10-15-15.pdf".
[422] ACC F Plus Holding, LLC October 2015 Full Analysis Checking.
[423] Email from Bowman to Gillis, Jesenik, et. al, November 9, 2015, "Note Transactions and Cash Movements Today"; ACC F Plus Holding, LLC November 2015 Full Analysis Checking.
[424] November 10, 2015, "ACCFPH Subordinated Promissory Note - $1,000,000 (Royal Fund LP) 10-15-15.pdf".
[425] ACC F Plus Holding, LLC October 2015 Full Analysis Checking.
[426] Email from Bowman to Gillis, Jesenik, et. al, November 9, 2015, "Note Transactions and Cash Movements Today"; ACC F Plus Holding, LLC November 2015 Full Analysis Checking.

CPHLLC00007 - Stephenson Ventures:[427]

Funds were deposited into CPH on October 16, 2015, although the note was issued as of October 15. The funds were then injected into CPLLC for further originations.

Additional details:

- $1.0 million initial amount on October 15, 2015
- Subordinated, 36 months @ 8.5%

CPHLLC00008 - Royal Fund, LP:[428]

Funds were deposited into CPH on October 16, 2015, although the note was issued as of October 15. The funds were then injected into CPLLC for further originations.

Additional details:

- $1.0 million initial amount on October 15, 2015
- Subordinated, 36 months @ 8.5%

MLFHLLC00016 - Stephenson Ventures:

Funds were deposited into MLFH on October 16, 2015, although the note was issued as of October 15. Due to growing concerns over appropriate use of funds, the funds remained in the account until note MLFLLC00003 was redeemed to BriLight on December 2, 2015. At that time, funds were transferred from MLFH to MLF and then paid to BriLight.

Additional details:

- $1.0 million initial amount on October 15, 2015
- Subordinated, 12 months @ 14%

MLFHLLC00017 — Royal Fund, LP:

Funds were deposited into MLFH on October 16, 2015, although the note was issued as of October 15. Due to growing concerns over appropriate use of funds, the funds remained in the account until December 14, 2015, when the funds were sent to IOFII to partially retire insider note MLFHLLC00003. Funds were then sent from IOFII to ACCCPH, to issue note ACCCPHLLC00006 for further FFN asset purchases.

Additional details:

- $1.0 million initial amount on October 15, 2015
- Subordinated, 12 months @ 14%

MLFLLC00007 - Stephenson Ventures:[429]

A single check was deposited into MLF on October 16, 2015 for both MLFLLC00007 and MLFLLC00008, although the note was issued as of October 15.[430] Due to growing concerns over appropriate use of funds, the funds remained in the account until November 9 when Gillis approved a

---

[427] January 14, 2016, "CPH Subordinated Note - $1,000,000 (Stephenson Ventures) 10-15-15.pdf".
[428] January 14, 2016, "CPH Subordinated Note - $1,000,000 (Royal Fund LP) 10-15-15.pdf".
[429] November 10, 2015, "MLF Senior Secured Promissory Note - ACF Guaranty - $1,000,000 (Stephenson Ventures) 10-15-15.pdf".
[430] MotoLease Financial, LLC October 2015 Full Analysis Checking.

series of pay-downs to IOFII.  Stephenson funds were combined with funds from MLFLLC00008 and distributed up to MLFH.  After receipt, MLFH sent the funds to IOFII.  From there, IOFII then combined it with funds from ACCFPHLLC00005 & ACCFPHLLC00006 and transferred $4.0 million to CSF in exchange for a new CSF note (CSFLLC00014).  CSF then distributed the funds to ACF-Op for corporate use.[431]

Additional details:

- $1.0 million initial amount on October 15, 2015

- Senior secured, 12 months @ 9.25%

MLFLLC00008 - Royal Fund, LP:[432]

A single check was deposited into MLF on October 16, 2015 for both MLFLLC00007 and MLFLLC00008, although the note was issued as of October 15.[433]  Due to growing concerns over appropriate use of funds, the funds remained in the account until November 9, when Gillis approved a series of pay-downs to IOFII.  Royal funds were combined with funds from MLFLLC00007 and distributed up to MLFH.  After receipt, MLFH sent the funds to IOFII.  From there, IOFII then combined it with funds from ACCFPHLLC00005 & ACCFPHLLC00006 and transferred $4.0 million to CSF in exchange for a new CSF note (CSFLLC00014).  CSF then distributed the funds to ACF-Op for corporate use.[434]

Additional details:

- $1.0 million initial amount on October 15, 2015

- Senior secured, 12 months @ 9.25%

CPHLLC00009 - Stephenson Ventures:[435]

Funds were deposited into CPH on December 1, 2015, although the note was issued as of November 30. The funds were then injected into CPLLC for further originations.

Additional details:

- $1.5 million initial amount on November 30, 2015

- Subordinated, 12 months @ 7.5%

MLFLLC00009 - Perennial Specialty Income Fund, LP:[436]

Funds were deposited into MLF on December 30, 2015.  The following day, the funds were distributed to MLFH and transferred to IOFII and used to retire internal note MLFHLLC00012.  The funds were then comingled with a variety of funds from other internal sources and used to issue either a $1.3 million ACLLLC00009 note or a $300 thousand CPHLLC00014 note.

---

[431] Email from Bowman to Gillis, Jesenik et. al, November 9, 2015, "Note Transactions and Cash Movements Today"; ML Financial Holdings, LLC November 2015 Full Analysis Checking.
[432] November 10, 2015, "MLF Senior Secured Promissory Note - ACF Guaranty - $1,000,000 (Royal Fund LP) 10-15-15.pdf".
[433] MotoLease Financial, LLC October 2015 Full Analysis Checking.
[434] Email from Bowman to Gillis, Jesenik, et. al., November 9, 2015, "Note Transactions and Cash Movements Today"; ML Financial Holdings, LLC November 2015 Full Analysis Checking.
[435] December 1, 2015, "CPH Subordinated Note - ACF Guaranty $1,500,000 (Stephenson Ventures) 11-30-15.pdf".
[436] January 5, 2016, "MLF Senior Secured Note - ACF Guaranty $1,000,000 (Perennial Specialty Income Fund) 12-30-15.pdf".

Additional details:

- $1.0 million initial amount on December 30, 2015

- Senior secured, 6 months @ 13%

### F.3. Income Opportunity Fund

Fund summary:

Established in 2009, IOF was marketed to investors as a fixed interest Aequitas Fund (primarily 9% plus Enhanced Yield) to be paid quarterly in arrears.

In 2012, the PPM was updated on page 3 to describe the following investments to be the core investment strategy of IOF:[437]

> *The Fund intends to follow a value investing approach by acquiring or investing in receivables or loans with an intrinsic worth that is undervalued by the market. The Fund intends to achieve its investment objective by:*
>
> *1. Purchasing or participating in financing the purchase of portfolios of non-recourse educational receivables.*
>
> *2. Purchasing or participating in financing the purchase of portfolios of recourse and non-recourse motorcycle and other power sports equipment lease receivables (such as the MotoLease program).*
>
> *3. Purchasing or participating in financing the purchase of portfolios of non-recourse healthcare receivables.*
>
> *4. Originating, purchasing or participating in financing other commercial and consumer credit strategies.*
>
> *Proceeds from the Senior Notes may also be used to pay redemptions of previously issued Senior Notes and to provide for the Fund's working capital needs. In addition, cash assets of the Fund which are not immediately invested may be loaned on a short-term basis to an affiliate of the Fund at prevailing intercompany rates.*

As seen above, the main objective of IOF was to invest in portfolios related to CSF, MLF & CPH (and CPH subsidiaries). However, the PPM also allowed investments in "Other Investments" as described on page 10:

> *Other Investments: As part of its portfolio investments, the Fund may also hold secured debt positions, but the Fund does not anticipate that these investments will constitute a significant part of it overall assets.*

Furthermore, the PPM allowed for a "short-term" loans to affiliates of the fund, primarily ACF, through a subordinated promissory note.[438] The original PPM of the IOF fund did not include allowance for these short-term loans, but the PPM was edited after a 2010 Code of Conduct internal investigation[439] into

---

[437] December 31, 2012, "Confidential Private Place Memorandum, Aequitas Income Opportunity Fund, LLC".
[438] November 1, 2010, "(1) Note-Secured Subordinated $12MM (ACF-IOF) 11-01-10 v1_0" as amended on January 1, 2012, November 1, 2012, January 1, 2013, and January 1, 2015.
[439] In 2010, a former Corporate Controller brought allegations against ACM, concerning improper cash management procedures surrounding the use of cash received from Investors in IOF. The main concern was the loan to ACF and how it was presented to the Investors.

allegations against Aequitas by a former Corporate Controller.[440]  Per the findings of the 2010 investigation, the PPM did not include proper disclosures informing the Investors that these short-term loans were allowable.  While the short-term loan balance fluctuated up and down each month, there were at least three occasions between 2014 and 2015 when the short-term loan to ACF equaled between 8% and 9% of IOF's overall asset base.

2014 investment summary:

In the beginning of 2014, IOF had $33.6 million of outstanding senior notes to 179 Investors.  IOF had five primary investments that made up the bulk of its assets.  These were composed of secured note receivables from ACF (backed by ACF's equity in various portfolio entities, direct notes to CPYT and MSP, and short-term loans to ACF).  In January 2014, IOF held the following:

1. $11.8 million note receivable from ACF, backed by equity in MLF[441] ("IOF–ACF(MLF) Note")

2. $8.8 million note receivable from ACF, backed by equity in non-recourse student loans ("IOF–ACF(SL) Note")

3. $11.4 million participation interest in the ACF-CPYT Note

4. $1.8 million note receivable from MSP

5. $3.5 million short-term loan to ACF

Throughout 2014, the investment strategy remained consistent; however, there were changes to the asset mix as Investors were redeemed, transferred or converted, or note balances increased or decreased.  In 2014, there were $628 thousand of new additions or investment combinations, $1.3 million of transfers/conversions out of IOF to Private Note, and $3.5 million worth of cash redemptions out of IOF (resulting in a $4.1 million liability reduction).  Through various cash and equity transfers, the short-term loan to ACF was paid off and the asset base at the end of 2014 became:

1. $8.3 million IOF–ACF(MLF) Note

2. $6.8 million IOF–ACF(SL) Note

3. $16.0 million participation interest in the ACF-CPYT Note

4. $2.1 million note receivable from MSP

5. ~$0 short-term loan to ACF

January - May 2015 investment summary:

At the beginning of 2015, there were no large changes to the investment strategy for IOF.  However, in March, Aequitas decided to convert the MSP note receivable into equity in MSP.  To compensate IOF, ACF replaced the $2.1 million MSP note with an increase in IOF's investment in the IOF–ACF(MLF) Note.

---

[440] April 21, 2010, "Code of Conduct Investigation Report (IOF-ACF) 04-21-10 v1_0.pdf".  As this falls outside of the Investigation period, research has not been completed at this time.
[441] May 12, 2015, "Business Loan Agmt - MotoLease Receivables (ACF-IOF) 12-31-2012 v1_0.pdf"; May 12, 2015, "Commercial Security Agmt - MotoLease Receivables (ACF-IOF) 12-31-2012 v1_0.pdf".

In May, a large change to the investment makeup occurred, corresponding to the ACL restructure and TGM/Ruh participation.[442]  Effective May 1, ACF announced its intent to repurchase all IOF participation interest in the ACF-CPYT Note, totaling $18.1 million ($17.9 million of principal, and $160 thousand of accrued and unpaid interest).  Rather than giving IOF cash in exchange for the note, ACF increased the outstanding principal balance of its short-term promissory note.[443]  Later, to reduce the short-term promissory note balance, ACF increased its IOF–ACF(MLF) Note by $17.4 million through a non-cash advance.

40 Act impact and June 2015 IOF asset conversion:

As discussed earlier in this Report, ACF was required to obtain an opinion letter regarding its compliance with the 40 Act.[444]  In an attempt to avoid registration requirements (which would have had detrimental impacts on Aequitas' investment strategies, including loans/transfers to affiliates), ACF had to prove via calculation that it contained an appropriate level of deemed Good Assets versus Bad Assets.  ACF was determined to hold several Bad Assets that needed to be moved outside of ACF (through AH, IOF and other investment vehicles).  Moreover, ACF needed to acquire interest in additional Good Assets, some of which were identified as being owned by other AH subsidiaries and Aequitas Funds.

These Good Assets included interests in consumer receivables such as student loans, motorcycle loans and other consumer debt.  As $31.8 million of student and motorcycle loans were held in IOF, it was determined by management (in conjunction with many other transfers/conversions) that these assets would be contributed back to ACF in exchange for notes which were Bad Assets.[445]  In mid-July 2015, management approved a plan to remove IOF from under ACF, and to replace all the $31.8 million of IOF–ACF(MLF) and IOF–ACF(SL) Notes with the following, then back-dated the agreements to have them effective on June 30, 2015:[446]

1.  ACF sale of membership interest in IOF to AH[447]

    a.  $2.3 million

    b.  Consideration through a non-cash increase on the ACF-AH Note

2.  Assignment of ACL due to ACF receivable from ACF to IOF

    a.  $15.7 million

    b.  Consideration through a non-cash decrease in the amount owed by ACF to IOF under the IOF–ACF(MLF) Note and/or IOF–ACF(SL) Note

3.  Issuance of ACM promissory note to IOF

    a.  $7.1 million

    b.  Consideration through:

---

[442] October 25, 2015, "ACF JE Checklist - May.xlsx" tab JE M – 5; August 25, 2015, "Contribution Agreement - CPYT Loan (ACF to ACL) 05-01-15 v1_0.pdf".
[443] August 31, 2015, "JE 224521 - 05.pdf "; August 25, 2015, "Notice and Agreement Regarding Repurchase of Participation Interest (IOF-ACF) 05-01-15 v1_0.pdf".
[444] Aequitas asserted they were exempt under Section 3(c)5.
[445] November 4, 2015, "Paydowns - IOF NR JE (from Significant Transaction Memo).pdf"
[446] October 9, 2015 "Asset Reallocation Agreement - IOF (IOF-ACF-AH-ACM-P2P-CPH-ACL) 06-30-15 v1_0.pdf"; November 4, 2015, "Paydowns - IOF NR JE (from Significant Transaction Memo).pdf".
[447] October 9, 2015, "Sale of IOF Membership Agreement - IOF (ACF to AH) 06-30-15 v1_0"; November 5, 2015, "ACF Sale of IOF to AH Transactions.pdf", JE# 230407, JE# 230409 and JE# 230413.

      i.    Non-cash decrease in the amount owed by ACF to IOF under the IOF–ACF(MLF) Note and/or IOF–ACF(SL) Note

      ii.    Non-cash decrease in the ACF-AH Note

      iii.    Non-cash decrease in the ACM due to AH line of credit

4.  Issuance of a ACCCPH subordinated promissory note to IOF

    a.  $3.6 million

    b.  Consideration through:

      i.    Non-cash decrease in the amount owed by ACF to IOF under the IOF–ACF(MLF) Note and/or IOF–ACF(SL) Note

      ii.    Non-cash decrease in the ACF-AH Note

      iii.    AH reduction in value of ACCCPH equity

5.  Issuance of two AP2PF promissory notes to IOF

    a.  $750 thousand senior secured promissory note

    b.  $750 thousand subordinated promissory note

    c.  Consideration through:

      i.    Non-cash decrease in the amount owed by ACF to IOF under the IOF–ACF(MLF) Note and/or IOF–ACF(SL) Note

      ii.    ACF reduction in value of AP2PF equity

6.  Assignment of MSP loan from ACF to IOF

    a.  $675 thousand

    b.  Consideration through:

      i.    Non-cash decrease in the amount owed by ACF to IOF under the IOF–ACF(MLF) Note and/or IOF–ACF(SL) Note

7.  Assignment of QuarterSpot investment from ACF to IOF

    a.  $2.3 million, less reserve of ($171 thousand) plus cash of $339 thousand

    b.  Consideration through:

      i.    Non-cash decrease in the amount owed by ACF to IOF under the IOF–ACF(MLF) Note and/or IOF–ACF(SL) Note

In addition to the above, IOF distributed its net income for 2014 and the stub period of 2015 to ACF, and used that to offset a small intercompany balance for payments paid out of ACF on IOF's behalf.  To facilitate the new notes above, $28.7 million of notes in IOFII, EIF, ACF and AH had to be retired, as the SPEs' debts would exceed their assets if each held its prior notes as well as the new issuances to IOF.

Aequitas management and an analyst created a series of memos which were used to rationalize and seek approval for these changes.  These were originally presented to the IC on June 29, 2015,[448] were slightly revised to lower the expected interest rate of the newly-proposed assets (payable to IOF), and were approved on July 14, 2015.[449]  Essentially identical reports were then presented to the CRC on June 30, 2015.[450]  In the updated memo, the expected interest rate was calculated to be 11.7%, which was significantly less than the existing interest rate of 16% on the IOF–ACF(MLF) / IOF–ACF(SL) Notes.  However, it was presented as beneficial to IOF Investors because of the increased diversification the new notes would allow.  Neither memo mentioned that the underlying cause for the conversions is to help ACF comply with the 40 Act requirements.  It was not until the meeting minutes with the CRC that Gillis disclosed that the underlying reason for the conversion is for 40 Act compliance.[451]  Furthermore, in an email response from the lead analyst, it was suggested that they strike the conversation about 40 Act from the official record, per below:[452]

> *Bob, my only major concern is in the last line of the minutes. Is that portion of the conversation something that we want to officially record? We intentionally did not reference that motivation for the transaction in the memos presented to IC and CRC*

Ultimately, the sentence was not removed from the CRC minutes; however, an approved version of the minutes was not located after reasonable amount of research was conducted.

Objections to conversion:

As the IC and CRC memos were circulated, several objections were raised against the conversion, most notably by the Director of Compliance.[453]  In her objections, she raised the following points:[454]

> *Just read this CRC memo closer, and in conjunction with the IOF PPM dated 12/31/12, and I'm not sure how I understand how the new asset mix is contemplated by the PPM. The PPM, on page 9 and 10 in "investment thesis" lists the following strategies: education strategies, vehicular loans and leasing strategies, and non-recourse healthcare strategies. The last part "Other investments" states the following: "As part of its portfolio investments, the Fund may also hold secured debt positions, but the Fund does not anticipate that these investments will constitute a significant part of it[s] overall assets." The new asset mix has a bunch of the "other investments" and access to Ed plus through ACL. Does the "new asset mix" have a significant part in "other investments"?*

Without receiving a response, the proposed plan was approved by both IC and CRC, and the conversion took place.  The Director of Compliance went on record after the fact to state, while the conversion is technically allowed within the PPM, it would cause the "Other Investments" portion of IOF's asset mix to constitute a significant percentage of IOF's overall investments (which is against IOF's PPM Investment Strategy).[455]

July – December 2015 investment summary:

[448] June 29, 2015, "IC Minutes 06 29 15 (FINAL DRAFT).pdf".
[449] July 14, 2015, "IC Minutes 07 14 15 (APPROVED).pdf"; July 15, 2015, "MEMO Re: Income Opportunity Fund, LLC Asset Reallocation.
[450] June 30, 2015, "iof crc memo 20150630.pdf".
[451] August 18, 2015, "CRC MINUTES June 30 2015 draft.pdf".
[452] Email from Schock to Cataudella and Holmen, August 11, 2015, "RE: Transaction Outline - Conflicts Review Committee".
[453] Voluntarily resigned September 25, 2015.
[454] Email from Cataudella to MacRitchie and Mazer, July 7, 2015, "FW: Updated CRC Memo".
[455] Email from Cataudella to Chong, July 22, 2015, "FW: IC Minutes 7/14/15".

| | Jan-15 | May-15 | Jun-15 | Dec-15 |
|---|---|---|---|---|
| **Notes Receivable - Intercompany** | | | | |
| IOF–ACF(MLF) Note | $8.3M | $25.5M | | |
| IOF–ACF(SL) Note | $6.8M | $6.3M | | |
| ACL Note | | | $15.7M | $15.7M |
| AP2PF Senior Note | | | $750.0K | |
| AP2PF Sub Note | | | $750.0K | |
| ACC C+ Note | | | $3.6M | |
| ACM Note | | | $7.1M | $2.4M |
| **Total NR - Intercompany** | **$15.1M** | **$31.8M** | **$27.9M** | **$18.1M** |
| **NR - Related Party** | | | | |
| CPYT Note | $16.0M | | | |
| MSP Note | $2.1M | | | |
| MSP - Business Loan | | | $674.7K | $130.8K |
| Quarterspot Note | | | $2.3M | $724.7K |
| Quarterspot Reserve | | | - $171.4K | - $54.4K |
| **Total NR – Related Party** | **$18.0M** | **$0.0K** | **$2.8M** | **$801.2K** |
| **Short Term Loan to ACF / Due From ACF** | **$636.1K** | **$438.8K** | **$110.5K** | **$1.9M** |

After IOF was assigned its new investment mix, its structure substantially remained the same for the remainder of 2015. There were several changes to the balances on the assets, as described below.

In September of 2015, through a series of non-cash entries, IOF repaid a $5.8 million liability to AH that was created in August 2015. As a part of the entry, AH used $4.7 million to increase its equity in ACM. ACM in turn used the additional equity in order to pay down the note with IOF, all completed without cash being moved.[456]

In December of 2015, management reviewed AP2PF and, as a liquidating entity, it was determined to be severely under-collateralized. To compensate, AH contributed $2.0 million to AP2PF, of which $1.5 million was utilized to retire the entire IOF note outstanding. The remainder stayed in the AP2PF account and was used to redeem two outside Investors (Integrity Capital and IBAT) in February 2016.

Effective as of December 1, 2015, Jesenik and Gillis approved a series of non-cash journal entries, to assign IOF's ACCCPH Manufactured Note (ACCCPHLLC00002) to ACF, plus accrued interest of $137 thousand.[457] For consideration, IOF reduced a note payable that was outstanding to ACF (for IOF to Private Note Investor conversions) by $1.9 million. The remaining $1.7 million was added under the short-term loan to ACF, totaling the $1.9 million shown for December 2015 above. ACF then assigned the note to IOFII, taking a reduction in the ACF due to IOFII account.[458]

---

[456] November 9, 2015, "Adjusting Journal Form – JE# 254874".
[457] December 28, 2015, "Assignment of Note - $3.6M C+ Note (IOF to ACF) 12-01-15 v1_0.pdf".
[458] January 15, 2016, "Adjusting Journal Form – JE# 265026"; December 28, 2015, "Assignment of Note - $3.6M C+ Note (IOF to ACF) 12-01-15 v1_0.pdf"; December 28, 2015, "Assignment of Note - $3.6M C+ Note (ACF to IOF II) 12-01-15 v1_0.pdf".

On October 29, 2015, IOF received a principal payment from MSP, totaling $544 thousand.[459] Additionally, IOF received weekly cash deposits from Quarterspot, reducing the Quarterspot note by $1.6 million.

Conclusion:

At the end of 2015, IOF records show assets including $18.9 million in notes receivable, none of which was on account of any cash consideration.  Likewise, IOF did not receive cash consideration for the vast majority of the receivables reassigned to other Aequitas entities in June 2015, with exception of payments on notes such as Quarterspot and MSP.  In order to maintain compliance with the 40 Act, management and the AB approved these conversions, drastically changing IOF's investments as a whole.

### F.4. Income Opportunity Fund II

Summary of Assets:

During the active life of the Fund, IOFII received a total of 69 notes, for a gross principal amount of $131.1 million, from numerous Aequitas SPEs.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

---

[459] Email from Baldwin to How, October 29, 2015, "RE: MSP – IOF Business Loan Monthly Interest"; Aequitas Income Opprtunty (sic) Fund LLC October 2015 Full Analysis Checking.

| All IOFII Originations (Net) | | | | | | |
|---|---|---|---|---|---|---|
| **Credit Strategy Receivables** | **Base Policy Mix** | **Note Structure** | **Initial Principal** | **Min Interest Rate** | **Max Interest Rate** | **Wtd. Avg. Interest Rate** |
| Education | 41.7% | Sr. Secured | $29.129MM | 5.00% | 8.00% | 6.88% |
| | | Subordinated | $25.533MM | 14.00% | 21.00% | 17.00% |
| Transportation | 18.3% | Sr. Secured | $10.910MM | 8.25% | 8.25% | 8.25% |
| | | Subordinated | $13.049MM | 14.00% | 22.50% | 21.29% |
| Consumer (C+) | 11.8% | Sr. Secured | $1.655MM | 3.75% | 3.75% | 3.75% |
| | | Subordinated | $13.883MM | 12.50% | 22.50% | 19.17% |
| Consumer (F+) | 11.8% | Sr. Secured | $3.422MM | 5.75% | 5.75% | 5.75% |
| | | Subordinated | $12.086MM | 12.00% | 22.50% | 19.79% |
| Corporate | 7.4% | Sr. Secured | | | | |
| | | Subordinated | $9.748MM | 11.00% | 15.00% | 12.86% |
| Healthcare | 6.0% | Sr. Secured | | | | |
| | | Subordinated | $7.825MM | 8.50% | 11.00% | 9.57% |
| Real Estate | 2.2% | Sr. Secured | | | | |
| | | Subordinated | $2.919MM | 14.00% | 14.00% | 14.00% |
| Peer Lending | 0.7% | Sr. Secured | $0.408MM | 2.75% | 2.75% | 2.75% |
| | | Subordinated | $0.540MM | 22.50% | 22.50% | 22.50% |
| **Grand Total:** | **100.0%** | | **$131.108MM** | **2.75%** | **22.50%** | **13.40%** |

Of the $131.1 million of notes receivable, 83% ($109.0 million) were the result of non-cash journal entries (see IOFII note issuance, cash movement and redemption chart below). It was not until November 2015 that IOFII began sending funds directly to an SPE, per direction from new legal counsel. After that date, all but two note issuances would result from cash transfers, totaling $22.0 million of cash-consideration issuances (18 notes in total).

Between March 2015 and January 2016, IOFII was repaid $31.4 million of its intercompany notes receivable as a result of various management decisions (such as 40 Act compliance) or due to other SPE requirements (such as under-collateralization). With respect to 50.3% ($15.8 million) of the repayments, the SPE sent cash directly to IOFII. The remaining 49.7% was redeemed through non-cash journal

entries, similar to how the IOFII receivable was created.  In 11 cases, a note was received without cash consideration being sent, yet IOFII received cash from the SPE at redemption.

| As of March 2016 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| (Net) | | | | | | |
| Credit Strategy Receivables | Base Policy Mix | Note Structure | Initial Principal | Min Interest Rate | Max Interest Rate | Wtd. Avg. Interest Rate |
| Education | 54.8% | Sr. Secured | $29.129MM | 5.00% | 8.00% | 7.05% |
| | | Subordinated | $25.533MM | 14.00% | 21.00% | 16.16% |
| Transportation | 14.3% | Sr. Secured | $7.560MM | 8.25% | 8.25% | 8.25% |
| | | Subordinated | $6.655MM | 14.00% | 22.50% | 15.26% |
| Corporate | 8.0% | Sr. Secured | | | | |
| | | Subordinated | $7.940MM | 11.00% | 15.00% | 13.20% |
| Healthcare | 7.9% | Sr. Secured | | | | |
| | | Subordinated | $7.825MM | 8.50% | 11.00% | 9.34% |
| Consumer (F+) | 6.8% | Sr. Secured | | | | |
| | | Subordinated | $6.765MM | 12.00% | 22.50% | 20.43% |
| Consumer (C+) | 5.4% | Sr. Secured | | | | |
| | | Subordinated | $5.335MM | 12.50% | 22.50% | 22.06% |
| Real Estate | 2.9% | Sr. Secured | | | | |
| | | Subordinated | $2.919MM | 14.00% | 14.00% | 14.00% |
| Total: | 100.0% | | $99.662MM | 5.00% | 22.50% | 12.60% |
| Due-From ACF | | | $3.899MM | 0.00% | 0.00% | 0.00% |
| Grand Total: | | | $103.561MM | | | |

As of March 2016, IOFII had $99.7 million in SPE notes receivable, despite having $104.6 million of outstanding senior secured debt.  In addition to this principal shortfall, the required return or hurdle rate of IOFII was 14.0% yet the weighted average interest rate of the IOFII notes receivable was only 12.6%.

Out of IOFII's March 2016 notes receivable, 81.1% ($80.9 million) were issued without direct cash consideration going to the SPE, and only 18.9% ($18.8 million) were issued following a cash transfer.  IOFII also carries a $3.9 million due-from ACF asset on its balance sheet, from transfers IOFII made to ACF, for which formal notes were never received.

IOFII note issuance, cash movement and redemption chart:

| # | | Issued To: | Registry No. | Note Structure | Principal Amts | Issue Date | Maturity Date | Retirement Date | Cash Moved |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | IOFII | ACCH2LLC00001 | Sr. Secured | 0 | 1-Dec-14 | 1-Dec-15 | | |
| | a | | | | 254,000 | 1-Dec-14 | | | No |
| | b | | | | (254,000) | | | 1-Mar-15 | Yes |
| 2 | | IOFII | ACCH2LLC00002 | Subordinated | 0 | 1-Dec-14 | 1-Dec-15 | | |
| | a | | | | 307,000 | 1-Dec-14 | | | No |
| | b | | | | (307,000) | | | 1-Mar-15 | Yes |
| 3 | | IOFII | ACCH1LLC00001 | Sr. Secured | 0 | 1-Dec-14 | 1-Dec-15 | | |
| | a | | | | 285,000 | 1-Dec-14 | | | No |
| | b | | | | (285,000) | | | 1-Mar-15 | No |
| 4 | | IOFII | ACCH1LLC00002 | Subordinated | 0 | 1-Dec-14 | 1-Dec-15 | | |
| | a | | | | 276,000 | 1-Dec-14 | | | No |
| | b | | | | (276,000) | | | 1-Mar-15 | No |
| 5 | | IOFII | AP2PFLLC00001 | Sr. Secured | 0 | 1-Dec-14 | 1-Dec-15 | | |
| | a | | | | 161,000 | 1-Dec-14 | | | No |
| | b | | | | (161,000) | | | 1-Jun-15 | No |
| 6 | | IOFII | AP2PFLLC00002 | Subordinated | 0 | 1-Dec-14 | 1-Dec-15 | | |
| | a | | | | 213,000 | 1-Dec-14 | | | No |
| | b | | | | (213,000) | | | 1-Jun-15 | No |
| 7 | | IOFII | MLFHLLC00001 | Sr. Secured | 0 | 1-Dec-14 | 1-Dec-15 | | |
| | a | | | | 558,000 | 1-Dec-14 | | | No |
| | b | | | | (558,000) | | | 9-Nov-15 | Yes |
| 8 | | IOFII | MLFHLLC00002 | Subordinated | 0 | 1-Dec-14 | 1-Dec-15 | | |
| | a | | | | 377,000 | 1-Dec-14 | | | No |
| | b | | | | (377,000) | | | 1-Dec-15 | No |
| 9 | | IOFII | CSFLLC00001 | Sr. Secured | 131,000 | 1-Dec-14 | 31-Mar-16 | | No |
| 10 | | IOFII | CSFLLC00002 | Subordinated | 1,178,000 | 1-Dec-14 | 31-Mar-16 | | No |
| 11 | | IOFII | ACCH2LLC00003 | Sr. Secured | 0 | 1-Jan-15 | 1-Jan-16 | | |
| | a | | | | 1,229,131 | 1-Jan-15 | | | No |
| | b | | | | (1,229,131) | | | 1-Mar-15 | Yes |
| 12 | | IOFII | ACCH2LLC00004 | Subordinated | 0 | 1-Jan-15 | 1-Jan-16 | | |
| | a | | | | 1,482,188 | 1-Jan-15 | | | No |
| | b | | | | (1,482,188) | | | 1-Mar-15 | Yes |
| 13 | | IOFII | ACCH1LLC00003 | Sr. Secured | 0 | 1-Jan-15 | 1-Jan-16 | | |
| | a | | | | 2,751,786 | 1-Jan-15 | | | No |
| | b | | | | (2,751,786) | | | 1-Mar-15 | No |
| 14 | | IOFII | ACCH1LLC00004 | Subordinated | 0 | 1-Jan-15 | 1-Jan-16 | | |
| | a | | | | 2,670,852 | 1-Jan-15 | | | No |
| | b | | | | (2,670,852) | | | 1-Mar-15 | No |

| # | | Code | Type | Amount | Date 1 | Date 2 | Date 3 | Flag |
|---|---|------|------|--------|--------|--------|--------|------|
| 15 | IOFII | MLFHLLC00003 | Sr. Secured | 442,556 | 1-Jan-15 | 31-Mar-16 | | |
| | a | | | 3,234,556 | 1-Jan-15 | | | No |
| | b | | | (1,442,000) | | | 9-Nov-15 | Yes |
| | c | | | (1,350,000) | | | 14-Dec-15 | Yes |
| 16 | IOFII | MLFHLLC00004 | Subordinated | 0 | 1-Jan-15 | 1-Jan-16 | | |
| | a | | | 2,188,082 | 1-Jan-15 | | | No |
| | b | | | (2,188,082) | | | 1-Dec-15 | No |
| 17 | IOFII | CSFLLC00003 | Sr. Secured | 6,778,298 | 1-Jan-15 | 1-Jan-18 | | No |
| 18 | IOFII | CSFLLC00004 | Subordinated | 6,778,298 | 1-Jan-15 | 1-Jan-18 | | No |
| 19 | IOFII | ACCH2LLC00005 | Sr. Secured | 0 | 1-Feb-15 | 1-Feb-16 | | |
| | a | | | 171,967 | 1-Feb-15 | | | No |
| | b | | | (171,967) | | | 1-Mar-15 | Yes |
| 20 | IOFII | ACCH2LLC00006 | Subordinated | | 1-Feb-15 | 1-Feb-16 | | |
| | a | | | 207,373 | 1-Feb-15 | | | No |
| | b | | | (207,373) | | | 1-Mar-15 | Yes |
| 21 | IOFII | ACCH1LLC00005 | Sr. Secured | 0 | 1-Feb-15 | 1-Feb-16 | | |
| | a | | | 385,002 | 1-Feb-15 | | | No |
| | b | | | (385,002) | | | 1-Mar-15 | No |
| 22 | IOFII | ACCH1LLC00006 | Subordinated | 0 | 1-Feb-15 | 1-Feb-16 | | |
| | a | | | 373,678 | 1-Feb-15 | | | No |
| | b | | | (373,678) | | | 1-Mar-15 | No |
| 23 | IOFII | MLFHLLC00005 | Sr. Secured | 452,546 | 1-Feb-15 | 30-Jun-16 | | No |
| 24 | IOFII | MLFHLLC00006 | Subordinated | 0 | 1-Feb-15 | 1-Feb-16 | | |
| | a | | | 306,134 | 1-Feb-15 | | | No |
| | b | | | (306,134) | | | 1-Dec-15 | No |
| 25 | IOFII | CSFLLC00005 | Sr. Secured | 948,350 | 1-Feb-15 | 1-Feb-18 | | No |
| 26 | IOFII | CSFLLC00006 | Subordinated | 948,350 | 1-Feb-15 | 1-Feb-18 | | No |
| 27 | IOFII | AP2PFLLC00005 | Sr. Secured | 0 | 1-Mar-15 | 1-Mar-18 | | |
| | a | | | 150,138 | 1-Mar-15 | | | No |
| | b | | | (150,138) | | | 1-Jun-15 | No |
| 28 | IOFII | AP2PFLLC00006 | Subordinated | 0 | 1-Mar-15 | 1-Mar-18 | | |
| | a | | | 198,712 | 1-Mar-15 | | | No |
| | b | | | (198,712) | | | 1-Jun-15 | No |
| 29 | IOFII | MLFHLLC00009 | Sr. Secured | 1,456,599 | 1-Mar-15 | 30-Jun-16 | | No |
| 30 | IOFII | MLFHLLC00010 | Subordinated | 985,347 | 1-Mar-15 | 30-Jun-16 | | No |
| 31 | IOFII | CSFLLC00007 | Subordinated | 11,163,182 | 1-Mar-15 | 1-Mar-18 | | No |
| 32 | IOFII | AP2PFLLC00011 | Sr. Secured | 0 | 1-Apr-15 | 1-Apr-16 | | |
| | a | | | 97,255 | 1-Apr-15 | | | No |
| | b | | | (97,255) | | | 1-Jun-15 | No |
| 33 | IOFII | AP2PFLLC00012 | Subordinated | 0 | 1-Apr-15 | 1-Apr-16 | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | a | | | | 128,720 | 1-Apr-15 | | No |
| | b | | | | (128,720) | | 1-Jun-15 | No |
| 34 | IOFII | MLFHLLC00011 | Sr. Secured | 1,482,713 | 1-Apr-15 | 1-Apr-16 | | No |
| 35 | IOFII | MLFHLLC00012 | Subordinated | 0 | 1-Apr-15 | 1-Apr-16 | | |
| | a | | | | 1,003,012 | 1-Apr-15 | | No |
| | b | | | | (1,003,012) | | 30-Dec-15 | Yes |
| 36 | IOFII | ACLLLC00001 | Subordinated | 0 | 1-Apr-15 | 1-Apr-16 | | |
| | a | | | | 1,807,800 | 1-Apr-15 | | No |
| | b | | | | (1,807,800) | | 1-Jun-15 | No |
| 37 | IOFII | ACCCPHLLC00001 | Subordinated | 0 | 1-May-15 | 1-May-16 | | |
| | a | | | | 3,251,232 | 1-May-15 | | No |
| | b | | | | (3,251,232) | | 1-Jun-15 | No |
| 38 | IOFII | ACCFPHLLC00001 | Subordinated | 1,251,232 | 1-May-15 | 1-May-16 | | |
| | a | | | | 3,251,232 | 1-May-15 | | No |
| | b | | | | (2,000,000) | | 9-Nov-15 | Yes |
| 39 | IOFII | ACCFPHLLC00002 | Subordinated | 3,903,982 | 1-Jun-15 | 1-Jun-16 | | No |
| 40 | IOFII | MLFHLLC00013 | Sr. Secured | 3,725,906 | 1-Jun-15 | 1-Jun-16 | | No |
| 41 | IOFII | MLFHLLC00014 | Subordinated | 0 | 1-Jun-15 | 1-Jun-16 | | |
| | a | | | | 2,520,466 | 1-Jun-15 | | No |
| | b | | | | (2,520,466) | | 2-Oct-15 | Yes |
| 42 | IOFII | CSFLLC00009 | Subordinated | 5,465,575 | 1-Jun-15 | 1-Jun-18 | | No |
| 43 | IOFII | ACCCPHLLC00002 | Subordinated | 3,600,000 | 30-Jun-15 | 30-Jun-16 | | No |
| 44 | IOFII | ACCFPHLLC00003 | Subordinated | 1,460,249 | 1-Jul-15 | 1-Jul-16 | | No |
| 45 | IOFII | MLFHLLC00015 | Subordinated | 5,669,202 | 1-Jul-15 | 1-Jul-16 | | No |
| 46 | IOFII | ACLLLC00005 | Subordinated | 1,460,249 | 1-Jul-15 | 1-Jul-18 | | No |
| 47 | IOFII | ACLLLC00007 | Subordinated | 3,000,034 | 1-Aug-15 | 1-Aug-18 | | No |
| 48 | IOFII | ASHLLC00001 | Subordinated | 2,918,952 | 1-Aug-15 | 1-Aug-18 | | No |
| 49 | IOFII | CSFLLC00011 | Sr. Secured | 10,800,000 | 1-Sep-15 | 31-Mar-16 | | No |
| 50 | IOFII | CSFLLC00014 | Sr. Secured | 4,000,000 | 9-Nov-15 | 30-Jun-16 | | Yes |
| 51 | IOFII | ACCCPHLLC00004 | Subordinated | 1,500,000 | 16-Nov-15 | 30-Jun-16 | | Yes |
| 52 | IOFII | CPHLLC00010 | Subordinated | 2,000,000 | 25-Nov-15 | 30-Jun-16 | | Yes |
| 53 | IOFII | CSFLLC00016 | Sr. Secured | 2,871,216 | 1-Dec-15 | 1-Dec-16 | | No |
| 54 | IOFII | ACCCPHLLC00005 | Subordinated | 235,000 | 8-Dec-15 | 8-Dec-16 | | |
| | a | | | | 1,300,000 | 8-Dec-15 | | Yes |
| | b | | | | (1,065,000) | | 29-Jan-16 | Yes |
| 55 | IOFII | ACCCPHLLC00006 | Subordinated | 0 | 14-Dec-15 | 14-Dec-16 | | |
| | a | | | | 1,435,000 | 14-Dec-15 | | Yes |
| | b | | | | (1,435,000) | | 29-Jan-16 | Yes |
| 56 | IOFII | CPHLLC00011 | Subordinated | 2,000,000 | 14-Dec-15 | 14-Dec-16 | | Yes |
| 57 | IOFII | CPHLLC00012 | Subordinated | 825,000 | 17-Dec-15 | 17-Dec-16 | | Yes |

| 58 | IOFII | CSFLLC00017 | Sr. Secured | 2,000,000 | 23-Dec-15 | 23-Dec-16 | | No |
| 59 | IOFII | ACCFPHLLC00007 | Subordinated | 150,000 | 28-Dec-15 | 28-Dec-16 | | Yes |
| 60 | IOFII | CPHLLC00013 | Subordinated | 1,500,000 | 30-Dec-15 | 30-Dec-16 | | Yes |
| 61 | IOFII | CPHLLC00014 | Subordinated | 300,000 | 31-Dec-15 | 31-Dec-16 | | Yes |
| 62 | IOFII | ACLLLC00009 | Subordinated | 1,350,000 | 31-Dec-15 | 31-Dec-16 | | Yes |
| 63 | IOFII | CSFLLC00018 | Sr. Secured | 1,600,000 | 7-Jan-16 | 7-Jan-17 | | Yes |
| 64 | IOFII | ACCCPHLLC00003 | Subordinated | 0 | 15-Jan-16 | 15-Jan-17 | | |
| | a | | | 800,000 | 15-Jan-16 | | | Yes |
| | b | | | (800,000) | | | 16-Jan-16 | Yes |
| 65 | IOFII | ACLLLC00011 | Subordinated | 730,000 | 15-Jan-16 | 15-Jan-17 | | Yes |
| 66 | IOFII | ACLLLC00012 | Subordinated | 1,300,000 | 19-Jan-16 | 19-Jan-17 | | Yes |
| 67 | IOFII | ACLLLC00013 | Subordinated | 100,000 | 22-Jan-16 | 22-Jan-17 | | Yes |
| 68 | IOFII | CPHLLC00016 | Subordinated | 800,000 | 1-Feb-16 | 1-Feb-17 | | Yes |
| 69 | IOFII | CPHLLC00017 | Subordinated | 400,000 | 8-Feb-16 | 8-Feb-17 | | Yes |

IOFII Issues Summary:

Due-from ACF:

IOFII was heavily involved in the Manufactured Note process, as a vehicle to bring new investor funds into the enterprise to be used as needed at the time. It was the common practice for newly invested funds to be swept frequently to ACF or an affiliate, to be used for whatever purpose funds were needed at that time. The transaction would be recorded as a due-from ACF or affiliate. The language in the PPM allowed for these "short-term" affiliate loans; however, it was not marketed as a main investment under IOFII, nor would IOFII receive any interest, security or other compensation from ACF for such loans. When an employee from the fundraising department ACP questioned the backlog of ACF due to IOFII, and the requirement for ACF to make up for losses incurred in IOFII, Corporate Counsel responded as follows:

> ...the security to IOF II is the underlying collateral; if the loan is directly to the SPE, then ACF is not obligated to make up losses; if the loan is to ACF who then uses the proceeds to finance an SPV, then it would depend on the terms of the note to ACF who had priority (ACF note holders or IOF II).[460]

However, as noted by the Director of Treasury in a response, the funds do not move to ACF as a note, but rather "cash moves to ACF and sits in the fund's [AR] until the notes are issued directly from the SPV."[461]

On almost a weekly occurrence, new Investor funds would be transferred out of IOFII to ACF under this "due-from" arrangement, to be used for various corporate purposes. The amount would stay as such on the balance sheet of IOFII until such time as it would be considered by the Asset Allocation Policy meeting. During that process, IOFII would be retroactively assigned notes from SPE credit strategies that were consistent with the PPM.

---

[460] Email from Lordi to Holmen, September 3, 2015, "IOF II Backing by ACF Balance sheet".
[461] Email from Abushaaban to Cataudella and Hulquist, September 3, 2015, "RE: IOF II Backing by ACF Balance sheet".

These intercompany balances could be adjusted up or down for non-cash investment conversions between funds (such as Private Note, IOF, etc.). If the account was converted into IOFII, IOFII could receive a due-from the redeeming Aequitas Fund in lieu of cash. If an account would convert out of IOFII to another Aequitas Fund, then IOFII could see either a decrease in the amount owed to such Aequitas Fund, or a due-to liability in the amount of the conversion (and any outstanding interest as necessary).

The first Investors came into IOFII in November 2014, with $4.2 million invested in that first month. Weekly new Investor note issuances, or note transfers/conversions from another Aequitas Fund to IOFII, ramped up in December of that year, totaling $27.5 million, for a year-end senior debt amount of $31.8 million. As of the end of 2014, despite incurring $31.8 million in new senior debt liabilities, IOFII only had $267 thousand in cash in its operating account, plus $3.7 million in notes receivable from various Aequitas SPEs. The remaining $27.7 million was held as a "due-from" ACF or IPF.

To correct an improper asset mix (as determined by the PPM), on January 16, 2015, management met and assigned eight notes to IOFII, totaling $27.1 million. These notes included:

| Credit Strategy | Registry No. | Note Structure | Principal Amt | Interest Rate | Cash Moved | *Later Assignments* |
|---|---|---|---|---|---|---|
| Consumer (C+) | ACCH2LLC00003 | Sr. Secured | $1.2 million | 3.75% | No | *Assigned to ACCCPH* |
| | ACCH2LLC00004 | Subordinated | $1.5 million | 22.50% | No | *Assigned to ACCCPH* |
| Consumer (F+) | ACCH1LLC00003 | Sr. Secured | $2.8 million | 5.75% | No | *Assigned to ACCFPH* |
| | ACCH1LLC00004 | Subordinated | $2.7 million | 22.50% | No | *Assigned to ACCFPH* |
| Transportation | MLFHLLC00003 | Sr. Secured | $3.2 million | 8.25% | No | |
| | MLFHLLC00004 | Subordinated | $2.2 million | 22.50% | No | |
| Education | CSFLLC00003 | Sr. Secured | $6.8 million | 7.00% | No | |
| | CSFLLC00004 | Subordinated | $6.8 million | 21.00% | No | |

For all the notes above, no direct cash consideration was received by the corresponding SPE; rather, the SPE's liability for the notes was created through a series of journal entries. To offset incurring this liability, the SPE reduced ACF's equity in an amount equal to the additional liability to IOFII. On occasions where an SPE was owned by AH, the transaction would include a decrease in the ACF-AH Note, as ACF would "borrow" the equity reduction from AH. Once IOFII received the note from the SPE, IOFII would reduce its due-from ACF balance to match.

This process was generally repeated monthly, yet the due-from balance would never equal $0. There could be a difference in the monthly note issuances and the monthly CPD, and IOFII would always have new Investors who would come into the Fund during the preceding month and whose funds would be transferred to ACF or affiliates on a weekly basis. On April 10, the intercompany receivable reached its lowest point when $14.0 million of notes were issued to IOFII, including a $11.2 million CSF note, all of

which were backdated to March 1, 2015.  Therefore, in April, the balance sheet for March was amended using non-cash journal entries, to bring the monthly balance of the due-from ACF down to $584 thousand.  The highest amount reflected on a 2015/2016 balance sheet was in May 2015, when it reached $9.8 million.[462]

Note terms determination:

Interest rates were determined during the Asset Allocation process and could be between 2.75% and 8.25% for senior secured notes and between 8.5% and 22.5% for subordinated notes.  Notes with the same term length, but different origination dates, could receive different interest rates.  For example, both ACCFPHLLC00002 and ACCFPHLLC00003 have the same term length and their effective dates are within one month of each other, yet one note carries a 22.5% interest rate while the other has a 14% rate (8.5% difference).

| Registry No. | Note Structure | Principal Amt | Term (Yr.) | Interest Rate | Issue Date |
|---|---|---|---|---|---|
| ACCFPHLLC00002 | Subordinated | $3.9 million | 1 | 22.5% | 1-Jun-15 |
| ACCFPHLLC00003 | Subordinated | $1.5 million | 1 | 14.0% | 1-Jul-15 |

CSF concentration:

IOFII was weighted quite heavily in notes issued by CSF, regardless of the 20% concentration limit that was recommended for "education loans" per the Asset Allocation Policy.  Management was questioned on several occasions regarding the decisions that allowed IOFII to be weighed so heavily in CSF.  In one such email on November 5, the General Counsel emailed Jesenik, Gillis and other parties involved in the discussion and warned them against issuing any more CSF notes to IOFII.  He listed several reasons, predominantly IOFII's current overexposure, as well as the impact any CFPB settlement would have on IOFII's collateral.[463]

> ...the proposed transactions will result in IOFII's exposure to CSF rising from $33.4M (~38% of assets) to $51.8M (~59% of assets), while reducing IOFII's exposure to MotoLease and Freedom. I think we need a strong justification as to why that makes sense for the IOFII note holders. In addition, we are exposing IOFII to a potential $10M loss if we ended up settling with the CFBP at a 20% discount. Overall, I think it would be prudent to run this by the CRC given the net result is that we are directing IOFII to acquire from ACF a substantial interest in CSF assets.

> Note further that if we proceed with this, I think we need to immediately update IOFII tear sheets given the material change in asset mix.

Management did not respond directly to the email, and on November 12, 2015, management executed a new note from CSF to IOFII for $10.8 million, backdated to September 1, 2015.  Another $10.4 million of CSF notes subsequently were issued to IOFII, for a total of $21.3 million in CSF notes post the General Counsel's warning.

---

[462] Note, this is not the highest it ever reached, as notes would be backdated, but this is the highest that was reported in financials.
[463] Email from Holmen to Gillis, Jesenik, et. al, November 5, 2015, "FW: Sept Note Issuance/Collateral Assessment".

### G. Focused Investment Funds

*In some instances, Aequitas solicited investors to invest (together with other investors) into specific asset vehicles with little to no comingling of funds in ACF or another fund vehicle.*

### G.1. Luxembourg bonds

The Receivership Entity is involved in a complex trust structure related to several series of bonds offered on the Luxembourg Stock Exchange to non-U.S. investors. The issuer of such bonds is Aequitas Income Opportunities (Luxembourg) SA ("AIO-SA"), which is not part of the Receivership Entity. AIO-SA purchased limited partnership interests in AIO, a Cayman Islands limited partnership which is one of the Extended Entities under the Final Receivership Order. AIO is the holder of certificates of beneficial interest in ACC Holdings 5, LLC ("ACCH5", part of the Receivership Entity), which is wholly-owned by AH (also part of the Receivership Entity). ACCH5 established a grantor trust, ACCFST-5 that purchased and currently holds certain C+ and F+ FFN loan portfolios.

In late July 2015, AIO-SA issued $5 million of Compartment A and $5 million of Compartment B asset-backed bonds. After AIO-SA used the Investor funds to purchase limited partnership interests in AIO, Aequitas used a portion of the proceeds to purchase loans from FFN by way of the AIO intermediary ACCFST-5. At that time, the flow of F+ consumer loans available for purchase was insufficient. Given the lack of available F+ loan assets, AIO advanced excess funds to ACF in the form of a $4 million loan. In late September 2015, an additional $5 million of Compartment A bonds were issued. Similarly, to the July 2015 issuance, there were insufficient F+ loan assets available to be purchased and AIO loaned the excess funds to ACF in three loan tranches in Q4 2015 – on October 1 for $1 million; October 2 for $2 million and October 14 for $3 million. As of December 31, 2015, the remaining cumulative principal balance remaining on all AIO to ACF loans was $3.8 million.

Availability of F+ assets for AIO-SA was contingent upon other Aequitas entities (ACCFT-1 and ACCFT-2) funding an additional ~$4.5 million a month in F+ and C+ loans. In January 2016, Aequitas could no longer meet that funding commitment, which has cut off the availability of F+ assets.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

| AIO Sources and Uses of Cash | 2014 | 2015[464] | Q1 2016 | Total |
|---|---|---|---|---|
| **Beginning Cash Account** | $    - | $        - | $17,799 | $        - |
| **AIO-SA Bonds** | - | **15,110,701** | **70,942** | **15,181,643** |
| AIO-SA Bond Issuance | - | 15,611,112 | 400,000 | 16,011,112 |
| AIO-SA Bond Redemption | - | (350,000) | - | (350,000) |
| AIO-SA Preferred Return Payment | - | (150,411) | (329,058) | (479,469) |
| **Portfolio Investments** | - | **(11,327,398)** | **(66,843)** | **(11,394,241)** |
| ACCFST-5 Investments | - | (11,697,918) | (500,000) | (12,197,918) |
| ACCFST-5 Returns to AIO | - | 370,520 | 433,157 | 803,677 |
| **ACF Loan** | - | **(3,758,315)** | **33,000** | **(3,725,315)** |
| ACF Loan from AIO | - | (9,000,000) | - | (9,000,000) |
| ACF Loan Repayments to AIO | - | 5,180,329 | 33,000 | 5,213,329 |
| ACF Interest to AIO | - | 61,356 | - | 61,356 |
| **Intercompany Transfers** | - | **14,310** | **-** | **14,310** |
| AIH Investment in AIO | - | 17,460 | - | 17,460 |
| AIH Disbursement to AIO | - | (3,150) | - | (3,150) |
| **Expenses** | - | **(21,499)** | **-** | **(21,499)** |
| Licenses & Fees Expense | - | (17,460) | - | (17,460) |
| RAI Fees | - | (4,039) | - | (4,039) |
| **Ending Cash Account** | $    - | $   17,799 | $54,898 | $   54,898 |

### G.2. Window Rock Feeder Fund (a/k/a WRFF)

In November 2013, Aequitas formed WRFF for the purposes of raising and aggregating investor funds for subsequent investment into Window Rock/Aequitas Residential Recovery Fund, L.P. ("WR"). WR was focused on identifying and acquiring deeply discounted residential whole loans with an unpaid principal balance of less than $150 thousand and transforming those loans into consistent, valuable, cash-flowing assets through proprietary valuation and servicing techniques. Investment pools were expected to range from $5 to $50 million. Properties were located across the United States. Aequitas entities had no investment in WR or WRFF. At December 31, 2015, outside investor equity in WRFF totaled $21.7 million.

WRFF, through its affiliates, held a management contract entitling the Receivership Entity to a management fee of 75 basis points annually on invested capital (approximately $21.8 million) by the investors in WR.

On March 14, 2017, the transaction restructuring the fund closed and the Receiver received $328 thousand as compensation for the Receivership interest in accrued but unpaid, as well as future, management fees. Investors in WRFF were granted limited partner interests in the underlying master fund - WR.

---

[464] Bank account for AIO at Bank of America opened in July 2015. Three subsequent accounts were opened in January 2016 for the same entity.

| WRFF Sources and Uses of Cash | 2014 | 2015 | Q1 2016 | Total |
|---|---|---|---|---|
| **Beginning Cash Account** | $           - | $450,000 | $57,286 | $           - |
| **WRFF Investments** | **19,180,553** | **4,436,702** | **-** | **23,617,255** |
| Outside Party New Investment Funds | - | - | - | - |
| Investor Cash Transfers from ACF | 19,461,536 | 10,193,869 | - | 29,655,405 |
| Investor Distribution Paid | (280,983) | (5,757,167) | - | (6,038,150) |
| **Investment Purchases** | **(18,000,000)** | **(7,000,000)** | **-** | **(25,000,000)** |
| Investment in Window Rock Recovery Fund | (18,000,000) | (7,000,000) | - | (25,000,000) |
| **Interest Income** | **804,020** | **1,773,360** | **-** | **2,577,380** |
| Interest from Window Rock Recovery Fund | 804,020 | 1,773,360 | - | 2,577,380 |
| **Intercompany Transfers** | **(1,505,997)** | **506,169** | **-** | **(999,828)** |
| Intercompany Receipt from ACF | - | 1,927,498 | - | 1,927,498 |
| Intercompany Payment to ACF | (1,452,592) | (1,405,875) | - | (2,858,467) |
| Intercompany Payment to ACM | (53,405) | (15,454) | - | (68,859) |
| **Expenses** | **(28,576)** | **(108,945)** | **(57,186)** | **(194,707)** |
| Operating Expenses | - | 7 | (5,256) | (5,249) |
| Management Fee to AIM | (28,576) | (108,952) | (51,930) | (189,458) |
| **Ending Cash Account** | $    450,000 | $    57,286 | $    100 | $    100 |

### G.3. ETC Founders Fund (ETCFF)

Aequitas formed ETCFF as a means of investing in ETC. ETCFF's only assets were intended to be equity securities issued by ETC, cash and cash equivalents. Such securities initially would include up to 2.7 million shares of Series A Preferred pursuant to the terms of a stock purchase agreement between the ETCFF and ETC dated September 26, 2011 (the "Stock Purchase Agreement"). Any proceeds of ETCFF not used to purchase Series A Preferred would be used by the ETCFF to pay organizational expenses, operating costs and management fees.

Pursuant to the stock purchase agreement, on September 26, 2011 ETCFF made an initial purchase of 760 thousand shares of Series A Preferred. This purchase was made utilizing the proceeds of a loan from ACF in the principal amount of $3.8 million (the "ACF-ETCFF Loan"). The terms of the ACF-ETCFF Loan required ETCFF to repay the loan on or before December 31, 2011. The ACF-ETCFF Loan is secured by a first priority lien on all of the assets of ETCFF, including the Series A Preferred purchased and held by the ETCFF.

ETCFF concluded its fundraising by September 2012 which included capital commitments of $9.2 million. ETCFF used those funds to acquire 1.8 million Series A Preferred shares at a cost of $8.8 million with the remaining funds being used to pay administrative costs and management fees. There was no significant cash activity during the Relevant Time Period.

### G.4. CCM Opportunity Fund (fka Capital Opportunity Fund)

Aequitas formed COF on June 14, 2013 for the express purpose of making privately-negotiated investments in equity, equity-related and other securities of investee companies. COF concluded its fundraising by February 2015 which included total capital commitments of $102.0 million. Of the $102.0

million, $78.8 million was attributable to Aequitas contributing assets into the fund at inflated values – resulting in a deferred gain on those assets of $50.3 million.[465]

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

---

[465] See Aequitas Holdings, LLC_FED_Form 1065_IT_WP_!4_FINAL.xlsx; Tab: "(TX-750A) COF Disguised Sale.

| COF Sources and Uses of Cash | 2014 | 2015 | Q1 2016 | Total |
|---|---|---|---|---|
| Beginning Cash Account | $          - | $  558,072 | $ 388,479 | $          - |
| COF Capital | 17,317,083 | 15,222,409 | - | 32,539,492 |
| Outside Party New Investor Funds[466] | 12,580,882 | 13,231,518 | - | 25,812,400 |
| Investor Cash Transfers from ACF[467] | 5,555,416 | 2,119,266 | - | 7,674,682 |
| Investor Cash Transfers from IOF[468] | 15,229 | - | - | 15,229 |
| Investor Distribution Paid[469] | (834,444) | (128,375) | - | (962,818) |
| Intercompany Transfers | (11,667,942) | 9,288,789 | (1,888) | (2,381,040) |
| Intercompany Receipt from ACF | 5,521,833 | 17,872,338 | - | 23,394,171 |
| Intercompany Payment to ACF | (16,343,618) | (8,920,650) | - | (25,264,268) |
| Intercompany Receipt from ACM | 375,385 | 240,423 | (1,888) | 613,920 |
| Intercompany Payment to ACM | (613,095) | (462,644) | - | (1,075,739) |
| Intercompany Receipt from AH | 281,347 | 925,100 | - | 1,206,447 |
| Intercompany Payment to AH | (889,794) | (368,380) | - | (1,258,174) |
| Intercompany Receipt from AIM | - | 2,603 | - | 2,603 |
| Investment Purchases | (4,212,255) | (24,972,896) | (70,000) | (29,255,151) |
| Quarterspot Purchase (from ACF) | (3,678,921) | - | - | (3,678,921) |
| SCA | (533,334) | - | - | (533,334) |
| Alternative Capital Advisors | - | (12,250) | - | (12,250) |
| MotoLease, LLC[470] | - | (1,040,000) | - | (1,040,000) |
| nD Bancgroup | - | (2,600,000) | - | (2,600,000) |
| MOGL Loyalty Services | - | (2,000,000) | - | (2,000,000) |
| CPYT Note Receivable | - | (19,000,000) | - | (19,000,000) |
| EdPlus Note Receivable | - | (320,646) | (70,000) | (390,646) |
| Interest Income | - | 1,307,224 | - | 1,307,224 |
| CPYT | - | 1,287,630 | - | 1,287,630 |
| EdPlus | - | 19,594 | - | 19,594 |
| Expenses | (878,814) | (1,765,120) | (216,000) | (2,859,934) |
| Operating Expenses | - | (93,103) | (16,000) | (109,103) |
| Management Fee to AIM | (878,814) | (1,672,017) | (200,000) | (2,750,831) |
| Misc. | - | 750,000 | - | 750,000 |
| Ruh Investment in ACL[471] | - | 750,000 | - | 750,000 |
| ACF and Ruh Partial Investment[472] | - | 949,588 | - | 949,588 |
| ACF and Ruh Partial Redemption | - | (949,588) | - | (949,588) |
| Ending Cash Account | $   558,072 | $  388,479 | $ 100,591 | $  100,591 |

[466] Capital call amounts could contain offsets for payments due to the Investor, and frequently were paid on a net basis, rather than a full contribution and distribution.
[467] Includes investment transfer from Private Note by Zam Capital Group, M. Zuffinetti, A. Zuffinetti, Barnes, Flichtbiel, Mulvaney, Ciuffitelli and McCormick.
[468] Includes investment transfer from IOF to COF by Glasgow and Ruh.
[469] Distributions were paid to Bar J Investments, Zam Capital Group, M. Zuffinetti, A. Zuffinetti, Barnes, Flichtbiel, M. O'Reilly, Ruh, McCormick, and McCormick under the equalization terms for original Investors of COF. Typically, these would be paid on a net basis, for any additional funds due to or from the Investor. A portion of the Investors chose to accept distributions from COF and reinvest those funds in Private Note.
[470] MotoLease, LLC is a separate and distinct entity, not included in the Receivership. MotoLease, LLC originated and to an extent serviced the receivables purchased by MLF. As of the Complaint Date COF held 230 membership units at a total purchase price of $1.8 million, representing 23% equity ownership in MotoLease, LLC.
[471] For additional information, see section E.1.4.
[472] In 2015, as Aequitas was aiming to close the COF fund, it was missing fund commitments from several investors. As such, Ruh invested an additional $67 thousand towards a $150 thousand commitment. Two months later, this limited partnership interest was purchased by a new Investor Drew Freides for $124 thousand, for which COF wired Ruh $124 thousand. Similarly, ACF advanced $826 thousand for a $1.0 million commitment, which was purchased by an Investor at CliftonLarsonAllen for $826 thousand in April of 2015.

### H.  Solvency

*SEC Complaint — By the end of June 2014 (after CoCo's default), projected cash inflows from CoCo were removed and Treasury projected a cash shortfall of $3.1 million for the following week.  According to internal projections prepared on July 18, 2014, ACF estimated that it was more than $200 thousand short of cash to meet its current obligations and had a cash shortfall of $19.1 million for the coming two weeks.*

*Ponzi schemes are inherently fraudulent.  Because these schemes require the unending raise of additional funds to maintain the fraud, courts have held them to be insolvent from their inception.*[473]

*Notwithstanding the likely determination of a "Ponzi presumption," the Receiver undertook a review of certain tests to determine if Aequitas was solvent during the Relevant Time Period.  A detailed discussion of each of the three commonly used tests and the Receiver's opinion of solvency follows.*

#### H.1. Aequitas was insolvent on or before July 3, 2014 and continued to be so during the remainder of the Relevant Time Period, as its assets at fair value did not exceed its liabilities [the "Balance Sheet Test"]

Under the Balance Sheet Test, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."  NUFTA § 112.160(1).  My conclusion of value for the assets and liabilities of Aequitas is based upon the fair value standard as defined by the *International Glossary of Business Valuation Terms*.  This definition is consistent with the definition of fair value by other authoritative sources, including Oregon's Uniform Fraudulent Transfer Act.[474]

As a common practice, Aequitas restated certain of its major assets to fair value.  Fair value is an estimate of an exit price, or the amount that would be received to sell an asset or transfer a liability between market participants.  There exists a fair value hierarchy which provides for prioritizing inputs to valuation techniques used to measure fair value.  As discussed earlier in this Report, Aequitas relied almost exclusively on Level 3 inputs for its fair value calculations — the most subjective methodology and the hierarchy most likely to be manipulated and impacted by the bias of management.  A review of the valuations for several of the investments in operating companies CPYT, ETC, MSP/Ivey and EdPlus indicate significant overstatement of value attributed to these assets.  Additionally, in the case of MSP/Ivey and EdPlus, the valuation review indicated impairment of large amounts of debt owed by those entities to Aequitas affiliates.

To determine the fair value of the portfolio of student loans held by CSF and other Aequitas entities, Aequitas used a fairly complex net present value model of numerous inputs which generated a sizable increase in asset values due to calculated but unrealized gains.  The model inputs were driven primarily by the creditworthiness of CoCo and the performance of the loan portfolio relative to students' payments.  Accordingly, these inputs, which were dubious before the CoCo default, should have been modified dramatically (and were not) when (1) CoCo defaulted on its obligation to repurchase defaulted student loans under the recourse program and (2) student loan defaults increased dramatically upon the announcement of the closure of the CoCo schools.  Also, Aequitas failed to recognize a loss reserve for defaulted loans and continued to carry those defaulted loans at full value.

---

[473] *Scholes v. Lehman*, 56 F. 3d 750, 755 (7th Cir. 1995) (Ponzi scheme was insolvent from the outset as a result of the tort claims of the investor); *In re Randy*, 189 B.R. 425, 441 (N.D. Ill. 1995) ("Having been convicted of a Ponzi scheme, Randy was insolvent from its inception as a matter of law."); *In re Independent Clearing House*, 77 B.R. 843, 871 (D. Utah 1987) ("By definition, an enterprise engaged in a Ponzi scheme is insolvent from day one.").
[474] *See* ORS 95.210(1).

ACF's largest single asset was debt owed to it by its parent (AH) under the ACF-AH Note ($80.6 million as of December 2012 and growing to $184.2 million as of March 2016). Internal documents prepared by Aequitas, intended to calculate the underlying asset value support for repayment of the ACF-AH Note, show that such assets failed to cover the amount owed — even at inflated, erroneous fair value calculations for those investments. Further, the amounts advanced under the ACF-AH Note were largely to fund overhead and expenses at affiliated entities, with no meaningful assets or ways to repay the advance. Accordingly, the ACF-AH Note, if properly adjusted to reflect fair value, would have had significantly less value than the amounts borrowed and its balance sheet carrying value.

Indeed, the highly leveraged business model of Aequitas left no margin for error. As phantom equity was contrived via Aequitas' accounting procedures, that equity was almost immediately erased by an increased debt load such that the first dollar of loss rendered the affiliate entity insolvent — thereby eradicating any equity investment value in that affiliate. Intercompany due-to/due-from accounts riddled the corporate balance sheet. This jenga-like structure, where one affiliate's solvency was dependent on a sister company's ability to pay its debts to that affiliate, collapses quickly and drives the entire enterprise into insolvency.

Based on adjustments described above, it is clear that the cumulative effect would more than erase the book equity of Aequitas — rendering it insolvent during the Relevant Time Period.

### H.2. Aequitas intended to incur, or had reason to believe that it would incur, debts beyond its ability to pay as they became due [the "Timely Payment Test"]

The Timely Payment Test is an alternative insolvency test which assesses whether, at the time of the transfer, the debtor intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they matured.[475]

I considered numerous factors in determining whether the Timely Payment Test of insolvency had been met. After considering (1) that Aequitas' reported profitability was solely driven through flawed fair value unrealized gains; (2) that the financial structure of its investments in consumer debt portfolios were significantly flawed to the point of rendering them unsustainable and uneconomic; (3) the inability of Aequitas to fund interest payments or debt maturities without the significant, ongoing flow of new Investor funds; (4) Aequitas' ongoing practice of commingling funds and "manufacturing" notes in a financial shell game to fund its obligations; and (5) the significant amount of evidence that Aequitas knew of its financial distress yet continued to fundraise in the face of deepening insolvency, I have concluded that Aequitas, with reasonably known information, knew or should have known it had incurred or would incur debts beyond its ability to pay.[476]

### H.3. Aequitas possessed insufficient assets to conduct its intended business ["Unreasonably Small Assets Test"]

The Unreasonably Small Assets Test is another alternative for determining insolvency.[477] The phrase "unreasonably small assets" is not defined in the UFTA or in the Bankruptcy Code. In addressing the

---

[475] See ORS 95.210(2). See also In re EBC I, Inc., 380 B.R. 348, 359 (Bankr. D. Del. 2008); see also WRT Creditors Liquidation Trust v. WRT Bankr.Litig. Master File Defendants (In re WRT Energy Corp.), 282 B.R. 343, 414–15 (Bankr.W.D.La.2001) ("The 'inability to pay debts' prong of section 548 is met if it can be shown that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured.").

[476] Liebersohn v. Campus Crusade for Christ (In re C.F. Food, L.P.), 280 B.R. 103, 116 (Bankr. E.D. Pa. 2002) (operation of the Debtor's Ponzi scheme demonstrates the subjective intent to incur debts beyond the company's ability to pay as they become due).

[477] "[T]he test for unreasonably small capital is reasonable foreseeability" that lack of capital will lead to an "inability to generate enough cash flow to sustain operations." Moody v. Security Pacific Business Credit, Inc., 971 F.2d 1056, 1070, 1073 (3rd Cir. 1992). See also Sol. Tr. v. 2100 Grand LLC (In re AWTR Liquidation Inc.), 548 B.R. 300, 313 (Bankr. C.D. Cal. 2016) (quoting same).

test, courts focus on the financial stability of the company, based on the company's ability to generate sufficient profits to sustain operations, pay its debts and remain financially stable.[478]  The fact-based test focuses on whether a company's cash flow forecasts combined with its assets or capital are reasonable and leave enough margin for error to account for reasonably foreseeable difficulties.[479]  The term "unreasonably small assets" denotes a financial condition short of balance sheet insolvency, and the Unreasonably Small Assets Test of financial condition is aimed at transferees that leave the transferor technically balance sheet solvent but likely doomed to fail.[480]

In applying the Unreasonably Small Assets Test, I considered several factors and reached the following conclusions:

1) I was unable to identify any other source of funding for Aequitas outside of ongoing fundraising by an entity embroiled in a deepening insolvency.

2) I further considered the financial condition of Aequitas in view of the impact of restated fair values and appropriate recognition of operating expenses that had been capitalized on the balance sheet via the ACF-AH Note.  I concluded that internal projections for Aequitas failed to adequately consider the business risks or incorporate a reasonable margin for error.

3) I also evaluated whether the fair value increases were reasonable in light of historical results. Beginning in 2014, Aequitas experienced a significant — if not fatal — blow to the student debt portfolio which should have resulted in a reversal of any fair value increases recognized on the portfolio.  Additionally, Aequitas should have booked significant loss reserves for the student loans that were no longer backed by functional recourse to CoCo.  Finally, the fair value increase in the operating companies were fabrications and not supported by historical financial performance, reasonable financial projections or appropriate comparable companies.

4) I also analyzed the extent to which the other investments in consumer debt portfolios or investments in operating companies could sustain Aequitas' operations.  As previously discussed, each of the portfolios suffered from catastrophic structural defects and none of the operating companies was cash positive after debt service.

5) As noted above, I took into account email evidence indicating that Aequitas knew it could not fund its operating expenses and was reliant on contrived internal debt transactions in order to mask a deepening insolvency.

Based on the testing I conducted, and factors considered, I have concluded that Aequitas did not possess sufficient assets or the ability to generate profits to conduct and sustain its business, had an insufficient cushion against reasonable uncertainty, and was doomed to fail.

---

[478] *Moody v. Sec. Pac. Bus. Credit, Inc.* 971 F.2d 1056, 1070 (3rd Cir. 1992) (discussing "unreasonably small capital" in the context of the Uniform Fraudulent Conveyance Act); *Liebersohn v. Campus Crusade for Christ (In re C.F. Food, L.P.),* 280 B.R. 103, 116 (Bankr. E.D. Pa. 2002) (because the ability of a Ponzi scheme to generate cash flow can only come from the continuation of the fraudulent scheme, the operation could never be 'financially stable,' since its collapse is inevitable).
[479] *See Moody v. Security Pacific Business Credit, Inc.,* 971 F.2d 1056, 1071-1076 (3d Cir. 1992)(discussing 'unreasonably small capital' under the circumstances of the failure of a company following a leveraged buyout); and *Credit Managers Ass'n v. Federal Co.,* 629 F. Supp. 175, 184-188 (C.D. Cal. 1985)(discussing 'unreasonably small capital' under the Uniform Fraudulent Conveyance Act).
[480] *Kipperman v. Onex Corp.,* 411 B.R. 805, 836 (N.D. Ga. 2009).

## I.  Payments to insiders

*In addition to the loans to insiders, consultant commission payments, AB member payments and other such incentives discussed earlier in the report, there were several payments during the Relevant Period to members of Aequitas upper management.*

### I.1.  Payments to Individual Defendants

In addition to the insider transactions (NorthBranch Member Loans, Hill Land lease, APF), the Individual Defendants also withdrew Investor funds in the form of salaries, bonus, 401k match payments, fringe benefits and distributions[481] totaling another $4.9 million during the Relevant Time Period.  Annual salaries for Jesenik, Oliver and Gillis were set at $685 thousand,[482] $350 thousand and $400 thousand, respectively, during the Relevant Time Period.[483]

| | Direct Payments to Individual Defendants | | | | | Outstanding Loans (principal balance) | | | |
| | Payroll & Allowances | Expenses | Consulting | Member Distributions & Advances | *Subtotal* | Newman Loan | Northbranch Loans | *Subtotal* | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| Gillis | $  526,799 | $  42,643 | $  34,675 | $  - | *$  604,117* | $  - | $  - | *$  -* | $  604,117 |
| Jesenik | 1,728,669 | 147,434 | - | 1,009,502 | *2,885,605* | 222,450 | 359,603 | *582,053* | 3,467,658 |
| Oliver | 1,183,376 | 81,090 | - | 190,502 | *1,454,968* | - | 218,555 | *218,555* | 1,673,523 |
| **Total** | **$3,438,844** | **$271,166** | **$  34,675** | **$  1,200,004** | ***$  4,944,690*** | **$222,450** | **$  578,158** | ***$  800,608*** | **$5,745,298** |

### I.2.  Olaf Janke separation payment

In late 2014, Janke announced his intended separation from Aequitas amid continued disagreements with management regarding certain practices.  On November 20, 2014, Jesenik emailed Janke and Gillis, discussing Janke's request for a proposal from Aequitas, in order to extend out his resignation date.[484]  Per the email, Janke had announced to management a separation date of December 31, 2014, however Jesenik was negotiating for a resignation date of April 30, 2015.  Chief among the discussions concerned the ownership stake Janke had purchased in AM, which was executed just six months prior to announcing his intention to resign.

Because all direct financial departments reported to Janke, and Janke was considered crucial in the Deloitte audit, Janke and management entered into an extended separation agreement on January 15, 2015, in exchange for significant and non-standard compensation.

Janke AM Unit background:

According to records, Jesenik first requested documentation from in-house counsel to allow Janke to purchase Aequitas Management Units ("AM Units") around November 2013.  On January 9, 2014, Jesenik emailed Janke document drafts for his purchase of AM Units.[485]  Several versions were turned, until the final versions were executed between May 15 and May 28, 2014, completing Janke's purchase of

---

[481] Member Distributions include distributions and advances on Special Units and AM Units, but does not include payments for any of the Individual Defendants investment into Aequitas Funds.  Jesenik's Member Distribution & Advance payment includes a $250 thousand payment received in October 2013, as an advance for AM Unit distribution paid out in February 2014.  Additionally, in January 2015 Jesenik received an additional $75 thousand "advance" on a future AM Unit distribution, which never came to fruition.

[482] Jesenik began 2014 with a salary of $450 thousand, but in September of 2014 increased his salary to $685 thousand retroactively to January 1, 2014.

[483] These figures do not include employer paid portions of the Individual Defendants health insurance, dental insurance, life insurance, short term disability, long term disability, or health savings account contributions.

[484] Email from Jesenik to Janke, November 20, 2014, "transition options-confidential".

[485] Email from Jesenik to Janke, January 9, 2014, "FW: Janke Purchase of Mgt Units".

196 thousand AM Units (6.2% of AM), backdated to be effective January 1, 2014.[486]  As consideration for the AM Units, Janke entered into a promissory note (the "AM Purchase Note") with AM, for $1.2 million, at a 1% interest rate with a maturity date of January 1, 2019.[487]

Separation discussion:

Only six months after signing the executed AM Unit documents, Janke entered into the confidential separation discussions between Jesenik and Gillis, who had been brought in by Jesenik "as an intermediary here to assist both of us in having the best outcome."  These talks occurred between November 20 and December 13, 2014.  Jesenik initially offered to buy out the AM Units for the value of the note, plus $500 thousand in cash.  Jesenik later amended this to state that they would calculate the value off of the AM valuation, after the 2014 valuation audit has been completed.  However, on December 7, 2014 Janke rejected Jesenik's offer, stating:

> As to the value of the equity, I am quite frankly surprised about the link to our financials as when the $70MM valuation was set this spring, it was mainly driven off the value of COF. As of 9/30, COF is valued at $120MM of which roughly 90% is owned by Aequitas and therefore the $70MM valuation already represents a significant discount to the asset value and does not account for the expected year-end valuation gains of $13MM+. In the end, the buyer of my equity is receiving ACF and the wealth management business for free in addition to a $50MM discount on COF. Therefore the financials of Holdings are superseded by the asset value.

Jesenik, Gillis and Janke entered into a discussion on December 12 to determine the details of his separation.  Per the summary sent by Janke to Jesenik after the meeting, they agreed to the following:[488]

- *On 1/15/15, I will sell my equity to Aequitas for $500k in cash and the retirement of my note with any accrued and unpaid interest. In addition, Aequitas issues a note of $835k to me which will be repaid in 1/3 increments on 3/15/15, 4/15/15 and 5/15/15.*

- *On 2/15/15, Aequitas will pay me 75% of my 2014 target bonus.*

- *On 4/30/15, Aequitas will pay me the remaining 25% of my 2014 target bonus in whole or in part subject to the successful conclusion of all audits due by 4/30/15, excluding the audit for Holdings, Unigo and CPYT. Any proportional payout would be calculated on the basis of how many audits should have been completed vis-à-vis how many actually got done.*

- *I am not eligible for any garden leave payment following my separation date of 4/30/15.*

On January 15, 2015, Jesenik emailed Accounting requesting a check to be cut for Janke for $500 thousand.[489]  On March 9, a fully executed version of Janke's "Membership Interest Sale Agreement"[490] and "Employee Separation Agreement"[491] was circulated, effective as of January 15.

---

[486] May 15, 2014, "Admission Agreement (AM-Janke) 01-01-14 v1_0.pdf"; May 28, 2014, "Assignment of Membership Interest (195,835 Common Units) (AM-Janke) 01-01-14 v1_0.pdf"; May 28, 2014, "Spousal Consent-Michelle Janke (Admission Agmt-AM-Janke) 1-01-14 v1_0.pdf"; May 28, 2014, "Pledge Agmt-Membership Units (Janke-AM) 01-01-14 v1_0.pdf" (note- Spousal Consent and Pledge Agmt are misnamed as each other).
[487] May 28, 2014, "Promissory Note (Janke-AM) 01-01-14 v1_0.pdf".
[488] Email from Janke to Jesenik, December 14, 2014, "RE: transition options-confidential".
[489] Email from Jesenik to Kang, January 15, 2015, "advance".
[490] March 6, 2015, "Membership Interest Sale Agmt (195,835 Common Units) (AM-OlafJanke) 01-15-15 v1_0.pdf".
[491] March 5, 2015, "20150305134649964.pdf" ("Janke Olaf Executed Separation Agreement.pdf") as amended on April 10, 2015.

Per the terms of the Membership Interest Sale Agreement, the complete balance of the AM Purchase Note ($1.2 million plus accrued interest) owed by Janke was to be canceled.  In addition, Janke was to receive the $500 thousand in cash (previously paid on January 15) and a new note payable ("New Note") to Janke for $1.3 million, payable by April 15, 2022.  Combined, this valued Janke's AM Unit Sale Price at $3.1 million.[492]

Per the Employment Separation Agreement, Janke would receive the following compensation and benefits, as detailed in his agreement:

- Full base salary, monthly auto allowance, employee health and dental benefits, club membership, and 401k matching through his separation date of April 30

- $278 thousand in unpaid 2014 incentive compensation

  o Representing 75% of the maximum bonus he could be entitled to receive, should he remain employed through March 15, 2015

- $93 thousand in unpaid 2014 incentive compensation

  o Representing the remaining 25% of his bonus, to be awarded should Janke lead scheduled ACF audits to completion by April 30, 2015

    ▪ No other employee would receive 100% of their scheduled incentive bonus, as Aequitas failed to meet its revenue threshold targets for 2014.  The majority of employees on the established annual bonus plan (like Janke) received only 54% of the bonus paid for reaching 2014 financial company goals

  o On April 10, 2015, the Separation Agreement was amended to remove the requirement to complete ACF audits, guaranteeing Janke the remaining 25%

    ▪ Janke was also required to exclude himself from any audit or financial statement preparation discussions with the accounting and finance teams he oversaw as of March 16, and only respond to questions directly to the new Chief Accounting Officer hired as his replacement

- Accelerated (and discounted) buyout of his New Note payable:[493]

  o $278 thousand payable on March 30, 2015[494]

  o $278 thousand payable on May 15, 2015[495]

  o $278 thousand payable on June 15, 2015[496]

- Reimbursement and a $200 hourly rate for any work completed after the Separation Date

Apart from Janke, several executives' departures have led to buyout agreements of their AM Units.  In each buyout agreement, the executive and Jesenik would determine the appropriate buyout price and payment terms.  However, unlike in the Janke buyout, these payments would be completed over time and

[492] April 1, 2015, "AM Ownership Chart with Jesenik Changes 3-31-2015.xlsx", F04452-E0038-00187758.
[493] Per Janke's Membership Interest Sale Agmt, the New Note balance was to be $1.3 million, with quarterly payments of 1.25% the original principal balance, until it was paid off by April 2022. However, per Janke's Employment Separation Agreement, he agreed that if Aequitas completes the three accelerated payments described above, the purchase price of the New Note would be adjusted down to reflect the New Note as paid in full as of June 2015 (seven years before it was due).
[494] May 6, 2015, "Janke Payment 3-30-2015.pdf".
[495] May 14, 2015, "Janke Payment 5-15-2015.pdf".
[496] June 15, 2015, "Janke Payment 6-15-2015.pdf".

follow an amortization schedule spread out over three to seven years, depending on the amount of the AM note held.

In contrast, Janke's agreement required unprecedented accelerated payments, with his first buyout payment being due 30 days before his separation from Aequitas and his final payment received within 45 days, in exchange for a discounted New Note purchase price.  Per the original terms of the New Note, Janke was to receive quarterly payments of $16 thousand, until the balance of the $1.3 million New Note was paid in full in April 2022.  Janke's agreed to reduce the purchase price of the New Note to $835 thousand (a 38% reduction), should he receive the payment within 45 days of separation, rather than paid quarterly throughout the next seven years.

As Janke oversaw the daily cash management of the enterprise, was involved in the frequent cash liquidity issues with Jesenik and the management team and was leaving amid disagreements over the proper way to continue Aequitas business, there is a logical tie between the demanded acceleration and Janke's uncertainty that Aequitas would have sufficient liquidity to pay out per the normal amortization schedule.  In fact, it is indisputable that the only source of funds for the payment of Janke's agreement was from Investors.  Within 13 months of acquiring his AM Units, and without investing any cash into the venture, Janke walked away with $1.3 million in cash for the "value" of his interest in AM – which value arguably declined during his tenure - plus $370 thousand in incentive compensation paid after announcing his resignation.

## J.  Information gathering

Upon taking possession of the Aequitas' offices, the Receiver's team performed a cursory review of all records located on the premises.  The team specifically sought out and reviewed in greater detail records pertaining to accounting, Investors/fundraising, legal communications, acquisition/disposition of assets, and other related matters.  These records consisted of both physical documents and computer files.  All pertinent records and data were reviewed in detail as appropriate during investigation and administration of the Receivership.  The universe of records continues to grow as the forensic accounting and other investigations continue.

### J.1.  Collection and preservation of hard copy data and electronically stored information

As of the date of this Report, the Receiver has consolidated all digital data within his control into a centralized, organized database (hosted by FTI Technology) which consists of all Aequitas data collected from local data servers, email archives, and third-party legal discovery platforms integrated into a single, managed repository.  The database contains more than 13 million documents/emails and was edited to remove non-Aequitas material (iTunes music libraries, personal pictures/videos, etc.).  In addition to the Receivership's database, the Receiver has also integrated the multiple data repositories in Document Technologies Inc.[497] possession as well as the data repository hosted by Pepper Hamilton, LLP.[498]  The Receiver is currently utilizing the centralized database to prepare his response to SEC requests for production and has granted access to multiple interested parties.

Additionally, Aequitas maintained data in both hosted (any data service and/or data repository that is hosted by an external third-party provider and managed by Aequitas personnel) and on-premise data

---

[497] Document Technologies, Inc. was the previous eDiscovery solution employed by Aequitas, and the database contains valuable work product related to prior productions in the ASFG litigation and to the SEC.
[498] The Pepper Hamilton repository contains valuable work product as to the files provided by Sidley Austin and the SEC, as well as the ongoing privilege dispute by the Individual Defendants.

services (any data service and/or data repository that is maintained and managed by Aequitas personnel on Aequitas-owned infrastructure within the bounds of Aequitas-managed facilities).

### J.1.1.Hosted data services

#### J.1.1.1.        Microsoft Exchange email communications

All corporate Microsoft Exchange email services are hosted via the Microsoft Office 365 Cloud Platform. https://www.microsoft.com/en-us/trustcenter/cloudservices/office365

#### J.1.1.2.        Email data archiving service

All corporate email (inbound/outbound) is journaled and archived in real-time to the SMARSH Cloud Archiving & Discovery Platform.  https://www.smarsh.com/email-archiving-solutions

#### J.1.1.3.        Secure online file sharing service

Secure file sharing with non-Aequitas third parties is hosted on the Citrix ShareFile platform. https://www.sharefile.com/features

#### J.1.1.4.        Online virtual data room service

Secure online virtual data room services for Aequitas are hosted on the Citrix ShareFile Virtual Data Room platform.  https://www.sharefile.com/virtual-data-room

#### J.1.1.5.        Salesforce CRM data (deprecated 2017)

Salesforce CRM data was previously hosted on the Salesforce.com Enterprise cloud platform up until the end of 2017.  A complete data download of all Salesforce data now resides in the Receivership data warehouse (on-premise).

#### J.1.1.6.        Concur employee expense data (deprecated 2017)

Aequitas Concur employee data was previously hosted on the Concur cloud platform until early 2017.  A complete data download of all Concur data now resides in the Receivership Ringtail Discovery Platform (hosted).

### J.1.2.On-premise data services

#### J.1.2.1.        Microsoft active directory services

All Aequitas user accounts, security principals, service accounts and access groups were managed via Microsoft Active Directory Security Services on-premise by Aequitas IT personnel.

#### J.1.2.2.        Microsoft windows network file sharing services

Microsoft Windows Network File Sharing Services provide Aequitas personnel secure access to business data on network file shares located on the local Aequitas network.  All file shares are secured via Microsoft Active Directory Security Services and managed on-premise by Aequitas IT personnel.

#### J.1.2.3.        Aequitas data warehouse services

Aequitas maintained a significant data repository of financial portfolio and other operational business databases both current and historical.  The data is hosted on-premise using Microsoft SQL Server and managed by Receivership IT personnel.

#### J.1.2.4.        Virtual server infrastructure services

Aequitas maintained and hosted VMware virtual server infrastructure in support of the business computing and data needs.  The Receivership currently maintains 52 total virtual servers within the VMware environment managed on-premise by Receivership IT personnel.

### J.1.2.5.    Enterprise data backup services

Receivership IT personnel maintain the local enterprise data backup service, which integrates with the VMware virtual server infrastructure and is responsible for the core enterprise data backup services outlined in the Data Protection Policy.

## J.2.  Accounting data

Aequitas managed its business using Microsoft Dynamics GP (aka "Great Plains") as its core enterprise resource planning financial accounting system.  Each entity was assigned a company number and financial transactions were recorded using double-entry accounting in each entity impacted by the transaction.  A review of the accounting records for the Receivership Entity showed that similar transactions were not recorded consistently both from entity to entity and within the individual entities themselves.  This resulted in transaction data that is not comparable and made it difficult to generate functional reports from such data.

To perform the analyses requested and generate useful reports from the accounting data, the forensic team reviewed cash transactions for the 48 Receivership entities and categorized them to facilitate the analysis and create reports to answer questions posed during the course of the Investigation.  To start, cash debit and credit transactions from Great Plains were downloaded for each Receivership entity.  This included both cash and restricted cash accounts and produced over 65 thousand lines of data for review.

Also downloaded from Great Plains were the non-cash transactions.  Because journal entries often included entries to both cash and non-cash accounts, these were sometimes used as a resource for additional information about the transactions that helped to place that transaction in the most appropriate category.  Due to the volume of transactions and the time necessary to download, non-cash transactions for CPLLC were not downloaded.

## J.3.  Bank data

After the cash transactions had been categorized, a reconciliation to the bank statements was performed to ensure that all cash transactions were included in the cash analysis and that the data set was complete.  At the time this Report was issued, Aequitas did not have complete bank statements or other records necessary to tie all cash transactions to this third-party evidence.  Most of the missing documents were related to a subset of Bank of America accounts for which Aequitas used an online banking tool commonly referred to as CashPro.[499]  Despite the missing bank records, an analysis of the Receivership Entity showed that approximately 94% of the lines of data could be verified to bank statements.  Additional validation methods were employed to compensate where there was a lack of physical bank statements.  No exceptions were noted during that validation.

## J.4.  Payroll data

Aequitas maintained all payroll-related data and files in accordance with the federal Fair Labor Standards Act, IRS and Equal Employment Opportunity Commission.  Aequitas utilized various cloud-based online payroll platforms to run its bi-monthly payroll.[500]  These secure sites provide online access to all employee data, including employee contact information, pay history, employee earnings and deductions, tax documents, etc.  In addition to the online payroll tools, Aequitas maintained electronic payroll reports on a per-payroll basis, which are securely saved in the document repository tool, Document Locator.  Access to payroll-specific files is strictly limited to members of IT, HR and one Accounting Contractor.

---

[499] CashPro is a registered trademark of Bank of America Corporation and is used to identify its electronic platform for managing banking and treasury functions.
[500] Paychex 2009 – 2010; Paylocity (cloud-based online tool) 2011 – 2014 and Paychex 2015 – present.

### J.5.  Tax returns

#### J.5.1. Tax return preparers

Aequitas has had tax returns prepared by several firms in the past.  Starting with the most recent years and working back, the preparers were:

- 2015 and forward: a tax preparer retained by the Receivership, Barbara M. Smith Accounting Inc., has prepared the returns for 2015 and forward.

- 2013 to 2014: Deloitte Tax prepared the returns for 2013 and 2014.

- 2012: EisnerAmper LLP prepared the 2012 returns.

- 2008 to 2011: EisnerAmper LLP prepared returns for several of the Aequitas Funds for 2008 thru 2011.  The 2010 returns (and years before that) show the firm name as Harb, Levy & Weiland LLP, a firm that was merged into EisnerAmper LLP.  The rest of the Aequitas entity returns for these years were prepared by AKT LLP.

- Before 2008: Based on the copies of returns available, AKT LLP (formerly known as Aldrich Kilbride & Tatone LLC) prepared the Aequitas returns in years back to about 2005.

#### J.5.2. Electronic tax records

The Aequitas Shared Drive contains electronic tax records for years back to 2004.  For years prior to 2013, the electronic files are mainly only copies of returns.  Some information related to the preparation of returns from those earlier years on the Aequitas server; however, the Receiver has not confirmed the completeness of the workpapers.

Starting in 2013, and for all years thereafter, tax information provided to the tax preparer, review copies, work papers and final tax returns were saved on the Aequitas server along with copies of extensions, payments and estimates.

The tax information on the Aequitas server also contains various topic folders, copies of local tax returns (personal property tax returns, etc.), tax notices, tax planning, research and other folders related to the operation of the Tax department.  For the most part, information from 2013 and forward is saved electronically (there are some paper files).  Information from earlier years may or may not be included in the electronic files.

#### J.5.3. Other tax records

Paper copies of prior-year tax returns (generally all from years 2010 and back) are kept on the premises.  About four drawers of tax topic files are also located on the premises.  The paper files are mostly from years prior to 2013 and are not complete.

### J.6.  Management of data/records

In addition to its electronic data sources, Aequitas maintains certain hard-copy records consisting of signed documents and accounting support.  This inventory consists of 72 banker boxes of records stored on-premises and 644 banker boxes inventoried and warehoused offsite in DataSafe storage.[501]

---

[501] https://www.datasafe.com/

### J.7.  Information from Aequitas Entity personnel

The Receiver retained several former Aequitas employees as members of the Receivership accounting and forensic team.  This staff includes personnel knowledgeable in the Investor, Tax, Treasury, Portfolio Management and IT operations of Aequitas who contributed greatly to the content of this Report.

**In re AEQUITAS MANAGEMENT, LLC, et al.**

**Case No. 3:16-cv-00438-PK**

**Report Regarding the Investigation of the Receivership Entity's Business Conduct**

***Exhibit A***

***Aequitas Organizational Chart***

NOTE: Does not include inactive and non-operating entities



**In re AEQUITAS MANAGEMENT, LLC, et al.**
**Case No. 3:16-cv-00438-PK**
**Report Regarding the Investigation of the Receivership Entity's Business Conduct**

*Exhibit B*
*Glossary*

| Term | Definition | Page |
|---|---|---|
| 40 Act | the 1940 Investment Companies Act | 64 |
| ACCCPH | ACC C Plus Holdings, LLC; an entity in the Receivership Entity | 5 |
| ACCFPH | ACC F Plus Holdings, LLC; an entity in the Receivership Entity | 5 |
| ACCFT-1 | ACC Funding Trust 2014-1; an entity in the Receivership Entity | 17 |
| ACCFT-2 | ACC Funding Trust 2014-2; an entity in the Receivership Entity | 17 |
| ACCFST-5 | ACC Funding Series Trust 2015-5; an entity in the Receivership Entity | 58 |
| ACCH2 | ACC Holdings 2, LLC; an entity in the Receivership Entity | 28 |
| ACCH5 | ACC Holdings 5, LLC; an entity in the Receivership Entity | 122 |
| ACF | Aequitas Commercial Finance, LLC; an entity in the Receivership Entity, and one of the Entity Defendants | 5 |
| ACF-AH Note | the intercompany receivable due from Aequitas Holdings, LLC payable to Aequitas Commercial Finance, LLC | 19 |
| ACF-CPYT Note | the various loan receivables due from CarePayment Technologies, Inc. payable to Aequitas Commercial Finance, LLC | 19 |
| ACF-ETCFF Loan | loan receivable due from Aequitas ETC Founders Fund, LLC and payable to Aequitas Commercial Finance, LLC | 124 |
| ACF-Op | the operating bank account of Aequitas Commercial Finance, LLC | 14 |
| ACF-PN | the Private Note bank account of Aequitas Commercial Finance, LLC | 13 |
| ACL | Aequitas Corporate Lending, LLC; an entity in the Receivership Entity | 5 |
| ACL-CPYT Note | the ACF-CPYT Note after Aequitas Commercial Finance, LLC contributed its interests in the notes receivable due from CarePayment Technologies, Inc. to Aequitas Corporate Lending, LLC | 19 |
| ACM | Aequitas Capital Management, Inc.; an entity in the Receivership Entity, and one of the Entity Defendants | 5 |
| ACP | Aequitas Capital Partners, an Aequitas run RIA membership group which provided benefits to Registered Investment Advisers who promoted Aequitas investment products. | 79 |
| AB | Aequitas Advisory Board - consisted of William McCormick, Edmund Jensen, Patrick Terrell, Martin Brantley, William Glasgow J.D., Keith Barnes, Donna Miles, Robert (Bob) Zukis and Gerry Frank as of January 28, 2016. | 8 |
| AEF | Aequitas Equipment Finance, LLC; a former Aequitas entity not included in the Receivership Entity | 67 |
| Aequitas or Aequitas Entity | the Entity Defendants and its 43 subsidiaries and/or majority-owned affiliates | 5 |
| Aequitas Funds | a general term to describe any outside investor fund, with exception of Private Notes, Direct Notes, and equity funds. These funds are: Aequitas Enhanced Income Fund, LLC; Aequitas Income Opportunity Fund, LLC; Aequitas Income Opportunity Fund II, LLC; Aequitas Income Protection Fund, LLC; Aequitas Private Client Fund, LLC | 12 |
| AES | Aequitas Enterprise Services, LLC; an entity in the Receivership Entity | 39 |

| AFSN | Aequitas Financial Services Network, an Aequitas run Registered Investment Advisors membership group which provided benefits to Registered Investment Advisers who promoted Aequitas investment products. | 63 |
|---|---|---|
| AGES | Aspen Grove Equity Solutions, LLC; an entity in the Receivership Entity | 19 |
| AH | Aequitas Holdings, LLC; an entity in the Receivership Entity, and one of the Entity Defendants | 5 |
| AHF | Aequitas Hybrid Fund, LLC; an entity in the Receivership Entity | 5 |
| AICPA | American Institute of Certified Public Accountants | 6 |
| AIO | Aequitas International Opportunities LP; one of the Extended Entities under the Final Receivership Order | 5 |
| AIO-SA | Aequitas Income Opportunities (Luxembourg) SA; a former Aequitas entity not included in the Receivership Entity | 122 |
| AIM | Aequitas Investment Management, LLC; an entity in the Receivership Entity, and one of the Entity Defendants | 5 |
| AM | Aequitas Management, LLC; an entity in the Receivership Entity, and one of the Entity Defendants | 5 |
| AM Units | equity membership units of Aequitas Management, LLC | 130 |
| AH-AM Note | the intercompany note receivable due from Aequitas Management, LLC payable to Aequitas Holdings, LLC | 81 |
| AP2PF | Aequitas Peer-To-Peer Funding, LLC; an entity in the Receivership Entity | 5 |
| APF | Aequitas Partner Fund, LLC; an entity in the Receivership Entity | 5 |
| ASA | Administrative Services Agreement | 9 |
| ASFG | ASFG, LLC, an former Aequitas entity later known as Campus Student Funding, LLC | 14 |
| ASFGLI | ASFG Leverage I, LLC; an Aequitas entity later known as CSF Leverage I, LLC | 14 |
| ASFG-Op | the bank account of ASFG, LLC | 14 |
| ASFG, Inc. | American Student Financial Group, Inc., a Delaware corporation, is a separate and distinct entity from ASFG, LLC. American Student Financial Group, Inc. is not part of the Receivership Entity or otherwise affiliated with the Receivership. | 55 |
| Asset Allocation Policy | a internal Aequitas policy established in 2014 and updated in 2015 for the issuance of Manufactured Notes to Aequitas Funds | 33 |
| ASU | Accounting Standards Update No. 2013-08 issued by the Financial Accounting Standards Board | 40 |
| Atalaya | Atalaya Asset Income Fund II LP, and certain of its affiliates | 59 |
| AWM | Aequitas Wealth Management, LLC; an entity in the Receivership Entity | 9 |
| Bad Assets | Aequitas' terminology for certain equity and security assets that would trigger registration under the 1940 Investment Companies Act | 64 |
| Billing accounts | healthcare accounts that are originated under the program and CarePayment Technologies, Inc. services, but that were not acquired by CarePayment, LLC or its affiliates at the point of origination.  These accounts were typically converted to Funded after certain number of payments were received from the patients | 42 |
| BSR | Business Service Revenue, a calculation as defined by Aequitas, intended to be a net interest margin calculation. Otherwise known as a Program Management Fee | 38 |
| C+ Loans | a portfolio of unsecured consumer loans denominated as ConsolidationPlus or "C+" loans held by ACC Funding Trust 2014-2 and ACC Funding Series Trust 2015-5 | 58 |

| | | |
|---|---|---|
| Cana's Feast | Cana's Feast Winery, LLC | 82 |
| CapitalSource | CapitalSource Inc. | 14 |
| CashReady Judgment | the judgment in favor of Income Opportunity Fund, LLC in the litigated dispute against CashReady, LLC and Brandon Becker | 82 |
| Catalyst Fund | Aequitas Catalyst Fund, LLC; a former Aequitas entity not included in the Receivership Entity | 48 |
| Cerberus | Cerberus Capital Management L.P. | 54 |
| CFPB | the Consumer Financial Protection Bureau | 9 |
| CoCo | Corinthian Colleges, Inc. | 9 |
| COF | Aequitas Capital Opportunities Fund, LP; an entity in the Receivership Entity | 5 |
| COFGP | Aequitas Capital Opportunities GP, LLC; an entity in the Receivership Entity | 41 |
| Commission or SEC | the Securities and Exchange Commission | 5 |
| Complaint | the complaint filed on March 10, 2016 by the Commission against the Entity Defendants and the Individual Defendants [Dkt. 1] | 5 |
| Complaint Date | March 10, 2016 | 5 |
| Comvest | Comvest Capital, III, L.P. | 59 |
| Comvest Lenders | Comvest Capital, III, L.P., Atalaya Asset Income Fund II, LP, and certain of its affiliates | 59 |
| Comvest Notes | two secured loans from the third party Comvest Lenders used as acquisition financing with respect to the Consumer Loan Portfolios | 59 |
| Consumer Loan Portfolios | two portfolios of unsecured consumer loans – the F+ Loans and the C+ Loans – held by the Receivership Entity | 58 |
| Covert or conversion | a transfer of an asset or liability from one Aequitas Entity to another without cash consideration | 9 |
| CPA | Certified Public Accountants | 6 |
| CPD | Capital Pending Deployment term used by Aequitas in the note manufacturing process to reflect the total capital raised within a defined time period, which had not been collateralized by a note to a SPE | 31 |
| CPF | Aequitas CarePayment Fund, LLC; a former Aequitas entity not included in the Receivership Entity | 14 |
| CPFIT | CP Funding 1 Trust | 55 |
| CPH | CarePayment Holdings, LLC; an entity in the Receivership Entity | 5 |
| CPLLC | CarePayment, LLC; an entity in the Receivership Entity | 14 |
| CPYT | CarePayment Technologies, Inc.; an Extended Entity of the Receivership | 19 |
| CRC | Aequitas Conflicts Review Committee | 84 |
| CSF | Campus Student Funding, LLC; an entity in the Receivership Entity, formerly known as AFSG | 14 |
| CSFLI | CSF Leverage I, LLC; an entity formerly known as AFSGLI, that was later merged into Campus Student Funding, LLC | 12 |
| CSF-Op | the operating bank account of Campus Student Funding, LLC | 16 |
| CSS | Certified Security Solutions, Inc. | 82 |
| DCEF | DC Equipment Finance, LLC; a former Aequitas entity that is not included in the Receivership Entity | 25 |
| Direct Note(s) | debt instruments of SPEs of Aequitas Commercial Finance, LLC, and Aequitas Holdings, LLC, where an Investor invests directly into a specific SPE, rather than through an Aequitas Fund. Entities with outstanding notes to Investors include; ACC C Plus Holdings 2, ACC F Plus Holdings 2, Aequitas Corporate Lending, Aequitas Peer-to-Peer Funding, CarePayment Holdings, MotoLease Financial Holdings and MotoLease Financial | 5 |
| EdPlus | EDPlus Holdings, LLC; an Extended Entity of the Receivership | 19 |

| | | |
|---|---|---|
| EIF | Aequitas Enhanced Income Fund, LLC; an entity in the Receivership Entity | 5 |
| Entity Defendants | the entities Aequitas Management, LLC; Aequitas Holdings, LLC; Aequitas Commercial Finance, LLC; Aequitas Capital Management, Inc.; Aequitas Investment Management, LLC | 5 |
| ETC | ETC Global Group, LLC, ETC USA, ETC Canada, and affiliates | 52 |
| ETCFF | Aequitas ETC Founders Fund, LLC; an entity in the Receivership Entity | 5 |
| Etelos | Etelos, Inc. f/k/a Cloudward, Inc. | 83 |
| Extended Entities | Aequitas affiliated entities which must cooperate fully with the Receiver, but are not otherwise included in the Receivership Entity. Extended Entities are located in Exhibit B of the Final Receivership Order [Dkt. 156] | 5 |
| External APF Investors | non-Aequitas investors in Aequitas Partner Fund, LLC; William McCormick, Richard Terrell and PatRick Investments. | 85 |
| F+ Loans | a portfolio of unsecured consumer loans denominated as FreedomPlus or "F+" loans held by ACC Funding Trust 2014-1 and ACC Funding Series Trust 2015-5 | 58 |
| Fargo Rose | The Fargo Rose, LLC, a Aequitas restaurant investment which ultimately became a part of the Northbranch restructuring | 67 |
| FFN | Freedom Financial Network and its affiliates | 17 |
| Fieldstone | Fieldstone Financial Management Group, LLC | 19 |
| Final Receivership Order | the Order Appointing Receiver filed on April 14, 2016 appointing Ronald Greenspan as Receiver for the Receivership Entity [Dkt. 156] | 5 |
| FINRA | Financial Industry Regulatory Authority, Inc. | 53 |
| FTI Consulting | FTI Consulting, Inc. | 6 |
| Funded accounts | healthcare accounts that are originated under the program and that CarePayment, LLC or its affiliate acquires and provides the funding for | 42 |
| Gladstone Technology | Gladstone Technology Partners, LLC; and its affiliates | 19 |
| Good Assets | Aequitas' terminology for assets that allow Aequitas to maintain compliance with the 1940 Investment Companies Act, through an exemption for companies that hold higher percentages of consumer and corporate debt. | 64 |
| Great Plains | Microsoft Dynamics GP, the financial accounting system of Aequitas | 135 |
| Ground Lease with an Option to Purchase | April 26, 2013 lease agreement and put option between Westside Christian High School and The Hill Land, LLC | 60 |
| Hill Land | The Hill Land, LLC; an entity in the Receivership Entity | 60 |
| IBAT | an affiliate of Integrity Bank & Trust | 8 |
| IC | the Aequitas Investment Committee | 20 |
| Individual Defendants | Robert J. Jesenik, Brian A. Oliver, and N. Scott Gillis | 5 |
| Interim Receivership Order | the Stipulated Interim Order Appointing Receiver filed on March 16, 2016 appointing Ronald Greenspan as Receiver for the Receivership Entity on an interim basis [Dkt. 30] | 5 |
| Investigation | the Receiver's investigation into the manner in which the financial and business affairs of the Receivership Entity were conducted, as empowered under the Final Receivership Order | 5 |
| Investors | the defrauded Investors of Aequitas Entities | 5 |
| IOF | Aequitas Income Opportunity Fund, LLC; an entity in the Receivership Entity | 5 |
| IOF–ACF(MLF) Note | note receivable due from Aequitas Commercial Finance, LLC and payable to Aequitas Income Opportunity Fund, LLC, backed by Aequitas Commercial Finance's equity in MotoLease Financial, LLC | 108 |
| IOF–ACF(SL) Note | note receivable due from Aequitas Commercial Finance, LLC and payable to Aequitas Income Opportunity Fund, LLC, backed by Aequitas Commercial Finance's equity in Non-Recourse Student Loans | 108 |

| | | |
|---|---|---|
| IOFII | Aequitas Income Opportunity Fund II, LLC; an entity in the Receivership Entity | 5 |
| IPF | Aequitas Income Protection Fund, LLC; an entity in the Receivership Entity | 5 |
| Ivey | Ivey Performance Marketing, LLC; an Extended Entity of the Receivership | 48 |
| Manchester | Manchester Partners (later to be known as Hancock Investment Advisors) | 62 |
| Manufactured Notes | A self-described program, for which Aequitas management would assign collateral to Aequitas Funds in the form of a note from a SPE. The SPE would assume the liability of repaying the note, often times without receiving any direct cash consideration. | 8 |
| Membership Interest Sale Agreement | agreement between Aequitas Management, LLC and Olaf Janke for the sale of his membership interest in Aequitas Management, LLC, executed on March 9, 2015 | 131 |
| MHLXU | microHelix, Inc. | 42 |
| MLF | MotoLease Financial, LLC; an entity in the Receivership Entity | 5 |
| MLFH | ML Financial Holdings, LLC; an entity in the Receivership Entity | 5 |
| MotoLease, LLC | separate and distinct entity, not included in the Receivership. MotoLease, LLC originated and to an extent serviced the receivables, purchased by MotoLease Financial, LLC. As of the Complaint Date, Aequitas Capital Opportunities Fund, LP held 230 membership units at a total purchase price of $1.8 million, representing 23% equity ownership in MotoLease, LLC | 126 |
| MSP | Marketing Services Platform, Inc.; an Extended Entity of the Receivership | 9 |
| nD | nD Bancgroup, an entity in which Aequitas Capital Opportunities Fund, LP held an equity investment in, for a total purchase price of $2.6 million | 20 |
| New Note | the promissory note for $1.3 million, with a maturity date of April 15, 2022, owed to Olaf Janke from Aequitas, under the terms of his Membership Interest Sale Agreement | 132 |
| Newman Loan | the December 17, 2010 loan from Aequitas Commercial Finance, LLC to Michael J. and Susan L. Newman with a original principal balance of $325 thousand, and remaining principal balance of $222 thousand | 65 |
| NIM | fee paid by Aequitas to CarePayment Technologies, Inc. and EdPlus Holdings, LLC, intended to be the net interest margin, also referred to as BSR or Program Management Fee | 43 |
| NorthBranch | NorthBranch, LLC | 66 |
| NorthBranch Member Loans | the limited recourse loans from Aequitas Holdings, LLC to the NorthBranch Members to fund the buyout of RDA, and continued funding of the NorthBranch restructuring | 68 |
| NorthBranch Members | the managing members of NorthBranch, LLC following the May 15, 2011 buyout of RDA, LLC | 68 |
| NorthBranch Notes | the NorthBranch Member Loans and the additional promissory note from Riffle, assigned to NorthBranch, LLC | 70 |
| OA | outdoor amusement industry (carnivals, fairs, waterparks, etc.) | 62 |
| OCCO meeting | Office of the Chief Compliance Officer meeting | 74 |
| OCIO | the Aequitas Office of the Chief Investment Officer | 33 |
| Operating Entities | Aequitas Enterprise Services, LLC, Aequitas Capital Management, Inc., and Aequitas Investment Management, LLC | 88 |
| PAG | Private Advisory Group, LLC | 79 |
| PatRick Investments | PatRick Investments, LLC; a company managed by Patrick (Pat) Terrell, Aequitas Advisory Board Member. | 82 |
| PCF | Aequitas Private Client Fund, LLC; an entity in the Receivership Entity | 5 |
| Pipeline Health | Pipeline Health Holdings, LLC | 85 |

| | | |
|---|---|---|
| PMA | Program Management Agreement between CarePayment Technologies, Inc. and Aequitas Commercial Finance, LLC, in which CarePayment Technologies, Inc. were to provide administrative services and strategic advice regarding operations, planning, and financing | 43 |
| PPM | Private Placement Memorandum; a document provided to prospective investors in specific Aequitas Funds or SPEs, otherwise also known as an offering document. | 77 |
| Prairie | Prairie Financial, Inc. | 61 |
| Private Note | debt instruments of Aequitas Commercial Finance, LLC | 5 |
| Product Menu | an Aequitas produced report which, as a part of the Manufactured Note process, would list SPEs which had "available collateral" based on a Aequitas calculation, in order to issue a note or liability to a Aequitas Fund | 31 |
| Program Management Fee | intended to be net interest margin, also known as BSR or NIM | 43 |
| Proposed Receivership Order | the Proposed Stipulated Order Appointing Receiver filed on March 10, 2016 by the Commission and the Entity Defendants [Dkt. 2-2] | 5 |
| PTI | Printing Today, Inc. a company under the control of Ivey Performance Marketing | 49 |
| AM Purchase Note | the promissory note with principal balance of $1.2 million and a maturity date of January 1, 2019 owed by Olaf Janke to Aequitas Management, LLC | 131 |
| Quantlab | Quantlab Investments, LLC | 54 |
| Quarter Club | an additional premium tier of Aequitas Capital Partners, for Registered Investment Advisers who sold Aequitas product greater than $25.0 million | 79 |
| RDA | RDA, LLC (dba Roses Bakery), a Aequitas restaurant investment which ultimately became a part of the Northbranch restructuring | 67 |
| Receiver | Ronald Greenspan | 5 |
| Receivership or Receivership Entity | the Entity Defendants and its 43 subsidiaries and/or majority-owned affiliates. A list of Receivership Entities can be found on Exhibit A of the Final Receivership Order [Dkt. 156] | 5 |
| Receivership Property | all assets of the Receivership Entity | 5 |
| Relevant Time Period | the period of January 1, 2014 through March 10, 2016 determined by the Receiver to be the most relevant time period for the Investigation | 5 |
| Report | the Report Regarding the Investigation of the Receivership Entity's Business Conduct | 5 |
| RIA | Registered Investment Adviser | 62 |
| Riffle | Riffle NW, LLC, a Aequitas restaurant investment which ultimately became a part of the Northbranch restructuring | 67 |
| Rock and Roll Restaurants Note | a note receivable with Rock and Roll Restaurants, LLC with a book balance of $500 thousand, held by Aequitas Partner Fund, LLC as of the Complaint Date | 82 |
| SCA | Strategic Capital Alternatives, LLC | 79 |
| SCAH | SCA Holdings, LLC | 19 |
| SCG | Strategic Capital Group, LLC | 79 |
| Scottrade | Scottrade Bank | 62 |
| SEC or Commission | the Securities and Exchange Commission | 5 |
| Service Only accounts | healthcare accounts that the health care providers retain ownership of, but which they request CarePayment Technologies, Inc. to service | 42 |
| Skagit | Skagit Gardens, Inc.; an Extended Entity of the Receivership | 14 |
| SPE | a Special Purpose Entity | 9 |
| Special Units | Class A Special Units of Aequitas Holdings, LLC | 82 |

| | | |
|---|---|---|
| Stock Purchase Agreement | Agreement between Aequitas ETC Founders Fund, LLC and ETC Global Holdings, LLC dated September 26, 2011 | 124 |
| Syncronex | Syncronex, LLC; an Extended Entity of the Receivership | 19 |
| Tear Sheet | A fact sheet and marketing material compiled by Aequitas for Aequitas Funds or SPEs, intended to summarize the holdings and financial performance of the Aequitas Fund or SPE, and provided to current and prospective investors | 91 |
| Timely Payment Test | alternative solvency test which assesses whether, at the time of the transfer, the debtor intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they matured | 128 |
| TGM | Terrell Group Management; A company controlled by Patrick (Pat) Terrell, Aequitas Advisory Board Member. | 14 |
| TGM-ACL Note | the senior secured promissory note owed by Aequitas Corporate Lending, LLC payable to Terrell Group Management | 26 |
| U.S. GAAP | United States generally accepted accounting principles | 41 |
| UFTA | the Uniform Fraudulent Transfer Act | 7 |
| Unreasonably Small Assets Test | a test used by courts to determine solvency, focusing on the financial stability of the company, based on the company's ability to generate sufficient profits to sustain operations, pay its debts and remain financially stable | 128 |
| WCHS | Westside Christian High School, Inc. | 60 |
| Weider | Weider Health and Fitness | 12 |
| Weider/Forman | Weider Health and Fitness, together with Weider's CFO Bruce Forman | 12 |
| WR | WindowRock/Aequitas Residential Recovery Fund, L.P. | 123 |
| WRFF | Aequitas WRFF I, LLC; an entity in the Receivership Entity | 5 |

**In re AEQUITAS MANAGEMENT, LLC, et al.**

**Case No. 3:16-cv-00438-PK**

**Report Regarding the Investigation of the Receivership Entity's Business Conduct**

*Exhibit C.1*
*Cash Raised During Relevant Time Period*

| Aequitas Legal Entity | Beginning Investor Account Balances | Cash Raised During Period [1] | Unique Accounts for Cash Raised [2] |
|---|---|---|---|
| **Aequitas Funds** | | | |
| Aequitas Enhanced Income Fund, LLC | $        - | $       6,490,978 | 10 |
| Aequitas Income Opportunity Fund, LLC | 34,661,669 | 804,139 | 5 |
| Aequitas Income Opportunity Fund II, LLC | - | 67,988,383 | 71 |
| Aequitas Income Protection Fund, LLC | 48,835,893 | 15,227,290 | 23 |
| Aequitas Private Client Fund, LLC | - | 300,000 | 1 |
| **Aequitas Funds Total** | $    83,497,562 | $     90,810,790 | 110 |
| **Aequitas Commercial Finance, LLC – Private Note** | $  248,904,528 | $   205,453,682 | 832 |
| **Equity Funds** | | | |
| Aequitas Capital Opportunities Fund, LP | - | 27,248,480 | 59 |
| [3] Aequitas ETC Founders Fund, LLC | 14,858,390 | - | - |
| [3] Aequitas Hybrid Fund, LLC | 6,801,784 | - | - |
| Aequitas Partner Fund, LLC | - | - | - |
| [3] Aequitas WRFF I, LLC | - | 25,749,912 | 44 |
| **Equity Funds Total** | $    21,660,174 | $     52,998,392 | 103 |
| **Direct Notes** | | | |
| [4] ACC C Plus Holdings, LLC | - | 2,500,000 | 3 |
| ACC F Plus Holdings, LLC | - | 2,000,000 | 2 |
| Aequitas Corporate Lending, LLC | - | 3,677,100 | 2 |
| Aequitas Peer-to-Peer Funding, LLC | - | 1,025,000 | 4 |
| CarePayment Holdings, LLC | - | 11,000,000 | 9 |
| [5] CSF Leverage I, LLC | 12,625,000 | - | - |
| [6] DC Equipment Finance, LLC | 2,338,000 | 7,600,500 | 1 |
| MotoLease Financial, LLC | - | 8,000,000 | 7 |
| [7] ML Financial Holdings, LLC | - | 2,700,000 | 3 |
| **Direct Notes Total** | $    14,963,000 | $     38,502,600 | 31 |
| Aequitas International Opportunities, LP | - | 15,400,000 | 1 |
| **Grand Total** | $  369,025,264 | $   403,165,464 | 1,077 |

[1] Does not include intercompany transfers from Aequitas entities (current Receivership Entity or former Aequitas entities) relating to Investor transfers.

[2] Aequitas entities with Integrity Bank and Trust ("IBAT") as an investor, count IBAT as only one "Unique Account" for cash raised per entity.

[3] "Beginning Investor Account Balance" amounts include effects of net income allocations on the Investors' investment accounts.

[4] Investors included under ACC C Plus Holdings, LLC ("ACCCPH") initially invested into ACC Holdings 2, LLC ("ACCH2"), a Receivership Entity, in March 2015; these investments were assumed by ACCCPH, the sole member of ACCH2, in May 2015. The consolidated investment activity is shown.

[5] CSF Leverage I, LLC was the investment vehicle for the Weider Health and Fitness and Bruce Forman notes prior to Weider's conversion to CarePayment Holdings, LLC.

[6] DC Equipment Finance, LLC was the investment vehicle for the Terrell Group Management notes prior to its conversion to Aequitas Corporate Lending, LLC.

**In re AEQUITAS MANAGEMENT, LLC, et al.**
**Case No. 3:16-cv-00438-PK**
**Report Regarding the Investigation of the Receivership Entity's Business Conduct**

*Exhibit C.2*
*Cash Payments During Relevant Time Period*

| Aequitas Legal Entity | Principal Payments to Investors | Returns Paid to Investors | Principal Payments to Insiders | Returns Paid to Insiders |
|---|---|---|---|---|
| **Aequitas Funds** | | | | |
| Aequitas Enhanced Income Fund, LLC | $ - | $ (771,654) | $ - | $ - |
| Aequitas Income Opportunity Fund, LLC | (9,926,304) | (7,234,179) | (500,000) | (96,943) |
| Aequitas Income Opportunity Fund II, LLC | | (6,737,797) | - | - |
| Aequitas Income Protection Fund, LLC | (17,354,474) | (7,420,230) | - | - |
| Aequitas Private Client Fund, LLC | - | (1,021,520) | - | (54,494) |
| **Aequitas Funds Total** | $ (27,280,778) | $ (23,185,380) | $ (500,000) | $ (151,437) |
| **Aequitas Commercial Finance, LLC – Private Note** | $ (113,533,514) | $ (55,382,776) | $ (4,519,778) | $ (3,421,639) |
| **Equity Funds** | | | | |
| Aequitas Capital Opportunities Fund, LP | (444,529) | - | (380,332) | - |
| Aequitas ETC Founders Fund, LLC | - | - | - | - |
| Aequitas Hybrid Fund, LLC | (2,102,666) | - | - | - |
| Aequitas Partner Fund, LLC | - | - | - | - |
| Aequitas WRFF I, LLC | (6,028,632) | - | - | - |
| **Equity Funds Total** | $ (8,575,827) | $ - | $ (380,332) | $ - |
| **Direct Notes** | | | | |
| ACC C Plus Holdings, LLC | - | (259,373) | - | - |
| ACC F Plus Holdings, LLC | - | (52,000) | - | - |
| Aequitas Corporate Lending, LLC | (2,964,086) | (925,794) | (2,964,086) | (925,794) |
| Aequitas Peer-to-Peer Funding, LLC | (800,000) | (148,182) | - | - |
| CarePayment Holdings, LLC | | (1,558,819) | - | - |
| [1] CSF Leverage I, LLC | (6,625,000) | (1,198,771) | - | - |
| [2] DC Equipment Finance, LLC | (4,020,500) | (884,152) | (4,020,500) | (884,152) |
| MotoLease Financial, LLC | (1,000,000) | (216,125) | - | - |
| ML Financial Holdings, LLC | - | (174,412) | - | - |
| **Direct Notes Total** | $ (15,409,586) | $ (5,417,629) | $ (6,984,586) | $ (1,809,947) |
| Aequitas International Opportunities, LP | (350,000) | (479,469) | - | - |
| **Grand Total** | $ (165,149,706) | $ (84,465,254) | $ (12,384,696) | $ (5,383,022) |

[1] CSF Leverage I, LLC was the investment vehicle for the Weider Health and Fitness and Bruce Forman notes prior to Weider's conversion to CarePayment Holdings, LLC.

[2] DC Equipment Finance, LLC was the investment vehicle for the Terrell Group Management notes prior to its conversion to Aequitas Corporate Lending, LLC.

**In re AEQUITAS MANAGEMENT, LLC, et al.**
**Case No. 3:16-cv-00438-PK**
**Report Regarding the Investigation of the Receivership Entity's Business Conduct**

*Exhibit C.3*
***Amount Remaining Due to Investors as of March 10, 2016***
*(includes accrued and unpaid interest)*

| Aequitas Legal Entity | | Amount Due to Investors 3.10.16 |
|---|---|---|
| **Aequitas Funds** | | |
| Aequitas Enhanced Income Fund, LLC | $ | 14,230,375 |
| Aequitas Income Opportunity Fund, LLC | | 18,009,400 |
| Aequitas Income Opportunity Fund II, LLC | | 104,563,054 |
| Aequitas Income Protection Fund, LLC | | 9,347,999 |
| Aequitas Private Client Fund, LLC | | 37,230,590 |
| **Aequitas Funds Total** | $ | 183,381,419 |
| **Aequitas Commercial Finance, LLC – Private Note** | $ | 315,981,042 |
| **Equity Funds** | | |
| [1] Aequitas Capital Opportunities Fund, LP | | 20,246,646 |
| [1] Aequitas ETC Founders Fund, LLC | | 14,687,326 |
| [1] Aequitas Hybrid Fund, LLC | | 4,944,375 |
| [1] Aequitas Partner Fund, LLC | | 1,330,723 |
| [1] Aequitas WRFF I, LLC | | 21,908,430 |
| **Equity Funds Total** | $ | 63,117,500 |
| **Direct Notes** | | |
| ACC C Plus Holdings, LLC | | 2,500,000 |
| ACC F Plus Holdings, LLC | | 2,000,000 |
| Aequitas Corporate Lending, LLC | | 7,668,000 |
| Aequitas Peer-to-Peer Funding, LLC | | 225,000 |
| CarePayment Holdings, LLC | | 17,000,000 |
| CSF Leverage I, LLC | | - |
| DC Equipment Finance, LLC | | - |
| MotoLease Financial, LLC | | 8,000,000 |
| ML Financial Holdings, LLC | | 2,700,000 |
| **Direct Notes Total** | $ | 40,093,000 |
| Aequitas International Opportunities, LP | | 15,050,000 |
| **Grand Total** | $ | 617,622,960 |

[1] Ending Balances for these investments include effects of net income allocations.

**In re AEQUITAS MANAGEMENT, LLC, et al.**
**Case No. 3:16-cv-00438-PK**
**Report Regarding the Investigation of the Receivership Entity's Business Conduct**

*Exhibit C.4*
*Investments through IRA Custodians*

| Aequitas Legal Entity | Amount Invested in IRA Custodians [1] | Unique Accounts in IRA Custodians [1] |
|---|---|---|
| **Aequitas Funds** | | |
| Aequitas Enhanced Income Fund, LLC | $                - | - |
| Aequitas Income Opportunity Fund, LLC | 4,070,084 | 32 |
| Aequitas Income Opportunity Fund II, LLC | 1,953,411 | 16 |
| Aequitas Income Protection Fund, LLC | 709,238 | 3 |
| Aequitas Private Client Fund, LLC | 651,786 | 2 |
| **Aequitas Funds Total** | $      7,384,519 | 53 |
| **Aequitas Commercial Finance, LLC – Private Note** | $     81,132,572 | 564 |
| **Equity Funds** | | |
| Aequitas Capital Opportunities Fund, LP | - | - |
| Aequitas ETC Founders Fund, LLC | - | - |
| Aequitas Hybrid Fund, LLC | - | - |
| Aequitas Partner Fund, LLC | - | - |
| Aequitas WRFF I, LLC | 2,240,700 | 5 |
| **Equity Funds Total** | $      2,240,700 | 5 |
| **Direct Notes** | | |
| ACC C Plus Holdings, LLC | 500,000 | 1 |
| ACC F Plus Holdings, LLC | - | - |
| Aequitas Corporate Lending, LLC | - | - |
| Aequitas Peer-to-Peer Funding, LLC | - | - |
| CarePayment Holdings, LLC | - | - |
| CSF Leverage I, LLC | - | - |
| DC Equipment Finance, LLC | - | - |
| MotoLease Financial, LLC | - | - |
| ML Financial Holdings, LLC | - | - |
| **Direct Notes Total** | $         500,000 | 1 |
| Aequitas International Opportunities, LP | - | - |
| **Grand Total** | $     91,257,791 | 623 |

[1] Aequitas Legal Entities with Integrity Bank and Trust ("IBAT") as an investor count IBAT as only one "Unique Account" per entity for purposes of these exhibits. While IBAT may have investors who invested through IRA custodians, these accounts are not included.

**In re AEQUITAS MANAGEMENT, LLC, et al.**
**Case No. 3:16-cv-00438-PK**
**Report Regarding the Investigation of the Receivership Entity's Business Conduct**

*Exhibit C.6.7*
*Redemptions after September 1, 2015*

| Aequitas Legal Entity | Principal Payments to Investors | Principal Payments to Insiders |
|---|---|---|
| **Aequitas Funds** | | |
| Aequitas Enhanced Income Fund, LLC | $            - | $            - |
| Aequitas Income Opportunity Fund, LLC | (500,000) | - |
| Aequitas Income Opportunity Fund II, LLC | - | - |
| Aequitas Income Protection Fund, LLC | (472,825) | - |
| Aequitas Private Client Fund, LLC | - | - |
| **Aequitas Funds Total** | $ (972,825) | $            - |
| **Aequitas Commercial Finance, LLC – Private Note** | $ (28,368,020) | $ (1,800,000) |
| **Equity Funds** | | |
| Aequitas Capital Opportunities Fund, LP | - | - |
| Aequitas ETC Founders Fund, LLC | - | - |
| Aequitas Hybrid Fund, LLC | - | - |
| Aequitas Partner Fund, LLC | - | - |
| Aequitas WRFF I, LLC | (2,590,140) | - |
| **Equity Funds Total** | $ (2,590,140) | $            - |
| **Direct Notes** | | |
| ACC C Plus Holdings, LLC | - | - |
| ACC F Plus Holdings, LLC | - | - |
| Aequitas Corporate Lending, LLC | (1,677,100) | (1,677,100) |
| Aequitas Peer-to-Peer Funding, LLC | (800,000) | - |
| CarePayment Holdings, LLC | - | - |
| CSF Leverage I, LLC | - | - |
| DC Equipment Finance, LLC | - | - |
| MotoLease Financial, LLC | (1,000,000) | - |
| ML Financial Holdings, LLC | - | - |
| **Direct Notes Total** | $ (3,477,100) | $ (1,677,100) |
| Aequitas International Opportunities, LP | (350,000) | - |
| **Grand Total** | $ (35,758,086) | $ (3,477,100) |

**In re AEQUITAS MANAGEMENT, LLC, et al.**
**Case No. 3:16-cv-00438-PK**
**Report Regarding Investigation of the Receivership Entities' Business Conduct**

*Exhibit C.8*
*Payments and Loans to Individual Defendants 2014-2016*

| | Direct Payments to Individual Defendants | | | | | Outstanding Loans (principal balance) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Payroll & Allowances[1] | Expenses | Consulting | Member Distributions[2] & Advances | *Subtotal* | Newman Loan | Northbranch Loans | *Subtotal* | Grand Total |
| Gillis | $ 526,799 | $ 42,643 | $ 34,675 | $ - | *$ 604,117* | $ - | $ - | *$ -* | $ 604,117 |
| Jesenik[3] | 1,728,669 | 147,434 | - | 1,009,502 | *2,885,605* | 222,450 | 359,603 | *582,053* | 3,467,658 |
| Oliver | 1,183,376 | 81,090 | - | 190,502 | *1,454,968* | - | 218,555 | *218,555* | 1,673,523 |
| Total | $ 3,438,844 | $ 271,166 | $ 34,675 | $ 1,200,004 | *$ 4,944,690* | $ 222,450 | $ 578,158 | *$ 800,608* | $ 5,745,298 |

1. These figures do not include employer paid portions of the Individual Defendants health insurance, dental insurance, life insurance, short term disability, long term disability, or health savings account contributions.
2. Member Distributions include distributions and advances on Special Units and AM Units.
3. Jesenik's Member Distribution & Advance payment includes a $250 thousand payment received in October 2013, as an advance for AM Unit distribution paid out in February 2014. Additionally, in January 2015 Jesenik received an additional $75 thousand "advance" on a future AM Unit distribution, which never came to fruition.

**In re AEQUITAS MANAGEMENT, LLC, et al.**
**Case No. 3:16-cv-00438-PK**
**Report Regarding the Investigation of the Receivership Entity's Business Conduct**

*Exhibit C.9*

*Investor Funds Spent on Commissions, Advisory, and Consulting Fees during the Relevant Time Period*

| Names | Commissions | Loans | Consulting Fees | Other | Total |
|---|---|---|---|---|---|
| RP Capital, LLC | $ 8,087,824 | | | $ 5,750 | $ 8,093,574 |
| Fieldstone Financial | | 1,408,994 | | | 1,408,994 |
| Kristofor Behn | | | | 25,000 | 25,000 |
| Circle Squared Alternative Investments, LLC | | 500,000 | 500,000 | | 1,000,000 |
| Sica Wealth Management, LLC | | | 1,020,000 | | 1,020,000 |
| Atherton Capital Holdings, LLC | | | 672,000 | 19,429 | 691,429 |
| Tom Szabo | | | | 13,424 | 13,424 |
| Fortress Investment Management, LLC | | | 326,833 | 69,455 | 396,288 |
| Accelerate-IT, LLC | | | | 41,860 | 41,860 |
| MBO Partners (James Alexander) | 155,000 | | 160,000 | 66,887 | 381,887 |
| Jerome Anglade | | | | 210,000 | 210,000 |
| PPG Partners | | | 225,000 | | 225,000 |
| Nicholas Mavroleon | | | 205,000 | 18,258 | 223,258 |
| Keith Gregg | | | 115,323 | 30,617 | 145,939 |
| James Reinmuth | | | 125,000 | 1,257 | 126,257 |
| Rachel Minard (Minard Capital) | | | 90,000 | 8,341 | 98,341 |
| Matrix Capital | 71,086 | | | | 71,086 |
| William (Bill) Corbett | | | 69,000 | | 69,000 |
| George King | | | 65,000 | | 65,000 |
| Capital Alliance Partners | | | 50,786 | 257 | 51,043 |
| Allen & Associates (Marcia Allen) | | | 35,000 | | 35,000 |
| Integrity Bank & Trust | | | | 22,224 | 22,224 |
| Hancock Securities | 19,509 | | | | 19,509 |
| Ocean Avenue Wealth Mgmt | 19,500 | | | | 19,500 |
| Elite Wealth Management Inc | | | | 4,512 | 4,512 |
| **Total** | **$ 8,352,919** | **$ 1,908,994** | **$ 3,658,942** | **$ 537,271** | **$ 14,458,125** |

### Advisory Board Members

| Names | Accrued 2014 -Q1 2016[1] Fees | | | | Total | Cash Payments | Expense Offsets[2] | Accrued and Unpaid[3] |
|---|---|---|---|---|---|---|---|---|
| | Advisory Fees | Commissions | Transaction Fees | Other | | | | |
| Terrell Mgt. Group (Pat Terrell) | $ 93,000 | $ 171,591 | $ 262,188 | $ 109,781 | $ 636,560 | $ (309,781) | $ (393,114) | 113,953 |
| William (Bill) McCormick | 360,000 | - | - | - | 360,000 | (270,000) | (26,000) | 182,875 |
| William (Will) Glasgow | 135,000 | - | - | 7,027 | 142,027 | (132,027) | - | 10,000 |
| Gerry Frank | 135,000 | - | - | - | 135,000 | (125,000) | - | 10,000 |
| Martin Brantley | 135,000 | - | - | - | 135,000 | (125,000) | - | 10,000 |
| Donna Miles | 105,354 | - | - | 4,785 | 110,139 | (103,099) | - | 12,000 |
| Robert (Bob) Zukis | 31,000 | - | - | 4,771 | 35,771 | (25,271) | - | 10,500 |
| Gillis Mgt. Solutions, Inc. (Scott Gillis) | 30,000 | - | - | 4,675 | 34,675 | (34,675) | - | - |
| Edmund Jensen | - | - | - | - | - | - | - | - |
| Keith Barnes | - | - | - | - | - | - | - | - |
| **Total** | **$ 1,024,354** | **$ 171,591** | **$ 262,188** | **$ 131,038** | **$ 1,589,172** | **$ (1,124,853)** | **$ (419,114)** | **349,328** |

1. Q1 2016 amount is estimated based off available actual data, and estimates for standard expenses
2. Offsets include Aequitas payment of Advisory Board members office rent, healthcare, direct employees salary and healthcare, etc.
3. Includes carry over accrued and unpaid balances from 2013

**In re AEQUITAS MANAGEMENT, LLC, et al.**
**Case No. 3:16-cv-00438-PK**
**Report Regarding the Investigation of the Receivership Entity's Business Conduct**

*Exhibit C.11*
*Annual Cash Flow*
*(in millions)*

| Cash Flow | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|
| **Fundraising** | $193.3 | $213.5 | $5.0 | $411.9 |
| (Redemption) | -61.2 | -107.7 | -2.2 | -171.2 |
| (Interest) | -33.1 | -41.3 | -9.7 | -84.0 |
| *Net Fundraising* | *99.0* | *64.5* | *-6.8* | ***156.7*** |
| **Institutional Debt & Portfolio Fees** | | | | |
| Institutional Debt Advances | 90.1 | 158.0 | 39.8 | 287.9 |
| (Institutional Debt Paydowns) | -117.5 | -91.1 | -35.3 | -243.9 |
| (Interest and Portfolio Fees/Expenses) | -19.9 | -33.2 | -4.3 | -57.3 |
| *Net Institutional Debt* | *-47.2* | *33.7* | *0.1* | ***-13.3*** |
| **Portfolio Activity** | | | | |
| (Receivable Purchases) | -95.4 | -162.1 | -19.5 | -277.0 |
| Receivable Collections | 100.8 | 152.0 | 37.4 | 290.1 |
| *Net Portfolio Activity* | *5.4* | *-10.1* | *17.9* | ***13.1*** |
| **Outside Investment Activity** | | | | |
| (Loans/Investment Out) | -29.7 | -49.6 | -1.4 | -80.8 |
| Repayment/Sale | 5.7 | 5.1 | 1.9 | 12.7 |
| Interest Payments | 4.9 | 5.0 | 0.4 | 10.4 |
| Settlement Revenue | 0.5 | 1.0 | 0.3 | 1.8 |
| *Net Investment Activity* | *-18.6* | *-38.5* | *1.2* | ***-55.9*** |
| **Overhead & BSR** | | | | |
| (Expenses) | -49.9 | -61.7 | -5.8 | -117.4 |
| CPYT/EdPlus Cash Rebill Payments | 13.2 | 14.0 | 0.4 | 27.6 |
| CPYT/EdPlus Cash ASA Payments | 8.2 | 5.8 | 0.0 | 14.0 |
| (BSR) | -14.2 | -8.0 | -0.5 | -22.6 |
| *Net Overhead and BSR* | *-42.7* | *-49.8* | *-5.9* | ***-98.4*** |
| **Approx. Account Balance Increase (Decrease)** | **-$4.1** | **-$0.2** | **$6.4** | **$2.2** |

Excludes internal payments and blocked funds

| Management Fee Coverage | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|
| Expenses | -$49.9 | -$61.7 | -$5.8 | -$117.4 |
| CPYT/EdPlus Cash Rebill Payments | 13.2 | 14.0 | 0.4 | 27.6 |
| **Net Expenses** | **-36.7** | **-47.6** | **-5.5** | **-89.8** |
| CPYT/EdPlus Cash ASA Payments | 8.2 | 5.8 | 0.0 | 14.0 |
| Internal ASA Payments* | 0.9 | 0.9 | 0.0 | 1.8 |
| Management Fees* | 8.3 | 10.9 | 3.6 | 22.7 |
| **Net Expense Coverage** | **-$19.4** | **-$30.0** | **-$1.9** | **-$51.3** |

*Excludes Management Fee and ASA payments between one Operating Entity to another

**In re AEQUITAS MANAGEMENT, LLC, et al.**
Case No: 3:16-cv-00438-PK
**Report Regarding the Investigation of the Receivership Entity's Business Conduct**

*Exhibit C.12*
*Timeline of Events Leading to Corinthian Colleges Closure (2012-2015)*

- **April 2012** - CoCo was served with a Civil Investigative Demand ("CFPB CID") from the U.S. Consumer Financial Protection Bureau ("CFPB"). The CFPB CID stated that its purpose is to "determine whether for-profit postsecondary companies, student loan origination and servicing providers, or other unnamed persons, have engaged or are engaging in unlawful acts or practices relating to the advertising, marketing, or origination of private student loans." The CFPB CID contained extensive interrogatories and document production demands related to the Company's involvement with student loans and many other aspects of the Company's business.
- **September 2013**, the CFPB withdrew its prior CFPB CID and issued a new CFPB CID to the CoCo covering substantially the same matters as the prior CFPB CID.
- **October 10, 2013** - the California Attorney General filed a lawsuit against CoCo for false and predatory advertising, intentional misrepresentations to students, securities fraud, and unlawful use of military seals in advertisements
- **December 2013** - The CFPB issues a Notice and Opportunity to Respond and Advise (the "NORA Letter") informing CoCo that the CFPB's Office of Enforcement is recommending that legal action be taken against CoCo for alleged violations of the Consumer Financial Protection Act of 2010.
- **January 2014** – Aequitas Counterparty Risk Review advises that "funding under the CoCo 2.0 program should cease immediately due to the increased operational and legal risk at Corinthian."
- **June 19, 2014** - The Federal Department of Education ("DOE") announces that it has placed CoCo on an increased level of financial oversight due to its failure to turn over records to assist in an ongoing investigation of its business practices. DOE suspends CoCo's access to student aid funds, creating cash flow crisis.
- **June 26, 2014** - California Department of Veterans Affair suspends GI Bill benefits for veterans at CoCo's schools.
- **July 3, 2014** - The DOE announces that it and CoCo have agreed to an operating plan requiring the company to either close or sell all its campuses over the next six months, and appointing an independent monitor to oversee the process. DOE restores access to student aid funds to facilitate orderly wind-down.
- **August 8, 2014** - CoCo receives a grand jury subpoena from the U.S. Attorney's Office in the Central District of California about an ongoing criminal investigation.

- **September 16, 2014** - The CFPB files a civil complaint against CoCo in the U.S. District Court for the Northern District of Illinois alleging that CoCo engaged in an illegal predatory lending scheme.
- **February 3, 2015** – CoCo sells most of its campuses to Zenith Education Group, a subsidiary of the education debt collection company ECMC. No California campuses are part of the deal. The CFPB approves the sale on condition that ECMC forgive 40% of students' outstanding private debt and agree to other consumer protection measures.
- **February 13, 2015** – California Student Aid Commission suspends Cal Grant Payments to Heald.
- **April 1, 2015** - Members of the Debt Collective and the "Corinthian 100" meet with the DOE in Washington and submit hundreds of applications to discharge CoCo students' loans.
- **April 9, 2015** - Nine state Attorneys General call on the DOE to discharge the federal loans of CoCo students.
- **April 14, 2015** - The DOE releases an "intent to fine notice" finding that CoCo misrepresented job placement rates and other information to students. It fines the company $30 million, suspends Heald College's Salinas and Stockton campuses, and bars all Heald campuses from receiving federal funds for new enrollments.
- **April 16, 2015** - California's Bureau for Private Post-Secondary Education issues an emergency decision ordering CoCo to cease enrollment of any new students in all programs at Everest College and Wyotech locations in California effective upon close of business. The California Student Aid Commission permanently terminates Heald's eligibility for the Cal Grant program.
- **April 27, 2015** – CoCo closed all California campuses and shuts down its website.
- **May 4, 2015** – CoCo files for Chapter 11 bankruptcy protection.

Sources:
https://www.sec.gov/Archives/edgar/data/1066134/000110465914037670/a14-9787_110q.htm
http://www.publiccounsel.org/tools/assets/files/0635.pdf
http://www.lao.ca.gov/handouts/education/2015/Corinthian-Colleges-051315.pdf
http://www.leginfo.ca.gov/pub/15-16/bill/asm/ab_0551-0600/ab_573_cfa_20150911_212134_asm_floor.html

**In re AEQUITAS MANAGEMENT, LLC, et al.**
**Case No. 3:16-cv-00438-PK**
**Report Regarding the Investigation of the Receivership Entity's Business Conduct**

*Exhibit E.1.2*
*Summary of Weider / Forman Investments*

| ID | Date | Transaction | Note Holder | Cash/ Journal Entry (JE) | CarePayment Fund (CPF) | Campus Student Funding Leverage (AFSGLI & CSFLI) | CarePayment Holdings (CPH) | Aequitas Commercial Finance (Private Note) | Total Investment | Entity which ultimately received benefit of incoming funds | Entity which funded payout |
|----|------|-------------|-------------|--------------------------|------------------------|--------------------------------------------------|----------------------------|---------------------------------------------|------------------|------------------------------------------------------------|----------------------------|
| 1 | 05/03/11 | Debt at ACF | Weider | Cash | | | | 2,000,000 | 2,000,000 | IOF | - |
| 2 | 07/19/11 | Debt at ACF | Forman | Cash* | | | | 125,000 | 2,125,000 | ACF/CSF | - |
| 3 | 05/25/12 | Debt at CPF | Weider | Cash | 2,000,000 | | | | 4,125,000 | CPLLC | - |
| 4 | 06/27/12 | Debt at CPF | Forman | Cash | 100,000 | | | | 4,225,000 | CPF | - |
| 5 | 01/29/13 | Debt at AFSGLI | Weider | Cash | | 5,000,000 | | | 9,225,000 | ACF/IOF/IPF/CPF & Skag | - |
| 6 | 05/17/13 | Additional debt at AFSGLI | Weider | Cash | | 3,000,000 | | | 12,225,000 | CSF | - |
| 6b | 05/17/13 | Additional debt at AFSGLI | Forman | Cash | | 500,000 | | | 12,725,000 | CSF | - |
| 6c | 05/17/13 | ACF Transfer to AFSGLI | Forman | Cash - Interco | | 125,000 | | (125,000) | 12,725,000 | ACF | ACF |
| 7 | 09/10/13 | CPF Pays Forman | Forman | Cash | (100,000) | | | | 12,625,000 | - | ACF |
| 8a | 11/15/13 | CPF Debt transferred to AFSGLI | Weider | Cash - Interco | (2,000,000) | 2,000,000 | | | 12,625,000 | ACF/CPF/CSF | CSF |
| 8b | 11/15/13 | ACF Debt transferred to AFSGLI | Weider | Cash - Interco | | 2,000,000 | | (2,000,000) | 12,625,000 | ACF/CPF/CSF | CSF |
| 9 | 10/03/14 | CSFLI debt transferred to CPH | Weider | JE - Interco | | (6,000,000) | 6,000,000 | | 12,625,000 | - | - |
| 9b | 10/03/14 | CSFLI Pays Weider | Weider | Cash | | (2,000,000) | | | 10,625,000 | - | CPLLC/ACF |
| 9c | 10/03/14 | CSFLI Pays Forman | Forman | Cash | | (625,000) | | | 10,000,000 | - | CPLLC/ACF |
| 10 | 11/06/14 | CSFLI Pays Weider | Weider | Cash | | (1,500,000) | | | 8,500,000 | - | ACF |
| 11 | 11/13/14 | CSFLI Pays Weider | Weider | Cash | | (1,000,000) | | | 7,500,000 | - | ACF |
| 12 | 12/01/14 | CSFLI Pays Weider | Weider | Cash | | (1,500,000) | | | 6,000,000 | - | CPLLC/ACF |
| 13a | 06/29/15 | Subsequent debt at CPH | Weider | Cash | | | 4,000,000 | | 10,000,000 | - | Corporate Wide |
| 13b | 06/30/15 | Subsequent debt at CPH | Forman | Cash | | | 500,000 | | 10,500,000 | - | Corporate Wide |
| | | | | | - | - | 10,500,000 | - | | | |
| | | *Non Cash Adustments* | | | | 6,000,000 | (6,000,000) | | | | |
| | | | | | | 6,000,000 | 4,500,000 | | | | |

*Note- bank statement and wire activity missing for 7/19/11 investment

**In re AEQUITAS MANAGEMENT, LLC, et al.**
**Case No. 3:16-cv-00438-PK**
**Report Regarding the Investigation of the Receivership Entity's Business Conduct**

*Exhibit E.1.6.a*
*Copy of Aequitas Document Entitled*
*"Aequitas_Note Manufacturing Process_2015_05_01.pdf"*



In re AEQUITAS MANAGEMENT, LLC, et al.

Case No. 3:16-cv-00438-PK

Report Regarding the Investigation of the Receivership Entity's Business Conduct

*Exhibit E.1.6.b*
*Example of a Product Menu,*
*as emailed on May 20, 2015*

## Product Menu: Manufactured Notes Available for Sale

**aequitas** CAPITAL

As of: 20-May-15

| Program | Yield | Gross Underlying Assets | Issuing Entity | Structure | Current Available for Sale | 30-Day Forecast Available for Sale | 60-Day Forecast Available for Sale | 90-Day Forecast Available for Sale | Interest Rate 1 yr. | 2 yr. | 3 yr. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MotoLease | 23% | $22MM | MLFH | Sr. 75% | $16.7MM | $16.2MM | $16.8MM | $17.4MM | 8.000% | 8.500% | 9.250% |
| | | | MLFH | Sub. 25% | $5.6MM | $5.4MM | $6.0MM | $6.5MM | 14.000% | 16.500% | 18.000% |
| Corporate Loans | 10% | $44MM | ACL | Sr. 70% | $29.8MM | $29.8MM | $29.8MM | $29.8MM | 6.250% | 7.000% | 8.000% |
| | | | ACL | Sub. 30% | $12.8MM | $12.8MM | $12.8MM | $12.8MM | 12.500% | 13.500% | 15.000% |
| Freedom F+ | 18% | $25MM | ACCFPH | Sr. 70% | $1.9MM | $6.7MM | $11.2MM | $16.4MM | 2.750% | 3.250% | 4.000% |
| | | | ACCFPH | Sub. 30% | $8.5MM | $10.0MM | $11.5MM | $13.3MM | 12.000% | 13.000% | 14.000% |
| Freedom C+ | 20% | $29MM | ACCCPH | Sr. 90% | $1.8MM | $5.3MM | $8.5MM | $11.6MM | 2.750% | 3.250% | 4.000% |
| | | | ACCCPH | Sub. 10% | $0.6MM | $0.0MM | $0.4MM | $0.8MM | 11.000% | 11.750% | 12.500% |
| TOTAL | | $121MM | | | $78MM | $86MM | $97MM | $109MM | | | |

# Product Menu: All Aequitas Credit Strategies



| As of: | 20-May-15 |
| --- | --- |

| Program | Yield* | Gross Assets | Issuing Entity | Structure | Current Net Assets Available** | Current Notes Outstanding | 30-Day Forecast Net Assets Available** | 30-Day Forecast Notes Matured (Issued) | 60-Day Forecast Net Assets Available** | 60-Day Forecast Notes Matured (Issued) | 90-Day Forecast Net Assets Available** | 90-Day Forecast Notes Matured (Issued) | Interest Rate*** 1 yr. | 2 yr. | 3 yr. |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| CarePayment | 29% | $41MM | CPH | Sr. 85% | $0.3MM | $0.0MM | $0.2MM | $0.0MM | $0.2MM | $0.0MM | $0.2MM | $0.0MM | 2.500% | 3.000% | 3.500% |
| | | | CPH | Sub. 15% | $0.0MM | ($6.0MM) | $1.9MM | $1.0MM | $3.9MM | $0.0MM | $5.7MM | $0.0MM | 6.000% | 7.000% | 8.500% |
| Unigo | 10% | $51MM | CSF | Sr. 25% | ($0.1MM) | ($7.9MM) | ($0.5MM) | $0.0MM | ($0.5MM) | $0.0MM | ($0.5MM) | $0.0MM | 0.000% | 0.000% | 0.000% |
| | | | CSF | Sub. 75% | ($0.8MM) | ($24.1MM) | ($2.0MM) | $0.0MM | ($1.9MM) | $0.0MM | ($1.8MM) | $0.0MM | 11.000% | 12.000% | 14.000% |
| MotoLease | 23% | $22MM | MLFH | Sr. 75% | $9.5MM | ($7.2MM) | $9.0MM | $0.0MM | $9.6MM | $0.0MM | $10.2MM | $0.0MM | 8.000% | 8.500% | 9.250% |
| | | | MLFH | Sub. 25% | $0.0MM | ($5.6MM) | ($0.2MM) | $0.0MM | $0.4MM | $0.0MM | $1.0MM | $0.0MM | 14.000% | 16.500% | 18.000% |
| OnDeck | 22% | $4MM | AP2PF | Sr. 50% | $1.3MM | ($0.8MM) | $1.2MM | $0.0MM | $1.1MM | $0.0MM | $1.0MM | $0.0MM | 2.750% | 3.250% | 4.000% |
| | | | AP2PF | Sub. 50% | $0.0MM | ($2.1MM) | ($0.1MM) | $0.0MM | ($0.1MM) | $0.0MM | ($0.1MM) | $0.0MM | 12.000% | 15.500% | 17.500% |
| QuarterSpot | 28% | $2MM | ACF | Sr. 70% | $1.3MM | $0.0MM | $1.2MM | $0.0MM | $1.1MM | $0.0MM | $1.1MM | $0.0MM | 5.250% | 6.000% | 7.500% |
| | | | ACF | Sub. 30% | $0.6MM | $0.0MM | $0.5MM | $0.0MM | $0.5MM | $0.0MM | $0.5MM | $0.0MM | 12.500% | 14.000% | 16.500% |
| Freedom F+ | 18% | $28MM | ACCPH | Sr. 70% | $1.9MM | ($0.0MM) | $6.7MM | $0.0MM | $11.2MM | $0.0MM | $16.4MM | $0.0MM | 2.750% | 3.250% | 4.000% |
| | | | ACCFPH | Sub. 30% | $8.5MM | $0.0MM | $10.0MM | $0.0MM | $11.5MM | $0.0MM | $13.3MM | $0.0MM | 12.000% | 13.000% | 14.000% |
| Freedom C+ | 20% | $31MM | ACCCPH | Sr. 90% | $1.8MM | $0.0MM | $5.3MM | $0.0MM | $8.5MM | $0.0MM | $11.6MM | $0.0MM | 2.750% | 3.250% | 4.000% |
| | | | ACCCPH | Sub. 10% | $0.6MM | ($2.5MM) | $0.0MM | ($0.8MM) | $0.4MM | $0.0MM | $0.8MM | $0.0MM | 11.000% | 11.750% | 12.500% |
| Corporate Loans | 10% | $44MM | ACL | Sr. 70% | $20.8MM | ($9.1MM) | $20.8MM | $0.0MM | $20.8MM | $0.0MM | $20.8MM | $0.0MM | 6.250% | 7.000% | 8.000% |
| | | | ACL | Sub. 30% | $11.0MM | ($1.8MM) | $11.0MM | $0.0MM | $11.0MM | $0.0MM | $11.0MM | $0.0MM | 12.500% | 13.500% | 15.000% |
| Real Estate (CBFL) | 46% | $0MM | ACF | Sr. 70% | $0.0MM | | $0.0MM | | $0.0MM | | $0.0MM | | 3.750% | 4.250% | 5.000% |
| | | | ACF | Sub. 30% | $0.0MM | | $0.0MM | | $0.0MM | | $0.0MM | | 10.000% | 11.000% | 12.500% |
| Real Estate (WR) | 38% | $5MM | WRFF | Sr. 0% | $0.0MM | | $0.0MM | | $0.0MM | | $0.0MM | | | | |
| | | | WRFF | Sub. 100% | $4.5MM | | $4.5MM | | $4.5MM | | $4.5MM | | 11.500% | 13.000% | 15.000% |
| TOTAL | | $228MM | | | $61MM | | $70MM | | $82MM | | $96MM | | | | |
| MANAGED FUND RESERVE (STAGES 3, 4, & 5) | | | | | ($9MM) | | ($9MM) | | ($9MM) | | ($9MM) | | | | |
| MANAGED FUND RESERVE (FORWARD FLOW BUDGET) | | | | | | | ($3MM) | | ($7MM) | | ($10MM) | | | | |
| NET AVAILABLE ASSETS (CASH CUSHION) | | | | | $52MM | | $57MM | | $66MM | | $76MM | | | | |

*Net of loan loss provisions & asset management fee | **Net of Sr. Secured & Subordinated Promissory Notes Outstanding | ***Per anum

| As of: | 20-May-15 |
|---|---|

| Product Menu by Entity Detail | | | | Current | | 30-Day Forecast | | 60-Day Forecast | | 90-Day Forecast | | Action Items, Assumptions, & Remarks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Program | Gross Assets | Entity | Funding Source | Loans & Notes Outstanding | Net Assets Available** | Net Assets Available** | Notes Matured (Issued) | Net Assets Available** | Notes Matured (Issued) | Net Assets Available** | Notes Matured (Issued) | |
| CarePayment | $41MM | CP LLC | B of A | ($18.2MM) | | | | | | | | Fully Funded |
| | | CP Funding I Trust | Well Fargo | ($17.7MM) | | | | | | | | |
| | | CP Holdings | AE Funds | ($6.0MM) | $0.3MM | $2.1MM | $1.0MM | $4.1MM | $0.0MM | $5.8MM | $0.0MM | |
| Unigo | $51MM | CSF LLC | Scottrade | ($5.1MM) | | | | | | | | Fully Funded |
| | | CSF LLC | AE Funds | ($47.6MM) | ($0.9MM) | ($2.5MM) | $0.0MM | ($2.4MM) | $0.0MM | ($2.3MM) | $0.0MM | |
| Freedom C+ | $31MM | ACC Funding Trust 2 | Comvest | ($25.8MM) | | | | | | | | Notes Available for Sale |
| | | ACC C Plus Holdings | AE Funds | ($2.5MM) | $2.4MM | $5.3MM | ($0.8MM) | $8.9MM | $0.0MM | $12.3MM | $0.0MM | |
| Freedom F+ | $28MM | ACC Funding Trust 1 | Comvest | ($17.7MM) | | | | | | | | Notes Available for Sale |
| | | ACC F Plus Holdings | AE Funds | $0.0MM | $10.4MM | $16.7MM | $0.0MM | $22.6MM | $0.0MM | $29.7MM | $0.0MM | |
| MotoLease | $22MM | MLFH LLC | AE Funds | ($12.7MM) | $9.5MM | $8.9MM | $0.0MM | $10.0MM | $0.0MM | $11.2MM | $0.0MM | Assumes no Senior Leverage, Notes Available for Sale |
| OnDeck | $4MM | AP2PF LLC | AE Funds | ($3.0MM) | $1.4MM | $1.1MM | $0.0MM | $1.0MM | $0.0MM | $1.0MM | $0.0MM | Assumes no Senior Leverage, Notes Available for Sale |
| Corp. Loans | $44MM | ACL | Ruh & TGM | ($9.1MM) | | | | | | | | Notes Available for Sale |
| | | ACL | AE Funds | ($1.8MM) | $31.8MM | $31.8MM | $0.0MM | $31.8MM | $0.0MM | $31.8MM | $0.0MM | |
| WR | $5MM | WRFF | PN | $0.0MM | $4.5MM | $4.5MM | $0.0MM | $4.5MM | $0.0MM | $4.5MM | $0.0MM | |
| QuarterSpot | $2MM | ACF | PN | $0.0MM | $1.8MM | $1.7MM | $0.0MM | $1.6MM | $0.0MM | $1.5MM | $0.0MM | |
| TOTAL | $228MM | | | ($167MM) | $61MM | $70MM | | $82MM | | $96MM | | |
| MANAGED FUND RESERVE (STAGES 3, 4, & 5) | | | | ($9MM) | | ($9MM) | | ($9MM) | | ($9MM) | | |
| MANAGED FUND RESERVE (FORWARD FLOW BUDGET) | | | | | | ($3MM) | | ($7MM) | | ($10MM) | | |
| NET AVAILABLE ASSETS (CASH CUSHION) | | | | $52MM | | $57MM | | $66MM | | $76MM | | |

*Net of loan loss provisions & asset management fee | **Net of Sr. Secured & Subordinated Promissory Notes Outstanding

**In re AEQUITAS MANAGEMENT, LLC, et al.**

**Case No. 3:16-cv-00438-PK**

**Report Regarding the Investigation of the Receivership Entity's Business Conduct**

*Exhibit E.1.6.c*

*Example of an Aequitas Manufactured Note Issuances and Allocation Summary, as emailed on May 27, 2015*

## AEQUITAS INCOME OPPORTUNITY FUND II, LLC

### Notes Issued

| Capital Raised: | $6,502,463.67 |
|---|---|
| Note Maturities: | $0.00 |
| Total Notes Issued: | $6,502,463.67 |
| Hurdle Rate*: | 14.000% |
| Issue Date: | 1-May-15 |

| Issuing SPV | Base Policy Mix | Note Structure | | Registry No. | Notes Issued | Term (yr.) | Interest Rate** | Return** |
|---|---|---|---|---|---|---|---|---|
| ACC F Plus Holdings, LLC | 50.0% | Sr. Secured | 0% | | 0.00 | 1 | 7.500% | $0.000MM |
| | | Subordinated | 100% | ACCFPHLLC00001 | 3,251,231.84 | 1 | 22.500% | $0.732MM |
| ACC C Plus Holdings, LLC | 50.0% | Sr. Secured | 0% | | 0.00 | 1 | 7.500% | $0.000MM |
| | | Subordinated | 100% | ACCCPHLLC00001 | 3,251,231.84 | 1 | 22.500% | $0.732MM |
| Aequitas Peer-to-Peer Funding, LLC | | Sr. Secured | 100% | | 0.00 | 1 | 2.750% | $0.000MM |
| | | Subordinated | 0% | | 0.00 | 1 | 22.500% | $0.000MM |
| **Grand Total:** | **100.0%** | | | | **6,502,463.67** | | | **$1.463MM** |

*Inclusive of: 2.00% Management Fee, 0.50% Operating Expenses, & 1.00% for capital deployment lead time.

**Per annum

| Credit Strategy Receivables | Note Structure | Current Status of Inventory | Current Balance | Notes Issued to IOF II | Notes Issued to EIF | Pro-Forma Balance |
|---|---|---|---|---|---|---|
| CarePayment | Sr. | | $0.269MM | $0.000MM | $0.000MM | $0.269MM |
| | 2nd Lien Sr. | | $0.018MM | $0.000MM | $0.000MM | $0.018MM |
| CSF | Sr. | Unavailable | ($0.113MM) | $0.000MM | $0.000MM | ($0.113MM) |
| | 2nd Lien Sr. | Unavailable | ($0.833MM) | $0.000MM | $0.000MM | ($0.833MM) |
| MotoLease | Sr. | | $9.514MM | $0.000MM | $0.000MM | $9.514MM |
| | 2nd Lien Sr. | | $0.007MM | $0.000MM | $0.000MM | $0.007MM |
| Freedom (F+) | Sr. | | $2.765MM | $0.000MM | $0.000MM | $2.765MM |
| | 2nd Lien Sr. | | $8.824MM | ($3.251MM) | $0.000MM | $5.573MM |
| Freedom (C+) | Sr. | | $3.585MM | $0.000MM | $0.000MM | $3.585MM |
| | 2nd Lien Sr. | Unavailable | $0.792MM | ($3.251MM) | $0.000MM | ($2.459MM) |
| OnDeck | Sr. | | $1.339MM | $0.000MM | $0.000MM | $1.339MM |
| | 2nd Lien Sr. | | $0.043MM | $0.000MM | $0.000MM | $0.043MM |
| ACL | Sr. | | $20.689MM | $0.000MM | $0.000MM | $20.689MM |
| | 2nd Lien Sr. | | $10.983MM | $0.000MM | $0.000MM | $10.983MM |
| Grand Total: | | | $57.881MM | ($6.502MM) | $0.000MM | $51.379MM |

AEQUITAS INCOME OPPORTUNITY FUND II, LLC
Year-to-Date Fund Allocation



| Portfolio Value: | $55.730MM |
|---|---|

| Hurdle Rate*: | 14.000% |
|---|---|

| As of: | 31-May-15 |
|---|---|

| Credit Strategy Receivables | Base Policy Mix | Note Structure | Notes Issued | Interest Rate** | Return** |
|---|---|---|---|---|---|
| Healthcare | 0.0% | Sr. Secured | $0.000MM | 0.00% | $0.000MM |
| | | Subordinated | $0.000MM | 0.00% | $0.000MM |
| Education | 49.3% | Sr. Secured | $7.858MM | 0.00% | $0.000MM |
| | | Subordinated | $20.068MM | 14.00% | $2.809MM |
| Transportation | 21.3% | Sr. Secured | $7.184MM | 8.25% | $0.593MM |
| | | Subordinated | $4.860MM | 22.50% | $1.093MM |
| Consumer | 11.5% | Sr. Secured | ($0.000MM) | 7.50% | ($0.000MM) |
| | | Subordinated | $6.502MM | 22.50% | $1.463MM |
| Small Business | 1.7% | Sr. Secured | $0.408MM | 2.75% | $0.011MM |
| | | Subordinated | $0.540MM | 22.50% | $0.122MM |
| Real Estate | 0.0% | Sr. Secured | $0.000MM | 0.00% | $0.000MM |
| | | Subordinated | $0.000MM | 0.00% | $0.000MM |
| Corporate | 3.2% | Sr. Secured | $0.000MM | 8.00% | $0.000MM |
| | | Subordinated | $1.808MM | 15.00% | $0.271MM |
| Cash | 13.1% | | $7.427MM | 0.00% | $0.000MM |
| **Grand Total:** | **100.0%** | | **$56.654MM** | | **$6.363MM** |

*The Hurdle Rate is inclusive of: the 2.00% Management Fee, 0.50% for Operating Expenses, and 1.00% for any capital deployment lead time.

**per annum

| Term (Years) | Current | YTD | % | Note Structure | Current | YTD | % |
|---|---|---|---|---|---|---|---|
| 1 | $6.502MM | $20.803MM | 37% | Sr. Secured | $0.000MM | $15.450MM | 27% |
| 3 | $0.000MM | $28.424MM | 50% | Subordinated | $6.502MM | $33.778MM | 60% |
| < 1 | $7.427MM | $7.427MM | 13% | < 1 | $7.427MM | $7.427MM | 13% |
| **Total** | **$13.929MM** | **$56.654MM** | **100%** | **Total** | **$13.929MM** | **$56.654MM** | **100%** |

**In re AEQUITAS MANAGEMENT, LLC, et al.**
**Case No. 3:16-cv-00438-PK**
**Report Regarding the Investigation of the Receivership Entity's Business Conduct**

*Exhibit E.2.1.1*
*Cash Flows From Operating Activities for Aequitas Commercial Finance, LLC (2011 - 2015)*

| Aequitas Commercial Finance, LLC | Unaudited 2015 | Audited 2014 | Audited 2013 | Audited 2012 | As Restated 2011 |
|---|---|---|---|---|---|
| Net income | $ 8,928,858 | $ 12,025,861 | $ 21,219,400 | $ 8,316,020 | $ 5,288,251 |
| **Adjustments to reconcile net income to net cash used in operating activities:** | | | | | |
| Amortization of unearned income | (16,811,546) | (13,425,519) | (10,062,184) | - | - |
| Amortization of deferred charges | 526,585 | 373,460 | 1,106,736 | 7,389,717 | 4,705,210 |
| Net realized gain (loss) on investments | (273,902) | 871,338 | (594,077) | - | (3,659,029) |
| **Net unrealized gain on fair value option election assets** | **(42,116,028)** | **(39,481,017)** | **(37,827,636)** | **(15,558,622)** | **(7,021,671)** |
| Provision for credit losses | 7,105,224 | 6,230,482 | 8,441,137 | 6,324,172 | 734,381 |
| Changes in assets and liabilities: | - | - | - | - | - |
| Deposits in escrow | 1,012,938 | 1,730,054 | 2,879,157 | - | - |
| Accounts receivable | (2,287,816) | 3,603,146 | (2,188,484) | (5,598,784) | (7,534,704) |
| Receivable from affiliates | (1,098,236) | (669,530) | (844,261) | - | - |
| Other assets | 2,471,133 | (1,364,128) | (3,694,900) | 3,488,961 | 1,071,835 |
| Accounts payable and accrued expenses | (63,406) | (6,913,510) | 7,275,877 | 4,386,596 | 5,985,906 |
| Payable to affiliates | 7,071,787 | 2,644,857 | 4,894,890 | - | - |
| Accrued interest payable | 9,557,034 | 7,112,342 | 3,397,949 | 1,438,730 | 1,250,556 |
| Subtotal of adjustments to net income | (34,906,232) | (39,288,025) | (27,215,796) | 1,870,770 | (4,467,516) |
| **Net cash used in operating activities** | **$ (25,977,374)** | **$ (27,262,164)** | **$ (5,996,396)** | **$ 10,186,790** | **$ 820,735** |

**In re AEQUITAS MANAGEMENT, LLC, et al.**

**Case No. 3:16-cv-00438-PK**

**Report Regarding the Investigation of the Receivership Entity's Business Conduct**

*Exhibit 2.1.2.a*
*COF Equity Interests*

| COF Equity Interests | G/L Balance at 12/31/2012 | Purchases | 2013 Pre-Transfer Change in unrealized gain | COF Initial Investment | 2013 Post-Transfer Change in unrealized gain | Audited Balance at 12/31/2013 | Purchases | Change in unrealized gain | Audited Balance at 12/31/2014 | (Sales) Purchases /Collections | Change in unrealized gain | G/L Pre-Audit Balance at 12/31/2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [1] ETC Global Holdings, Inc. | $ 8,000,000 | $ 1,854,561 | $ (1,640,626) | $ 8,213,935 | $ 358,745 | $ 8,572,680 | $ - | $ 527,320 | $ 9,100,000 | $ - | $ - | $ 9,100,000 |
| [1][2] Motolease, LLC | 800,000 | - | - | 800,000 | - | 800,000 | 1,040,000 | 6,470,000 | 8,310,000 | - | 190,000 | 8,500,000 |
| QuarterSpot, Inc. | | | | | | | | | | | | |
| Common Shares | - | - | - | - | - | - | 3,695,460 | 1,404,275 | 5,099,735 | - | 4,340,265 | 9,440,000 |
| Warrants | - | - | - | - | - | - | 100 | (100) | - | - | 1,210,000 | 1,210,000 |
| nD Bank | - | - | - | - | - | - | - | - | - | 2,450,000 | - | 2,450,000 |
| MOGL Loyalty Services | - | - | - | - | - | - | - | - | - | 2,000,000 | - | 2,000,000 |
| **Subtotal** | **$ 8,800,000** | **$ 1,854,561** | **$ (1,640,626)** | **$ 9,013,935** | **$ 358,745** | **$ 9,372,680** | **$ 4,735,560** | **$ 8,401,495** | **$ 22,509,735** | **$ 4,450,000** | **$ 5,740,265** | **$ 32,700,000** |
| [3] Carepayment Technologies, Inc | 21,398,220 | 5,971,505 | 11,476,623 | 38,846,348 | 5,153,652 | 44,000,000 | - | 48,000,000 | 92,000,000 | - | 48,000,000 | 140,000,000 |
| [4] EdPlus Holdings, Inc. | - | 1,732,760 | 5,357,240 | 7,090,000 | 17,910,000 | 25,000,000 | - | (13,300,000) | 11,700,000 | - | (4,700,000) | 7,000,000 |
| [4] Strategic Capital Alternatives, LLC | - | 800,000 | - | 800,000 | - | 800,000 | 533,334 | 2,666,666 | 4,000,000 | (31,500) | 675,000 | 4,643,500 |
| **Total** | **$ 30,198,220** | **$ 10,358,826** | **$ 15,193,237** | **$ 55,750,283** | **$ 23,422,397** | **$ 79,172,680** | **$ 5,268,894** | **$ 45,768,161** | **$ 130,209,735** | **$ 4,418,500** | **$ 49,715,265** | **$ 184,343,500** |

[1]   Transferred to COF from ACF

[2]   Includes membership units and warrants

[3]   Transferred to COF from AH and ACF

[4]   Transferred to COF from AH; Includes Class A and B Common Stock

**In re AEQUITAS MANAGEMENT, LLC, et al.**
**Case No. 3:16-cv-00438-PK**
**Report Regarding the Investigation of the Receivership Entity's Business Conduct**

*Exhibit E.2.1.2.b*
*FTI Consulting Review of Investment Valuations*
*($ in millions)*

**Valuation Ranges for CarePayment Technologies**

| Valuation Date Range | November 30, 2013 | | | December 31, 2013 | | | June 30, 2014 | | | December 31, 2014 | | | June 30, 2015 | | | September 30, 2015 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Low | High | Fair Value[1] | Low | High | Fair Value[1] | Low | High | Fair Value[1] | Low | High | Fair Value[1] | Low | High | Fair Value[1] | Low | High | Fair Value[1] |
| Duff & Phelps | $ 25.0 | $ 35.0 | | | | | $ 58.0 | $ 75.0 | | $ 90.0 | $ 110.0 | | | | | | | |
| Aequitas | | | | | | $ 44.0 | | | $ 62.0 | | | $ 92.0 | | | $ 116.0 | | | $ 140.0 |
| FTI Consulting | $ 9.2 | $ 12.0 | | | | | $ 15.1 | $ 19.7 | | $ 28.0 | $ 35.5 | | | | | | | |

The Duff & Phelps November 30, 2013 valuation range represents the more conservative "Existing Product Only" case, which excludes revenue associated with new products slated to launch in 2015 and thereafter.

The Duff & Phelps valuation also included a Management Case with a range of $35.0M to $45.0M.

**Valuation Ranges for EdPlus**

| Valuation Date Range | November 30, 2013 | | | December 31, 2013 | | | June 30, 2014 | | | December 31, 2014 | | | June 30, 2015 | | | September 30, 2015 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Low | High | Fair Value[1] | Low | High | Fair Value[1] | Low | High | Fair Value[1] | Low | High | Fair Value[1] | Low | High | Fair Value[1] | Low | High | Fair Value[1] |
| Duff & Phelps | $ 13.0 | $ 31.0 | | | | | $ 29.5 | $ 35.0 | | $ 30.0 | $ 35.0 | | | | | | | |
| Aequitas | | | | | | $ 25.0 | | | $ 20.7 | | | $ 11.7 | | | $ 7.6 | | | $ 7.0 |
| FTI Consulting | $ - | $ 0.9 | | | | | $ - | $ - | | $ - | $ - | | | | | | | |

**Valuation Ranges for ETC**

| Valuation Date Range | November 30, 2013 | | | December 31, 2013 | | | June 30, 2014 | | | December 31, 2014 | | | June 30, 2015 | | | September 30, 2015 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Low | High | Fair Value[1] | Low | High | Fair Value[1] | Low | High | Fair Value[1] | Low | High | Fair Value[1] | Low | High | Fair Value[1] | Low | High | Fair Value[1] |
| Duff & Phelps | $ 34.5 | $ 47.5 | | $ 37.9 | $ 48.4 | | $ 32.0 | $ 44.1 | | $ 44.3 | $ 59.5 | | | | | | | |
| Aequitas | | | | | | $ 45.5 | | | $ 44.0 | | | $ 47.8 | | | $ 47.8 | | | $ 47.8 |
| FTI Consulting | $ 5.7 | $ 7.3 | | | | | $ 11.6 | $ 14.9 | | $ 14.4 | $ 18.6 | | | | | | | |

[1] Fair values represented by Aequitas to investors in investment update reports.

**In re AEQUITAS MANAGEMENT, LLC, et al.**
**Case No. 3:16-cv-00438-PK**
**Report Regarding the Investigation of the Receivership Entity's Business Conduct**

*Exhibit E.2.1.2.3.a*
*History of MSP Equity Investments (2008 - 2016)*

| | APF - Investment MSP | Catalyst - Investment MSP | ACF - Investment MSP (from Catalyst) | AH - Investment MSP | Valuation Adjustment | AH - Series E Preferred Stock | Total Equity Investment |
|---|---|---|---|---|---|---|---|
| **Balance 12/31/2008** | $ - | $ 2,880,237 | $ - | $ - | $ - | $ - | $ 2,880,237 |
| June 30, 2009- Debt to Equity Conversion | | 3,593,855 | | | | | 3,593,855 |
| Market Value Adjustment | | (1,604,092) | | | | | (1,604,092) |
| **Balance 12/31/2009** | $ - | $ 4,870,000 | $ - | $ - | $ - | $ - | $ 4,870,000 |
| **Balance 12/31/2010** | $ - | $ 4,870,000 | $ - | $ - | $ - | $ - | $ 4,870,000 |
| Adjustment Market Value | | (600,000) | | | | | (600,000) |
| **Balance 12/31/2011** | $ - | $ 4,270,000 | $ - | $ - | $ - | $ - | $ 4,270,000 |
| Sale from Catalyst to ACF thru AH 12/31/2012 | | (2,000,000) | 2,000,000 | | | | - |
| Adjustment Market Value | | (737,007) | | | | | (737,007) |
| **Balance 12/31/2012** | $ - | $ 1,532,993 | $ 2,000,000 | $ - | $ - | $ - | $ 3,533,493 |
| Purchase of MSP Stock & Loans from Jim McDaniel 5/3/2013 | | | 1,581,381 | | | | 1,581,381 |
| Adjust MSP Stock Valuation 12/31/2013 | | | (771,999) | | | | (771,999) |
| Transfer from Catalyst to APF 12/31/2013 | 1,532,933 | (1,532,993) | | | | | (60) |
| **Balances 12/31/2013** | $ 1,532,933 | $ - | $ 2,809,382 | $ - | $ - | | $ 4,342,815 |
| 2014 Valuation Adjustment | | | 100,618 | | | | 100,618 |
| 2014 ACF to AH | - | | (2,910,000) | 2,910,000 | | | - |
| 2014 AH Contribution to APF | 2,910,000 | | | (2,910,000) | | | - |
| 9/30/2014 Valuation Adjustment | | | | | 727,067 | | 727,067 |
| **Balance 12/31/2014** | $ 4,442,933 | $ - | $ - | $ - | $ 727,067 | $ - | $ 5,170,500 |
| March 1 Debt Conversion to Preferred Stock | | | | | | 14,998,764 | 14,998,764 |
| **Balance 12/31/2015** | $ 4,442,933 | $ - | $ - | $ - | $ 727,067 | $ 14,998,764 | $ 20,169,264 |
| **Balance 12/31/2016** | $ 4,442,933 | $ - | $ - | $ - | $ 727,067 | $ 14,998,764 | $ 20,169,264 |

In re AEQUITAS MANAGEMENT, LLC, et al.
Case No. 3:16-cv-00438-PK
Report Regarding the Investigation of the Receivership Entity's Business Conduct

*Exhibit E.2.1.2.3.b*
*History of MSP Debt (2008 - 2016)*

| | DCEF Note & Interest Receivable | Catalyst MSP Note & Interest Receivable | Catalyst Printing Today Note & Interest Receivable | AIOF Note & Interest Receivable | Hybrid Note & Interest Receivable | ACF Notes & Interest Receivable[1] | ACF - Loan Loss Reserve | Total Notes & Int Receivable[1] |
|---|---|---|---|---|---|---|---|---|
| **Balance 9/30/2008** | $ - | $ - | $ - | $ - | $ 4,592,681 | $ 913,009 | $ - | $ 5,505,690 |
| 2008 Debt Assignment from ACF to Hybrid[2] | | | | | 913,009 | (913,009) | | - |
| 2008 Hybrid Increases[2] | | | | | 5,440,432 | | | 5,440,432 |
| 2008 Hybrid Decreases[2] | | | | | (5,274,879) | | | (5,274,879) |
| **Balance 12/31/2008** | $ - | $ - | $ - | $ - | $ 5,671,243 | $ - | $ - | $ 5,671,243 |
| Note Funding | | 3,414,214 | 900,000 | | | 250,000 | | 4,564,214 |
| 2009 Interest Accrued | | 179,641 | 72,353 | 81,460 | 1,290,393 | 16,027 | | 1,639,874 |
| Possible Interest Payments | | | (44,288) | | (395,279) | | | (439,567) |
| Move from Hybrid to AIOF | | | | 1,100,000 | (1,100,000) | | | - |
| June 30, 2009- Debt to Equity Conversion | | (3,593,855) | | | | | | (3,593,855) |
| **Balance 12/31/2009** | $ - | $ - | $ 928,065 | $ 1,181,460 | $ 5,466,357 | $ 266,027 | $ - | $ 7,841,909 |
| Loan Funding | | | 1,000,000 | | | 1,250,000 | | 2,250,000 |
| Interest Accrued | 214,289 | | 276,884 | | 594,508 | 129,289 | | 1,214,970 |
| Possible Interest Paid thru Accts Rec | (157,139) | | (223,875) | 182,639 | | | | (198,375) |
| Transfer from ACF to DCEF 6/30/2010 | 1,645,316 | | | | | (1,645,316) | | - |
| **Balance 12/31/2010** | $ 1,702,466 | $ - | $ 1,981,074 | $ 1,364,099 | $ 6,060,865 | $ - | $ - | $ 11,108,504 |
| Loan Funding | 1,417,500 | | 350,000 | | | 305,500 | | 2,073,000 |
| Payments | | | | | | (139,863) | | (139,863) |
| Interest Accrued | 147,758 | | 261,766 | 164,945 | 310,437 | | | 884,906 |
| Possible Interest Paid thru Accts Rec | (39,025) | | (132,547) | (53,817) | | | | (225,389) |
| **Balance 12/31/2011** | $ 3,228,699 | $ - | $ 2,460,293 | $ 1,475,227 | $ 6,371,302 | $ - | $ - | $ 13,701,158 |
| ACF In and Loan MSG 1/20/2012 | | | | | | 300,000 | | 300,000 |
| Loan Funding | 637,917 | | 1,134,196 | | | | | 1,772,113 |
| Interest Accrued | 121,126 | | 52,177 | 182,389 | 810,542 | | | 1,166,234 |
| Payments | (80,077) | | (92,538) | | | (65,432) | | (238,047) |
| Transfer Note from ACF to DCEF | 296,086 | | | | | (296,086) | | - |
| Transfer Note from Catalyst to ACF thru AH | | | (3,384,197) | | | 3,384,197 | | - |
| Record Loan Loss Reserve | | | | | | | (344,000) | - |
| **Balance 12/31/2012** | $ 4,203,751 | $ - | $ 169,931 | $ 1,657,616 | $ 7,181,844 | $ 3,488,316 | $ (344,000) | $ 16,701,458 |
| Loan Funding | | | | | | 1,137,555 | | 1,137,555 |
| Interest Accrued | 574,846 | | | 189,963 | 910,621 | 873,246 | | 2,548,676 |
| Payments | (477,651) | | | | | (88,578) | | (566,229) |
| Purchase of MSP Stock & Loans from Jim McDaniel 5/3/2013 | | | | | | 2,697,807 | | 2,697,807 |
| Move Deferred Interest to From Catalyst to ACF | | | (169,931) | | | 169,931 | | - |
| Adjust Loan Loss Reserve | | | | | (26,228) | | (2,116,000) | (26,228) |
| **Balances 12/31/2013** | $ 4,300,946 | $ - | $ - | $ 1,821,351 | $ 8,092,465 | $ 8,278,277 | $ (2,460,000) | $ 20,033,039 |
| 2014 Interest Accrued | 525,968 | | | 230,992 | 1,026,326 | 977,370 | | 2,760,656 |
| 2014 Interest Paid | (530,645) | | | | | - | | (530,645) |
| Principal Payments | | | | | | (15,541) | | (15,541) |
| **Balance 12/31/2014** | $ 4,296,268 | $ - | $ - | $ 2,052,343 | $ 9,118,791 | $ 9,240,106 | $ (2,460,000) | $ 22,247,509 |
| 2015 Interest Accrued | 85,032 | | | 13,773 | 1,156,520 | 161,406 | | 1,416,731 |
| 2015 Interest Paid | (172,946) | | | | | - | | (172,946) |
| Principal Payments | | | | | | (28,786) | | (28,786) |
| Reverse Bad Debt Reserve | | | | | | | 2,460,000 | 2,460,000 |
| March 1 Debt Conversion to Preferred Stock | (4,208,354) | | | (2,092,344) | | (8,698,066) | | (14,998,764) |
| Transfer from ACF to AIOF | | | | 674,660 | | (674,660) | | - |
| **Balance 12/31/2015** | $ - | $ - | $ - | $ 648,432 | $ 10,275,311 | $ - | $ - | $ 10,923,744 |
| 2015 Interest Accrued | | | | 12,128 | 1,306,933 | | | 1,319,061 |
| 2015 Interest Paid | | | | (2,975) | | | | (2,975) |
| Principal Payments | | | | (543,892) | | | | (543,892) |
| **Balance 12/31/2016** | $ - | $ - | $ - | $ 113,693 | $ 11,582,244 | $ - | $ - | $ 11,695,938 |

*1. Includes a $2.46M Bad Debt Reserve.*
*2. No documentation of transaction found.*

**In re AEQUITAS MANAGEMENT, LLC, et al.**
**Case No. 3:16-cv-00438-PK**
**Report Regarding the Investigation of the Receivership Entity's Business Conduct**

*Exhibit E.2.1.3.3*
*Summary of Freedom Portfolios at Face Value Compared to Outstanding Debt*

| | Q4 2014 | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | 2016 (as of 6/17/16 sale) |
|---|---|---|---|---|---|---|
| **Consumer Debt Portfolios at Face Value** | | | | | | |
| C+ Face Value - Investments | 14,785,866 | 25,659,852 | 34,577,351 | 42,043,094 | 49,363,020 | 43,479,721 |
| F+ Face Value - Investments | 7,388,958 | 20,586,872 | 27,220,278 | 26,925,819 | 23,665,963 | 19,492,195 |
| **Total Consumer Debt Portfolios at Face Value** | **22,174,825** | **46,246,723** | **61,797,628** | **68,968,913** | **73,028,983** | **62,971,916** |
| **Outstanding Debt** | | | | | | |
| C+ Total Debt | 8,461,997 | 24,806,642 | 35,487,121 | 41,752,392 | 50,991,803 | 45,938,618 |
| F+ Total Debt | 585,413 | 13,021,816 | 26,282,190 | 28,938,388 | 25,412,903 | 23,694,315 |
| **Total Outstanding Debt** | **9,047,411** | **37,828,458** | **61,769,311** | **70,690,780** | **76,404,706** | **69,632,933** |
| | | | | | | |
| **Net Consumer Debt Porfolios Less Debt** | **13,127,414** | **8,418,265** | **28,317** | **(1,721,868)** | **(3,375,723)** | **(6,661,017)** |
| | | | | | | |
| **AH and ACF Cash Investment** | **24,210,825** | **12,088,820** | **17,555,232** | **19,253,040** | **17,936,440** | **19,657,340** |

**In re AEQUITAS MANAGEMENT, LLC, et al.**
**Case No. 3:16-cv-00438-PK**
**Report Regarding the Investigation of the Receivership Entity's Business Conduct**

*Exhibit E.6*
*Summary of Aequitas Portfolio Assets to Debt*

| | Q4 2013 | Q1 2014 | Q2 2014 | Q3 2014 | Q4 2014 | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | Q1 2016 |
|---|---|---|---|---|---|---|---|---|---|---|
| Consumer Portfolios at Fair Value | 191,923,379 | 177,250,792 | 166,165,352 | 171,881,983 | 186,488,102 | 206,301,102 | 226,979,698 | 240,148,692 | 243,327,026 | 230,622,828 |
| Institutional Debt | (65,446,542) | (58,534,736) | (51,125,812) | (39,647,265) | (38,404,496) | (75,176,348) | (89,988,524) | (103,608,867) | (106,998,054) | (111,828,943) |
| Value After Retiring Institutional Debt | 126,476,837 | 118,716,056 | 115,039,540 | 132,234,717 | 148,083,606 | 131,124,754 | 136,991,174 | 136,539,825 | 136,328,971 | 118,793,886 |
| | | | | | | | | | | |
| **Investor Debt** | **345,474,171** | **363,326,635** | **381,399,704** | **410,893,696** | **445,713,388** | **464,635,584** | **474,155,496** | **469,440,991** | **488,346,649** | **493,832,135** |
| | | | | | | | | | | |
| Portfolio Coverage for Institutional Debt | 293% | 303% | 325% | 434% | 486% | 274% | 252% | 232% | 227% | 206% |
| Portfolio Coverage for Investor Debt | 37% | 33% | 30% | 32% | 33% | 28% | 29% | 29% | 28% | 24% |

**In re AEQUITAS MANAGEMENT, LLC, et al.**
**Case No. 3:16-cv-00438-PK**
**Report Regarding the Investigation of the Receivership Entity's Business Conduct**

*Exhibit E.8*
*Summary of Disclosure Language in Quarterly Updates*

| Private Note | Private Note Tear Sheet Summary | ACF Collateral Summary | | Asset Allocation (cost basis) | |
|---|---|---|---|---|---|
| Q1 2014 | The Aequitas Private Note ("Private Note") is a high yielding subordinated debt instrument issued by Aequitas Commercial Finance, LLC ("ACF"). The Private Notes are issued as direct obligations of ACF and are supported by the balance sheet of ACF. The Notes are structured to provide a fixed quarterly return and principal return upon maturity. ACF uses proceeds from Private Note primarily to fund or finance the purchase of student loan receivables from education providers, patient-pay receivables from healthcare providers, other private credit strategy receivables and loan portfolios, or direct collateralized loan and lease obligations, equities and secured liquidity lines to affiliates for general corporate purposes. | Book Value of Assets<br>Collaterla Value of Assets<br>Subordinated Debt<br>Senior Debt and Credit Facilities | Not Shown | Education Credit<br>Healthcare Credit<br>Corporate Debt<br>Corporate Equity<br>Transporation Credit<br>Other Assets<br>Cash | Not shown |
| Q2 2014 | The Aequitas Private Note ("Private Note") is a high yielding subordinated debt instrument issued by Aequitas Commercial Finance, LLC ("ACF"). The Private Notes are issued as direct obligations of ACF and are supported by the balance sheet of ACF. The Notes are structured to provide a fixed quarterly return and principal return upon maturity. ACF uses proceeds from Private Note primarily to fund or finance the purchase of student loan receivables from education providers, patient-pay receivables from healthcare providers, other private credit strategy receivables and loan portfolios, or direct collateralized loan and lease obligations, equities and secured liquidity lines to affiliates for general corporate purposes. | Book Value of Assets<br>Collateral Value of Assets<br>Subordinated Debt<br>Senior Debt and Credit Facilities | 482,190,000.00<br>646,976,000.00<br>275,511,000.00<br>102,464,000.00 | Education Credit<br>Healthcare Credit<br>Corporate Debt<br>Corporate Equity<br>Transporation Credit<br>Other Assets<br>Cash | 137,802,000.00<br>39,709,000.00<br>151,256,000.00<br>113,473,000.00<br>18,365,000.00<br>5,141,000.00<br>16,171,000.00 |
| Q3 2014 | The Aequitas Private Note ("Private Note") is a high yielding subordinated debt instrument issued by Aequitas Commercial Finance, LLC ("ACF"). The Private Notes are issued as direct obligations of ACF and are supported by the balance sheet of ACF. The Notes are structured to provide a fixed quarterly return and principal return upon maturity. ACF uses proceeds from Private Note primarily to fund or finance the purchase of student loan receivables from education providers, patient-pay receivables from healthcare providers, other private credit strategy receivables and loan portfolios, or direct collateralized loan and lease obligations, equities and secured liquidity lines to affiliates for general corporate purposes. | Book Value of Assets<br>Collateral Value of Assets<br>Subordinated Debt<br>Senior Debt and Credit Facilities | 512,436,000.00<br>674,495,000.00<br>316,829,000.00<br>88,408,000.00 | Education Credit<br>Healthcare Credit<br>Corporate Debt<br>Corporate Equity<br>Transporation Credit<br>Other Assets<br>Cash | 127,664,000.00<br>44,413,000.00<br>174,103,000.00<br>133,688,000.00<br>21,644,000.00<br>2,513,000.00<br>8,411,000.00 |
| Q1 2015 | The Aequitas Private Note ("Private Note") is a high yielding subordinated debt instrument issued by Aequitas Commercial Finance, LLC ("ACF"). The Private Notes are issued as direct obligations of ACF and are supported by the balance sheet of ACF. The Notes are structured to provide a fixed quarterly return and principal return upon maturity. ACF uses proceeds from Private Note primarily to fund or finance the purchase of student loan receivables from education providers, patient-pay receivables from healthcare providers, other private credit strategy receivables and loan portfolios, or direct collateralized loan and lease obligations, equities and secured liquidity lines to affiliates for general corporate purposes. | Book Value of Assets<br>Collateral Value of Assets<br>Subordinated Debt<br>Senior Debt and Credit Facilities | 610,261,000.00<br>772,259,000.00<br>364,822,000.00<br>136,721,000.00 | Education Credit<br>Healthcare Credit<br>Corporate Debt<br>Corporate Equity<br>Transporation Credit<br>Consumer & Small Business Credit<br>Other Assets<br>Cash | 113,595,000.00<br>205,034,000.00<br>168,710,000.00<br>41,832,000.00<br>26,505,000.00<br>28,816,000.00<br>4,664,000.00<br>21,105,000.00 |
| Q2 2015 | The Aequitas Private Note ("Private Note") is a high yielding subordinated debt instrument issued by Aequitas Commercial Finance, LLC ("ACF"). The Private Notes are issued as direct obligations of ACF and are supported by the balance sheet of ACF. The Notes are structured to provide a fixed quarterly return and principal return upon maturity. ACF uses proceeds from Private Note primarily to fund or finance the purchase of student loan receivables from education providers, patient-pay receivables from healthcare providers, other private credit strategy receivables and loan portfolios, or direct collateralized loan and lease obligations, equities and secured liquidity lines to affiliates for general corporate purposes. | Book Value of Assets<br>Collateral Value of Assets<br>Subordinated Debt<br>Senior Debt and Credit Facilities | 575,456,000.00<br>82,292,000.00<br>139,045,000.00<br>344,265,000.00 | Education Credit<br>Healthcare Credit<br>Corporate Debt<br>Corporate Equity<br>Transporation Credit<br><br>Consumer & Small Business Credit<br>Other Assets<br>Cash | 103,128,000.00<br>189,542,000.00<br>159,372,000.00<br>48,439,000.00<br>29,163,000.00<br><br>30,370,000.00<br>3,234,000.00<br>12,208,000.00 |

**Aequitas footnotes to values included in Q2 2015 tear sheet**

| | |
|---|---|
| Footnote on Assets Under Management (AUM): | 1. Book value of assets is not an indication of liquidation value. In the event of a sale of assets, the cost basis or book value of the underlying investments may or may not be realized. |
| Footnote on Aequitas Investment: | 2. Aequitas controlling equity and related party Private Note investments. |
| Footnote on Interest Rate Schedule: | 3. Interest rates are annualized; paid after any applicable advisor fees; rates exclusively for investors through GPS Capital Management. |
| Footnote on Weighted Average Interest Rate (2008-2015): | 4. Annual weighted average interest rate is calculated as of quarter end, then divided by four to arrive at the quarterly interest rate to be paid for the next quarter. The annual rate is the weighted average interest rate as of December 31 of each completed year. For incomplete years, the annual rate is as of the most recently completed quarter. Weighted average interest rate contains returns on 4-year Notes which have been discontinued for new and renewing investments effective January 1, 2014. Index returns are shown as cumulative year-to-date as of June 30, 2015. |
| Footnote on Corporate Equity: | 5. The assets held in Corporate Equity include equity investments which are internally fair valued by Aequitas. Year-end valuations are audited by an independent third party audit firm. |
| Footnote on Cash and Other Assets: | 6. Cash includes $976,000 of restricted cash primarily related to reserve accounts held at a third party credit facility provider and third party receivable originator. These reserve accounts are restricted to their use per the terms of each respective contract. |

| Private Note | Private Note Tear Sheet Summary | ACF Collateral Summary | | Asset Allocation (cost basis) | | |
|---|---|---|---|---|---|---|
| Q3 2015 | The Aequitas Private Note ("Private Note") is a high yielding subordinated debt instrument issued by Aequitas Commercial Finance, LLC ("ACF"). The Private Notes are issued as direct obligations of ACF and are supported by the balance sheet of ACF. The Notes are structured to provide a fixed quarterly return and principal return upon maturity. ACF uses proceeds from Private Note primarily to fund or finance the purchase of student loan receivables from education providers, patient-pay receivables from healthcare providers, other private credit strategy receivables and loan portfolios, or direct collateralized loan and lease obligations, equities and secured liquidity lines to affiliates for general corporate purposes. | Book Value of Assets | 633,819,000.00 | Corporate Equity | 198,493,000.00 | 106,848,000.00 |
| | | Less: Non-controlling Members' Equity | (123,635,000.00) | Loans To Affiliates, Operating Line | 93,553,000.00 | 93,553,000.00 |
| | | Less: Credit Facilities and Senior Debt | (168,012,000.00) | Loans to Affiliates, Private Equity | 100,734,000.00 | 88,178,000.00 |
| | | Assets Securing Subordinated Debt | 342,172,000.00 | Education Credit | 100,338,000.00 | 31,107,000.00 |
| | | Subordinated Debt | 321,332,000.00 | Healthcare Credit | 64,071,000.00 | 8,791,000.00 |
| | | | | Cash & Other Assets | 19,123,000.00 | 11,800,000.00 |
| | **removal of :** | **Collateral Value of Assets** | | Consumer & Small Business Credit | 29,941,000.00 | 1,895,000.00 |
| | | **Senior Debt and Credit Facilities** | | Transportation Credit | 21,497,000.00 | - |
| | | | | Loans to Affiliates, Credit Strategies | 6,069,000.00 | - |
| | | | removal of : | Corporate Debt | | |
| | **Aequitas footnotes to values included in Q3 2015 tear sheet** | | | | | |
| | Footnote on Assets Under Management (AUM): | 1.  Book value of assets is not an indication of liquidation value. In the event of a sale of assets, the cost basis or book value of the underlying investments may or may not be realized. | | | | |
| | Footnote on Interest Rate Schedule: | 2.  Interest rates are annualized; paid after any applicable advisor fees. | | | | |
| | Footnote on Weighted Average Interest Rate (2008-2015): | 3.  Annual weighted average interest rate is calculated as of quarter-end, then divided by four to arrive at the quarterly interest rate to be paid for the next quarter. The annual rate is the weighted average interest rate as of December 31 of each completed year. For incomplete years, the annual rate is as of the most recently completed quarter. Weighted average interest rate contains returns on 4-year Notes which have been discontinued for new and renewing investments effective January 1, 2014. Index returns are shown as cumulative year-to-date as of September 30, 2015. The interest rates do not represent the performance of the underlying assets; it only represents the fixed interest actually paid on the Subordinated Debt. | | | | |
| | Footnote on Assets Securing Subordinated Debt: | 4.  The remainder of assets are pledged to senior debt and non-controlling members' equity. | | | | |
| | Footnote on Corporate Equity: | 5.  The assets held in Corporate Equity include equity investments which are internally fair valued by Aequitas. Year-end valuations are audited by an independent third party audit firm. | | | | |
| | Footnote on Cash and Other Assets: | 6.  Cash includes $973,000 of restricted cash primarily related to reserve accounts held at a third party credit facility provider and third party receivable originator. These reserve accounts are restricted to their use per the terms of each respective contract. | | | | |

| IOF II | IOF II Tear Sheet Summary | Asset Allocation by Structure | | |
|---|---|---|---|---|
| Q4 2014 | The Aequitas Income Opportunity Fund II ("IOF II" or "Fund") follows a value investing approach by acquiring or investing in receivables or loans. IOF II accomplishes this by investing in receivables, loans, and leases, often at discounted prices, through the Aequitas Capital platform. Aequitas Capital has established itself within large and inefficient credit markets such as education, healthcare and private credit, where it provides unique financing solutions to companies and their consumers, many through its proprietary platform.  This platform provides the Fund with a consistent toward flow of assets with similar credit characteristics, within given risk parameters, and structures to provide predictable, stable yields, allowing IOF II to offer investors principal security, low market correlation, and upside potential. | Education | 1,309,000.00 | Not included |
| | | Transportation | 935,000.00 | |
| | | Consumer | 1,122,000.00 | |
| | | Small Vusinesses | 374,000.00 | |
| | | Other Assets | 27,735,000.00 | |
| | | Cash & Short Term Investments | 268,000.00 | |
| Q1 2015 | The Aequitas Income Opportunity Fund II ("IOF II" or "Fund") follows a value investing approach by acquiring or investing in receivables or loans. IOF II accomplishes this by investing in receivables, loans, and leases, often at discounted prices, through the Aequitas Capital platform. Aequitas Capital has established itself within large and inefficient credit markets such as education, healthcare and private credit, where it provides unique financing solutions to companies and their consumers, many through its proprietary platform.  This platform provides the Fund with a consistent toward flow of assets with similar credit characteristics, within given risk parameters, and structures to provide predictable, stable yields, allowing IOF II to offer investors principal security, low market correlation, and upside potential. | Education | 33,391,000.00 | |
| | | Transportation | 18,290,000.00 | |
| | | Consumer | 7,155,000.00 | |
| | | Small Businesses | | |
| | | Other Assets | 9,296,000.00 | |
| | | Cash & Short Term Investments | 1,453,000.00 | |
| Q2 2015 | The Aequitas Income Opportunity Fund II ("IOF II" or "Fund") follows a value investing approach by acquiring or investing in receivables or loans. IOF II accomplishes this by investing in receivables, loans, and leases, often at discounted prices, through the Aequitas Capital platform. Aequitas Capital has established itself within large and inefficient credit markets such as education, healthcare and private credit, where it provides unique financing solutions to companies and their consumers, many through its proprietary platform.  This platform provides the Fund with a consistent toward flow of assets with similar credit characteristics, within given risk parameters, and structures to provide predictable, stable yields, allowing IOF II to offer investors principal security, low market correlation, and upside potential. | Education | 33,391,000.00 | Senior Secured | 18,767,000.00 |
| | | Transportation | 18,290,000.00 | Subordinated | 40,069,000.00 |
| | | Consumer | 7,155,000.00 | Other | 8,990,000.00 |
| | | Small Businesses | - | |
| | | Other Assets | 9,296,000.00 | |
| | | Cash & Short Term Investments | 1,453,000.00 | |
| Q3 2015 | The Aequitas Income Opportunity Fund II ("IOF II" or "Fund") follows a value investing approach by acquiring or investing in receivables or loans. IOF II accomplishes this by investing in receivables, loans, and leases, often at discounted prices, through the Aequitas Capital platform. Aequitas Capital has established itself within large and inefficient credit markets such as education, healthcare and private credit, where it provides unique financing solutions to companies and their consumers. These companies provide a forward flow of assets with similar credit characteristics, within given risk parameters, and structured to provide predictable, stable yields, allowing IOF II to offer investors stated yield payments and low market correlation. | Education | 44,191,000.00 | Senior Secured | 29,568,000.00 |
| | | Transportation | 23,960,000.00 | 2nd Lien Senior Secured | 54,577,000.00 |
| | | Consumer | 8,615,000.00 | Other | 1,034,000.00 |
| | | Middle Market | 7,379,000.00 | |
| | | Other Assets | 3,873,000.00 | |
| | | Cash & Short Term Investments | 1,453,000.00 | |