**Troy Greenfield**, OSB #892534
Email: tgreenfield@schwabe.com
**Alex I. Poust**, OSB #925155
Email: apoust@schwabe.com
**Lawrence R. Ream** (Admitted *Pro Hac Vice*)
Email: lream@schwabe.com
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Facsimile: 503.796.2900

**Ivan B. Knauer** (Admitted *Pro Hac Vice*)
Email: iknauer@swlaw.com
SNELL & WILMER LLP
1101 Pennsylvania Avenue, N.W., Suite 300
Washington, DC 20004
Telephone: 202.802.9770
Facsimile: 202.688.2201

*Attorneys for Receiver for Defendants*
*AEQUITAS MANAGEMENT, LLC; AEQUITAS HOLDINGS, LLC;*
*AEQUITAS COMMERCIAL FINANCE, LLC; AEQUITAS*
*CAPITAL MANAGEMENT, INC.; AEQUITAS INVESTMENT*
*MANAGEMENT, LLC*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>AEQUITAS MANAGEMENT, LLC; AEQUITAS HOLDINGS, LLC; AEQUITAS COMMERCIAL FINANCE, LLC; AEQUITAS CAPITAL MANAGEMENT, INC.; AEQUITAS INVESTMENT MANAGEMENT, LLC; ROBERT J. JESENIK; BRIAN A. OLIVER; and N. SCOTT GILLIS,<br><br>Defendants. | No. 3:16-cv-00438-JR<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Page 1  FINDINGS OF FACT AND CONCLUSIONS OF LAW

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

On March 10, 2016, the Securities and Exchange Commission ("SEC") filed a complaint in this Court against the Entity Defendants and three individual defendants, Robert J. Jesenik, Brian A. Oliver, and N. Scott Gillis. In the following weeks, this Court appointed Ronald F. Greenspan as Receiver; he continues in that capacity.

On December 31, 2019, the Receiver filed his Motion to Approve Receiver's Distribution Plan and Determination of a Ponzi Scheme (the "Distribution/Ponzi Determination Motion") [Dkt. No. 787].[1] For the reasons stated below, the Court finds by a preponderance of the evidence that a Ponzi scheme existed. Further, the Court finds by a preponderance of the evidence that Receiver's distribution plan is fair and equitable, as clarified and modified to address two matters: the resolution of one objection and one housekeeping matter. As addressed below, this Court adopts the Receiver's proposed distribution plan and authorizes the Receiver to commence distributions.

## FINDINGS

The Court has considered the record in this case, including the Distribution/Ponzi Determination Motion as well as materials relating to that motion—namely, materials cited in the Distribution/Ponzi Determination Motion; submissions filed in support of that distribution plan by the SEC [Dkt. No. 794], and one interested party [Dkt. No. 798]; the resolved objection filed by Brett M. Brown [Dkt. No. 799]; the Receiver's reply in support of the Distribution/Ponzi Determination Motion [Dkt. No. 807]; the Receiver's declaration [Dkt. No. 808]; and testimony proffered and argument made by interested parties at the March 31, 2020 hearing on the Receiver's Distribution/Ponzi Determination Motion. The Court makes the following findings of fact.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Distribution/Ponzi Determination Motion [Dkt. No. 787].

Page 2 **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

### A. Procedural History

1. On March 10, 2016, the SEC filed the above-captioned action, alleging violations of federal securities law by certain individuals who controlled the Aequitas Enterprise. Those Individual Defendants are: Robert J. Jesenik, Brian A. Oliver, and N. Scott Gillis. The SEC alleged that these individuals—through the Aequitas Enterprise for which they were principals—executed a "Ponzi-like" scheme.[2] The Individual Defendants, according to the SEC, defrauded Investors, who were led to believe that they were purchasing indirect interests in consumer credit receivables.[3] Rather than purchasing such indirect interests, the SEC alleged, the Defendants were misusing the bulk of raised funds to pay operating expenses and to repay earlier Investors.[4] The SEC further alleged that "[b]y the end of 2015, [Aequitas] owed Investors $312.0 million and had virtually no operating income to repay them."[5]

2. The SEC Enforcement Action against the Receivership Entities has been resolved as to the liability claims in the complaint, but unresolved as to monetary relief.[6]

3. The Receiver was appointed for the Entity Defendants and various affiliated entities—initially on an interim basis on March 16, 2016,[7] and later, on April 14, 2016, on an enduring basis.[8] When the Receiver was appointed, the Receivership Estate consisted of the Entity Defendants as well as 43 other related entities,[9] and interests in the additional nine

---

[2] Complaint [Dkt. No. 1], ¶¶ 3, 56.

[3] *Id.* at ¶¶ 1-7.

[4] *Id.*

[5] *Id.* at ¶ 5.

[6] Dkt. No. 192.

[7] Stipulated Interim Order Appointing Receiver [Dkt. No. 30].

[8] Order Appointing Receiver [Dkt. No. 156].

[9] Collectively defined in the Appendix to the Distribution/Ponzi Determination Motion as the "Aequitas Entities."

Page 3    **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

Extended Entities in which Aequitas had a material investment, that are required by Court order to cooperate with the Receiver.[10]

4. Consistent with that role and the powers authorized by the Court, the Receiver has, among other activities, operated the Receivership Estate, performed reporting obligations, made records available to Investors for use in litigation, and substantially monetized the assets of the Receivership Estate.[11]

5. Notwithstanding those efforts and the resulting benefit to the Receivership Estate, which have been significant, the Receivership Estate's liabilities are extensive and significantly exceed the Receivership Estate's assets, as found below.

6. The Receiver has also investigated the Aequitas Enterprise's pre-Receivership conduct of its financial and business affairs. The findings of that investigation were set forth in the Receiver's Report Regarding the Investigation of the Receivership Entity's Business Conduct (the "Forensic Report").[12]

7. Relating to both the Receiver's findings set forth in the Forensic Report and the vast disparity between the Receivership Estate's assets and liabilities, on December 31, 2019, the Receiver filed the Distribution/Ponzi Determination Motion.

8. On the Receiver's separate motion,[13] the Court entered an order establishing a notice procedure to provide fair notice to interested parties of the Receiver's Distribution/Ponzi

---

[10] *See* Dkt. No. 156, Exhibit B.

[11] *See generally* the Receiver's Quarterly Reports.

[12] Dkt. No. 663.

[13] Receiver's Motion for Order (1) Approving Form and Manner of Notice Regarding Approval of Proposed Distribution Plan and Ponzi Determination, (2) Approving Procedures and Deadlines, (3) Setting a Hearing, and for Related Relief [Dkt. No. 785].

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

Determination Motion, the briefing schedule, and the hearing date.[14] On the request of certain interested parties, the Receiver stipulated to twice extending the objection deadline, which was allowed by the Court.[15]

9. The SEC and another interested party filed statements in support of the Receiver's Distribution/Ponzi Determination Motion.[16]

10. On February 20, 2020, former Aequitas employee Brett M. Brown submitted a letter to the Court [Dkt. No. 799] objecting that the Distribution/Ponzi Determination Motion misclassified him—specifically, he was identified by name in the Distribution/Ponzi Determination Motion on a list of past and present officers and directors of the Aequitas-affiliated companies.[17]

11. On March 20, 2020, the Receiver filed a reply to Mr. Brown's objection, which resolved that objection and identified a related limited clarification to the proposed distribution plan, which is addressed below.

12. On March 31, 2020, the Court held a telephonic hearing on the Receiver's Distribution/Ponzi Determination Motion, and responses and objections thereto. Interested parties appeared and presented argument and testimony, as recorded in the transcript of that hearing.

**B. The Receiver's Investigation**

13. This is a complex case. The Aequitas Enterprise had grown to include over 57

---

[14] Order Approving the Procedures for Consideration of the Proposed Distribution Plan and Request for a Finding of a Ponzi Scheme [Dkt. No. 790].

[15] Dkt Nos. 797 and 802.

[16] *See* SEC's Response to Motion to Approve the Receiver's Distribution Plan and Determination of a Ponzi Scheme [Dkt. No. 794]; Wiltjer Letter Response [Dkt. No. 798].

[17] Distribution/Ponzi Determination Motion [Dkt. No. 787] at 57-58 n. 174 & App. A, 8-9.

Page 5 **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

affiliated and controlled entities by the time this Court instituted this receivership proceeding.[18] In just over two years preceding the appointment of the Receiver, the company had completed at least $1.3 billion in intercompany cash transfers.[19]

14. The Receiver investigated the operations of the Aequitas Enterprise for the period from January 1, 2014 through March 10, 2016.[20] That investigation is detailed in the Forensic Report. The Receiver concluded that the Aequitas Enterprise was insolvent by not later than July 3, 2014. The Receiver fairly summarized pertinent findings of the forensic investigation in the Distribution/Ponzi Determination Motion. Among those facts, for example, were that after July 3, 2014, the Aequitas Enterprise:

    a. "Was dependent on continued infusion of new money from Defrauded Investors to pay operating expenses;"

    b. "Did not use Defrauded Investor money for the purposes represented by the Aequitas Enterprise;"

    c. "Used a significant portion of new money from Defrauded Investors to execute transfers to earlier Investors, supposedly in the form of returns and principal;"

    d. "Did not generate sufficient (any) profits to pay the promised returns to Investors;"

    e. "Created numerous, self-described "Manufactured Notes," which purported to create liabilities among the entities and which frequently did not reflect the actual receipt of funds by the entities issuing such notes;" and

    f. "Converted liabilities between entities—*i.e.*, undertook a non-cash journal entry, intended to transfer an asset or liability from one Aequitas Entity to another without cash consideration—to favor specific Investors even when

---

[18] *See generally* Distribution/Ponzi Determination Motion [Dkt. No. 787] at Appendix C (Aequitas Organization Chart).

[19] Forensic Report [Dkt. No. 663] at 8 and 9, n.13 (period January 1, 2014 to March 10, 2016).

[20] *Id.* at 5.

Page 6    **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

the new obligors did not receive any material benefit from assuming such liability."[21]

15. Given that no party has disputed that summary or any aspect of the Forensic Report, the Court adopts the Receiver's Forensic Report, as well as the summary the Receiver provided on pages 24 through 30 of the Distribution/Ponzi Determination Motion as findings of fact regarding the operation of the Aequitas Enterprise.

**C. The Receiver's Distribution Plan**

16. As disclosed in Quarterly Reports and the Distribution/Ponzi Determination Motion, the Receivership Estate's liabilities far exceed its assets.

17. The following classes of Claimants have asserted claims against the Receivership Estate: Defrauded Investors (composed of Direct Investors and Fund Investors); Pass-through Investors; Non-Officer Former Employee Claims; Taxing authorities; and Creditor Claims. Further, there are claims associated with the operation of the Receivership: Administrative Claims; and Professional Claims.

18. In the Distribution/Ponzi Determination Motion, the Receiver estimated Total Investment from Defrauded Investors to total approximately $557 million and other total non-duplicative, non-Defrauded Investor Claims asserted against the Receivership Estate are estimated to exceed $89 million.[22] Those estimates are subject to the caveats expressed in the Distribution/Ponzi Determination Motion [Dkt. No. 787] and are without prejudice to the Receiver's right to object to any individual claim. No party has objected to or disputed those estimates, and the Court finds by a preponderance of the evidence based on the record before it that those estimates are reasonable.

---

[21] Distribution/Ponzi Determination Motion [Dkt. No. 787] at 26 (citing Forensic Report [Dkt. No. 663] at 8 and 9, n.16).

[22] Distribution/Ponzi Determination Motion [Dkt. No. 787] at 23-24.

Page 7  FINDINGS OF FACT AND
CONCLUSIONS OF LAW

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

19. Consistent with his Court-authorized powers and duties, the Receiver has marshalled and liquidated assets of the Receivership Estate and its interests in the Extended Entities, investigated and litigated claims, and timely reported to this Court about the current status of the Receivership Estate. In the Distribution/Ponzi Determination Motion and Quarterly Reports, the Receiver has summarized the Receivership Estate's assets, including cash and outstanding claims by the Receivership against third parties. In particular, the Receiver has noted that the Receivership Estate's liabilities exceed its assets by hundreds of millions of dollars.[23]

20. No party has objected to or disputed that factual conclusion, and the Court finds from the record before it that fact by a preponderance of the evidence.

21. Under these circumstances, the Court finds that Investors and other Claimants with Allowed Claims against the Receivership Estate cannot be made whole from the estate's available assets. The Court faces challenging decisions regarding how to allocate those assets overseen by this Court in connection with the Receivership amongst the many deserving claimants.

22. In the Distribution/Ponzi Determination Motion—as clarified and modified thereafter—the Receiver detailed his proposed distribution of assets (the "Distribution Plan").[24] Aspects of the plan are addressed in the Conclusions of Law, below.

23. The resolved objection, filed by Mr. Brown, related to his employment status as a Non-Officer Former Employee. Mr. Brown was identified by name in the Distribution/Ponzi Determination Motion in a list of past and present officers and directors of the Aequitas-affiliated companies who, as proposed by the Receiver, would be precluded from holding a Non-Officer

---

[23] *See* Distribution/Ponzi Determination Motion [Dkt. No. 787].

[24] *See e.g.*, *id.* at 4-7 (summarizing plan).

Page 8    **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

Former Employee Claim.[25] Following investigation, the Receiver found that: (a) Mr. Brown, who was a Senior Vice President, was ultimately excluded from the Aequitas Enterprise's executive management organizational chart; and (b) individuals with the title Senior Vice President likely should not be considered executive level.[26] Relatedly, the Receiver proposed omitting from the list of individuals precluded from holding a Non-Officer Former Employee Claim the following individuals: Brett Brown; Patricia Brown; Bill Malloy; and Thomas Szabo.[27] The Court finds that change is reasonable and supported by the facts.

24. As a housekeeping matter, on page 41 of the Distribution/Ponzi Determination Motion [Dkt. No. 787], the sentence beginning "In the event of transfers of an investment between investors or any other type of investment ownership or control changes," the second clause should omit "is" in favor of "may be" such that the clause now states "all of the pre-transfer activity of the transferor associated with the transferred investment during the relevant time period may, in the exercise of the Receiver's discretion, be attributed to the transferee." As modified, the Receiver has discretion when determining, on equitable grounds, whether and to what extent the prior activity of the transferor should or should not be attributed to the transferee. The Court finds that change is reasonable and supported by the facts.

## CONCLUSIONS OF LAW

A receivership is appropriate where, for example, there is a need to "marshal and preserve assets from further misappropriation and dissipation" and "clarify the financial affairs

---

[25] Distribution/Ponzi Determination Motion [Dkt. No. 787] at 57-58 n. 174 & App. A, 8-9.

[26] Receiver's Reply ISO Distribution/Ponzi Determination Motion [Dkt. No. 807] at 2-3.

[27] *Compare* Distribution/Ponzi Determination Motion [Dkt. No. 787] at 57-58 n. 174 & App. A, 8-9 (addressing Non-Officer Former Employee Claims) *with* Receiver's Reply ISO Distribution/Ponzi Determination Motion [Dkt. No. 807] at 2-3 (showing change to same).

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

of an entity for the benefit of investors."[28] This Court possesses "extremely broad" power when "determin[ing] the appropriate action to be taken in the administration of the receivership."[29] That "authority derives from the inherent power of a court of equity to fashion effective relief," and the exercise of that power is particularly appropriate "where a federal agency seeks enforcement in the public interest."[30]

This Court's power and its related "wide discretion" extend to "determin[ing] the appropriate relief in an equity receivership."[31] In part, because every fraudulent situation is different, "[t]here are no hard rules governing a district court's [distribution] decisions in [federal equity receiverships]."[32] That is, a distribution plan is subject to approval if it is "fair and reasonable."[33] Indeed, the Ninth Circuit will uphold any "'reasonable procedures instituted by the district court that serve the purpose of orderly and efficient administration of the receivership for the benefit of creditors."[34] Such broad deference is warranted, according to the Ninth Circuit, because "most receiverships involve multiple parties and complex transactions."[35]

Here, as set forth below, the Court concludes that the Aequitas Enterprise operated as a

---

[28] *SEC v. Schooler*, No. 12-2164, 2012 U.S. Dist. LEXIS 188994, at *11 (S.D. Cal. Nov. 30, 2012).

[29] *SEC v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986).

[30] *SEC v. Wencke*, 622 F.2d 1363, 1369, 1371 (9th Cir. 1980).

[31] *SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 606 (9th Cir. 1978). *See also SEC v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005) (quoting same).

[32] *SEC v. Enter. Tr. Co.*, No. 08 C 1260, 2008 U.S. Dist. LEXIS 79731, at *10 (N.D. Ill. Oct. 7, 2008).

[33] *See SEC v. Copeland*, No. CV 11-8607-R, 2014 U.S. Dist. LEXIS 195315, at *5 (C.D. Cal. May 19, 2014) ("With respect to the motion to approve the distribution of CWM Realty, 'the primary job of the district court is to ensure that the proposed plan of distribution is fair and reasonable.'" (Quoting *S.E.C. v. Wealth Management LLC*, 628 F.3d 323, 332 (7th Cir. 2010))).

[34] *CFTC. v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1115 (9th Cir. 1999) (quoting *Hardy*, 803 F.2d at 1037-38).

[35] *Hardy*, 803 F.2d at 1037.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

Ponzi scheme at least as early as July 1, 2014, such that it is appropriate to look to equity to determine how to compensate claimants. Relatedly, the Court concludes that the Distribution Plan, as proposed by the Receiver, provides an equitable means of distributing the Receivership Estate's assets to holders of Allowed Claims.

**A.     Ponzi Determination**

1.     A Ponzi scheme is "a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors."[36] A finding that a Ponzi scheme was perpetrated creates a so-called "Ponzi presumption," by which a court may infer the perpetrator's intention to hinder, delay, or defraud for purposes of voiding transfers.[37] That is because a Ponzi scheme is insolvent.[38]

2.     Proof of a Ponzi scheme is commonly understood to involve proof that "(1) deposits were made by investors; (2) the Debtor conducted little or no legitimate business operations as represented to investors; (3) the purported business operations of the Debtor produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors."[39] That said, there are many other factors that courts will consider, including many that are commonly recognized as badges of fraud.[40]

---

[36] *Santa Barbara Capital Mgmt. v. Neilson (In re Slatkin)*, 525 F.3d 805, 809 n.1 (9th Cir. 2008) (quoting *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 759 n.1 (9th Cir. 2000)).

[37] *See, e.g.*, *In re Slatkin*, 525 F.3d at 814 ("We hold that once the existence of a Ponzi scheme is established, payments received by investors as purported profits—*i.e.*, funds transferred to the investor that exceed that investor's initial 'investment'—are deemed to be fraudulent transfers as a matter of law.").

[38] *See, e.g., Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995) (Posner, J.) (remarking that the perpetrator's Ponzi scheme was "insolvent from the outset"); *In re Independent Clearing House*, 77 B.R. 843, 871 (D. Utah 1987) ("By definition, an enterprise engaged in a Ponzi scheme is insolvent from day one."); *In re Randy*, 189 B.R. 425, 441 (N.D. Ill. 1995) ("Having been convicted of a Ponzi scheme, Randy was insolvent from its inception as a matter of law.").

[39] Phelps, *The Ponzi Book* at § 2.03 (quoting *Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 630 (Bankr. S.D. Ohio 2006) (citation omitted). *See also Hayes v. Palm Seedlings*

(*continued on next page*)

Page 11   FINDINGS OF FACT AND
         CONCLUSIONS OF LAW

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

3. The Receiver has established that the Aequitas Enterprise was operated as a Ponzi scheme at least as early as July 1, 2014 through March 16, 2016 (the "Ponzi Period). In

---

*Partners-A (In re Agric. Research & Tech. Grp., Inc.)*, 916 F.2d 528, 536 (9th Cir. 1990) ("Distributing funds to earlier investors from the receipt of monies from later investors is the hallmark of Ponzi schemes.").

[40] The author of *The Ponzi Book: Unraveling Ponzi Schemes* § 2.03 (2012), identified the following:

> (1) The Ponzi perpetrator did not have any legitimate business operation to which its alleged investment program is connected.
>
> (2) The Ponzi perpetrator made unrealistic promises of returns on their investments.
>
> (3) "[N]ew investor money was being used to pay old investors' and 'money was commingled.'"
>
> (4) The perpetrator recruited agents to sell its products and paid commissions to perpetuate the scheme.
>
> (5) The perpetrator paid the brokers high commissions to induce them to continue the sales and keep the cash flowing in.
>
> (6) The commission structure with the sales people provided incentives "to discourage investors from requesting withdrawals."
>
> (7) Excessively large fees were taken by the perpetrator from the customers' "investment" funds.
>
> (8) There were inconsistencies between debtors' bank statements and "false statements issued to customers."
>
> (9) The perpetrator failed to invest all of the investors' funds in promised investments.
>
> (10) The perpetrator used customer funds "for non-customer purposes."
>
> (11) Later investors received lower returns than earlier investors.
>
> (12) Investors were encouraged to roll over or extend their investments rather than receive back their principal.
>
> (13) The perpetrator "mischaracterize[s] the nature of the … investment opportunities and any risk associated with making an investment."
>
> (14) The perpetrator overstated its investment returns and understated its losses.
>
> (15) Investors' monies were commingled.

(Footnotes omitted.)

Page 12  **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

particular, the Receiver presented the following:

> It is incontrovertible with respect to the Aequitas Enterprise that: (i) moneys were transferred to it by Defrauded Investors as putative investments; (ii) the Aequitas Enterprise acquired significant portfolios of consumer accounts receivable; (iii) the Aequitas Enterprise acquired significant and sometimes controlling interests in numerous businesses both related to and independent of the consumer accounts receivable; and (iv) that due to the exceptionally high leverage, high cost of capital, high operating, overhead and marketing costs, and generally poor performance of these various investments, a substantial portion of the transfers back to Investors (purportedly as principal and interest) between January 1, 2014, and March 10, 2016, was possible only because of new funds from Defrauded Investors. Moreover, … at least since July 2014, the Aequitas Enterprise was insolvent, and the actual financial condition of the Aequitas Enterprise and activities undertaken were not accurately disclosed to Defrauded Investors.
>
> The Aequitas Enterprise's collapse was all-but inevitable after July 3, 2014, for at least four interrelated reasons—each consistent with the existence of a Ponzi scheme. First, the Aequitas Enterprise had inadequate funds to pay existing Investors as of at least July 3, 2014, which led the perpetrators to obtain new investments from Defrauded Investors. Second, in relation to the representations made to Defrauded Investors about how their moneys would be used, the Aequitas Enterprise used little of their moneys for those purposes. Third, the Aequitas Enterprise's numerous actual business operations generally produced no profits or, more often, produced significant losses, especially on an after debt-service basis because entities were capitalized almost entirely with debt. And fourth, indebtedness to earlier Investors (as well as operating expenses) were being paid with cash infused by new Defrauded Investors.
>
> The conclusion that the Aequitas Enterprise was a Ponzi scheme is further cemented by considering additional factors commonly considered by courts in assessing whether a Ponzi scheme was being operated.
>
> First, Defrauded Investors' moneys were commingled, a factor consistent with a Ponzi scheme. …
>
> Second, even though the Aequitas Enterprise supplied the appearance of legitimate business operations, the operations were both money losing and rendered illegitimate because they were sustained only by moneys from Defrauded Investors.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

> Third, Defrauded Investors received unrealistic promises of returns. …
>
> Fourth, agents were recruited to sell the Aequitas Enterprise's products and commissions, consulting fees, bonuses, and other consideration were provided to agents to perpetuate the Ponzi scheme. …
>
> Fifth, Defrauded Investors' moneys were not invested as promised. …
>
> Sixth, Defrauded Investors were misled, for example, about the nature of investments and associated risk, investment returns, and losses as well as whether Defrauded Investor money was primarily being used to purchase receivables.
>
> Taken together, the evidence overwhelmingly supports the conclusion that the Aequitas Enterprise was operated as a Ponzi scheme.[41]

4. Upon review of the evidence before this Court, the Court accepts the uncontroverted evidence presented by the Receiver and concludes that "[t]aken together, the evidence overwhelmingly supports the conclusion that the Aequitas Enterprise was operated as a Ponzi scheme."[42]

**B.  Distribution Plan**

5. The Distribution Plan has many interrelated components, some of which this Court addresses with particularity.

6. Equity can displace an investor's claim to "benefit of the bargain" recoveries.[43] Under such circumstances, it can be appropriate to craft a formula for investor claims that relies

---

[41] Distribution/Ponzi Determination Motion [Dkt. No. 787] at 32-38 (footnotes omitted).

[42] *Id.* at 38-9.

[43] *See In re Tedlock Cattle Company, Inc.*, 552 F.2d 1351, 1352 (9th Cir. 1977) (holding in a Ponzi scheme that equity cannot sanction early investors, who may already have been repaid their principal with later investors' money to recover paper profits that were "never earned," when those "false profit[s]" would "unfairly" reduce and defeat claims of later investors who had received none of their principal back).

Page 14  FINDINGS OF FACT AND
CONCLUSIONS OF LAW

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

on how much money each investor paid in and received back.[44] Here, the Receiver has identified why he proposes rejecting "benefit of the bargain" recoveries in favor of a formula for addressing investor claims and a related equitable distribution model. This Court concludes that equity and the collective interests of Defrauded Investors are best served by precluding "benefit of the bargain" recoveries in favor of the Receiver's proposal.

7. Ponzi schemes often feature a commingling of investor funds. As such, it is typically inequitable to endeavor to "trace" any investor's transferred money—whether to a particular account, entity, collateral, or asset—to provide some investors recourse at the expense of other Ponzi victims for whom "tracing" is impossible or yields a less favorable distribution.[45] Instead, federal equity receiverships generally support equitable pooling of the receivership entities' assets to enable equal treatment of all defrauded investors.[46] Here, the Receiver has identified that not all assets associated with the Aequitas Enterprise should be combined for all purposes because certain entities' assets were not commingled and the Investors in those entities were not defrauded.[47] The Receiver has detailed and explained the basis for distinguishing

---

[44] *Id*. at 1352, 1354 (upholding what that trustee described as a "cash-in-cash-out plan").

[45] *See Cunningham, Trustee of Ponzi v. Brown*, 265 U.S. 1, 12-13 (1924) (rejecting "tracing" in Ponzi scheme because equity demands that all victims of the fraud be treated equally).

[46] *See, e.g.*, *S.E.C. v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 328 (5th Cir. 2001) (rejecting investor's argument that its funds could be traced to a segregated account); *United States v. Durham*, 86 F.3d 70, 72 (5th Cir. 1996) (rejecting tracing where investment was in commingled account); *S.E.C. v. Elliott*, 953 F.2d 1560, 1569, 1570 (11th Cir. 1992) (rejecting tracing because "[a]s all of the former securities owners occupied the same legal position, it would not be equitable to give some of them preferential treatment in equity"); *S.E.C. v. Bivona*, No. 16-cv-01386-EMC, 2017 U.S. Dist. LEXIS 148575, at *3 (N.D. Cal. Sep. 13, 2017) (ordering consolidation for purposes of distributing receivership assets without reference to bankruptcy case law); *Commodity Futures Trading Comm'n v. Eustace*, No. 05-2973, 2008 U.S. Dist. LEXIS 11810, at *17 (E.D. Pa. Feb. 15, 2008) (holding that bankruptcy authority regarding substantive consolidation is not controlling in equitable receivership).

[47] Distribution/Ponzi Determination Motion [Dkt. No. 787] at 41-45.

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

between assets to be pooled versus certain other assets. The Court concludes that the Receiver's plan for pooling certain assets and not others for purposes of the Distribution Plan is equitable.

8. There are two generally recognized distribution methodologies for allocating limited funds among defrauded investors in a Ponzi scheme: net loss and rising tide. "Rising tide appears to be the method most commonly used (and judicially approved) for apportioning receivership assets."[48] Under this method, distributions are made with the purpose of equalizing the percentage of invested funds that are returned to each Ponzi-scheme investor without regard for whether those funds were returned by the perpetrators of the fraud before the scheme collapsed or as part of a distribution plan. Stated differently, the goal is for all investors to ultimately receive a distribution equal to the same percentage of their cumulative investment, irrespective of whether the distribution was made directly by the Ponzi scheme or by a receiver from the assets remaining from the Ponzi scheme. Here, the Receiver has proposed using the rising tide method.[49] The Receiver has detailed and explained the basis for selecting that method, including by comparing it to the net loss method and explaining the characteristics of Defrauded Investor Claims that are benefited by each method. The Court concludes that the use of the rising tide method in the Distribution Plan is equitable.

9. Other courts have recognized that—to prevent disparate outcomes between a Defrauded Investor with a single account and similarly situated Defrauded Investors who may hold multiple accounts, each with different pre-Receivership recovery rates—consolidating multiple "accounts" associated with the same person is equitable.[50] Here, the Receiver has

---

[48] *SEC v. Huber*, 702 F.3d 903, 906 (7th Cir. 2012) (Posner, J.) (citing authority).

[49] Distribution/Ponzi Determination Motion [Dkt. No. 787] at 45-55.

[50] *See CFTC v. Equity Fin. Grp., LLC*, No. 04-1512-RBK-AMD, 2005 U.S. Dist. LEXIS 20001, at *88 (D.N.J. Sep. 2, 2005) (failing to consolidate "would permit an investor who used

(*continued on next page*)

Page 16 FINDINGS OF FACT AND
CONCLUSIONS OF LAW

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

detailed and justified his proposal for equitably consolidating multiple accounts or claims of a Defrauded Investor for purposes of calculating claim amounts and distributions.[51] The Court concludes that the Receiver's plan is equitable.

10. Under both federal bankruptcy law and the Oregon Receivership Code, certain former employee claims receive a priority claim for a certain amount.[52] Here, the Receiver, although not compelled by law to do so, proposes that the Court accord priority to Non-Officer Former Employee Claims that accrued prior to the Aequitas Enterprise being placed in

---

different investment vehicles and received funds in one account to obtain a disproportionately large distribution when compared to other single account investors.").

[51] Distribution/Ponzi Determination Motion [Dkt. No. 787] at 55-57.

[52] Under 11 U.S.C. § 507(4), wage claims have administrative priority:

> but only to the extent of [$12,850] for each individual or corporation, as the case may be, earned within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first, for—
>
> (A) wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual; or
>
> (B) sales commissions earned by an individual or by a corporation with only 1 employee, acting as an independent contractor in the sale of goods or services for the debtor in the ordinary course of the debtor's business if, and only if, during the 12 months preceding that date, at least 75 percent of the amount that the individual or corporation earned by acting as an independent contractor in the sale of goods or services was earned from the debtor.

(Dollar amount modified per Judicial Conference of the United States, by notice dated Feb. 16, 2016, 81 F.R. 8748, effective Apr. 1, 2016.)

The Oregon Receivership Code, set forth at O.R.S. Ch. 37, also places a high priority on wage claims. Under O.R.S. § 37.370(g), priority is afforded:

> claims for wages, salaries or commissions, including vacation, severance and sick leave pay, or contributions to an employee benefit plan, earned by the claimant within 180 days of the earlier of the date of appointment of the receiver and the cessation of the estate's business, but only to the extent of $12,850 in aggregate for each claimant.

Page 17  **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

receivership with an Allowed Claim up to $12,850.[53] The Court concludes that the Receiver's plan in this regard is equitable.

11. The Receiver has proposed a classification and treatment of claims.[54] The Court has reviewed that proposal and concludes that the Receiver's plan in that regard is equitable.

12. The Receiver has summarized various tax considerations.[55] The Court has reviewed that aspect of the Receiver's plan and has not identified any inequity.

13. The Court has reviewed the sections of the Receiver's Distribution/Ponzi Determination Motion captioned "Miscellaneous Provisions" and "Retention of Jurisdiction" and concluded that those aspects of the Receiver's plan contribute to the overall equity of the Distribution Plan.

14. In sum, the Court has reviewed the Distribution Plan, as proposed by the Receiver and with the modifications herein expressly adopted. This Court concludes that it is fair, reasonable, and serves the purpose of the orderly and efficient administration of this Receivership. Because it is equitable and in the best interests of Defrauded Investors and other Claimants, the Court adopts and approves the Distribution Plan with the modifications expressly adopted herein.

## ORDER

IT IS HEREBY ORDERED AND DECREED as follows:

1. The Receiver's Distribution/Ponzi Determination Motion [Dkt. No. 787], as expressly modified by the Receiver and acknowledged herein, is granted.

2. All objections to the Receiver's Distribution/Ponzi Determination Motion that

---

[53] Distribution/Ponzi Determination Motion [Dkt. No. 787] at 57-58.

[54] *Id*. at 62-67.

[55] *Id*. at 67-72.

Page 18  **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

have not been withdrawn, waived, settled, or expressly reserved pursuant to the terms of this Order are overruled.

3. The Receiver may commence with distributions consistent with the terms of the Distribution Plan without further order by the Court. All distributions shall be free and clear of any and all liens, claims, interests, and encumbrances.

4. Each Defrauded Investor and other Claimant is directed to cooperate and supply such information and documentation as is requested by the Receiver and his professionals to effectuate the Distribution Plan.

5. This Court shall retain exclusive jurisdiction over all issues, as described in the Distribution/Ponzi Determination Motion.

6. This Order shall be binding in all respects on all creditors and interest holders of the Receivership Entity and their successors and assigns.

IT IS SO ORDERED.

Dated this 31st day of March, 2020.

    /s/ Jolie A. Russo
United States Magistrate Judge Jolie A. Russo

SUBMITTED BY:

SCHWABE, WILLIAMSON & WYATT, P.C.

By: s/ Troy Greenfield
    Troy Greenfield, OSB #892534
    Email: tgreenfield@schwabe.com
    Alex I. Poust, OSB #925155
    Email: apoust@schwabe.com
    Lawrence R. Ream (Admitted *Pro Hac Vice*)
    Email: lream@schwabe.com
    Telephone: 503.222.9981
    Facsimile: 503.796.2900

Page 19   **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

Ivan B. Knauer (Admitted *Pro Hac Vice*)
Email: iknauer@swlaw.com
SNELL & WILMER LLP
1001 Pennsylvania Avenue NW, Suite 300
Washington, D.C. 20004
Telephone: 202.802.9770

*Attorneys for Receiver for Defendants Aequitas Management, LLC, Aequitas Holdings, LLC, Aequitas Commercial Finance, LLC, Aequitas Capital Management, Inc., and Aequitas Investment Management, LLC*

Page 20 **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900